IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

VICTOR LEAL,                                      §
                                                  §
     Plaintiff,                                   §
                                                  §
v.                                                §          2:20-CV-185-Z
                                                  §
ALEX M. AZAR II, *et al.*,                        §
                                                  §
     Defendants.                                  §
                                                  §

**MEMORANDUM OPINION AND ORDER**

Before the Court are the respective motions to dismiss filed by the federal defendants[1] and

the state defendants.[2] ECF Nos. 7, 15. Having reviewed the motions, related pleadings, and

applicable law, the Court finds the federal defendants' Motion (ECF No. 15) should be and is

hereby GRANTED as to Plaintiffs Leal and Von Dohlen and DENIED IN PART as to Plaintiff

Armstrong. Plaintiffs Leal and Von Dohlen's claims against the federal defendants are

DISMISSED WITH PREJUDICE under Rule 12(b)(6) because the claims are barred by res

judicata. Plaintiff Armstrong's nondelegation challenge is DISMISSED WITH PREJUDICE

under Rule 12(b)(6) for failing to state a claim.

The Court also finds the state defendants' Motion (ECF No. 7) should be and is hereby

GRANTED. Plaintiffs' state-law claims against the state defendants are DISMISSED WITHOUT

PREJUDICE under Rule 12(b)(1) because Texas' sovereign immunity deprives this Court of

jurisdiction.

---

[1] The federal defendants are the United States, Alex M. Azar II in his official capacity as Secretary of Health and Human Services, Steven T. Mnuchin in his official capacity as Secretary of the Treasury, and Eugene Scalia in his official capacity as Secretary of Labor.

[2] The state defendants are the Texas Department of Insurance and Kent Sullivan in his official capacity of Texas Commissioner of Insurance.

**FEDERAL DEFENDANTS' MOTION TO DISMISS**

The Affordable Care Act requires group health plans and health-insurance issuers to cover "preventive care and screenings . . . as provided for in comprehensive guidelines supported by the Health Resources and Services Administration for purposes of this paragraph." *See* 42 U.S.C. § 300gg-13(a)(4). Preventive care and screenings must be provided without any cost-sharing requirements such as deductibles or co-pays. In 2011, the Health Resources and Services Administration issued guidelines requiring that all FDA-approved contraceptive methods be covered as "preventive care" under 42 U.S.C. § 300gg-13(a)(4). Consequently, the Secretary of Health and Human Services, the Secretary of the Treasury, and the Secretary of Labor issued notice-and-comment regulations to implement HRSA's decision to require private insurers to cover contraception. *See* 45 C.F.R. § 147.130(a)(1)(iv); 29 C.F.R. § 2590.715–.2713(a)(1)(iv); 26 C.F.R. § 54.9815–.2713(a)(1)(iv). These rules are commonly known as the federal "Contraceptive Mandate."

In 2018, the Departments issued a final rule giving individual religious objectors the option of purchasing health insurance that excludes contraception from any willing health insurance issuer. 45 C.F.R. § 147.133(b). But enforcement of the 2018 final rule was enjoined by a nationwide injunction on the day it was to take effect. *See Pennsylvania v. Trump*, 351 F. Supp. 3d 791 (E.D. Pa. 2019), *rev'd sub nom, Little Sisters of the Poor Saints Peter and Paul Home v. Pennsylvania*, 140 S. Ct. 2367 (2020).

As a result of that injunction, litigation was filed in this District contending that the 2018 final rule's exemption for religious objectors was required by the Religious Freedom Restoration Act ("RFRA"). *DeOtte v. Azar*, 393 F. Supp. 3d 490 (N.D. Tex. 2019). The court in *DeOtte* certified a class of individuals who "(1) object to coverage or payments for some or all

2

contraceptive services based on sincerely held religious beliefs; and (2) would be willing to purchase or obtain health insurance that excludes coverage or payments for some or all contraceptive services," and "permanently enjoined federal officials from enforcing the Contraceptive Mandate against any religious objector protected by the [2018] final rule." *Id.* at 513–14.

Plaintiffs Victor Leal and Patrick Von Dohlen are devout Roman Catholics who oppose all forms of birth control. They want to purchase health insurance that excludes coverage of contraception to avoid subsidizing other people's contraception and becoming complicit in its use.[3]

These Plaintiffs contend the federal Contraceptive Mandate continues to inflict injury in fact on them and other religious objectors even though the *DeOtte* injunction permits issuers of health insurance to issue group or individual health-insurance coverage that excludes contraception to religious objectors. Plaintiffs aver that this remedy is not enough:

> [F]ew if any insurance companies are offering health insurance [which excludes contraception] because only a small number of individuals hold sincere religious objections to all forms of contraception. And even if a health insurer were willing to create and offer a policy that excludes contraceptive coverage solely for religious objectors, the Contraceptive Mandate drastically restricts the available options on the market to consumers who hold religious objections to contraceptive coverage. The Mandate requires any policy that covers anyone who lacks a sincere religious objection to contraception to cover all forms of FDA-approved contraceptive methods, without any deductibles or co-pays. Without the federal Contraceptive Mandate, insurers will have the freedom to offer policies that exclude contraceptive coverage to the general public, just as they did before the Contraceptive Mandate, which will expand the health-insurance options available to consumers who oppose contraceptive coverage for sincere religious reasons.

ECF No. 1 at 9.

---

[3] For years, the Federal Program Branch tasked with defending earlier versions of the Contraceptive Mandate argued that religious plaintiffs were "fighting an invisible dragon" when religious plaintiffs argued they were morally complicit in the use of contraception. This is merely a *factual* impossibility argument masquerading as a *legal* impossibility argument under the "substantial burden" prong of RFRA. *See, e.g.* Defendants' Reply in Support of Their Motion to Dismiss at 1, *Little Sisters of the Poor Home for the Aged v. Sebelius*, 6 F. Supp. 3d 1225 (D. Colo. 2013); Brief of Former Justice Department Officials as Amici Curiae Supporting Petitioners, *Zubik v. Burwell*, 136 S. Ct. 1557 (2016) (No. 14-1418), 2016 WL 155631. The federal defendants do not invoke the Dragon Argument in this case and should never chase the Dragon Argument *in this Court.*

Plaintiff Kim Armstrong also alleges she is injured by the Contraceptive Mandate. Although she is not a religious objector to the mandate, she alleges she is forced to pay higher premiums for health insurance that covers contraceptive services that she does not want. Plaintiff Armstrong is fifty years old and has had a hysterectomy and therefore is incapable of becoming pregnant. Armstrong would prefer to acquire less expensive health insurance which excludes contraceptive coverage but is unable because she is outside of the protections of the *DeOtte* injunction and the Trump Administration's rules that exempt religious and moral objectors from the Contraceptive Mandate.

Plaintiffs filed suit in this Court on August 1, 2020 challenging the federal Contraceptive Mandate on various grounds. Specifically, Plaintiffs filed a complaint alleging violations of (1) the Appointments Clause; (2) the nondelegation doctrine; and (3) RFRA.[4] The federal defendants moved to dismiss the case arguing Plaintiffs lack standing and are time-barred under Rule 12(b)(1). Additionally, federal defendants allege under Rule 12(b)(6) that Plaintiffs Leal and Von Dohlen are barred by res judicata and, even if they are not, all Plaintiffs fail to state claims for violations of the Appointments Clause, the nondelegation doctrine, and RFRA.

### A. Legal Standards

Federal courts are courts of limited jurisdiction which possess only that power authorized by Constitution and statute. *Xitronix Corp. v. KLA-Tencor Corp.*, 916 F.3d 429, 435 (5th Cir. 2019). "The requirement that jurisdiction be established as a threshold matter spring[s] from the nature and limits of the judicial power of the United States and is inflexible and without exception." *Id.* (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998)).

---

[4] Plaintiff Armstrong is not asserting a claim against the federal defendants under RFRA, because she has no religious or moral objections to contraceptive coverage.

*1. Rule 12(b)(1)*

When a motion to dismiss for lack of subject-matter jurisdiction "is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001). Furthermore, where a complaint could be dismissed under Rule 12(b)(1) or 12(b)(6), "the court should dismiss only on the jurisdictional ground . . . without reaching the question of failure to state a claim . . . ." *Hitt v. City of Pasadena*, 561 F.2d 606, 608 (5th Cir. 1977). By doing so, courts avoid issuing advisory opinions. *Steel Co.*, 523 U.S. at 101. Additionally, this prevents courts without jurisdiction "from prematurely dismissing a case with prejudice." *Ramming*, 281 F.3d at 161.

A Rule 12(b)(1) motion can mount either a facial or factual challenge. *See, e.g.*, *Hunter v. Branch Banking & Tr. Co.*, 2013 WL 607151, at *2 (N.D. Tex. Feb. 19, 2013) (citing *Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. May 1981)). When a party makes a Rule 12(b)(1) motion without including evidence, the challenge to subject matter jurisdiction is facial. *Id.* The court assesses a facial challenge as it does a Rule 12(b)(6) motion in that it "looks only at the sufficiency of the allegations in the pleading and assumes them to be true. If the allegations are sufficient to allege jurisdiction, the court must deny the motion." *Id.*

*2. 12(b)(6) dismissal*

"To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead 'enough facts to state a claim to relief that is plausible on its face.'" *In re Katrina Canal Breaches Litigation*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more

than labels and conclusions, and a formulaic recitation of the elements of the cause of action will not do." *Twombly*, 550 U.S. at 555 (internal marks omitted). "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *In re Katrina*, 495 F.3d at 205 (quoting *Twombly*, 550 U.S. at 555) (internal marks omitted). "The court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *Id.* (quoting *Martin K. Eby Construction Company, Inc. v. Dallas Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004)) (internal marks omitted).

The Court must "begin by identifying the pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). After assuming the veracity of any well-pleaded allegations, the Court should then "determine whether they plausibly give rise to an entitlement of relief." *Id.* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citation omitted). This standard of "plausibility" is not necessarily a "probability requirement," but it requires "more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* (internal marks omitted). "Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

## B. Analysis

### 1. Standing

At a minimum, Article III requires a plaintiff to show (1) an "injury in fact" that is (2) fairly traceable to the defendant's conduct and (3) is likely to be redressed by the requested relief. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). An injury in fact means an injury that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Id.* (internal marks omitted). "At the pleading stage, allegations of injury are liberally construed." *Little v. KPMG LLP*, 575 F.3d 533, 540 (5th Cir. 2009). Although "when the injury's existence depends on the decisions of third parties not before the court," it is *generally* "too conjectural or hypothetical to confer standing." *Id.* Yet the bar for proving causality at the pleading stage is low and allows for an injury to be traced to a defendant even if defendant's conduct just "contributes" in a "scientifically imprecise" way to the plaintiff's injury. *Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1522–24 (2019); *Massachusetts v. EPA*, 549 U.S. 523–25 (2007). Standing is a jurisdictional inquiry and thus falls under the standards of Rule 12(b)(1) and must be decided before motions under Rule 12(b)(6).

### a. Plaintiffs Leal and Von Dohlen have properly alleged standing

First, Leal and Von Dohlen have alleged an injury in fact. These plaintiffs allege the continued enforcement of the Contraceptive Mandate makes it "impossible" for them to obtain health insurance that excludes contraceptive coverage. ECF No. 1 at 9. This is true, they allege, notwithstanding the *DeOtte* injunction. Plaintiffs Leal and Von Dohlen allege the "inability to purchase a desired product or service constitutes injury in fact. ECF No. 16 at 2 (citing *Consumer Fed'n of Am. v. FCC*, 348 F.3d 1009, 1012 (D.C. Cir. 2003)).

For their part, the federal defendants argue "Plaintiffs Leal and Von Dohlen's allegation that their options to choose health insurance coverage are narrower than they would prefer is insufficient to establish a cognizable injury." ECF No. 15 at 6. Defendants, however, cite no case law supporting this proposition. Although neither party nor the Court has located any Fifth Circuit cases on point, the D.C. Circuit has long held a restricted marketplace can constitute an injury in fact:

> Orangeburg suffered an injury-in-fact because it cannot purchase wholesale power on its desired terms. "This Court has permitted consumers of a product to challenge agency action that prevented the consumers from purchasing a desired product." *Coal. for Mercury-Free Drugs v. Sebelius*, 671 F.3d 1275, 1281 (D.C. Cir. 2012); *see, e.g.*, *Chamber of Comm. v. SEC*, 412 F.3d 133, 136-38 (D.C. Cir. 2005) (lost opportunity to purchase shares in mutual funds with fewer than 75% independent directors).

> The lost opportunity to purchase a desired product is a cognizable injury, even though Orangeburg *can* purchase, and *has* purchased, wholesale power from another source. "[T]he inability of consumers to buy a desired product may constitute injury-in-fact *even if they could ameliorate the injury by purchasing some alternative product*." *Consumer Fed'n of Am.*, 348 F.3d at 1012 (emphasis added).

> *Orangeburg, S.C. v. Fed. Energy Regulatory Comm'n*, 862 F.3d 1071, 1078 (D.C. Cir. 2017) (collecting cases) (some citations omitted).

In response, the federal defendants argue "there is no legally protected right to an unfettered choice in health insurance coverage." ECF No. 15 at 6. But the Supreme Court has made it clear "[t]he 'legal interest' test goes to the merits. The question of standing is different." *Ass'n of Data Processing Serv. Org., Inc. v. Camp*, 397 U.S. 150, 153 (1970). Plaintiffs need only "allege[] that the challenged action has caused him injury in fact, economic or otherwise" *Id.* at 152. Plaintiffs have done so here.

Second, Leal and Von Dohlen have alleged the injury in fact is fairly traceable to the federal defendants. Article III standing requires a plaintiff to show "a causal connection between the injury and the conduct complained of." *Lujan*, 504 U.S. at 560. This is where the parties spill the most

ink. Plaintiffs argue "few if any insurance companies are currently offering health insurance that excludes coverage for contraception" even though "the *DeOtte* injunction permits issuers of health insurance to issue group or individual health insurance that excludes contraception to religious objectors." ECF No. 1 at 7, 9. Plaintiffs' theory is that the "the continued enforcement of the Contraceptive Mandate makes it untenable for insurers to offer contraceptive-free health-insurance policies to the general public." ECF No. 16 at 5. In other words, even though insurance companies can issue contraceptive-free policies, they do not because the Contraceptive Mandate which still applies to all other policies makes it financially untenable to do so.

The federal defendants seize on this allegation to show that the injury in fact is traceable to the "business choices of insurers" and not the Contraceptive Mandate. ECF No. 20 at 1. The federal defendants argue Plaintiffs' real quarrel is with the free market for not providing the policies they would prefer. The federal defendants aver that when Plaintiffs' asserted injuries "depend[] on the unfettered choices made by independent actors not before the courts," rendering standing "substantially more difficult to establish." *Lujan*, 504 U.S. at 562 (citations omitted). Additionally, the federal defendants note courts are "reluctan[t] to endorse standing theories that rest on speculation about the decisions of independent actors." *Clapper v. Amnesty Int'l, USA*, 568 U.S. 398, 414 (2013). The federal defendants correctly state a plaintiff in these circumstances must show that the government's action will have a "determinative or coercive effect upon the action of" those third parties. *Bennett v. Spear*, 520 U.S. 154, 169 (1997).

But Plaintiffs have precisely alleged that insurance companies are not *independent* and do not make *unfettered* choices regarding the insurance policies they issue. On the contrary, insurers are heavily regulated. Plaintiffs allege the Contraceptive Mandate creates a coercive effect by making "it untenable for insurers to offer contraceptive-free health-insurance policies to the

general public." ECF No. 16 at 5. Defendants contest this allegation, but that is a fact and merits determination which is inappropriate to address at the motion to dismiss stage. *In re Katrina*, 495 F.3d at 205 ("The court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.").

Lastly, Leal and Von Dohlen have alleged redressability. This analysis follows in close lockstep to the traceability analysis. These Plaintiffs allege an "injunction against the continued enforcement of the will expand the availability of contraceptive-free health insurance." ECF No. 16 at 6. The federal defendants counter that Plaintiffs must show "it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Inclusive Cmtys. Project, Inc. v. Dept. of Treasury*, 946 F.3d 649, 655 (5th Cir. 2019) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000)). The federal defendants would be correct if this case were at the summary judgment stage where the Plaintiffs "'must set forth by affidavit or other evidence specific facts' supporting standing." *Id.* (quoting *Lujan*, 504 U.S. at 561). At this stage, the Court must "accept[] all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *In re Katrina*, 495 F.3d at 205. Plaintiffs have alleged insurance companies will expand their insurance policies to include contraceptive-free policies and, at this stage, that is enough for Plaintiffs to satisfy their burden.[5]

In sum, Leal and Von Dohlen have satisfied their burden to allege standing at the motion to dismiss stage by articulating an injury in fact which is fairly traceable to the federal defendants and can be redressed by a decision of this Court.

---

[5] In addition, Plaintiffs argue "[t]he entire reason for the Contraceptive Mandate's existence was that some private insurers were *not* providing contraceptive coverage on their own initiative or in response to market forces; that is why the Obama Administration issued regulations to force every insurer to provide this coverage regardless of whether the beneficiary wanted or needed it." ECF No. 16 at 5 (emphasis added). If the Contraceptive Mandate were enjoined or repealed, the market might return to pre-mandate conditions where insurers offered contraceptive-free policies.

### b. *Plaintiff Armstrong has also properly alleged standing*

Plaintiff Armstrong has also adequately alleged standing. Although not a religious objector, Armstrong has likewise alleged injury in fact by asserting that she is unable to purchase or obtain less expensive health insurance that excludes contraceptive coverage. ECF No. 16 at 3. An economic burden is a classic injury in fact. Indeed, the federal defendants' main objection to Armstrong's standing is that the federal defendants contest Armstrong's allegations that she is forced to pay higher premiums for contraceptive coverage that she does not want. ECF No. 15 at 9 (citing to Federal Regulations to show that the Contraceptive Mandate is cost-neutral to insurance providers). But this is a mere *factual* disagreement with Armstrong about the impact of the Contraceptive Mandate on premiums. Such a disagreement is inappropriate grounds for dismissal at the motion to dismiss stage.

The traceability and redressability analyses are far easier here because the Contraceptive Mandate is being applied directly to Armstrong because she is unprotected by the *DeOtte* injunction or the Trump Administration's final rules detailing exceptions for religious objectors. The Court hereby incorporates the same analyses as above, *supra* p. 8–10, and concludes Armstrong has adequately alleged standing at this stage in this case.

### 2. *Statute of Limitations*

The federal defendants urge the Court to dismiss Plaintiffs' claims as time barred. Normally, a statute of limitations defense is waivable and thus is decided under the Rule 12(b)(6) standard. But "the United States enjoys sovereign immunity unless it consents to suit, 'and the terms of its consent circumscribe our jurisdiction.'" *Texas v. Rettig*, 968 F.3d 402, 413 (5th Cir. 2020) (quoting *Dunn-McCampbell Royalty Interest, Inc. v. Nat'l Park Serv.*, 112 F.3d 1283, 1287 (5th Cir. 1997)). "'The applicable statute of limitations is one such term of consent,' so, unlike the

ordinary world of statutes of limitations, here the failure to sue the United States within the limitations period deprives us of jurisdiction." *Id.* Accordingly, the Court reviews the issue under the Rule 12(b)(1) standard.

The federal defendants argue Plaintiffs failed to sue within the relevant limitations period for each claim. The federal defendants argue Plaintiffs' claims under the Appointments Clause and nondelegation doctrine are barred by under the six-year statute of limitations governing civil actions against the United States. 28 U.S.C. § 2401(a). And Plaintiff Leal and Von Dohlen's RFRA claims are barred by a four-year statute of limitations. 28 U.S.C. § 1658(a). Most importantly, under the federal defendants' theory, all the claims accrued eight years ago when the Contraceptive Mandate *took effect*. Because Plaintiffs did not sue within the relevant time periods, the federal defendants state their claims must be barred by the statute of limitations thus depriving this Court of jurisdiction.

The federal defendants, however, fundamentally misunderstand the type of suit Plaintiffs bring in this case. For example, in their Reply, the federal defendants state "[t]he courts readily apply the same six-year statute of limitations at issue here to facial claims that an agency violated its procedural obligations under the Administrative Procedure Act in issuing a rule." ECF No. 20 at 2.

But Plaintiffs are *not* bringing an APA claim, nor are they challenging a final agency action. Instead, they are bringing a suit for injunctive relief under the *Larson* framework.[6] *Larson v.*

---

[6] Plaintiffs state this suit is being brought pursuant *Ex parte Young*. But this is incorrect. As discussed in *Leal v. Azar*, No. 2:20-CV-124, 2020 WL 6281641 (N.D. Tex. Sept. 24, 2020), *Ex parte Young* applies to state officials who attempt to invoke sovereign immunity while the *Larson* doctrine applies to federal officials. While these two doctrines are similar, they are not identical. *E.V. v. Robinson*, 906 F.3d 1082, 1090 n.8 (9th Cir. 2018) ("The [*Larson*] framework is not identical to the [*Young*] fiction that is commonly invoked in the Eleventh Amendment context.").

[7] The court acknowledges it is an open question whether the 1976 amendments to the APA abrogated the *Larson* doctrine in suits against federal agency officials. *See, e.g., Robinson*, 906 F.3d at 1092–93; *Danos v. Jones*, 652 F.3d 577, 582 (5th Cir. 2011); *Geyen v. Marsh*, 775 F.2d 1303, 1307 (5th Cir. 1985). Most challenges to federal agency action are now brought via the APA, so there has been little need to litigate the margins of the *Larson* doctrine.

*Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949). Under the *Larson* doctrine, there are two types of suits that can proceed against federal officers in their official capacities: (1) suits alleging a federal official acted *ultra vires* of statutorily delegated authority; and (2) suits alleging "the statute or order conferring power upon the officer to take action in the sovereign's name is claimed to be unconstitutional" *Id.* at 689–90. As the Supreme Court stated, "in case of an injury threatened by his illegal action, the officer cannot claim [sovereign] immunity from injunction process." *Id.* at 690 (quoting *Philadelphia Co. v. Stimson*, 223 U.S. 605, 620 (1912)). This suit implicates the second type of case as Plaintiffs are challenging the constitutionality of the statute which conferred power upon the agencies to create the Contraceptive Mandate.

So, like *Ex parte Young* and state sovereign immunity, the *Larson* doctrine pierces the United States' traditional sovereign immunity. There are, however, limits to the doctrine. Just like *Young*, cases brought under the *Larson* doctrine are limited to injunctive relief—Plaintiffs cannot pursue damages for past conduct. *Id.* at 691 n. 11 ("[A] suit may fail, as one against the sovereign . . . if the relief requested cannot be granted by merely ordering the cessation of the conduct complained."); *Quern v. Jordan*, 440 U.S. 332, 337 (1979) ("The distinction between that relief permissible under the doctrine of *Ex parte Young* and that found barred in *Edelman* was the difference between prospective relief on one hand and retrospective relief on the other.").

This is why neither party cites a case where a statute of limitations barred a suit brought under *Ex parte Young* or *Larson*. By their very nature, these types of suits are seeking *prospective* relief for *ongoing* injuries. Statutes of limitations are simply inapplicable to such injuries. Assuming 42 U.S.C. § 300gg-13(a)(4) violates the Appointments Clause and the nondelegation doctrine, Plaintiffs have demonstrated a continuing violation. The same is true for Plaintiffs Leal

---

Defendants do not challenge Plaintiffs' invocation of this "equitable cause of action," so the Court assumes the *Larson* doctrine applies here.

and Von Dohlen's RFRA claims. *Flynt v. Shimazu*, 940 F.3d 457, 462 (9th Cir. 2019) ("When the continued enforcement of a statute inflicts a continuing or repeated harm, a new claim arises (and a new limitations period commences) with each new injury.").

The federal defendants respond that there is no continuing violation, but rather the Plaintiffs' inability to acquire health insurance is the continued effects of a past violation. ECF No. 20 at 2 (citing *McGregor v. Louisiana State Univ. Bd. of Sup'rs*, 3 F.3d 850, 867 (5th Cir. 1993). The agencies' promulgation of the Contraceptive Mandate *eight years ago* is not what impedes or prohibits Plaintiffs from acquiring health insurance *today*. Rather, it is the agencies' *continued enforcement* of the Contraceptive Mandate which harms Plaintiffs. Accordingly, *McGregor* is inapplicable.[8] In sum, the Court finds that none of Plaintiffs' claims are time barred.

*3. Res Judicata*

All of Plaintiff Leal and Von Dohlen's claims are barred by *res judicata*. As Plaintiffs' Complaint states, another court in this District "permanently enjoined federal officials from enforcing the Contraceptive Mandate against any religious objector." ECF No. 1 at 6–7 (citing *DeOtte v. Azar*, 393 F. Supp. 3d 490 (N.D. Tex. 2019)). The final judgment in that case bars all of Plaintiffs Leal and Von Dohlen's claims in this case because the claims in both cases are "based on the same nucleus of operative facts, and could have been brought in the first lawsuit." *Houston Pro. Towing Ass'n v. City of Houston*, 812 F.3d 443, 447 (5th Cir. 2016). Plaintiffs try to rebuff this finding by making two arguments: (1) the two suits are not based on the same transaction under the traditional *res judicata* test or (2) *Hellerstedt* reworked the *res judicata* test for cases that

---

[8] For the same reason, even if one views Plaintiffs' claims against the agencies as an administrative challenge under the APA, they are not barred by the statute of limitations. "Indeed, we have held that when an agency applies a rule, the limitations period running from the rule's publication will not bar a claimant from challenging the agency's statutory authority." *Dunn-McCampbell*, 112 F.3d at 1287. Here, under Plaintiffs' theory of the case, the agencies continued alleged unconstitutional application of the Contraceptive Mandate which causes harm to Plaintiffs creates a new limitations period each and every day.

involved "important human values." *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2306 (2016). Neither of Plaintiffs' arguments are availing.

> ### a. *Plaintiffs Leal and Von Dohlen's claims are barred by the traditional test for* res judicata

The Fifth Circuit's test for *res judicata* "has four elements: (1) the parties are identical or in privity; (2) the judgment in the prior action was rendered by a court of competent jurisdiction; (3) the prior action was concluded by a final judgment on the merits; and (4) the same claim or cause of action was involved in both actions." *Houston*, 812 F.3d at 447 (quoting *Comer v. Murphy Oil USA, Inc.*, 718 F.3d 460, 467 (5th Cir. 2013)). Plaintiffs do not contest the application of the first three elements.[9] Rather, Plaintiffs disputes whether the "same claim or case of actions" exists here and in *DeOtte*.

To determine whether two suits involve the same claim or cause of action, the Fifth Circuit uses a transactional test. "The transactional test focuses on whether the two cases are based on the same nucleus of operative facts. It is the nucleus of operative facts, rather than the type of relief requested, substantive theories advanced, or types of rights asserted that defines the claim." *Id.* (citations and footnotes omitted).

The federal defendants argue this case arises from the same nucleus of operative facts. In both cases, Plaintiffs were injured by the Contraceptive Mandate and sought an injunction against its enforcement. The federal defendants contend Plaintiffs cannot now use new legal *theories* to attack the Contraceptive Mandate based on the same alleged injury.

---

[9] The parties here are in privity with those in *DeOtte*. Plaintiffs Leal and Von Dohlen allege that they have no desire to purchase health insurance that includes contraceptive coverage because "[they] are devout Roman Catholics who oppose all forms of birth control, and they want to purchase health insurance that excludes coverage of contraception. . . ." ECF No. 1 at 8. As such, Plaintiffs Leal and Von Dohlen are members of the plaintiff class certified in *DeOtte*.

The second and third criteria for res judicata are also satisfied: The *DeOtte* court entered final judgment in favor of the plaintiffs on July 29, 2019. Although appealed, the District Court judgment continues to have preclusive effect pending the appeal. *See, e.g., Prager v. El Paso Nat'l Bank*, 417 F.2d 1111, 1112 (5th Cir. 1969).

For their part, Plaintiffs maintain the suits are based on two separate transactions. They argue in this case:

> [T]he constitutional challenges to section 300gg-13(a)(4) allege that *Congress* violated the Constitution by enacting this statute. They are challenges to the *legislature's* action in enacting a law that confers authority on individuals who are not appointed in conformity with Article II, and that fails to provide an intelligible principle to guide the discretion of the Health Resources Services Administration. The "nucleus" of relevant facts concerns the text of this statute and the meaning of the Constitution—nothing more. The alleged constitutional violation occurred at the moment of the statute's enactment, and the "nucleus" of relevant facts is centered around that event and nothing else. There is no concern with how HRSA decides to use its powers under the statute; that is irrelevant to the Appointments Clause and nondelegation challenges alleged in the complaint."

Plaintiffs ask the Court to compare that nucleus with the previous case:

> The claims in *DeOtte*, by contrast, were challenging only the behavior of *executive-branch officials* who enforced the Contraceptive Mandate in a manner that violated the Religious Freedom Restoration Act. The relevant facts concerned the meaning of RFRA and the conduct of the executive branch, which have nothing to do with *any* of facts surrounding the plaintiffs' constitutional challenges to section 300gg-13(a)(4).

> ECF No. 16 at 16–17.

But Plaintiffs' theory about differing nuclei cannot square with their theory of standing in this case. Plaintiffs' theory, which the Court adopted in its Rule 12(b)(1) analysis, is that the Contraceptive Mandate inflicts an injury in fact. But Plaintiffs' suit, by its own terms, is challenging the constitutionality of the statute which is only logically possible if the statute and the mandate were related in some way. And obviously they are because the mandate was promulgated *pursuant* to the statute; they are inextricably intertwined. The mandate could not exist without the statute.

Plaintiffs' distinctions between the cases are based on different legal theories, not different facts. To the extent Plaintiffs did not challenge the statutory basis for the Contraceptive Mandate in *DeOtte*, they unquestionably "could have raised" those claims there. *Colonial Oaks Assisted*

*Living Lafeyette, LLC v. Hannie Dev., Inc.*, 972 F.3d 684, 691 (5th Cir. 2020). And this sort of litigation is exactly what the traditional test for *res judicata* bars.

Additionally, if Plaintiffs' theory about two different nuclei were accepted as true, it would run headlong into other standing issues. Assuming 42 U.S.C. § 300gg-13(a)(4) violates the Constitution, Plaintiffs could not just bring a suit challenging that violation because the violation, at that point, is a mere *generalized grievance*. The Supreme Court has "consistently held that a plaintiff raising only a generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy." *Lance v. Coffman*, 549 U.S. 437, 439 (2007) (quoting *Lujan*, 504 U.S. at 573–74). Here, Plaintiffs cannot challenge "the legislature's actions in enacting a law" alleged to be unconstitutional because that is a textbook example of a generalized grievance. It was the "behavior of executive-branch officials" by promulgating regulations pursuant to that statute which elevated Plaintiffs' injuries from generalized to particularized.

In sum, Plaintiffs' argument that this suit is not part of the same transaction under the traditional *res judicata* test is of no avail. But Plaintiffs spend most of their Response arguing the traditional test *should not apply at all* after *Hellerstedt*. The Court now turns to this argument and finds that it too is unconvincing.

> b. Hellerstedt *altered the test for* res judicata *in cases that involve "important human values"*

Plaintiffs Leal and Von Dohlen contend *Hellerstedt* is incompatible with the conventional test for *res judicata* in the Fifth Circuit. Plaintiffs view the holding of *Hellerstedt* as "courts need not apply the same-transaction test for res judicata when 'important human values' are at stake—and that even the slightest change of circumstances allows abortion litigants to avoid res judicata

and litigate claims that they undoubtedly could have brought in a previous lawsuit." ECF No. 16 at 17 (quoting *Hellerstedt*, 136 S. Ct. at 2305). Plaintiffs even concede "*Hellerstedt* did not overrule the same transaction test for res judicata—and that test remains applicable in mine run of cases, *i.e.*, cases in which 'important human values' are not at stake." *Id.* at 18.[10]

Plaintiffs argue the right of religious freedom — a right notable for being enshrined in the written text of the First Amendment — is at least as important a human value as the judicially-created right to an abortion — a "right" notable for a complete lack of historical or textual support. *Hellerstedt*, 136 S. Ct. at 2329 (Thomas, J., dissenting) ("The Court has simultaneously transformed judicially created rights like the right to abortion into preferred constitutional rights, while disfavoring many of the rights actually enumerated in the Constitution."). Accordingly, Plaintiffs argue they should at least receive the same latitude as the abortion litigants and have the substantially narrower version of *res judicata* promulgated in *Hellerstedt* applied in this case.

The Court begin its analysis by first noting — even though the Supreme Court said that it applied a narrower version of *res judicata* because "important human values" were at stake — *everyone* knows that "important human values" is a euphemism for abortion. "The abortion-rights debate, and the attendant language wars, are emotionally charged" and thus makes "[t]he law [] awash in coy euphemisms." This is but another example. *Whole Woman's Health v. Paxton*, 978 F.3d 896, 912 (5th Cir. 2020) (Willett, J., dissenting), *reh'g en banc granted by* 978 F.3d 974, 975.

Every case that comes into a court involves "important human values." The whole system of law is predicated upon the notion of *justice*.[11] And *justice*, which is a part of every case before

---

[10] Plaintiff must make this concession because the Fifth Circuit has continually applied its traditional *res judicata* test since *Hellerstedt*. *See, e.g.*, *Colonial Oak.*, 972 F.3d at 691. It is impossible to claim that *Hellerstedt* completely abrogated the traditional test.

[11] Of course, invocations of "justice" are frequently euphemistic too: The Department of Justice, John Rawls' *Theory of Justice*, and the 501(c)(3) Earthjustice use the same word to describe very different things. "We must think things not words . . . if we are to keep to the real and the true." Oliver Wendell Holmes, Jr., *Law in Science and Science in*

any court, is undoubtably an "important human value."[12] But, as stated, *Hellerstedt* does not apply in every case and no one pretends that it does. The only logical conclusion is that the phrase "important human values" is a synonym for abortion.

Given this tortured and much-maligned jurisdictional trajectory, it is altogether unsurprising that the Supreme Court treats abortion differently. It always has. *Hill v. Colorado*, 530 U.S. 703, 742 (2000) (Scalia, J., dissenting) ("Like the rest of our abortion jurisprudence, today's decision is in stark contradiction of the constitutional principles we apply in all other contexts."). And it continues to do so. *June Med. Serv. LLC v. Russo*, 140 S. Ct. 2103, 2171 (2020) (Gorsuch, J., dissenting) ("The real question we face concerns our willingness to follow the traditional constraints of the judicial process when a case touching on abortion enters the courtroom."). Indeed, lower courts are left to wonder whether the rules crafted for abortion-related cases have *any* application outside of that setting. *Hellerstedt*, 136 S. Ct. at 2311 (Thomas, J., dissenting) ("[T]oday's decision creates an abortion exception to ordinary rules of res judicata.").

While a majority of the Supreme Court may act "unconstrained by many of the neutral principles that normally govern the judicial process," *June Med.*, 140 S. Ct. at 2181–82 (Gorsuch, J., dissenting), this Court has "an obligation to apply [*res judicata*] in a neutral fashion in all cases, regardless of the subject of the suit." *Hellerstedt*, 136 S. Ct. at 2330 (Alito, J., dissenting). But this Court also must apply "[abortion] precedent[]." *Planned Parenthood of Greater Texas v. Kauffman*, 981 F.3d 347, 2020 WL 6867212, at *29 (5th Cir. 2020) (Ho, J., concurring). Accordingly, this Court must "analyze the law faithfully, without fear or favor" and

---

*Law*, 12 HARV. L. REV. 443, 460 (1899). Holmes' words came in an address delivered before the New York State Bar Association on January 17, 1899

[12] *See e.g.*, ARISTOTLE, NICOMACHEAN ETHICS (W.D. Ross trans., Digireads 2016); J. BUDZISZEWSKI, COMMENTARY ON THOMAS AQUINAS'S TREATISE ON LAW (2014); THE FEDERALIST NO. 78 (Alexander Hamilton). Notably, the members of the Supreme Court are called "Justices."

will not apply the *adulterated* version of *res judicata* enthroned by *Hellerstedt* unless it applies squarely to the instant case before the Court. *Id.*

Turning to the present case, if the Court takes the *Hellerstedt* majority at its word, this case certainly involves "important human values." The right of religious freedom has been enshrined in both the Constitution and the Religious Freedom Restoration Act. The federal defendants do not challenge this characterization. Rather, the focus of the dispute is whether this case is comparable to *Hellerstedt*.

Plaintiffs make two arguments why *Hellerstedt* should apply in this case. One, like *Hellerstedt*, Plaintiffs allege their challenge is based on "new material facts that post-date the *DeOtte* litigation." ECF No. 16 at 10. Two, Plaintiff alleges, like *Hellerstedt*, this lawsuit challenges a statute that is "separate and distinct" from the agency rules that were challenged in *DeOtte*. *Id.* The Court examines each of these arguments in turn and finds them unpersuasive.

> c.  *The factual development standard in* Hellerstedt *related to the injury in fact, not the remedy*

First, Plaintiffs allege their "facial challenge to the Contraceptive Mandate is not 'the very same claim' as the as-applied challenge in *DeOtte* because it rests on factual developments that emerged after *DeOtte*" which makes this case "indistinguishable from *Hellerstedt*." ECF No. 16 at 11.

In *Hellerstedt*, the plaintiffs brought an initial lawsuit against Texas's then-recently enacted admitting-privileges law known as H.B. 2. *See* 136 S. Ct. at 2306. The lawsuit was a *facial* challenge that sought to enjoin the law before it was enforced. *Id.* After losing at the Fifth Circuit, the plaintiffs filed a new lawsuit that brought an *as-applied* challenge after the law was being enforced which resulted in the closing of several clinics. The Supreme Court held this second as-applied challenge was not barred because "[f]actual developments may show that constitutional

harm, which seemed too remote or speculative to afford relief at the time of an earlier suit, was in fact indisputable. In our view, such changed circumstances will give rise to a new constitutional claim." *Id.* at 2305.

Here, Leal and Von Dohlen argue their situation is comparable to the abortion litigants in *Hellerstedt*. Plaintiffs allege the plaintiffs in *DeOtte* brought their initial lawsuit against the Contraceptive Mandate *before* they could know for certain whether the as-applied relief that they sought would ensure the availability of contraceptive-free health insurance to each member of the class. The instant second lawsuit was filed *after* the *DeOtte* injunction had taken effect, because now it is clear the as-applied relief in *DeOtte* was insufficient to fully protect the religious freedom of Plaintiffs. In essence, Plaintiffs are alleging the injunction they received in *DeOtte* was insufficient to remedy their situation.

But Plaintiffs' analogy is mistaken. The *Hellerstedt* majority's analysis was not focused on the *scope* of the remedy. Rather, the analysis asked whether "factual developments" showed that an injury *had actually occurred*. The abortion litigants were unable to prove an undue burden in their first case, but they were able to prove an undue burden in *Hellerstedt* with newly acquired evidence.

That is nothing like this case. Consider Plaintiffs' constitutional challenge. Plaintiffs allege Congress violated the Appointments Clause and nondelegation doctrine. Those violations occurred over eight years ago. Those same alleged violations undisputedly existed when the *DeOtte* suit was brought. There have been *zero* "factual developments" since *DeOtte* that would shine a light on whether the Appointments Clause or nondelegation doctrines were violated. Thus, unlike *Hellerstedt*, there is no newly acquired evidence that would create a new *cause of action*.

To put it succinctly, Plaintiffs failed to distinguish between causes of actions and remedies in their analysis of *Hellerstedt*'s "factual developments" test. When an injunction fails to provide the remedy for which it is purposed, the correct response is not to file a new lawsuit. Rather, Plaintiffs should seek to *modify* the *DeOtte* injunction. "An injunction is by nature an equitable decree. The power of a federal court that enters an equitable injunction is not spent simply because it has once spoken. The federal courts have always affirmed their equitable power to modify any final decree that has prospective application." *LULAC v. City of Boerne*, 659 F.3d 421, 436 (5th Cir. 2011) (quoting *United States v. Lawrence Cnty. Sch. Dist.*, 799 F.2d 1031, 1046 (5th Cir. 1986)). "Inasmuch as an injunctive decree is drafted in light of what the court believes will be the future course of events, a court must continually be willing to redraft the order *at the request of the party who obtained equitable* relief in order to insure that the decree accomplishes its intended result." *Lawrence Cnty.*, 799 F.2d at 1046 (quoting 11 Charles Allen Wright & Arthur Miller, Federal Practice and Procedure § 2961, at 599 (1973)) (emphasis added).

> d.  Unlike Hellerstedt, *this case does not involve separate and distinct statutes*

Plaintiffs also argue this case falls into the "separate and distinct" category in *Hellerstedt*. This too is unpersuasive. The Court has already analyzed above how the Contraceptive Mandate and the statute are "inextricably intertwined." *Supra*, p. 16.  *Hellerstedt* involved two *statutes* passed in the same bill. Here, Plaintiffs are challenging a statute and a regulation passed *pursuant to* that same statute. This forms a nexus that cannot possibly fall into the "separate and distinct" category from *Hellerstedt*.

For these reasons, the Court finds *Hellerstedt* inapplicable to this case. Accordingly, all of Leal and Von Dohlen's claims are barred by the traditional test for *res judicata* and thus the Court finds the federal defendants' Motion to Dismiss should be GRANTED as to these Plaintiffs. Of

course, this dismissal is without prejudice to Plaintiffs' right to seek modification of the order granting relief in *DeOtte.*

### 4. Failure to State a Claim

Plaintiff Armstrong is not barred by *res judicata*, however, because she is not part of the religious objector class certified in *DeOtte*. The federal defendants, however, move to dismiss Plaintiff Armstrong's claims under Rule 12(b)(6) for failing to state a claim for violation of the Appointments Clause and for failing to state a claim for violation of the nondelegation doctrine.

#### a. Plaintiff Armstrong has alleged a violation of the Appointments Clause

Armstrong alleges 42 U.S.C. § 300gg-13(a)(4) violates the Appointments Clause. Her argument proceeds as follows: the members of the HRSA — who determine the guidelines which mandate what private insurers must cover — exercise "significant authority pursuant to laws of the United States." *Buckley v. Valeo*, 424 U.S. 1, 126 (1976). Anyone who exercises such authority is an "Officer of the United States." *Id.* The Appointments Clause requires all Officers of the United States to be nominated by the President and confirmed by the Senate. U.S. CONST. art. II § 2. Because the members of the HRSA were not nominated or confirmed, their exercise of significant authority is in violation of the Appointments Clause.[13] Accordingly, any law promulgated pursuant to 42 U.S.C. § 300gg-13(a)(4) must be struck down as unconstitutional.

For their part, the federal defendants do not contest this chain of argument. Rather, the federal defendants assert Armstrong has failed to state a claim because she (1) forfeited the claim by failing to raise it before the agencies and (2) any constitutional defect was cured by the Secretary

---

[13] Plaintiff also asserts the members of the HRSA are not "inferior officers" either. Because the federal defendants do not contest this assertion that members of the HRSA are Officers, the Court does not reach a conclusion on the question.

of Health and Human Services' ratification of the Contraceptive Mandate. Both arguments come up short.

First, there is no requirement that a potential plaintiff must raise a challenge to a regulation at the time of notice and comment. *City of Seabrook v. EPA*, 659 F.3d 1349, 1360–61 (5th Cir. Unit A Oct. 1981).[14]

Second, there is no hard and fast rule about whether a claim must be presented to agency through an adversarial process before proceeding to federal court. Rather, there are three types of exhaustion requirements: those that are (1) statutorily created, (2) regulatorily created, and (3) judicially created. *Sims v. Apfel*, 530 U.S 103, 107–09 ("It is true that we have imposed an issue-exhaustion requirement even in the absence of a statute or regulation."). The federal defendants have cited neither a statute nor a regulation that presumes to require exhaustion.

This leaves only judicially created exhaustion requirements. The Fifth Circuit has not decided what standards should apply for exhaustion in Appointment Clause related cases. But the Third Circuit has recently decided a persuasive case which set a standard for "whether to impose an exhaustion requirement where we have not done so before." *Cirko v. Commissioner of Social Security*, 948 F.3d 148 (3d Cir. 2020). The Third Circuit articulated a three-part test which balances "(a) the 'nature of the claim presented,' (b) the 'characteristics of the particular administrative procedure provided,' and (c) the proper 'balance [between] the interest of the individual in retaining prompt access to a federal judicial forum [and] countervailing institutional interests favoring exhaustion.'" *Id.* at 153 (quoting *McCarthy v. Madigan*, 503 U.S. 140, 146 (1992)).

---

[14] The Fifth Circuit's precedents in this area are admittedly in conflict. *See BCCA Appeal Grp. v. EPA*, 355 F.3d 817, 829 (5th Cir. 2003) (acknowledging conflict); *Tex. Oil & Gas Ass'n v. EPA*, 161 F.3d 923, 933 n.7 (5th Cir. 1998) (finding waiver due to "failure to raise the objections during the notice and comment period."). The Court must follow the earlier precedent, however, which directly refutes the agency's forfeiture argument. When precedents conflict, "under our rule of orderliness, the earlier case controls." *GlobeRanger Corp. v. Software AG United States of Am., Inc.*, 836 F.3d 477, 497 (5th Cir. 2016).

Examining the first factor, the Third Circuit explained that the nature of Appointments Clause claims does not favor exhaustion:

> As a general matter, exhaustion is appropriate for certain claims involving "exercise of the agency's discretionary power or when the agency proceedings in question allow the agency to apply its special expertise." *McCarthy*, 503 U.S. at 145. But exhaustion is generally inappropriate where a claim serves to vindicate structural constitutional claims like Appointments Clause challenges, which implicate both individual constitutional rights and the structural imperative of separation of powers.

*Id.* at 153–54 (citing *Glidden Co. v. Zdanok*, 370 U.S. 530, 536–37 (1962)).

The second factor was whether the administrative process is adversarial or inquisitorial. *Id.* at 155–56. That factor weighs in favor of not requiring an exhaustion requirement because at the notice-and-comment stage there is no adversarial process.

The third factor is actually itself a two-part balancing test. On one hand, the Third Circuit weighed the interest of the individual and found it to be high. "[T]he Appointments Clause is aimed at more than an abstract division of labor between the branches of government. *Id.* at 156. "The structural principles secured by the separation of powers protect the individual as well." *Id.* (quoting *Bond v. United States*, 564 U.S. 211, 222 (2011)). "[S]o a citizen's ability to enforce it through a merits hearing is critical to "protec[ting] individual liberty." *Id.* (quoting *NLRB v. Noel Canning*, 573 U.S. 513, 571 (2014) (Scalia, J., concurring)).

On the other hand, the governmental interest in exhaustion is "negligible at best." *Id.* This is because the two traditional governmental interests in exhaustion — "deference to agency expertise and opportunity for agency error" — are not implicated in Appointment Clause cases. *Id.*

"[D]eference to agency expertise[] is rendered irrelevant here by the well-worn maxim that constitutional questions, including Appointments Clause challenges, are 'outside the [agency's]

competence and expertise.'" *Id.* at 158 (quoting *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 491 (2010)). "[C]ourts are at no disadvantage in answering" Appointments Clause claims and thus the Secretaries have no legitimate basis to argue that agency expertise requires that those claims be exhausted before the agency. *Free Enter. Fund*, 561 U.S. at 491.

The second traditional rationale for exhaustion is no more applicable. "We need not give an agency the opportunity for error correction that it is incapable of providing — *i.e.*, where it is not 'empowered to grant effective relief.'" *Cirko*, 948 F.3d at 158 (quoting *McCarthy*, 503 U.S. at 147). This case falls into that category. At no point could the Secretaries cure the constitutionality of the appointments of the members of the HRSA because only an act of Congress could change the statute which vested them with the power to manufacture binding guidelines.

In the end, all three of the *Cirko* factors weigh in favor of *not* having a judicially created exhaustion requirement for Appointments Clause claims in this context.

Lastly, the federal defendants' alternative argument — that the Secretary's ratification cured any constitutional maladies — fares no better. The federal defendants cite *Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosive*, for the proposition that a "properly appointed official's ratification of an allegedly improper official's prior action . . . resolves the claim on the merits by 'remedying the defect' (if any) from the initial appointment." 920 F.3d 1, 13 (D.C. Cir. 2019) (quoting *Wilkes-Barre Hosp. Co., LLC v. NLRB*, 857 F.3d 364, 371 (D.C. Cir. 2017) (internal marks omitted). While this is true, "ratification can remedy a defect arising from the decision of 'an improperly appointed official . . . when . . . . a properly appointed official has the power *to conduct an independent evaluation of the merits and does so.*'" *Wilkes-Barre Hosp.*, 857

F.3d at 371 (D.C. Cir. 2017) (quoting *Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 796 F.3d 111, 117 (D.C. Cir. 2015)) (alterations in original) (emphasis added).

A plain reading of 42 U.S.C. § 300gg-13(a)(4) shows the statute does not allow the Secretary to countermand HRSA's guidelines nor does it give the Secretary the discretion to accept or reject the guidelines that HRSA produces. *See Little Sisters of the Poor*, 140 S. Ct. at 2381 ("By its terms, the ACA leaves the Guidelines' content to the exclusive discretion of HRSA.").

The federal defendants attempt to counter this argument by noting "Reorganization Plan No. 3 of 1966—which is part of the United States Code, *see* 5 U.S.C. app. 1—vests the Secretary with 'all functions of all agencies of or in the Public Health Service,' including HRSA, which is the Secretary's creation." ECF No. 20 at 7. But reorganization plans are nothing more than executive regulations which are done unilaterally by the President pursuant to 5 U.S.C. § 901 et seq. But a regulation cannot confer authority on the Secretary which the statute vests exclusively in HRSA. *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984) ("If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.").

In conclusion, the Court finds both arguments made by the federal defendants unpersuasive. Accordingly, the Court DENIES the federal defendants' motion to dismiss as to Plaintiff Armstrong's Appointments Clause claim.

### b. *Plaintiff Armstrong has not alleged a violation of the nondelegation doctrine*

"The nondelegation doctrine is rooted in the principle of separation of power that underlies our tripartite system of Government." *Big Time Vapes, Inc. v. FDA*, 963 F.3d 436, 441 (5th Cir. 2020) (quoting *Mistretta v. United States*, 488 U.S. 361, 371 (1989)). This is because "All legislative Powers herein granted shall be vested in a Congress of the United States." U.S. CONST.

art. I, § 1. Because the legislative power must be vested in Congress, "[a]ccompanying that assignment of power to Congress is a bar on its further delegation." *Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019) (plurality).

But "[t]he Constitution has never been regarded as denying to the Congress the necessary resources of flexibility and practicality to perform its function." *Yakus v. United States*, 321 U.S. 414, 425 (1944) (internal marks omitted). Thus, "delegations are constitutional so long as Congress 'lays down by legislative act an *intelligible principle* to which the person or body authorized to exercise the authority is directed to conform.'" *Big Time Vapes*, 963 F.3d at 441 (quoting *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928)) (internal marks omitted) (emphasis added). An intelligible principle is "constitutionally sufficient if Congress (1) clearly delineates its general policy, (2) the public agency which is to apply it, and (3) the boundaries of that delegated authority." *Id.* at 443–44 (quoting *Mistretta*, 488 U.S. at 372–73).[15]

"'A nondelegation inquiry always begins (and often almost ends) with statutory interpretation,' because we need 'to figure out what task the statute delegates and what instructions it provides.'" *Id.* at 443 (quoting *Gundy*, 139 S. Ct. at 2123) (plurality) (internal marks omitted). The first two factors are not disputed by Armstrong. First, the general policy of the Affordable Care Act was ostensibly to improve health care coverage for Americans. Second, the text designates the Secretary of Health and Human Services as the one who will apply the law. 42 U.S.C. § 201(c). But regarding the last factor, despite Plaintiff's arguments, the delegation falls within the outer boundaries of the intelligible principle doctrine drawn by the Supreme Court.

---

[15] Much of "nondelegation doctrine" jurisprudence sounds in policy *not* the plain text of the Constitution. Relevant here, the Article I legislature may confer "legislative Powers" to Article II agencies *if* Congress is careful enough to articulate an "intelligible principle"—an extraconstitutional basis for disrupting the "separation of powers." Hopefully, the Supreme Court will revisit this issue in the near future. *See Gundy*, 139 S. Ct. at 2131–48 (Alito, J., concurring) (Gorsuch, J., dissenting).

Beginning with the text, Section 2713 of the Affordable Care Act states:

> A group health plan and a health insurance issuer offering group or individual health insurance coverage shall, at a minimum provide coverage for and shall not impose any cost sharing requirements for— . . .

> (4) with respect to women, such additional preventive care and screenings not described in paragraph (1) as provided for in comprehensive guidelines supported by the Health Resources and Services Administration for purposes of this paragraph.

> *Codified at* 42 U.SC. § 300gg-13(a)(4).

It is plain from the text of the statute that Congress has limited the authority it delegated. Congress's purpose in this section was to mandate coverage of certain health insurance items. In delegating its authority to the HRSA to decide which items to mandate, Congress imposed at least two limits. First, (a)(4) only relates to health coverage for women. Second, and more importantly, the statute limits the agency to only "preventive care and screenings."

Armstrong admits the text outlines a "statutory boundary" but argues "limiting the scope of HRSA's powers to 'preventive care and screenings' does nothing to provide guidance when HRSA is deciding *which* 'preventive care' and *which* 'screenings' will be covered." ECF No. 16 at 23 (emphasis in original). However, the guiding principle is that of all health items that insurers may be forced to cover, HRSA is limited to mandating preventive care and screenings. As it currently stands, this lies within the bounds of the intelligible principle test. While the Supreme Court might soon breathe new life into the nondelegation doctrine, that time has not yet come. *Gundy*, 139 S. Ct. at 2130–31 (Alito, J., concurring) ("If a majority of this Court were willing to reconsider the approach we have taken for the past 84 years, I would support that effort."). The Supreme Court "has found only two delegations to be unconstitutional. Ever. And none in more than eighty years." *Big Time Vapes*, 963 F.3d at 446. The Court is bound by this precedent. The Court thus GRANTS the federal defendants' Motion as to Armstrong's nondelegation claim.

### STATE DEFENDANTS' MOTION TO DISMISS

In Texas, a health insurance provider offering a health benefit plan that covers prescription drugs must also provide coverage for prescription contraception drugs at no additional cost to an insured. TEX. INS. CODE §§ 1369.104–.105. There is a limited exception to this requirement if the health insurance plan is issued by a religious organization. *Id.* § 1369.108. But overall, Texas prohibits insurance providers from excluding prescription contraception drugs unless the health benefit plan excludes coverage for all prescription drugs. *See id.* §§ 1369.101–.109. These requirements are commonly known as Texas' "contraceptive-equity laws."

Plaintiffs Leal and Von Dohlen contend the state defendants' enforcement of the contraceptive-equity laws prohibits health insurers from excluding coverage of non-abortifacient contraception unless they also exclude coverage of all prescription drugs, which drastically limits the scope of acceptable health insurance that Plaintiffs can purchase consistent with their religious beliefs.[16] Plaintiffs contend this substantially burdens their exercise of religion in violation of the Texas Religious Freedom Restoration Act ("TRFRA").

The state defendants moved to dismiss the case arguing Plaintiffs lack standing and are barred by sovereign immunity from suing them in federal court. Alternatively, the state defendants argue Plaintiffs have failed to state a claim for violation of the TRFRA.

### A. Legal Standards

"[S]overeign immunity deprives the court of jurisdiction, [so] claims barred by sovereign immunity can be dismissed only under Rule 12(b)(1) and not with prejudice." *Warnock v. Pecos Cnty.*, 88 F.3d 341, 343 (5th Cir. 1996). A motion to dismiss pursuant to Rule 12(b)(1) is analyzed under the same plausibility standard as a motion to dismiss under Rule 12(b)(6). *Lane v.*

---

[16] Plaintiff Armstrong is not asserting a claim against the state defendants under Texas RFRA, because she has no religious or moral objections to contraceptive coverage.

*Halliburton*, 529 F.3d 548, 557 (5th Cir. 2008). The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction. *Ramming*, 281 F.3d at 161.

### B. Analysis

The Court grants the states defendants' motion to dismiss for two reasons. First, the Court finds Texas has not waived its sovereign immunity in federal court. Although Plaintiffs are correct regarding the distinctions between state sovereign immunity inherent in the structure of Article III and sovereign immunity as expressly protected by the Eleventh Amendment, Plaintiffs misread Fifth Circuit precedent regarding the unequivocal statement needed to affect a waiver of sovereign immunity. Second, even if the state waived its sovereign immunity, the Court declines to exercise supplemental jurisdiction over the state-law claim.

#### 1. *Plaintiffs' TRFRA claim is barred by sovereign immunity*

"The preeminent purpose of state sovereign immunity is to accord States the dignity that is consistent with their status as sovereign entities." *Fed. Mar. Comm'n v. South Carolina State Ports Auth.*, 535 U.S. 743, 760 (2002). "The founding generation thought it neither becoming nor convenient that the several States of the Union, invested with that large residuum of sovereignty which had not been delegated to the United States, should be summoned as defendants to answer the complaints of private persons." *Id.* (quoting *Alden v. Maine*, 527 U.S. 706, 748 (1999)) (internal marks omitted). Therefore, a state's consent to suit in federal court must be "unequivocally expressed." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S 89, 99 (1984). Indeed, a waiver must be "stated by the most express language or by such overwhelming implication from the text as will leave no room for any other reasonable construction." *Port. Auth. Trans-Hudson Corp. v. Feeney*, 495 U.S. 299, 305 (1990) (internal marks omitted). Accordingly, a statutory waiver of

31

immunity in federal court "must specify the State's intention to subject itself to suit *in federal court*." *Id.* at 306 (emphasis in original).

> ### a. Supreme Court precedent makes it clear state sovereign immunity is enshrined in the Constitution

To provide context for Plaintiffs' arguments, the Court will lay out a primer on the sovereign immunity enjoyed by the States. "When the states ratified the Constitution, they did not abrogate their sovereignty, but instead created a federal government of limited, enumerated powers." *United States Oil Recovery Site Potentially Responsible Parties Grp. v. R.R. Comm'n of Texas*, 898 F.3d 497, 500 (5th Cir. 2018). "As the Supreme Court has observed, 'the founding document specifically recognizes the States as sovereign entities.'" *Id.* (quoting *Alden v. Maine*, 527 U.S. 706, 713 (1999) (internal marks omitted). "'Any doubt regarding the constitutional role of the States as sovereign entities is removed by the Tenth Amendment'—reserving those powers not delegated to the federal government to the states in their sovereign capacity, or to the people." *Id.* (quoting *Alden*, 527 U.S. at 713).

As sovereign entities, the several States enjoy the privilege of sovereign immunity which has "ancient origins." *Cutrer v. Tarrant Cnty. Loc. Workforce Dev. Bd.*, 943 F.3d 265, 268 (5th Cir. 2019). However, the Supreme Court undermined this immunity in *Chisolm v. Georgia*, 2 U.S. (2 Dall.) 419 (1793). In response to this decision, the Eleventh Amendment was ratified. *Principality of Monaco v. Mississippi*, 292 U.S. 313, 325 (1934) (noting the *Chisholm* "decision created such a shock of surprise that the Eleventh Amendment was at once proposed and adopted").

The text of the Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of *another* State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend XI (emphasis added). Thus, it is accurate to say that the Eleventh Amendment

only expressly "prohibits an individual from suing a *foreign* state in federal court (as Chisholm

had)." *Cutrer*, 943 F.3d at 269.

But for over a hundred years, the Supreme Court has made it clear that the States'

constitutional sovereign immunity is far broader than the express text of the Eleventh Amendment.

"Shortly after Congress gave the courts federal question jurisdiction in 1875, the Supreme Court

held that sovereign immunity also prohibits an individual from suing his *home* state in federal

court." *Id.* (citing *Hans v. Louisiana*, 134 U.S. 1 (1890)). As the Fifth Circuit recently explained:

> [The Eleventh Amendment] says nothing about a suit brought by a citizen against
> her home state. But a long line of precedent holds that "the Eleventh Amendment
> accomplished much more: It repudiated the central premise of *Chisholm* that the
> jurisdictional heads of Article III superseded the sovereign immunity that the States
> possessed before entering the Union." *College Sav. Bank v. Fla. Prepaid
> Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 669 (1999); *see also Alden v.
> Maine*, 527 U.S. 706, 736 (1999) ("[T]he bare text of the Amendment is not an
> exhaustive description of the States' constitutional immunity from suit.").

*Cutrer*, 943 F.3d at 269 n. 3 (some citations omitted)

The States thus possess sovereign immunity that predates the Constitution from suit by its

own citizens and foreign citizens.[17] For clarity's sake, the Court will refer to this broad sovereign

immunity from suit as *Hans* immunity.[18] The Eleventh Amendment expressly protects only a small

sub-part of this *Hans* immunity. This small subsection of *Hans* immunity the Court will refer to as

"Eleventh Amendment immunity."

---

[17] There are three exceptions to this sovereign immunity. "First, Congress may authorize such a suit in the exercise of
its power to enforce the Fourteenth Amendment—an Amendment enacted after the Eleventh Amendment and
specifically designed to alter the federal-state balance. Second, a State may waive its sovereign immunity by
consenting to suit." *College Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 670 (1999).
The third exception is suing the state indirectly by using the *Ex parte Young* fiction. *See Green Valley Spec. Util. Dist.
v. City of Shertz*, 969 F.3d 460, 496 (5th Cir. 2020) (Oldham, J., concurring). The issue in this case implicates the
second ground concerning whether Texas waived its sovereign immunity.

[18] *Hans v. Louisiana*, 134 U.S. 1 (1890) was the seminal case that recognized this broad sovereign immunity. Plaintiffs
also refer to this immunity as *Hans* immunity in their briefing.

  *b. The parties diverge on whether there is a meaningful distinction between* Hans *and Eleventh Amendment immunity*

With this predicate laid, the Court now examines Plaintiffs' legal arguments and the text of the statute. Plaintiffs argue Texas has consented to this lawsuit by waiving its sovereign immunity for claims brought pursuant to the Texas Religious Freedom Restoration Act. ECF No. 17 at 1. The relevant portion of the statute is reproduced below.

> SOVEREIGN IMMUNITY WAIVED. (a) Subject to Section 110.006, sovereign immunity to suit and from liability is waived and abolished to the extent of liability created by Section 110.005, and a claimant may sue a government agency for damages allowed by that section.
>
> (b) Notwithstanding Subsection (a), this chapter does not waive or abolish sovereign immunity to suit and from liability under the Eleventh Amendment to the United States Constitution.
>
> TEX. CIV. PRAC. & REM. CODE § 110.008(a)-(b).

Plaintiffs' argument is as follows. Section 110.008(a) waived the *entirety* of *Hans* immunity including Eleventh Amendment immunity. ECF No. 17 at 3 ("Subsection (a) waives *all* sovereign-immunity defenses") (emphasis in original). To be clearer, under Plaintiff's understanding, Subsection (a) waives sovereign immunity in both state *and* federal court and in suits brought by foreign citizens *and* its own citizens. Plaintiffs then argue that Subsection (b) "claws back and preserves" only the state's sovereign immunity under the Eleventh Amendment. *Id.* at 5. Plaintiffs aver that the Eleventh Amendment, by its express terms, does not apply to this case. Thus, because Subsection (a) waived *Hans* immunity, and Subsection (b) does not apply in this case, Texas has waived sovereign immunity against its own citizens in federal court under TRFRA.

 Both Plaintiffs and the state defendants proceed to spill much ink over the application of Subsection (b). The state defendants make two main arguments. First, the state defendants contend

"Eleventh Amendment immunity" is the exact same thing as *Hans* immunity and not merely a sub-part. In support of this theory, the state defendants aver that even the Supreme Court has recognized Eleventh Amendment immunity is "convenient shorthand" for a State's sovereign immunity in federal court. *Alden*, 527 U.S. at 713. Additionally, the Supreme Court has noted "the Court long ago held that the *Eleventh Amendment bars a citizen from bringing suit against the citizen's own State in federal court*, even though the express terms of the Amendment refer only to suits by citizens of another State." *Welch v. Texas Dep't of Highways & Pub. Transp.*, 483 U.S. 468, 472 (1987) (emphasis added). Accordingly, the state defendants reject the split between *Hans* immunity and Eleventh Amendment immunity outright. Thus Subsection (b) serves to preserve and claw back both *Hans* and Eleventh Amendment immunity (because they are the same thing).

Secondly, the state defendants aver that even if *Hans* immunity and Eleventh Amendment immunity are not the same thing, the Texas legislature surely *intended* to preserve sovereign immunity in federal court. The state defendants argue if federal courts use the terms *Hans* immunity and Eleventh Amendment immunity interchangeably then legislatures should be allowed to do the same thing. The state defendants then cite *nineteen* Fifth Circuit and District Court cases (including one case by this Court) stretching over three decades that use the terms interchangeably. In a recent concurrence, Judge Oldham also noted the imprecision with which courts talk about sovereign immunity:

> By its terms, the Amendment does not apply . . . where a citizen sues his *own* State (or a public official of that State). Still, the Supreme Court has often used "Eleventh Amendment immunity" as a synonym for the States' broader constitutional sovereign immunity. *See, e.g.*, *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44 (1996) (using "state sovereign immunity" and "Eleventh Amendment immunity" interchangeably); *Franchise Tax Bd. of Cal. v. Hyatt*, 139 S. Ct. 1485, 1496 (2019) ("Although the terms of [the Eleventh] Amendment address only . . . specific provisions . . . [,] the natural inference from its speedy adoption is that the Constitution was understood . . . to preserve the States' traditional immunity from private suits." (quotation omitted)).

*Green Valley*, 969 F.3d at 495 n. 2[19] (some citations omitted).

For their part, Plaintiffs assert there *is* a difference between *Hans* and Eleventh Amendment immunity. Plaintiffs stress both the Supreme Court and the Fifth Circuit have identified Eleventh Amendment immunity as a "misnomer, however, because that immunity is really an aspect of the Supreme Court's concept of state sovereign immunity and is neither derived from nor limited by the Eleventh Amendment." *Meyers ex rel. Benzing v. Texas*, 410 F.3d 236, 240–41 (5th Cir. 2005) (citing *Alden*, 527 U.S. at 713). The Court agrees with Plaintiffs on this point. The Fifth Circuit has emphasized, as exampled by Judge Oldham's recent concurrence, that *Hans* and Eleventh Amendment immunity are distinctly different concepts.

Plaintiffs then counter the state defendants' argument that the Court should look at the presumed intent of the Texas legislature which allegedly did not intend to waive sovereign immunity in federal court. Again, the Court agrees with Plaintiffs that courts "cannot replace the actual text with speculation as to [the legislature's] intent." *Magwood v. Patterson*, 561 U.S. 320, 334 (2010). The Supreme Court has made it crystal clear that "[i]f [the legislature] enacted into law something different from what it intended, then it should amend the statute to conform it to its intent." *Lamie v. U.S. Trustee*, 540 U.S. 526, 542 (2006). This Court "has no roving license . . . to disregard clear language simply on the view that . . . [the legislature] 'must have intended' something broader." *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 794 (2014). In fact, the Supreme Court recently applied an ultra-literalist hermeneutic that defied "long-settled principles of statutory interpretation" and "widespread ordinary use of the English language" to avoid even an appearance of an inquiry into legislative intent. *Bostock v. Clayton County*, 140 S. Ct. 1731,

---

[19] Judge Oldham then stated he would "use the term 'Eleventh Amendment immunity' to refer to the immunity recognized in the text of that amendment and the term 'state sovereign immunity' to refer to the States' broader constitutional immunity that predated the ratification of the Eleventh Amendment." Courts and legislatures should follow this example and be more precise in their drafting and writing.

1833 (2020) (Kavanaugh, J., dissenting). In fact, it appears the only piece of legislation that is not

subject to these usual textual rules of statutory interpretation is the Affordable Care Act. *King v.*

*Burwell*, 576 U.S. 473, 517 (2015) (Scalia, J., dissenting).

Sub-section (b)'s text is clear and unambiguous. It only preserves Eleventh Amendment

immunity, not *Hans* immunity. This does not mean, however, that Plaintiffs have the winning

argument. Even though Subsection (b) does not "claw back" *Hans* immunity, Plaintiffs' argument

only succeeds if Subsection (a) waived *Hans* immunity *in federal court*. As detailed below,

Subsection (a) does not.

### c. *The Fifth Circuit's holding in* Martinez *necessitates the conclusion that Subsection (a) does not waive* Hans *immunity in federal court*

The Fifth Circuit has already reviewed statutory language that is identical to TRFRA and

held that it does not waive sovereign immunity in federal court. In *Martinez v. Texas Dept. of*

*Crim. Just.*, the Fifth Circuit addressed whether the Texas Whistleblower Act ("TWA") waived

Texas' sovereign immunity in federal court.[20] 300 F.3d 567 (5th Cir. 2002). The panel held that

the claim could only be brought in state court because Texas had not waived its sovereign

immunity from suit in federal court. *Id.* at 575–76. The panel's reasoning consisted of two textual

statutory analyses: the waiver section and the venue provision. The text of the waiver section

provides that "**Sovereign immunity is waived and abolished to the extent of liability** for the

relief allowed under the chapter for violation of this chapter." TEX. GOVT. CODE § 554.0035

(Vernon Supp. 2001) (emphasis added). The bolded language is *identical* to the language of

TRFRA.

---

[20] *Martinez* is yet another case where the Fifth Circuit uses Eleventh Amendment immunity and *Hans* immunity interchangeably.

37

The *Martinez* panel held this language did not evidence any intent by Texas to waive its *Hans* sovereign immunity in federal court, and that "the only reasonable construction of the Act" was that it waived state sovereign immunity in Texas state court but not in *federal court*. *Martinez*, 300 F.3d at 575.

Plaintiffs try to sidestep *Martinez*'s clear holding by insisting the panel only reached its conclusion because of the existence of the venue provision which mandated the case to be filed in state district court. The venue provision of the TWA "specif[ies] that a public employee may sue 'in a district court of the county in which the cause of action arises or in a district court of Travis County.'" *Id.* (quoting TEX. GOVT. CODE § 554.007(a) (Vernon. Supp. 2001)). Plaintiffs argue without this provision "there would be [no] basis for limiting section 554.0035's waiver of sovereign immunity to state-court litigation." ECF No. 17 at 8. Plaintiffs state there is no comparable venue provision in TRFRA, so *Martinez* does not apply.

But Plaintiffs misread *Martinez*. Under Plaintiffs' interpretation of *Martinez*, the TWA's waiver provision showed an intent to waive immunity in federal court, but the venue provision showed the opposite. But that interpretation does not comport with the Fifth Circuit's statement that "*[n]either section* evidences any intent by Texas to waive its Eleventh Amendment immunity and subject itself to suit in federal courts" *Martinez*, 300 F.3d at 575 (emphasis added). It is abundantly clear that *Martinez*'s holding is that the *waiver provision itself* does not "evidence[] any intent by Texas" to waive its sovereign immunity. *Id.*

Applying *Martinez* to Subsection (a) is a straightforward task. The language waiving sovereign immunity in each statute is identical. Therefore, just as the Texas Whistleblower Act did not waive sovereign immunity in federal court, TRFRA likewise does not waive sovereign immunity in federal court.

Moreover, contrary to Plaintiff's assertion, there is a venue provision in TRFRA which is somewhat similar to the venue provision of the TWA. Under the section titled "Remedies", TRFRA states "[a]n action under this section must be brought in district court." TEX. CIV. PRAC. & REM. CODE § 110.005(c). While the phrase "district court" may be ambiguous as to whether an action may be brought in state district court or federal district court,[21] this ambiguity serves to underline the fact that there is no "unequivocal" expression of waiver of sovereign immunity in federal court.

### d. Plaintiffs' claims appear to be barred by TRFRA's statute of limitations

In most cases, failure to sue within the statute of limitations is a waivable defense, but this is not so here. "In order to preserve the legislature's interest in managing state fiscal matters through the appropriations process, a statute shall not be construed as a waiver of sovereign immunity unless the waiver is effected by clear and unambiguous language." TEX. GOVT. CODE § 311.034 "Statutory prerequisites to a suit, including the provision of notice, are *jurisdictional requirements* in all suits against a governmental entity." *Id.* (emphasis added) Accordingly, complying with the statute of limitations is a jurisdictional prerequisite and noncompliance deprives this Court of jurisdiction.

TRFA mandates that "[a] person must bring an action to assert a claim for damages under this chapter not later than one year after the date the *person knew or should have known of the substantial burden* on the person's free exercise of religion." TEX. CIV. PRAC. & REM. CODE §110.007 (emphasis added). Thus, unlike the federal statute of limitations under RFRA which runs

---

[21] If the Court were to try to resolve the ambiguity, the Court could proceed by reviewing legislative history "as mere *evidence* of the 'ordinary public meaning'" of the phrase "district court." *Deanda v. Azar*, No. 2:20-CV-092 (N.D. Tex. Sept. 24, 2020), ECF No. 23 at 5 (emphasis in original) (citing A. SCALIA, A MATTER OF INTERPRETATION 17 (1997)). The Committee Report of the House Research Organization on TRFRA shows a legislative expectancy that "an action would have to be brought in state district court." TEX. H. RESEARCH ORGANIZATION, BILL ANALYSIS, S.B. 138, 76th Leg., R.S. (May 17, 1999), available at https://www.lrl.texas.gov/scanned/hroBillAnalyses/76-0/SB138.PDF.

from each day the cause of action accrues, a TRFRA claim must be brought from the date the person knew or should have known of the burden even if the burden continues for more than one year. *Walters v. Livingston*, 519 S.W.3d 658, 667 (Tex.App.—Amarillo 2017, no pet.). Consequently, Plaintiffs Leal and Von Dohlen's burden arose when the contraceptive-equity laws were enacted in 2001.[22] Because Plaintiffs' claims are time barred, this is yet another reason the Court does not have jurisdiction over Plaintiffs' TRFRA claim.

### 2. Alternatively, the Court declines to exercise supplemental jurisdiction over the state-law claim

Alternatively, even if Texas did waive its sovereign immunity, the Court, in its discretion, declines to exercise supplemental jurisdiction over the remainder of this case. Supplemental jurisdiction is codified at 28 U.S.C. § 1367 which gives courts discretion to exercise jurisdiction over pendant state-law claims when: "(1) federal question jurisdiction is proper, and (2) the state-law claims derive from a common nucleus of operative facts." *Arena v. Graybar Elec. Co., Inc.*, 669 F.3d 214, 221 (5th Cir. 2012).

Only after finding that original jurisdiction exists over at least one claim can a court decide whether to exercise its discretion to decline supplemental jurisdiction. 28 U.S.C. § 1367(a). The statutory provisions of section 1367(c) set out four factors that control this Court's discretion over state-law claims: whether (1) the claim raises a novel or complex issue of state law; (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction; (3) the district court has dismissed all claims over which it has original jurisdiction; or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction. *Id.* at § 1367(c).

---

[22] Plaintiff does not allege any facts that support the statute of limitations not applying such as if Plaintiffs Leal or Von Dohlen were new residents to the state or have never sought health insurance in Texas before and were thus unaware of the contraceptive-equity laws. Indeed, neither party briefed on the issue at all.

Additionally, "a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction over a case brought in that court involving pendent state-law claims." *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988).

Here, the Court has no original jurisdiction over Plaintiffs' state-law claims. First, no diversity jurisdiction exists between Plaintiffs (who are all residents of Texas) and the state defendants. Second, there is no federal question jurisdiction because it is a state-law claim. Lastly, *Ex Parte Young* is inapplicable here because *Young* does not apply in cases where plaintiffs are alleging that state actors are violating state law. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 111 (1984). This means Plaintiffs' TRFRA claim's only hook to federal court is supplemental jurisdiction.

The section 1367 factors and *Carnegie-Mellon* weigh heavily in favor of declining to exercise supplemental jurisdiction. As for the section 1367 factors, the Court has dismissed all federal claims by Plaintiffs Leal and Von Dohlen. § 1367(c)(3). These claims were the only hook for supplemental jurisdiction. With these federal claims dismissed, there is simply no connection — no "common nucleus of operative facts" — between Plaintiff Armstrong's surviving claim which is explicitly *not* based on religious beliefs and Plaintiffs Leal and Von Dohlen's TRFRA claim.[23] As *Carnegie-Mellon* indicates, this fact weighs heavily in favor of dismissing the claim and leads the Court to not exercise supplemental jurisdiction over the TRFRA claims.

---

[23] In fact, the Court is unsure whether supplemental jurisdiction would exist even if Plaintiffs Leal and Von Dohlen's federal claims were not dismissed. The only "common nucleus of operative facts" is that the actions of Texas and the United States harm the Plaintiffs in trying to find health insurance. But having merely the same type of injury doesn't necessarily mean the two cases share a "common nucleus of operative facts." In this case, Plaintiffs are suing two separate sovereigns for enacting two separate statutes (one which allegedly violates the Constitution and one which allegedly violates TRFRA) which have no relationship with one another which are causing two distinct injuries. Neither party addresses these arguments. But, because it does not affect the disposition of the case, the Court assumes *arguendo* that the claims do share a common nucleus of operative facts.

Lastly, the *Carnegie-Mellon* factors also favor declining supplemental jurisdiction. The case is in the very early stages of litigation, the discovery process has not yet started, and no trial date has been set. As a result, judicial economy will not be wasted by dismissing this case. Additionally, Leal and Von Dohlen are free to litigate their claim in state court as the dismissal in this case is without prejudice. Therefore, the Court declines to exercise supplemental jurisdiction.

CONCLUSION

In sum, the Court holds (1) all Plaintiffs have standing for their claims against the federal defendants; (2) no federal claims are barred by the statute of limitations; (3) all of Plaintiffs Leal and Von Dohlen's federal claims are barred by res judicata; (4) Plaintiff Armstrong has adequately stated a claim for violations of the Appointments Clause but (5) has not stated a claim for a violation of the nondelegation doctrine; (6) all claims against the state defendants are barred by sovereign immunity; and (7), even if Texas waived its sovereign immunity, the Court declines to exercise its supplemental jurisdiction over the state-law claims.

Accordingly, the federal defendants' Motion to Dismiss (ECF No. 15) is GRANTED as to Plaintiffs Leal and Von Dohlen and DENIED IN PART as to Plaintiff Armstrong. Plaintiffs Leal and Von Dohlen's claims against the federal defendants are DISMISSED WITH PREJUDICE. Plaintiff Armstrong's nondelegation claim is DISMISSED WITH PREJUDICE.

The state defendants' Motion to Dismiss (ECF No. 7) is GRANTED. Plaintiffs' state-law claims against the state defendants are DISMISSED WITHOUT PREJUDICE.

**SO ORDERED**.

December 23, 2020.

MATTHEW J. KACSMARYK
UNITED STATES DISTRICT JUDGE