UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

**John Kelley**, et al.

                    Plaintiffs,

v.                                              Case No. 4:20-cv-00283-O

**Xavier Becerra**, et al.,

                    Defendants.

**APPENDIX TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

42 U.S.C. § 300gg-13 ........................................................................ App. 1 (Tab 1)

U.S. Preventive Services Task Force ratings ........................................ App. 4 (Tab 2)

ACIP vaccine recommendations and guidelines .............................. App. 13 (Tab 3)

Bright Futures Periodicity Schedule ................................................ App. 16 (Tab 4)

HRSA's women's preventive services guidelines .............................. App. 19 (Tab 5)

Declaration of John Kelley ................................................................ App. 32 (Tab 6)

Declaration of Joel Starnes ............................................................... App. 38 (Tab 7)

Declaration of Gregory Scheideman ................................................ App. 44 (Tab 8)

Declaration of Zach Maxwell ........................................................... App. 49 (Tab 9)

Declaration of Ashley Maxwell ...................................................... App. 55 (Tab 10)

Declaration of Joel Miller ............................................................. App. 61 (Tab 11)

Declaration of Steven F. Hotze ..................................................... App. 66 (Tab 12)

Declaration of Michael F. Cannon ................................................ App. 72 (Tab 13)

Declaration of Jonathan F. Mitchell ............................................. App. 76 (Tab 14)

Interim Final Rule of July 19, 2010 ............................................. App. 78 (Tab 15)

Staff Report by House Committee on Energy and Commerce .... App. 114 (Tab 16)

# Tab 1
**(42 U.S.C. § 300gg-13)**

I of Pub. L. 111–148, enacting this section and sections 300gg–12 to 300gg–15, 300gg–16 to 300gg–19, 300gg–93, and 300gg–94 of this title, amending former sections 300gg–11 and 300gg–12 of this title and sections 300gg–21 to 300gg–23 of this title, and transferring section 300gg–13 of this title to section 300gg–9 of this title and sections 300gg–4 to 300gg–7 of this title to sections 300gg–25 to 300gg–28 of this title, respectively] [and the amendments made by this subtitle] shall become effective for plan years beginning on or after the date that is 6 months after the date of enactment of this Act [Mar. 23, 2010], except that the amendments made by sections 1002 and 1003 [enacting sections 300gg–93 and 300gg–94 of this title] shall become effective for fiscal years beginning with fiscal year 2010.

''(b) SPECIAL RULE.—The amendments made by sections 1002 and 1003 [enacting sections 300gg–93 and 300gg–94 of this title] shall take effect on the date of enactment of this Act [Mar. 23, 2010].''

## § 300gg–12. Prohibition on rescissions

A group health plan and a health insurance issuer offering group or individual health insurance coverage shall not rescind such plan or coverage with respect to an enrollee once the enrollee is covered under such plan or coverage involved, except that this section shall not apply to a covered individual who has performed an act or practice that constitutes fraud or makes an intentional misrepresentation of material fact as prohibited by the terms of the plan or coverage. Such plan or coverage may not be cancelled except with prior notice to the enrollee, and only as permitted under section 300gg–2(b)[1] or 300gg–42(b) of this title.

(July 1, 1944, ch. 373, title XXVII, § 2712, as added Pub. L. 111–148, title I, § 1001(5), Mar. 23, 2010, 124 Stat. 131.)

### REFERENCES IN TEXT

Section 300gg–2(b) of this title, referred to in text, was in the original a reference to section ''2702(c)'' of act July 1, 1944, which was translated as meaning section 2703(b) of act July 1, 1944, to reflect the probable intent of Congress. Section 2702(c), which is classified to section 300gg–1 of this title, relates to special rules for network plans, while section 2703(b) specifies the reasons for which a health insurance issuer may nonrenew or discontinue health insurance coverage offered in connection with a health insurance coverage offering in the group or individual market. Section 300gg–2(b) also parallels section 300gg–42(b) which appears in the same context in this section as the reference to section 300gg–2(b).

### PRIOR PROVISIONS

A prior section 300gg–12, act July 1, 1944, ch. 373, title XXVII, § 2712, as added Pub. L. 104–191, title I, § 102(a), Aug. 21, 1996, 110 Stat. 1964, which related to guaranteed renewability of coverage for employers in a group market, was renumbered section 2732 of act July 1, 1944, amended, and transferred to subsecs. (b) to (e) of section 300gg–2 of this title, by Pub. L. 111–148, title I, §§ 1001(3), 1563(c)(9), formerly § 1562(c)(9), title X, § 10107(b)(1), Mar. 23, 2010, 124 Stat. 130, 267, 911.

Another prior section 2712 of act July 1, 1944, was successively renumbered by subsequent acts and transferred, see section 238k of this title.

### EFFECTIVE DATE

Section effective for plan years beginning on or after the date that is 6 months after Mar. 23, 2010, see section 1004 of Pub. L. 111–148, set out as a note under section 300gg–11 of this title.

## § 300gg–13. Coverage of preventive health services

### (a) In general

A group health plan and a health insurance issuer offering group or individual health insurance coverage shall, at a minimum provide coverage for and shall not impose any cost sharing requirements for—

(1) evidence-based items or services that have in effect a rating of ''A'' or ''B'' in the current recommendations of the United States Preventive Services Task Force;

(2) immunizations that have in effect a recommendation from the Advisory Committee on Immunization Practices of the Centers for Disease Control and Prevention with respect to the individual involved; and[1]

(3) with respect to infants, children, and adolescents, evidence-informed preventive care and screenings provided for in the comprehensive guidelines supported by the Health Resources and Services Administration.[2]

(4) with respect to women, such additional preventive care and screenings not described in paragraph (1) as provided for in comprehensive guidelines supported by the Health Resources and Services Administration for purposes of this paragraph.[2]

(5) for the purposes of this chapter, and for the purposes of any other provision of law, the current recommendations of the United States Preventive Service Task Force regarding breast cancer screening, mammography, and prevention shall be considered the most current other than those issued in or around November 2009.

Nothing in this subsection shall be construed to prohibit a plan or issuer from providing coverage for services in addition to those recommended by United States Preventive Services Task Force or to deny coverage for services that are not recommended by such Task Force.

### (b) Interval

#### (1) In general

The Secretary shall establish a minimum interval between the date on which a recommendation described in subsection (a)(1) or (a)(2) or a guideline under subsection (a)(3) is issued and the plan year with respect to which the requirement described in subsection (a) is effective with respect to the service described in such recommendation or guideline.

#### (2) Minimum

The interval described in paragraph (1) shall not be less than 1 year.

### (c) Value-based insurance design

The Secretary may develop guidelines to permit a group health plan and a health insurance issuer offering group or individual health insurance coverage to utilize value-based insurance designs.

(July 1, 1944, ch. 373, title XXVII, § 2713, as added Pub. L. 111–148, title I, § 1001(5), Mar. 23, 2010, 124 Stat. 131.)

---

[1] See References in Text note below.

[1] So in original. The word ''and'' probably should not appear.
[2] So in original. The period probably should be a semicolon.

A prior section 300gg–13, act July 1, 1944, ch. 373, title XXVII, §2713, as added Pub. L. 104–191, title I, §102(a), Aug. 21, 1996, 110 Stat. 1966, was renumbered section 2709 of act July 1, 1944, and transferred to section 300gg–9 of this title by Pub. L. 111–148, title I, §§1001(3), 1563(c)(10)(C), formerly §1562(c)(10)(C), title X, §10107(b)(1), Mar. 23, 2010, 124 Stat. 130, 268, 911.

Another prior section 2713 of act July 1, 1944, was successively renumbered by subsequent acts and transferred, see section 238*l* of this title.

EFFECTIVE DATE

Section effective for plan years beginning on or after the date that is 6 months after Mar. 23, 2010, see section 1004 of Pub. L. 111–148, set out as a note under section 300gg–11 of this title.

## § 300gg–14. Extension of dependent coverage

### (a) In general

A group health plan and a health insurance issuer offering group or individual health insurance coverage that provides dependent coverage of children shall continue to make such coverage available for an adult child until the child turns 26 years of age. Nothing in this section shall require a health plan or a health insurance issuer described in the preceding sentence to make coverage available for a child of a child receiving dependent coverage.

### (b) Regulations

The Secretary shall promulgate regulations to define the dependents to which coverage shall be made available under subsection (a).

### (c) Rule of construction

Nothing in this section shall be construed to modify the definition of ''dependent'' as used in title 26 with respect to the tax treatment of the cost of coverage.

(July 1, 1944, ch. 373, title XXVII, §2714, as added Pub. L. 111–148, title I, §1001(5), Mar. 23, 2010, 124 Stat. 132; amended Pub. L. 111–152, title II, §2301(b), Mar. 30, 2010, 124 Stat. 1082.)

PRIOR PROVISIONS

A prior section 2714 of act July 1, 1944, was successively renumbered by subsequent acts and transferred, see section 238m of this title.

AMENDMENTS

2010—Subsec. (a). Pub. L. 111–152 struck out ''(who is not married)'' after ''adult child''.

EFFECTIVE DATE

Section effective for plan years beginning on or after the date that is 6 months after Mar. 23, 2010, see section 1004 of Pub. L. 111–148, set out as a note under section 300gg–11 of this title.

## § 300gg–15. Development and utilization of uniform explanation of coverage documents and standardized definitions

### (a) In general

Not later than 12 months after March 23, 2010, the Secretary shall develop standards for use by a group health plan and a health insurance issuer offering group or individual health insurance coverage, in compiling and providing to applicants, enrollees, and policyholders or certificate holders a summary of benefits and coverage explanation that accurately describes the benefits and coverage under the applicable plan or coverage. In developing such standards, the Secretary shall consult with the National Association of Insurance Commissioners (referred to in this section as the ''NAIC''), a working group composed of representatives of health insurance-related consumer advocacy organizations, health insurance issuers, health care professionals, patient advocates including those representing individuals with limited English proficiency, and other qualified individuals.

### (b) Requirements

The standards for the summary of benefits and coverage developed under subsection (a) shall provide for the following:

### (1) Appearance

The standards shall ensure that the summary of benefits and coverage is presented in a uniform format that does not exceed 4 pages in length and does not include print smaller than 12-point font.

### (2) Language

The standards shall ensure that the summary is presented in a culturally and linguistically appropriate manner and utilizes terminology understandable by the average plan enrollee.

### (3) Contents

The standards shall ensure that the summary of benefits and coverage includes—

(A) uniform definitions of standard insurance terms and medical terms (consistent with subsection (g)) so that consumers may compare health insurance coverage and understand the terms of coverage (or exception to such coverage);

(B) a description of the coverage, including cost sharing for—

(i) each of the categories of the essential health benefits described in subparagraphs (A) through (J) of section 18022(b)(1) of this title; and

(ii) other benefits, as identified by the Secretary;

(C) the exceptions, reductions, and limitations on coverage;

(D) the cost-sharing provisions, including deductible, coinsurance, and co-payment obligations;

(E) the renewability and continuation of coverage provisions;

(F) a coverage facts label that includes examples to illustrate common benefits scenarios, including pregnancy and serious or chronic medical conditions and related cost sharing, such scenarios to be based on recognized clinical practice guidelines;

(G) a statement of whether the plan or coverage—

(i) provides minimum essential coverage (as defined under section 5000A(f) of title 26); and

(ii) ensures that the plan or coverage share of the total allowed costs of benefits provided under the plan or coverage is not less than 60 percent of such costs;

(H) a statement that the outline is a summary of the policy or certificate and that

# Tab 2

**(U.S. Preventive Services Task Force ratings)**

| Topic | Description | Grade | Release Date of Current Recommendation |
|-------|-------------|-------|----------------------------------------|
| Abdominal Aortic Aneurysm: Screening: men aged 65 to 75 years who have ever smoked | The USPSTF recommends 1-time screening for abdominal aortic aneurysm (AAA) with ultrasonography in men aged 65 to 75 years who have ever smoked. | B | December 2019 * |
| Abnormal Blood Glucose and Type 2 Diabetes Mellitus: Screening: adults aged 40 to 70 years who are overweight or obese | The USPSTF recommends screening for abnormal blood glucose as part of cardiovascular risk assessment in adults aged 40 to 70 years who are overweight or obese. Clinicians should offer or refer patients with abnormal blood glucose to intensive behavioral counseling interventions to promote a healthful diet and physical activity. | B | October 2015 * |
| Aspirin Use to Prevent Cardiovascular Disease and Colorectal Cancer: Preventive Medication: adults aged 50 to 59 years with a 10% or greater 10-year cvd risk | The USPSTF recommends initiating low-dose aspirin use for the primary prevention of cardiovascular disease (CVD) and colorectal cancer (CRC) in adults aged 50 to 59 years who have a 10% or greater 10-year CVD risk, are not at increased risk for bleeding, have a life expectancy of at least 10 years, and are willing to take low-dose aspirin daily for at least 10 years. | B | April 2016 * |
| Asymptomatic Bacteriuria in Adults: Screening: pregnant persons | The USPSTF recommends screening for asymptomatic bacteriuria using urine culture in pregnant persons. | B | September 2019 * |
| BRCA-Related Cancer: Risk Assessment, Genetic Counseling, and Genetic Testing: women with a personal or family history of breast, ovarian, tubal, or peritoneal cancer or an ancestry associated with brca1/2 gene mutation | The USPSTF recommends that primary care clinicians assess women with a personal or family history of breast, ovarian, tubal, or peritoneal cancer or who have an ancestry associated with breast cancer susceptibility 1 and 2 (BRCA1/2) gene mutations with an appropriate brief familial risk assessment tool. Women with a positive result on the risk assessment tool should receive genetic counseling and, if indicated after counseling, genetic testing. | B | August 2019 * |
| Breast Cancer: Medication Use to Reduce Risk: women at increased risk for breast cancer aged 35 | The USPSTF recommends that clinicians offer to prescribe risk-reducing medications, such as tamoxifen, raloxifene, or aromatase inhibitors, to women who are at increased risk for breast cancer and at low risk for adverse medication effects. | B | September 2019 * |

**App. 5**

| Breast Cancer: Screening: women aged 50 to 74 years | The USPSTF recommends biennial screening mammography for women aged 50 to 74 years. † | B | January 2016 * |
| Breastfeeding: Primary Care Interventions: pregnant women, new mothers, and their children | The USPSTF recommends providing interventions during pregnancy and after birth to support breastfeeding. | B | October 2016 * |
| Cervical Cancer: Screening: women aged 21 to 65 years | The USPSTF recommends screening for cervical cancer every 3 years with cervical cytology alone in women aged 21 to 29 years. For women aged 30 to 65 years, the USPSTF recommends screening every 3 years with cervical cytology alone, every 5 years with high-risk human papillomavirus (hrHPV) testing alone, or every 5 years with hrHPV testing in combination with cytology (cotesting). See the Clinical Considerations section for the relative benefits and harms of alternative screening strategies for women 21 years or older. | A | August 2018 * |
| Screening for Colorectal Cancer: adults aged 50 to 75 years | The USPSTF recommends screening for colorectal cancer in all adults aged 50 to 75 years. See the "Practice Considerations" section and Table 1 for details about screening strategies. | A | May 2021 * |
| Screening for Colorectal Cancer: adults aged 45 to 49 years | The USPSTF recommends screening for colorectal cancer in adults aged 45 to 49 years. See the "Practice Considerations" section and Table 1 for details about screening strategies. | B | May 2021 * |
| Dental Caries in Children from Birth Through Age 5 Years: Screening: children from birth through age 5 years | The USPSTF recommends that primary care clinicians prescribe oral fluoride supplementation starting at age 6 months for children whose water supply is deficient in fluoride. | B | May 2014 * |
| Dental Caries in Children from Birth Through Age 5 Years: Screening: children from birth through age 5 years | The USPSTF recommends that primary care clinicians apply fluoride varnish to the primary teeth of all infants and children starting at the age of primary tooth eruption. | B | May 2014 * |
| Depression in Adults: Screening: general adult population, including pregnant | The USPSTF recommends screening for depression in the general adult population, including pregnant and postpartum women. Screening should be implemented with adequate systems in | B | January 2016 * |

| and postpartum women | place to ensure accurate diagnosis, effective treatment, and appropriate follow-up. | | |
|---|---|---|---|
| Depression in Children and Adolescents: Screening: adolescents aged 12 to 18 years | The USPSTF recommends screening for major depressive disorder (MDD) in adolescents aged 12 to 18 years. Screening should be implemented with adequate systems in place to ensure accurate diagnosis, effective treatment, and appropriate follow-up. | B | February 2016 * |
| Falls Prevention in Community-Dwelling Older Adults: Interventions: adults 65 years or older | The USPSTF recommends exercise interventions to prevent falls in community-dwelling adults 65 years or older who are at increased risk for falls. | B | April 2018 * |
| Folic Acid for the Prevention of Neural Tube Defects: Preventive Medication: women who are planning or capable of pregnancy | The USPSTF recommends that all women who are planning or capable of pregnancy take a daily supplement containing 0.4 to 0.8 mg (400 to 800 µg) of folic acid. | A | January 2017 * |
| Gestational Diabetes Mellitus, Screening: asymptomatic pregnant women, after 24 weeks of gestation | The USPSTF recommends screening for gestational diabetes mellitus (GDM) in asymptomatic pregnant women after 24 weeks of gestation. | B | January 2014 |
| Chlamydia and Gonorrhea: Screening: sexually active women | The USPSTF recommends screening for chlamydia in sexually active women age 24 years and younger and in older women who are at increased risk for infection. | B | September 2014 * |
| Chlamydia and Gonorrhea: Screening: sexually active women | The USPSTF recommends screening for gonorrhea in sexually active women age 24 years and younger and in older women who are at increased risk for infection. | B | September 2014 * |
| Healthy Diet and Physical Activity for Cardiovascular Disease Prevention in Adults With Cardiovascular Risk Factors: Behavioral Counseling Interventions: adults with cardiovascular disease risk factors | The USPSTF recommends offering or referring adults with cardiovascular disease risk factors to behavioral counseling interventions to promote a healthy diet and physical activity. | B | November 2020 * |
| Screening for Hepatitis B Virus Infection in | The USPSTF recommends screening for hepatitis B virus (HBV) | | |

App. 7

| Adolescents and Adults: adolescents and adults at increased risk for infection | infection in adolescents and adults at increased risk for infection. See the Practice Considerations section for a description of adolescents and adults at increased risk for infection. | B | December 2020 * |
| Hepatitis B Virus Infection in Pregnant Women: Screening: pregnant women | The USPSTF recommends screening for hepatitis B virus (HBV) infection in pregnant women at their first prenatal visit | A | July 2019 * |
| Hepatitis C Virus Infection in Adolescents and Adults: Screening: adults aged 18 to 79 years | The USPSTF recommends screening for hepatitis C virus (HCV) infection in adults aged 18 to 79 years. | B | March 2020 * |
| Human Immunodeficiency Virus (HIV) Infection: Screening: pregnant persons | The USPSTF recommends that clinicians screen for HIV infection in all pregnant persons, including those who present in labor or at delivery whose HIV status is unknown. | A | June 2019 * |
| Human Immunodeficiency Virus (HIV) Infection: Screening: adolescents and adults aged 15 to 65 years | The USPSTF recommends that clinicians screen for HIV infection in adolescents and adults aged 15 to 65 years. Younger adolescents and older adults who are at increased risk of infection should also be screened. See the Clinical Considerations section for more information about assessment of risk, screening intervals, and rescreening in pregnancy. | A | June 2019 * |
| Screening for Hypertension in Adults: adults 18 years or older without known hypertension | The USPSTF recommends screening for hypertension in adults 18 years or older with office blood pressure measurement (OBPM). The USPSTF recommends obtaining blood pressure measurements outside of the clinical setting for diagnostic confirmation before starting treatment. | A | April 2021 * |
| Intimate Partner Violence, Elder Abuse, and Abuse of Vulnerable Adults: Screening: women of reproductive age | The USPSTF recommends that clinicians screen for intimate partner violence (IPV) in women of reproductive age and provide or refer women who screen positive to ongoing support services. See the Clinical Considerations section for more information on effective ongoing support services for IPV and for information on IPV in men. | B | October 2018 * |
| Latent Tuberculosis Infection: Screening: asymptomatic adults at increased risk for infection | The USPSTF recommends screening for latent tuberculosis infection (LTBI) in populations at increased risk. | B | September 2016 * |
| Low-Dose Aspirin Use | | B | |

| | | | |
|---|---|---|---|
| for the Prevention of Morbidity and Mortality From Preeclampsia: Preventive Medication : pregnant women who are at high risk for preeclampsia | The USPSTF recommends the use of low-dose aspirin (81 mg/d) as preventive medication after 12 weeks of gestation in women who are at high risk for preeclampsia. | B | September 2014 |
| Lung Cancer: Screening: adults aged 50 to 80 years who have a 20 pack-year smoking history and currently smoke or have quit within the past 15 years | The USPSTF recommends annual screening for lung cancer with low-dose computed tomography (LDCT) in adults aged 50 to 80 years who have a 20 pack-year smoking history and currently smoke or have quit within the past 15 years. Screening should be discontinued once a person has not smoked for 15 years or develops a health problem that substantially limits life expectancy or the ability or willingness to have curative lung surgery. | B | March 2021 * |
| Obesity in Children and Adolescents: Screening: children and adolescents 6 years and older | The USPSTF recommends that clinicians screen for obesity in children and adolescents 6 years and older and offer or refer them to comprehensive, intensive behavioral interventions to promote improvements in weight status. | B | June 2017 * |
| Ocular Prophylaxis for Gonococcal Ophthalmia Neonatorum: Preventive Medication: newborns | The USPSTF recommends prophylactic ocular topical medication for all newborns to prevent gonococcal ophthalmia neonatorum. | A | January 2019 * |
| Osteoporosis to Prevent Fractures: Screening: postmenopausal women younger than 65 years at increased risk of osteoporosis | The USPSTF recommends screening for osteoporosis with bone measurement testing to prevent osteoporotic fractures in postmenopausal women younger than 65 years who are at increased risk of osteoporosis, as determined by a formal clinical risk assessment tool. See the Clinical Considerations section for information on risk assessment. | B | June 2018 * |
| Osteoporosis to Prevent Fractures: Screening: women 65 years and older | The USPSTF recommends screening for osteoporosis with bone measurement testing to prevent osteoporotic fractures in women 65 years and older. | B | June 2018 * |
| Perinatal Depression: Preventive Interventions: pregnant and postpartum persons | The USPSTF recommends that clinicians provide or refer pregnant and postpartum persons who are at increased risk of perinatal depression to counseling interventions. | B | February 2019 |

App. 9

| Preeclampsia Screening: pregnant woman | The USPSTF recommends screening for preeclampsia in pregnant women with blood pressure measurements throughout pregnancy. | B | April 2017 * |
|---|---|---|---|
| Prevention of Human Immunodeficiency Virus (HIV) Infection: Preexposure Prophylaxis: persons at high risk of hiv acquisition | The USPSTF recommends that clinicians offer preexposure prophylaxis (PrEP) with effective antiretroviral therapy to persons who are at high risk of HIV acquisition. See the Clinical Considerations section for information about identification of persons at high risk and selection of effective antiretroviral therapy. | A | June 2019 |
| Prevention and Cessation of Tobacco Use in Children and Adolescents: Primary Care Interventions: school-aged children and adolescents who have not started to use tobacco | The USPSTF recommends that primary care clinicians provide interventions, including education or brief counseling, to prevent initiation of tobacco use among school-aged children and adolescents. | B | April 2020 * |
| Rh(D) Incompatibility: Screening: unsensitized rh(d)-negative pregnant women | The USPSTF recommends repeated Rh(D) antibody testing for all unsensitized Rh(D)-negative women at 24 to 28 weeks' gestation, unless the biological father is known to be Rh(D)-negative. | B | February 2004 * |
| Rh(D) Incompatibility: Screening: pregnant women, during the first pregnancy-related care visit | The USPSTF strongly recommends Rh(D) blood typing and antibody testing for all pregnant women during their first visit for pregnancy-related care. | A | February 2004 * |
| Sexually Transmitted Infections: Behavioral Counseling: sexually active adolescents and adults at increased risk | The USPSTF recommends behavioral counseling for all sexually active adolescents and for adults who are at increased risk for sexually transmitted infections (STIs). See the Practice Considerations section for more information on populations at increased risk for acquiring STIs. | B | August 2020 * |
| Skin Cancer Prevention: Behavioral Counseling: young adults, adolescents, children, and parents of young children | The USPSTF recommends counseling young adults, adolescents, children, and parents of young children about minimizing exposure to ultraviolet (UV) radiation for persons aged 6 months to 24 years with fair skin types to reduce their risk of skin cancer. | B | March 2018 * |
| Statin Use for the Primary Prevention of | The USPSTF recommends that adults without a history of cardiovascular disease (CVD) (ie, symptomatic coronary artery | | |

App. 10

| | | | |
|---|---|---|---|
| Cardiovascular Disease in Adults: Preventive Medication: adults aged 40 to 75 years with no history of cvd, 1 or more cvd risk factors, and a calculated 10-year cvd event risk of 10% or greater | disease or ischemic stroke) use a low- to moderate-dose statin for the prevention of CVD events and mortality when all of the following criteria are met: 1) they are aged 40 to 75 years; 2) they have 1 or more CVD risk factors (ie, dyslipidemia, diabetes, hypertension, or smoking); and 3) they have a calculated 10-year risk of a cardiovascular event of 10% or greater. Identification of dyslipidemia and calculation of 10-year CVD event risk requires universal lipids screening in adults aged 40 to 75 years. See the "Clinical Considerations" section for more information on lipids screening and the assessment of cardiovascular risk. | B | November 2016 * |
| Syphilis Infection in Nonpregnant Adults and Adolescents: Screening : asymptomatic, nonpregnant adults and adolescents who are at increased risk for syphilis infection | The USPSTF recommends screening for syphilis infection in persons who are at increased risk for infection. | A | June 2016 * |
| Syphilis Infection in Pregnant Women: Screening: pregnant women | The USPSTF recommends early screening for syphilis infection in all pregnant women. | A | September 2018 * |
| Interventions for Tobacco Smoking Cessation in Adults, Including Pregnant Persons: pregnant persons | The USPSTF recommends that clinicians ask all pregnant persons about tobacco use, advise them to stop using tobacco, and provide behavioral interventions for cessation to pregnant persons who use tobacco. | A | January 2021 * |
| Interventions for Tobacco Smoking Cessation in Adults, Including Pregnant Persons: nonpregnant adults | The USPSTF recommends that clinicians ask all adults about tobacco use, advise them to stop using tobacco, and provide behavioral interventions and US Food and Drug Administration (FDA)--approved pharmacotherapy for cessation to nonpregnant adults who use tobacco. | A | January 2021 * |
| Unhealthy Alcohol Use in Adolescents and Adults: Screening and Behavioral Counseling Interventions: adults 18 years or older, including pregnant women | The USPSTF recommends screening for unhealthy alcohol use in primary care settings in adults 18 years or older, including pregnant women, and providing persons engaged in risky or hazardous drinking with brief behavioral counseling interventions to reduce unhealthy alcohol use. | B | November 2018 * |

App. 11

| | | | |
|---|---|---|---|
| Unhealthy Drug Use: Screening: adults age 18 years or older | The USPSTF recommends screening by asking questions about unhealthy drug use in adults age 18 years or older. Screening should be implemented when services for accurate diagnosis, effective treatment, and appropriate care can be offered or referred. (Screening refers to asking questions about unhealthy drug use, not testing biological specimens.) | B | June 2020 |
| Vision in Children Ages 6 Months to 5 Years: Screening: children aged 3 to 5 years | The USPSTF recommends vision screening at least once in all children aged 3 to 5 years to detect amblyopia or its risk factors. | B | September 2017 * |
| Weight Loss to Prevent Obesity-Related Morbidity and Mortality in Adults: Behavioral Interventions: adults | The USPSTF recommends that clinicians offer or refer adults with a body mass index (BMI) of 30 or higher (calculated as weight in kilograms divided by height in meters squared) to intensive, multicomponent behavioral interventions. | B | September 2018 * |

Pages: 1

†The Department of Health and Human Services, under the standards set out in revised Section 2713(a)(5) of the Public Health Service Act and Section 9(h)(v)(229) of the 2015 Consolidated Appropriations Act, utilizes the 2002 recommendation on breast cancer screening of the U.S. Preventive Services Task Force. To see the USPSTF 2016 recommendation on breast cancer screening, go to http://www.uspreventiveservicestaskforce.org/uspstf/recommendation/breast-cancer-screening1.

*Previous recommendation was an "A" or "B."

App. 12

# Tab 3

**(ACIP vaccine recommendations and guidelines)**

**CDC** Centers for Disease Control and Prevention
CDC 24/7: Saving Lives, Protecting People™

# ACIP Vaccine Recommendations and Guidelines

Advisory Committee on Immunization Practices (ACIP)

## Vaccine-Specific ACIP Recommendations

- Anthrax
- BCG
- Cholera
- COVID-19  **UPDATED April 2021**
- DTaP-IPV-Hib-HepB
- DTaP/Tdap/Td
- Ebola **NEW Jan 2021**
- Hepatitis A **UPDATED Jul 2020**
- Hepatitis B
- Hib
- HPV
- Influenza **UPDATED Aug 2020**
- Japanese Encephalitis
- Measles, Mumps and Rubella
- MMRV
- Meningococcal **UPDATED Sep 2020**
- Pneumococcal
- Polio
- Rabies
- Rotavirus
- Smallpox (Vaccinia)
- Typhoid
- Varicella (Chickenpox)
- Yellow Fever
- Zoster (Shingles)

## COVID-19 Vaccination Provider Requirements and Support



Vaccination providers participating in the COVID-19 Vaccination Program must adhere to CDC requirements and ACIP recommendations related to COVID-19 vaccination. This includes vaccination prioritization, administration fees, and clinical guidance. Find additional information about these and other requirements and resources on enrollment, ordering, reporting, reimbursement, and data in support of COVID-19 vaccination.

App. 14

## ACIP Abbreviations

These abbreviations provide a uniform approach to vaccine references used in ACIP Recommendations that are published in the *MMWR*, the *Pink Book*, and the AAP *Red Book*; and in the U.S. immunization schedules for children, adolescents, and adults.

## Comprehensive ACIP Recommendations and Guidelines

- General Best Practice Guidelines on Immunization
- Immunization of Health-Care Personnel
  - See also: Influenza Vaccination of Health-Care Personnel

**NOTE:** Web version indicates the reports above are "archived" only because they were published in MMWR before January 2013. The recommendations listed above ARE CURRENT.

- See also:
  - Guidance for vaccine recommendations for pregnant and breastfeeding women
  - Vaccine guidelines for **emergency situations**
  - Archived comprehensive ACIP recommendations

Page last reviewed: July 16, 2013
Content source: National Center for Immunization and Respiratory Diseases

# Tab 4

**(Bright Futures Periodicity Schedule)**

American Academy of Pediatrics
DEDICATED TO THE HEALTH OF ALL CHILDREN®

# Recommendations for Preventive Pediatric Health Care

Bright Futures/American Academy of Pediatrics

Bright Futures.
prevention and health promotion for infants, children, adolescents, and their families™

Each child and family is unique; therefore, these Recommendations for Preventive Pediatric Health Care are designed for the care of children who are receiving competent parenting, have no manifestations of any important health problems, and are growing and developing in a satisfactory fashion. Developmental, psychosocial, and chronic disease issues for children and adolescents may require frequent counseling and treatment visits separate from preventive care visits. Additional visits also may become necessary if circumstances suggest variations from normal.

These recommendations represent a consensus by the American Academy of Pediatrics (AAP) and Bright Futures. The AAP continues to emphasize the great importance of continuity of care in comprehensive health supervision and the need to avoid fragmentation of care.

Refer to the specific guidance by age as listed in the *Bright Futures Guidelines* (Hagan JF, Shaw JS, Duncan PM, eds. *Bright Futures: Guidelines for Health Supervision of Infants, Children, and Adolescents.* 4th ed. American Academy of Pediatrics; 2017).

The recommendations in this statement do not indicate an exclusive course of treatment or serve as a standard of medical care. Variations, taking into account individual circumstances, may be appropriate.

The Bright Futures/American Academy of Pediatrics Recommendations for Preventive Pediatric Health Care are updated annually.

Copyright © 2021 by the American Academy of Pediatrics, updated March 2021.

No part of this statement may be reproduced in any form or by any means without prior written permission from the American Academy of Pediatrics except for one copy for personal use.

| | INFANCY | | | | | | | | EARLY CHILDHOOD | | | | | | | MIDDLE CHILDHOOD | | | | | | ADOLESCENCE | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **AGE[1]** | **Prenatal[2]** | **Newborn[3]** | **3-5 d[4]** | **By 1 mo** | **2 mo** | **4 mo** | **6 mo** | **9 mo** | **12 mo** | **15 mo** | **18 mo** | **24 mo** | **30 mo** | **3 y** | **4 y** | **5 y** | **6 y** | **7 y** | **8 y** | **9 y** | **10 y** | **11 y** | **12 y** | **13 y** | **14 y** | **15 y** | **16 y** | **17 y** | **18 y** | **19 y** | **20 y** | **21 y** |
| **HISTORY** Initial/Interval | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● |
| **MEASUREMENTS** | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Length/Height and Weight | | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● |
| Head Circumference | | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | | | | | | | | | | | | | | | | | | | | |
| Weight for Length | | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | | | | | | | | | | | | | | | | | | | | | |
| Body Mass Index[5] | | | | | | | | | | | | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● |
| Blood Pressure[6] | | ★ | ★ | ★ | ★ | ★ | ★ | ★ | ★ | ★ | ★ | ★ | ★ | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● |
| **SENSORY SCREENING** | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Vision[7] | | ★ | ★ | ★ | ★ | ★ | ★ | ★ | ★ | ★ | ★ | ★ | ★ | ● | ● | ● | ● | ★ | ● | ★ | ● | ★ | ● | ★ | ★ | ● | ★ | ★ | ★ | ★ | ★ | ★ |
| Hearing | | ●[8] | ●[9] → | → | → | ★ | ★ | ★ | ★ | ★ | ★ | ★ | ★ | ★ | ● | ● | ● | ★ | ● | ★ | ● | ← | ← | ●[10] | → | ← | ● | → | ← | ← | ● | → |
| **DEVELOPMENTAL/BEHAVIORAL HEALTH** | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Developmental Screening[11] | | | | | | | | ● | | | ● | | ● | | | | | | | | | | | | | | | | | | | |
| Autism Spectrum Disorder Screening[12] | | | | | | | | | | | ● | ● | | | | | | | | | | | | | | | | | | | | |
| Developmental Surveillance | | ● | ● | ● | ● | ● | ● | | ● | ● | | ● | | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● |
| Psychosocial/Behavioral Assessment[13] | | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● |
| Tobacco, Alcohol, or Drug Use Assessment[14] | | | | | | | | | | | | | | | | | | | | | | ★ | ★ | ★ | ★ | ★ | ★ | ★ | ★ | ★ | ★ | ★ |
| Depression Screening[15] | | | | | | | | | | | | | | | | | | | | | | | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● |
| Maternal Depression Screening[16] | | | | ● | ● | ● | ● | | | | | | | | | | | | | | | | | | | | | | | | | |
| **PHYSICAL EXAMINATION[17]** | | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● |
| **PROCEDURES[18]** | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Newborn Blood | | ●[19] | ●[20] → | → | → | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Newborn Bilirubin[21] | | ● | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Critical Congenital Heart Defect[22] | | ● | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Immunization[23] | | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● |
| Anemia[24] | | | | | | ★ | | | ● | ★ | ★ | ★ | ★ | ★ | ★ | ★ | ★ | ★ | ★ | ★ | ★ | ★ | ★ | ★ | ★ | ★ | ★ | ★ | ★ | ★ | ★ | ★ |
| Lead[25] | | | | | | | ★ | ★ | ● or ★[26] | | ★ | ● or ★[26] | | ★ | ★ | ★ | ★ | | | | | | | | | | | | | | | |
| Tuberculosis[27] | | | | ★ | | | ★ | | ★ | | | ★ | | ★ | ★ | ★ | ★ | ★ | ★ | ★ | ★ | ★ | ★ | ★ | ★ | ★ | ★ | ★ | ★ | ★ | ★ | ★ |
| Dyslipidemia[28] | | | | | | | | | | | | ★ | | | ★ | | ★ | | ★ | ← | ● | → | ★ | ★ | ★ | ★ | ★ | ← | ← | ← | ● | → |
| Sexually Transmitted Infections[29] | | | | | | | | | | | | | | | | | | | | | | ★ | ★ | ★ | ★ | ★ | ★ | ★ | ★ | ★ | ★ | ★ |
| HIV[30] | | | | | | | | | | | | | | | | | | | | | | ★ | ★ | ★ | ★ | ← | ← | ● | → | ★ | ★ | ★ |
| Hepatitis C Virus Infection[31] | | | | | | | | | | | | | | | | | | | | | | | | | | | | | ● | → | → | → |
| Cervical Dysplasia[32] | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | ● |
| **ORAL HEALTH[33]** | | | | | | | ●[34] | ●[34] | ★ | | ★ | ★ | ★ | ★ | ★ | ★ | ★ | | | | | | | | | | | | | | | |
| Fluoride Varnish[35] | | | | | | | ← | ← | ← | ← | ● | → | → | → | → | → | | | | | | | | | | | | | | | | |
| Fluoride Supplementation[36] | | | | | | | ★ | ★ | ★ | | ★ | ★ | ★ | ★ | ★ | ★ | ★ | ★ | ★ | ★ | ★ | ★ | ★ | ★ | ★ | ★ | ★ | | | | | |
| **ANTICIPATORY GUIDANCE** | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● |

1. If a child comes under care for the first time at any point on the schedule, or if any items are not accomplished at the suggested age, the schedule should be brought up to date at the earliest possible time.
2. A prenatal visit is recommended for parents who are at high risk, for first-time parents, and for those who request a conference. The prenatal visit should include anticipatory guidance, pertinent medical history, and a discussion of benefits of breastfeeding and planned method of feeding, per "The Prenatal Visit" (https://pediatrics.aappublications.org/content/142/1/e20181218).
3. Newborns should have an evaluation after birth, and breastfeeding should be encouraged (and instruction and support should be offered).
4. Newborns should have an evaluation within 3 to 5 days of birth and within 48 to 72 hours after discharge from the hospital to include evaluation for feeding and jaundice. Breastfeeding newborns should receive formal breastfeeding evaluation, and their mothers should receive encouragement and instruction, as recommended in "Breastfeeding and the Use of Human Milk" (http://pediatrics.aappublications.org/content/129/3/e827.full). Newborns discharged less than 48 hours after delivery must be examined within 48 hours of discharge, per "Hospital Stay for Healthy Term Newborns" (http://pediatrics.aappublications.org/content/125/2/405.full).
5. Screen, per "Expert Committee Recommendations Regarding the Prevention, Assessment, and Treatment of Child and Adolescent Overweight and Obesity: Summary Report" (http://pediatrics.aappublications.org/content/120/Supplement_4/S164.full)
6. Screening should occur per "Clinical Practice Guideline for Screening and Management of High Blood Pressure in Children and Adolescents" (http://pediatrics.aappublications.org/content/140/3/e20171904). Blood pressure measurement in infants and children with specific risk conditions should be performed at visits before age 3 years.
7. A visual acuity screen is recommended at ages 4 and 5 years, as well as in cooperative 3-year-olds. Instrument-based screening may be used to assess risk at ages 12 and 24 months, in addition to the well visits at 3 through 5 years of age. See "Visual System Assessment in Infants, Children, and Young Adults by Pediatricians" (http://pediatrics.aappublications.org/content/137/1/e20153596) and "Procedures for the Evaluation of the Visual System by Pediatricians" (http://pediatrics.aappublications.org/content/137/1/e20153597).
8. Confirm initial screen was completed, verify results, and follow up, as appropriate. Newborns should be screened, per "Year 2007 Position Statement: Principles and Guidelines for Early Hearing Detection and Intervention Programs" (http://pediatrics.aappublications.org/content/120/4/898.full).
9. Verify results as soon as possible, and follow up, as appropriate.
10. Screen with audiometry including 6,000 and 8,000 Hz high frequencies once between 11 and 14 years, once between 15 and 17 years, and once between 18 and 21 years. See "The Sensitivity of Adolescent Hearing Screens Significantly Improves by Adding High Frequencies" (https://www.sciencedirect.com/science/article/abs/pii/S1054139X16000483).
11. Screening should occur per "Promoting Optimal Development: Identifying Infants and Young Children With Developmental Disorders Through Developmental Surveillance and Screening" (https://pediatrics.aappublications.org/content/145/1/e20193449).
12. Screening should occur per "Identification, Evaluation, and Management of Children With Autism Spectrum Disorder" (https://pediatrics.aappublications.org/content/145/1/e20193447).
13. This assessment should be family centered and may include an assessment of child social-emotional health, caregiver depression, and social determinants of health. See "Promoting Optimal Development: Screening for Behavioral and Emotional Problems" (http://pediatrics.aappublications.org/content/135/2/384) and "Poverty and Child Health in the United States" (http://pediatrics.aappublications.org/content/137/4/e20160339).
14. A recommended assessment tool is available at http://crafft.org.
15. Recommended screening using the Patient Health Questionnaire (PHQ)-2 or other tools available in the GLAD-PC toolkit and at https://downloads.aap.org/AAP/PDF/Mental_Health_Tools_for_Pediatrics.pdf.
16. Screening should occur per "Incorporating Recognition and Management of Perinatal Depression Into Pediatric Practice" (https://pediatrics.aappublications.org/content/143/1/e20183259).
17. At each visit, age-appropriate physical examination is essential, with infant totally unclothed and older children undressed and suitably draped. See "Use of Chaperones During the Physical Examination of the Pediatric Patient" (http://pediatrics.aappublications.org/content/127/5/991.full).
18. These may be modified, depending on entry point into schedule and individual need.
19. Confirm initial screen was accomplished, verify results, and follow up, as appropriate. The Recommended Uniform Screening Panel (https://www.hrsa.gov/advisory-committees/heritable-disorders/rusp/index.html), as determined by The Secretary's Advisory Committee on Heritable Disorders in Newborns and Children, and state newborn screening laws/regulations (https://www.babysfirsttest.org/newborn-screening/states) establish the criteria for and coverage of newborn screening procedures and programs.

*(continued)*

**KEY:** ● = to be performed ★ = risk assessment to be performed with appropriate action to follow, if positive ←—●—→ = range during which a service may be provided

BFNC.2021.PSFEB
3-359/0221

(continued)

20. Verify reactivity as soon as possible, and follow-up as appropriate.
21. Confirm initial screening was accomplished, verify results, and follow-up as appropriate. See the periodicity schedule for a risk-based schedule (https://www.aap.org/en-us/Documents/periodicity_schedule.pdf). Clarification (http://pediatrics.aappublications.org/content/134/4/e1001).
22. Screening should occur per "2017 AAP/AHA/ACC guidance and reporting should be performed in accordance with the Division of Adolescent and Young Adult Health at the Centers for Disease Control and Prevention.
23. Screening per the AAP Committee on Adolescence and the AAP Bright Futures. See "Guidelines for Adolescent Depression in Primary Care (GLAD-PC): Part I. Practice Preparation, Identification, Assessment, and Initial Management" (http://pediatrics.aappublications.org/content/141/3/e20174081).
24. Perform risk assessment or screening, as appropriate, per recommendations in the current edition of the AAP Pediatric Nutrition: Policy of the American Academy of Pediatrics.
25. Perform dyslipidemia screening once per "Integrated Guidelines for Cardiovascular Health and Risk Reduction in Children and Adolescents" (http://pediatrics.aappublications.org/content/128/Supplement_5/S213).
26. For children at risk of lead exposure, see "Prevention of Childhood Lead Toxicity" (http://pediatrics.aappublications.org/content/138/1/e20161493) and Low Level Lead Exposure Harms Children: A Renewed Call for Primary Prevention (https://www.cdc.gov/nceh/lead/acclpp/final_document_030712.pdf).
27. Tuberculosis testing per recommendations of the AAP Committee on Infectious Diseases, published in the current edition of the AAP Red Book: Report of the Committee on Infectious Diseases. Testing should be performed on recognition of high-risk factors.
28. Administer recommended immunizations according to the schedule found at https://www.cdc.gov/vaccines/schedules.
29. Adolescents should be screened for sexually transmitted infections (STIs) per recommendations in the current edition of the AAP Red Book: Report of the Committee on Infectious Diseases.
30. Adolescents should be screened for HIV according to the US Preventive Services Task Force (USPSTF) recommendations (https://www.uspreventiveservicestaskforce.org/uspstf/recommendation/human-immunodeficiency-virus-hiv-infection-screening) once between the ages of 15 and 18, making every effort to preserve confidentiality of the adolescent. Those at increased risk of HIV infection, including those who are sexually active, participate in injection drug use, or are being tested for other STIs, should be tested for HIV and reassessed annually.

31. All individuals should be screened for hepatitis C virus (HCV) infection according to the USPSTF (https://www.uspreventiveservicestaskforce.org/uspstf/recommendation/hepatitis-c-screening) and CDC (https://www.cdc.gov/hepatitis/hcv/guidelinesc.htm) recommendations at least once between the ages of 18 and 79 years. The AAP recommends screening for those who are at risk for or suspect injection drug use, should be screened per recommendations.
32. See USPSTF recommendations (https://www.uspreventiveservicestaskforce.org/uspstf/recommendation/syphilis-screening-nonpregnant-adolescents-and-adults). Indications for syphilis screening listed in the current edition of the AAP Red Book: Report of the Committee on Infectious Diseases.
33. Assess whether the child is behind on immunizations if vaccines not administered. Additional information available at http://redbook.solutions.aap.org/selfserve/ssPage.aspx?SelfServeContentId=Schedules.asp. Every visit should be an opportunity to update and complete a child's immunizations.
34. Perform risk assessments or screenings as appropriate, based on universal screening requirements for patients with Medicaid or in high-prevalence areas.
35. See "Maintaining and Improving the Oral Health of Young Children" (http://pediatrics.aappublications.org/content/134/6/1224).
36. Perform risk assessment or screening, as appropriate (https://www.aap.org/en-us/advocacy-and-policy/aap-health-initiatives/Oral-Health/Pages/Oral-Health-Practice-Tools.aspx). See "Fluoride Use in Caries Prevention in the Primary Care Setting" (http://pediatrics.aappublications.org/content/134/3/626).



Summary of Changes Made to the Bright Futures/AAP Recommendations for Preventive Pediatric Health Care (Periodicity Schedule)

This schedule reflects changes approved in November 2020 and published in March 2021. For updates and a list of previous changes made, visit www.aap.org/periodicityschedule.

CHANGES MADE IN NOVEMBER 2020

DEVELOPMENTAL
• Footnote 11 has been updated to read as follows: "Screening should occur per 'Promoting Optimal Development: Identifying Infants and Young Children With Developmental Disorders Through Developmental Surveillance and Screening' (https://pediatrics.aappublications.org/content/145/1/e20193449)."

AUTISM SPECTRUM DISORDER
• Footnote 12 has been updated to read as follows: "Screening should occur per Identification, Evaluation, and Management of Children With Autism Spectrum Disorder (https://pediatrics.aappublications.org/content/145/1/e20193447)."

HEPATITIS C VIRUS INFECTION
• Screening for hepatitis C virus infection has been added to occur at least once between the ages of 18 and 79 years to be consistent with recommendations of the USPSTF and CDC.
• Footnote 31 has been added to read as follows: "All individuals should be screened for hepatitis C virus (HCV) infection according to the USPSTF (https://www.uspreventiveservicestaskforce.org/uspstf/recommendation/hepatitis-c-screening) and Centers for Disease Control and Prevention (CDC) recommendations (https://www.cdc.gov/hepatitis/hcv/guidelinesc.htm) at least once between the ages of 18 and 79 years. Those at increased risk of HCV infection, including those who are persons with past or current injection drug use, should be tested for HCV infection and reassessed annually."
• Footnotes 31 through 35 have been renumbered as footnotes 32 through 36.

CHANGES MADE IN OCTOBER 2019

MATERNAL DEPRESSION
• Footnote 18 has been updated to read as follows: "Screening should occur per Incorporating Recognition and Management of Perinatal Depression into Pediatric Practice (https://pediatrics.aappublications.org/content/143/1/e20183259)."

CHANGES MADE IN DECEMBER 2018

BLOOD PRESSURE
• Footnote 6 has been updated to read as follows: "Screening should occur per Clinical Practice Guideline for Screening and Management of High Blood Pressure in Children and Adolescent (https://pediatrics.aappublications.org/content/140/3/e20171904). Blood pressure measurement in infants and children with specific risk conditions should be performed at visits before age 3 years."

HEMA
• Footnote 24 has been updated to read as follows: "For children at risk of lead exposure, see 'Prevention of Childhood Lead Toxicity' (https://pediatrics.aappublications.org/content/138/1/e20161493) and Low Level Lead Exposure Harms Children: A Renewed Call for Primary Prevention (https://www.cdc.gov/nceh/lead/acclpp/final_document_030712.pdf)."



HRSA

This project is supported by the Health Resources and Services Administration (HRSA) of the US Department of Health and Human Services (HHS) as part of an award totaling $3,200,000 with 0 percentage financed with nongovernmental sources. The contents are those of the author(s) and do not necessarily represent the official views of, nor an endorsement, by HRSA, HHS, or the US Government. For more information, please visit HRSA.gov.

App. 18

# Tab 5
## (HRSA's women's preventive services guidelines)

Health Resources & Services Administration                                                    Explore

**Get reimbursed for COVID-19 testing and treatment of uninsured individuals.**   Learn more »



Home > Women's Preventive Services Guidelines

# Women's Preventive Services Guidelines

   On December 17, 2019, HRSA updated the HRSA-supported Women's Preventive Services Guidelines. Read the most current version.

*Non-grandfathered plans and coverage (generally, plans or policies created or sold after March 23, 2010, or older plans or policies that have been changed in certain ways since that date) are required to provide coverage without cost sharing consistent with these guidelines beginning with the first plan year (in the individual market policy year) that begins on or after December 17, 2020. Before that time, non-grandfathered plans are generally required to provide coverage without cost sharing consistent with the previously issued guidelines.*

In 2018, the HRSA-supported Women's Preventive Services Initiative released the Well Woman Chart ⧉, a resource that includes age-based preventive service recommendations for women from adolescence to maturity. The chart does not include updates to the HRSA-supported comprehensive guidelines, but provides additional clarity for patients and providers, with the goal of improving women's health across the life span.

## Affordable Care Act Expands Prevention Coverage for Women's Health and Well-Being

The Affordable Care Act – the health insurance reform legislation passed by Congress and signed into law by President Obama on March 23, 2010 – helps make prevention affordable and accessible for all Americans by requiring health plans to cover preventive services and by eliminating cost sharing for those services. Preventive services that have strong scientific evidence of their health benefits must be covered and plans can no longer charge a patient a copayment, coinsurance or deductible for these services when they are delivered by a network provider.

## Women's Preventive Services Guidelines Supported by the Health Resources and Services Administration

Under the Affordable Care Act, women's preventive health care – such as mammograms, screenings for cervical cancer, prenatal care, and other services – generally must be covered with no cost sharing. However, the law recognizes and HHS understands the need to take into account the unique health needs of women throughout their lifespan.

The HRSA-supported health plan coverage guidelines, developed by the Institute of Medicine (IOM), will help ensure that women receive a comprehensive set of preventive services without having to pay a co-payment, co-insurance or a deductible. HHS commissioned an IOM study to review what preventive services are necessary for women's health and well-being and therefore should be considered in the development of comprehensive guidelines for preventive services for women. HRSA is supporting the IOM's recommendations on preventive services that address health needs specific to women and fill gaps in existing guidelines.

Health Resources and Services Administration Women's Preventive Services Guidelines

## Learn More

- Women's Preventive Services Initiative report ⧉
- 2011 IOM Report *Clinical Preventive Services for Women: Closing the Gaps* ⧉
- 2016 Guidelines
- US Preventive Services Task Force ⧉
- Bright Futures ⧉
- Advisory Committee on Immunization Practices ⧉

## For Further Information

Contact wellwomancare@hrsa.gov.

**App. 20**

*Non-grandfathered plans (plans or policies created or sold after March 23, 2010, or older plans or policies that have been changed in certain ways since that date) generally are required to provide coverage without cost sharing consistent with these guidelines in the first plan year (in the individual market, policy year) that begins on or after August 1, 2012.*

| Type of Preventive Service | HHS Guideline for Health Insurance Coverage | Frequency |
|---|---|---|
| **Well-woman visits.** | Well-woman preventive care visit annually for adult women to obtain the recommended preventive services that are age and developmentally appropriate, including preconception care and many services necessary for prenatal care. This well-woman visit should, where appropriate, include other preventive services listed in this set of guidelines, as well as others referenced in section 2713. | Annual, although HHS recognizes that several visits may be needed to obtain all necessary recommended preventive services, depending on a woman's health status, health needs, and other risk factors.* (see note) |
| **Screening for gestational diabetes.** | Screening for gestational diabetes. | In pregnant women between 24 and 28 weeks of gestation and at the first prenatal visit for pregnant women identified to be at high risk for diabetes. |
| **Human papillomavirus testing.** | High-risk human papillomavirus DNA testing in women with normal cytology results. | Screening should begin at 30 years of age and should occur no more frequently than every 3 years. |
| **Counseling for sexually transmitted infections.** | Counseling on sexually transmitted infections for all sexually active women. | Annual. |
| **Counseling and screening for human immune-deficiency virus.** | Counseling and screening for human immune-deficiency virus infection for all sexually active women. | Annual. |
| **Contraceptive methods and counseling. \*\* , \*\*\* (see note)** | All Food and Drug Administration approved contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity. | As prescribed. |
| **Breastfeeding support, supplies, and counseling.** | Comprehensive lactation support and counseling, by a trained provider during pregnancy and/or in the postpartum period, and costs for renting breastfeeding equipment. | In conjunction with each birth. |

**App. 21**

| Screening and counseling for interpersonal and domestic violence. | Screening and counseling for interpersonal and domestic violence. | Annual. |
|---|---|---|
| Screening for anxiety. | Screening for anxiety in adolescent and adult women, including those who are pregnant or postpartum. Optimal screening intervals are unknown and clinical judgement should be used to determine screening frequency. | As prescribed. |
| Screening for breast cancer. | Screening for breast cancer by mammography in average-risk women no earlier than age 40 and no later than age 50. Screening should continue through at least age 74 and age alone should not be the basis to discontinue screening. | Screening mammography should occur at least biennially and as frequently as annually. |
| Screening for diabetes mellitus after pregnancy. | Screening for diabetes mellitus in women with a history of gestational diabetes mellitus (GDM) who are not currently pregnant and who have not previously been diagnosed with type 2 diabetes mellitus . | Initial testing should ideally occur within the first year postpartum and can be conducted as early as 4–6 weeks postpartum. |
| Screening for urinary incontinence. | Screening for urinary incontinence. | Annual. |

_* Refer to guidance issued by the Center for Consumer Information and Insurance Oversight entitled Affordable Care Act Implementation FAQs, Set 12, Q10.

**(I)(a) Objecting entities—religious beliefs.

(1) These Guidelines do not provide for or support the requirement of coverage or payments for contraceptive services with respect to a group health plan established or maintained by an objecting organization, or health insurance coverage offered or arranged by an objecting organization, and thus the Health Resources and Service Administration exempts from any Guidelines requirements issued under 45 CFR 147.130(a)(1)(iv) that relate to the provision of contraceptive services:
(i) A group health plan and health insurance coverage provided in connection with a group health plan to the extent the non-governmental plan sponsor objects as specified in paragraph (I)(a)(2) of this note. Such non-governmental plan sponsors include, but are not limited to, the following entities:
(A) A church, an integrated auxiliary of a church, a convention or association of churches, or a religious order;
(B) A nonprofit organization;
(C) A closely held for-profit entity;
(D) A for-profit entity that is not closely held; or
(E) Any other non-governmental employer;
(ii) An institution of higher education as defined in 20 U.S.C. 1002 in its arrangement of student health insurance coverage, to the extent that institution objects as specified in paragraph (I)(a)(2) of this note. In the case of student health insurance coverage, section (I) of this note is applicable in a manner comparable to its applicability to group health insurance coverage provided in connection with a group health plan established or maintained by a plan sponsor that is an employer, and references to "plan participants and beneficiaries" will be interpreted as references

*to student enrollees and their covered dependents; and*

*(iii) A health insurance issuer offering group or individual insurance coverage to the extent the issuer objects as specified in paragraph (I)(a)(2) of this note. Where a health insurance issuer providing group health insurance coverage is exempt under this paragraph (I)(a)(1)(iii), the plan remains subject to any requirement to provide coverage for contraceptive services under these Guidelines unless it is also exempt from that requirement.*

*(2) The exemption of this paragraph (I)(a) will apply to the extent that an entity described in paragraph (I)(a)(1) of this note objects to its establishing, maintaining, providing, offering, or arranging (as applicable) coverage, payments, or a plan that provides coverage or payments for some or all contraceptive services, based on its sincerely held religious beliefs.*

*(b) Objecting individuals—religious beliefs. These Guidelines do not provide for or support the requirement of coverage or payments for contraceptive services with respect to individuals who object as specified in this paragraph (I)(b), and nothing in 45 CFR 147.130(a)(1)(iv), 26 CFR 54.9815–2713(a) (1)(iv), or 29 CFR 2590.715-2713(a)(1)(iv) may be construed to prevent a willing health insurance issuer offering group or individual health insurance coverage, and as applicable, a willing plan sponsor of a group health plan, from offering a separate benefit package option, or a separate policy, certificate or contract of insurance, to any individual who objects to coverage or payments for some or all contraceptive services based on sincerely held religious beliefs.*

*(II)(a) Objecting entities—moral convictions.*

*(1) These Guidelines do not provide for or support the requirement of coverage or payments for contraceptive services with respect to a group health plan established or maintained by an objecting organization, or health insurance coverage offered or arranged by an objecting organization, and thus the Health Resources and Service Administration exempts from any Guidelines requirements issued under 45 CFR 147.130(a)(1)(iv) that relate to the provision of contraceptive services:*

*(i) A group health plan and health insurance coverage provided in connection with a group health plan to the extent one of the following non-governmental plan sponsors object as specified in paragraph (II)(a)(2) of this note:*

*(A) A nonprofit organization; or*

*(B) A for-profit entity that has no publicly traded ownership interests (for this purpose, a publicly traded ownership interest is any class of common equity securities required to be registered under section 12 of the Securities Exchange Act of 1934);*

*(ii) An institution of higher education as defined in 20 U.S.C. 1002 in its arrangement of student health insurance coverage, to the extent that institution objects as specified in paragraph (II)(a)(2) of this note. In the case of student health insurance coverage, section (I) of this note is applicable in a manner comparable to its applicability to group health insurance coverage provided in connection with a group health plan established or maintained by a plan sponsor that is an employer, and references to "plan participants and beneficiaries" will be interpreted as references to student enrollees and their covered dependents; and*

*(iii) A health insurance issuer offering group or individual insurance coverage to the extent the issuer objects as specified in paragraph (II)(a)(2) of this note. Where a health insurance issuer providing group health insurance coverage is exempt under this paragraph (II)(a)(1)(iii), the group health plan established or maintained by the plan sponsor with which the health insurance issuer contracts remains subject to any requirement to provide coverage for contraceptive services under these Guidelines unless it is also exempt from that requirement.*

*(2) The exemption of this paragraph (II)(a) will apply to the extent that an entity described in paragraph (II)(a)(1) of this note objects to its establishing, maintaining, providing, offering, or arranging (as applicable) coverage or payments for some or all contraceptive services, or for a plan, issuer, or third party administrator that provides or arranges such coverage or payments, based on its sincerely held moral convictions.*

*(b) Objecting individuals—moral convictions. These Guidelines do not provide for or support the requirement of coverage or payments for contraceptive services with respect to individuals who object as specified in this paragraph (II)(b), and nothing in § 147.130(a)(1)(iv), 26 CFR 54.9815–2713(a) (1)(iv), or 29 CFR 2590.715-2713(a)(1)(iv) may be construed to prevent a willing health insurance issuer offering group or individual health insurance coverage, and as applicable, a willing plan sponsor of a group health plan, from offering a separate policy, certificate or contract of insurance or a separate group health plan or benefit package option, to any individual who objects to coverage or payments for some or all contraceptive services based on sincerely held moral convictions.*

*(III) Definition. For the purposes of this note, reference to "contraceptive" services, benefits, or coverage includes contraceptive or sterilization items, procedures, or services, or related patient education or counseling, to the extent specified for purposes of these Guidelines.*

*See Federal Register Notice:* [*Religious Exemptions and Accommodations for Coverage of Certain Preventive Services under the Affordable Care Act*](#) *(PDF - 488 kb).*

HRSA, in concert with an external review committee, will review, and continually update, the [*Women's Preventive Services' Guidelines*](#).

*\*\*\* General Notice*

*On July 29, 2019, in a case in the Northern District of Texas, DeOtte v. Azar, No. 4:18-CV-00825-O, 2019 WL 3786545 (N.D. Tex. July 29, 2019) the court determined that the "Contraceptive Mandate, codified at 42 U.S.C. § 300gg–13(a)(4), 45 C.F.R. § 147.130(a)(1)(iv), 29 C.F.R. § 2590.715–2713(a)(1) (iv), and 26 C.F.R. § 54.9815–2713(a)(1)(iv), violates the Religious Freedom Restoration Act" with respect to individuals and entities with religious objections to contraceptive coverage and thus enjoined enforcement of those provisions against such individuals and entities.*

Date Last Reviewed:  October 2020

 **About HRSA**　　　　 **Connect with HRSA**　　　　 **Find Health Services**

- [**Bureaus & Offices**](#)
- [**Budget**](#)
- [**Strategic Plan**](#)
- [**Working at HRSA**](#)
- [**About HRSA**](#)

   

Health Center

HIV Medical Care and Treatment

 Sign up for email updates

 Locate other health services

Contact Us  |  Viewers & Players  |  Privacy Policy  |  Disclaimers  |  Accessibility  |  Freedom of Information Act  |  EEO/No FEAR Act
U.S. Department of Health and Human Services  |  USA.gov  |  Whitehouse.gov

Language Assistance Available

[Español](#)

[繁體中文](#)

[Tiếng Việt](#)

[한국어](#)

[Tagalog](#)

[Русский](#)

[العربية](#)

[Kreyòl Ayisyen](#)

[Français](#)

[Polski](#)

[Português](#)

[Italiano](#)

[Deutsch](#)

[日本語](#)

**App. 24**

Health Resources & Services Administration                                          Explore

**Get reimbursed for COVID-19 testing and treatment of uninsured individuals.**   Learn more »



Home > Women's Preventive Services Guidelines > Women's Preventive Services Guidelines

# Women's Preventive Services Guidelines

## Guideline Development

The HRSA-supported Women's Preventive Services Guidelines were originally established in 2011 based on recommendations from a Department of Health and Human Services' commissioned study by the Institute of Medicine (IOM), now known as the National Academy of Medicine (NAM). Since then, there have been advancements in science and gaps identified in the existing guidelines, including a greater emphasis on practice-based clinical considerations.  To address these, the Health Resources and Services Administration (HRSA) awarded a five-year cooperative agreement in March 2016 to convene a coalition of clinician, academic, and consumer-focused health professional organizations and conduct a scientifically rigorous review to develop recommendations for updated Women's Preventive Services Guidelines in accordance with the model created by the NAM *Clinical Practice Guidelines We Can Trust*. The American College of Obstetricians and Gynecologists was awarded the cooperative agreement and formed an expert panel called the Women's Preventive Services Initiative.

The purpose of the Women's Preventive Services Guidelines is to improve women's health across the lifespan by identifying preventive services and screenings to be used in clinical practice. The Women's Preventive Services Initiative will review the recommendations biennially, or upon the availability of new evidence.  Topics for future consideration can also be submitted on a rolling basis at the Women's Preventive Services Initiative website.

Under section 2713 of the Public Health Service Act, non-grandfathered group health plans and issuers of non-grandfathered group and individual health insurance coverage are required to cover specified preventive services without a copayment, coinsurance, deductible, or other cost sharing, including preventive care and screenings for women as provided for in comprehensive guidelines supported by HRSA for this purpose.

## Updated HRSA-Supported Women's Preventive Services Guidelines

HRSA is supporting the Women's Preventive Services Initiative clinical recommendations listed below for preventive services that address health needs specific to women and fill gaps in existing guidelines.*

### Screening for Anxiety

The Women's Preventive Services Initiative recommends screening for anxiety in adolescent and adult women, including those who are pregnant or postpartum. Optimal screening intervals are unknown and clinical judgement should be used to determine screening frequency. Given the high prevalence of anxiety disorders, lack of recognition in clinical practice, and multiple problems associated with untreated anxiety, clinicians should consider screening women who have not been recently screened.

### Breast Cancer Screening for Average-Risk Women

The Women's Preventive Services Initiative recommends that average-risk women initiate mammography screening no earlier than age 40 and no later than age 50. Screening

## Learn More

- Women's Preventive Services Initiative report
- 2011 IOM Report *Clinical Preventive Services for Women: Closing the Gaps*
- 2016 Guidelines
- US Preventive Services Task Force
- Bright Futures
- Advisory Committee on Immunization Practices

## For Further Information

Contact wellwomancare@hrsa.gov.

**App. 26**

mammography should occur at least biennially and as frequently as annually. Screening should continue through at least age 74 and age alone should not be the basis to discontinue screening.

These screening recommendations are for women at average risk of breast cancer. Women at increased risk should also undergo periodic mammography screening, however, recommendations for additional services are beyond the scope of this recommendation.

## Breastfeeding Services and Supplies

The Women's Preventive Services Initiative recommends comprehensive lactation support services (including counseling, education, and breastfeeding equipment and supplies) during the antenatal, perinatal, and the postpartum period to ensure the successful initiation and maintenance of breastfeeding.

## Screening for Cervical Cancer

The Women's Preventive Services Initiative recommends cervical cancer screening for average-risk women aged 21 to 65 years. For women aged 21 to 29 years, the Women's Preventive Services Initiative recommends cervical cancer screening using cervical cytology (Pap test) every 3 years. Cotesting with cytology and human papillomavirus testing is not recommended for women younger than 30 years. Women aged 30 to 65 years should be screened with cytology and human papillomavirus testing every 5 years or cytology alone every 3 years. Women who are at average risk should not be screened more than once every 3 years.

## Contraception**, ***

The Women's Preventive Services Initiative recommends that adolescent and adult women have access to the full range of female-controlled contraceptives to prevent unintended pregnancy and improve birth outcomes.  Contraceptive care should include contraceptive counseling, initiation of contraceptive use, and follow-up care (e.g., management, and evaluation as well as changes to and removal or discontinuation of the contraceptive method). The Women's Preventive Services Initiative recommends that the full range of female-controlled U.S. Food and Drug Administration-approved contraceptive methods, effective family planning practices, and sterilization procedures be available as part of contraceptive care.

The full range of contraceptive methods for women currently identified by the U.S. Food and Drug Administration include: (1) sterilization surgery for women, (2) surgical sterilization via implant for women, (3) implantable rods, (4) copper intrauterine devices, (5) intrauterine devices with progestin (all durations and doses), (6) the shot or injection, (7) oral contraceptives (combined pill), 8) oral contraceptives (progestin only, and), (9) oral contraceptives (extended or continuous use), (10) the contraceptive patch, (11) vaginal contraceptive rings, (12) diaphragms, (13) contraceptive sponges, (14) cervical caps, (15) female condoms, (16) spermicides, and (17) emergency contraception (levonorgestrel), and (18) emergency contraception (ulipristal acetate), and additional methods as identified by the FDA.  Additionally, instruction in fertility awareness-based methods, including the lactation amenorrhea method, although less effective, should be provided for women desiring an alternative method.

## Screening for Gestational Diabetes Mellitus

The Women's Preventive Services Initiative recommends screening pregnant women for gestational diabetes mellitus after 24 weeks of gestation (preferably between 24 and 28 weeks of gestation) in order to prevent adverse birth outcomes. Screening with a 50-g oral glucose challenge test (followed by a 3-hour 100- g oral glucose tolerance test if results on the initial oral glucose challenge test are abnormal) is preferred because of its high sensitivity and specificity.

The Women's Preventive Services Initiative suggests that women with risk factors for diabetes mellitus be screened for preexisting diabetes before 24 weeks of gestation—ideally at the first prenatal visit, based on current clinical best practices.

## Screening for Human Immunodeficiency Virus Infection

The Women's Preventive Services Initiative recommends prevention education and risk assessment for human immunodeficiency virus (HIV) infection in adolescents and women at least annually throughout the lifespan.  All women should be tested for HIV at least once during their lifetime. Additional screening should be based on risk, and screening annually or more often may

be appropriate for adolescents and women with an increased risk of HIV infection.

Screening for HIV is recommended for all pregnant women upon initiation of prenatal care with retesting during pregnancy based on risk factors.  Rapid HIV testing is recommended for pregnant women who present in active labor with an undocumented HIV status. Screening during pregnancy enables prevention of vertical transmission.

## Screening for Interpersonal and Domestic Violence

The Women's Preventive Services Initiative recommends screening adolescents and women for interpersonal and domestic violence at least annually, and, when needed, providing or referring for initial intervention services. Interpersonal and domestic violence includes physical violence, sexual violence, stalking and psychological aggression (including coercion), reproductive coercion, neglect, and the threat of violence, abuse, or both. Intervention services include, but are not limited to, counseling, education, harm reduction strategies, and referral to appropriate supportive services.

## Counseling for Sexually Transmitted Infections

The Women's Preventive Services Initiative recommends directed behavioral counseling by a health care provider or other appropriately trained individual for sexually active adolescent and adult women at an increased risk for sexually transmitted infections (STIs).

The Women's Preventive Services Initiative recommends that health care providers use a woman's sexual history and risk factors to help identify those at an increased risk of STIs. Risk factors may include age younger than 25, a recent history of an STI, a new sex partner, multiple partners, a partner with concurrent partners, a partner with an STI, and a lack of or inconsistent condom use. For adolescents and women not identified as high risk, counseling to reduce the risk of STIs should be considered, as determined by clinical judgement.

## Well-Woman Preventive Visits

The Women's Preventive Services Initiative recommends that women receive at least one preventive care visit per year beginning in adolescence and continuing across the lifespan to ensure that the recommended preventive services, including preconception, and many services necessary for prenatal and interconception care are obtained.  The primary purpose of these visits should be the delivery and coordination of recommended preventive services as determined by age and risk factors.

## Screening for Urinary Incontinence

The Women's Preventive Services Initiative recommends screening women for urinary incontinence annually. Screening should ideally assess whether women experience urinary incontinence and whether it impacts their activities and quality of life. The Women's Preventive Services Initiative recommends referring women for further evaluation and treatment if indicated.

The Women's Preventive Services Initiative recommends screening women for urinary incontinence as a preventive service. Factors associated with an increased risk for urinary incontinence include increasing parity, advancing age, and obesity; however, these factors should not be used to limit screening.

Several screening tools demonstrate fair to high accuracy in identifying urinary incontinence in women. Although minimum screening intervals are unknown, given the prevalence of urinary incontinence, the fact that many women do not volunteer symptoms, and the multiple, frequently-changing risk factors associated with incontinence, it is reasonable to conduct annually.

## Screening for Diabetes Mellitus after Pregnancy

The Women's Preventive Services Initiative recommends women with a history of gestational diabetes mellitus (GDM) who are not currently pregnant and who have not previously been diagnosed with type 2 diabetes mellitus should be screened for diabetes mellitus. Initial testing should ideally occur within the first year postpartum and can be conducted as early as 4–6 weeks postpartum.

Women with a negative initial postpartum screening test result should be rescreened at least every 3 years for a minimum of 10 years after pregnancy. For women with a positive postpartum

screening test result, testing to confirm the diagnosis of diabetes is indicated regardless of the initial test (eg, oral glucose tolerance test, fasting plasma glucose, or hemoglobin A1c). Repeat testing is indicated in women who were screened with hemoglobin A1c in the first 6 months postpartum regardless of the result.

## Implementation Considerations

While not included as part of the HRSA-supported guidelines, the Women's Preventive Services Initiative also developed implementation considerations, available at http://www.womenspreventivehealth.org/ (link), which provide additional clarity on implementation of the guidelines into clinical practice.  The implementation considerations are separate from the clinical recommendations, are informational, and are not part of the formal action by the Administrator under Section 2713.

---

*Non-grandfathered plans and coverage (generally, plans or policies created or sold after March 23, 2010, or older plans or policies that have been changed in certain ways since that date) are required to provide coverage without cost sharing consistent with these guidelines beginning with the first plan year (in the individual market policy year) that begins on or after December 20, 2017. Before that time, non-grandfathered plans are generally required to provide coverage without cost sharing consistent with the 2011 guidelines.*

**(I)(a) Objecting entities—religious beliefs.*

*(1) These Guidelines do not provide for or support the requirement of coverage or payments for contraceptive services with respect to a group health plan established or maintained by an objecting organization, or health insurance coverage offered or arranged by an objecting organization, and thus the Health Resources and Service Administration exempts from any Guidelines requirements issued under 45 CFR 147.130(a)(1)(iv) that relate to the provision of contraceptive services:*
*(i) A group health plan and health insurance coverage provided in connection with a group health plan to the extent the non-governmental plan sponsor objects as specified in paragraph (I)(a)(2) of this note. Such non-governmental plan sponsors include, but are not limited to, the following entities:*
*(A) A church, an integrated auxiliary of a church, a convention or association of churches, or a religious order;*
*(B) A nonprofit organization;*
*(C) A closely held for-profit entity;*
*(D) A for-profit entity that is not closely held; or*
*(E) Any other non-governmental employer;*
*(ii) An institution of higher education as defined in 20 U.S.C. 1002 in its arrangement of student health insurance coverage, to the extent that institution objects as specified in paragraph (I)(a)(2) of this note. In the case of student health insurance coverage, section (I) of this note is applicable in a manner comparable to its applicability to group health insurance coverage provided in connection with a group health plan established or maintained by a plan sponsor that is an employer, and references to "plan participants and beneficiaries" will be interpreted as references to student enrollees and their covered dependents; and*
*(iii) A health insurance issuer offering group or individual insurance coverage to the extent the issuer objects as specified in paragraph (I)(a)(2) of this note. Where a health insurance issuer providing group health insurance coverage is exempt under this paragraph (I)(a)(1)(iii), the plan remains subject to any requirement to provide coverage for contraceptive services under these Guidelines unless it is also exempt from that requirement.*

*(2) The exemption of this paragraph (I)(a) will apply to the extent that an entity described in paragraph (I)(a)(1) of this note objects to its establishing, maintaining, providing, offering, or arranging (as applicable) coverage, payments, or a plan that provides coverage or payments for some or all contraceptive services, based on its sincerely held religious beliefs.*
*(b) Objecting individuals—religious beliefs. These Guidelines do not provide for or support the requirement of coverage or payments for contraceptive services with respect to individuals who object as specified in this paragraph (I)(b), and nothing in 45 CFR 147.130(a)(1)(iv), 26 CFR 54.9815–2713(a) (1)(iv), or 29 CFR 2590.715-2713(a)(1)(iv) may be construed to prevent a willing health insurance issuer offering group or individual health insurance coverage, and as applicable, a willing plan sponsor of a group health plan, from offering a separate benefit package option, or a separate policy, certificate or contract of insurance, to any individual who objects to coverage or*

payments for some or all contraceptive services based on sincerely held religious beliefs.

*(II)(a) Objecting entities—moral convictions.*

*(1) These Guidelines do not provide for or support the requirement of coverage or payments for contraceptive services with respect to a group health plan established or maintained by an objecting organization, or health insurance coverage offered or arranged by an objecting organization, and thus the Health Resources and Service Administration exempts from any Guidelines requirements issued under 45 CFR 147.130(a)(1)(iv) that relate to the provision of contraceptive services:*

*(i) A group health plan and health insurance coverage provided in connection with a group health plan to the extent one of the following non-governmental plan sponsors object as specified in paragraph (II)(a)(2) of this note:*

*(A) A nonprofit organization; or*

*(B) A for-profit entity that has no publicly traded ownership interests (for this purpose, a publicly traded ownership interest is any class of common equity securities required to be registered under section 12 of the Securities Exchange Act of 1934);*

*(ii) An institution of higher education as defined in 20 U.S.C. 1002 in its arrangement of student health insurance coverage, to the extent that institution objects as specified in paragraph (II)(a)(2) of this note. In the case of student health insurance coverage, section (I) of this note is applicable in a manner comparable to its applicability to group health insurance coverage provided in connection with a group health plan established or maintained by a plan sponsor that is an employer, and references to "plan participants and beneficiaries" will be interpreted as references to student enrollees and their covered dependents; and*

*(iii) A health insurance issuer offering group or individual insurance coverage to the extent the issuer objects as specified in paragraph (II)(a)(2) of this note. Where a health insurance issuer providing group health insurance coverage is exempt under this paragraph (II)(a)(1)(iii), the group health plan established or maintained by the plan sponsor with which the health insurance issuer contracts remains subject to any requirement to provide coverage for contraceptive services under these Guidelines unless it is also exempt from that requirement.*

*(2) The exemption of this paragraph (II)(a) will apply to the extent that an entity described in paragraph (II)(a)(1) of this note objects to its establishing, maintaining, providing, offering, or arranging (as applicable) coverage or payments for some or all contraceptive services, or for a plan, issuer, or third party administrator that provides or arranges such coverage or payments, based on its sincerely held moral convictions.*

*(b) Objecting individuals—moral convictions. These Guidelines do not provide for or support the requirement of coverage or payments for contraceptive services with respect to individuals who object as specified in this paragraph (II)(b), and nothing in § 147.130(a)(1)(iv), 26 CFR 54.9815– 2713(a) (1)(iv), or 29 CFR 2590.715-2713(a)(1)(iv) may be construed to prevent a willing health insurance issuer offering group or individual health insurance coverage, and as applicable, a willing plan sponsor of a group health plan, from offering a separate policy, certificate or contract of insurance or a separate group health plan or benefit package option, to any individual who objects to coverage or payments for some or all contraceptive services based on sincerely held moral convictions.*

*(III) Definition. For the purposes of this note, reference to "contraceptive" services, benefits, or coverage includes contraceptive or sterilization items, procedures, or services, or related patient education or counseling, to the extent specified for purposes of these Guidelines.*

*See Federal Register Notice: [Religious Exemptions and Accommodations for Coverage of Certain Preventive Services under the Affordable Care Act](#) (PDF - 488 kb).*

*\*\*\*General Notice*

*On July 29, 2019, in a case in the Northern District of Texas, DeOtte v. Azar, No. 4:18-CV-00825-O, 2019 WL 3786545 (N.D. Tex. July 29, 2019) the court determined that the "Contraceptive Mandate, codified at 42 U.S.C. § 300gg–13(a)(4), 45 C.F.R. § 147.130(a)(1)(iv), 29 C.F.R. § 2590.715–2713(a)(1) (iv), and 26 C.F.R. § 54.9815– 2713(a)(1)(iv), violates the Religious Freedom Restoration Act" with respect to individuals and entities with religious objections to contraceptive coverage and thus enjoined enforcement of those provisions against such individuals and entities.*

*Date Last Reviewed:  October 2020*

 About HRSA   Connect with HRSA  Find Health Services

**Bureaus & Offices**

**Budget**

**Strategic Plan**

**Working at HRSA**

**About HRSA**

  

Health Center

HIV Medical Care and Treatment

 Sign up for email updates

Locate other health services

Contact Us  |  Viewers & Players  |  Privacy Policy  |  Disclaimers  |  Accessibility  |  Freedom of Information Act  |  EEO/No FEAR Act
U.S. Department of Health and Human Services  |  USA.gov  |  Whitehouse.gov

Language Assistance Available

Español

繁體中文

Tiếng Việt

한국어

Tagalog

Русский

العربية

Kreyòl Ayisyen

Français

Polski

Português

Italiano

Deutsch

日本語

فارسی

English

# Tab 6

**(Declaration of John Kelley)**

DocuSign Envelope ID: 7833F445-3108-4434-9D8C-67E248F0FCCC

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

|  |  |
|---|---|
| **John Kelley**, et al. <br><br>                    Plaintiffs, <br><br> v. <br><br> **Xavier Becerra**, et al., <br><br>                    Defendants. | Case No. 4:20-cv-00283-O |

## DECLARATION OF JOHN KELLEY

I, John Kelley, declare as follows:

1.     My name is John Kelley. I am over 21 years old and fully competent to make this declaration.

2.     I have personal knowledge of each of the facts stated in this declaration, and everything stated in this declaration is true and correct.

3.     I am a plaintiff in this lawsuit, and I submit this declaration in support of the plaintiffs' motion for summary judgment.

4.     I am responsible for purchasing health insurance for myself and my family.

5.     I want the option of purchasing health insurance that excludes or limits coverage of preventive care that I do not want or need, as well as preventive care that violates my sincere religious beliefs.

6.     I also want the option of purchasing health insurance that limits coverage of preventive care or that imposes copays or deductibles for preventive care, with corresponding adjustments in the monthly premiums, so that I can choose a policy that best suits my needs and the needs of my family.

App. 33

7.    Federal law requires all private health insurance to cover "evidence-based items or services that have in effect a rating of 'A' or 'B' in the current recommendations of the United States Preventive Services Task Force," and to cover these items or services without any cost-sharing requirements such as deductibles or co-pays. *See* 42 U.S.C. § 300gg-13(a)(1). The U.S. Preventive Services Task Force has assigned "A" or "B" ratings to numerous forms of preventive-care coverage that I do not want or need, because neither I nor my family members engage in the behaviors or lifestyle choices that makes this preventive treatment necessary. This unneeded and unwanted preventive-care coverage includes:

behavior interventions and pharmacotherapy for smoking and tobacco use

behavior interventions to address obesity and weight loss

behavior counseling to reduce unhealthy alcohol use

behavior counseling to promote healthful diet and physical activity

screening for chlamydia

screening for gonorrhea

screening for hepatitis B

screening for hepatitis C

screening for HIV

screening for lung cancer (only for smokers or former smokers)

screening and behavior interventions for childhood obesity

coverage of preexposure prophylaxis (PrEP) drugs

behavioral counseling for sexually active adolescents and adults who are at increased risk for sexually transmitted infections

**App. 34**

DocuSign Envelope ID: 7833F445-3108-4434-9D8C-67E248F0FCCC

screening for syphilis

screening for unhealthy drug use

8.　Federal law also requires private insurers to cover "immunizations that have in effect a recommendation from the Advisory Committee on Immunization Practices (ACIP) of the Centers for Disease Control and Prevention with respect to the individual involved," and to do so without any cost-sharing requirements such as deductibles or co-pays. *See* 42 U.S.C. § 300gg-13(a)(2). The Advisory Committee on Immunization Practices (ACIP) guidelines require coverage of the human papillomavirus (HPV) vaccine, which I do not want or need because neither I nor my family members engage in the behaviors that necessitate a vaccine for this sexually transmitted disease.

9.　Federal law also requires private insurers to cover "with respect to infants, children, and adolescents, evidence-informed preventive care and screenings provided for in the comprehensive guidelines supported by the Health Resources and Services Administration," and to cover this preventive care and screenings without any cost-sharing requirements such as deductibles or co-pays. *See* 42 U.S.C. § 300gg-13(a)(3). The Health Resources and Services Administration's preventive-care guidelines with respect to infants, children, and adolescents require coverage of screenings for HIV, Hepatitis C, and sexually transmitted infections, which I do not want or need because my children do not engage in the behaviors that makes this preventive treatment necessary.

10.　Federal law also compels coverage "with respect to women, [of] such additional preventive care and screenings not described in [42 U.S.C. § 300gg-13(a)(1)] as provided for in comprehensive guidelines supported by the Health Resources and Services Administration for purposes of this paragraph," and it forbids any cost-sharing requirements such as deductibles or co-pays with respect to this required coverage. *See* 42 U.S.C. § 300gg-13(a)(4). The Health Resources and Services Administration's

**App. 35**

DocuSign Envelope ID: 7833F445-3108-4434-9D8C-67E248F0FCCC

preventive-care guidelines with respect to women require coverage of contraception, contraceptive counseling, HIV screening, HPV screening, behavioral counseling for sexually transmitted infections, and screening for interpersonal and domestic violence, which I do not want or need because neither I nor my family members engage in the behaviors that makes this preventive treatment necessary.

11.   I also object on religious grounds to the compulsory coverage of PrEP drugs, contraception, the HPV vaccine, and the screenings and behavioral counseling for STDs and drug use described in paragraphs 7–10.

12.   I am a Christian and accept the Bible as the authoritative and inerrant word of God. The Bible condemns sexual activity outside marriage between one man and one woman, including homosexual conduct, and this stance is consistent with millenia of Christian teaching.

13.   Mandating coverage of PrEP drugs facilitates and encourages homosexual behavior, intravenous drug use, and sexual activity outside of marriage between one man and one woman, and participating in a health-insurance plan that uses our premiums to pay for coverage of PrEP drugs would make me complicit in these behaviors.

14.   Mandating coverage of contraception, the HPV vaccine, and screenings and behavioral counseling for STDs facilitates and encourages sexual activity outside of marriage between one man and one woman by forcing others to bear the costs associated with these activities, and participating in a health-insurance plan that uses our premiums to pay for coverage of contraception, the HPV vaccine, and the screenings and behavioral counseling for STDs would make me complicit in this behavior.

15.   Mandating coverage of screenings and behavioral counseling for drug use facilitates and encourages drug use by forcing others to bear the costs associated with these activities, and participating in a health-insurance plan that uses our premiums to

**App. 36**

pay for screenings and behavioral counseling for drug use would make me complicit in this behavior.

16.   I am also the owner of Kelley Orthodontics, one of the plaintiffs in this lawsuits.

17.   I want the option of purchasing health insurance for my employees that excludes or limits coverage of preventive care that I do not want to cover, including all of the preventive care listed in paragraphs 7–10.

18.   I also want the option of purchasing health insurance for my employees that excludes or limits coverage of preventive care that violates my religious beliefs, including the preventive care described in paragraphs 13–15.

19.   Finally, I want the option of purchasing health insurance for my employees that limits coverage of preventive care or that imposes copays or deductibles for preventive care, with corresponding adjustments in the monthly premiums, so that I can choose a policy that best suits the needs of my business.

20.   The defendants' enforcement of 42 U.S.C. § 300gg-13 has eliminated my option of obtaining the types of health-insurance policies described in paragraphs 5–6 and paragraphs 17–19.

This concludes my sworn statement. I declare under penalty of perjury that the foregoing is true and correct.

*John M Kelley Jr*

DocuSigned by:
8EF9C64076854C4...

DECLARANT

# Tab 7

**(Declaration of Joel Starnes)**

DocuSign Envelope ID: E93E3FD7-8CB0-4FBF-ADB0-3A4C953010D0

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

**John Kelley**, et al.,

                      Plaintiffs,

v.                                                          Case No. 4:20-cv-00283-O

**Xavier Becerra**, et al.,

                      Defendants.

## DECLARATION OF JOEL STARNES

I, Joel Starnes, declare as follows:

1.      My name is Joel Starnes. I am over 21 years old and fully competent to make this declaration.

2.      I have personal knowledge of each of the facts stated in this declaration, and everything stated in this declaration is true and correct.

3.      I am a plaintiff in this lawsuit, and I submit this declaration in support of the plaintiffs' motion for summary judgment.

4.      I am responsible for purchasing health insurance for myself and my family.

5.      I want the option of purchasing health insurance that excludes coverage of preventive care that I do not want or need, as well as preventive care that violates my sincere religious beliefs.

6.      I also want the option of purchasing health insurance that limits coverage of preventive care or that imposes copays or deductibles for preventive care, with corresponding adjustments in the monthly premiums, so that I can choose a policy that best suits my needs and the needs of my family.

**App. 39**

DocuSign Envelope ID: E93E3FD7-8CB0-4FBF-ADB0-3A4C953010D0

7.     Federal law requires all private health insurance to cover "evidence-based items or services that have in effect a rating of 'A' or 'B' in the current recommendations of the United States Preventive Services Task Force," and to cover these items or services without any cost-sharing requirements such as deductibles or co-pays. *See* 42 U.S.C. § 300gg-13(a)(1). The U.S. Preventive Services Task Force has assigned "A" or "B" ratings to numerous forms of preventive-care coverage that I do not want or need, because neither I nor my family members engage in the behaviors or lifestyle choices that makes this preventive treatment necessary. This unneeded and unwanted preventive-care coverage includes:

behavior interventions and pharmacotherapy for smoking and tobacco use

behavior interventions to address obesity and weight loss

behavior counseling to reduce unhealthy alcohol use

behavior counseling to promote healthful diet and physical activity

screening for chlamydia

screening for gonorrhea

screening for hepatitis B

screening for hepatitis C

screening for HIV

screening for lung cancer (only for smokers or former smokers)

screening and behavior interventions for childhood obesity

coverage of preexposure prophylaxis (PrEP) drugs

behavioral counseling for sexually active adolescents and adults who are at increased risk for sexually transmitted infections

**App. 40**

DocuSign Envelope ID: E93E3FD7-8CB0-4FBF-ADB0-3A4C953010D0

screening for syphilis

screening for unhealthy drug use

8.     Federal law also requires private insurers to cover "immunizations that have in effect a recommendation from the Advisory Committee on Immunization Practices (ACIP) of the Centers for Disease Control and Prevention with respect to the individual involved," and to do so without any cost-sharing requirements such as deductibles or co-pays. *See* 42 U.S.C. § 300gg-13(a)(2). The Advisory Committee on Immunization Practices (ACIP) guidelines require coverage of the human papillomavirus (HPV) vaccine, which I do not want or need because neither I nor my family members engage in the behaviors that necessitate a vaccine for this sexually transmitted disease.

9.     Federal law also requires private insurers to cover "with respect to infants, children, and adolescents, evidence-informed preventive care and screenings provided for in the comprehensive guidelines supported by the Health Resources and Services Administration," and to cover this preventive care and screenings without any cost-sharing requirements such as deductibles or co-pays. *See* 42 U.S.C. § 300gg-13(a)(3). The Health Resources and Services Administration's preventive-care guidelines with respect to infants, children, and adolescents require coverage of screenings for HIV, Hepatitis C, and sexually transmitted infections, which I do not want or need because my children do not engage in the behaviors that makes this preventive treatment necessary.

10.    Federal law also compels coverage "with respect to women, [of] such additional preventive care and screenings not described in [42 U.S.C. § 300gg-13(a)(1)] as provided for in comprehensive guidelines supported by the Health Resources and Services Administration for purposes of this paragraph," and it forbids any cost-sharing requirements such as deductibles or co-pays with respect to this required coverage. *See* 42 U.S.C. § 300gg-13(a)(4). The Health Resources and Services Administration's

**App. 41**

DocuSign Envelope ID: E93E3FD7-8CB0-4FBF-ADB0-3A4C953010D0

preventive-care guidelines with respect to women require coverage of contraception, contraceptive counseling, HIV screening, HPV screening, behavioral counseling for sexually transmitted infections, and screening for interpersonal and domestic violence, which I do not want or need because neither I nor my family members engage in the behaviors that makes this preventive treatment necessary.

11.   I also object on religious grounds to the compulsory coverage of PrEP drugs, contraception, the HPV vaccine, and the screenings and behavioral counseling for STDs and drug use described in paragraphs 7–10.

12.   I am a Christian and accept the Bible as the authoritative and inerrant word of God. The Bible condemns sexual activity outside marriage between one man and one woman, including homosexual conduct, and this stance is consistent with millenia of Christian teaching.

13.   Mandating coverage of PrEP drugs facilitates and encourages homosexual behavior, intravenous drug use, and sexual activity outside of marriage between one man and one woman, and participating in a health-insurance plan that uses our premiums to pay for coverage of PrEP drugs would make me complicit in these behaviors.

14.   Mandating coverage of contraception, the HPV vaccine, and screenings and behavioral counseling for STDs facilitates and encourages sexual activity outside of marriage between one man and one woman by forcing others to bear the costs associated with these activities, and participating in a health-insurance plan that uses our premiums to pay for coverage of contraception, the HPV vaccine, and the screenings and behavioral counseling for STDs would make me complicit in this behavior.

15.   Mandating coverage of screenings and behavioral counseling for drug use facilitates and encourages drug use by forcing others to bear the costs associated with these activities, and participating in a health-insurance plan that uses our premiums to

**App. 42**

pay for screenings and behavioral counseling for drug use would make me complicit in this behavior.

16.   The defendants' enforcement of 42 U.S.C. § 300gg-13 has eliminated my option of obtaining the types of health-insurance policies described in paragraphs 5–6.

This concludes my sworn statement. I declare under penalty of perjury that the foregoing is true and correct.

DocuSign by:

_____
DECLARANT

# Tab 8
## (Declaration of Gregory Scheideman)

DocuSign Envelope ID: 5438FC59-9AD3-493A-ADAC-1EB3AC47AE74

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

|  |  |
|---|---|
| **John Kelley**, et al.<br><br>                     Plaintiffs,<br><br>v.<br><br>**Xavier Becerra**, et al.,<br><br>                     Defendants. | Case No. 4:20-cv-00283-O |

### DECLARATION OF GREGORY SCHEIDEMAN

 I, Gregory Scheideman, declare as follows:

1.     My name is Gregory Scheideman. I am over 21 years old and fully competent to make this declaration.

2.     I have personal knowledge of each of the facts stated in this declaration, and everything stated in this declaration is true and correct.

3.     I am a plaintiff in this lawsuit, and I submit this declaration in support of the plaintiffs' motion for summary judgment.

4.     I am responsible for purchasing health insurance for myself and my family.

5.     I am also a part owner of Fort Worth Oral Surgery, and I am responsible for purchasing health insurance for my employees.

6.     I want the option of purchasing health insurance for myself and my family that excludes or limits coverage of preventive care that I do not want or need.

7.     I also want the option of purchasing health insurance for my employees that excludes or limits coverage of preventive care that my partners and I do not want to cover.

**App. 45**

DocuSign Envelope ID: 5438FC59-9AD3-493A-ADAC-1EB3AC47AE74

8.     I also want the option of purchasing health insurance that limits coverage of preventive care or that imposes copays or deductibles for preventive care, with corresponding adjustments in the monthly premiums, so that I can choose a policy that best suits my needs and the needs of my family, and so that my partners and I can choose policies for employees that best suit the needs of our business.

9.     Federal law requires all private health insurance to cover "evidence-based items or services that have in effect a rating of 'A' or 'B' in the current recommendations of the United States Preventive Services Task Force," and to cover these items or services without any cost-sharing requirements such as deductibles or co-pays. *See* 42 U.S.C. § 300gg-13(a)(1). The U.S. Preventive Services Task Force has assigned "A" or "B" ratings to numerous forms of preventive-care coverage that I do not want or need, and that my partners and I do not want to cover in our employee-benefits plan. This unneeded and unwanted preventive-care coverage includes:

behavior interventions and pharmacotherapy for smoking and tobacco use

behavior interventions to address obesity and weight loss

behavior counseling to reduce unhealthy alcohol use

behavior counseling to promote healthful diet and physical activity

screening for chlamydia

screening for gonorrhea

screening for hepatitis C

screening for HIV

screening for lung cancer (only for smokers or former smokers)

screening and behavior interventions for childhood obesity

coverage of preexposure prophylaxis (PrEP) drugs

**App. 46**

DocuSign Envelope ID: 5438FC59-9AD3-493A-ADAC-1EB3AC47AE74

behavioral counseling for sexually active adolescents and adults who are
at increased risk for sexually transmitted infections

screening for syphilis

screening for unhealthy drug use

10.   Federal law also requires private insurers to cover "immunizations that have
in effect a recommendation from the Advisory Committee on Immunization Practices
(ACIP) of the Centers for Disease Control and Prevention with respect to the indi-
vidual involved," and to do so without any cost-sharing requirements such as deduct-
ibles or co-pays. *See* 42 U.S.C. § 300gg-13(a)(2). The Advisory Committee on Im-
munization Practices (ACIP) guidelines require coverage of the human papilloma-
virus (HPV) vaccine, which I do not want or need because neither I nor my family
members engage in the behaviors that necessitate a vaccine for this sexually transmit-
ted disease, and which my partners and I do not want to cover in our employee-
benefits plan.

11.   Federal law also requires private insurers to cover "with respect to infants,
children, and adolescents, evidence-informed preventive care and screenings provided
for in the comprehensive guidelines supported by the Health Resources and Services
Administration," and to cover this preventive care and screenings without any cost-
sharing requirements such as deductibles or co-pays. *See* 42 U.S.C. § 300gg-13(a)(3).
The Health Resources and Services Administration's preventive-care guidelines with
respect to infants, children, and adolescents require coverage of screenings for HIV,
Hepatitis C, and sexually transmitted infections, which I do not want or need because
my children do not engage in the behaviors that makes this preventive treatment nec-
essary, and which my partners and I do not want to cover in our employee-benefits
plan.

**App. 47**

DocuSign Envelope ID: 5438FC59-9AD3-493A-ADAC-1EB3AC47AE74

12.   Federal law also compels coverage "with respect to women, [of] such additional preventive care and screenings not described in [42 U.S.C. § 300gg-13(a)(1)] as provided for in comprehensive guidelines supported by the Health Resources and Services Administration for purposes of this paragraph," and it forbids any cost-sharing requirements such as deductibles or co-pays with respect to this required coverage. *See* 42 U.S.C. § 300gg-13(a)(4). The Health Resources and Services Administration's preventive-care guidelines with respect to women require coverage of contraceptive counseling, HIV screening, behavioral counseling for sexually transmitted infections, and screening for interpersonal and domestic violence, which I do not want or need because neither I nor my family members engage in the behaviors that makes this preventive treatment necessary, and which my partners and I do not want to cover in our employee-benefits plan.

13.   The defendants' enforcement of 42 U.S.C. § 300gg-13 has eliminated my option of obtaining the types of health-insurance policies described in paragraphs 6–8.


This concludes my sworn statement. I declare under penalty of perjury that the foregoing is true and correct.

DocuSigned by:

*Gregory Scheideman*

B7F8B6B48C84C2...

DECLARANT

**App. 48**

# Tab 9

## (Declaration of Zach Maxwell)

DocuSign Envelope ID: 25330C1C-418E-448E-AAA1-095F4C8EF70A

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

|  |  |
|---|---|
| **John Kelley**, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>**Xavier Becerra**, et al.,<br><br>Defendants. | Case No. 4:20-cv-00283-O |

### DECLARATION OF ZACH MAXWELL

I, Zach Maxwell, declare as follows:

1.  My name is Zach Maxwell. I am over 21 years old and fully competent to make this declaration.

2.  I have personal knowledge of each of the facts stated in this declaration, and everything stated in this declaration is true and correct.

3.  I am a plaintiff in this lawsuit, and I submit this declaration in support of the plaintiffs' motion for summary judgment.

4.  I am responsible for purchasing health insurance for myself and my family.

5.  I want the option of purchasing health insurance that excludes or limits coverage of preventive care that I do not want or need, as well as preventive care that violates my sincere religious beliefs.

6.  I also want the option of purchasing health insurance that limits coverage of preventive care or that imposes copays or deductibles for preventive care, with corresponding adjustments in the monthly premiums, so that I can choose a policy that best suits my needs and the needs of my family.

**App. 50**

7.    Federal law requires all private health insurance to cover "evidence-based items or services that have in effect a rating of 'A' or 'B' in the current recommendations of the United States Preventive Services Task Force," and to cover these items or services without any cost-sharing requirements such as deductibles or co-pays. *See* 42 U.S.C. § 300gg-13(a)(1). The U.S. Preventive Services Task Force has assigned "A" or "B" ratings to numerous forms of preventive-care coverage that I do not want or need, because neither I nor my family members engage in the behaviors or lifestyle choices that makes this preventive treatment necessary. This unneeded and unwanted preventive-care coverage includes:

behavior interventions and pharmacotherapy for smoking and tobacco use

behavior interventions to address obesity and weight loss

behavior counseling to reduce unhealthy alcohol use

behavior counseling to promote healthful diet and physical activity

screening for chlamydia

screening for gonorrhea

screening for hepatitis B

screening for hepatitis C

screening for HIV

screening for lung cancer (only for smokers or former smokers)

screening and behavior interventions for childhood obesity

coverage of preexposure prophylaxis (PrEP) drugs

behavioral counseling for sexually active adolescents and adults who are at increased risk for sexually transmitted infections

DocuSign Envelope ID: 25330C1C-418E-448E-AAA1-095F4C8EF70A

screening for syphilis

screening for unhealthy drug use

8.    Federal law also requires private insurers to cover "immunizations that have in effect a recommendation from the Advisory Committee on Immunization Practices (ACIP) of the Centers for Disease Control and Prevention with respect to the individual involved," and to do so without any cost-sharing requirements such as deductibles or co-pays. *See* 42 U.S.C. § 300gg-13(a)(2). The Advisory Committee on Immunization Practices (ACIP) guidelines require coverage of the human papillomavirus (HPV) vaccine, which I do not want or need because neither I nor my family members engage in the behaviors that necessitate a vaccine for this sexually transmitted disease.

9.    Federal law also requires private insurers to cover "with respect to infants, children, and adolescents, evidence-informed preventive care and screenings provided for in the comprehensive guidelines supported by the Health Resources and Services Administration," and to cover this preventive care and screenings without any cost-sharing requirements such as deductibles or co-pays. *See* 42 U.S.C. § 300gg-13(a)(3). The Health Resources and Services Administration's preventive-care guidelines with respect to infants, children, and adolescents require coverage of screenings for HIV, Hepatitis C, and sexually transmitted infections, which I do not want or need because my children do not engage in the behaviors that makes this preventive treatment necessary.

10.    Federal law also compels coverage "with respect to women, [of] such additional preventive care and screenings not described in [42 U.S.C. § 300gg-13(a)(1)] as provided for in comprehensive guidelines supported by the Health Resources and Services Administration for purposes of this paragraph," and it forbids any cost-sharing requirements such as deductibles or co-pays with respect to this required coverage. *See* 42 U.S.C. § 300gg-13(a)(4). The Health Resources and Services Administration's

**App. 52**

DocuSign Envelope ID: 25330C1C-418E-448E-AAA1-095F4C8EF70A

preventive-care guidelines with respect to women require coverage of contraception, contraceptive counseling, HIV screening, HPV screening, behavioral counseling for sexually transmitted infections, and screening for interpersonal and domestic violence, which I do not want or need because neither I nor my family members engage in the behaviors that makes this preventive treatment necessary.

11.   I also object on religious grounds to the compulsory coverage of PrEP drugs, contraception, the HPV vaccine, and the screenings and behavioral counseling for STDs and drug use described in paragraphs 7–10.

12.   I am a Christian and accept the Bible as the authoritative and inerrant word of God. The Bible condemns sexual activity outside marriage between one man and one woman, including homosexual conduct, and this stance is consistent with millenia of Christian teaching.

13.   Mandating coverage of PrEP drugs facilitates and encourages homosexual behavior, intravenous drug use, and sexual activity outside of marriage between one man and one woman, and participating in a health-insurance plan that uses our premiums to pay for coverage of PrEP drugs would make me complicit in these behaviors.

14.   Mandating coverage of contraception, the HPV vaccine, and screenings and behavioral counseling for STDs facilitates and encourages sexual activity outside of marriage between one man and one woman by forcing others to bear the costs associated with these activities, and participating in a health-insurance plan that uses our premiums to pay for coverage of contraception, the HPV vaccine, and the screenings and behavioral counseling for STDs would make me complicit in this behavior.

15.   Mandating coverage of screenings and behavioral counseling for drug use facilitates and encourages drug use by forcing others to bear the costs associated with these activities, and participating in a health-insurance plan that uses our premiums to

**App. 53**

pay for screenings and behavioral counseling for drug use would make me complicit in this behavior.

16.   The defendants' enforcement of 42 U.S.C. § 300gg-13 has eliminated my option of obtaining the types of health-insurance policies described in paragraphs 5–6.


This concludes my sworn statement. I declare under penalty of perjury that the foregoing is true and correct.

DocuSigned by:

_____
Declarant

# Tab 10

**(Declaration of Ashley Maxwell)**

DocuSign Envelope ID: E65163A8-FBFD-4AA0-BE4C-30B44466AC04

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

|  |  |
|---|---|
| **John Kelley**, et al., | |
| Plaintiffs, | |
| v. | Case No. 4:20-cv-00283-O |
| **Xavier Becerra**, et al., | |
| Defendants. | |

### DECLARATION OF ASHLEY MAXWELL

I, Ashley Maxwell, declare as follows:

1.   My name is Ashley Maxwell. I am over 21 years old and fully competent to make this declaration.

2.   I have personal knowledge of each of the facts stated in this declaration, and everything stated in this declaration is true and correct.

3.   I am a plaintiff in this lawsuit, and I submit this declaration in support of the plaintiffs' motion for summary judgment.

4.   My husband and I are responsible for purchasing health insurance for ourselves and our family.

5.   I want the option of purchasing health insurance that excludes or limits coverage of preventive care that I do not want or need, as well as preventive care that violates my sincere religious beliefs.

6.   I also want the option of purchasing health insurance that limits coverage of preventive care or that imposes copays or deductibles for preventive care, with corresponding adjustments in the monthly premiums, so that I can choose a policy that best suits my needs and the needs of my family.

**App. 56**

DocuSign Envelope ID: E65163A8-FBFD-4AA0-BE4C-30B44466AC04

7.    Federal law requires all private health insurance to cover "evidence-based items or services that have in effect a rating of 'A' or 'B' in the current recommendations of the United States Preventive Services Task Force," and to cover these items or services without any cost-sharing requirements such as deductibles or co-pays. *See* 42 U.S.C. § 300gg-13(a)(1). The U.S. Preventive Services Task Force has assigned "A" or "B" ratings to numerous forms of preventive-care coverage that I do not want or need, because neither I nor my family members engage in the behaviors or lifestyle choices that makes this preventive treatment necessary. This unneeded and unwanted preventive-care coverage includes:

behavior interventions and pharmacotherapy for smoking and tobacco use

behavior interventions to address obesity and weight loss

behavior counseling to reduce unhealthy alcohol use

behavior counseling to promote healthful diet and physical activity

screening for chlamydia

screening for gonorrhea

screening for hepatitis B

screening for hepatitis C

screening for HIV

screening for lung cancer (only for smokers or former smokers)

screening and behavior interventions for childhood obesity

coverage of preexposure prophylaxis (PrEP) drugs

behavioral counseling for sexually active adolescents and adults who are at increased risk for sexually transmitted infections

App. 57

DocuSign Envelope ID: E65163A8-FBFD-4AA0-BE4C-30B44466AC04

screening for syphilis

screening for unhealthy drug use

8.    Federal law also requires private insurers to cover "immunizations that have in effect a recommendation from the Advisory Committee on Immunization Practices (ACIP) of the Centers for Disease Control and Prevention with respect to the individual involved," and to do so without any cost-sharing requirements such as deductibles or co-pays. *See* 42 U.S.C. § 300gg-13(a)(2). The Advisory Committee on Immunization Practices (ACIP) guidelines require coverage of the human papillomavirus (HPV) vaccine, which I do not want or need because neither I nor my family members engage in the behaviors that necessitate a vaccine for this sexually transmitted disease.

9.    Federal law also requires private insurers to cover "with respect to infants, children, and adolescents, evidence-informed preventive care and screenings provided for in the comprehensive guidelines supported by the Health Resources and Services Administration," and to cover this preventive care and screenings without any cost-sharing requirements such as deductibles or co-pays. *See* 42 U.S.C. § 300gg-13(a)(3). The Health Resources and Services Administration's preventive-care guidelines with respect to infants, children, and adolescents require coverage of screenings for HIV, Hepatitis C, and sexually transmitted infections, which I do not want or need because my children do not engage in the behaviors that makes this preventive treatment necessary.

10.    Federal law also compels coverage "with respect to women, [of] such additional preventive care and screenings not described in [42 U.S.C. § 300gg-13(a)(1)] as provided for in comprehensive guidelines supported by the Health Resources and Services Administration for purposes of this paragraph," and it forbids any cost-sharing requirements such as deductibles or co-pays with respect to this required coverage. *See* 42 U.S.C. § 300gg-13(a)(4). The Health Resources and Services Administration's

App. 58

DocuSign Envelope ID: E65163A8-FBFD-4AA0-BE4C-30B44466AC04

preventive-care guidelines with respect to women require coverage of contraception, contraceptive counseling, HIV screening, HPV screening, behavioral counseling for sexually transmitted infections, and screening for interpersonal and domestic violence, which I do not want or need because neither I nor my family members engage in the behaviors that makes this preventive treatment necessary.

11.   I also object on religious grounds to the compulsory coverage of PrEP drugs, contraception, the HPV vaccine, and the screenings and behavioral counseling for STDs and drug use described in paragraphs 7–10.

12.   I am a Christian and accept the Bible as the authoritative and inerrant word of God. The Bible condemns sexual activity outside marriage between one man and one woman, including homosexual conduct, and this stance is consistent with millenia of Christian teaching.

13.   Mandating coverage of PrEP drugs facilitates and encourages homosexual behavior, intravenous drug use, and sexual activity outside of marriage between one man and one woman, and participating in a health-insurance plan that uses our premiums to pay for coverage of PrEP drugs would make me complicit in these behaviors.

14.   Mandating coverage of contraception, the HPV vaccine, and screenings and behavioral counseling for STDs facilitates and encourages sexual activity outside of marriage between one man and one woman by forcing others to bear the costs associated with these activities, and participating in a health-insurance plan that uses our premiums to pay for coverage of contraception, the HPV vaccine, and the screenings and behavioral counseling for STDs would make me complicit in this behavior.

15.   Mandating coverage of screenings and behavioral counseling for drug use facilitates and encourages drug use by forcing others to bear the costs associated with these activities, and participating in a health-insurance plan that uses our premiums to

App. 59

pay for screenings and behavioral counseling for drug use would make me complicit in this behavior.

16.   The defendants' enforcement of 42 U.S.C. § 300gg-13 has eliminated my option of obtaining the types of health-insurance policies described in paragraphs 5–6.

This concludes my sworn statement. I declare under penalty of perjury that the foregoing is true and correct.

DocuSigned by:

*Ashley Maxwell*

DCA3CBE42BCC489...

DECLARANT

# Tab 11
**(Declaration of Joel Miller)**

DocuSign Envelope ID: F86E31FA-F6D2-4C83-B0AD-42E0D2FC3FB6

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| **John Kelley**, et al. | |
| Plaintiffs, | |
| v. | Case No. 4:20-cv-00283-O |
| **Xavier Becerra**, et al., | |
| Defendants. | |

### DECLARATION OF JOEL MILLER

I, Joel Miller, declare as follows:

1.    My name is Joel Miller. I am over 21 years old and fully competent to make this declaration.

2.    I have personal knowledge of each of the facts stated in this declaration, and everything stated in this declaration is true and correct.

3.    I am a plaintiff in this lawsuit, and I submit this declaration in support of the plaintiffs' motion for summary judgment.

4.    I am responsible for purchasing health insurance for myself and my family.

5.    I want the option of purchasing health insurance for myself and my family that excludes or limits coverage of preventive care that I do not want or need.

6.    I also want the option of purchasing health insurance that limits coverage of preventive care or that imposes copays or deductibles for preventive care, with corresponding adjustments in the monthly premiums, so that I can choose a policy that best suits my needs and the needs of my family.

**App. 62**

DocuSign Envelope ID: F86E31FA-F6D2-4C83-B0AD-42E0D2FC3FB6

7.     Federal law requires all private health insurance to cover "evidence-based items or services that have in effect a rating of 'A' or 'B' in the current recommendations of the United States Preventive Services Task Force," and to cover these items or services without any cost-sharing requirements such as deductibles or co-pays. *See* 42 U.S.C. § 300gg-13(a)(1). The U.S. Preventive Services Task Force has assigned "A" or "B" ratings to numerous forms of preventive-care coverage that I do not want or need, because neither I nor my wife and children engage in the behaviors or lifestyle choices that makes this preventive treatment necessary. This unneeded and unwanted preventive-care coverage includes:

> behavior interventions and pharmacotherapy for smoking and tobacco use

> behavior interventions to address obesity and weight loss

> behavior counseling to reduce unhealthy alcohol use

> behavior counseling to promote healthful diet and physical activity

> screening for chlamydia

> screening for gonorrhea

> screening for hepatitis B

> screening for hepatitis C

> screening for HIV

> screening for lung cancer (only for smokers or former smokers)

> screening and behavior interventions for childhood obesity

> coverage of preexposure prophylaxis (PrEP) drugs

> behavioral counseling for sexually active adolescents and adults who are at increased risk for sexually transmitted infections

**App. 63**

DocuSign Envelope ID: F86E31FA-F6D2-4C83-B0AD-42E0D2FC3FB6

     screening for syphilis

     screening for unhealthy drug use

8.    Federal law also requires private insurers to cover "immunizations that have in effect a recommendation from the Advisory Committee on Immunization Practices (ACIP) of the Centers for Disease Control and Prevention with respect to the individual involved," and to do so without any cost-sharing requirements such as deductibles or co-pays. *See* 42 U.S.C. § 300gg-13(a)(2). The Advisory Committee on Immunization Practices (ACIP) guidelines require coverage of the human papillomavirus (HPV) vaccine, which I do not want or need. I have two daughters and neither of them has gotten the HPV vaccine while they were on my plan, and both of them are now grown and have their own employer-provided health insurance.

9.    Federal law also requires private insurers to cover "with respect to infants, children, and adolescents, evidence-informed preventive care and screenings provided for in the comprehensive guidelines supported by the Health Resources and Services Administration," and to cover this preventive care and screenings without any cost-sharing requirements such as deductibles or co-pays. *See* 42 U.S.C. § 300gg-13(a)(3). The Health Resources and Services Administration's preventive-care guidelines with respect to infants, children, and adolescents require coverage of screenings for HIV, Hepatitis C, and sexually transmitted infections, which I do not want or need because my children do not engage in the behaviors that makes this preventive treatment necessary.

10.    Federal law also compels coverage "with respect to women, [of] such additional preventive care and screenings not described in [42 U.S.C. § 300gg-13(a)(1)] as provided for in comprehensive guidelines supported by the Health Resources and Services Administration for purposes of this paragraph," and it forbids any cost-sharing requirements such as deductibles or co-pays with respect to this required coverage. *See* 42 U.S.C. § 300gg-13(a)(4). The Health Resources and Services Administration's

**App. 64**

DocuSign Envelope ID: F86E31FA-F6D2-4C83-B0AD-42E0D2FC3FB6

preventive-care guidelines with respect to women require coverage of contraceptive counseling, HIV screening, behavioral counseling for sexually transmitted infections, and screening for interpersonal and domestic violence, which I do not want or need because my wife is past her childbearing years, and neither I nor my family members engage in the behaviors that makes this preventive treatment necessary.

11.   The defendants' enforcement of 42 U.S.C. § 300gg-13 has eliminated my option of obtaining the types of health-insurance policies described in paragraphs 5–6

This concludes my sworn statement. I declare under penalty of perjury that the foregoing is true and correct.

DocuSigned by:

*Joel Miller*

_____

DECLARANT

# Tab 12
## (Declaration of Steven F. Hotze)

DocuSign Envelope ID: 8766F483-5F8C-4450-86AB-5DD8C711B22A

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

**John Kelley**, et al.

                    Plaintiffs,

v.                                              Case No. 4:20-cv-00283-O

**Xavier Becerra**, et al.,

                    Defendants.

### DECLARATION OF STEVEN F. HOTZE

I, Steven F. Hotze, declare as follows:

1.    My name is Steven F. Hotze. I am over 21 years old and fully competent to make this declaration.

2.    I have personal knowledge of each of the facts stated in this declaration, and everything stated in this declaration is true and correct.

3.    I submit this declaration in support of the plaintiffs' motion for summary judgment.

4.    I am President, Secretary, Treasurer, and sole member of the board of Braidwood Management Inc., a plaintiff in this lawsuit.

5.    Braidwood Management Inc. employs approximately 70 individuals. Because Braidwood has more than 50 employees, it is compelled to offer ACA-compliant health insurance to its employees or face heavy financial penalties. *See* 26 U.S.C. § 4980H(c)(2).

6.    Braidwood provides health insurance to its employees through a self-insured plan.

**App. 67**

7.   I want Braidwood's self-insured plan to exclude or limit coverage of preventive care that I do not want to provide.

8.   I want Braidwood's self-insured plan to exclude coverage of preventive care that violates my sincere religious beliefs.

9.   I also want the option of imposing copays or deductibles for preventive care in Braidwood's self-insured plan, so that I can establish an employee health-insurance plan that best suit the needs of my businesses.

10.   Federal law requires all private health insurance to cover "evidence-based items or services that have in effect a rating of 'A' or 'B' in the current recommendations of the United States Preventive Services Task Force," and to cover these items or services without any cost-sharing requirements such as deductibles or co-pays. *See* 42 U.S.C. § 300gg-13(a)(1). The U.S. Preventive Services Task Force has assigned "A" or "B" ratings to numerous forms of preventive-care coverage that I do not want to provide to my employees through Braidwood's self-insured plan. This unneeded and unwanted preventive-care coverage includes:

behavior interventions and pharmacotherapy for smoking and tobacco use

behavior interventions to address obesity and weight loss

behavior counseling to reduce unhealthy alcohol use

behavior counseling to promote healthful diet and physical activity

screening for chlamydia

screening for gonorrhea

screening for hepatitis C

screening for HIV

screening for lung cancer (only for smokers or former smokers)

**App. 68**

DocuSign Envelope ID: 8766F483-5F8C-4450-86AB-5DD8C711B22A

screening and behavior interventions for childhood obesity

coverage of preexposure prophylaxis (PrEP) drugs

behavioral counseling for sexually active adolescents and adults who are at increased risk for sexually transmitted infections

screening for syphilis

screening for unhealthy drug use

11.   Federal law also requires private insurers to cover "immunizations that have in effect a recommendation from the Advisory Committee on Immunization Practices (ACIP) of the Centers for Disease Control and Prevention with respect to the individual involved," and to do so without any cost-sharing requirements such as deductibles or co-pays. *See* 42 U.S.C. § 300gg-13(a)(2). The Advisory Committee on Immunization Practices (ACIP) guidelines require coverage of the human papillomavirus (HPV) vaccine, which I do not want to provide to my employees through Braidwood's self-insured plan.

12.   Federal law also requires private insurers to cover "with respect to infants, children, and adolescents, evidence-informed preventive care and screenings provided for in the comprehensive guidelines supported by the Health Resources and Services Administration," and to cover this preventive care and screenings without any cost-sharing requirements such as deductibles or co-pays. *See* 42 U.S.C. § 300gg-13(a)(3). The Health Resources and Services Administration's preventive-care guidelines with respect to infants, children, and adolescents require coverage of screenings for HIV, Hepatitis C, and sexually transmitted infections, which I do not want to provide to my employees through Braidwood's self-insured plan.

13.   Federal law also compels coverage "with respect to women, [of] such additional preventive care and screenings not described in [42 U.S.C. § 300gg-13(a)(1)] as provided for in comprehensive guidelines supported by the Health Resources and

DocuSign Envelope ID: 8766F483-5F8C-4450-86AB-5DD8C711B22A

Services Administration for purposes of this paragraph," and it forbids any cost-sharing requirements such as deductibles or co-pays with respect to this required coverage. *See* 42 U.S.C. § 300gg-13(a)(4). The Health Resources and Services Administration's preventive-care guidelines with respect to women require coverage of contraceptive counseling, HIV screening, HPV screening, behavioral counseling for sexually transmitted infections, and screening for interpersonal and domestic violence, which I do not want to provide to my employees through Braidwood's self-insured plan.

14.   I also object on religious grounds to providing coverage of PrEP drugs, contraception, the HPV vaccine, and the screenings and behavioral counseling for STDs and drug use described in paragraphs 10–13.

15.   I am a Christian and accept the Bible as the authoritative and inerrant word of God. The Bible condemns sexual activity outside marriage between one man and one woman, including homosexual conduct, and this stance is consistent with millenia of Christian teaching.

16.   Providing coverage of PrEP drugs facilitates and encourages homosexual behavior, intravenous drug use, and sexual activity outside of marriage between one man and one woman, and providing this coverage in Braidwood's self-insured plan would make me complicit in these behaviors.

17.   Providing coverage of contraception, the HPV vaccine, and screenings and behavioral counseling for STDs facilitates and encourages sexual activity outside of marriage between one man and one woman by forcing others to bear the costs associated with these activities, and providing this coverage in Braidwood's self-insured plan would make me complicit in these behaviors.

18.   Providing coverage of screenings and behavioral counseling for drug use facilitates and encourages drug use by forcing others to bear the costs associated with these activities, and providing this coverage in Braidwood's self-insured plan would make me complicit in these behaviors.

**App. 70**

DocuSign Envelope ID: 8766F483-5F8C-4450-86AB-5DD8C711B22A

19.  The defendants' enforcement of 42 U.S.C. § 300gg-13 is preventing me from excluding the unwanted coverage described in paragraphs 7–18 from Braidwood's self-insured plan. It is also preventing me from imposing cost-sharing arrangements (such as co-pays or deductibles) on any of the preventive-care coverage compelled by the defendants.

This concludes my sworn statement. I declare under penalty of perjury that the foregoing is true and correct.

DocuSigned by:

*Steven F. Hotze*

826TBC2942D8425...

DECLARANT

# Tab 13
## (Declaration of Michael F. Cannon)

DocuSign Envelope ID: 37E2853A-1385-4C4C-87F2-7ECC765444C

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

**John Kelley**, et al.

Plaintiffs,

v.

**Xavier Becerra**, et al.,

Defendants.

Case No. 4:20-cv-00283-O

### DECLARATION OF MICHAEL F. CANNON

I, Michael F. Cannon, declare as follows:

1.     My name is Michael F. Cannon. I am over 21 years old and fully competent to make this declaration.

2.     I have personal knowledge of each of the facts stated in this declaration, and everything stated in this declaration is true and correct.

3.     I am currently director of health policy studies at the Cato Institute. I previously served as a domestic policy analyst for the U.S. Senate Republican Policy Committee, where I advised the Senate leadership on health, education, labor, welfare, and the Second Amendment. I received my B.A. from the University of Virginia in American government, and my M.A. in economics and J.M. in law and economics from George Mason University.

4.     Before the Affordable Care Act's preventive-services coverage mandate took effect, some private insurers offered policies that excluded or limited coverage of preventive care that the ACA currently mandates, or that charged copays or required deductibles for preventive care. The Department of Health and Human Services

DocuSign Envelope ID: 37E2853A-1385-4C4C-87F2-76ECC765444C

acknowledged this in its interim final rule of July 19, 2010, which includes the following:

> A survey of small, medium and large employers showed that 78 percent to 80 percent of their point of service, preferred provider organization (PPO), and health maintenance organization (HMO) health plans covered childhood immunizations and 57 percent to 66 percent covered influenza vaccines in 2001. . . . [A] 2005 America's Health Insurance Plans (AHIP) survey [found] almost all health plans (60 out of 61) covered diphtheria-tetanus-pertussis vaccines and influenza vaccines for adults. A survey of private and public employer health plans found that 84 percent covered influenza vaccines in 2002–2003.

> Similarly, many health plans already cover preventive services today, but there are differences in the coverage of these services in the group and individual markets. According to a 2009 survey of employer health benefits, over 85 percent of employer-sponsored health insurance plans covered preventive services without having to meet a deductible. Coverage of preventive services does vary slightly by employer size, with large employers being more likely to cover such services than small employers. In contrast, coverage of preventive services is less prevalent and varies more significantly in the individual market. For PPOs, only 66.2 percent of single policies purchased covered adult physicals, while 94.1 percent covered cancer screenings.

*Interim Final Rules for Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act*, 75 Fed. Reg. 41726, 41732–33 (July 19, 2010) (citing among other sources, America's Health Insurance Plans, "Individual Health Insurance 2006-2007: A Comprehensive Survey of Premiums, Availability, and Benefits," December 2007, available at https://nyti.ms/325Pjpq). An authentic copy of the interim final rule is attached to this declaration.

5.    Congress exempts "short-term, limited duration insurance" (STLDI) from the Affordable Care Act's preventive-care coverage requirements, including the contraceptive mandate.

DocuSign Envelope ID: 37E2853A-1385-4C4C-87F2-76ECC765444C

6.    A staff report by the House Committee on Energy and Commerce found that in the short-term, limited duration insurance market, some plans "exclude coverage of basic preventive care," and that "[a] number of insurers exclude coverage of contraception." An authentic copy of this report is attached, and these statements appear on page 61 of the report.

7.    The evidence from the pre-Affordable Care Act individual market and from the short-term, limited duration insurance market shows that when government leaves them free to do so, insurers offer health plans that exclude or limit coverage of preventive care, including contraceptives, and that consumers purchase those plans.

This concludes my sworn statement. I declare under penalty of perjury that the foregoing is true and correct.

*Michael F. Cannon*

DECLARANT

# Tab 14

**(Declaration of Jonathan F. Mitchell)**

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

|  |  |
|---|---|
| **John Kelley**, et al.<br><br>                         Plaintiffs,<br><br>v.<br><br>**Xavier Becerra**, et al.,<br><br>                         Defendants. | Case No. 4:20-cv-00283-O |

### DECLARATION OF JONATHAN F. MITCHELL

I, Jonathan F. Mitchell, declare as follows:

1.    My name is Jonathan F. Mitchell. I am over 21 years old and fully competent to make this declaration.

2.    I have personal knowledge of each of the facts stated in this declaration, and everything stated in this declaration is true and correct.

3.    I represent the plaintiffs in this litigation.

4.    The documents that appear at Tabs 2–5 of this appendix are authentic copies of the U.S. Preventive Services Task Force ratings, the ACIP vaccine recommendations and guidelines, the Bright Futures Periodicity Schedule, and HRSA's women's preventive services guidelines. I downloaded each of these documents from the websites of the U.S. Preventive Services Task Force, the Advisory Committee on Immunization Practices, and the Health Resources and Services Administration.

This concludes my sworn statement. I declare under penalty of perjury that the foregoing is true and correct.

*Jonathan F. Mitchell*
Declarant

**App. 77**

# Tab 15
### (Interim Final Rule of July 19, 2010)

(b) The additive is used or intended for use as a feed acidifying agent, to lower the pH, in complete swine feeds at levels not to exceed 1.2 percent of the complete feed.

(c) To assure safe use of the additive, in addition to the other information required by the Federal Food, Drug, and Cosmetic Act (the act), the label and labeling shall contain:

(1) The name of the additive.

(2) Adequate directions for use including a statement that ammonium formate must be uniformly applied and thoroughly mixed into complete swine feeds and that the complete swine feeds so treated shall be labeled as containing ammonium formate.

(d) To assure safe use of the additive, in addition to the other information required by the act and paragraph (c) of this section, the label and labeling shall contain:

(1) Appropriate warnings and safety precautions concerning ammonium formate (37 percent ammonium salt of formic acid and 62 percent formic acid).

(2) Statements identifying ammonium formate in formic acid (37 percent ammonium salt of formic acid and 62 percent formic acid) as a corrosive and possible severe irritant.

(3) Information about emergency aid in case of accidental exposure as follows:

(i) Statements reflecting requirements of applicable sections of the Superfund Amendments and Reauthorization Act (SARA), and the Occupational Safety and Health Administration's (OSHA) human safety guidance regulations.

(ii) Contact address and telephone number for reporting adverse reactions or to request a copy of the Material Safety Data Sheet (MSDS).

Dated: July 14, 2010.

**Tracey H. Forfa,**

*Acting Director, Center for Veterinary Medicine.*

[FR Doc. 2010–17565 Filed 7–16–10; 8:45 am]

**BILLING CODE 4160–01–S**

# DEPARTMENT OF THE TREASURY

**Internal Revenue Service**

**26 CFR Part 54**

**[TD 9493]**

**RIN 1545–BJ60**

# DEPARTMENT OF LABOR

**Employee Benefits Security Administration**

**29 CFR Part 2590**

**RIN 1210–AB44**

# DEPARTMENT OF HEALTH AND HUMAN SERVICES

**[OCIIO–9992–IFC]**

**45 CFR Part 147**

**RIN 0938–AQ07**

## Interim Final Rules for Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act

**AGENCIES:** Internal Revenue Service, Department of the Treasury; Employee Benefits Security Administration, Department of Labor; Office of Consumer Information and Insurance Oversight, Department of Health and Human Services.

**ACTION:** Interim final rules with request for comments.

**SUMMARY:** This document contains interim final regulations implementing the rules for group health plans and health insurance coverage in the group and individual markets under provisions of the Patient Protection and Affordable Care Act regarding preventive health services.

**DATES:** *Effective date.* These interim final regulations are effective on September 17, 2010.

*Comment date.* Comments are due on or before September 17, 2010.

*Applicability dates.* These interim final regulations generally apply to group health plans and group health insurance issuers for plan years beginning on or after September 23, 2010. These interim final regulations generally apply to individual health insurance issuers for policy years beginning on or after September 23, 2010.

**ADDRESSES:** Written comments may be submitted to any of the addresses specified below. Any comment that is submitted to any Department will be

shared with the other Departments. Please do not submit duplicates.

All comments will be made available to the public. *WARNING:* Do not include any personally identifiable information (such as name, address, or other contact information) or confidential business information that you do not want publicly disclosed. All comments are posted on the Internet exactly as received, and can be retrieved by most Internet search engines. No deletions, modifications, or redactions will be made to the comments received, as they are public records. Comments may be submitted anonymously.

*Department of Labor.* Comments to the Department of Labor, identified by RIN 1210–AB44, by one of the following methods:

• *Federal eRulemaking Portal: http://www.regulations.gov.* Follow the instructions for submitting comments.

• *E-mail: E-OHPSCA2713.EBSA@dol.gov.*

• *Mail or Hand Delivery:* Office of Health Plan Standards and Compliance Assistance, Employee Benefits Security Administration, Room N–5653, U.S. Department of Labor, 200 Constitution Avenue, NW., Washington, DC 20210, *Attention:* RIN 1210–AB44.

Comments received by the Department of Labor will be posted without change to *http://www.regulations.gov* and *http://www.dol.gov/ebsa,* and available for public inspection at the Public Disclosure Room, N–1513, Employee Benefits Security Administration, 200 Constitution Avenue, NW., Washington, DC 20210.

*Department of Health and Human Services.* In commenting, please refer to file code OCIIO–9992–IFC. Because of staff and resource limitations, we cannot accept comments by facsimile (FAX) transmission.

You may submit comments in one of four ways (please choose only one of the ways listed):

1. *Electronically.* You may submit electronic comments on this regulation to *http://www.regulations.gov.* Follow the instructions under the "More Search Options" tab.

2. *By regular mail.* You may mail written comments to the following address ONLY: Office of Consumer Information and Insurance Oversight, Department of Health and Human Services, Attention: OCIIO–9992–IFC, P.O. Box 8016, Baltimore, MD 21244–1850.

Please allow sufficient time for mailed comments to be received before the close of the comment period.

3. *By express or overnight mail.* You may send written comments to **App. 79**

following address ONLY: Office of Consumer Information and Insurance Oversight, Department of Health and Human Services, Attention: OCIIO–9992–IFC, Mail Stop C4–26–05, 7500 Security Boulevard, Baltimore, MD 21244–1850.

4. *By hand and courier.* If you prefer, you may deliver (by hand or courier) your written comments before the close of the comment period to either of the following addresses:

a. For delivery in Washington, DC—Office of Consumer Information and Insurance Oversight, Department of Health and Human Services, Room 445–G, Hubert H. Humphrey Building, 200 Independence Avenue, SW., Washington, DC 20201.

(Because access to the interior of the Hubert H. Humphrey Building is not readily available to persons without Federal government identification, commenters are encouraged to leave their comments in the OCIIO drop slots located in the main lobby of the building. A stamp-in clock is available for persons wishing to retain a proof of filing by stamping in and retaining an extra copy of the comments being filed.)

b. For delivery in Baltimore, MD—Centers for Medicare & Medicaid Services, Department of Health and Human Services, 7500 Security Boulevard, Baltimore, MD 21244–1850.

If you intend to deliver your comments to the Baltimore address, please call (410) 786–7195 in advance to schedule your arrival with one of our staff members.

Comments mailed to the addresses indicated as appropriate for hand or courier delivery may be delayed and received after the comment period.

*Submission of comments on paperwork requirements.* You may submit comments on this document's paperwork requirements by following the instructions at the end of the "Collection of Information Requirements" section in this document.

*Inspection of Public Comments.* All comments received before the close of the comment period are available for viewing by the public, including any personally identifiable or confidential business information that is included in a comment. We post all comments received before the close of the comment period on the following Web site as soon as possible after they have been received: *http://www.regulations.gov.* Follow the search instructions on that Web site to view public comments.

Comments received timely will also be available for public inspection as they are received, generally beginning approximately three weeks after publication of a document, at the

headquarters of the Centers for Medicare & Medicaid Services, 7500 Security Boulevard, Baltimore, Maryland 21244, Monday through Friday of each week from 8:30 a.m. to 4 p.m. EST. To schedule an appointment to view public comments, phone 1–800–743–3951.

*Internal Revenue Service.* Comments to the IRS, identified by REG–120391–10, by one of the following methods:

• *Federal eRulemaking Portal: http://www.regulations.gov.* Follow the instructions for submitting comments.

• *Mail:* CC:PA:LPD:PR (REG–120391–10), room 5205, Internal Revenue Service, P.O. Box 7604, Ben Franklin Station, Washington, DC 20044.

• *Hand or courier delivery:* Monday through Friday between the hours of 8 a.m. and 4 p.m. to: CC:PA:LPD:PR (REG–120391–10), Courier's Desk, Internal Revenue Service, 1111 Constitution Avenue, NW., Washington DC 20224.

All submissions to the IRS will be open to public inspection and copying in room 1621, 1111 Constitution Avenue, NW., Washington, DC from 9 a.m. to 4 p.m.

**FOR FURTHER INFORMATION CONTACT:** Amy Turner or Beth Baum, Employee Benefits Security Administration, Department of Labor, at (202) 693–8335; Karen Levin, Internal Revenue Service, Department of the Treasury, at (202) 622–6080; Jim Mayhew, Office of Consumer Information and Insurance Oversight, Department of Health and Human Services, at (410) 786–1565.

*Customer Service Information:* Individuals interested in obtaining information from the Department of Labor concerning employment-based health coverage laws may call the EBSA Toll-Free Hotline at 1–866–444–EBSA (3272) or visit the Department of Labor's Web site (*http://www.dol.gov/ebsa*). In addition, information from HHS on private health insurance for consumers can be found on the Centers for Medicare & Medicaid Services (CMS) Web site (*http://www.cms.hhs.gov/HealthInsReformforConsume/01_Overview.as*) and information on health reform can be found at *http://www.healthreform.gov.*

**SUPPLEMENTARY INFORMATION:**

## I. Background

The Patient Protection and Affordable Care Act (the Affordable Care Act), Public Law 111–148, was enacted on March 23, 2010; the Health Care and Education Reconciliation Act (the Reconciliation Act), Public Law 111–152, was enacted on March 30, 2010. The Affordable Care Act and the Reconciliation Act reorganize, amend,

and add to the provisions of part A of title XXVII of the Public Health Service Act (PHS Act) relating to group health plans and health insurance issuers in the group and individual markets. The term "group health plan" includes both insured and self-insured group health plans.[1] The Affordable Care Act adds section 715(a)(1) to the Employee Retirement Income Security Act (ERISA) and section 9815(a)(1) to the Internal Revenue Code (the Code) to incorporate the provisions of part A of title XXVII of the PHS Act into ERISA and the Code, and make them applicable to group health plans, and health insurance issuers providing health insurance coverage in connection with group health plans. The PHS Act sections incorporated by this reference are sections 2701 through 2728. PHS Act sections 2701 through 2719A are substantially new, though they incorporate some provisions of prior law. PHS Act sections 2722 through 2728 are sections of prior law renumbered, with some, mostly minor, changes.

Subtitles A and C of title I of the Affordable Care Act amend the requirements of title XXVII of the PHS Act (changes to which are incorporated into ERISA section 715). The preemption provisions of ERISA section 731 and PHS Act section 2724[2] (implemented in 29 CFR 2590.731(a) and 45 CFR 146.143(a)) apply so that the requirements of part 7 of ERISA and title XXVII of the PHS Act, as amended by the Affordable Care Act, are not to be "construed to supersede any provision of State law which establishes, implements, or continues in effect any standard or requirement solely relating to health insurance issuers in connection with group or individual health insurance coverage except to the extent that such standard or requirement prevents the application of a requirement" of the Affordable Care Act. Accordingly, State laws that impose on health insurance issuers requirements that are stricter than those imposed by the Affordable Care Act will not be superseded by the Affordable Care Act.

---

[1] The term "group health plan" is used in title XXVII of the PHS Act, part 7 of ERISA, and chapter 100 of the Code, and is distinct from the term "health plan," as used in other provisions of title I of the Affordable Care Act. The term "health plan" does not include self-insured group health plans.

[2] Code section 9815 incorporates the preemption provisions of PHS Act section 2724. Prior to the Affordable Care Act, there were no express preemption provisions in chapter 100 of the Code.

The Departments of Health and Human Services, Labor, and the Treasury (the Departments) are issuing regulations in several phases implementing the revised PHS Act sections 2701 through 2719A and related provisions of the Affordable Care Act. The first phase in this series was the publication of a Request for Information relating to the medical loss ratio provisions of PHS Act section 2718, published in the **Federal Register** on April 14, 2010 (75 FR 19297). The second phase was interim final regulations implementing PHS Act section 2714 (requiring dependent coverage of children to age 26), published in the **Federal Register** on May 13, 2010 (75 FR 27122). The third phase was interim final regulations implementing section 1251 of the Affordable Care Act (relating to status as a grandfathered health plan), published in the **Federal Register** on June 17, 2010 (75 FR 34538). The fourth phase was interim final regulations implementing PHS Act sections 2704 (prohibiting preexisting condition exclusions), 2711 (regarding lifetime and annual dollar limits on benefits), 2712 (regarding restrictions on rescissions), and 2719A (regarding patient protections), published in the **Federal Register** on June 28, 2010 (75 FR 37188). These interim final regulations are being published to implement PHS Act section 2713 (relating to coverage for preventive services). PHS Act section 2713 is generally effective for plan years (in the individual market, policy years) beginning on or after September 23, 2010, which is six months after the March 23, 2010 date of enactment of the Affordable Care Act. The implementation of other provisions of PHS Act sections 2701 through 2719A will be addressed in future regulations.

## II. Overview of the Regulations: PHS Act Section 2713, Coverage of Preventive Health Services (26 CFR 54.9815–2713T, 29 CFR 2590.715–2713, 45 CFR 147.130)

Section 2713 of the PHS Act, as added by the Affordable Care Act, and these interim final regulations require that a group health plan and a health insurance issuer offering group or individual health insurance coverage provide benefits for and prohibit the imposition of cost-sharing requirements with respect to:

• Evidence-based items or services that have in effect a rating of A or B in the current recommendations of the United States Preventive Services Task

Force (Task Force) with respect to the individual involved.[3]

• Immunizations for routine use in children, adolescents, and adults that have in effect a recommendation from the Advisory Committee on Immunization Practices of the Centers for Disease Control and Prevention (Advisory Committee) with respect to the individual involved. A recommendation of the Advisory Committee is considered to be "in effect" after it has been adopted by the Director of the Centers for Disease Control and Prevention. A recommendation is considered to be for routine use if it appears on the Immunization Schedules of the Centers for Disease Control and Prevention.

• With respect to infants, children, and adolescents, evidence-informed preventive care and screenings provided for in the comprehensive guidelines supported by the Health Resources and Services Administration (HRSA).

• With respect to women, evidence-informed preventive care and screening provided for in comprehensive guidelines supported by HRSA (not otherwise addressed by the recommendations of the Task Force). The Department of HHS is developing these guidelines and expects to issue them no later than August 1, 2011.

The complete list of recommendations and guidelines that are required to be covered under these interim final regulations can be found at *http://www.HealthCare.gov/center/regulations/prevention.html*. Together, the items and services described in these recommendations and guidelines are referred to in this preamble as "recommended preventive services."

These interim final regulations clarify the cost-sharing requirements when a recommended preventive service is provided during an office visit. First, if a recommended preventive service is billed separately (or is tracked as individual encounter data separately) from an office visit, then a plan or issuer may impose cost-sharing requirements with respect to the office visit. Second, if a recommended preventive service is

not billed separately (or is not tracked as individual encounter data separately) from an office visit and the primary purpose of the office visit is the delivery of such an item or service, then a plan or issuer may not impose cost-sharing requirements with respect to the office visit. Finally, if a recommended preventive service is not billed separately (or is not tracked as individual encounter data separately) from an office visit and the primary purpose of the office visit is not the delivery of such an item or service, then a plan or issuer may impose cost-sharing requirements with respect to the office visit. The reference to tracking individual encounter data was included to provide guidance with respect to plans and issuers that use capitation or similar payment arrangements that do not bill individually for items and services.

Examples in these interim final regulations illustrate these provisions. In one example, an individual receives a cholesterol screening test, a recommended preventive service, during a routine office visit. The plan or issuer may impose cost-sharing requirements for the office visit because the recommended preventive service is billed as a separate charge. A second example illustrates that treatment resulting from a preventive screening can be subject to cost-sharing requirements if the treatment is not itself a recommended preventive service. In another example, an individual receives a recommended preventive service that is not billed as a separate charge. In this example, the primary purpose for the office visit is recurring abdominal pain and not the delivery of a recommended preventive service; therefore the plan or issuer may impose cost-sharing requirements for the office visit. In the final example, an individual receives a recommended preventive service that is not billed as a separate charge, and the delivery of that service is the primary purpose of the office visit. Therefore, the plan or issuer may not impose cost-sharing requirements for the office visit.

With respect to a plan or health insurance coverage that has a network of providers, these interim final regulations make clear that a plan or issuer is not required to provide coverage for recommended preventive services delivered by an out-of-network provider. Such a plan or issuer may also impose cost-sharing requirements for recommended preventive services delivered by an out-of-network provider.

These interim final regulations provide that if a recommenda-

---

[3] Under PHS Act section 2713(a)(5), the Task Force recommendations regarding breast cancer screening, mammography, and prevention issued in or around November of 2009 are not to be considered current recommendations on this subject for purposes of any law. Thus, the recommendations regarding breast cancer screening, mammography, and prevention issued by the Task Force prior to those issued in or around November of 2009 (*i.e.*, those issued in 2002) will be considered current until new recommendations in this area are issued by the Task Force or appear in comprehensive guidelines supported by the Health Resources and Services Administration concerning preventive care and screenings for women.

guideline for a recommended preventive service does not specify the frequency, method, treatment, or setting for the provision of that service, the plan or issuer can use reasonable medical management techniques to determine any coverage limitations. The use of reasonable medical management techniques allows plans and issuers to adapt these recommendations and guidelines to coverage of specific items and services where cost sharing must be waived. Thus, under these interim final regulations, a plan or issuer may rely on established techniques and the relevant evidence base to determine the frequency, method, treatment, or setting for which a recommended preventive service will be available without cost-sharing requirements to the extent not specified in a recommendation or guideline.

The statute and these interim final regulations clarify that a plan or issuer continues to have the option to cover preventive services in addition to those required to be covered by PHS Act section 2713. For such additional preventive services, a plan or issuer may impose cost-sharing requirements at its discretion. Moreover, a plan or issuer may impose cost-sharing requirements for a treatment that is not a recommended preventive service, even if the treatment results from a recommended preventive service.

The statute requires the Departments to establish an interval of not less than one year between when recommendations or guidelines under PHS Act section 2713(a) [4] are issued, and the plan year (in the individual market, policy year) for which coverage of the services addressed in such recommendations or guidelines must be in effect. These interim final regulations provide that such coverage must be provided for plan years (in the

individual market, policy years) beginning on or after the later of September 23, 2010, or one year after the date the recommendation or guideline is issued. Thus, recommendations and guidelines issued prior to September 23, 2009 must be provided for plan years (in the individual market, policy years) beginning on or after September 23, 2010. For the purpose of these interim final regulations, a recommendation or guideline of the Task Force is considered to be issued on the last day of the month on which the Task Force publishes or otherwise releases the recommendation; a recommendation or guideline of the Advisory Committee is considered to be issued on the date on which it is adopted by the Director of the Centers for Disease Control and Prevention; and a recommendation or guideline in the comprehensive guidelines supported by HRSA is considered to be issued on the date on which it is accepted by the Administrator of HRSA or, if applicable, adopted by the Secretary of HHS. For recommendations and guidelines adopted after September 23, 2009, information at *http:// www.HealthCare.gov/center/ regulations/prevention.html* will be updated on an ongoing basis and will include the date on which the recommendation or guideline was accepted or adopted.

Finally, these interim final regulations make clear that a plan or issuer is not required to provide coverage or waive cost-sharing requirements for any item or service that has ceased to be a recommended preventive service.[5] Other requirements of Federal or State law may apply in connection with ceasing to provide coverage or changing cost-sharing requirements for any such item or service. For example, PHS Act section 2715(d)(4) requires a plan or issuer to give 60 days advance notice to an enrollee before any material modification will become effective.

Recommendations or guidelines in effect as of July 13, 2010 are described in section V later in this preamble. Any change to a recommendation or guideline that has—at any point since September 23, 2009—been included in the recommended preventive services will be noted at *http:// www.HealthCare.gov/center/ regulations/prevention.html*. As described above, new recommendations and guidelines will also be noted at this

site and plans and issuers need not make changes to coverage and cost-sharing requirements based on a new recommendation or guideline until the first plan year (in the individual market, policy year) beginning on or after the date that is one year after the new recommendation or guideline went into effect. Therefore, by visiting this site once per year, plans or issuers will have straightforward access to all the information necessary to determine any additional items or services that must be covered without cost-sharing requirements, or to determine any items or services that are no longer required to be covered.

The Affordable Care Act gives authority to the Departments to develop guidelines for group health plans and health insurance issuers offering group or individual health insurance coverage to utilize value-based insurance designs as part of their offering of preventive health services. Value-based insurance designs include the provision of information and incentives for consumers that promote access to and use of higher value providers, treatments, and services. The Departments recognize the important role that value-based insurance design can play in promoting the use of appropriate preventive services. These interim final regulations, for example, permit plans and issuers to implement designs that seek to foster better quality and efficiency by allowing cost-sharing for recommended preventive services delivered on an out-of-network basis while eliminating cost-sharing for recommended preventive health services delivered on an in-network basis. The Departments are developing additional guidelines regarding the utilization of value-based insurance designs by group health plans and health insurance issuers with respect to preventive benefits. The Departments are seeking comments related to the development of such guidelines for value-based insurance designs that promote consumer choice of providers or services that offer the best value and quality, while ensuring access to critical, evidence-based preventive services.

The requirements to cover recommended preventive services without any cost-sharing requirements do not apply to grandfathered health plans. *See* 26 CFR 54.9815–1251T, 29 CFR 2590.715–1251, and 45 CFR 147.140 (75 FR 34538, June 17, 2010).

**III. Interim Final Regulations and Request for Comments**

Section 9833 of the Code, section 734 of ERISA, and section 2792 of the PHS

---

[4] Section 2713(b)(1) refers to an interval between "the date on which a recommendation described in subsection (a)(1) or (a)(2) or a guideline under subsection (a)(3) is issued and the plan year with respect to which the requirement described in subsection (a) is effective with respect to the service described in such recommendation or guideline." While the first part of this statement does not mention guidelines under subsection (a)(4), it would make no sense to treat the services covered under (a)(4) any differently than those in (a)(1), (a)(2), and (a)(3). First, the same sentence refers to "the requirement described in subsection (a)," which would include a requirement under (a)(4). Secondly, the guidelines under (a)(4) are from the same source as those under (a)(3), except with respect to women rather than infants, children and adolescents; and other preventive services involving women are addressed in (a)(1), so there is no plausible policy rationale for treating them differently. Third, without this clarification, it would be unclear when such services would have to be covered. These interim final regulations accordingly apply the intervals established therein to services under section 2713(a)(4).

[5] For example, if a recommendation of the United States Preventive Services Task Force is downgraded from a rating of A or B to a rating of C or D, or if a recommendation or guideline no longer includes a particular item or service.

Act authorize the Secretaries of the Treasury, Labor, and HHS (collectively, the Secretaries) to promulgate any interim final rules that they determine are appropriate to carry out the provisions of chapter 100 of the Code, part 7 of subtitle B of title I of ERISA, and part A of title XXVII of the PHS Act, which include PHS Act sections 2701 through 2728 and the incorporation of those sections into ERISA section 715 and Code section 9815.

In addition, under Section 553(b) of the Administrative Procedure Act (APA) (5 U.S.C. 551 *et seq.*) a general notice of proposed rulemaking is not required when an agency, for good cause, finds that notice and public comment thereon are impracticable, unnecessary, or contrary to the public interest. The provisions of the APA that ordinarily require a notice of proposed rulemaking do not apply here because of the specific authority granted by section 9833 of the Code, section 734 of ERISA, and section 2792 of the PHS Act. However, even if the APA were applicable, the Secretaries have determined that it would be impracticable and contrary to the public interest to delay putting the provisions in these interim final regulations in place until a full public notice and comment process was completed. As noted above, the preventive health service provisions of the Affordable Care Act are applicable for plan years (in the individual market, policy years) beginning on or after September 23, 2010, six months after date of enactment. Had the Departments published a notice of proposed rulemaking, provided for a 60-day comment period, and only then prepared final regulations, which would be subject to a 60-day delay in effective date, it is unlikely that it would have been possible to have final regulations in effect before late September, when these requirements could be in effect for some plans or policies. Moreover, the requirements in these interim final

regulations require significant lead time in order to implement. These interim final regulations require plans and issuers to provide coverage for preventive services listed in certain recommendations and guidelines without imposing any cost-sharing requirements. Preparations presumably would have to be made to identify these preventive services. With respect to the changes that would be required to be made under these interim final regulations, group health plans and health insurance issuers subject to these provisions have to be able to take these changes into account in establishing their premiums, and in making other changes to the designs of plan or policy benefits, and these premiums and plan or policy changes would have to receive necessary approvals in advance of the plan or policy year in question.

Accordingly, in order to allow plans and health insurance coverage to be designed and implemented on a timely basis, regulations must be published and available to the public well in advance of the effective date of the requirements of the Affordable Care Act. It is not possible to have a full notice and comment process and to publish final regulations in the brief time between enactment of the Affordable Care Act and the date regulations are needed.

The Secretaries further find that issuance of proposed regulations would not be sufficient because the provisions of the Affordable Care Act protect significant rights of plan participants and beneficiaries and individuals covered by individual health insurance policies and it is essential that participants, beneficiaries, insureds, plan sponsors, and issuers have certainty about their rights and responsibilities. Proposed regulations are not binding and cannot provide the necessary certainty. By contrast, the interim final regulations provide the public with an opportunity for

comment, but without delaying the effective date of the regulations.

For the foregoing reasons, the Departments have determined that it is impracticable and contrary to the public interest to engage in full notice and comment rulemaking before putting these interim final regulations into effect, and that it is in the public interest to promulgate interim final regulations.

### IV. Economic Impact

Under Executive Order 12866 (58 FR 51735), a "significant" regulatory action is subject to review by the Office of Management and Budget (OMB). Section 3(f) of the Executive Order defines a "significant regulatory action" as an action that is likely to result in a rule (1) having an annual effect on the economy of $100 million or more in any one year, or adversely and materially affecting a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or State, local or tribal governments or communities (also referred to as "economically significant"); (2) creating a serious inconsistency or otherwise interfering with an action taken or planned by another agency; (3) materially altering the budgetary impacts of entitlement grants, user fees, or loan programs or the rights and obligations of recipients thereof; or (4) raising novel legal or policy issues arising out of legal mandates, the President's priorities, or the principles set forth in the Executive Order. OMB has determined that this regulation is economically significant within the meaning of section 3(f)(1) of the Executive Order, because it is likely to have an annual effect on the economy of $100 million in any one year. Accordingly, OMB has reviewed these rules pursuant to the Executive Order. The Departments provide an assessment of the potential costs, benefits, and transfers associated with these interim final regulations, summarized in the following table.

TABLE 1—ACCOUNTING TABLE (2011–2013)

| |
| --- |
| **Benefits:** |
| Qualitative: By expanding coverage and eliminating cost sharing for the recommended preventive services, the Departments expect access and utilization of these services to increase. To the extent that individuals increase their use of these services the Departments anticipate several benefits: (1) prevention and reduction in transmission of illnesses as a result of immunization and screening of transmissible diseases; (2) delayed onset, earlier treatment, and reduction in morbidity and mortality as a result of early detection, screening, and counseling; (3) increased productivity and fewer sick days; and (4) savings from lower health care costs. Another benefit of these interim final regulations will be to distribute the cost of preventive services more equitably across the broad insured population. |
| **Costs:** |
| Qualitative: New costs to the health care system result when beneficiaries increase their use of preventive services in response to the changes in coverage and cost-sharing requirements of preventive services. The magnitude of this effect on utilization depends on the price elasticity of demand and the percentage change in prices facing those with reduced cost sharing or newly gaining coverage. |
| **Transfers:** |

TABLE 1—ACCOUNTING TABLE (2011–2013)—Continued

Qualitative: Transfers will occur to the extent that costs that were previously paid out-of-pocket for certain preventive services will now be covered by group health plans and issuers under these interim final regulations. Risk pooling in the group market will result in sharing expected cost increases across an entire plan or employee group as higher average premiums for all enrollees. However, not all of those covered will utilize preventive services to an equivalent extent. As a result, these interim final regulations create a small transfer from those paying premiums in the group market utilizing less than the average volume of preventive services in their risk pool to those whose utilization is greater than average. To the extent there is risk pooling in the individual market, a similar transfer will occur.

## A. The Need for Federal Regulatory Action

As discussed later in this preamble, there is current underutilization of preventive services, which stems from three main factors. First, due to turnover in the health insurance market, health insurance issuers do not currently have incentives to cover preventive services, whose benefits may only be realized in the future when an individual may no longer be enrolled. Second, many preventive services generate benefits that do not accrue immediately to the individual that receives the services, making the individual less likely to take-up, especially in the face of direct, immediate costs. Third, some of the benefits of preventive services accrue to society as a whole, and thus do not get factored into an individual's decision-making over whether to obtain such services.

These interim final regulations address these market failures through two avenues. First, they require coverage of recommended preventive services by non-grandfathered group health plans and health insurance issuers in the group and individual markets, thereby overcoming plans' lack of incentive to invest in these services. Second, they eliminate cost-sharing requirements, thereby removing a barrier that could otherwise lead an individual to not obtain such services, given the long-term and partially external nature of benefits.

These interim final regulations are necessary in order to provide rules that plan sponsors and issuers can use to determine how to provide coverage for certain preventive health care services without the imposition of cost sharing in connection with these services.

## B. PHS Act Section 2713, Coverage of Preventive Health Services (26 CFR 54.9815–2713, 29 CFR 2590.715–2713, 45 CFR 147.130)

### 1. Summary

As discussed earlier in this preamble, PHS Act section 2713, as added by the Affordable Care Act, and these interim final regulations require a group health plan and a health insurance issuer offering group or individual health insurance coverage to provide benefits for and prohibit the imposition of cost-sharing requirements with respect to the following preventive health services:

• Evidence-based items or services that have in effect a rating of A or B in the current recommendations of the United States Preventive Services Task Force (Task Force). While these guidelines will change over time, for the purposes of this impact analysis, the Departments utilized currently available guidelines, which include blood pressure and cholesterol screening, diabetes screening for hypertensive patients, various cancer and sexually transmitted infection screenings, and counseling related to aspirin use, tobacco cessation, obesity, and other topics.

• Immunizations for routine use in children, adolescents, and adults that have in effect a recommendation from the Advisory Committee on Immunization Practices of the Centers for Disease Control and Prevention (Advisory Committee) with respect to the individual involved.

• With respect to infants, children, and adolescents, evidence-informed preventive care and screenings provided for in the comprehensive guidelines supported by the Health Resources and Services Administration (HRSA).

• With respect to women, evidence-informed preventive care and screening provided for in comprehensive guidelines supported by HRSA (not otherwise addressed by the recommendations of the Task Force). The Department of HHS is developing these guidelines and expects to issue them no later than August 1, 2011.

### 2. Preventive Services

For the purposes of this analysis, the Departments used the relevant recommendations of the Task Force and Advisory Committee and current HRSA guidelines as described in section V later in this preamble. In addition to covering immunizations, these lists include such services as blood pressure and cholesterol screening, diabetes screening for hypertensive patients, various cancer and sexually transmitted infection screenings, genetic testing for the BRCA gene, adolescent depression screening, lead testing, autism testing, and oral health screening and counseling related to aspirin use, tobacco cessation, and obesity.

### 3. Estimated Number of Affected Entities

For purposes of the new requirements in the Affordable Care Act that apply to group health plans and health insurance issuers in the group and individual markets, the Departments have defined a large group health plan as an employer plan with 100 or more workers and a small group plan as an employer plan with less than 100 workers. The Departments estimated that there are approximately 72,000 large and 2.8 million small ERISA-covered group health plans with an estimated 97.0 million participants in large group plans and 40.9 million participants in small group plans.[6] The Departments estimate that there are 126,000 governmental plans with 36.1 million participants in large plans and 2.3 million participants in small plans.[7] The Departments estimate there are 16.7 million individuals under age 65 covered by individual health insurance policies.[8]

As described in the Departments' interim final regulations relating to status as a grandfathered health plan,[9] the Affordable Care Act preserves the ability of individuals to retain coverage under a group health plan or health insurance coverage in which the individual was enrolled on March 23, 2010 (a grandfathered health plan). Group health plans, and group and individual health insurance coverage, that are grandfathered health plans do not have to meet the requirements of these interim final regulations. Therefore, only plans and issuers offering group and individual health insurance coverage that are not grandfathered health plans will be affected by these interim final regulations.

[6] All participant counts and the estimates of individual policies are from the U.S. Department of Labor, EBSA calculations using the March 2008 Current Population Survey Annual Social and Economic Supplement and the 2008 Medical Expenditure Panel Survey.

[7] Estimate is from the 2007 Census of Government.

[8] US Census Bureau, Current Population Survey, March 2009.

[9] 75 FR 34538 (June 17, 2010).

**App. 84**

Plans can choose to relinquish their grandfather status in order to make certain otherwise permissible changes to their plans.[10] The Affordable Care Act provides plans with the ability to maintain grandfathered status in order to promote stability for consumers while allowing plans and sponsors to make reasonable adjustments to lower costs and encourage the efficient use of services. Based on an analysis of the changes plans have made over the past few years, the Departments expect that more plans will choose to make these changes over time and therefore the number of grandfathered health plans is expected to decrease. Correspondingly, the number of plans and policies affected by these interim final regulations is likely to increase over time. In addition, the number of individuals receiving the benefits of the Affordable Care Act is likely to increase over time. The Departments' mid-range estimate is that 18 percent of large employer plans and 30 percent of small employer plans would relinquish grandfather status in 2011, increasing over time to 45 percent and 66 percent respectively by 2013, although there is substantial uncertainty surrounding these estimates.[11]

Using the mid-range assumptions, the Departments estimate that in 2011, roughly 31 million people will be enrolled in group health plans subject to the prevention provisions in these interim final regulations, growing to approximately 78 million in 2013.[12] The mid-range estimates suggest that approximately 98 million individuals will be enrolled in grandfathered group health plans in 2013, many of which already cover preventive services (see discussion of the extent of preventive services coverage in employer-sponsored plans later in this preamble).

In the individual market, one study estimated that 40 percent to 67 percent of individual policies terminate each year. Because all newly purchased individual policies are not grandfathered, the Departments expect that a large proportion of individual policies will not be grandfathered, covering up to and perhaps exceeding 10 million individuals.[13]

However, not all of the individuals potentially affected by these interim final regulations will directly benefit given the prevalence and variation in insurance coverage today. State laws will affect the number of entities affected by all or some provision of these interim final regulations, since plans, policies, and enrollees in States that already have certain requirements will be affected to different degrees.[14] For instance, 29 States require that health insurance issuers cover most or all recommended immunizations for children.[15] Of these 29 States, 18 States require first-dollar coverage of immunizations so that the insurers pay for immunizations without a deductible and 12 States exempt immunizations from copayments (*e.g.*, $5, $10, or $20 per vaccine) or coinsurance (*e.g.*, 10 percent or 20 percent of charges). State laws also require coverage of certain other preventive health services. Every State except Utah mandates coverage for some type of breast cancer screening for women. Twenty-eight States mandate coverage for some cervical cancer screening and 13 States mandate coverage for osteoporosis screening.[16]

Estimation of the number of entities immediately affected by some or all provisions of these interim final regulations is further complicated by the fact that, although not all States require insurance coverage for certain preventive services, many health plans have already chosen to cover these services. For example, most health plans cover most childhood and some adult immunizations contained in the recommendations from the Advisory Committee. A survey of small, medium and large employers showed that 78 percent to 80 percent of their point of service, preferred provider organization (PPO), and health maintenance organization (HMO) health plans covered childhood immunizations and 57 percent to 66 percent covered influenza vaccines in 2001.[17] All 61 health plans (HMOs and PPOs) responding to a 2005 America's Health Insurance Plans (AHIP) survey covered childhood immunizations [18] in their best-selling products and almost all health plans (60 out of 61) covered diphtheria-tetanus-pertussis vaccines and influenza vaccines for adults.[19] A survey of private and public employer health plans found that 84 percent covered influenza vaccines in 2002–2003.[20]

Similarly, many health plans already cover preventive services today, but there are differences in the coverage of these services in the group and individual markets. According to a 2009 survey of employer health benefits, over 85 percent of employer-sponsored health insurance plans covered preventive services without having to meet a deductible.[21] Coverage of preventive services does vary slightly by employer size, with large employers being more likely to cover such services than small employers.[22] In contrast, coverage of preventive services is less prevalent and varies more significantly in the individual market.[23] For PPOs,

---

[10] See 75 FR 34538 (June 17, 2010).

[11] See 75 FR 34538 (June 17, 2010) for a detailed description of the derivation of the estimates for the percentages of grandfathered health plans. In brief, the Departments used data from the 2008 and 2009 Kaiser Family Foundations/Health Research and Educational Trust survey of employers to estimate the proportion of plans that made changes in cost-sharing requirements that would have caused them to relinquish grandfather status if those same changes were made in 2011, and then applied a set of assumptions about how employer behavior might change in response to the incentives created by the grandfather regulations to estimate the proportion of plans likely to relinquish grandfather status. The estimates of changes in 2012 and 2013 were calculated by using the 2011 calculations and assuming that an identical percentage of plan sponsors will relinquish grandfather status in each year.

[12] To estimate the number of individuals covered in grandfathered health plans, the Departments extended the analysis described in 75 FR 34538, and estimated a weighted average of the number of employees in grandfathered health plans in the large employer and small employer markets separately, weighting by the number of employees in each employer's plan. Estimates for the large employer and small employer markets were then combined, using the estimates supplied above that there are 133.1 million covered lives in the large group market, and 43.2 million in the small group market.

[13] Adele M. Kirk. The Individual Insurance Market: A Building Block for Health Care Reform? *Health Care Financing Organization Research Synthesis.* May 2008.

[14] Of note, State insurance requirements do not apply to self-insured group health plans, whose participants and beneficiaries make up 57 percent of covered employees (in firms with 3 or more employees) in 2009 according to a major annual survey of employers due to ERISA preemption of State insurance laws. *See e.g.*, Kaiser Family Foundation and Health Research and Education Trust, *Employer Health Benefits 2009 Annual Survey* (2009).

[15] *See e.g.*, American Academy of Pediatrics, *State Legislative Report* (2009).

[16] See Kaiser Family Foundation, www.statehealthfacts.org.

[17] *See e.g.*, Mary Ann Bondi *et. al.*, "Employer Coverage of Clinical Preventive Services in the United States," *American Journal of Health Promotion, 20(3), pp. 214–222 (2006).*

[18] The specific immunizations include: DTaP (diphtheria and tetanus toxoids and acellular Pertussis), Hib (*Haemophilus influenza* type b), Hepatitis B, inactivated polio, influenza, MMR (measles, mumps, and rubella), pneumococcal, and varicella vaccine.

[19] McPhillips-Tangum C., Rehm B., Hilton O. "Immunization practices and policies: A survey of health insurance plans." *AHIP Coverage.* 47(1), 32–7 (2006).

[20] *See e.g.*, Matthew M. Davis *et al.*, "Benefits Coverage for Adult Vaccines in Employer-Sponsored Health Plans," University of Michigan for the CDC National Immunizations Program (2003).

[21] *See e.g.*, Kaiser Family Foundation and Health Research and Education Trust, *Employer Health Benefits 2009 Annual Survey* (2009) available at *http://ehbs.kff.org/pdf/2009/7936.pdf.*

[22] *See e.g.*, Mary Ann Bondi *et al.*, "Employer Coverage of Clinical Preventive Services in the United States," American Journal of Health Promotion, 20(3), pp. 214–222 (2006).

[23] *See e.g.*, Matthew M. Davis et. al., "Benefits Coverage for Adult Vaccines in Employer-Sponsored Health Plans," University of Michigan

App. 85

only 66.2 percent of single policies purchased covered adult physicals, while 94.1 percent covered cancer screenings.[24]

In summary, the number of affected entities depends on several factors, such as whether a health plan retains its grandfather status, the number of new health plans, whether State benefit requirements for preventive services apply, and whether plans or issuers voluntarily offer coverage and/or no cost sharing for recommended preventive services. In addition, participants, beneficiaries, and enrollees in such plans or health insurance coverage will be affected in different ways: Some will newly gain coverage for recommended preventive services, while others will have the cost sharing that they now pay for such services eliminated. As such, there is considerable uncertainty surrounding estimation of the number of entities affected by these interim final regulations.

### 4. Benefits

The Departments anticipate that four types of benefits will result from these interim final regulations. First, individuals will experience improved health as a result of reduced transmission, prevention or delayed onset, and earlier treatment of disease. Second, healthier workers and children will be more productive with fewer missed days of work or school. Third, some of the recommended preventive services will result in savings due to lower health care costs. Fourth, the cost of preventive services will be distributed more equitably.

By expanding coverage and eliminating cost sharing for recommended preventive services, these interim final regulations could be expected to increase access to and utilization of these services, which are not used at optimal levels today. Nationwide, almost 38 percent of adult residents over 50 have never had a colorectal cancer screening (such as a sigmoidoscopy or a colonoscopy)[25] and almost 18 percent of women over age 18 have not been screened for cervical cancer in the past three years.[26] Vaccination rates for childhood vaccines are generally high due to State laws requiring certain vaccinations for children to enter school, but recommended childhood vaccines that are not subject to State laws and adult vaccines have lower vaccination rates (e.g., the meningococcal vaccination rate among teenagers is 42 percent).[27] Studies have shown that improved coverage of preventive services leads to expanded utilization of these services,[28] which would lead to substantial benefits as discussed further below.

In addition, these interim final regulations limit preventive service coverage under this provision to services recommended by the Task Force, Advisory Committee, and HRSA. The preventive services given a grade of A or B by the Task Force have been determined by the Task Force to have at least fair or good[29] evidence that the preventive service improves important health outcomes and that benefits outweigh harms in the judgment of an independent panel of private sector experts in primary care and prevention.[30] Similarly, the mission of the Advisory Committee is to provide advice that will lead to a reduction in the incidence of vaccine preventable

diseases in the United States, and an increase in the safe use of vaccines and related biological products. The comprehensive guidelines for infants, children, and adolescents supported by HRSA are developed by multidisciplinary professionals in the relevant fields to provide a framework for improving children's health and reducing morbidity and mortality based on a review of the relevant evidence. The statute and interim final regulations limit the preventive services covered to those recommended by the Task Force, Advisory Committee, and HRSA because the benefits of these preventive services will be higher than others that may be popular but unproven.

Research suggests significant health benefits from a number of the preventive services that would be newly covered with no cost sharing by plans and issuers under the statute and these interim final regulations. A recent article in *JAMA* stated, "By one account, increasing delivery of just five clinical preventive services would avert 100,000 deaths per year."[31] These five services are all items and services recommended by the Task Force, Advisory Committee, and/or the comprehensive guidelines supported by HRSA. The National Council on Prevention Priorities (NCPP) estimated that almost 150,000 lives could potentially be saved by increasing the 2005 rate of utilization to 90 percent for eight of the preventive services recommended by the Task Force or Advisory Committee.[32] Table 2 shows eight of the services and the number of lives potentially saved if utilization of preventive services were to increase to 90 percent.

---

for the CDC National Immunizations Program (2003).

[24] See Individual Health Insurance 2006–2007: A Comprehensive Survey of Premiums, Availability, and Benefits. Available at *http://www.ahipresearch.org/pdfs/Individual_Market_Survey_December_2007.pdf.*

[25] This differs from the Task Force recommendation that individuals aged 50–75 receive fecal occult blood testing, sigmoidoscopy, or colonoscopy screening for colorectal cancer.

[26] For National Risk Factor Surveillance System Numbers *see e.g.* Centers for Disease Control and Prevention (CDC). *Behavioral Risk Factor Surveillance System Survey Data.* Atlanta, Georgia: U.S. Department of Health and Human Services, Centers for Disease Control and Prevention, (2008) at *http://apps.nccd.cdc.gov/BRFSS/page.asp?cat=CC&yr=2008&state=UB#CC.*

[27] See *http://www.cdc.gov/vaccines/stats-surv/imz-coverage.htm#nis* for vaccination rates.

[28] *See e.g.,* Jonathan Gruber, *The Role of Consumer Copayments for Health Care: Lessons from the RAND Health Insurance Experiment and Beyond,* Kaiser Family Foundation (Oct. 2006). This paper examines an experiment in which copays randomly vary across several thousand individuals.

The author finds that individuals are sensitive to prices for health services—i.e. as copays decline, more services are demanded. *See e.g.,* Sharon Long, "On the Road to Universal Coverage: Impacts of Reform in Massachusetts At One Year," *Health Affairs,* Volume 27, Number 4 (June 2008). The author investigated the case of Massachusetts, where coverage of preventive services became a requirement in 2007, and found that for individuals under 300 percent of the poverty line, doctor visits for preventive care increased by 6.1 percentage points in the year after adoption, even after controlling for observable characteristics. Additionally, the incidence of individuals citing cost as the reason for not receiving preventive screenings declined by 2.8 percentage points from 2006 to 2007. In the Massachusetts case, these preventive care services were not necessarily free; therefore, economists would expect a higher differential under these interim final rules because of the price sensitivity of health care usage.

[29] The Task Force defines good and fair evidence as follows. Good: Evidence includes consistent results from well-designed, well-conducted studies in representative populations that directly assess effects on health outcomes.

Fair: Evidence is sufficient to determine effects on health outcomes, but the strength of the evidence is limited by the number, quality or consistency of the individual studies, generalizability to routine practice or indirect nature of the evidence on health outcomes. See *http://www.ahrq.gov/clinic/uspstf/gradespre.htm#drec.*

[30] See *http://www.ahrq.gov/clinic/uspstf/gradespre.htm#drec* for details of the Task Force grading.

[31] Woolf, Steven. A Closer Look at the Economic Argument for Disease Prevention. *JAMA* 2009;301(5):536–538.

[32] See National Commission on Prevention Priorities. *Preventive Care: A National Profile on Use, Disparities, and Health Benefits.* Partnership for Prevention, August 2007 at *http://www.prevent.org/content/view/129/72/#citations* accessed on 6/22/2010. Lives saved were estimated using models previously developed to rank clinical preventive services. See Maciosek MV, Edwards NM, Coffield AB, Flottemesch TJ, Nelson WW, Goodman MJ, Rickey DA, Butani AB, Solberg LI. Priorities among effective clinical preventive services: methods. *Am J Prev Med* 2006; 31(1):90–96.

TABLE 2.—LIVES SAVED FROM INCREASING UTILIZATION OF SELECTED PREVENTIVE SERVICES TO 90 PERCENT

| Preventive service | Population group | Percent utilizing preventive service in 2005 | Lives saved annually if percent utilizing preventive service increased to 90 percent |
|---|---|---|---|
| Regular aspirin use ............................................... | Men 40+ and women 50+ ...................... | 40 | 45,000 |
| Smoking cessation advice and help to quit ............ | All adult smokers .................................. | 28 | 42,000 |
| Colorectal cancer screening .................................. | Adults 50+ ............................................ | 48 | 14,000 |
| Influenza vaccination ............................................ | Adults 50+ ............................................ | 37 | 12,000 |
| Cervical cancer screening in the past 3 years ...... | Women 18–64 ....................................... | 83 | 620 |
| Cholesterol screening ........................................... | Men 35+ and women 45+ ...................... | 79 | 2,450 |
| Breast cancer screening in the past 2 years ......... | Women 40+ ........................................... | 67 | 3,700 |
| Chlamydia screening ............................................. | Women 16–25 ....................................... | 40 | 30,000 |

**Source:** National Commission on Prevention Priorities, 2007.

Since financial barriers are not the only reason for sub-optimal utilization rates, population-wide utilization of preventive services is unlikely to increase to the 90 percent level assumed in Table 2 as a result of these interim final regulations. Current utilization of preventive services among insured populations varies widely, but the Departments expect that utilization will increase among those individuals in plans affected by the regulation because the provisions eliminate cost sharing and require coverage for these services.

These interim final regulations are expected to increase the take-up rate of preventive services and are likely, over time, to lead physicians to increase their use of these services knowing that they will be covered, and covered with zero copayment. In the absence of data on the elasticity of demand for these specific services, it is difficult to know precisely how many more patients will use these services. Evidence from studies comparing the utilization of preventive services such as blood pressure and cholesterol screening between insured and uninsured individuals with relatively high incomes suggests that coverage increases usage rates in a wide range between three and 30 percentage points, even among those likely to be able to afford basic preventive services out-of-pocket.[33] A reasonable assumption is that the average increase in utilization of these services will be modest, perhaps on the order of 5 to 10 percentage points for some of them. For services that are generally covered without cost sharing in the current market, the Departments would expect minimal change in utilization.

Preventive services' benefits have also been evaluated individually. Effective cancer screening, early treatment, and sustained risk reduction could reduce the death rate due to cancer by 29 percent.[34] Improved blood sugar control could reduce the risk for eye disease, kidney disease and nerve disease by 40 percent in people with Type 1 or Type 2 diabetes.[35]

Some recommended preventive services have both individual and public health value. Vaccines have reduced or eliminated serious diseases that, prior to vaccination, routinely caused serious illnesses or deaths. Maintaining high levels of immunization in the general population protects the un-immunized from exposure to the vaccine-preventable disease, so that individuals who cannot receive the vaccine or who do not have a sufficient immune response to the vaccine to protect against the disease are indirectly protected.[36]

A second type of benefit from these interim final regulations is improved workplace productivity and decreased absenteeism for school children. Numerous studies confirm that ill health compromises worker output and that health prevention efforts can improve worker productivity. For example, one study found that 69 million workers reported missing days due to illness and 55 million workers reported a time when they were unable to concentrate at work because of their own illness or a family member's illness.[37] Together, labor time lost due to health reasons represents lost economic output totaling $260 billion per year.[38] Prevention efforts can help prevent these types of losses. Studies have also shown that reduced cost-sharing for medical services results in fewer restricted-activity days at work,[39] and increased access to health insurance coverage improves labor market outcomes by improving worker health.[40] Thus, the expansion of benefits and the elimination of cost sharing for preventive services as provided in these

---

[33] The Commonwealth Fund. "Insurance Coverage and the Receipt of Preventive Care." 2005. http:// www.commonwealthfund.org/Content/ Performance-Snapshots/Financial-and-Structural-Access-to-Care/Insurance-Coverage-and-Receipt-of-Preventive-Care.aspx.

[34] Curry, Susan J., Byers, Tim, and Hewitt, Maria, eds. 2003. Fulfilling the Potential of Cancer Prevention and Early Detection. Washington, DC: National Academies Press.

[35] Centers for Disease Control and Prevention. 2010. Diabetes at a Glance. See http://www.cdc.gov/ chronicdisease/resources/publications/aag/pdf/ 2010/diabetes_aag.pdf.

[36] See Modern Infectious Disease Epidemiology by Johan Giesecke 1994, Chapter 18, The Epidemiology of Vaccination.

[37] Health and Productivity Among U.S. Workers, Karen Davis, Ph.D., Sara R. Collins, Ph.D., Michelle M. Doty, Ph.D., Alice Ho, and Alyssa L. Holmgren, The Commonwealth Fund, August 2005 http:// www.commonwealthfund.org/Content/ Publications/Issue-Briefs/2005/Aug/Health-and-Productivity-Among-U-S-Workers.aspx.

[38] Ibid.

[39] See e.g., RAND, The Health Insurance Experiment: A Classic RAND Study Speaks to the Current Health Care Reform Debate, Rand Research Brief, Number 9174 (2006), at http://www.rand.org/pubs/research_briefs/2006/ RAND_RB9174.pdf and Janet Currie et al., "Has Public Health Insurance for Older Children Reduced Disparities in Access to Care and Health Outcomes?", Journal of Health Economics, Volume 27, Issue 6, pages 1567–1581 (Dec. 2008). With early childhood interventions, there appear to be improved health outcomes in later childhood. Analogously, health interventions in early adulthood could have benefits for future productivity.

[40] In a RAND policy brief, the authors cite results from the RAND Health Insurance Experiment in which cost-sharing is found to correspond with workers having fewer restricted-activity days— evidence that free care for certain services may be productivity enhancing. See e.g., RAND, The Health Insurance Experiment: A Classic RAND Study Speaks to the Current Health Care Reform Debate, Rand Research Brief, Number 9174 (2006), at http://www.rand.org/pubs/research_briefs/2006/ RAND_RB9174.pdf. See e.g. Janet Currie et al., "Has Public Health Insurance for Older Children Reduced Disparities in Access to Care and Health Outcomes?" Journal of Health Economics, Volume 27, Issue 6, pages 1567–1581 (Dec. 2008). With early childhood interventions, there appear to be improved health outcomes in later childhood. Analogously, health interventions in early adulthood could have benefits for future productivity. Council of Economic Advisers, "The Economic Case for Health Reform." (2009.)

interim final regulations can be expected to have substantial productivity benefits in the labor market.

Illnesses also contribute to increased absenteeism among school children, which could be avoided with recommended preventive services. In 2006, 56 percent of students missed between one and five days of school due to illness, 10 percent missed between six and ten days and five percent missed 11 or more days.[41] Obesity in particular contributes to missed school days: One study from the University of Pennsylvania found that overweight children were absent on average 20 percent more than their normal-weight peers.[42] Studies also show that influenza contributes to school absenteeism, and vaccination can reduce missed school days and indirectly improve community health.[43] These interim final regulations will ensure that children have access to preventive services, thus decreasing the number of days missed due to illness.[44] Similarly, regular pediatric care, including care by physicians specializing in pediatrics, can improve child health outcomes and avert preventable health care costs. For example, one study of Medicaid enrolled children found that when children were up to date for their age on their schedule of well-child visits, they were less likely to have an avoidable hospitalization at a later time.[45]

A third type of benefit from some preventive services is cost savings. Increasing the provision of preventive services is expected to reduce the incidence or severity of illness, and, as a result, reduce expenditures on treatment of illness. For example, childhood vaccinations have generally been found to reduce such expenditures by more than the cost of the vaccinations themselves and generate considerable benefits to society. Researchers at the Centers for Disease Control and Prevention (CDC) studying the economic impact of DTaP (diphtheria and tetanus toxoids and acellular Pertussis), Td (tetanus and diphthera toxoids), Hib (*Haemophilus influenza* type b), IPV (inactivated poliovirus), MMR (measles, mumps and rubella), Hepatitis B and varicella routine childhood vaccines found that every dollar spent on immunizations in 2001 was estimated to save $5.30 on direct health care costs and $16.50 on total societal costs of the diseases as they are prevented or reduced (direct health care associated with the diseases averted were $12.1 billion and total societal costs averted were $33.9 billion).[46]

A review of preventive services by the National Committee on Prevention Priorities found that, in addition to childhood immunizations, two of the recommended preventive services—discussing aspirin use with high-risk adults and tobacco use screening and brief intervention—are cost-saving on net.[47] By itself, tobacco use screening with a brief intervention was found to save more than $500 per smoker.[48]

Another area where prevention could achieve savings is obesity prevention and reduction. Obesity is widely recognized as an important driver of higher health care expenditures.[49] The Task Force recommends children over age six and adults be screened for obesity and be offered or referred to counseling to improve weight status or promote weight loss. Increasing obesity screening and referrals to counseling should decrease obesity and its related costs. If providers are able to proactively identify and monitor obesity in child patients, they may reduce the incidence of adult health conditions that can be expensive to treat, such as diabetes, hypertension, and adult obesity.[50] One recent study estimated that a one-percentage-point reduction in obesity among twelve-year-olds would save $260.4 million in total medical expenditures.[51]

A full quantification of the cost savings from the extension of coverage of preventive services in these interim final regulations is not possible, but to illustrate the potential savings, an assessment of savings from obesity reduction was conducted. According to the CDC, in 2008, 34.2 percent of U.S. adults and 16.9 percent of children were obese (defined as having a body mass index (BMI) of 30.0 or greater).[52] Obesity is associated with increased risk for coronary heart disease, hypertension, stroke, type 2 diabetes, several types of cancer, diminished mobility, and social stigmatization.[53] As a result, obesity is widely recognized as an important driver of higher health care expenditures on an individual[54] and national level.[55]

As described below, the Departments' analysis assumes that the utilization of preventive services will increase when they are covered with zero copayment, and these interim final regulations are expected to increase utilization of dietary counseling services both among people who currently have the service covered with a copayment and among people for whom the service is not currently covered at all.

Data from the 2009 Kaiser Family Foundation Employer Health Benefits Survey shows that 73 percent of employees with employer-sponsored insurance from a small (< 200 employees) employer do not currently have coverage for weight loss programs,

---

[41] Bloom B, Cohen RA. Summary health statistics for U.S. children: National Health Interview Survey, 2006. Vital Health Stat 2007;10(234). Available at *http://www.cdc.gov/nchs/nhis.htm*.

[42] University of Pennsylvania 2007: *http://www.upenn.edu/pennnews/news/childhood-obesity-indicates-greater-risk-school-absenteeism-university-pennsylvania-study-revea*.

[43] Davis, Mollie M., James C. King, Ginny Cummings, and Laurence S. Madger. "Countywide School-Based Influenza Immunization: Direct and Indirect Impact on Student Absenteeism." *Pediatrics* 122.1 (2008).

[44] Moonie, Sheniz, David A. Sterling, Larry Figgs, and Mario Castro. "Asthma Status and Severity Affects Missed School Days." *Journal of School Health* 76.1 (2006): 18–24.

[45] Bye, "Effectiveness of Compliance with Pediatric Preventative Care Guidelines Among Medicaid Beneficiaries."

[46] Fangjun Zhou, Jeanne Santoli, Mark L. Messonnier, Hussain R. Yusuf, Abigail Shefer, Susan Y. Chu, Lance Rodewald, Rafael Harpaz, Economic Evaluation of the 7-Vaccine Routine Childhood Immunization Schedule in the United States. *Archives of Pediatric and Adolescent Medicine 2005;* 159(12): 1136–1144. The estimates of the cost savings are based on current immunization levels. The incremental impact of increasing immunization rates is likely to be smaller, but still significant and positive.

[47] Maciosek MV, Coffield AB, Edwards NM, Coffield AB, Flottemesch TJ, Goodman MJ, Solberg LI. Priorities among effective clinical preventive services: Results of a Systematic Review and Analysis. *Am J Prev Med 2006;* 31(1):52–61.

[48] Solberg LI, Maciosek, MV, Edwards NM, Khanchandani HS, and Goodman MJ. Repeated tobacco-use screening and intervention in clinical practice: Health impact and cost effectiveness. American Journal of Preventive Medicine. 2006;31(1).

[49] Congressional Budget Office. "Technological Change and the Growth of Health Care Spending." January 2008. Box 1, pdf p. 18. *http://www.cbo.gov/ftpdocs/89xx/doc8947/01-31-TechHealth.pdf*.

[50] "Working Group Report on Future Research Directions in Childhood Obesity Prevention and Treatment." National Heart, Lung and Blood Institute, National Institutes of Health, U.S. Department of Health and Human Services (2007), available at *http://www.nhlbi.nih.gov/meetings/workshops/child-obesity/index.htm*.

[51] *Ibid.*

[52] Centers for Disease Control and Prevention. "Obesity and Overweight." 2010. *http://www.cdc.gov/nchs/fastats/overwt.htm*.

[53] Agency for Healthcare Research and Quality (AHRQ). "Screening for Obesity in Adults." December 2003. *http://www.ahrq.gov/clinic/3rduspstf/obesity/obesrr.pdf*.

[54] Thorpe, Kenneth E. "The Future Costs of Obesity: National and State Estimates of the Impact of Obesity on Direct Health Care Expenses." November 2009; McKinsey Global Institute. "Sample data suggest that obese adults can incur nearly twice the annual health care costs of normal-weight adults." 2007.

[55] Congressional Budget Office. "Technological Change and the Growth of Health Care Spending." January 2008. Box 1, pdf p. 18. *http://www.cbo.gov/ftpdocs/89xx/doc8947/01-31-TechHeal*

compared to 38 percent at large firms.[56] In the illustrative analysis below, the share of individuals without weight loss coverage in the individual market is assumed to be equal to the share in the small group market.

The size of the increase in the number of individuals receiving dietary counseling or other weight loss services will be limited by current physician practice patterns, in which relatively few individuals who are obese receive physician recommendations for dietary counseling. In one study of patients at an internal medicine clinic in the Bronx, NY, approximately 15 percent of obese patients received a recommendation for dietary counseling.[57] Similarly, among overweight and obese patients enrolled in the Cholesterol Education and Research Trial, approximately 15 to 20 percent were referred to nutrition counseling.[58]

These interim final regulations are expected to increase the take-up rate of counseling among patients who are referred to it, and may, over time, lead physicians to increase their referral to such counseling, knowing that it will be covered, and covered without cost sharing. The effect of these interim final regulations is expected to be magnified because of the many other public and private sector initiatives dedicated to combating the obesity epidemic.

In the absence of data on take-up of counseling among patients who are referred by their physicians, it is difficult to know what fraction of the estimated 15 percent to 20 percent of patients who are currently referred to counseling follow through on that referral, or how that fraction will change after coverage of these services is expanded. A reasonable assumption is that utilization of dietary counseling among patients who are obese might increase by five to 10 percentage points as a result of these interim final regulations. If physicians change their behavior and increase the rate at which they refer to counseling, the effect might be substantially larger.

The share of obese individuals without weight loss coverage is estimated to be 29 percent.[59] It is assumed that obese individuals have health care costs 39 percent above average, based on a McKinsey Global Institute analysis.[60] The Task Force noted that counseling interventions led to sustained weight loss ranging from four percent to eight percent of body weight, although there is substantial heterogeneity in results across interventions, with many interventions having little long-term effect.[61] Assuming midpoint reduction of six percent of body weight, the BMI for an individual taking up such an intervention would fall by six percent as well, as height would remain constant. Based on the aforementioned McKinsey Global Institute analysis, a six percent reduction in BMI for an obese individual (from 32 to around 30, for example) would result in a reduction in health care costs of approximately five percent. This parameter for cost reduction is subject to considerable uncertainty, given the wide range of potential weight loss strategies with varying degrees of impact on BMI, and their interconnectedness with changes in individual health care costs.

Multiplying the percentage reduction in health care costs by the total premiums of obese individuals newly gaining obesity prevention coverage allows for an illustrative calculation of the total dollar reduction in premiums, and dividing by total premiums for the affected population allows for an estimate of the reduction in average premiums across the entire affected population. Doing so results in a potential private premium reduction of 0.05 percent to 0.1 percent from lower health care costs due to a reduction in obesity for enrollees in non-grandfathered plans. This does not account for potential savings in Medicaid, Medicare, or other health programs.

A fourth benefit of these interim final regulations will be to distribute the cost of preventive services more equitably across the broad insured population. Some Americans in plans affected by these regulations currently have no coverage of certain recommended preventive services, and pay for them entirely out-of-pocket. For some individuals who currently have no coverage of certain recommended preventive services, these interim final regulations will result in a large savings in out-of-pocket payments, and only a small increase in premiums. Many other Americans have limited coverage of certain recommended preventive services, with large coinsurance or deductibles, and also make substantial out-of-pocket payments to obtain preventive services. Some with limited coverage of preventive services will also experience large savings as a result of these interim final regulations. Reductions in out-of-pocket costs are expected to be largest among people in age groups in which relatively expensive preventive services are most likely to be recommended.

## 5. *Costs and Transfers*

The changes in how plans and issuers cover the recommended preventive services resulting from these interim final regulations will result in changes in covered benefits and premiums for individuals in plans and health insurance coverage subject to these interim final regulations. New costs to the health system result when beneficiaries increase their use of preventive services in response to the changes in coverage of preventive services. Cost sharing, including coinsurance, deductibles, and copayments, divides the costs of health services between the insurer and the beneficiaries. The removal of cost sharing increases the quantity of services demanded by lowering the direct cost of the service to consumers. Therefore, the Departments expect that the statute and these interim final regulations will increase utilization of the covered preventive services. The magnitude of this effect on utilization depends on the price elasticity of demand.

Several studies have found that individuals are sensitive to prices for health services.[62] Evidence that consumers change their utilization of preventive services is available from CDC researchers who studied out-of-pocket costs of immunizations for

---

[56] Kaiser Family Foundation. 2009 Employer Health Benefits Annual Survey. Public Use File provided to CEA; documentation of statistical analysis available upon request. *See http://ehbs.kff.org.*

[57] Davis NJ, Emerenini A, Wylie-Rosett J. "Obesity management: physician practice patterns and patient preference," *Diabetes Education.* 2006 Jul–Aug; 32(4):557–61.

[58] Molly E. Waring, PhD, Mary B. Roberts, MS, Donna R. Parker, ScD and Charles B. Eaton, MD, MS. "Documentation and Management of Overweight and Obesity in Primary Care," *The Journal of the American Board of Family Medicine* 22 (5): 544–552 (2009).

[59] This estimate is constructed using a weighted average obesity rate taking into account the share of the population aged 0 to 19 and 20 to 74 and their respective obesity rates, derived from Census Bureau and Centers for Disease Control and Prevention data. U.S. Census Bureau. "Current Population Survey (CPS) Table Creator." 2010. *http://www.census.gov/hhes/www/cpstc/cps_table_creator.html.* Centers for Disease Control and Prevention. "Obesity and Overweight." 2010. *http://www.cdc.gov/nchs/fastats/overwt.htm.*

[60] McKinsey Global Institute Analysis provided to CEA.

[61] Agency for Healthcare Research and Quality (AHRQ). "Screening for Obesity in Adults." December 2003. p. 4. *http://www.ahrq.gov/clinic/3rduspstf/obesity/obesrr.pdf.*

[62] *See e.g.,* Jonathan Gruber, *The Role of Consumer Copayments for Health Care: Lessons from the RAND Health Insurance Experiment and Beyond,* Kaiser Family Foundation (Oct. 2006). This paper examines an experiment in which copays randomly vary across several thousand individuals. The author finds that individuals are sensitive to prices for health services—*i.e.,* as copays decline more services are demanded.

privately insured children up to age 5 in families in Georgia in 2003, to find that a one percent increase in out-of-pocket costs for routine immunizations (DTaP, IPV, MMR, Hib, and Hep B) was associated with a 0.07 percent decrease in utilization.[63]

Along with new costs of induced utilization, there are transfers associated with these interim final regulations. A transfer is a change in who pays for the services, where there is not an actual change in the level of resources used. For example, costs that were previously paid out-of-pocket for certain preventive services will now be covered by plans and issuers under these interim final regulations. Such a transfer of costs could be expected to lead to an increase in premiums.

a. Estimate of Average Changes in Health Insurance Premiums

The Departments assessed the impact of eliminating cost sharing, increases in services covered, and induced utilization on the average insurance premium using a model to evaluate private health insurance plans against a nationally representative population. The model is based on the Medical Expenditure Panel Survey data from 2004, 2005, and 2006 on household spending on health care, which are scaled to levels consistent with the CMS projections of the National Health Expenditure Accounts.[64] This data is combined with data from the Employer Health Benefits Surveys conducted by the Kaiser Family Foundation and Health Research and Education Trust to model a "typical PPO coverage" plan. The model then allows the user to assess changes in covered expenses, benefits, premiums, and induced utilization of services resulting from changes in the characteristics of the plan. The analysis of changes in coverage is based on the average per-person covered expenses and insurance benefits. The average covered expense is the total charge for covered services; insurance benefits are the part of the covered expenses covered by the insurer. The effect on the average premium is then estimated based on the percentage changes in the insurance benefits and the distribution of the individuals across individual and group markets in the non-grandfathered plans.

The Departments assume that the percent increase for insurance benefits and premiums will be the same. This is based on two assumptions: (1) That administrative costs included in the premium will increase proportionally with the increase in insurance benefits; and (2) that the increases in insurance benefits will be directly passed on to the consumer in the form of higher premiums. These assumptions bias the estimates of premium changes upward. Using this model, the Departments assessed: (1) Changes in cost-sharing for currently covered and utilized services, (2) changes in services covered, and (3) induced utilization of preventive services. There are several additional sources of uncertainty concerning these estimates. First, there is no accurate, granular data on exactly what baseline coverage is for the particular preventive services addressed in these interim final regulations. Second, there is uncertainty over behavioral assumptions related to additional utilization that results from reduced cost-sharing. Therefore, after providing initial estimates, the Departments provide a sensitivity analysis to capture the potential range of impacts of these interim final regulations.

From the Departments' analysis of the Medical Expenditure Panel Survey (MEPS) data, controlled to be consistent with projections of the National Health Expenditure Accounts, the average person with employer-sponsored insurance (ESI) has $264 in covered expenses for preventive services, of which $240 is paid by insurance, and $24 is paid out-of-pocket.[65] When preventive services are covered with zero copayment, the Departments expect the average preventive benefit (holding utilization constant) will increase by $24. This is a 0.6 percent increase in insurance benefits and premiums for plans that have relinquished their grandfather status. A similar, but larger effect is expected in the individual market because existing evidence suggests that individual health insurance policies generally have less generous benefits for preventive services than group health plans. However, the evidence base for current coverage and cost sharing for preventive services in individual health insurance policies is weaker than for group health plans, making estimation of the increase in average benefits and premiums in the individual market highly uncertain.

For analyses of changes in covered services, the Departments used the Blue Cross/Blue Shield Standard (BC/BS) plan offered through the Federal Employees Health Benefits Program as an average plan.[66] Other analyses have used the BC/BS standard option as an average plan as it was designed to reflect standard practice within employer-sponsored health insurance plans.[67] BC/BS covers most of the preventive services listed in the Task Force and Advisory Committee recommendations, and most of the preventive services listed in the comprehensive guidelines for infants, children, and adolescents supported by HRSA. Not covered by the BC/BS Standard plan are the recommendations for genetic testing for the BRCA gene, adolescent depression screening,[68] lead testing, autism testing, and oral health screening.[69]

The Departments estimated the increase in benefits from newly covered services by estimating the number of new services that would be provided times the cost of providing the services, and then spread these new costs across the total insured population. The Departments estimated that adding coverage for genetic screening and depression screening would increase insurance benefits an estimated 0.10 percent. Adding lead testing, autism testing, and oral health screening would increase insurance benefits by an estimated 0.02 percent. This results in a total average increase in insurance benefits on these services of 0.12 percent, or just over $4 per insured person. This increase represents a mixture of new costs and transfers, dependent on whether beneficiaries previously would have purchased these services on their own. It is also important to remember that actual plan

---

[63] See e.g., Noelle-Angelique Molinari et al., "Out-of-Pocket Costs of Childhood Immunizations: A Comparison by Type of Insurance Plan," Pediatrics, 120(5) pp. 148–156 (2006).

[64] The National Health Expenditure Accounts (NHEA) are the official estimates of total health care spending in the United States. See http://www.cms.gov/NationalHealthExpendData/02_NationalHealthAccountsHistorical.asp.

[65] The model does not distinguish between recommended and non-recommended preventive services, and so this likely represents an overestimate of the insurance benefits for preventive services.

[66] The Blue Cross Blue Shield standard option plan documentation is available online at http://fepblue.org/benefitplans/standard-option/index.html.

[67] Frey A, Mika S, Nuzum R, and Schoen C. "Setting a National Minimum Standard for Health Benefits: How do State Benefit Mandates Compare with Benefits in Large-Group Plans?" Issue Brief. Commonwealth Fund June 2009 available at http://www.commonwealthfund.org/Content/Publications/Issue-Briefs/2009/Jun/Setting-a-National-Minimum-Standard-for-Health-Benefits.aspx.

[68] The Task Force recommends that women whose family history is associated with an increased risk for deleterious mutations in BRCA1 or BRCA2 genes be referred for genetic counseling and evaluation for BRCA testing and screening of adolescents (12–18 years of age) for major depressive disorder (MDD) when systems are in place to ensure accurate diagnosis, psychotherapy (cognitive-behavioral or interpersonal), and follow-up.

[69] Lead, autism, and oral health screening are from the HRSA comprehensive guideline

App. 90

impacts will vary depending on baseline benefit levels, and that grandfathered health plans will not experience any impact from these interim final regulations. The Departments expect the increase to be larger in the individual market because coverage of preventive services in the individual market is less complete than coverage in the group market, but as noted previously, the evidence base for the individual market is weaker than that of the group market, making detailed estimates of the size of this effect difficult and highly uncertain.

Actuaries use an "induction formula" to estimate the behavioral change in response to changes in the relative levels of coverage for health services. For this analysis, the Departments used the model to estimate the induced demand (the increased use of preventive services). The model uses a standard actuarial formula for induction 1/ (1+alpha*P), where alpha is the "induction parameter" and P is the average fraction of the cost of services paid by the consumer. The induction parameter for physician services is 0.7, derived by the standard actuarial formula that is generally consistent with the estimates of price elasticity of demand from the RAND Health Insurance Experiment and other economic studies.[70] Removing cost sharing for preventive services lowers the direct cost to consumers of using preventive services, which induces additional utilization, estimated with the model above to increase covered expenses and benefits by approximately $17, or 0.44 percent in insurance benefits in group health plans. The Departments expect a similar but larger effect in the individual market, although these estimates are highly uncertain.

The Departments calculated an estimate of the average impact using the information from the analyses described above, using estimates of the number of individuals in non-grandfathered health plans in the group and individual markets in 2011. The Departments estimate that premiums will increase by approximately 1.5 percent on average for enrollees in non-grandfathered plans. This estimate assumes that any changes in insurance benefits will be directly passed on to the consumer in the form of changes in premiums. As mentioned earlier, this assumption biases the estimates of premium change upward.

[70] Standard formula best described in "Quantity-Price Relationships in Health Insurance", Charles L Trowbridge, Chief Actuary, Social Security Administration (DHEW Publication No. (SSA)73–11507, November 1972).

### b. Sensitivity analysis

As discussed previously, there is substantial uncertainty associated with the estimates presented above. To address the uncertainty in the group market, the Departments first varied the estimated change to underlying benefits, to address the particular uncertainty behind the estimate of baseline coverage of preventive services in the group market. The estimate for the per person annual increase in insurance benefits from adding coverage for new services is approximately $4. The Departments considered the impact of a smaller and larger addition in benefits of approximately $2 and $6 per person. To consider the impact of uncertainty around the size of the behavioral change (that is, the utilization of more services when cost sharing is eliminated), the Departments analyzed the impact on insurance benefits if the behavioral change were 15 percent smaller and 15 percent larger.

In the individual market, to accommodate the greater uncertainty relative to the group market, the Departments considered the impact of varying the increase in benefits resulting from cost shifting due to the elimination of cost sharing, in addition to varying the cost of newly covered services and behavioral change.

Combining results in the group and individual markets for enrollees in non-grandfathered plans, the Departments' low-end is a few tenths of a percent lower than the mid-range estimate of approximately 1.5 percent, and the high-end estimate is a few tenths of a percent higher. Grandfathered health plans are not subject to these interim final regulations and therefore would not experience this premium change.

### 6. Alternatives Considered

Several provisions in these interim final regulations involved policy choices. One was whether to allow a plan or issuer to impose cost sharing for an office visit when a recommended preventive service is provided in that visit. Sometimes a recommended preventive service is billed separately from the office visit; sometimes it is not. The Departments decided that the cost sharing prohibition of these interim final regulations applies to the specific preventive service as recommended by the guidelines. Therefore, if the preventive service is billed separately from the office visit, it is the preventive service that has cost sharing waived, not the entire office visit.

A second policy choice was if the preventive service is not billed separately from the office visit, whether

these interim final regulations should prohibit cost sharing for any office visit in which any recommended preventive service was administered, or whether cost sharing should be prohibited only when the preventive service is the primary purpose of the office visit. Prohibiting cost sharing for office visits when any recommended preventive service is provided, regardless of the primary purpose of the visit, could lead to an overly broad application of these interim final regulations; for example, a person who sees a specialist for a particular condition could end up with a zero copayment simply because his or her blood pressure was taken as part of the office visit. This could create financial incentives for consumers to request preventive services at office visits that are intended for other purposes in order to avoid copayments and deductibles. The increased prevalence of the application of zero cost sharing would lead to increased premiums compared with the chosen option, without a meaningful additional gain in access to preventive services.

A third issue involves health plans that have differential cost sharing for services provided by providers who are in and out of their networks. These interim final regulations provide that a plan or issuer is not required to provide coverage for recommended preventive services delivered by an out-of-network provider. The plan or issuer may also impose cost sharing for recommended preventive services delivered by an out-of-network provider. The Departments considered that requiring coverage by out-of-network providers at no cost sharing would result in higher premiums for these interim final regulations. Plans and issuers negotiate allowed charges with in-network providers as a way to promote effective, efficient health care, and allowing differences in cost sharing in- and out-of-network enables plans to encourage use of in-network providers. Allowing zero cost sharing for out of network providers could reduce providers' incentives to participate in insurer networks. The Departments decided that permitting cost sharing for recommended preventive services provided by out-of-network providers is the appropriate option to preserve choice of providers for individuals, while avoiding potentially larger increases in costs and transfers as well as potentially lower quality care.

### C. Regulatory Flexibility Act— Department of Labor and Department of Health and Human Services

The Regulatory Flexibility Act (5 U.S.C. 601 *et seq.*) (RFA) impose

**App. 91**

certain requirements with respect to Federal rules that are subject to the notice and comment requirements of section 553(b) of the APA (5 U.S.C. 551 *et seq.*) and that are likely to have a significant economic impact on a substantial number of small entities. Section 9833 of the Code, section 734 of ERISA, and section 2792 of the PHS Act authorize the Secretaries to promulgate any interim final rules that they determine are appropriate to carry out the provisions of chapter 100 of the Code, part 7 of subtitle B or title I of ERISA, and part A of title XXVII of the PHS Act, which include PHS Act sections 2701 through 2728 and the incorporation of those sections into ERISA section 715 and Code section 9815.

Moreover, under Section 553(b) of the APA, a general notice of proposed rulemaking is not required when an agency, for good cause, finds that notice and public comment thereon are impracticable, unnecessary, or contrary to the public interest. These interim final regulations are exempt from APA, because the Departments made a good cause finding that a general notice of proposed rulemaking is not necessary earlier in this preamble. Therefore, the RFA does not apply and the Departments are not required to either certify that the rule would not have a significant economic impact on a substantial number of small entities or conduct a regulatory flexibility analysis.

Nevertheless, the Departments carefully considered the likely impact of the rule on small entities in connection with their assessment under Executive Order 12866. Consistent with the policy of the RFA, the Departments encourage the public to submit comments that suggest alternative rules that accomplish the stated purpose of the Affordable Care Act and minimize the impact on small entities.

## D. Special Analyses—Department of the Treasury

Notwithstanding the determinations of the Department of Labor and Department of Health and Human Services, for purposes of the Department of the Treasury, it has been determined that this Treasury decision is not a significant regulatory action for purposes of Executive Order 12866. Therefore, a regulatory assessment is not required. It has also been determined that section 553(b) of the APA (5 U.S.C. chapter 5) does not apply to these interim final regulations. For the applicability of the RFA, refer to the Special Analyses section in the preamble to the cross-referencing notice of proposed rulemaking published

elsewhere in this issue of the **Federal Register**. Pursuant to section 7805(f) of the Code, these temporary regulations have been submitted to the Chief Counsel for Advocacy of the Small Business Administration for comment on their impact on small businesses.

## E. Paperwork Reduction Act: Department of Labor, Department of the Treasury, and Department of Health and Human Services

These interim final regulations are not subject to the requirements of the Paperwork Reduction Act of 1980 (44 U.S.C. 3501 *et seq.*) because it does not contain a "collection of information" as defined in 44 U.S.C. 3502 (11).

## F. Congressional Review Act

These interim final regulations are subject to the Congressional Review Act provisions of the Small Business Regulatory Enforcement Fairness Act of 1996 (5 U.S.C. 801 *et seq.*) and have been transmitted to Congress and the Comptroller General for review.

## G. Unfunded Mandates Reform Act

The Unfunded Mandates Reform Act of 1995 (Pub. L. 104–4) requires agencies to prepare several analytic statements before proposing any rules that may result in annual expenditures of $100 million (as adjusted for inflation) by State, local and tribal governments or the private sector. These interim final regulations are not subject to the Unfunded Mandates Reform Act because they are being issued as interim final regulations. However, consistent with the policy embodied in the Unfunded Mandates Reform Act, these interim final regulations have been designed to be the least burdensome alternative for State, local and tribal governments, and the private sector, while achieving the objectives of the Affordable Care Act.

## H. Federalism Statement—Department of Labor and Department of Health and Human Services

Executive Order 13132 outlines fundamental principles of federalism, and requires the adherence to specific criteria by Federal agencies in the process of their formulation and implementation of policies that have "substantial direct effects" on the States, the relationship between the national government and States, or on the distribution of power and responsibilities among the various levels of government. Federal agencies promulgating regulations that have these federalism implications must consult with State and local officials, and describe the extent of their

consultation and the nature of the concerns of State and local officials in the preamble to the regulation.

In the Departments' view, these interim final regulations have federalism implications, because they have direct effects on the States, the relationship between the national government and States, or on the distribution of power and responsibilities among various levels of government. However, in the Departments' view, the federalism implications of these interim final regulations are substantially mitigated because, with respect to health insurance issuers, the Departments expect that the majority of States will enact laws or take other appropriate action resulting in their meeting or exceeding the Federal standards.

In general, through section 514, ERISA supersedes State laws to the extent that they relate to any covered employee benefit plan, and preserves State laws that regulate insurance, banking, or securities. While ERISA prohibits States from regulating a plan as an insurance or investment company or bank, the preemption provisions of section 731 of ERISA and section 2724 of the PHS Act (implemented in 29 CFR 2590.731(a) and 45 CFR 146.143(a)) apply so that the HIPAA requirements (including those of the Affordable Care Act) are not to be "construed to supersede any provision of State law which establishes, implements, or continues in effect any standard or requirement solely relating to health insurance issuers in connection with group health insurance coverage except to the extent that such standard or requirement prevents the application of a requirement" of a Federal standard. The conference report accompanying HIPAA indicates that this is intended to be the "narrowest" preemption of State laws. (*See* House Conf. Rep. No. 104–736, at 205, reprinted in 1996 U.S. Code Cong. & Admin. News 2018.) States may continue to apply State law requirements except to the extent that such requirements prevent the application of the Affordable Care Act requirements that are the subject of this rulemaking. State insurance laws that are more stringent than the Federal requirements are unlikely to "prevent the application of" the Affordable Care Act, and be preempted. Accordingly, States have significant latitude to impose requirements on health insurance issuers that are more restrictive than the Federal law.

In compliance with the requirement of Executive Order 13132 that agencies examine closely any policies that may have federalism implications or limit

the policy making discretion of the States, the Departments have engaged in efforts to consult with and work cooperatively with affected State and local officials, including attending conferences of the National Association of Insurance Commissioners and consulting with State insurance officials on an individual basis. It is expected that the Departments will act in a similar fashion in enforcing the Affordable Care Act requirements. Throughout the process of developing these interim final regulations, to the extent feasible within the specific preemption provisions of HIPAA as it applies to the Affordable Care Act, the Departments have attempted to balance the States' interests in regulating health insurance issuers, and Congress' intent to provide uniform minimum protections to consumers in every State. By doing so, it is the Departments' view that they have complied with the requirements of Executive Order 13132.

Pursuant to the requirements set forth in section 8(a) of Executive Order 13132, and by the signatures affixed to these interim final regulations, the Departments certify that the Employee Benefits Security Administration and the Centers for Medicare & Medicaid Services have complied with the requirements of Executive Order 13132 for the attached regulations in a meaningful and timely manner.

## V. Recommended Preventive Services as of July 14, 2010

The materials that follow list recommended preventive services, current as of July 14, 2010, that will have to be covered without cost-sharing

when delivered by an in-network provider. In many cases, the recommendations or guidelines went into effect before September 23, 2009; therefore the recommended services must be covered under these interim final regulations in plan years (in the individual market, policy years) that begin on or after September 23, 2010. However, there are some services that appear in the figure that are based on recommendations or guidelines that went into effect at some point later than September 23, 2009. Those services do not have to be covered under these interim final regulations until plan years (in the individual market, policy years) that begin at some point later than September 23, 2010. In addition, there are a few recommendations and guidelines that went into effect after September 23, 2009 and are not included in the figure. In both cases, information at *http:// www.HealthCare.gov/center/ regulations/prevention.html* specifically identifies those services and the relevant dates. The materials at *http:// www.HealthCare.gov/center/ regulations/prevention.html* will be updated on an ongoing basis, and will contain the most current recommended preventive services.

### A. Recommendations of the United States Preventive Services Task Force (Task Force)

Recommendations of the Task Force appear in a chart that follows. This chart includes a description of the topic, the text of the Task Force recommendation, the grade the recommendation received

(A or B), and the date that the recommendation went into effect.

### B. Recommendations of the Advisory Committee On Immunization Practices (Advisory Committee) That Have Been Adopted by the Director of the Centers for Disease Control and Prevention

Recommendations of the Advisory Committee appear in four immunization schedules that follow: A schedule for children age 0 to 6 years, a schedule for children age 7 to 18 years, a "catch-up" schedule for children, and a schedule for adults. Immunization schedules are issued every year, and the schedules that appear here are the 2010 schedules. The schedules contain graphics that provide information about the recommended age for vaccination, number of doses needed, interval between the doses, and (for adults) recommendations associated with particular health conditions. In addition to the graphics, the schedules contain detailed footnotes that provide further information on each immunization in the schedule.

### C. Comprehensive Guidelines Supported by the Health Resources and Services Administration (HRSA) for Infants, Children, and Adolescents

Comprehensive guidelines for infants, children, and adolescents supported by HRSA appear in two charts that follow: The Periodicity Schedule of the Bright Futures Recommendations for Pediatric Preventive Health Care, and the Uniform Panel of the Secretary's Advisory Committee on Heritable Disorders in Newborns and Children.

**BILLING CODE 4830–01–P; 4510–29–P; 4210–01–P**

Grade A and B Recommendations of the United States Preventive Services Task Force - July 13, 2010

| Topic | Text | Grade | Date in Effect |
|---|---|---|---|
| Screening for abdominal aortic aneurysm | The USPSTF recommends one-time screening for abdominal aortic aneurysm (AAA) by ultrasonography in men aged 65 to 75 who have ever smoked. | B | February 28, 2005 |
| Counseling for alcohol misuse | The U.S. Preventive Services Task Force (USPSTF) recommends screening and behavioral counseling interventions to reduce alcohol misuse (go to Clinical Considerations) by adults, including pregnant women, in primary care settings. | B | April 30, 2004 |
| Screening for anemia | The USPSTF recommends routine screening for iron deficiency anemia in asymptomatic pregnant women. | B | May 31, 2006 |
| Aspirin to prevent CVD: men | The USPSTF recommends the use of aspirin for men age 45 to 79 years when the potential benefit due to a reduction in myocardial infarctions outweighs the potential harm due to an increase in gastrointestinal hemorrhage. | A | March 30, 2009 |
| Aspirin to prevent CVD: women | The USPSTF recommends the use of aspirin for women age 55 to 79 years when the potential benefit of a reduction in ischemic strokes outweighs the potential harm of an increase in gastrointestinal hemorrhage. | A | March 30, 2009 |
| Screening for bacteriuria | The USPSTF recommends screening for asymptomatic bacteriuria with urine culture for pregnant women at 12 to 16 weeks gestation or at the first prenatal visit, if later. | A | July 31, 2008 |
| Screening for blood pressure | The U.S. Preventive Services Task Force (USPSTF) recommends screening for high blood pressure in adults aged 18 and older. | A | December 31, 2007 |
| Counseling for BRCA screening | The USPSTF recommends that women whose family history is associated with an increased risk for deleterious mutations in BRCA1 or BRCA2 genes be referred for genetic counseling and evaluation for BRCA testing. | B | September 30, 2005 |
| Screening for breast cancer (mammography) | The USPSTF recommends screening mammography for women with or without clinical breast examination (CBE), every 1-2 years for women aged 40 and older. | B | September 30, 2002 |
| Chemoprevention of breast cancer | The USPSTF recommends that clinicians discuss chemoprevention with women at high risk for breast cancer and at low risk for adverse effects of chemoprevention. Clinicians should inform patients of the potential benefits and harms of chemoprevention. | B | July 31, 2002 |
| Counseling for breast feeding | The USPSTF recommends interventions during pregnancy and after birth to promote and support breastfeeding. | B | October 31, 2008 |
| Screening for cervical cancer | The USPSTF strongly recommends screening for cervical cancer in women who have been sexually active and have a cervix. | B | January 31, 2003 |
| Screening for chlamydial infection: non-pregnant women | The U.S. Preventive Services Task Force (USPSTF) recommends screening for chlamydial infection for all sexually active non-pregnant young women aged 24 and younger and for older non-pregnant women who are at increased risk. | A | June 30, 2007 |
| Screening for chlamydial infection: pregnant women | The USPSTF recommends screening for chlamydial infection for all pregnant women aged 24 and younger and for older pregnant women who are at increased risk. | B | June 30, 2007 |

**App. 94**

| | | | |
|---|---|---|---|
| Screening for cholesterol abnormalities: men 35 and older | The U.S. Preventive Services Task Force (USPSTF) strongly recommends screening men aged 35 and older for lipid disorders. | A | June 30, 2008 |
| Screening for cholesterol abnormalities: men younger than 35 | The USPSTF recommends screening men aged 20 to 35 for lipid disorders if they are at increased risk for coronary heart disease | B | June 30, 2008 |
| Screening for cholesterol abnormalities: women 45 and older | The USPSTF strongly recommends screening women aged 45 and older for lipid disorders if they are at increased risk for coronary heart disease. | A | June 30, 2008 |
| Screening for cholesterol abnormalities: women younger than 45 | The USPSTF recommends screening women aged 20 to 45 for lipid disorders if they are at increased risk for coronary heart disease | B | June 30, 2008 |
| Screening for colorectal cancer | The USPSTF recommends screening for colorectal cancer (CRC) using fecal occult blood testing, sigmoidoscopy, or colonoscopy, in adults, beginning at age 50 years and continuing until age 75 years. The risks and benefits of these screening methods vary. | A | October 31, 2008 |
| Chemoprevention of dental caries | The USPSTF recommends that primary care clinicians prescribe oral fluoride supplementation at currently recommended doses to preschool children older than 6 months of age whose primary water source is deficient in fluoride. | B | April 30, 2004 |
| Screening for depression: adults | The USPSTF recommends screening adults for depression when staff-assisted depression care supports are in place to assure accurate diagnosis, effective treatment, and follow-up. | B | December 31, 2009, identical to a 2002 recommendation |
| Screening for depression: adolescents | The USPSTF recommends screening of adolescents (12-18 years of age) for major depressive disorder (MDD) when systems are in place to ensure accurate diagnosis, psychotherapy (cognitive-behavioral or interpersonal), and follow-up | B | March 30, 2009 |
| Screening for diabetes | The USPSTF recommends screening for type 2 diabetes in asymptomatic adults with sustained blood pressure (either treated or untreated) greater than 135/80 mm Hg. | B | June 30, 2008 |
| Counseling for diet | The USPSTF recommends intensive behavioral dietary counseling for adult patients with hyperlipidemia and other known risk factors for cardiovascular and diet-related chronic disease. Intensive counseling can be delivered by primary care clinicians or by referral to other specialists, such as nutritionists or dietitians. | B | January 30, 2003 |
| Supplementation with folic acid | The USPSTF recommends that all women planning or capable of pregnancy take a daily supplement containing 0.4 to 0.8 mg (400 to 800 µg) of folic acid. | A | May 3[1], 2009 |
| Screening for gonorrhea: women | The U.S. Preventive Services Task Force (USPSTF) recommends that clinicians screen all sexually active women, including those who are pregnant, for gonorrhea infection if they are at increased risk for infection (that is, if they are young or have other individual or population risk factors go to Clinical Considerations for further discussion of risk factors) | B | May 31, 2005 |
| Prophylactic medication for gonorrhea: newborns | The USPSTF strongly recommends prophylactic ocular topical medication for all newborns against gonococcal ophthalmia neonatorum. | A | May 31, 2005 |

| Screening for hearing loss | The USPSTF recommends screening for hearing loss in all newborn infants | B | July 31, 2008 |
| Screening for hemoglobinopathies | The U.S. Preventive Services Task Force (USPSTF) recommends screening for sickle cell disease in newborns. | A | September 30, 2007 |
| Screening for hepatitis B | The U.S. Preventive Services Task Force (USPSTF) strongly recommends screening for hepatitis B virus (HBV) infection in pregnant women at their first prenatal visit. | A | June 30, 2009 |
| Screening for HIV | The U.S. Preventive Services Task Force (USPSTF) strongly recommends that clinicians screen for human immunodeficiency virus (HIV) all adolescents and adults at increased risk for HIV infection (go to Clinical Considerations for discussion of risk factors). | A | July 31, 2005 |
| Screening for congenital hypothyroidism | The USPSTF recommends screening for congenital hypothyroidism (CH) in newborns. | A | March 31, 2008 |
| Iron supplementation in children | The U.S. Preventive Services Task Force (USPSTF) recommends routine iron supplementation for asymptomatic children aged 6 to 12 months who are at increased risk for iron deficiency anemia (go to Clinical Considerations for a discussion of increased risk) | B | May 30, 2006 |
| Screening and counseling for obesity adults | The USPSTF recommends that clinicians screen all adult patients for obesity and offer intensive counseling and behavioral interventions to promote sustained weight loss for obese adults. | B | December 31, 2003 |
| Screening and counseling for obesity children | The USPSTF recommends that clinicians screen children aged 6 years and older for obesity and offer them or refer them to comprehensive, intensive behavioral interventions to promote improvement in weight status. | B | January 31, 2010 |
| Screening for osteoporosis | The U.S. Preventive Services Task Force (USPSTF) recommends that women aged 65 and older be screened routinely for osteoporosis. The USPSTF recommends that routine screening begin at age 60 for women at increased risk for osteoporotic fractures. (Go to Clinical Considerations for discussion of women at increased risk.) | B | September 30, 2002 |
| Screening for PKU | The USPSTF recommends screening for phenylketonuria (PKU) in newborns. | A | March 31, 2008 |
| Screening for Rh incompatibility | The U.S. Preventive Services Task Force (USPSTF) strongly recommends Rh (D) blood typing and antibody testing for all pregnant women during their first visit for pregnancy-related care | A | February 29, 2004 |
| Screening for Rh incompatibility 24-28 weeks gestation | The USPSTF recommends repeated Rh (D) antibody testing for all unsensitized Rh (D)-negative women at 24-28 weeks' gestation, unless the biological father is known to be Rh (D)-negative | B | February 29, 2004 |
| Counseling for STIs | The USPSTF recommends high-intensity behavioral counseling to prevent sexually transmitted infections (STIs) for all sexually active adolescents and for adults at increased risk for STIs. | B | October 31, 2008 |
| Counseling for tobacco use adults | The USPSTF recommends that clinicians ask all adults about tobacco use and provide tobacco cessation interventions for those who use tobacco products. | A | April 30, 2009 |
| Counseling for tobacco use pregnant women | The USPSTF recommends that clinicians ask all pregnant women about tobacco use and provide augmented, pregnancy-tailored counseling for those who smoke. | A | April 30, 2009 |

| | | |
|---|---|---|
| Screening for syphilis, non-pregnant persons | The U.S. Preventive Services Task Force (USPSTF) strongly recommends that clinicians screen persons at increased risk for syphilis infection. | A | July 31, 2004 |
| Screening for syphilis, pregnant women | The USPSTF recommends that clinicians screen all pregnant women for syphilis infection. | A | July 31, 2004 |
| Screening for visual acuity in children | The USPSTF recommends screening to detect amblyopia, strabismus, and defects in visual acuity in children younger than age 5 years. | B | May 31, 2004 |

**Federal Register** / Vol. 75, No. 137 / Monday, July 19, 2010 / Rules and Regulations 41745

## Recommended Immunization Schedule for Persons Aged 0 Through 6 Years—United States · 2010

For those who fall behind or start late, see the catch-up schedule

| Vaccine ▼ Age ▶ | Birth | 1 month | 2 months | 4 months | 6 months | 12 months | 15 months | 18 months | 19-23 months | 2-3 years | 4-6 years | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Hepatitis B | HepB | HepB | | | HepB | | | | | | | |
| Rotavirus | | | RV | RV | RV | | | | | | | |
| Diphtheria, Tetanus, Pertussis | | | DTaP | DTaP | DTaP | | DTaP | | | | DTaP | Range of recommended ages for all children |
| Haemophilus influenzae type b | | | Hib | Hib | Hib | Hib | | | | | | |
| Pneumococcal | | | PCV | PCV | PCV | PCV | | | | PPSV | | |
| Inactivated Poliovirus | | | IPV | IPV | | IPV | | | | | IPV | |
| Influenza | | | | | | Influenza (Yearly) | | | | | | Range of recommended ages for certain high-risk groups |
| Measles, Mumps, Rubella | | | | | | MMR | | see footnote | | | MMR | |
| Varicella | | | | | | Varicella | | see footnote | | | Varicella | |
| Hepatitis A | | | | | | HepA (2 doses) | | | | HepA Series | | |
| Meningococcal | | | | | | | | | | | MCV | |

This schedule includes recommendations in effect as of December 15, 2009. Any dose not administered at the recommended age should be administered at a subsequent visit, when indicated and feasible. The use of a combination vaccine generally is preferred over separate injections of its equivalent component vaccines. Considerations should include provider assessment, patient preference, and the potential for adverse events. Providers should consult the relevant Advisory Committee on Immunization Practices statement for detailed recommendations: http://www.cdc.gov/vaccines/pubs/acip-list.htm. Clinically significant adverse events that follow immunization should be reported to the Vaccine Adverse Event Reporting System (VAERS) at http://www.vaers.hhs.gov or by telephone, 800-822-7967.

**1. Hepatitis B vaccine (HepB).** (Minimum age: birth)

**At birth:**
- Administer monovalent HepB to all newborns before hospital discharge.
- If mother is hepatitis B surface antigen (HBsAg)-positive, administer HepB and 0.5 mL of hepatitis B immune globulin (HBIG) within 12 hours of birth.
- If mother's HBsAg status is unknown, administer HepB within 12 hours of birth. Determine mother's HBsAg status as soon as possible and, if HBsAg-positive, administer HBIG (no later than age 1 week).

**After the birth dose:**
- The HepB series should be completed with either monovalent HepB or a combination vaccine containing HepB. The second dose should be administered at age 1 or 2 months. Monovalent HepB vaccine should be used for doses administered before age 6 weeks. The final dose should be administered no earlier than age 24 weeks.
- Infants born to HBsAg-positive mothers should be tested for HBsAg and antibody to HBsAg 1 to 2 months after completion of at least 3 doses of the HepB series, at age 9 through 18 months (generally at the next well-child visit).
- Administration of 4 doses of HepB to infants is permissible when a combination vaccine containing HepB is administered after the birth dose. The fourth dose should be administered no earlier than age 24 weeks.

**2. Rotavirus vaccine (RV).** (Minimum age: 6 weeks)
- Administer the first dose at age 6 through 14 weeks (maximum age: 14 weeks 6 days). Vaccination should not be initiated for infants aged 15 weeks 0 days or older.
- The maximum age for the final dose in the series is 8 months 0 days.
- If Rotarix is administered at ages 2 and 4 months, a dose at 6 months is not indicated.

**3. Diphtheria and tetanus toxoids and acellular pertussis vaccine (DTaP).** (Minimum age: 6 weeks)
- The fourth dose may be administered as early as age 12 months, provided at least 6 months have elapsed since the third dose.
- Administer the final dose in the series at age 4 through 6 years.

**4. Haemophilus influenzae type b conjugate vaccine (Hib).** (Minimum age: 6 weeks)
- If PRP-OMP (PedvaxHIB or Comvax [HepB-Hib]) is administered at ages 2 and 4 months, a dose at age 6 months is not indicated.
- TriHiBit (DTaP/Hib) and Hiberix (PRP-T) should not be used for doses at ages 2, 4, or 6 months for the primary series but can be used as the final dose in children aged 12 months through 4 years.

**5. Pneumococcal vaccine.** (Minimum age: 6 weeks for pneumococcal conjugate vaccine [PCV]; 2 years for pneumococcal polysaccharide vaccine [PPSV])
- PCV is recommended for all children aged younger than 5 years. Administer 1 dose of PCV to all healthy children aged 24 through 59 months who are not completely vaccinated for their age.
- Administer PPSV 2 or more months after last dose of PCV to children aged 2 years or older with certain underlying medical conditions, including a cochlear implant. See MMWR 1997;46(No. RR-8).

**6. Inactivated poliovirus vaccine (IPV).** (Minimum age: 6 weeks)
- The final dose in the series should be administered on or after the fourth birthday and at least 6 months following the previous dose.
- If 4 doses are administered prior to age 4 years a fifth dose should be administered at age 4 through 6 years. See MMWR 2009;58(30):829–30.

**7. Influenza vaccine (seasonal).** (Minimum age: 6 months for trivalent inactivated influenza vaccine [TIV]; 2 years for live, attenuated influenza vaccine [LAIV])
- Administer annually to children aged 6 months through 18 years.
- For healthy children aged 2 through 6 years (i.e., those who do not have underlying medical conditions that predispose them to influenza complications), either LAIV or TIV may be used, except LAIV should not be given to children aged 2 through 4 years who have had wheezing in the past 12 months.
- Children receiving TIV should receive 0.25 mL if aged 6 through 35 months or 0.5 mL if aged 3 years or older.
- Administer 2 doses (separated by at least 4 weeks) to children aged younger than 9 years who are receiving influenza vaccine for the first time or who were vaccinated for the first time during the previous influenza season but only received 1 dose.
- For recommendations for use of influenza A (H1N1) 2009 monovalent vaccine see MMWR 2009;58(No. RR-10).

**8. Measles, mumps, and rubella vaccine (MMR).** (Minimum age: 12 months)
- Administer the second dose routinely at age 4 through 6 years. However, the second dose may be administered before age 4, provided at least 28 days have elapsed since the first dose.

**9. Varicella vaccine.** (Minimum age: 12 months)
- Administer the second dose routinely at age 4 through 6 years. However, the second dose may be administered before age 4, provided at least 3 months have elapsed since the first dose.
- For children aged 12 months through 12 years the minimum interval between doses is 3 months. However, if the second dose was administered at least 28 days after the first dose, it can be accepted as valid.

**10. Hepatitis A vaccine (HepA).** (Minimum age: 12 months)
- Administer to all children aged 1 year (i.e., aged 12 through 23 months). Administer 2 doses at least 6 months apart.
- Children not fully vaccinated by age 2 years can be vaccinated at subsequent visits.
- HepA also is recommended for older children who live in areas where vaccination programs target older children, who are at increased risk for infection, or for whom immunity against hepatitis A is desired.

**11. Meningococcal vaccine.** (Minimum age: 2 years for meningococcal conjugate vaccine [MCV4] and for meningococcal polysaccharide vaccine [MPSV4])
- Administer MCV4 to children aged 2 through 10 years with persistent complement component deficiency, anatomic or functional asplenia, and certain other conditions placing them at high risk.
- Administer MCV4 to children previously vaccinated with MCV4 or MPSV4 after 3 years if first dose administered at age 2 through 6 years. See MMWR 2009;53:1042–3.

The Recommended Immunization Schedules for Persons Aged 0 through 18 Years are approved by the Advisory Committee on Immunization Practices (http://www.cdc.gov/vaccines/recs/acip), the American Academy of Pediatrics (http://www.aap.org), and the American Academy of Family Physicians (http://www.aafp.org).

Department of Health and Human Services • Centers for Disease Control and Prevention

41746    **Federal Register** / Vol. 75, No. 137 / Monday, July 19, 2010 / Rules and Regulations

### Recommended Immunization Schedule for Persons Aged 7 Through 18 Years—United States • 2010

For those who fall behind or start late, see the schedule below and the catch-up schedule

| Vaccine ▼          Age ▶ | 7–10 years | 11–12 years | 13–18 years | |
|---|---|---|---|---|
| Tetanus, Diphtheria, Pertussis[1] | | Tdap | Tdap | Range of recommended ages for all children except certain high-risk groups |
| Human Papillomavirus[2] | see footnote 2 | HPV (3 doses) | HPV series | |
| Meningococcal[3] | MCV | MCV | MCV | |
| Influenza[4] | Influenza (Yearly) | | | |
| Pneumococcal[5] | PPSV | | | Range of recommended ages for catch-up immunization |
| Hepatitis A[6] | HepA Series | | | |
| Hepatitis B[7] | Hep B Series | | | |
| Inactivated Poliovirus[8] | IPV Series | | | |
| Measles, Mumps, Rubella[9] | MMR Series | | | Range of recommended ages for certain high-risk groups |
| Varicella[10] | Varicella Series | | | |

This schedule includes recommendations in effect as of December 15, 2009. Any dose not administered at the recommended age should be administered at a subsequent visit, when indicated and feasible. The use of a combination vaccine generally is preferred over separate injections of its equivalent component vaccines. Considerations should include provider assessment, patient preference, and the potential for adverse events. Providers should consult the relevant Advisory Committee on Immunization Practices statement for detailed recommendations: http://www.cdc.gov/vaccines/pubs/acip-list.htm. Clinically significant adverse events that follow immunization should be reported to the Vaccine Adverse Event Reporting System (VAERS) at http://www.vaers.hhs.gov or by telephone, 800-822-7967.

1. **Tetanus and diphtheria toxoids and acellular pertussis vaccine (Tdap).** (Minimum age: 10 years for Boostrix and 11 years for Adacel)
   - Administer at age 11 or 12 years for those who have completed the recommended childhood DTP/DTaP vaccination series and have not received a tetanus and diphtheria toxoid (Td) booster dose.
   - Persons aged 13 through 18 years who have not received Tdap should receive a dose.
   - A 5-year interval from the last Td dose is encouraged when Tdap is used as a booster dose; however, a shorter interval may be used if pertussis immunity is needed.

2. **Human papillomavirus vaccine (HPV).** (Minimum age: 9 years)
   - Two HPV vaccines are licensed: a quadrivalent vaccine (HPV4) for the prevention of cervical, vaginal and vulvar cancers (in females) and genital warts (in females and males), and a bivalent vaccine (HPV2) for the prevention of cervical cancers in females.
   - HPV vaccines are most effective for both males and females when given before exposure to HPV through sexual contact.
   - HPV4 or HPV2 is recommended for the prevention of cervical precancers and cancers in females.
   - HPV4 is recommended for the prevention of cervical, vaginal and vulvar precancers and cancers and genital warts in females.
   - Administer the first dose to females at age 11 or 12 years.
   - Administer the second dose 1 to 2 months after the first dose and the third dose 6 months after the first dose (at least 24 weeks after the first dose).
   - Administer the series to females at age 13 through 18 years if not previously vaccinated.
   - HPV4 may be administered in a 3-dose series to males aged 9 through 18 years to reduce their likelihood of acquiring genital warts.

3. **Meningococcal conjugate vaccine (MCV4).**
   - Administer at age 11 or 12 years, or at age 13 through 18 years if not previously vaccinated.
   - Administer to previously unvaccinated college freshmen living in a dormitory.
   - Administer MCV4 to children aged 2 through 10 years with persistent complement component deficiency, anatomic or functional asplenia, or certain other conditions placing them at high risk.
   - Administer to children previously vaccinated with MCV4 or MPSV4 who remain at increased risk after 3 years (if first dose administered at age 2 through 6 years) or after 5 years (if first dose administered at age 7 years or older). Persons whose only risk factor is living in on-campus housing are not recommended to receive an additional dose. See MMWR 2009;58:1042–3.

4. **Influenza vaccine (seasonal).**
   - Administer annually to children aged 6 months through 18 years.
   - For healthy nonpregnant persons aged 7 through 18 years (i.e., those who do not have underlying medical conditions that predispose them to influenza complications), either LAIV or TIV may be used.
   - Administer 2 doses (separated by at least 4 weeks) to children aged younger than 9 years who are receiving influenza vaccine for the first time or who were vaccinated for the first time during the previous influenza season but only received 1 dose.
   - For recommendations for use of influenza A (H1N1) 2009 monovalent vaccine. See MMWR 2009;58(No. RR-10).

5. **Pneumococcal polysaccharide vaccine (PPSV).**
   - Administer to children with certain underlying medical conditions, including a cochlear implant. A single revaccination should be administered after 5 years to children with functional or anatomic asplenia or an immunocompromising condition. See MMWR 1997;46(No. RR-8).

6. **Hepatitis A vaccine (HepA).**
   - Administer 2 doses at least 6 months apart.
   - HepA is recommended for children aged older than 23 months who live in areas where vaccination programs target older children, who are at increased risk for infection, or for whom immunity against hepatitis A is desired.

7. **Hepatitis B vaccine (HepB).**
   - Administer the 3-dose series to those not previously vaccinated.
   - A 2-dose series (separated by at least 4 months) of adult formulation Recombivax HB is licensed for children aged 11 through 15 years.

8. **Inactivated poliovirus vaccine (IPV).**
   - The final dose in the series should be administered on or after the fourth birthday and at least 6 months following the previous dose.
   - If both OPV and IPV were administered as part of a series, a total of 4 doses should be administered, regardless of the child's current age.

9. **Measles, mumps, and rubella vaccine (MMR).**
   - If not previously vaccinated, administer 2 doses or the second dose for those who have received only 1 dose, with at least 28 days between doses.

10. **Varicella vaccine.**
   - For persons aged 7 through 18 years without evidence of immunity (see MMWR 2007;56[No. RR-4]), administer 2 doses if not previously vaccinated or the second dose if only 1 dose has been administered.
   - For persons aged 7 through 12 years, the minimum interval between doses is 3 months. However if the second dose was administered at least 28 days after the first dose, it can be accepted as valid.
   - For persons aged 13 years and older, the minimum interval between doses is 28 days.

The Recommended Immunization Schedules for Persons Aged 0 through 18 Years are approved by the Advisory Committee on Immunization Practices (http://www.cdc.gov/vaccines/recs/acip), the American Academy of Pediatrics (http://www.aap.org), and the American Academy of Family Physicians (http://www.aafp.org).
Department of Health and Human Services • Centers for Disease Control and Prevention

**Catch-up Immunization Schedule for Persons Aged 4 Months Through 18 Years Who Start Late or Who Are More Than 1 Month Behind**—United States • 2010

This table below provides catch-up schedules and minimum intervals between doses for children whose vaccinations have been delayed. A vaccine series does not need to be restarted, regardless of the time that has elapsed between doses. Use the section appropriate for the child's age.

| Vaccine | Minimum Age for Dose 1 | Minimum Interval Between Doses | | | |
|---|---|---|---|---|---|
| | | Dose 1 to Dose II | Dose 2 to Dose 3 | Dose 3 to Dose 4 | Dose 4 to Dose 5 |
| **PERSONS AGED 4 MONTHS THROUGH 6 YEARS** | | | | | |
| Hepatitis B[1] | Birth | 4 weeks | 8 weeks (and at least 16 weeks after first dose) | | |
| Rotavirus[2] | 6 wks | 4 weeks | 4 weeks[2] | | |
| Diphtheria, Tetanus, Pertussis[3] | 6 wks | 4 weeks | 4 weeks | 6 months | 6 months[3] |
| Haemophilus influenzae type b[4] | 6 wks | 4 weeks (if first dose administered at age <12 months); 8 weeks (as final dose) (if first dose administered at age 12–14 months); No further doses needed (if first dose administered at age ≥15 months) | 4 weeks (if current age <12 months); 8 weeks (as final dose) (if current age ≥12 months and second dose administered at age <15 months); No further doses needed (if previous dose administered at age ≥15 months) | 8 weeks (as final dose) This dose only necessary for children aged 12 months through 59 months who received 3 doses before age 12 months | |
| Pneumococcal[5] | 6 wks | 4 weeks (if first dose administered at age <12 months); 8 weeks (as final dose for healthy children) (if first dose administered at age ≥12 months or current age 24 through 59 months); No further doses needed for healthy children if previous dose administered at age ≥24 months | 4 weeks (if current age <12 months); 8 weeks (as final dose for healthy children) (if current age ≥12 months); No further doses needed for healthy children if previous dose administered at age ≥24 months | 8 weeks (as final dose) This dose only necessary for children aged 12 months through 59 months who received 3 doses before age 12 months | |
| Inactivated Poliovirus[6] | 6 wks | 4 weeks | 4 weeks | 6 months | |
| Measles, Mumps, Rubella[7] | 12 mos | 4 weeks | | | |
| Varicella[8] | 12 mos | 3 months | | | |
| Hepatitis A[9] | 12 mos | 6 months | | | |
| **PERSONS AGED 7 THROUGH 18 YEARS** | | | | | |
| Tetanus, Diphtheria / Tetanus, Diphtheria, Pertussis[10] | 7 yrs[10] | 4 weeks | 4 weeks (if first dose administered at age <12 months); 6 months (if first dose administered at age 12 months or older) | 6 months (if first dose administered at age <12 months) | |
| Human Papillomavirus[11] | 9 yrs | Routine dosing intervals are recommended[11] | | | |
| Hepatitis A[9] | 12 mos | 6 months | | | |
| Hepatitis B[1] | Birth | 4 weeks | 8 weeks (and at least 16 weeks after first dose) | | |
| Inactivated Poliovirus[6] | 6 wks | 4 weeks | 4 weeks | 6 months | |
| Measles, Mumps, Rubella[7] | 12 mos | 4 weeks | | | |
| Varicella[8] | 12 mos | 3 months (if person is younger than age 13 years); 4 weeks (if person is aged 13 years or older) | | | |

1. **Hepatitis B vaccine (HepB).**
 • Administer the 3-dose series to those not previously vaccinated.
 • A 2-dose series (separated by at least 4 months) of adult formulation Recombivax HB is licensed for children aged 11 through 15 years.
2. **Rotavirus vaccine (RV).**
 • The maximum age for the first dose is 14 weeks 6 days. Vaccination should not be initiated for infants aged 15 weeks 0 days or older.
 • The maximum age for the final dose in the series is 8 months 0 days.
 • If Rotarix was administered for the first and second doses, a third dose is not indicated.
3. **Diphtheria and tetanus toxoids and acellular pertussis vaccine (DTaP).**
 • The fifth dose is not necessary if the fourth dose was administered at age 4 years or older.
4. **Haemophilus influenzae type b conjugate vaccine (Hib).**
 • Hib vaccine is not generally recommended for persons aged 5 years or older. No efficacy data are available on which to base a recommendation concerning use of Hib vaccine for older children and adults. However, studies suggest good immunogenicity in persons who have sickle cell disease, leukemia, or HIV infection, or who have had a splenectomy; administering 1 dose of Hib vaccine to these persons who have not previously received Hib vaccine is not contraindicated.
 • If the first 2 doses were PRP-OMP (PedvaxHIB or Comvax), and administered at age 11 months or younger, the third (and final) dose should be administered at age 12 through 15 months and at least 8 weeks after the second dose.
 • If the first dose was administered at age 7 through 11 months, administer the second dose at least 4 weeks later and a final dose at age 12 through 15 months.
5. **Pneumococcal vaccine.**
 • Administer 1 dose of pneumococcal conjugate vaccine (PCV) to all healthy children aged 24 through 59 months who have not received at least 1 dose of PCV on or after age 12 months.
 • For children aged 24 through 59 months with underlying medical conditions, administer 1 dose of PCV if 3 doses were received previously or administer 2 doses of PCV at least 8 weeks apart if fewer than 3 doses were received previously.
 • Administer pneumococcal polysaccharide vaccine (PPSV) to children aged 2 years or older with certain underlying medical conditions, including a cochlear implant. See MMWR 1997;46(No. RR-8).
6. **Inactivated poliovirus vaccine (IPV).**
 • The final dose in the series should be administered on or after the fourth birthday and at least 6 months following the previous dose.

 • A fourth dose is not necessary if the third dose was administered at age 4 years or older and at least 6 months following the previous dose.
 • In the first 6 months of life, minimum age and minimum intervals are only recommended if the person is at risk for imminent exposure to circulating poliovirus (i.e., travel to a polio-endemic region or during an outbreak).
7. **Measles, mumps, and rubella vaccine (MMR).**
 • Administer the second dose routinely at age 4 through 6 years. However, the second dose may be administered before age 4, provided at least 28 days have elapsed since the first dose.
 • If not previously vaccinated, administer 2 doses with at least 28 days between doses.
8. **Varicella vaccine.**
 • Administer the second dose routinely at age 4 through 6 years. However, the second dose may be administered before age 4, provided at least 3 months have elapsed since the first dose.
 • For persons aged 12 months through 12 years, the minimum interval between doses is 3 months. However, if the second dose was administered at least 28 days after the first dose, it can be accepted as valid.
 • For persons aged 13 years and older, the minimum interval between doses is 28 days.
9. **Hepatitis A vaccine (HepA).**
 • HepA is recommended for children aged older than 23 months who live in areas where vaccination programs target older children, who are at increased risk for infection, or for whom immunity against hepatitis A is desired.
10. **Tetanus and diphtheria toxoids vaccine (Td) and tetanus and diphtheria toxoids and acellular pertussis vaccine (Tdap).**
 • Doses of DTaP are counted as part of the Td/Tdap series.
 • Tdap should be substituted for a single dose of Td in the catch-up series or as a booster for children aged 10 through 18 years; use Td for other doses.
11. **Human papillomavirus vaccine (HPV).**
 • Administer the series to females at age 13 through 18 years if not previously vaccinated.
 • Use recommended routine dosing intervals for series catch-up (i.e., the second and third doses should be administered at 1 to 2 and 6 months after the first dose). The minimum interval between the first and second doses is 4 weeks. The minimum interval between the second and third doses is 12 weeks, and the third dose should be administered at least 24 weeks after the first dose.

Information about reporting reactions after vaccination is available online at http://www.vaers.hhs.gov or by telephone, 800-822-7967. Suspected cases of vaccine-preventable diseases should be reported to the state or local health department. Additional information, including precautions and contraindications for vaccination, is available from the National Center for Immunization and Respiratory Diseases at http://www.cdc.gov/vaccines or telephone, 800-CDC-INFO (800-232-4636).

Department of Health and Human Services • Centers for Disease Control and Prevention

App. 100

# Recommended Adult Immunization Schedule
## UNITED STATES · 2010
Note: These recommendations must be read with the footnotes that follow
containing number of doses, intervals between doses, and other important information.

### Figure 1. Recommended adult immunization schedule, by vaccine and age group



| VACCINE ▼    AGE GROUP ▶ | 19–26 years | 27–49 years | 50–59 years | 60–64 years | ≥65 years |
|---|---|---|---|---|---|
| Tetanus, diphtheria, pertussis (Td/Tdap) | Substitute 1-time dose of Tdap for Td booster; then boost with Td every 10 yrs | | | | Td booster every 10 yrs |
| Human papillomavirus (HPV) | 3 doses (females) | | | | |
| Varicella | 2 doses | | | | |
| Zoster | | | | 1 dose | |
| Measles, mumps, rubella (MMR) | 1 or 2 doses | | 1 dose | | |
| Influenza | 1 dose annually | | | | |
| Pneumococcal (polysaccharide) | 1 or 2 doses | | | | 1 dose |
| Hepatitis A | 2 doses | | | | |
| Hepatitis B | 3 doses | | | | |
| Meningococcal | 1 or more doses | | | | |

*Covered by the Vaccine Injury Compensation Program.

For all persons in this category who meet the age requirements and who lack evidence of immunity (e.g., lack documentation of vaccination or have no evidence of prior infection)

Recommended if some other risk factor is present (e.g., on the basis of medical, occupational, lifestyle, or other indications)

No recommendation

Report all clinically significant postvaccination reactions to the Vaccine Adverse Event Reporting System (VAERS). Reporting forms and instructions on filing a VAERS report are available at www.vaers.hhs.gov or by telephone, 800-822-7967.

Information on how to file a Vaccine Injury Compensation Program claim is available at www.hrsa.gov/vaccinecompensation or by telephone, 800-338-2382. To file a claim for vaccine injury, contact the U.S. Court of Federal Claims, 717 Madison Place, N.W., Washington, D.C. 20005; telephone, 202-357-6400.

Additional information about the vaccines in this schedule, extent of available data, and contraindications for vaccination is also available at www.cdc.gov/vaccines or from the CDC-INFO Contact Center at 800-CDC-INFO (800-232-4636) in English and Spanish, 24 hours a day, 7 days a week.

Use of trade names and commercial sources is for identification only and does not imply endorsement by the U.S. Department of Health and Human Services.

Figure 2. Vaccines that might be indicated for adults based on medical and other indications

Case 4:20-cv-00283-O   Document 46   Filed 11/15/21   Page 105 of 314   PageID 656

# Footnotes

## Recommended Adult Immunization Schedule—UNITED STATES · 2010

For complete statements by the Advisory Committee on Immunization Practices (ACIP), visit www.cdc.gov/vaccines/pubs/ACIP-list.htm.

### 1. Tetanus, diphtheria, and acellular pertussis (Td/Tdap) vaccination

### 2. Human papillomavirus (HPV) vaccination

### 3. Varicella vaccination

### 4. Herpes zoster vaccination

### 5. Measles, mumps, rubella (MMR) vaccination

App. 103

### 6. Seasonal Influenza vaccination

### 7. Pneumococcal polysaccharide (PPSV) vaccination

### 8. Revaccination with PPSV

### 9. Hepatitis A vaccination

### 10. Hepatitis B vaccination

**11. Meningococcal vaccination**

Meningococcal vaccine should be administered to persons with the following indications.

Medical. Adults with anatomic or functional asplenia, or persistent complement component deficiencies.

Other. First-year college students living in dormitories; microbiologists routinely exposed to isolates of *Neisseria meningitidis*; military recruits; and persons who travel to or live in countries in which meningococcal disease is hyperendemic or epidemic (e.g., the "meningitis belt" of sub-Saharan Africa during the dry season [December through June]), particularly if their contact with local populations will be prolonged. Vaccination is required by the government of Saudi Arabia for all travelers to Mecca during the annual Hajj.

Meningococcal conjugate vaccine (MCV4) is preferred for adults with any of the preceding indications who are aged ≤55 years; meningococcal polysaccharide vaccine (MPSV4) is preferred for adults aged ≥56 years. Revaccination with MCV4 after 5 years is recommended for adults previously vaccinated with MCV4 or MPSV4 who remain at increased risk for infection (e.g., adults with anatomic or functional asplenia). Persons whose only risk factor is living in on-campus housing are not recommended to receive an additional dose.

**12. Selected conditions for which *Haemophilus influenzae* type b (Hib) vaccine may be used**

Hib vaccine generally is not recommended for persons aged ≥5 years. No efficacy data are available on which to base a recommendation concerning use of Hib vaccine for older children and adults. However, studies suggest good immunogenicity in patients who have sickle cell disease, leukemia, or HIV infection or who have had a splenectomy; administering 1 dose of Hib vaccine to these high-risk persons who have not previously received Hib vaccine is not contraindicated.

**13. Immunocompromising conditions**

Inactivated vaccines generally are acceptable (e.g., pneumococcal, meningococcal, influenza [inactivated influenza vaccine]) and live vaccines generally are avoided in persons with immune deficiencies or immunocompromising conditions. Information on specific conditions is available at www.cdc.gov/vaccines/pubs/acip-list.htm.



**41754**   **Federal Register**/Vol. 75, No. 137/Monday, July 19, 2010/Rules and Regulations

SACHDNC Recommended Uniform Screening Panel[1]
CORE[2] CONDITIONS[3]
(as of February 2010)

| ACMG Code | Core Condition | Metabolic Disorder | | | Endocrine Disorder | Hemoglobin Disorder | Other Disorder |
|---|---|---|---|---|---|---|---|
| | | Organic acid condition | Fatty acid oxidation disorders | Amino acid disorders | | | |
| PROP | Propionic academia | ▓ | | | | | |
| MUT | Methylmalonic acidemia (methylmalonyl-CoA mutase) | ▓ | | | | | |
| Cbl A,B | Methylmalonic acidemia (cobalamin disorders) | ▓ | | | | | |
| IVA | Isovaleric acidemia | ▓ | | | | | |
| 3-MCC | 3-Methylcrotonyl-CoA carboxylase deficiency | ▓ | | | | | |
| HMG | 3-Hydroxy-3-methyglutaric aciduria | ▓ | | | | | |
| MCD | Holocarboxylase synthase deficiency | ▓ | | | | | |
| βKT | β-Ketothiolase deficiency | ▓ | | | | | |
| GA1 | Glutaric acidemia type I | ▓ | | | | | |
| CUD | Carnitine uptake defect/carnitine transport defect | | ▓ | | | | |
| MCAD | Medium-chain acyl-CoA dehydrogenase deficiency | | ▓ | | | | |
| VLCAD | Very long-chain acyl-CoA dehydrogenase deficiency | | ▓ | | | | |
| LCHAD | Long-chain L-3 hydroxyacyl-CoA dehydrogenase deficiency | | ▓ | | | | |
| TFP | Trifunctional protein deficiency | | ▓ | | | | |
| ASA | Argininosuccinic aciduria | | | ▓ | | | |
| CIT | Citrullinemia, type I | | | ▓ | | | |
| MSUD | Maple syrup urine disease | | | ▓ | | | |
| HCY | Homocystinuria | | | ▓ | | | |
| PKU | Classic phenylketonuria | | | ▓ | | | |
| TYR I | Tyrosinemia, type I | | | ▓ | | | |
| CH | Primary congenital hypothyroidism | | | | ▓ | | |
| CAH | Congenital adrenal hyperplasia | | | | ▓ | | |
| Hb SS | S,S disease (Sickle cell anemia) | | | | | ▓ | |
| Hb S/βTh | S, βeta-thalassemia | | | | | ▓ | |
| Hb S/C | S,C disease | | | | | ▓ | |
| BIOT | Biotinidase deficiency | | | | | | ▓ |
| GALT | Classic galactosemia | | | | | | ▓ |
| SCID | Severe Combined Immunodeficiences | | | | | | ▓ |
| CF | Cystic fibrosis | | | | | | ▓ |
| HEAR | Hearing loss | | | | | | ▓ |

1. The selection of these conditions is based on the report "Newborn Screening: Towards a Uniform Screening Panel and System. Genet Med. 2006; 8(5) Suppl: S12-S252" as authored by the American College of Medical Genetics (ACMG) and commissioned by the Health Resources and Services Administration (HRSA).
2. Disorders that should be included in every Newborn Screening Program
3. The Nomenclature for Conditions is based on the report "Naming and Counting Disorders (Conditions) Included in Newborn Screening Panels" Pediatrics 2006; 117 (5) Suppl: S308-S314

**App. 107**

SACHDNC Recommended Uniform Screening Panel[1]
SECONDARY[2] CONDITIONS [3]
(as of February 2010)

| ACMG Code | Secondary Condition | Metabolic Disorder | | | Hemoglobin Disorder | Other Disorder |
|---|---|---|---|---|---|---|
| | | Organic acid condition | Fatty acid oxidation disorders | Amino acid disorders | | |
| Cbl C,D | Methylmalonic acidemia with homocystinuria | ▓ | | | | |
| MAL | Malonic acidemia | ▓ | | | | |
| IBG | Isobutyrylglycinuria | ▓ | | | | |
| 2MBG | 2-Methylbutyrylglycinuria | ▓ | | | | |
| 3MGA | 3-Methylglutaconic aciduria | ▓ | | | | |
| 2M3HBA | 2-Methyl-3-hydroxybutyric aciduria | ▓ | | | | |
| SCAD | Short-chain acyl-CoA dehydrogenase deficiency | | ▓ | | | |
| M/SCHAD | Medium/short-chain L-3-hydroxyacyl-CoA dehydrogenase deficiency | | ▓ | | | |
| GA2 | Glutaric acidemia type II | | ▓ | | | |
| MCAT | Medium-chain ketoacyl-CoA thiolase deficiency | | ▓ | | | |
| DE RED | 2,4 Dienoyl-CoA reductase deficiency | | ▓ | | | |
| CPT IA | Carnitine palmitoyltransferase type I deficiency | | ▓ | | | |
| CPT II | Carnitine palmitoyltransferase type II deficiency | | ▓ | | | |
| CACT | Carnitine acylcarnitine translocase deficiency | | ▓ | | | |
| ARG | Argininemia | | | ▓ | | |
| CIT II | Citrullinemia, type II | | | ▓ | | |
| MET | Hypermethioninemia | | | ▓ | | |
| H-PHE | Benign hyperphenylalaninemia | | | ▓ | | |
| BIOPT (BS) | Biopterin defect in cofactor biosynthesis | | | ▓ | | |
| BIOPT (REG) | Biopterin defect in cofactor regeneration | | | ▓ | | |
| TYR II | Tyrosinemia, type II | | | ▓ | | |
| TRY III | Tyrosinemia, type III | | | ▓ | | |
| Var Hb | Various other hemoglobinopathies | | | | ▓ | |
| GALE | Galactoepimerase deficiency | | | | | ▓ |
| GALK | Galactokinase deficiency | | | | | ▓ |
| | T-cell related lymphocyte deficiencies | | | | | ▓ |

1. The selection of these conditions is based on the report "Newborn Screening: Towards a Uniform Screening Panel and System. Genet. Med. 2006, 8(5) Suppl: S12-S252" as authored by the American College of Medical Genetics (ACMG) and commissioned by the Health Resources and Services Administration (HRSA).

2. Disorders that can be detected in the differential diagnosis of a core disorder.

3. The Nomenclature for Conditions is based on the report "Naming and Counting Disorders (Conditions) Included in Newborn Screening Panels" Pediatrics 2006, 117 (5) Suppl: S308-S314.

BILLING CODE 4830–01–C; 4510–29–C; 4210–01–C

## VI. Statutory Authority

The Department of the Treasury temporary regulations are adopted pursuant to the authority contained in sections 7805 and 9833 of the Code.

App. 108

The Department of Labor interim final regulations are adopted pursuant to the authority contained in 29 U.S.C. 1027, 1059, 1135, 1161–1168, 1169, 1181–1183, 1181 note, 1185, 1185a, 1185b, 1191, 1191a, 1191b, and 1191c; sec. 101(g), Pub. L. 104–191, 110 Stat. 1936; sec. 401(b), Pub. L. 105–200, 112 Stat. 645 (42 U.S.C. 651 note); sec. 512(d), Pub. L. 110–343, 122 Stat. 3881; sec. 1001, 1201, and 1562(e), Pub. L. 111–148, 124 Stat. 119, as amended by Pub. L. 111–152, 124 Stat. 1029; Secretary of Labor's Order 6–2009, 74 FR 21524 (May 7, 2009).

The Department of Health and Human Services interim final regulations are adopted pursuant to the authority contained in sections 2701 through 2763, 2791, and 2792 of the PHS Act (42 USC 300gg through 300gg-63, 300gg-91, and 300gg-92), as amended.

**List of Subjects**

*26 CFR Part 54*

Excise taxes, Health care, Health insurance, Pensions, Reporting and recordkeeping requirements.

*29 CFR Part 2590*

Continuation coverage, Disclosure, Employee benefit plans, Group health plans, Health care, Health insurance, Medical child support, Reporting and recordkeeping requirements.

*45 CFR Part 147*

Health care, Health insurance, Reporting and recordkeeping requirements, and State regulation of health insurance.

**Steven T. Miller**,

*Deputy Commissioner for Services and Enforcement, Internal Revenue Service.*

Approved: July 8, 2010

**Michael F. Mundaca,**

*Assistant Secretary of the Treasury (Tax Policy).*

Signed this 9th day of July, 2010.

**Phyllis C. Borzi,**

*Assistant Secretary, Employee Benefits Security Administration, Department of Labor.*

Dated: July 9, 2010

**Jay Angoff,**

*Director, Office of Consumer Information and Insurance Oversight.*

Dated: July 9, 2010.

**Kathleen Sebelius**,

*Secretary, Department of Health and Human Services.*

**DEPARTMENT OF THE TREASURY**

**Internal Revenue Service**

**26 CFR Chapter 1**

■ Accordingly, 26 CFR Part 54 is amended as follows:

**PART 54—PENSION EXCISE TAXES**

■ **Paragraph 1.** The authority citation for part 54 is amended by adding an entry for § 54.9815–2713T in numerical order to read in part as follows:

**Authority:** 26 U.S.C. 7805. * * *

Section 54.9815–2713T also issued under 26 U.S.C. 9833. * * *

■ **Par. 2.** Section 54.9815–2713T is added to read as follows:

**§ 54.9815–2713T   Coverage of preventive health services (temporary).**

(a) *Services*—(1) *In general.* Beginning at the time described in paragraph (b) of this section, a group health plan, or a health insurance issuer offering group health insurance coverage, must provide coverage for all of the following items and services, and may not impose any cost-sharing requirements (such as a copayment, coinsurance, or deductible) with respect to those items or services:

(i) Evidence-based items or services that have in effect a rating of A or B in the current recommendations of the United States Preventive Services Task Force with respect to the individual involved (except as otherwise provided in paragraph (c) of this section);

(ii) Immunizations for routine use in children, adolescents, and adults that have in effect a recommendation from the Advisory Committee on Immunization Practices of the Centers for Disease Control and Prevention with respect to the individual involved (for this purpose, a recommendation from the Advisory Committee on Immunization Practices of the Centers for Disease Control and Prevention is considered in effect after it has been adopted by the Director of the Centers for Disease Control and Prevention, and a recommendation is considered to be for routine use if it is listed on the Immunization Schedules of the Centers for Disease Control and Prevention);

(iii) With respect to infants, children, and adolescents, evidence-informed preventive care and screenings provided for in comprehensive guidelines supported by the Health Resources and Services Administration; and

(iv) With respect to women, to the extent not described in paragraph (a)(1)(i) of this section, evidence-informed preventive care and screenings provided for in comprehensive guidelines supported by the Health Resources and Services Administration.

(2) *Office visits*—(i) If an item or service described in paragraph (a)(1) of this section is billed separately (or is tracked as individual encounter data separately) from an office visit, then a plan or issuer may impose cost-sharing requirements with respect to the office visit.

(ii) If an item or service described in paragraph (a)(1) of this section is not billed separately (or is not tracked as individual encounter data separately) from an office visit and the primary purpose of the office visit is the delivery of such an item or service, then a plan or issuer may not impose cost-sharing requirements with respect to the office visit.

(iii) If an item or service described in paragraph (a)(1) of this section is not billed separately (or is not tracked as individual encounter data separately) from an office visit and the primary purpose of the office visit is not the delivery of such an item or service, then a plan or issuer may impose cost-sharing requirements with respect to the office visit.

(iv) The rules of this paragraph (a)(2) are illustrated by the following examples:

*Example 1.* (i) *Facts.* An individual covered by a group health plan visits an in-network health care provider. While visiting the provider, the individual is screened for cholesterol abnormalities, which has in effect a rating of A or B in the current recommendations of the United States Preventive Services Task Force with respect to the individual. The provider bills the plan for an office visit and for the laboratory work of the cholesterol screening test.

(ii) *Conclusion.* In this *Example 1*, the plan may not impose any cost-sharing requirements with respect to the separately-

App. 109

billed laboratory work of the cholesterol screening test. Because the office visit is billed separately from the cholesterol screening test, the plan may impose cost-sharing requirements for the office visit.

*Example 2.* (i) *Facts.* Same facts as *Example 1.* As the result of the screening, the individual is diagnosed with hyperlipidemia and is prescribed a course of treatment that is not included in the recommendations under paragraph (a)(1) of this section.

(ii) *Conclusion.* In this *Example 2,* because the treatment is not included in the recommendations under paragraph (a)(1) of this section, the plan is not prohibited from imposing cost-sharing requirements with respect to the treatment.

*Example 3.* (i) *Facts.* An individual covered by a group health plan visits an in-network health care provider to discuss recurring abdominal pain. During the visit, the individual has a blood pressure screening, which has in effect a rating of A or B in the current recommendations of the United States Preventive Services Task Force with respect to the individual. The provider bills the plan for an office visit.

(ii) *Conclusion.* In this *Example 3,* the blood pressure screening is provided as part of an office visit for which the primary purpose was not to deliver items or services described in paragraph (a)(1) of this section. Therefore, the plan may impose a cost-sharing requirement for the office visit charge.

*Example 4.* (i) *Facts.* A child covered by a group health plan visits an in-network pediatrician to receive an annual physical exam described as part of the comprehensive guidelines supported by the Health Resources and Services Administration. During the office visit, the child receives additional items and services that are not described in the comprehensive guidelines supported by the Health Resources and Services Administration, nor otherwise described in paragraph (a)(1) of this section. The provider bills the plan for an office visit.

(ii) *Conclusion.* In this *Example 4,* the service was not billed as a separate charge and was billed as part of an office visit. Moreover, the primary purpose for the visit was to deliver items and services described as part of the comprehensive guidelines supported by the Health Resources and Services Administration. Therefore, the plan may not impose a cost-sharing requirement with respect to the office visit.

(3) *Out-of-network providers.* Nothing in this section requires a plan or issuer that has a network of providers to provide benefits for items or services described in paragraph (a)(1) of this section that are delivered by an out-of-network provider. Moreover, nothing in this section precludes a plan or issuer that has a network of providers from imposing cost-sharing requirements for items or services described in paragraph (a)(1) of this section that are delivered by an out-of-network provider.

(4) *Reasonable medical management.* Nothing prevents a plan or issuer from using reasonable medical management

techniques to determine the frequency, method, treatment, or setting for an item or service described in paragraph (a)(1) of this section to the extent not specified in the recommendation or guideline.

(5) *Services not described.* Nothing in this section prohibits a plan or issuer from providing coverage for items and services in addition to those recommended by the United States Preventive Services Task Force or the Advisory Committee on Immunization Practices of the Centers for Disease Control and Prevention, or provided for by guidelines supported by the Health Resources and Services Administration, or from denying coverage for items and services that are not recommended by that task force or that advisory committee, or under those guidelines. A plan or issuer may impose cost-sharing requirements for a treatment not described in paragraph (a)(1) of this section, even if the treatment results from an item or service described in paragraph (a)(1) of this section.

(b) *Timing*—(1) *In general.* A plan or issuer must provide coverage pursuant to paragraph (a)(1) of this section for plan years that begin on or after September 23, 2010, or, if later, for plan years that begin on or after the date that is one year after the date the recommendation or guideline is issued.

(2) *Changes in recommendations or guidelines.* A plan or issuer is not required under this section to provide coverage for any items and services specified in any recommendation or guideline described in paragraph (a)(1) of this section after the recommendation or guideline is no longer described in paragraph (a)(1) of this section. Other requirements of Federal or State law may apply in connection with a plan or issuer ceasing to provide coverage for any such items or services, including PHS Act section 2715(d)(4), which requires a plan or issuer to give 60 days advance notice to an enrollee before any material modification will become effective.

(c) *Recommendations not current.* For purposes of paragraph (a)(1)(i) of this section, and for purposes of any other provision of law, recommendations of the United States Preventive Services Task Force regarding breast cancer screening, mammography, and prevention issued in or around November 2009 are not considered to be current.

(d) *Effective/applicability date.* The provisions of this section apply for plan years beginning on or after September 23, 2010. *See* § 54.9815–1251T for determining the application of this section to grandfathered health plans (providing that these rules regarding

coverage of preventive health services do not apply to grandfathered health plans).

(e) *Expiration date.* This section expires on *July 12, 2013* or on such earlier date as may be provided in final regulations or other action published in the **Federal Register.**

**DEPARTMENT OF LABOR**

**Employee Benefits Security Administration**

**29 CFR Chapter XXV**

■ 29 CFR Part 2590 is amended as follows:

**PART 2590—RULES AND REGULATIONS FOR GROUP HEALTH PLANS**

■ 1. The authority citation for Part 2590 continues to read as follows:

**Authority:** 29 U.S.C. 1027, 1059, 1135, 1161–1168, 1169, 1181–1183, 1181 note, 1185, 1185a, 1185b, 1191, 1191a, 1191b, and 1191c; sec. 101(g), Pub. L. 104–191, 110 Stat. 1936; sec. 401(b), Pub. L. 105–200, 112 Stat. 645 (42 U.S.C. 651 note); sec. 512(d), Pub. L. 110–343, 122 Stat. 3881; sec. 1001, 1201, and 1562(e), Pub. L. 111–148, 124 Stat. 119, as amended by Pub. L. 111–152, 124 Stat. 1029; Secretary of Labor's Order 6–2009, 74 FR 21524 (May 7, 2009).

**Subpart C—Other Requirements**

■ 2. Section 2590.715–2713 is added to subpart C to read as follows:

**§ 2590.715–2713  Coverage of preventive health services.**

(a) *Services*—(1) *In general.* Beginning at the time described in paragraph (b) of this section, a group health plan, or a health insurance issuer offering group health insurance coverage, must provide coverage for all of the following items and services, and may not impose any cost-sharing requirements (such as a copayment, coinsurance, or deductible) with respect to those items or services:

(i) Evidence-based items or services that have in effect a rating of A or B in the current recommendations of the United States Preventive Services Task Force with respect to the individual involved (except as otherwise provided in paragraph (c) of this section);

(ii) Immunizations for routine use in children, adolescents, and adults that have in effect a recommendation from the Advisory Committee on Immunization Practices of the Centers for Disease Control and Prevention with respect to the individual involved (for this purpose, a recommendation from the Advisory Committee on Immunization Practices of the Centers for Disease Control and Prevention is considered in effect after it has been

Page 110

adopted by the Director of the Centers for Disease Control and Prevention, and a recommendation is considered to be for routine use if it is listed on the Immunization Schedules of the Centers for Disease Control and Prevention);

(iii) With respect to infants, children, and adolescents, evidence-informed preventive care and screenings provided for in comprehensive guidelines supported by the Health Resources and Services Administration; and

(iv) With respect to women, to the extent not described in paragraph (a)(1)(i) of this section, evidence-informed preventive care and screenings provided for in comprehensive guidelines supported by the Health Resources and Services Administration.

(2) *Office visits*—(i) If an item or service described in paragraph (a)(1) of this section is billed separately (or is tracked as individual encounter data separately) from an office visit, then a plan or issuer may impose cost-sharing requirements with respect to the office visit.

(ii) If an item or service described in paragraph (a)(1) of this section is not billed separately (or is not tracked as individual encounter data separately) from an office visit and the primary purpose of the office visit is the delivery of such an item or service, then a plan or issuer may not impose cost-sharing requirements with respect to the office visit.

(iii) If an item or service described in paragraph (a)(1) of this section is not billed separately (or is not tracked as individual encounter data separately) from an office visit and the primary purpose of the office visit is not the delivery of such an item or service, then a plan or issuer may impose cost-sharing requirements with respect to the office visit.

(iv) The rules of this paragraph (a)(2) are illustrated by the following examples:

*Example 1.* (i) *Facts.* An individual covered by a group health plan visits an in-network health care provider. While visiting the provider, the individual is screened for cholesterol abnormalities, which has in effect a rating of A or B in the current recommendations of the United States Preventive Services Task Force with respect to the individual. The provider bills the plan for an office visit and for the laboratory work of the cholesterol screening test.

(ii) *Conclusion.* In this *Example 1,* the plan may not impose any cost-sharing requirements with respect to the separately-billed laboratory work of the cholesterol screening test. Because the office visit is billed separately from the cholesterol screening test, the plan may impose cost-sharing requirements for the office visit.

*Example 2.* (i) *Facts.* Same facts as *Example 1.* As the result of the screening, the

individual is diagnosed with hyperlipidemia and is prescribed a course of treatment that is not included in the recommendations under paragraph (a)(1) of this section.

(ii) *Conclusion.* In this *Example 2,* because the treatment is not included in the recommendations under paragraph (a)(1) of this section, the plan is not prohibited from imposing cost-sharing requirements with respect to the treatment.

*Example 3.* (i) *Facts.* An individual covered by a group health plan visits an in-network health care provider to discuss recurring abdominal pain. During the visit, the individual has a blood pressure screening, which has in effect a rating of A or B in the current recommendations of the United States Preventive Services Task Force with respect to the individual. The provider bills the plan for an office visit.

(ii) *Conclusion.* In this *Example 3,* the blood pressure screening is provided as part of an office visit for which the primary purpose was not to deliver items or services described in paragraph (a)(1) of this section. Therefore, the plan may impose a cost-sharing requirement for the office visit charge.

*Example 4.* (i) *Facts.* A child covered by a group health plan visits an in-network pediatrician to receive an annual physical exam described as part of the comprehensive guidelines supported by the Health Resources and Services Administration. During the office visit, the child receives additional items and services that are not described in the comprehensive guidelines supported by the Health Resources and Services Administration, nor otherwise described in paragraph (a)(1) of this section. The provider bills the plan for an office visit.

(ii) *Conclusion.* In this *Example 4,* the service was not billed as a separate charge and was billed as part of an office visit. Moreover, the primary purpose for the visit was to deliver items and services described as part of the comprehensive guidelines supported by the Health Resources and Services Administration. Therefore, the plan may not impose a cost-sharing requirement with respect to the office visit.

(3) *Out-of-network providers.* Nothing in this section requires a plan or issuer that has a network of providers to provide benefits for items or services described in paragraph (a)(1) of this section that are delivered by an out-of-network provider. Moreover, nothing in this section precludes a plan or issuer that has a network of providers from imposing cost-sharing requirements for items or services described in paragraph (a)(1) of this section that are delivered by an out-of-network provider.

(4) *Reasonable medical management.* Nothing prevents a plan or issuer from using reasonable medical management techniques to determine the frequency, method, treatment, or setting for an item or service described in paragraph (a)(1) of this section to the extent not specified in the recommendation or guideline.

(5) *Services not described.* Nothing in this section prohibits a plan or issuer

from providing coverage for items and services in addition to those recommended by the United States Preventive Services Task Force or the Advisory Committee on Immunization Practices of the Centers for Disease Control and Prevention, or provided for by guidelines supported by the Health Resources and Services Administration, or from denying coverage for items and services that are not recommended by that task force or that advisory committee, or under those guidelines. A plan or issuer may impose cost-sharing requirements for a treatment not described in paragraph (a)(1) of this section, even if the treatment results from an item or service described in paragraph (a)(1) of this section.

(b) *Timing*—(1) *In general.* A plan or issuer must provide coverage pursuant to paragraph (a)(1) of this section for plan years that begin on or after September 23, 2010, or, if later, for plan years that begin on or after the date that is one year after the date the recommendation or guideline is issued.

(2) *Changes in recommendations or guidelines.* A plan or issuer is not required under this section to provide coverage for any items and services specified in any recommendation or guideline described in paragraph (a)(1) of this section after the recommendation or guideline is no longer described in paragraph (a)(1) of this section. Other requirements of Federal or State law may apply in connection with a plan or issuer ceasing to provide coverage for any such items or services, including PHS Act section 2715(d)(4), which requires a plan or issuer to give 60 days advance notice to an enrollee before any material modification will become effective.

(c) *Recommendations not current.* For purposes of paragraph (a)(1)(i) of this section, and for purposes of any other provision of law, recommendations of the United States Preventive Services Task Force regarding breast cancer screening, mammography, and prevention issued in or around November 2009 are not considered to be current.

(d) *Applicability date.* The provisions of this section apply for plan years beginning on or after September 23, 2010. *See* § 2590.715–1251 of this Part for determining the application of this section to grandfathered health plans (providing that these rules regarding coverage of preventive health services do not apply to grandfathered health plans).

**App. 111**

Federal Register / Vol. 75, No. 137 / Monday, July 19, 2010 / Rules and Regulations **41759**

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

## 45 CFR Subtitle A

■ For the reasons stated in the preamble, the Department of Health and Human Services amends 45 CFR part 147, added May 13, 2010, at 75 FR 27138, effective July 12, 2010, as follows:

## PART 147—HEALTH INSURANCE REFORM REQUIREMENTS FOR THE GROUP AND INDIVIDUAL HEALTH INSURANCE MARKETS

■ 1. The authority citation for part 147 continues to read as follows:

**Authority:** Sections 2701 through 2763, 2791, and 2792 of the Public Health Service Act (42 U.S.C. 300gg through 300gg–63, 300gg–91, and 300gg–92), as amended.

■ 2. Add § 147.130 to read as follows:

### § 147.130   Coverage of preventive health services.

(a) *Services*—(1) *In general.* Beginning at the time described in paragraph (b) of this section, a group health plan, or a health insurance issuer offering group or individual health insurance coverage, must provide coverage for all of the following items and services, and may not impose any cost-sharing requirements (such as a copayment, coinsurance, or deductible) with respect to those items or services:

(i) Evidence-based items or services that have in effect a rating of A or B in the current recommendations of the United States Preventive Services Task Force with respect to the individual involved (except as otherwise provided in paragraph (c) of this section);

(ii) Immunizations for routine use in children, adolescents, and adults that have in effect a recommendation from the Advisory Committee on Immunization Practices of the Centers for Disease Control and Prevention with respect to the individual involved (for this purpose, a recommendation from the Advisory Committee on Immunization Practices of the Centers for Disease Control and Prevention is considered in effect after it has been adopted by the Director of the Centers for Disease Control and Prevention, and a recommendation is considered to be for routine use if it is listed on the Immunization Schedules of the Centers for Disease Control and Prevention);

(iii) With respect to infants, children, and adolescents, evidence-informed preventive care and screenings provided for in comprehensive guidelines supported by the Health Resources and Services Administration; and

(iv) With respect to women, to the extent not described in paragraph

(a)(1)(i) of this section, evidence-informed preventive care and screenings provided for in comprehensive guidelines supported by the Health Resources and Services Administration.

(2) *Office visits*—(i) If an item or service described in paragraph (a)(1) of this section is billed separately (or is tracked as individual encounter data separately) from an office visit, then a plan or issuer may impose cost-sharing requirements with respect to the office visit.

(ii) If an item or service described in paragraph (a)(1) of this section is not billed separately (or is not tracked as individual encounter data separately) from an office visit and the primary purpose of the office visit is the delivery of such an item or service, then a plan or issuer may not impose cost-sharing requirements with respect to the office visit.

(iii) If an item or service described in paragraph (a)(1) of this section is not billed separately (or is not tracked as individual encounter data separately) from an office visit and the primary purpose of the office visit is not the delivery of such an item or service, then a plan or issuer may impose cost-sharing requirements with respect to the office visit.

(iv) The rules of this paragraph (a)(2) are illustrated by the following examples:

*Example 1.* (i) *Facts.* An individual covered by a group health plan visits an in-network health care provider. While visiting the provider, the individual is screened for cholesterol abnormalities, which has in effect a rating of A or B in the current recommendations of the United States Preventive Services Task Force with respect to the individual. The provider bills the plan for an office visit and for the laboratory work of the cholesterol screening test.

(ii) *Conclusion.* In this *Example 1,* the plan may not impose any cost-sharing requirements with respect to the separately-billed laboratory work of the cholesterol screening test. Because the office visit is billed separately from the cholesterol screening test, the plan may impose cost-sharing requirements for the office visit.

*Example 2.* (i) *Facts.* Same facts as *Example 1.* As the result of the screening, the individual is diagnosed with hyperlipidemia and is prescribed a course of treatment that is not included in the recommendations under paragraph (a)(1) of this section.

(ii) *Conclusion.* In this *Example 2,* because the treatment is not included in the recommendations under paragraph (a)(1) of this section, the plan is not prohibited from imposing cost-sharing requirements with respect to the treatment.

*Example 3.* (i) *Facts.* An individual covered by a group health plan visits an in-network health care provider to discuss recurring abdominal pain. During the visit, the individual has a blood pressure

screening, which has in effect a rating of A or B in the current recommendations of the United States Preventive Services Task Force with respect to the individual. The provider bills the plan for an office visit.

(ii) *Conclusion.* In this *Example 3,* the blood pressure screening is provided as part of an office visit for which the primary purpose was not to deliver items or services described in paragraph (a)(1) of this section. Therefore, the plan may impose a cost-sharing requirement for the office visit charge.

*Example 4.* (i) *Facts.* A child covered by a group health plan visits an in-network pediatrician to receive an annual physical exam described as part of the comprehensive guidelines supported by the Health Resources and Services Administration. During the office visit, the child receives additional items and services that are not described in the comprehensive guidelines supported by the Health Resources and Services Administration, nor otherwise described in paragraph (a)(1) of this section. The provider bills the plan for an office visit.

(ii) *Conclusion.* In this *Example 4,* the service was not billed as a separate charge and was billed as part of an office visit. Moreover, the primary purpose for the visit was to deliver items and services described as part of the comprehensive guidelines supported by the Health Resources and Services Administration. Therefore, the plan may not impose a cost-sharing requirement for the office visit charge.

(3) *Out-of-network providers.* Nothing in this section requires a plan or issuer that has a network of providers to provide benefits for items or services described in paragraph (a)(1) of this section that are delivered by an out-of-network provider. Moreover, nothing in this section precludes a plan or issuer that has a network of providers from imposing cost-sharing requirements for items or services described in paragraph (a)(1) of this section that are delivered by an out-of-network provider.

(4) *Reasonable medical management.* Nothing prevents a plan or issuer from using reasonable medical management techniques to determine the frequency, method, treatment, or setting for an item or service described in paragraph (a)(1) of this section to the extent not specified in the recommendation or guideline.

(5) *Services not described.* Nothing in this section prohibits a plan or issuer from providing coverage for items and services in addition to those recommended by the United States Preventive Services Task Force or the Advisory Committee on Immunization Practices of the Centers for Disease Control and Prevention, or provided for by guidelines supported by the Health Resources and Services Administration, or from denying coverage for items and services that are not recommended by that task force or that advisory committee, or under those guidelines.

plan or issuer may impose cost-sharing requirements for a treatment not described in paragraph (a)(1) of this section, even if the treatment results from an item or service described in paragraph (a)(1) of this section.

(b) *Timing*—(1) *In general.* A plan or issuer must provide coverage pursuant to paragraph (a)(1) of this section for plan years (in the individual market, policy years) that begin on or after September 23, 2010, or, if later, for plan years (in the individual market, policy years) that begin on or after the date that is one year after the date the recommendation or guideline is issued.

(2) *Changes in recommendations or guidelines.* A plan or issuer is not required under this section to provide coverage for any items and services specified in any recommendation or guideline described in paragraph (a)(1) of this section after the recommendation or guideline is no longer described in paragraph (a)(1) of this section. Other requirements of Federal or State law may apply in connection with a plan or issuer ceasing to provide coverage for any such items or services, including PHS Act section 2715(d)(4), which requires a plan or issuer to give 60 days advance notice to an enrollee before any material modification will become effective.

(c) *Recommendations not current.* For purposes of paragraph (a)(1)(i) of this section, and for purposes of any other provision of law, recommendations of the United States Preventive Services Task Force regarding breast cancer screening, mammography, and prevention issued in or around November 2009 are not considered to be current.

(d) *Applicability date.* The provisions of this section apply for plan years (in the individual market, for policy years) beginning on or after September 23, 2010. *See* § 147.140 of this Part for determining the application of this section to grandfathered health plans (providing that these rules regarding coverage of preventive health services do not apply to grandfathered health plans).

[FR Doc. 2010–17242 Filed 7–14–10; 11:15 am]

**BILLING CODE 4830–01–P; 4510–29–P; 4210–01–P**

# DEPARTMENT OF HOMELAND SECURITY

## Coast Guard

### 33 CFR Part 165

[Docket No. USCG–2010–0646]

RIN 1625–AA00

### Safety Zone; Transformers 3 Movie Filming, Chicago River, Chicago, IL

**AGENCY:** Coast Guard, DHS.

**ACTION:** Temporary final rule.

**SUMMARY:** The Coast Guard is establishing a temporary safety zone on the Chicago River near Chicago, Illinois. This zone is intended to restrict vessels from a portion of the Chicago River due to the filming of a major motion picture. This temporary safety zone is necessary to protect the surrounding public and vessels from the hazards associated with the different types of stunts that will be performed during the filming of this movie.

**DATES:** *Effective Date:* this rule is effective in the CFR from July 19, 2010 until 9 p.m. on July 19, 2010. This rule is effective with actual notice for purposes of enforcement beginning 7 a.m. on July 16, 2010.

**ADDRESSES:** Documents indicated in this preamble as being available in the docket are part of docket USCG–2010–0646 and are available online by going to *http://www.regulations.gov,* inserting USCG–2010–0646 in the "Keyword" box, and then clicking "search." They are also available for inspection or copying at the Docket Management Facility (M–30), U.S. Department of Transportation, West Building Ground floor, Room W12–140, 1200 New Jersey Avenue, SE., Washington DC 20590, between 9 a.m. and 5 p.m., Monday through Friday, except Federal holidays.

**FOR FURTHER INFORMATION CONTACT:** If you have questions on this temporary rule, contact or email BM1 Adam Kraft, U.S. Coast Guard Sector Lake Michigan, at 414–747–7154 or *Adam.D.Kraft@uscg.mil.* If you have questions on viewing the docket, call Renee V. Wright, Program Manager, Docket Operations, telephone 202–366–9826.

**SUPPLEMENTARY INFORMATION:**

## Regulatory Information

The Coast Guard is issuing this temporary final rule without prior notice and opportunity to comment pursuant to authority under section 4(a) of the Administrative Procedure Act (APA) (5 U.S.C. 553(b)). This provision authorizes an agency to issue a rule without prior notice and opportunity to comment when an agency for good cause finds that those procedures are "impracticable, unnecessary, or contrary to the public interest." Under U.S.C. 553 (b)(B), the Coast Guard finds that good cause exists for not publishing a notice of proposed rulemaking (NPRM) with respect to the fact that the application for this event was not submitted to our office in time to allow for publishing an NPRM. Based on the hazards associated with the filming of this major motion picture, delaying the publication of this rule to provide for a comment would be contrary to public interest as immediate action is necessary to protect the public.

Under 5 U.S.C. 553(d)(3), the Coast Guard finds that good cause exists for making this rule effective less than 30 days after publication in the **Federal Register** because delaying the effective date would be contrary to the public interest since immediate action is needed to protect the public and the event would be over by the time the 30 day period is completed.

## Basis and Purpose

This temporary safety zone is necessary to protect vessels from the hazards associated with the filming of the major motion picture, Transformers 3. The combination of congested waterways and the filming of dangerous stunts taking place on or near the water pose serious risks of injury to persons and property. As such, the Captain of the Port, Sector Lake Michigan, has determined that the filming of this motion picture does pose significant risks to public safety and property and that a temporary safety zone is necessary.

## Discussion of Rule

The safety zone will encompass all U.S. navigable waters of the Chicago River between the Michigan Avenue Bridge, 41°53′20″ N. 087°37′27″ W. and the North Columbus Drive Bascule Bridge, 41°53′19″ N. 087°37′13″ W. [DATUM: NAD 83].

All persons and vessels shall comply with the instructions of the Coast Guard Captain of the Port, Sector Lake Michigan, or his or her on-scene representative. Entry into, transiting, or anchoring within the safety zone is prohibited unless authorized by the Captain of the Port, Sector Lake Michigan, or his or her on-scene representative. The Captain of the Port, Sector Lake Michigan, or his or her on-scene representative may be contacted via VHF Channel 16.

**App. 113**

# Tab 16

**(Staff Report by House Committee on Energy and Commerce)**

App. 114



**U.S. House of Representatives**
**Committee on Energy and Commerce**
**Chairman Frank Pallone, Jr.**
**Subcommittee on Health**
**Chairwoman Anna G. Eshoo**
**Subcommittee on Oversight**
**and Investigations**
**Chair Diana DeGette**
**Democratic Staff Report**

---

## Shortchanged: How the Trump Administration's Expansion of Junk Short-Term Health Insurance Plans is Putting Americans at Risk

---

**June 2020**

## Table of Contents

I.    EXECUTIVE SUMMARY ........................................................................ 3

I.    MAJOR FINDINGS AND RECOMMENDATIONS ................................. 6

III.  BACKGROUND ....................................................................................... 11

   A.   Short-Term Limited Duration Insurance (STLDI) ............................... 11

   B.   State Regulation .................................................................................. 13

   C.   The Democratic Committee Staff Investigation ................................... 15

   D.   Overview of Insurers and Brokers ...................................................... 16

IV.  FINDINGS ............................................................................................... 20

   A.   STLDI Plans are Widely Available and Represent a Growing Proportion of the Individual Market ...................................................................................... 20

   B.   States Have Limited Authority to Conduct Oversight of STLDI Plans and Federal Oversight is Nonexistent ................................................................... 25

   C.   Some STLDI Brokers Engage in Misleading and Fraudulent Marketing Practices 29

      1.   Background on the State Investigations .......................................... 31

      2.   Simple Health ............................................................................... 33

      3.   Brokers Associated with HII Defraud and Deliberately Mislead Consumers ........... 35

   D.   Some SLTDI Plans Engage in Misleading Marketing Practices ............... 40

      1.   Marketing Materials Advertise STLDI Plan Under the Guise of a Prominent Insurance Company ........................................................................ 42

   E.   STLDI Plans are Highly Profitable for Insurers and Brokers .................... 43

      1.   Brokers Receive Significant Financial Compensation for the Sale of STLDI Plans . 43

      2.   Brokers May Be Incentivized to Engage in Aggressive Marketing Practices ........... 44

      3.   Misleading Marketing Practices Amid COVID-19 ........................ 46

      4.   Consumers' Coverage is Rescinded Due to Brokers' Behavior ..................... 47

      5.   STLDI Plans Provide Consumers Little Value, and Spend Only Less Than Half of Earnings on Medical Care ........................................................... 48

   F.   STLDI Plans Discriminate Against Individuals with Pre-Existing Conditions ........ 49

      1.   STLDI Plans Screen Consumers for Health Status and Discriminate Against Individuals with Pre-Existing Conditions.............................................. 49

      2.   Some STLDI Plans Provide Coverage to Individuals with Pre-Existing Conditions, but Enrollees are Exposed to Significant Cost-Sharing............................... 55

      3.   STLDI Insurers Exclude Coverage for Pre-Existing Conditions ................... 57

   G.   STLDI Plans Offer Limited Benefits and Limited Financial Protection ............ 58

      1.   STLDI Plans Exclude Coverage of Many Common Medical Conditions ............ 59

App. 116

    2.     All STLDI Plans Exclude Coverage for Basic Services ............................ 60

        a.  Some STLDI Plans Exclude Coverage of Basic Preventive Care ........................... 61

        b.  STLDI Plans Exclude Altogether or Limit Coverage of Prescription Drugs ........... 62

        c.  STLDI Plans Discriminate Against Individuals with Mental Health and Substance Use Disorders ................................................................................... 62

    3.     All STLDI Plans Impose Limitations & Exclusions on Benefits Covered ............... 64

        a.  Some STLDI Plans Impose Limitations on Physician Office Visits ........................ 65

        b.  Some STLDI Plans Impose Limitations on Hospitalization ..................................... 66

        d.  Some STLDI Plans Impose Severe Limitations on Emergency Services ................ 68

        e.  Some STLDI Plans Limit Coverage and Impose Exclusions for Surgery Services .. 69

        f.  STLDI Plans Impose Lifetime Limits, Exposing Consumers to Significant, Unexpected Health Care Costs ................................................................. 71

        g.  STLDI Plans Impose Waiting Periods ................................................................. 72

**H.  All STLDI Plans Discriminate Against Women ............................................................. 73**

**I.   STLDI Plans Employ Many Ways to Refuse to Pay for Medical Care After Claims Arise ............................................................................................................................... 75**

    1.     STLDI Plans Deny Claims Related to Pre-Existing Conditions ................................ 75

    2.     STLDI Plans Deny Claims for Cancer Treatment ..................................................... 76

    3.     STLDI Plans Deny Claims for Surgery ..................................................................... 77

    4.     STLDI Plans Deny Claims for "At-Risk" Consumers .............................................. 79

    5.     STLDI Plans Deny Claims for Routine Medical Services and Procedures ................ 81

    6.     STLDI Plans Deny Claims for Missing Documentation ........................................... 82

    7.     STLDI Plans Refuse to Pay for Medical Claims that Should Be Covered ................ 84

**J.   Most STLDI Insurers Rescind Coverage ....................................................................... 87**

    1.     Some STLDI Plans Rescind Policies if Consumers Previously Exhibited Risk Factors ...................................................................................................................... 89

    2.     Some STLDI Plans Rescind Policies of Cancer Patients ........................................... 92

**V.   CONCLUSION ............................................................................................................ 92**

**VI.  APPENDIX ................................................................................................................. 94**

App. 117

## I.     EXECUTIVE SUMMARY

        This report outlines the findings of the Democratic Committee staff's oversight investigation into the deeply concerning industry practices of Short-Term Limited Duration Health Insurance (STLDI) plans and insurance brokers selling those plans.

        **The Committee's investigation finds that the Trump Administration's policy of expanding these dangerous, unregulated plans presents a threat to the health and financial well-being of American families, particularly in light of the current public health emergency.**  These plans are simply a bad deal for consumers and oftentimes leave patients who purchase them saddled with thousands of dollars in medical debt.  The unregulated landscape of STLDI plans also serves as an unfortunate reminder of what a post-Affordable Care Act (ACA) world would look like in the individual market, in the event that the legal challenge brought by Republican Attorneys General and supported by the Trump Administration succeeds in striking down the law.

        **The Committee's investigation finds that STLDI plans systematically discriminate against individuals with pre-existing conditions, and against women**.  Most STLDI plans both exclude coverage for pre-existing conditions and decline to offer coverage altogether to individuals with pre-existing conditions.  STLDI plans also discriminate against women by denying women basic medical services and charging women more than men for the same coverage.

        **These plans offer bare bones coverage, including major coverage limitations that are not always clear in marketing materials, making it difficult for consumers to know what they are buying.**  STLDI plans often include major coverage limitations for health care items and services such as emergency services, hospitalization, and prescription drugs.  In a few cases, STLDI plans exclude coverage of routine care such as basic preventive care, wellness exams, pelvic exams, pap smears and birth control.  Coverage limitations vary greatly from plan to plan and insurer to insurer, and limitations are not always made clear in marketing materials, making it extremely difficult for consumers to understand what they are purchasing.

        **STLDI plans offer wholly inadequate protection against catastrophic medical costs**, one of the primary reasons that individuals and families purchase health insurance.  These plans often deny coverage for lifesaving or necessary medical treatment.  In its review of consumer complaints made against STLDI insurers, the Committee found numerous examples of patients who were denied coverage for such lifesaving treatment as heart surgery and cancer, leaving consumers on the hook for hundreds of thousands of dollars.  Some STLDI plans deny claims for emergency care or pay very little.  Claims are denied for a myriad of reasons, including coverage limitations and maximum allowable benefits, to denials due to claims being incurred during waiting periods, to denials due to the claim being ostensibly linked to a pre-existing condition when, in fact, this linkage may be tenuous.  The lack of protection against catastrophic medical costs raises the question of the utility and value of these products for many Americans.

        **Some STLDI plans impose draconian coverage limitations even for illnesses, injuries, and conditions arising after a consumer purchases a policy**; limitations that

3

App. 118

consumers may not be aware of when they sign up for coverage, due to the misleading marketing of these plans by both insurers and brokers.  For instance, some of these plans impose a maximum of $500 per policy period for doctor's office visits, a maximum of $1,000 per day for hospitalization, $500 per visit for emergency services, and maximum of $2,500 per surgery for surgeon services.  Consumers who fall sick while enrolled in one of these plans may incur huge, potentially ruinous medical costs.  In some cases the Committee examined, STLDI plans denied thousands of dollars in medical claims due to such limitations, stating that these costs exceeded the maximum allowable benefit.

**The Committee's investigation finds that on average, less than half of the premium dollars collected from consumers are spent on medical care**, unlike ACA-compliant individual market plans, which are required to spend at least 80 percent of all premium dollars on health care.

**STLDI plans engage in heavy-handed back end tactics to avoid paying medical claims that do arise.**  The Committee's investigation finds that in addition to restricting their financial liability by excluding individuals with pre-existing conditions and imposing coverage limitations, it is a common industry practice for STLDI plans to engage in intrusive and burdensome administrative processes to avoid paying medical claims.  Through a process some have described as "post-claims underwriting," STLDI insurers challenge consumers whose claims may actually be covered by the terms of the plan by requiring them to submit extensive medical documentation (often dating back many years) in order to prove that the condition for which they seek treatment was not in fact pre-existing.  If a medical provider does not provide documentation within the time period requested, which can be as short as 30 days, the claim is denied or closed.  STLDI plans also rescind coverage when an individual gets sick or injured during the term of a policy.  Through these tactics, STLDI plans significantly limit their financial liability for medical claims.

**The Committee's investigation concludes that these plans <u>are simply a bad deal for consumers</u>.**  Given that STLDI plans include limited protection for both catastrophic medical costs and routine medical care, it is unclear what kind of value consumers are getting for their premium dollars, other than a false sense of security.

The anti-consumer strategies and tactics uncovered by these STLDI plans in this investigation underscores the importance of the ACA's interlocking consumer protections, which are currently under threat due to the *Texas v. Azar* lawsuit.  The ACA's protections for pre-existing conditions, such as guaranteed issue and renewability, are critically important to prevent consumers from getting excluded from coverage.  But simply passing these protections at either the state or federal level would be wholly inadequate to protect individuals with pre-existing conditions, as the Committee's investigation into STLDI plans clearly illustrates.  The ACA essential health benefits and preventive services requirements are also equally important in ensuring that insurance plans *actually cover the healthcare items and services that consumers need*, such as prescription drugs, maternity care, mental health and substance use disorder treatment, basic preventive care, and laboratory and rehabilitative services.  The law's prohibition on annual and lifetime limits ensures that consumers are not billed hundreds of thousands of dollars.  Lastly, the law's requirements that insurers provide valuable coverage,

both through the medical loss ratio (MLR) requirements and actuarial value requirements, are also critically important to ensuring that plans actually provide value to consumers and pay out medical claims rather than leaving consumers holding the bag.

## I.      MAJOR FINDINGS AND RECOMMENDATIONS

The Committee investigated 14 companies that either sell or assist consumers in signing up for STLDI plans.  The Committee received responses and documents from all 14 companies. The investigation found that:

> **STLDI plans represent a significant and growing proportion of the individual market.**

The Committee finds that STLDI plans are widely available in some states and most STLDI insurers offer plans that provide coverage for up to 364 days in duration.  The Committee finds that there was an increase of over 600,000 individuals enrolled in STLDI plans during the 2019 plan year, compared to the 2018 plan year across nine STLDI insurers under the Committee's investigation.  During the 2018 plan year, there were approximately 2.36 million consumers enrolled in STLDI plans, and there were approximately 3.0 million consumers enrolled in STLDI plans during the 2019 plan year across the same nine companies.  The significant uptick in enrollment in 2019 indicates that these plans represent a significant and growing proportion of the individual market, and that the Trump Administration's expansion of these dangerous, unregulated plans has caused an increase in the availability of STLDI plans. Additionally, the Committee finds that there was a significant uptick in enrollment in STLDI plans by brokers during December 2018 and January 2019.  Enrollment by brokers increased by approximately 60 percent in December 2018, and by over 120 percent in January 2019, compared to previous months.  The increase in enrollment in December and January suggests that these plans are benefiting from, and possibly capitalizing on the marketing and advertising around the ACA's open enrollment season.

> **STLDI plans operate in a significant regulatory gap, with little federal or state oversight of their practices.**

The federal government does not have comprehensive data on the availability and the number of individuals enrolled in STLDI plans, nor does it appear to have taken any enforcement action or conducted any oversight of insurers and brokers selling STLDI plans.  Currently, 24 states have banned or restricted the sale of STLDI plans.  The Committee finds that among states that allow these plans to be sold, some states have not exercised sufficient regulatory authority to protect consumers, and they have little information about the availability and type of STLDI plans in their states.  State regulators appear to exercise limited authority to monitor and regulate STLDI plans, and to prevent noncompliant STLDI plans from being sold in their states.  State regulators also face challenges in taking disciplinary action and enforcement against insurers found to be in violation of their state laws.  Additionally, state regulators generally lack the authority to preemptively conduct oversight of STLDI brokers who engage in deceptive marketing tactics.

App. 121

> ### Brokers who sell STLDI plans receive significant financial compensation for the sale of STLDI plans, and thereby may be incentivized to engage in deceptive and fraudulent marketing practices.

For the companies under the Committee's investigation, brokers received up to ten times the compensation rate for STLDI plans than for ACA-compliant plans. As a result, they are incentivized to make the hard sell to consumers and engage in questionable tactics, such as pushing consumers to purchase plans over the phone without reviewing any written information or coverage documents, misleading consumers about the type of coverage they are purchasing, failing to disclose that STLDI plans exclude coverage for pre-existing conditions, and failing to disclose the plans' significant coverage limitations and exclusions.

> ### Marketing materials by STLDI insurers and brokers provide consumers misleading or incomplete information, including failure to disclose relevant plan limitations and exclusions.

The Committee finds that consumers seeking to purchase STLDI plans are deprived of robust information to inform their purchasing decisions. While some marketing materials provided by the STLDI plans include the appropriate limitations and exclusions, others provide incomplete and misleading information about a plan's limitations and exclusions. Some marketing brochures do not provide consumers with all the information necessary in order to make an informed decision about coverage options. For example, brochures may advertise coverage for hospitalization, emergency room services, surgery, and prescription drugs. However, some of the marketing materials fail to disclose to consumers that those benefits are subject to significant limitations and exclusion or fail to list all of the plan's limitations and exclusions. These marketing materials may be confusing for consumers to understand and comprehend.

> ### STLDI insurers screen consumers for health status and systematically discriminate against individuals with pre-existing conditions.

Most of the insurers under investigation require consumers seeking coverage to complete invasive and complex plan applications that require disclosure of medical history. These same insurers deny coverage altogether to individuals with pre-existing conditions. Two of the companies under the Committee's investigation offer coverage to individuals with pre-existing conditions, despite the fact that they offer STLDI policies that specifically exclude coverage for pre-existing conditions. Two companies offer some STLDI plans that exclude coverage of basic

preventive care, including immunization and routine physical exams, and exclude coverage of major medical conditions.

**STLDI insurers systematically exclude coverage for major medical conditions, as well as coverage of basic medical services that consumers would reasonably expect to be covered by health insurance.**

STLDI insurers exclude coverage for most common medical diagnoses resulting from pre-existing conditions, including diabetes, cancer, stroke, arthritis, heart disease, and substance use and mental health disorders. STLDI insurers also often exclude coverage entirely for prescription drugs, rehabilitative services, and maternity and newborn care, and some exclude coverage entirely for mental health and substance use disorders. Some STLDI insurers also impose significant limitations and exclusions on the limited benefits and services that are covered, including for hospitalization, emergency services, and surgical services.

**STLDI insurers engage in discriminatory practices against women by denying women basic medical services and charging women more than men for the same coverage.**

All companies under the Committee's investigation require women to disclose whether they are pregnant. Most companies require women to disclose whether they are an expectant parent, in the process of adoption, or in the process of undergoing infertility treatment. Women who respond affirmatively are denied coverage. All insurers offer STLDI plans that exclude coverage of maternity and newborn care. Some STLDI plans reviewed also exclude coverage of routine pre-natal care, childbirth, and post-natal care, as well as consider a prior pregnancy, a Cesarean delivery, breast or cervical cancer as a pre-existing condition. Additionally, two major STLDI insurers offer STLDI plans that do not provide coverage for routine tests or preventive screening procedures for women, one of which excludes coverage for pelvic exams and pap smear exams. Some STLDI plans exclude coverage of drugs that prevent conception, including birth control pills, implants, injections, and devices.

**All eight STLDI insurers under the Committee's investigation deny claims for medical care through post-claims underwriting.**

All eight STLDI insurers subject consumers to extensive and invasive post-claims review process to determine whether the medical condition for which the claim was submitted may have

8

resulted from a pre-existing condition or whether the enrollee had a health condition that should have been disclosed by the applicant in the plan application.  All eight companies require enrollees and enrollees' health care providers to provide medical and prescription drug records dating back six months to up to five years, with one company requiring seven years of records. Claims are closed or denied pending a final determination regarding whether the medical claim filed is due to a pre-existing condition.  All eight insurers deny a medical claim if a determination is made that the medical claim submitted was due to a pre-existing condition and subject to the pre-existing condition exclusion, or that it resulted from a pre-existing condition. Claims are also denied if the STLDI insurers determine there were risk factors present at time of enrollment, or the medical condition manifested itself in such a manner that would have caused an ordinary prudent person to seek medical advice, diagnosis, care or treatment dating back six months to up to five to seven years.  In a number of cases the Committee reviewed, the STLDI insurer's conclusion that the claim was due to a pre-existing condition, or one that the patient should have been aware of, is tenuous at best.

STLDI insurers also deny or close claims if the enrollee or the enrollee's provider do not provide the medical and prescription drug records within the time period requested, which can be as short as 30 days.  Some STLDI insurers also sometimes refuse to pay for medical claims that are not due to pre-existing conditions or subject to any of the plan's exclusions and limitations. The claims are processed only after consumers retain attorneys or file complaints with state regulators.  The refusal of STLDI plans to pay legitimate claims result in tremendous financial burden for consumers.

> ### Most STLDI insurers under investigation rescind coverage, leaving consumers uninsured and with large medical bills.

Most STLDI insurers rescind the underlying policy if a determination is made that the enrollee had a prior health condition that should have been disclosed in the plan application, or if there were certain risk factors present at the time of enrollment that the individual failed to disclose.  Some STLDI insurers disenroll consumers and deny claims for individuals who develop medical conditions after enrollment.  These individuals have their claims denied for medical conditions that they were not previously diagnosed with or sought treatment. In these instances, these companies assert that the consumer failed to disclose they had testing performed, or were advised to have treatment or further medical evaluation.  In one case, a consumer was billed $280,000 and his coverage was rescinded after seeking treatment for an infection.  The company asserted that the patient previously had an ultrasound that revealed something "suspicious for deep venous thrombosis".  In another instance, a patient was billed approximately $190,000 for treatment of heart related condition, and the company rescinded the coverage asserting that the patient failed to disclose that he was previously diagnosed with diabetes.  Some STLDI plans also rescind policies of cancer patients and deny claims related to cancer treatment.

**The Committee staff offers the following recommendations to address the investigation's findings:**

**Subject STLDI plans to all of the ACA's consumer protections at a federal level.**

The Committee staff recommends federal legislation to subject STLDI plans to all of the ACA's interlocking consumer protections, including guaranteed issue and renewability, the ban on pre-existing condition exclusions, coverage of the essential health benefits, the medical loss ratio, and the prohibition on rescissions.

**In the absence of federal legislation, states should severely restrict STLDI.**

The Committee staff recommend that states severely restrict these plans and subject STLDI to the following requirements:

- Limit STLDI plan duration to 90 days;
- Prohibit renewability, including prohibiting the purchase of multiple STLDI plans in one plan year;
- Prohibit the sale of STLDI plans during ACA's Open Enrollment;
- Subject STLDI plans to the ACA's consumer protection provisions; including the requirement that they provide coverage for all essential health benefits, cover pre-existing conditions, and prohibit rescissions; and
- Require STLDI plans to be sold only in-person.

## III.    BACKGROUND

### A.    Short-Term Limited Duration Insurance (STLDI)

Short-Term Limited Duration Insurance (STLDI) is an insurance product that provides coverage for a limited period, originally designed to help individuals transition from one health plan to another when they experience a temporary gap in health coverage.  The Public Health Service Act (PHSA) defines "individual health insurance coverage" as "health insurance coverage offered to individuals in the individual market, but [which] does not include short-term limited duration insurance."  STLDI is also exempt from the definition of "individual health insurance coverage" under the Health Insurance Portability and Accountability Act of 1996 (HIPAA).  Whereas HIPAA required all other individual health insurance to be guaranteed renewable and required certain protections for individuals with pre-existing conditions, STLDI was exempt from these requirements, including the guaranteed availability and guaranteed renewability provisions of HIPAA.

The ACA did not change the PHSA's definition of STLDI, while establishing a number of federal requirements on individual and small group market health plans, including comprehensive consumer protections for individuals with pre-existing conditions.  The ACA prohibited insurers from basing applicant eligibility on health status-related factors, required guaranteed issue and guaranteed renewability, and banned the practice of rescissions.  The ACA also prohibited insurers from varying premiums based on health status, claims experience, medical history, and gender.  The law required health plans to vary premiums based only on four factors: type of enrollment, geographic rating area, age, and tobacco use.  The ACA required plans to cover ten categories of essential health benefits, provide coverage of preventive services without cost-sharing, and prohibited plans from excluding coverage for pre-existing health conditions.  The ACA banned annual and lifetime coverage limits, and required plans to comply with annual limits on out-of-pocket spending.  The ACA also required plans to spend a minimum percentage of premium revenue on medical claims, known as medical loss ratio (MLR).  The ACA required plans in the individual and small group markets to meet a minimum MLR of 80 percent.

STLDI plans are exempt from all of the ACA's consumer protection provisions.  As a result, STLDI plans can be medically underwritten, vary premiums based on health status or gender, exclude coverage for pre-existing conditions, and include annual or lifetime limits.  STLDI plans can offer limited benefits coverage and are not subject to cost-sharing limits.  Given these coverage limitations, STLDI plans on average have lower premiums than ACA-compliant plans.[1]  However, while consumers may experience up front savings in premiums, individuals are faced with significant out of-pocket expenses, and limitations and exclusions when they need health care.

---

[1] Kaiser Family Foundation, *Why Do Short-Term Health Insurance Plans Have Lower Premiums Than Plans That Comply with the ACA*? (Oct. 31, 2018) (www.kff.org/health-reform/issue-brief/why-do-short-term-health-insurance-plans-have-lower-premiums-than-plans-that-comply-with-the-aca/).

The ACA's consumer protection provisions went into full effect in 2014.  However, insurers continued to sell STLDI plans that lasted for up to 364 days.  STLDI plans were being marketed as an alternative to comprehensive, major medical insurance despite the fact that STLDI plans are not subject to the ACA's market reform provisions.[2]  This resulted in a parallel market that exposed consumers seeking comprehensive coverage to increased premiums and greater risk.[3]  It also caused confusion for consumers as some may have been unaware that they were purchasing plans that did not provide comprehensive coverage.[4]  In 2016, the Department of Health and Human Services (HHS), the Department of Labor (DOL), and the Department of Treasury (Treasury) issued final regulations limiting STLDI plan duration to three months.[5]  The final regulation also required STLDI plans to include prominent notices that the coverage does not constitute qualifying health coverage for purposes of satisfying the ACA's individual mandate.

On August 3, 2018, the Trump Administration issued a final rule expanding the availability of STLDI plans.[6]  The final rule extended the maximum duration of STLDI plans from three months to up to 364 days, and allowed insurers to renew STLDI plans further for up to 36 months.  The latter policy, to allow STLDI plans to be renewed for up to 36 months, was not included in the Administration's proposed rule, and stakeholders did not have an opportunity to comment on this proposal.[7]  The Committee believes extension of short-term policies for up to 36 months is contrary to the law.[8]  The final rule revised the notice requirement, requiring plans to advise consumers that the coverage "is not required to comply with federal requirements for health insurance, principally those contained in the Affordable Care Act."  The final rule also required the notice to state that coverage may have annual or lifetime dollar limits on benefits,

---

[2] *The Short-Term, Limited-Duration Coverage Final Rule: The Background, The Content, And What Could Come Next,* Health Affairs Blog (Aug. 1, 2018) (www.healthaffairs.org/do/10.1377/hblog20180801.169759/full/).

[3] Department of the Treasury, Department of Labor, Department of Health and Human Services, *Excepted Benefits; Lifetime and Annual Limits; and Short-Term, Limited-Duration Insurance,* 81 Fed. Reg. 210 (Oct. 31, 2016) (www.govinfo.gov/content/pkg/FR-2016-10-31/pdf/2016-26162.pdf) (final regulations).

[4] *See* note 2.

[5] *See* note 3.

[6] Department of the Treasury, Department of Labor, Department of Health and Human Services, *Short-Term, Limited-Duration Insurance,* 83 Fed. Reg. 150 (Aug. 3, 2018) (www.govinfo.gov/content/pkg/FR-2018-08-03/pdf/2018-16568.pdf) (final rule).

[7] Department of the Treasury, Department of Labor, Department of Health and Human Services, *Short-Term, Limited-Duration Insurance*, 83 Fed. Reg. 35 (Feb. 21, 2018) (www.govinfo.gov/content/pkg/FR-2018-02-21/pdf/2018-03208.pdf) (proposed rule).

[8] Brief *Amicus Curiae* of the U.S. House of Representatives in Support of Appellants, *Association for Community Affiliated Health Plans v. United States Department of the Treasury,* D.D.C. (No. 19-5212).

and that consumers should be "aware of any exclusions or limitations regarding coverage of pre-existing conditions or health benefits (such as hospitalization, emergency services, maternity care, preventive care, prescription drugs, and mental health and substance use disorder services)."

## B.    State Regulation

States are the primary regulators of insurance, and state laws and regulations governing STLDI plans vary widely.[9]  As of December 2019, STLDI plans are effectively banned in Massachusetts, California, New Jersey, and New York.[10]

A number of other states have also implemented laws or adopted regulations that restrict access, limit the allowed duration, and prohibit renewability of STLDI.  For instance, Rhode Island requires STLDI plans to cover pre-existing conditions, and prohibits insurers from setting premiums based on medical history.[11]  In Colorado, STLDI plans are limited to plan duration of six months, required to be available to consumers regardless of health status or medical history, and have to provide coverage for essential health benefits.[12]  Connecticut requires STLDI to cover the ACA's essential health benefits and limited the plan duration to six months with no renewals.[13]  Hawaii prohibits insurers from selling STLDI plans to individuals who are eligible to buy coverage through the ACA Marketplace, and limited the plan duration to three months. [14] Maine prohibits STLDI plans from being marketed or sold during the ACA's annual open enrollment period, requires brokers to check for and inform applicants when they may be eligible

---

[9] The Commonwealth Fund, *What Is Your State Doing to Affect Access to Adequate Health Insurance?* (www.commonwealthfund.org/publications/maps-and-interactives/2019/nov/what-your-state-doing-affect-access-adequate-health?redirect_source=/publications/interactive/2018/nov/what-your-state-doing-affect-access-adequate-health-insurance) (accessed Mar. 4, 2020).

[10] Milliman, *The impact of short-term limited-duration policy expansion on patients and the ACA individual market* (Feb. 25, 2020).

[11] Community Catalyst, *The Advocate's Guide to Short-Term Limited Duration Insurance* (June 2019) (www.communitycatalyst.org/resources/tools/guide-health-insurance-reform/pdf/Advocates-Guide-to-Short-Term-Plans-FINAL2.pdf)

[12] Colorado Department of Regulatory Agencies, *Updated regulation to govern short-term health plans in Colorado* (Jan. 28, 2019) (www.colorado.gov/pacific/dora/news/updated-regulation-govern-short-term-health-plans-colorado) (press release).

[13] The Commonwealth Fund, *States Step Up to Protect Insurance Markets and Consumers from Short-Term Health Plans* (May 2019).

[14] H.B. No. 1520, H.D. 2, S.D. 1, C.D. 1 (2018) (www.capitol.hawaii.gov/session2018/bills/GM1301_.pdf).

for ACA Marketplace subsidies, and requires STLDI plans to be sold only in-person.[15]  As of December 2019, no insurer offers STLDI plans in Rhode Island, Maine, Connecticut, Colorado, and Hawaii.[16]  Delaware, the District of Columbia, New Mexico, Maryland, Washington, Vermont, and Oregon have limited STLDI plan duration to three months and prohibited renewals.[17]  Ten states have limited plan duration to between 3 and 11 months.[18]  In over 25 states, STLDI plans are allowed for a duration of 11 months or longer.[19]

In states that allow these plans to be sold, state regulators have little information and insight about the STLDI plan availability in their states.[20]  The Commonwealth Fund found that a number of states do not require annual reapproval of STLDI plans once insurers have filed for approval.[21]  As a result, they may not have insight into the availability and type of STLDI plans being sold in their states.

In a number of states, there is limited authority under state law to regulate STLDI plans generally, particularly when STLDI plans are marketed and sold through out-of-state associations.[22]  For instance, insurers can receive approval for STLDI plans in one state and then sell the same plans in a different state through an out-of-state association.  Some states do not have the authority to regulate out-of-state associations or a mechanism to monitor sales by out-of-state associations.[23]  In these states, STLDI plans are being sold through out-of-state

---

[15] An Act Regarding Short-term, Limited-duration Health Plans, Pub. L. No. 2019, Chapter 330 (2019).

[16] Milliman, *The impact of short-term limited-duration policy expansion on patients and the ACA individual market* (Feb. 25, 2020).

[17] *More States Protecting Residents Against Skimpy Short-Term Health Plans*, Center on Budget and Policy Priorities (Feb. 6, 2019) (www.cbpp.org/blog/more-states-protecting-residents-against-skimpy-short-term-health-plans).

[18] Center on Budget and Policy Priorities, State Limitations on Duration of Short-Term Health Insurance Plans (Feb. 2019) (www.cbpp.org/state-limitations-on-the-duration-of-short-term-health-insurance-plans-february-2019) (accessed Mar. 4, 2020).

[19] *Id.*

[20] *Do States Know the Status of Their Short-Term Health Plan Markets?*, The Commonwealth Fund (Aug. 3, 2018) (www.commonwealthfund.org/blog/2018/do-states-know-short-term-health-plan-markets).

[21] *Id.*

[22] *Short-Term Health Plans Sold Through Out-of-State Associations Threaten Consumer Protections*, The Commonwealth Fund (Jan. 31, 2019) (www.commonwealthfund.org/blog/2019/short-term-health-plans-sold-through-out-state-associations-threaten-consumer-protections).

[23] *Id.*

14

associations that have not been approved or reviewed by state regulators.[24]  For instance, the Commonwealth Fund found that STLDI plans offered by UnitedHealthOne were being sold in Florida, Iowa, and Mississippi when the plans were approved under Arkansas law.  The same report concluded that consumers who join out-of-state associations may not know that they are losing access to the consumer protections of their home state.[25]

## C.      The Democratic Committee Staff Investigation

In January of 2019, the Committee began examining the practices of STLDI insurers, in response to growing concerns raised by consumer advocates and press accounts of STLDI plans leaving consumers with massive unpaid medical bills.  For example, in 2017, *the New York Times* published an article reporting multiple troubling cases where consumers enrolled in STLDI plans were left without comprehensive coverage for expensive health care costs.  The *Times* reported that a heart attack victim was left with $900,000 in medical bills after his insurer refused to cover bypass surgery under his STLDI plan, and a stroke victim "was left with $250,000 in unpaid medical bills because the policy did not cover prescription drugs and other basic treatment."[26]

The Committee convened a hearing on February 13, 2019, entitled "Strengthening Our Health Care System: Legislation to Reverse ACA Sabotage and Ensure Pre-Existing Conditions Protection."  During the hearing, the Committee considered a number of legislative bills to protect Americans with pre-existing conditions, including H.R. 1010 which would overturn the Administration's STLDI final rule, giving it no force or effect.  The Committee received testimony from a number of witnesses including Ms. Jessica Altman, Commissioner of Pennsylvania insurance Department, Ms. Katie Keith, Associate Research Professor and Adjunct Professor of Law at Georgetown University, Ms. Grace-Marie Turner, President of Galen Institute, and Mr. Sam Bloechl.  Mr. Bloechl, a patient from Chicago, wrote in testimony to the Committee that he was diagnosed with cancer while enrolled in a STLDI plan.[27]   His insurer refused to pay for his cancer treatment, leaving him with $800,000 in medical bills.  The insurer deemed Mr. Bloechl's cancer diagnosis a pre-existing condition, even though Mr. Bloechl was diagnosed with cancer after he enrolled in the STLDI plan.

Commissioner Altman testified to the Committee regarding numerous incidents involving consumers enrolled in STLDI plans whose coverage were retroactively rescinded by insurers.

---

[24] *Id*

[25] *Id.*

[26] *Without Obamacare Mandate, 'You Open the Floodgates' for Skimpy Health Plans*, The New York Times (Nov. 30, 2017) (www.nytimes.com/2017/11/30/health/health-insurance-obamacare-mandate.html).

[27] House Committee on Energy and Commerce, *Hearing on Strengthening Our Health Care System: Legislation to Reverse ACA Sabotage and Ensure Pre-Existing Conditions Protections*, 116th Cong. (Feb.13, 2019).

15

One consumer was diagnosed with heart failure while enrolled in a STLDI plan.[28] Commissioner Altman testified that after the consumer filed a claim for medical services, the insurer denied coverage even though the consumer had not been previously diagnosed or treated for his condition. Over the last two years, there have been additional articles in the press of consumers enrolled in STLDI plans who were left without comprehensive coverage and stuck with exorbitant medical bills. *Bloomberg* reported on a patient who experienced a heart attack and was left with $244,477 in medical bills.[29] The STLDI insurer, Everest Reinsurance, refused to pay for the patient's medical bills. Additionally, *Bloomberg* reported that the insurance broker affiliated with Health Insurance Innovations (HII) led the consumer to believe that the STLDI plan by Everest Reinsurance provided comprehensive coverage.

The Committee also examined troubling accounts of consumers who sign up for STLDI plans and are misled about whether the plans comply with the ACA's comprehensive consumer protection requirements. A study by the Georgetown University Health Policy Institute found that insurers and brokers selling STLDI plans often engage in marketing tactics that can mislead consumers about the nature of the insurance policy they are purchasing, and often fail to provide consumers with detailed plan information such as the medical services and benefits excluded from coverage.[30] The report found that brokers selling STLDI plans over the phone pressure consumers to quickly purchase STLDI plans without providing written information, including information on the benefits covered.

The Committee's initial examination of these plans yielded disturbing information about how insurance companies that sell STLDI discriminate against individuals with pre-existing conditions and put consumers at significant financial risk.

**In March 2019, the Committee officially launched its investigation by sending letters to fourteen companies that either sell or assist consumers in enrolling in STLDI plans, requesting documents and information about industry practices.**

### D.     Overview of Insurers and Brokers

**The Committee sent requests for information and documents to the following STLDI insurers:**

**Blue Cross of Idaho Health Service, Inc. (BCI)** is a not-for-profit mutual insurance company based in Idaho that offers health insurance products and

---

[28] *Id.*

[29] *Health Insurance That Doesn't Cover the Bills Has Flooded the Market Under Trump*, Bloomberg Businessweek (Sept. 17, 2019) (www.bloomberg.com/news/features/2019-09-17/under-trump-health-insurance-with-less-coverage-floods-market).

[30] Georgetown University Health Policy Institute, *The Marketing of Short-Term Health Plans: An Assessment of Industry Practices and State Regulatory Responses,* (Jan. 31, 2019) (www.rwjf.org/en/library/research/2019/01/the-marketing-of-short-term-health-plans.html).

services.  BCI is an independent licensee of the Blue Cross and Blue Shield Association, and offers STLDI plans that are available for a period of up to ten months in duration.

**Arkansas Blue Cross Blue Shield (Arkansas BCBS)** is based in Arkansas, and offers three types of STLDI plans that range in duration from 30 days to 364-days.

**Cambia Health Solutions (Cambia)** is the parent company of **LifeMap Assurance Company (LifeMap)** headquartered in Oregon.  LifeMap is a Cambia subsidiary that offers STLDI plans in Idaho, Oregon, Utah, and Washington. All of LifeMap's STLDI plans have a duration of 90 days or less.

**National General Accident and Health (National General)** is the marketing name for products underwritten by National Health Insurance Company ("NHIC").  NHIC offers STLDI plans in over 30 states with plan duration of up to 364 days.

**Everest Reinsurance Company (Everest)** is a Delaware-domiciled insurance company, operating as a state-licensed carrier across the United States.  Everest offers plans in 26 states, including as individual policies in 8 states and through associations in 18 states.  Everest offers STLDI plans with plan duration of up to 364 days.  Everest Re Group, Ltd is the holding company, and is domiciled in Bermuda.

**Independence Holding Company (IHC)** is a publicly traded holding company that offers a range of insurance products.  **Independence American Insurance Company (IAIC)** is a wholly owned indirect subsidiary of IHC that offers STLDI plans in 35 states with plan duration of up to 364 days.

**UnitedHealth Group** is the parent company of **Golden Rule Insurance Company (Golden Rule)**.  Golden Rule offers STLDI plans in 31 states, either through individual policies or through non-employer associations.

**LifeShield National Insurance Co. (LNIC)** offered STLDI plans in over 30 states that range in duration from three months to  364 days.  In October 2019, LNIC gave notice that it was discontinuing the sale of STLDI plans and provided enrollees a 90-day phase out period.

The Committee requested that each STLDI insurer provide information on the number of individuals enrolled in STLDI plans for each state in which the company sells these plans for 2018 and 2019 plan years, and the average loss ratios and profit margins for the company's STLDI products.  The Committee also requested the companies to provide information on how

much commission the companies provide to brokers and agents for the sale of STLDI plans and ACA-compliant plans.  The Committee also requested that the companies provide information on marketing practices, including an explanation of how they market STLDI plans to consumers.  Lastly, the Committee requested the companies to provide a written explanation of how they process medical claims.

The Committee also requested the following documents from each STLDI company under the Committee's investigation: 1) documents provided to applicants seeking STLDI coverage, including plan applications; 2) marketing materials and plan documents for STLDI policies offered in each state; 3) consumer complaints documents; and 4) the company's policies on post-claims underwriting, including each company's claims review manuals and data on number of claims denied and policies rescinded.

| The Committee requested information and documents from the following insurance brokers: |
|---|
| **eHealth (eHealth)** is an Internet-based health insurance agency that sells health insurance products including STLDI plans. |
| **Healthcare Solutions Team (HST)** is a managing general agency that contracts with independent agents and brokers who provide consumers assistance in purchasing health insurance, including STLDI. |
| **Anthem (Anthem)** is the parent company of Designated Agent Company (DAC), a company comprised of external agents and internal Anthem licensed agents.  DAC markets and sells STLDI plans that are developed and underwritten by IHC. |
| **Pivot Health (Pivot)** offers STLDI plans in 30 states as individual policies and through associations.  Pivot offers STLDI plans underwritten by Companion Life, and the products range in duration from 90 to 364 days. |
| **Health Plan Intermediaries Holding** known under the trade name Health Insurance Innovations. **"HII"** is a cloud-based technology platform that allows carriers and brokers to sell STLDI plans.  On March 6, 2020, HII announced that it had officially been renamed Benefytt Technologies, Inc. |
| **AgileHealthInsurance (Agile)** is a tradename of HealthPocket, Inc., an indirect subsidiary of HII.  Agile operates as an online insurance agency that sells insurance products, including STLDI plans. |

The Committee requested that each company provide information on the number of individuals the companies' agents and brokers enrolled in STLDI plans for each state in which

the company markets these plans for 2018 and 2019 plan years.  The Committee requested that the companies provide information on how much commission they receive for the sale of STLDI plans and ACA-compliant plans.  The Committee also requested that the companies provide information on marketing practices, including an explanation of how they market STLDI plans to consumers.

Additionally, the Committee requested the following documents from the insurance brokers under the Committee's investigation: 1) documents provided to applicants seeking STLDI coverage, including plan applications; 2) marketing materials and plan documents for STLDI policies offered in each state; and 3) consumer complaints documents.

With respect to the consumer complaints documents, the Committee represented the complaint file as it existed at the point in time in which the complaints were produced to the Committee, and as the consumer presented the facts in the complaint.  The Committee provided opportunities for all of the companies under the investigation to provide material updates to the complaint files, including any further adjudications or amounts paid on behalf of enrollees, and incorporated updates where provided.

The Committee conducted phone calls with all of the companies under the Committee's investigation and followed up over the past fifteen months to request additional information and seek clarification as needed.  The Committee also received numerous briefings from HII.

The appendix includes plan applications and examples of companies' marketing documents.  The Committee acknowledges that the companies designated these documents as confidential and made such indications in writing.  However, the Committee sees no basis for the confidentiality claims asserted by the companies.  The STDLI applications and marketing documents are consumer facing and available to prospective and actual enrollees.  Therefore, they cannot be claimed to include trade secrets or confidential, commercial, and proprietary information as any competitor could access this information via public facing websites.  Additionally, while the Committee agreed to take into consideration such assertions of confidentiality, the Committee made clear from the outset that ultimately any assertions of confidentiality would need to be weighed against the interests in its disclosure.  The Committee concludes that the interest of public disclosure here outweighs the attenuated claims of confidentiality asserted by the companies.

## IV.    FINDINGS

### A.    STLDI Plans are Widely Available and Represent a Growing Proportion of the Individual Market

The Committee finds that STLDI plans are widely available in certain states and insurers offer STLDI plans that range in plan duration from 30 days to 364 days depending on state laws and restrictions.

**During the 2018 plan year, there were approximately 2.36 million consumers enrolled in STLDI plans across the nine companies the Committee investigated.[31] [32]  There were approximately 3.0 million consumers enrolled in STLDI plans during the 2019 plan year across the same nine companies.  There was an increase of over 600,000 individuals in STLDI plans in 2019.**  The significant uptick in enrollment in 2019 indicates that these plans represent a significant and growing proportion of the individual market.  Additionally, the enrollment data suggests that the Trump Administration's regulatory actions has caused an increase in the availability of STLDI plans.

To date, there has been little research or data on the number of individuals enrolled in STLDI plans.  The Committee included nine of the major sellers of STLDI plans in our inquiry and believe we have captured most of the companies with the greatest market share in our investigation.  However, we note that due to the highly unregulated nature of these products, lack of data or public information on the companies selling these products, and the lack of state or federal oversight, overall enrollment is likely higher than what we have captured in our analyses.

---

[31] All companies under the Committee's investigation provided enrollment data for both 2018 and 2019 plan years. The data represent the total number of individuals enrolled in a STLDI plan by each company.  The month by month enrollment data also represents the total number of individuals enrolled in a STLDI plan in that month. In cases where only aggregate annual enrollment data were given, the number of unique individuals enrolled per month was calculated as an average.

[32] The Committee included Pivot as part of the aggregate enrollment data. Pivot sells STLDI plans on behalf of Companion Life Insurance, a major STLDI insurer. Companion Life Insurance was not subject to the Committee's investigation.

App. 135



The data represents the total number of individuals enrolled in STLDI plans across all insurers during 2018 plan year.[33]



The data represents the total number of individuals enrolled in STLDI plans across all insurers during 2019 plan year.

During the 2018 plan year, there were approximately 337,468 individuals who were sold STLDI by the five brokers under the Committee's investigation, and 338,339 individuals were sold STLDI plans during 2019 plan year.[34]  **The Committee finds that there was an uptick in enrollment in STLDI plans by brokers during December 2018 and January 2019.**

---

[33] The data represent the aggregate number of individuals enrolled in STLDI plans across all STLDI insurers.  The month by month enrollment data also represents the total number of individuals enrolled in a STLDI plan in that month.

[34] Pivot's enrollment data was not aggregated as part of the overall broker enrollment data. The company's enrollment data was captured as part of the insurer enrollment data.

App. 136

**Enrollment by brokers increased by approximately 60 percent in December 2018 compared to November 2018, and by over 120 percent in January 2019, compared to November 2018. The increase in enrollment in December and January coincided with the ACA's Open Enrollment.**



The data represents the total number of individuals enrolled in STLDI plans across STLDI brokers during 2018 plan year.



The data represents the total number of individuals enrolled in STLDI plans across STLDI brokers during 2019 plan year.

There is widespread availability of STLDI plans in states that have not taken any regulatory action to restrict the sale and duration of STLDI plans.  **Of the total number of individuals enrolled in SLTDI plans, approximately 28 percent of the consumers enrolled in STLDI plans are in Florida and Texas across 2018 and 2019 plan years.  Arizona, Georgia, Illinois, North Carolina, Ohio, Missouri, Indiana, Tennessee, and Wisconsin also**

App. 137

make up a bulk share of enrollment.  All of these states with the exception of Illinois allow STLDI plans to be sold for up to 364 days or to be renewable for up to 36 months.[35]



The data represents the total number of individuals enrolled in STLDI plans across the top ten states during 2019 plan year.

1.      **Trump Administration's Expansion of STLDI Plans has Caused an Increase in the Availability of these Plans**

**A majority of the STLDI plans offer policies with a plan duration of up to 364 days.**

- Golden Rule, LNIC, IAIC, Everest, NHIC, and Arkansas BCBS all offer STLDI plans that range in plan duration from 30 days to 364 days.[36]
- BCI offers STLDI plans that are available for a period of up to ten months in duration.
- LifeMap is the only insurer that offers STLDI plans with duration of 90 days or less.

**Five of the eight STLDI companies offer consumers the opportunity to re-enroll in STLDI plans for a period that ranges from 24 months to 36 months.**

- Golden Rule offers "TriTerm" STLDI plans that allow consumers purchasing a single STLDI policy to purchase the policy for three consecutive terms totaling up to 36 months.
- Arkansas BCBS, and IAIC also offer STLDI plans that can be renewed to provide coverage for up to 36 months.  LNIC offered plans that could be renewed to provide coverage for up to 36 months.

---

[35] Milliman, *The impact of short-term limited-duration policy expansion on patients and the ACA individual market* (Feb. 25, 2020).

[36] LNIC has ceased the sale of STLDI plans.

App. 138

- NHIC offers STLDI plans that renew for up to 36 months.

However, given that many STLDI plans are not renewable, consumers who are newly diagnosed with a condition are left uninsured until the next ACA Open Enrollment period, regardless of whether the policy is renewable, and are therefore exposed to health care providers' full billed charges.  For consumers whose coverage is rescinded, they are not only left uninsured but stuck with the unpaid medical bills.

Individuals who purchase consecutive policies may not fully understand the policies' limitations and exclusions, including the pre-existing conditions exclusions.

- For instance, based on consumer complaints documents provided to the Committee, one consumer who was enrolled in multiple STLDI plans offered by IAIC first visited a primary care doctor for stomach pain, and then subsequently visited a gastroenterologist while covered under another STLDI plan by IAIC. IAIC denied all claims for the gastroenterologist visit asserting that it was due to pre-existing conditions even though the consumer first experienced stomach pain and related symptoms while enrolled in the company's STLDI plan.[37]
- Another consumer enrolled in multiple STLDI plans offered by IAIC was billed approximately $11,000 for a knee surgery and other related services.[38]  The consumer was diagnosed with osteoarthritis while enrolled in the first STLDI plan.  During the second policy, the consumer had knee surgery but IAIC denied the claims asserting that the surgery was due to pre-existing condition.[39]
- A consumer enrolled in multiple STLDI plans by Golden Rule was treated for a heart condition.  However, Golden Rule denied the claims for the treatment.  The company asserted that the claims submitted was due to pre-existing condition because the consumer was previously diagnosed while enrolled in a different Golden Rule STLDI plan.[40]  In a letter to the patient, the company wrote that exclusion of pre-existing conditions applies to medical conditions treated under previous policies.[41]

---

[37] Letter from Prescription Drug MAC Appeals Investigatory, Life and Health Section, Maryland Insurance Administration, to Standard Security Life Insurance Company of New York (2018) (IHC00004171); Letter from Compliance Specialist, IHC Carrier Solutions, to Maryland Insurance Administration (2019) (IHC00004179); Ebix Health Administration Exchange, *Payment Authorization Form* (2015).

[38] Letter from Complainant, to Ohio Department of Insurance (2018) (IHC00002328).

[39] Letter from Insurance Paralegal, IHC Carrier Solutions, Independence Holding Group, to Ohio Department of Insurance (2018) (IHC00002330).

[40] Letter from Senior Appeals Representative, Golden Rule Insurance Company, to Complainant (2018) (2018 14362 Golden Rule).

[41] *Id.*

24

B.     **States Have Limited Authority to Conduct Oversight of STLDI Plans and Federal Oversight is Nonexistent**

Currently, 24 states have banned or restricted the sale of STLDI plans.  In states that allow these plans to be sold, state regulators lack sufficient regulatory authority to protect consumers, or fail to exert such authority, and have little information about the availability and type of STLDI plans in their states.[42]  State regulators face limitations on their authority to prevent noncompliant STLDI plans from being sold in their states, and may face challenges in taking disciplinary action and enforcement against insurers found to be in violation.  State regulators generally lack the authority to preemptively conduct oversight of STLDI brokers who engage in deceptive marketing tactics.[43] [44]

Insurers offer STLDI plans through both the individual market and through associations.  Insurers sell STLDI plans through associations that have minimal requirements in order for an individual to join the association and purchase STLDI coverage.  Whereas association health plans (AHPs) are subject to the Employee Retirement Income Security Act of 1974 (ERISA) and employer groups and associations offer AHPs to provide health coverage for their employees, associations that offer STLDI plans are not required to have a relationship with an employer plan.  Associations serve as a vehicle for insurers to offer STLDI plans, and can enable them to skirt state regulations.

**Six of the STLDI insurers under the Committee's investigation offer STLDI through associations.[45]  Across the six companies, there were 1.7 million consumers enrolled in STLDI plans through associations in 2018 plan year, and approximately 2.2 million individuals enrolled in 2019.  This is a very significant percentage of overall enrollment in STLDI amongst the companies under the Committee's investigation, and suggests that STLDI insurers are aggressively pursuing sales through out-of-state associations, possibly to take advantage of these regulatory gaps.**  Two companies under the Committee's investigation primary sell STLDI plans through these non-employer associations, and enrollment through associations make up over 70 percent of their overall enrollment.[46]

In a number of states, there is either limited authority under state laws to regulate STLDI plans generally or states exercise limited authority, particularly when they are sold through out-

_____

[42] *Do States Know the Status of Their Short-Term Health Plan Markets?*, The Commonwealth Fund (Aug. 3, 2018) (www.commonwealthfund.org/blog/2018/do-states-know-short-term-health-plan-markets)

[43] *Id.*

[44] *The Marketing of Short-Term Health Plans*, Georgetown University Health Policy Institute (Jan. 31, 2019).

[45] One STLDI company ceased offering STLDI plans through associations in 2019.

[46] Enrollment data was provided to the Committee by both companies.

25

of-state associations.[47]  For instance, some states either do not have the authority to regulate out-of-state associations, or have exempted plans issued by out-of-state associations from their market standards.  **Insurers who offer STLDI plans through out-of-state associations can bypass state laws and regulations in states in which they do not file their products.[48]  As a result, states may face significant challenges in monitoring and regulating STLDI plans. Some states also do not have the mechanism to monitor sales by out-of-state associations.[49]**

Insurers use these regulatory loopholes as a vehicle to market and sell STLDI policies through out-of-state associations.

- Everest offered STLDI plans through non-employer associations in 18 states in plan year 2018.[50]  The company sells STLDI plans through out-of-state associations in six states that do not exert jurisdiction over out-of-state association group policies.  This includes Alabama, Arizona, Georgia, Ohio, Pennsylvania, and Wisconsin.[51] [52]  In these states, Everest sells STLDI plans that are filed with and approved by Delaware and Illinois.[53]
- NHIC offers STLDI plans through non-employer associations in 21 states.[54]  In Arizona and Michigan, NHIC sells STLDI plans that are approved in another

---

[47] *Short-Term Health Plans Sold Through Out-of-State Associations Threaten Consumer Protections*, The Commonwealth Fund (Jan. 31, 2019) (www.commonwealthfund.org/blog/2019/short-term-health-plans-sold-through-out-state-associations-threaten-consumer-protections).

[48] *Id.*

[49] *Id.*

[50] Letter from Sanjoy Mukherjee, Executive Vice President, General Counsel, and Secretary, Everest Re Group, Ltd., to Rep. Frank Pallone, Jr., Chairman, House Committee on Energy and Commerce, Rep. Anna G. Eshoo, Chairwoman, Subcommittee on Health, Rep. Diana DeGette, Chair, Subcommittee on Oversight and Investigations (May 7, 2019) (Everest's Narrative Response).

[51] *Id.*

[52] On June 19, 2020, Everest informed the Committee that it had ceased offering plans in Pennsylvania.

[53] *Id.*

[54] Letter from Vice President, Managing Attorney, National General Accident & Health, to Rep. Frank Pallone, Jr., Chairman, House Committee on Energy and Commerce, Rep. Anna Eshoo, Chairwoman, Subcommittee on Health, Rep. Diana DeGette, Chair, Subcommittee on Oversight and Investigations (Apr. 16, 2019) (National General's Narrative Response).

state.[55]  Both Arizona and Michigan do not require filing of plans issued on an association platform if the master policy is issued outside of the state.[56]

- In 2018, Golden Rule offered STLDI coverage through non-employer-based association in 19 states.  Golden Rule files its policy both in the state in which coverage is offered, and in the state which the association master policy is filed.  The company offers STLDI coverage to members of the Federation of American Consumers and Travelers (FACT), a non-employer-based association based in Arkansas that serves as an information hub on consumer issues, and offers its members products and services in a variety of areas.[57]

- According to data provided to the Committee, LNIC offered STLDI plans through three different non-employer-based associations in 23 states.  LNIC offered STLDI plans through Med-Sense Guaranteed Association (Med-Sense), Association of United Internet Consultants (AUIC), and National Congress of Employers.[58]  LNIC offered STLDI plans in a number of states that do not exert jurisdiction over out-of-state associations or require a filing.[59]  This includes Georgia, Arizona, Ohio, Pennsylvania, and Alabama.

States that do not exert jurisdiction over out-of-state association policies have experienced a proliferation of STLDI plans that were not reviewed or approved by their state regulators.

---

[55] *Id.*

[56] *Id.*

[57] Letter from Chief Executive Officer, UnitedHealthcare, Ancillary & Individual, to Rep. Frank Pallone, Jr., Chairman, House Committee on Energy and Commerce, Rep. Anna Eshoo, Chairwoman, Subcommittee on Health, Rep. Diana DeGette, Chair, Subcommittee on Oversight and Investigations (Oct. 4, 2019) (Golden Rule's Narrative Response).

[58] Letter from LifeShield National Insurance Company, to Rep. Frank Pallone, Jr., Chairman, House Committee on Energy and Commerce (May 6, 2019) (LifeShield's Narrative Response).

[59] Letter from LifeShield National Insurance Company, to Rep. Frank Pallone, Jr., Chairman, House Committee on Energy and Commerce (Aug. 23, 2019) (LifeShield's Narrative Response).

App. 142

> For instance, Commissioner Altman of the Pennsylvania Insurance Department testified that the Insurance Department "has repeatedly learned of STLDI being sold within Pennsylvania that has not been approved by [the] Department", and that it presents a significant challenge to the Department in ensuring that consumers are protected.[60]

In these states, regulators may not have the ability to effectively monitor their markets and protect consumers who face problems getting medical services covered or their claims properly adjudicated.  Consumers also may not be aware that they lose protections under their state law, including the right to an external appeal.[61]

There is no oversight of STLDI plans and brokers by the federal government.  The federal government does not have comprehensive data on the availability and the number of individuals enrolled in STLDI plans.[62]

> In discussion with Committee staff, a senior Agency official conceded that the federal government is not in a position to take enforcement action or conduct active oversight of STLDI insurers and brokers.[63]

---

[60] House Committee on Energy and Commerce, *Hearing on Strengthening Our Health Care System: Legislation to Reverse ACA Sabotage and Ensure Pre-Existing Conditions Protections*, 116th Cong. (Feb.13, 2019).

[61] Emily Curran, Dania Palanker, and Sabrina Corlette, *Short-Team Health Plans Sold Through Out-of-State Associations Threaten Consumer Protections,* The Commonwealth Fund (Jan. 31, 2019).

[62] Briefing by Center for Medicare & Medicaid Services, to House Committee on Energy and Commerce Staff (June 19, 2019).

The agency also stated they are concerned with some of the marketing practices by STLDI brokers and agents, but have not taken any enforcement action to date.[64]  In an Energy and Commerce hearing on HHS's Fiscal Year 2021 Budget, HHS Secretary Alex Azar stated that oversight of STLDI plans is a state responsibility.[65]

### C.   Some STLDI Brokers Engage in Misleading and Fraudulent Marketing Practices

Health Plan Intermediaries Holdings is known under the trade name Health Insurance Innovations (HIIQ) or "HII".  HII brands itself as a cloud-based technology platform that "links carriers and distributors for the sale of health insurance plans," including STLDI plans.[66]  HII markets itself as an online platform that provides access to insurance products to individuals through an external distribution of independently licensed third-party agents.[67]  HII also owns "AgileHealthInsurance", a licensed online insurance agency that sells health insurance plans, including STLDI plans to consumers through Agile's website.[68]

HII maintains that HIIQ is a "technology platform" and a third-party billing administrator. The company further maintains that its technology platform "simplifies the insurance application process via direct electronic communication with carriers, enabling license insurance agents to provide consumers with convenient access to insurance products."[69]  However, HII solicits

---

[63] *Id*.

[64] The Committee wrote to the Trump Administration on numerous occasions requesting a material update regarding whether the agency was taking any enforcement action in regards to STLDI insurers or brokers.  Specifically, the Committee requested an update on January 22, May 26, and June 2, 2020.  CMS did not provide a response.

[65] House Committee on Energy and Commerce, *Hearing on The Fiscal Year 2021 HHS Budget and Oversight of the Coronavirus Outbreak*, 116th Cong. (Feb. 26, 2020).

[66] Letter from Gavin D. Southwell, Chief Executive Officer, Health Insurance Innovations, to Rep. Frank Pallone, Jr., Chairman, House Committee on Energy and Commerce (Apr. 30, 2019) (HII's Narrative Response).

[67] Letter from Gavin D. Southwell, Chief Executive Officer, Health Insurance Innovations, to Rep. Frank Pallone, Jr., Chairman, House Committee on Energy and Commerce (Apr. 30, 2019) (HII's Narrative Response).

[68] Letter from Shaun Greene, Head of Business Operations/General Manager, HealthPocket/AgileHealthInsurance, to Rep. Frank Pallone, Jr., Chairman, House Committee on Energy and Commerce (Apr. 30, 2019) (Agile's Narrative Response).

[69] Letter from Gavin D. Southwell, Chief Executive Officer, Health Insurance Innovations, to Rep. Frank Pallone, Jr., Chairman, House Committee on Energy and Commerce (Apr. 30, 2019) (HII's Narrative Response).

carriers and helps them develop products for HII's target markets, including STLDI products.[70] HII also maintains third-party agent licenses in over 40 states, and coordinates and trains third-party agents and brokers to sell these insurance products.[71]

**As of September 2019, there were 14,000 independent agents and brokers licensed to sell insurance products through HII's platform.[72]  Based on documents reviewed by the Committee, the Committee concludes that HII's operation and business structure incentivizes third-party agents and brokers to actively target vulnerable consumers seeking comprehensive health coverage and deceive them into purchasing STLDI plans, in addition to limited benefit indemnity plans, life insurance plans, and medical discount plans.  These are often consumers who are looking to buy comprehensive health insurance.**

The Committee reviewed thousands of consumer complaints made directly to HII in arriving at these findings, including complaints from consumers who were deceptively enrolled in these plans.[73]  The Committee also reviewed hundreds of complaints made to the Better Business Bureau (BBB) in reaching these findings.

---

[70] Letter from Gavin D. Southwell, Chief Executive Officer, Health Insurance Innovations, to Rep. Frank Pallone, Jr., Chairman, House Committee on Energy and Commerce (Apr. 30, 2019) (HII's Narrative Response).

[71] *Id.*

[72] Letter from Gavin D. Southwell, Chief Executive Officer, Health Insurance Innovations, to Rep. Frank Pallone, Jr., Chairman, House Committee on Energy and Commerce (Sept. 25, 2019) (HII's Narrative Response).

[73] HII provided the Committee documentation of 60 complaints that were made directly to the company through a formal process.  The company also provided the Committee an "escalation log" and a "tier 2 log" that documented thousands of consumer complaints, a vast majority of which were due to misrepresentation of coverage by brokers. The company maintains that the complaints in the logs are "resolved immediately", and that "the customer's concern is dealt with during the call." As such, this is done without a "high level of formality".  In most of these circumstances, the consumers were either provided a refund or the policy was cancelled.  The Committee notes, however, that a refund on premiums or a cancellation of the policy is an extremely inadequate response for individuals and families who may have incurred thousands of dollars in unpaid medical bills as a result of purchasing an STLDI policy. The company also asserts that "escalations" do not necessarily translate into complaints because "escalations are customer contact not dealt with immediately by a customer service agent."   Nevertheless, the Committee finds these complaints to be broadly indicative of the types of problems consumers interacting with HII experience.

### 1. Background on the State Investigations

In 2016, HII was the subject of a multistate market conduct examination into its sales and marketing practices by 43 states.[74]  In 2018, the company entered into a multistate regulatory settlement agreement, and agreed to pay $3.4 million.[75]  As part of its settlement, the company was required to more closely monitor its sale and marketing practices, and to more clearly advise consumers of restrictions on pre-existing conditions and coverage limitations of insurance products.  The company was also required to improve monitoring of agent sales calls, and to closely monitor external sales practice of external third-party agents.  The settlement specifically subjected the company to the following requirements:[76]

- Ensure that all third-party agents are properly licensed in the state in which they are selling insurance products;
- Consumers are to be made fully aware of policy details and fees when purchasing STLDI plans;
- Clearly advise consumers that not all products are required as part of purchase plan;
- Clearly advise consumers of restrictions on pre-existing conditions and coverage limitations;
- 100 percent of all sales calls and verification calls, both internal and external, are to be recorded within one year of the effective date of the settlement.  All calls are to be retained for a period of five years;
- Implement a training plan for all internal and external sales personnel, agents, contractors, and any related third parties; and
- Develop and implement a written comprehensive compliance plan.

In a separate suit filed against HII by Montana, the state's Commission of Securities & Insurance alleged that HII violated a number of its state laws.[77]  The legal filing states that HII "solicited insurers to underwrite short-term medical and excepted benefit policies and then organized an extensive operation of insurance producers to sell these policies."[78]  The complaint alleged that "at best, [HII]'s scheme creates the incentive for high-pressure sales tactics.  At

---

[74] Health Insurance Innovations, Inc., Florida Department of Financial Services, Indiana Department of Insurance, Kansas Insurance Department, Office of the Montana State Auditor, Commissioner of Securities and Insurance, Utah Insurance Department, *Regulatory Settlement Agreement* (Dec. 12, 2018).

[75] *Id.*

[76] *Id.*

[77] Plaintiff's Notice of Proposed Agency Action and Opportunity for Hearing (May 12, 2016), *Office of the Montana State Auditor, Commissioner of Securities and Insurance v. Health Insurance Innovations, Inc.…Western Heritage Insurance Marketing Group*, (Case No. INS-2015-348).

[78] *Id.*

App. 146

worst, the unlicensed individuals selling these policies are induced to misrepresent the policy terms in order to a complete a sale."

According to the legal filing, Montana received complaints from numerous consumers who were enrolled in STLDI plans through HII entities after these consumers searched online for insurance, and entered their information in what they believed were "government-sponsored ACA website."  These consumers all received numerous telephone calls from individuals at HII affiliated call centers who were trying to sell them STLDI plans.  The legal suit states that consumers were enrolled in insurance products through HII entities by producers who were not licensed insurance producers.  Additionally, these consumers were not aware that STLDI did not provide comprehensive protections including protections for people with pre-existing conditions or meet the ACA's minimum standards.  All of these consumers also had their claims denied. The state alleged that HII violated a number of Montana's state laws.

HII was dismissed from the Montana suit as Montana was one of the lead states in the multi-state market conduct examination against the company, and the state wanted to focus its enforcement efforts in the multi-state examination.[79]  In 2019, the state announced that 3,645 Montanans who were misled about the insurance products they purchased including through HII may be eligible for restitution payments.[80]  According to the state, many of the consumers who purchased these plans were sold insurance products by agents who were not licensed and/or provided misleading information about the terms of the policies.

HII is also currently subject to a number of state investigations and lawsuits which entail allegations of misrepresentation of coverage, including allegations that the company made false or misleading statements or omissions to consumers.[81][82]  HII is also subject to a class action lawsuit filed on behalf of all individuals that purchased HII shares between February 2018 and

---

[79] Office of the Montana State Auditor, *Rosendale Secures Restitution for Montanans Who Were Misled During Insurance Sales* (Sept. 11, 2019) (press release).

[80] *Id.*

[81] United States Securities Exchange Commission, *Form 10-K, Legal Proceedings* (FY Dec. 31, 2019) (www.sec.gov/Archives/edgar/data/1561387/000156138720000002/hiiq-2019x12x31x10k.htm) [page 95-98].

[82] In January 2020, HII faced significant enforcement action in Washington.  HII agreed to pay $1.5 million fine to the state and was found to have committed more than 50,000 violation of Washington insurance laws and rules.  The state Commissioner Mike Kreidler stated that, "HII had the highest number of law violations we've ever seen from an insurance producer in the history of our state."  Violations included the sale of unauthorized products in the state of Washington.  HII asserts that these violations were not in relation to the company's sale of STLDI plans.  Nonetheless, the Committee finds these activities and allegations deeply concerning.  Office of the Insurance Commissioner, Washington State, *Health Insurance Innovation pays $1.5 million fine to Washington State* (Jan. 2, 2020) (press release).

November 2018.  The complaint alleges that HII made false and misleading statements to investors as well as failing to properly disclose facts about the company's business operations.[83]

### 2.  Simple Health

Beginning in 2012 until November 2018, HII was in a contractual and financial relationship with Mr. Steven Dorfman, and companies owned by Mr. Dorfman (Dorfman Companies), including Simple Health Plans and Health Benefits One.[84]  In November 2018, the Federal Trade Commission (FTC) filed a complaint in the United States Court of Appeals against Mr. Steven Dorfman, and his company, Simple Health Plans (Simple Health).[85]  In its legal filing, the FTC stated that Mr. Dorfman defrauded tens of thousands of Americans of more than $180 million by selling them worthless plans marketed as comprehensive health insurance.[86]  The FTC determined that Mr. Dorfman was the "'mastermind' of a 'classic bait and switch scheme' to deceive people into believing they were enrolling in comprehensive health insurance while actually providing them with 'practically worthless' plans that did not cover their medical bills."[87]

According to the FTC, Mr. Dorfman and Simple Health engaged in a deliberate telemarketing scheme and falsely claimed to be selling comprehensive health insurance plans to consumers across the country.[88]  Simple Health preyed on consumers seeking affordable health insurance, many of whom were uninsured and had pre-existing medical conditions.  The FTC wrote in a legal filing that Simple Health gained consumers' trust by falsely claiming to be affiliated with reputable organizations, such as the Blue Cross Blue Shield Association and AARP, and by falsely claiming to be experts on, and providers of, government sponsored health insurance policies, such as those offered pursuant to the ACA.[89]  The company deceived consumers into paying hundreds of dollars per month for what they were led to believe were comprehensive health insurance.  Instead, Simple Health enrolled consumers in STLDI plans and limited benefit indemnity plans that provided "none of the promised benefits."  Mr. Dorfman and the Dorfman companies engaged in a massive scheme that took millions of dollars in premiums

---

[83] RM Law, *RM LAW Announces Class Action Lawsuit Against Health Insurance Innovations, Inc.* (Mar. 20, 2019) (press release).

[84] Letter from Health Insurance Innovations, Inc., to Rep. Frank Pallone, Jr., Chairman, House Committee on Energy and Commerce (June 14, 2019) (HII's Narrative Response).

[85] *Federal Trade Commission v. Simple Health Plans LLC*, No. 19-11932-FF (11th Cir. 2019).

[86] *Id.*

[87] *Id.*

[88] *Id.*

[89] *Id.*

from consumers, and left them saddled with tens of thousands of dollars in unpaid medical bills. In November 2018, a federal judge temporarily shut down Simple Health.[90]

**After reviewing documents and engaging in discussions with HII executives, the Committee finds it highly implausible that HII was unaware of Mr. Dorfman's scheme, as the Company attempted to represent to the Committee, and concludes that HII was abetting or willfully ignorant of Simple Health and Mr. Dorfman in its operation of defrauding vulnerable Americans.[91]** HII had a financial arrangement over a period of six years with companies owned by the Dorfman Companies, including Simple Health Plans and Health Benefits One. The relationship was only terminated in November 2018 when a federal judge shut down the Dorfman Companies.[92]

In a letter provided to the Committee, HII maintains that it never had ownership or equity interest in the Dorfman Companies, and the Dorfman Companies and their affiliates did not have an equity or ownership interest in HII.[93] However, according to documents and information provided to the Committee by HII, HII was in an advance commission arrangement with the Dorfman Companies, and provided Mr. Dorfman approximately $118 million in loans.[94] HII made advance loans to Mr. Dorfman's businesses that were taken out of, and secured by future premium commissions for the sale of insurance products sold by the Dorfman Companies and offered through HII's platform.[95] HII and its subsidiaries provided Mr. Dorfman's Companies with approximately $83 million in sales commission in just 2017 and 2018 plan years.[96] Through commission sales and advance loans, it appears that HII was abetting Simple Health advance its fraudulent scheme.

---

[90] Federal Trade Commission, *FTC Halts Purveyors of Sham Health Insurance Plans* (Nov. 2, 2018) (press release).

[91] The Committee reviewed thousands of consumer complaints made directly to HII regarding the Dorfman Companies, where consumers alleged that brokers misrepresented the nature of coverage. These complaints date 2014 until November 2018 when Simple Health was shut down.

[92] Letter from Health Insurance Innovations, Inc., to Rep. Frank Pallone, Jr., Chairman, House Committee on Energy and Commerce (June 14, 2019) (HII's Narrative Response).

[93] *Id.*

[94] Letter from Gavin D. Southwell, Chief Executive Officer, Health Insurance Innovations, to Rep. Frank Pallone, Jr., House Committee on Energy and Commerce (Sept. 25, 2019); Letter from Health Insurance Innovations, Inc., to Rep. Frank Pallone, Jr., Chairman, House Committee on Energy and Commerce (June 14, 2019) (HII's Narrative Response).

[95] Letter from Health Insurance Innovations, Inc., to Rep. Frank Pallone, Jr., Chairman, House Committee on Energy and Commerce (June 14, 2019) (HII's Narrative Response).

[96] Letter from Gavin D. Southwell, Chief Executive Officer, Health Insurance Innovations, to Rep. Frank Pallone, Jr., House Committee on Energy and Commerce (Sept. 25, 2019) (HII's narrative response).

HII maintains that Mr. Dorfman was a third-party agent and denies any acknowledgement of wrongdoing.[97]  HII also maintains that it was only through the FTC action against the Dorfman Companies that HII was made aware "that the Dorfman companies were refusing to comply with HII's compliance and disclosure requirements."[98]  However, according to consumer complaints documents provided to the Committee dating 2014 until November 2018, thousands of consumers logged complaints directly to HII regarding Simple Health and Mr. Dorfman's companies, and the insurance products they were sold through HII's platform.[99] [100]  The complaints were made directly to HII even until November 2018 when Simple Health was shut down.[101]  According to the consumer complaints, Simple Health agents deceptively sold consumers STLDI and indemnity plans under the guise of comprehensive coverage.  These consumers were left with unpaid medical bills when they sought medical treatment, even in emergency situations.[102]  The majority of the complaints reviewed are due to agents misrepresenting the nature of coverage, and enrolling consumers in insurance products that they did not agree to, including life insurance policies.  The Committee concludes from its review of documents and by examining the relationship between HII and Simple Health that HII was likely aware that Simple Health and the Dorfman companies were deliberately misleading consumers.

### 3.  Brokers Associated with HII Defraud and Deliberately Mislead Consumers

The Committee concludes that HII, its subsidiary companies, and the third-party agents and brokers that HII is in a contractual relationship with defraud and deliberately mislead consumers seeking comprehensive health coverage, leaving them saddled with hundreds of thousands of dollars of medical debt.

As outlined in consumer complaints documents provided to the Committee, HII's third-party agents and broker actively deceive and deliberately mislead consumers about the type of coverage they are purchasing, fail to disclose that STLDI plans exclude coverage for pre-existing

---

[97] Briefing by Executives, Health Insurance Innovations, to House Committee on Energy and Commerce Staff (Aug. 1, 2019).

[98] Letter from Health Insurance Innovations, Inc., to Rep. Frank Pallone, Jr., Chairman, House Committee on Energy and Commerce (June 14, 2019) (HII's Narrative Response).

[99] The company asserts that it did not have a formal system for tracking and logging complaints prior to 2014, and has been unable to gather reliable documentation of complaints prior to 2014.

[100] These complaints are documented in "escalation log", a "complaint schedule log" and in complaints made to state regulators, and the BBB.  These documents were provided to the Committee by HII.  The majority of the complaints are due to misrepresentation of coverage by brokers.

[101] *Id.*

[102] *Id.*

conditions, and fail to disclose the plans' significant coverage limitations and exclusions.[103]  In some instances, these agents and brokers specifically target Americans seeking to purchase comprehensive insurance.  The Committee reviewed thousands of consumer complaints to reach these findings.[104]

The Committee's review of consumer complaints revealed that HII affiliated agents and brokers selling STLDI plans through HII's platform regularly make false and deceptive representation of coverage to consumers.[105]

- These agents and brokers sell STLDI plans through telephone sales, and actively mislead consumers and make deceptive statements during the calls.
- The agents and brokers fail to disclose to consumers that STLDI plans do not provide protections for pre-existing conditions, and fail to inform consumers of STLDI plans limitations and exclusions.
- They also make false assertions to consumers by stating that pre-existing conditions will be covered and that these policies provide comprehensive coverage.

Consumers with medical conditions who are actively looking for comprehensive health insurance are often sold STLDI plans that provide bare-bones benefits without appropriate disclosures.[106]

---

[103] HII provided the Committee documentation of 60 complaints that were made directly to the company through a formal process.  The company also provided the Committee an "escalation log" and a "tier 2 log" that documented thousands of consumer complaints, a vast majority of which were due to misrepresentation of coverage by brokers.  The company maintains that the complaints in the logs are "resolved immediately", and that "the customer's concern is dealt with during the call." As such, this is done without a "high level of formality." In a most of these circumstances, the consumers were either provided a refund or the policy was cancelled. Narrative response provided to Committee on September 12, 2019 and October 4, 2019.

[104] *Id.*

[105] These findings are based on consumer complaints provided by HII to the Committee. This includes complaints documented through the company's formal process, complaints documented in an "escalation log" and a "tier 2 log."

[106] Letter from Health Insurance Innovations, to Rep. Frank Pallone, Jr., Chairman, House Committee on Energy and Commerce (Oct. 4, 2019) (HII Tier 2 Log).

App. 151

According to consumer complaints documents reviewed by the Committee, consumers who are searching for "health insurance" are directed to HII-affiliated websites and brokers selling non-ACA complaint plans, including STLDI plans.[107]

These consumers are assured by agents and brokers selling insurance products through HII's platform that their medical conditions will be covered, when in fact these plans specifically exclude coverage for pre-existing conditions.

- According to documents provided to the Committee by HII, a cancer patient was deceptively enrolled in a plan and left with $42,000 in medical debt.[108]  The cancer patient was also enrolled in a life insurance plan that she did not consent to.
- Another consumer was enrolled by a HII affiliated agent and told that the plan would cover his kidney procedure.[109]  However, after the consumer had surgery, he was billed for the medical procedure and informed that the kidney surgery would not be covered due to the pre-existing conditions exclusion.[110]
- Based on another consumer complaint, a consumer was explicitly told that the plan would cover her son's pre-existing condition when in fact it did not.[111]
- In a consumer complaint document provided to the Committee, another consumer was told that the plan would provide coverage for up to a $1 million maximum. However, the consumer was stuck with $80,000 in medical bills for a surgery after the plan only paid a maximum of $5,000.[112]

---

[107] *Id.*

[108] Letter from Pennsylvania Insurance Department, to Health Insurance Innovation (2017).

[109] Letter from Consumer Specialist, Consumer Protection Division, Arizona Department of Insurance, to Health Plan Intermediaries Holdings LLC [Health Insurance Innovations] (2016)

[110] *Id.*

[111] Letter from Senior Investigator, Office of the Insurance Commissioner, Washington State, to Health Insurance Innovations (2017).

[112] Letter from Complainant, to Department of Consumer & Business Services, Insurance Division, State of Oregon (2017).

App. 152

> Based on the consumer complaints documents provided to the Committee, it appears that some consumers are told that these plans provide comprehensive coverage and are ACA-compliant plans, when in fact they are not. Consumers are also pushed to purchase plans over the phone without reviewing any written information or coverage documents, and are asked to pay the monthly premium up front.

Consumers who enroll in these plans are then left with thousands of dollars in medical bills for medical procedures after insurers deny their medical claims due to plan limitations.  HII affiliated agents and brokers also deceivingly inform consumers that these plans provide coverage for prescription drugs in instances when prescription drug is not included in the benefits package.[113]

**HII affiliated brokers and agents also misleadingly advertise to consumers that these policies provide "access to extensive provider network," and assure consumers that they can visit any doctor they want.[114]  However, consumers may not be able find a provider that is willing to accept their insurance.**

For instance, according to consumer complaint documents reviewed by the Committee, a consumer was assured that she can visit any provider in her area and that the plan included the "largest PPO policy," but the consumer could not find a single health care provider that was willing to take accept the insurance.[115]  The Committee reviewed multiple consumer complaints who were led to believe that the STDLI plan had extensive provider network but could not find a provider who would accept the insurance.[116]

The agents and brokers require consumers to make payments over the telephone and enroll consumers in these plans without the consumers receiving or reviewing written details of the

---

[113] Letter from Health Insurance Innovations, to Rep. Frank Pallone, Jr., Chairman, House Committee on Energy and Commerce (Oct. 4, 2019) (HII Tier 2 Log).

[114]*Id.*

[115] Health Insurance Innovations, *Web Complaint* (2018) (Complaint file 67361611).

[116] Letter from Health Insurance Innovations, to Rep. Frank Pallone, Jr., Chairman, House Committee on Energy and Commerce (Oct. 4, 2019) (HII Tier 2 Log).

App. 153

policy.[117]  Written disclosures and information is provided to consumers only after consumers have purchased the plan.  In consumer complaints made to the company, consumers also note that HII often fails to process their refunds.[118]  Additionally, HII affiliated agents and brokers routinely enroll consumers without their consent in life insurance policies.[119]

In discussions with Committee staff, HII declined to take any responsibility for the agents and brokers engaging in these fraudulent schemes as documented in the thousands of consumer complaints reviewed by the Committee.[120]  The company asserts that the consumers receive a welcome email and electronically sign the application.[121]  **However, many consumers are enrolled over the telephone and only receive the disclosure documents listing all of the plan's limitations and exclusions after enrolling in coverage.**

**HII's business practices incentivize agents and brokers to engage in fraudulent and misleading practices.  HII provides loans to agents and brokers as an advance against future commissions**.[122]  Agents are required to reimburse the loans back to the company through the premiums of plans sold.  Agents and brokers receive up to 30 percent commission for the sale of STLDI plans.[123]  Based on the consumer complaints made directly to HII and the documents reviewed by the Committee, we conclude that HII is aware or should be aware that agents and brokers engage in these misleading, aggressive, and deceptive marketing practices.

The Committee notes that this is just one company that was included in our investigation, and the Committee is not concluding that these business practices are widespread throughout the industry.  The Committee also recognizes that some states have taken enforcement action against HII to protect their citizens.  The Committee also notes that HII represents that it has undertaken a compliance program, and now has a "staffed compliance department consisting of professionals who provide training to the Company's own staff and third-party agents and perform audits and other monitoring of those third-party agents.  HII was required to develop and implement a written comprehensive compliance plan as part of the regulatory settlement agreement.  The Committee does not opine on the efficacy or adequacy of the compliance

---

[117] *Id.*

[118] *Id.*

[119] *Id.*

[120] Briefing by Health Insurance Innovations, to House Committee on Energy and Commerce Staff (Aug. 1 and Apr. 4, 2019).

[121] Letter from Health Insurance Innovations, to Rep. Frank Pallone, Jr., Chairman, House Committee on Energy and Commerce (Oct. 4, 2019).

[122] Letter from Gavin D. Southwell, Chief Executive Officer, Health Insurance Innovations, to Rep. Frank Pallone, Jr., House Committee on Energy and Commerce (Sept. 25, 2019).

[123] Letter from Gavin D. Southwell, Chief Executive Officer, Health Insurance Innovations, to Rep. Frank Pallone, Jr., Chairman, House Committee on Energy and Commerce (Apr. 30, 2019).

program, but notes that the Company's "escalations" log provided to the Committee contains consumer complaints regarding the Company's sale and marketing practices from 2019. However, it is nevertheless unsurprising that the type of deceptive practices HII undertakes exist in the industry, due to the unregulated nature of STLDI, the financial incentives created by the huge percentage of premiums that go to broker's commissions, and the lack of adequate state or federal oversight over these plans.

### D.   Some SLTDI Plans Engage in Misleading Marketing Practices

Marketing brochures reviewed from major STLDI insurers including IAIC, Golden Rule, Arkansas BCBS, LNIC, and NHIC do disclose STLDI plan's limitations and exclusions, including the fact that STLDI plans do not provide protections for pre-existing conditions. **However, the Committee finds that some marketing materials fail to properly disclose all of STLDI plans' limitations and exclusions.**

- For example, a marketing brochure by LifeMap advertises STLDI plans as "medical insurance," but the brochure does not disclose or provide the list of STLDI plans limitations and exclusions.[124] [125]
- Some STLDI marketing materials from NHIC also fail to disclose all of the policies' limitations and exclusions.[126]
- A few marketing brochures reviewed list some of the medical conditions excluded from coverage but not all. For instance, a brochure by Everest notes that it is only a "summary of what is not included."[127] The brochure lists up to ten medical

---

[124] LifeMap, *Individual & Family Short Term Medical Insurance* (2017) (LifeMap Exhibit 6, LM-E&C-000088).

[125] LifeMap initially represented to Committee this document was exclusively broker facing and not used with consumers. However, the document appears to be targeted to consumers on its face. Moreover, when the Committee requested that the Company provide in writing that this document is not used with consumers, the Company could not state that it was designed solely for broker use. The Committee continues to assert that this document does not appropriately disclose or provide a list of STLDI plan limitations and exclusions.

[126] National General Accident & Health, *Get the coverage you want, for the time you need* (2019) (National General V4). National General disputed this characterization, arguing that the document cited constituted a "flyer," not a brochure, and constituted an "invitation to inquire," and is thereby not required to disclose limitations to the policy, in accordance with the National Association of Insurance Commissioners Model Regulation Accident & Health Advertising Model Regulation. The Committee notes that while it does not assert that National General was not in compliance with this or other state laws, the Committee continues to believe that this document is inadequate to put consumers on notice regarding the nature of STLDI coverage and the many limitations that come with such coverage, including very limited coverage for existing medical conditions.

[127] Everest, *FlexTerm Health Insurance* (Oct. 6, 2018) (FlexTerm Brochure Traditional 2 10 06 18.pdf).

conditions excluded from coverage, but the certification of coverage that consumers receive after enrollment includes over forty conditions that are excluded from coverage.[128]

- Another brochure from LNIC listed only some medical conditions excluded from coverage, and the brochure notes, "we offer this summary of what is not covered."[129]

STLDI marketing materials may be confusing for consumers to understand and difficult to comprehend. Agile's webpage advertises STLDI plans from LNIC and Everest as providing health care coverage of up to $1 million.[130] However, not all of the webpages on Agile's site disclose all of STLDI plan's limitations or exclusions.[131] The policy certificate that consumers receive after enrolling in the STLDI plan lists over a number of exclusions and limitations.[132]

Marketing brochures also use misleading images to promote STLDI plans. Everest's marketing brochures predominantly feature images of mountain climbers, but the insurer's STLDI plans specifically exclude coverage for injuries resulting from any sports including mountain climbing.[133]

STLDI plans are required to disclose to consumers that the plan may not provide coverage for pre-existing conditions. However, it appears that these disclosures have limited effect. Consumers do not appear to understand the limitations of STLDI, perhaps in part due to their expectations and experiences being shaped by the ACA.[134] A study conducted by the

---

[128] Letter from General Counsel and Secretary, Everest, to Rep. Frank Pallone, Jr. Chairman, House Committee on Energy and Commerce, Rep. Anna G. Eshoo, Chairwoman, Subcommittee on Health, Rep. Diana DeGette, Chair, Subcommittee on Oversight and Investigations (May 7, 2019) (Everest exhibit 2(2)) (EAH 00 524 08 15).

[129] LifeShield National Insurance, *Short Term Medical* (Apr. 22, 2019) (Exhibit III LNG-3001 SMART Term Health_brochure_4.22.19).

[130] LNIC has ceased the sale of STLDI plans.

[131] Letter from General Counsel and Secretary, Everest, to Rep. Frank Pallone, Jr. Chairman, House Committee on Energy and Commerce, Rep. Anna G. Eshoo, Chairwoman, Subcommittee on Health, Rep. Diana DeGette, Chair, Subcommittee on Oversight and Investigations (May 7, 2019) (Everest exhibit 2(e)); Agile Health Insurance, Get Affordable Short Team Health Insurance Quotes (www.agilehealthinsurance.com/short-term-health-insurance-quotes#compare).

[132] LifeShield National Insurance Co., Home Page (www.lifeshieldnational.com/).

[133] Letter from General Counsel and Secretary, Everest, to Rep. Frank Pallone, Jr. Chairman, House Committee on Energy and Commerce, Rep. Anna G. Eshoo, Chairwoman, Subcommittee on Health, Rep. Diana DeGette, Chair, Subcommittee on Oversight and Investigations (May 7, 2019) (Everest exhibit 2(b)).

[134] Report on Testing Consumer Understanding of a Short-Term Health Insurance Plan, Submitted to Georgians for a Healthy Future on behalf of consumer representatives to the

consumer representatives of the National Association of Insurance Commissioners (NAIC) found that most consumers do not understand STLDI coverage benefits and limitations, and express confusion over pre-existing condition exclusions and coverage limitations.  The Committee's review of the consumer complaints documents leads us to draw similar conclusions.  Consumers face difficulty understanding STLDI plan limitations and exclusions.  Unlike comprehensive medical insurance coverage, STLDI plans are not required to provide consumers information with access to provider directories, sample coverage documents, summaries of benefits and coverage, and a uniform glossary.  Consumers are deprived of robust information to inform their purchasing decisions.[135]

### 1.  Marketing Materials Advertise STLDI Plan Under the Guise of a Prominent Insurance Company

In one instance, the Committee identified a troubling example of one STDLI company marketing its plans under the guise of a different, more prominent health insurance company.  **IHC's marketing material prominently features Anthem BlueCross BlueShield's (BCBS) logo and marketing images.[136]  One marketing document explicitly advertises the STLDI plans as "interim coverage through Anthem BCBS and IHC."[137]  However, the product is underwritten by IHC and administered by the Loomis Company.  A small-size font disclaimer notes that the IHC and the Loomis Company are solely responsible for the STLDI product, and that Anthem BCBS "does not underwrite, insure or administer the insurance plans described in this brochure."[138]**

The use of Anthem's logo on IHC's STLDI marketing brochures can be misleading for consumers.  The Committee finds that IHC used Anthem BCBS's marketing logo from 2016 to June 2018.  During this period, Anthem BCBS did not insure or administer STLDI plans.[139]  Anthem BCBS only sold and administered comprehensive insurance products that provides comprehensive protections for pre-existing conditions.  However, IHC's STLDI plans exclude coverage for pre-existing conditions and basic medical services.  Consumers purchasing IHC's

---

National Association of Insurance Commissioners (Mar. 15, 2019) (healthyfuturega.org/wp-content/uploads/2019/04/Consumer-Testing-Report_NAIC-Consumer-Reps.pdf).

[135] The Committee notes that STLDI plans offer consumers enrolling in these plans a 10-day lookback period and right to examine the policy upon receipt of the policy documents.  Consumers can seek to cancel the policy and receive a full refund within the 10-day period.

[136] Anthem, BlueCross BlueShield, The IHC Group, *Interim Coverage Plus* (2018) (NG 000190) (NG000189-NG000189) (Anthem V2). Anthem, BlueCross BlueShield, The IHC Group, *Interim Coverage Plus* (Brochure Interim Coverage Plus 0318).

[137] *Id.*

[138] *Id.*

[139] On September 23, 2019, Anthem and IHC entered into a risk sharing agreement and the agreement was retroactive to January 2019.  Under the agreement, Anthem will assume some risk with respect to STLDI plans.

STLDI plans may have been led to believe they were purchasing comprehensive medical products from Anthem BCBS.  According to information provided to the Committee, the arrangement between IHC and Anthem BCBS terminated in June of 2018.  Nevertheless, this example sheds light on the troublingly lax regulatory landscape that has allowed these plans to flourish and push the limits on their marketing and advertising techniques.

### E.   STLDI Plans are Highly Profitable for Insurers and Brokers

#### 1.   Brokers Receive Significant Financial Compensation for the Sale of STLDI Plans

Insurers compensate brokers for selling insurance products through commissions based on either a percentage of the premium or a flat "per member per month" (PMPM) dollar amount. Brokers generally receive compensation for selling STLDI plans based on a percentage of the premium.

**The Committee finds that brokers receive up to ten times the compensation rate for STLDI plans than for ACA-compliant plans.**  Broker compensation for STLDI plans still exceeds compensation for ACA-compliant plans, even after accounting for the fact that STLDI plan premiums are lower than ACA-compliant plans.

> The Committee reviewed 14 companies' broker compensation rates and finds that **commission rate for STLDI plans range between 10 percent to 40 percent**, with an average commission rate of 23 percent.[140]

The commission rate for ACA-compliant plans was approximately 2 percent in 2018.[141] [142] [143]

---

[140] Some companies provided the Committee with a range for the commission. For the companies that provided a range, the Committee calculated the average rate.

[141] Kaiser Family Foundation, *Broker Compensation by Health Insurance Market* (2018).

[142] The Committee notes that there is variation in broker commission for ACA-compliant plans from state to state and carrier to carrier. The Committee arrived at the ACA-compliant commission rate by dividing the broker fee for the individual market PMPM for 2018 by the monthly premium for 2018.   The Committee also notes the variation in plan duration between STLDI and ACA-compliant plans.  ACA compliant plans are for at least 12 months whereas STLDI plans can range between 30 days to 364 days.

[143] Kaiser Family Foundation, *Individual Insurance Market Performance in 2018* (2018).

App. 158

### 2. Brokers May Be Incentivized to Engage in Aggressive Marketing Practices

Brokers may be incentivized to engage in aggressive or even fraudulent marketing practices given the significantly higher compensation for STLDI plans.  In addition to the discussion of the sale and marketing practices of HII, **the Committee's review of additional complaints documents from consumers suggest that brokers are not always forthright with consumers about the STLDI plan's limitations and exclusions.**

Based on documents provided to the Committee:

- There are numerous instances in which HII-affiliated agents and brokers selling LNIC policies mispresented the nature of coverage to consumers, and as a result, LNIC provided these consumers with a refund.[144]
- Another consumer filed a complaint with LNIC asserting that the agent had falsified his information and misrepresented the STLDI plan to the consumer. The company provided the consumer with a refund, and terminated the agent's contract.[145]
- Another consumer received a $9,000 settlement from a broker selling LNIC plans due to the broker's marketing practices.[146]

**The Committee reviewed consumer complaints documents from consumers who had purchased Everest's STLDI plans, and were under the impression that the plans provided consumer protection.[147]**

- In one instance, a consumer enrolled in a STLDI plan was billed approximately $12,000.[148]  Everest denied the claims and asserted that it was due to pre-existing conditions.  The consumer wrote in a letter to the company that she was under the impression that ACA banned all discrimination against pre-existing conditions.
- Another patient was billed approximately $14,000 for an emergency procedure. Everest denied the claims due to the waiting period exclusion.  In a complaint to

---

[144] Letter from LifeShield National Insurance Company, to Rep. Frank Pallone, Jr. Chairman, House Committee on Energy and Commerce (May 6, 2019) (LNIC complaints log).

[145] *Id.*

[146] *Id.*

[147] Letter from Executive Vice President, General Counsel and Secretary, Everest, to Rep. Frank Pallone, Jr., Chairman, House Committee on Energy and Commerce, Rep. Anna G. Eshoo, Chairwoman, Subcommittee on Health, Rep. Diana DeGette, Chair, Subcommittee on Oversight and Investigations (Sept. 3, 2019) (Complaint documents.)

[148] Letter from Executive Vice President, General Counsel and Secretary, Everest, to Rep. Frank Pallone, Jr., Chairman, House Committee on Energy and Commerce, Rep. Anna G. Eshoo, Chairwoman, Subcommittee on Health, Rep. Diana DeGette, Chair, Subcommittee on Oversight and Investigations (Sept. 3, 2019) (Everest Complaint #5 (WA)).

the company, the consumer wrote that he purchased the policy through Agile and was led to believe that any medications would be covered.[149]

Another consumer wrote in a complaint to state regulators that she was $85,000 in medical debt for medical treatment for both her and her husband.   Her broker had informed her that "short-term policies" were all that could be issued until "it was decided what President Trump was going to do about ObamaCare."  According to the consumer complaint, the broker had also claimed that the STLDI plan was "major medical policy."[150]

- A consumer was enrolled in a NHIC STLDI plan by a health insurance broker after specifically requesting to be enrolled in an ACA-compliant plan.  The consumer filed a complaint, noting that the broker had assured him that the STLDI plan was ACA-compliant.[151]
- Another consumer seeking to enroll in an ACA-compliant plan was enrolled in multiple consecutive STLDI plans[152] by a broker selling NHIC plans.[152]   According to the consumer's complaint, the broker failed to inform the consumer of how the pre-existing condition exclusion works, and that basic preventive services would not be covered.  Additionally, the consumer was told that the plan had a $2,000 deductible.  However, the consumer was enrolled in consecutive STLDI plans

---

[149] Letter from Executive Vice President, General Counsel and Secretary, Everest, to Rep. Frank Pallone, Jr., Chairman, House Committee on Energy and Commerce, Rep. Anna G. Eshoo, Chairwoman, Subcommittee on Health, Rep. Diana DeGette, Chair, Subcommittee on Oversight and Investigations (Sept. 3, 2019) (Everest Complaint #6 (WA)).

[150] Letter from Complainant, to Ohio Department of Insurance (2018) (IHC00002328).

[151] Letter from Life, Accident & Health Intake Unit, Complaints Resolution, Texas Department of Insurance, to Complainant (2018) (NG001135); Letter from Manager, Contract and Policy Administration, National General Accident & Health, to Life, Accident & Health Intake Unit, Texas Department of Insurance (2018) (NG001679); Letter from Senior Insurance Market Examiner, Life and Health Division, Bureau of Insurance, Commonwealth of Virginia, to Customer Experience Manager, National General Insurance Company (2017) (NG000825).

[152] Letter from Senior Investigator, Enforcement Division, Consumer Protection Unit, Indiana Department of Insurance, State of Indiana, to National General Insurance Company (2018) (NG001629).

with a $5,000 deductible that reset each quarter.  NHIC refunded the consumer after the consumed filed an official complaint.[153]

- Another consumer enrolled in a NHIC STLDI plan filed a complaint asserting that the broker had misrepresented the coverage.[154]

### 3.  Misleading Marketing Practices Amid COVID-19

Misleading and fraudulent marketing practices are particularly concerning amid a COVID-19 public health emergency.  Many uninsured individuals may be seeking to enroll in health coverage and given the Trump Administration's refusal to allow for an Open Enrollment period on the ACA Marketplaces, uninsured individuals may turn to STLDI as an alternative form of coverage.  The Brookings Institution conducted a survey with nine STLDI agents and brokers who were selling STLDI plans.[155]  Based on the survey results, Brookings concludes that it was given "misleading – and sometimes false – information about how COVID-19 related testing and treatment would be covered by [STLDI] and the circumstances under which it would be a pre-existing condition."[156]  Brookings further notes that in "no conversations would [they] characterize the brokers as having accurately and clearly described the terms of coverage and the relevant plan limitation."[157]

Total costs for COVID-19 related treatment could range from $9,800 to $74,310.[158] [159]  According to Brookings, STLDI agents and brokers "often significantly overstated the degree of coverage a [STLDI] plan would provide and sometimes misrepresented the terms of the plan."[160]  In addition to significantly misrepresenting the nature of STLDI coverage, agents and brokers also gave either misleading or false information about the circumstances in which COVID-19 symptoms, diagnosis, and treatment would be considered a pre-existing condition.[161]  It is particularly concerning that amid a COVID-19 public health emergency, STLDI agents and brokers are continuing to provide misleading information about the type of coverage they are

---

[153] Letter from Manager, Contract and Policy Administration, National General Accident & Health, to Special Investigator, Enforcement Division, Consumer Protection Unit, Indiana Department of Insurance (2018) (NG001612, NG001629).

[154] Letter from Life, Accident & Health Intake Unit, Texas Department of Insurance, to Customer Experience Manager, National Health Insurance (2018) (NG001226).

[155] Christen Linke Young and Kathleen Hannick, *Misleading marketing of short-term health plans amid COVID-19,* The Brookings Institution (Mar. 24, 2020).

[156] *Id.*

[157] *Id.*

[158] Kaiser Family Foundation, *Potential costs of coronavirus treatment for people with employer coverage,* (Mar. 13, 2020).

[159] Fair Health Inc, *The Projected Economic Impact of COVID-19 Pandemic on the US Health Care System,* (Mar. 25, 2020).

[160] *See* note 13

[161] *Id.*

purchasing, failing to properly disclose that STLDI plans exclude coverage for pre-existing conditions, and failing to disclose the plans' significant coverage limitations and exclusions.

### 4. Consumers' Coverage is Rescinded Due to Brokers' Behavior

Based on the Committee's review of consumer complaint documents, it appears that STLDI plans have rescinded consumers' coverage because of brokers' failure to inform consumers of STLDI plan's limitations and exclusions.

- **A consumer enrolled in a Golden Rule STLDI plan by a broker had his coverage rescinded, despite the fact that the consumer claimed in his complaint that he was forthcoming about his medical conditions with the broker.** According to the company's complaint files, the consumer previously had a heart attack outside of the plan's lookback period and was on medication for Plavix at the time of enrollment. Based on the consumer's complaint filing, the consumer alleges that he disclosed to the broker that he was taking cholesterol medication, and the company's response notes that the broker also stated that he did not think the consumer was withholding any information. However, Golden Rule rescinded the consumer's coverage and asserted that the patient should have disclosed his medication.[162]
- **Another consumer appealed after NHIC denied claims of $100,000 in billed charges for a sinus surgery.** In a letter to the patient, the company initially wrote that the consumer previously had a history of chronic sinusitis, and that sinus condition and asthma condition were determined to be pre-existing conditions. In the complaint, the consumer asserted that their agent told them that pre-existing conditions only related to heart disease or cancer would be excluded from coverage. The consumer wrote that,

"I told [the broker] that I did have sinus issues that I had dealt with off and on, but was told that was not considered pre-existing. I would have gone with another insurance policy if sinuses were considered pre-existing."[163]

Upon appeal, NHIC processed the claims due to the representation made by the agent.
- NHIC rescinded another consumer's plan and denied claims based on certain conditions that were within five years prior to the application date for coverage.

---

[162] Letter from Senior Appeal Representative, Golden Rule, to Complainant (2018 13367 Golden Rule).

[163] Letter from Complainant, to National General Accidental and Health (2017) (NG001674).

The consumer filed an appeal stating that he recalled the broker only asking whether such conditions were diagnosed during the 12 months preceding the effective date of coverage.[164]

- Another consumer enrolled in a Golden Rule STLDI plan over the telephone via a broker wrote in a complaint that he had informed the broker of his prior medical history.[165]  However, the company rescinded the consumer's coverage asserting that the consumer was previously hospitalized for a heart condition that would have made him ineligible for coverage.

### 5.  STLDI Plans Provide Consumers Little Value, and Spend Only Less Than Half of Earnings on Medical Care

Medical loss ratio (MLR) measures the share of health care premium dollars spent on health care claims and medical benefits, as opposed to expenses such as profits and overhead expenses.  The ACA required insurers to spend at least 80 or 85 percent of premium dollars on consumers' medical care.  The ACA also required insurers to issue rebates to consumers each year that they did not meet the 80 or 85 percent MLR.  STLDI plans are exempt from the ACA's MLR requirement.

STLDI plans provide consumers little value for their premium dollars, and consumers enrolled in STLDI plans pay more in premiums than they receive in health care benefits.

**The Committee finds that on average, less than half of the premium dollars collected from consumers are spent on medical care by STLDI plans.  The Committee finds the median MLR to be 48 percent across the eight companies that offer STLDI products.**  This means that only 48 percent of premium dollars a consumer pays into a plan is paid out in the form of health care claims and medical benefits.

---

[164] Letter from Complainant, to National General Accident & Health (2018) (NG000782, NG0000972).

[165] Letter from Senior Appeal Representative, Golden Rule Insurance Company, to Complainant (2018 00749 Golden Rule).

PREMIUM DOLLARS SPENT ON CONSUMERS' MEDICAL CARE





### F.   STLDI Plans Discriminate Against Individuals with Pre-Existing Conditions

STLDI plans systematically exclude coverage for most major medical conditions resulting from pre-existing conditions, discriminate against individuals with pre-existing conditions, and provide wholly inadequate protection against catastrophic medical costs.  The Committee's investigation finds that all STLDI plans discriminate against individuals with pre-existing conditions by denying coverage altogether or excluding coverage for pre-existing conditions.

### 1.   STLDI Plans Screen Consumers for Health Status and Discriminate Against Individuals with Pre-Existing Conditions

**The Committee's review of all of the documents revealed that six of the eight STLDI insurers screen applicants for health status, illnesses, and prior medical treatment, denying coverage altogether to consumers with pre-existing conditions or excluding coverage for most common medical conditions resulting from pre-existing conditions.[166]**  These STLDI plans require consumers seeking coverage to complete invasive and complex applications.

**Five of the eight STLDI insurers deny coverage outright to individuals with pre-existing conditions, and all offer STLDI plans that exclude coverage of pre-existing**

---

[166] These six insurers include Golden Rule, LNIC, NHIC, Arkansas BCBS, IAIC, and Everest.  Additionally, Pivot sells STLDI plans on behalf of Companion Life Insurance, a major STLDI insurer and the medical conditions listed below include examples from Pivot's applications.

**conditions for individuals who are offered a policy.** STLDI insurers deny coverage to individuals that may have been diagnosed with, received treatment, had abnormal test results, medication, consultation, advice or exhibited symptoms for any of the medical conditions listed below:[167]

- Insulin or diabetes;[168]
- Stroke, seizures disorder, or other neurological disorder;[169]
- Heart or circulatory system disorders, coronary artery disease or circulatory system disorder, including by-pass, stent surgery, carotid artery disease, heart attack or heart failure;[170]
- Cancer or tumor;[171]

---

[167] The Committee notes that the list of medical conditions noted here is an illustrative list aggregated across insurers for which are cited. Each condition is bulleted and footnoted to indicate which companies include the exclusion for that particular condition. The Committee further notes that the condition description may not be exactly as stated in each company's coverage documents, and these may be stated with either greater specificity or a greater level of generality, depending on the circumstances. Please refer to the appendix for company specific list of medical conditions that applicants are denied coverage for.

[168] Golden Rule Insurance Company, *Application for Short Term Medical Insurance* (June 20, 2017); Everest Reinsurance Company, *Individual Short Term Medical Plan Insurance Enrollment Form* (n.d.); LifeShield National Insurance Company, *Medical Questions* (n.d.); National General Accident & Health, *Short Term Medical Enrollment – Client Form* (n.d.); Independence American Insurance Company [IHC], *Application for Individual Limited Short Term Medical Expense Insurance* (Feb. 2019); Arkansas BlueCross BlueShield, *Application for Short Term* (n.d.).

[169] Everest Reinsurance Company, *Individual Short Term Medical Plan Insurance Enrollment Form* (n.d.); LifeShield National Insurance Company, *Medical Questions* (n.d.); National General Accident & Health, *Short Term Medical Enrollment – Client Form* (n.d.); Independence American Insurance Company [IHC], *Application for Individual Limited Short Term Medical Expense Insurance* (Feb. 2019).

[170] [Pivot Health] Companion Life Insurance Company, *Group Short Term Medical Plan Application* (Aug. 2018); Golden Rule Insurance Company, *Application for Short Term Medical Insurance* (June 20, 2017); Everest Reinsurance Company, *Individual Short Term Medical Plan Insurance Enrollment Form* (n.d.); LifeShield National Insurance Company, *Medical Questions* (n.d.); National General Accident & Health, *Short Term Medical Enrollment – Client Form* (n.d.); Independence American Insurance Company [IHC], *Application for Individual Limited Short Term Medical Expense Insurance* (Feb. 2019); Arkansas BlueCross BlueShield, *Application for Short Term* (n.d.).

[171] [Pivot Health] Companion Life Insurance Company, *Group Short Term Medical Plan Application* (Aug. 2018); Golden Rule Insurance Company, *Application for Short Term Medical Insurance* (June 20, 2017); Everest Reinsurance Company, *Individual Short Term Medical Plan Insurance Enrollment Form* (n.d.); LifeShield National Insurance Company, *Medical Questions*

50

- Taking medication for cancer or tumorous growth;[172]
- Crohn's disease;[173]
- Alcohol or drug abuse;[174]
- Bipolar disorder;[175]
- Mental disorder;[176]
- Immune system disorder;[177]
- Substance use disorders;[178]

---

(n.d.); National General Accident & Health, *Short Term Medical Enrollment – Client Form* (n.d.); Independence American Insurance Company [IHC], *Application for Individual Limited Short Term Medical Expense Insurance* (Feb. 2019); Arkansas BlueCross BlueShield, *Application for Short Term* (n.d.).

[172] Everest Reinsurance Company, *Individual Short Term Medical Plan Insurance Enrollment Form* (n.d.); Golden Rule Insurance Company, *Application for Short Term Medical Insurance* (June 20, 2017); Independence American Insurance Company [IHC], *Application for Individual Limited Short Term Medical Expense Insurance* (Feb. 2019); LifeShield National Insurance Company, *Medical Questions* (n.d.); National General Accident & Health, *Short Term Medical Enrollment – Client Form* (n.d.);

[173] Golden Rule Insurance Company, *Application for Short Term Medical Insurance* (June 20, 2017); Everest Reinsurance Company, *Individual Short Term Medical Plan Insurance Enrollment Form* (n.d.); LifeShield National Insurance Company, *Individual Short Term Medical Plan Insurance Enrollment Form* (n.d.); National General Accident & Health, *Short Term Medical Enrollment – Client Form* (n.d.).

[174] [Pivot Health] Companion Life Insurance Company, *Group Short Term Medical Plan Application* (Aug. 2018); Golden Rule Insurance Company, *Application for Short Term Medical Insurance* (June 20, 2017); Everest Reinsurance Company, *Individual Short Term Medical Plan Insurance Enrollment Form* (n.d.); LifeShield National Insurance Company, *Medical Questions* (n.d.); National General Accident & Health, *Short Term Medical Enrollment – Client Form* (n.d.); Independence American Insurance Company [IHC], *Application for Individual Limited Short Term Medical Expense Insurance* (Feb. 2019); Arkansas BlueCross BlueShield, *Application for Short Term* (n.d.).

[175] [Pivot Health] Companion Life Insurance Company, *Group Short Term Medical Plan Application* (Aug. 2018); Everest Reinsurance Company, *Individual Short Term Medical Plan Insurance Enrollment Form* (n.d.); LifeShield National Insurance Company, *Medical Questions* (n.d.).

[176] Everest Reinsurance Company, *Individual Short-Term Medical Plan Insurance Enrollment Form* (n.d.).

[177] Golden Rule Insurance Company, *Application for Short Term Medical Insurance* (June 20, 2017); Arkansas BlueCross BlueShield, *Application for Short Term* (n.d.).

[178] Independence American Insurance Company [IHC], *Application for Individual Limited Short Term Medical Expense Insurance* (Feb. 2019).

- Schizophrenia;[179]
- Eating disorders;[180]
- Liver disorders;[181]
- Kidney disorders;[182]
- Any disease or disorder of the brain;[183]
- Any diseases or disorder of the lung;[184]
- Neck or back disorder;[185]

---

[179] [Pivot Health] Companion Life Insurance Company, *Group Short Term Medical Plan Application* (Aug. 2018); Everest Reinsurance Company, *Individual Short Term Medical Plan Insurance Enrollment Form* (n.d.); LifeShield National Insurance Company, *Individual Short Term Medical Plan Insurance Enrollment Form* (n.d.); Independence American Insurance Company [IHC], *Individual Short Term Medical Expense Insurance Policy* (n.d.).

[180] [Pivot Health] Companion Life Insurance Company, *Group Short Term Medical Plan Application* (Aug. 2018); Everest Reinsurance Company, *Individual Short Term Medical Plan Insurance Enrollment Form* (n.d.); LifeShield National Insurance Company, *Medical Questions* (n.d.).

[181] [Pivot Health] Companion Life Insurance Company, *Group Short Term Medical Plan Application* (Aug. 2018), Golden Rule Insurance Company, *Application for Short Term Medical Insurance* (June 20, 2017); Everest Reinsurance Company, *Individual Short Term Medical Plan Insurance Enrollment Form* (n.d.); LifeShield National Insurance Company, *Medical Questions* (n.d.); National General Accident & Health, *Short Term Medical Enrollment – Client Form* (n.d.); , Arkansas BlueCross BlueShield, *Application for Short Term* (n.d.).

[182] [Pivot Health] Companion Life Insurance Company, *Group Short Term Medical Plan Application* (Aug. 2018); Golden Rule Insurance Company, *Application for Short Term Medical Insurance* (June 20, 2017); Everest Reinsurance Company, *Individual Short Term Medical Plan Insurance Enrollment Form* (n.d.); LifeShield National Insurance Company, *Medical Questions* (n.d.); National General Accident & Health, *Short Term Medical Enrollment – Client Form* (n.d.); Independence American Insurance Company [IHC], *Application for Individual Limited Short Term Medical Expense Insurance* (Feb. 2019); Arkansas BlueCross BlueShield, *Application for Short Term* (n.d.).

[183] Everest Reinsurance Company, *Individual Short Term Medical Plan Insurance Enrollment Form* (n.d.); LifeShield National Insurance Company, *Medical Questions* (n.d.); LifeShield National Insurance Company, *Individual Short Term Medical Plan Insurance Enrollment Form* (n.d.).

[184] Everest Reinsurance Company, *Individual Short Term Medical Plan Insurance Enrollment Form* (n.d.); LifeShield National Insurance Company, *Medical Questions* (n.d.); LifeShield National Insurance Company, *Individual Short Term Medical Plan Insurance Enrollment Form* (n.d.).

[185] National Health Insurance Company, *Application for Short Term Medical Insurance* (2018).

- Ulcerative colitis;[186]
- Rheumatoid arthritis;[187]
- Degenerative arthritis (Degenerative disc disease, degenerative joint disease of the knee, herniated disc, rheumatoid or psoriatic arthritis or degenerative joint disease);[188]
- Systemic lupus;[189]
- Chronic obstructive pulmonary disease (COPD) or emphysema;[190]
- Cystic fibrosis;[191]
- Transient ischemic attack;[192]
- Hepatitis C;[193]

---

[186] Everest Reinsurance Company, *Individual Short Term Medical Plan Insurance Enrollment Form* (n.d.); LifeShield National Insurance Company, *Group Short Term Medical Plan Insurance Enrollment Form* (n.d.).

[187] [Pivot Health] Companion Life Insurance Company, *Group Short Term Medical Plan Application* (Aug. 2018); Everest Reinsurance Company, *Individual Short Term Medical Plan Insurance Enrollment Form* (n.d.); LifeShield National Insurance Company, *Medical Questions* (n.d.); National General Accident & Health, *Short Term Medical Enrollment – Client Form* (n.d.).

[188] [Pivot Health] Companion Life Insurance Company, *Group Short Term Medical Plan Application* (Aug. 2018); National General Accident & Health, *Short Term Medical Enrollment – Client Form* (n.d.).

[189] LifeShield National Insurance Company, *Group Short Term Medical Plan Insurance Enrollment Form* (n.d.); Independence American Insurance Company [IHC], *Application for Individual Limited Short Term Medical Expense Insurance* (Feb. 2019).

[190] [Pivot Health] Companion Life Insurance Company, *Group Short Term Medical Plan Application* (Aug. 2018); Golden Rule Insurance Company, *Application for Short Term Medical Insurance* (June 20, 2017); Everest Reinsurance Company, *Individual Short Term Medical Plan Insurance Enrollment Form* (n.d.); LifeShield National Insurance Company, *Medical Questions* (n.d.); National General Accident & Health, *Short Term Medical Enrollment – Client Form* (n.d.); Independence American Insurance Company [IHC], *Application for Individual Limited Short Term Medical Expense Insurance* (Feb. 2019); Arkansas BlueCross BlueShield, *Application for Short Term* (n.d.).

[191] Everest Reinsurance Company, *Individual Short Term Medical Plan Insurance Enrollment Form* (n.d.); LifeShield National Insurance Company, *Individual Short Term Medical Pan Insurance Enrollment Form* (n.d.).

[192] Everest Reinsurance Company, *Individual Short Term Medical Plan Insurance Enrollment Form* (n.d.); LifeShield National Insurance Company, *Individual Short Term Medical Pan Insurance Enrollment Form* (n.d.).

[193] [Pivot Health] Companion Life Insurance Company, *Group Short Term Medical Plan Application* (Aug. 2018); Everest Reinsurance Company, *Individual Short Term Medical Plan*

- Multiple sclerosis, paraplegia, or quadriplegia;[194]
- Muscular dystrophy;[195]
- Blood/bleeding disorders including but not limited to: hemophilia, anemia, aplastic, thalassemia, hemolytic, hemorrhagic, agranulocytosis, pancytopenia, thrombocytopenia, von willebrand disease, Wegener's granulomatosis, or rare factor deficiencies;[196]
- Leukemia; and[197]
- Pancreas illness.[198]

All STLDI insurers deny coverage to individuals who are pregnant or an expectant parent. Five of the eight STLDI insurers also deny coverage to individuals who are in the process of adoption, or undergoing fertility treatment. Most STLDI insurers deny coverage to individuals who have been diagnosed with AIDS, AIDS related complex, or tested positive for HIV, and some STLDI plans reviewed require applicants to disclose whether they have been diagnosed or treated for AIDS or HIV within the last five years. Some STLDI insurers also deny coverage to female applicants who weigh over 250 or 275, pounds and male applicants who weigh over 300 or 325 pounds.

- NHIC's short-term policies in some states require applicants to disclose whether they have been hospitalized for a mental illness in the last five years or have seen a psychiatrist more than five times within the last twelve months. Individuals who have been hospitalized for a mental illness are denied coverage.[199] The

---

*Insurance Enrollment Form* (n.d.); LifeShield National Insurance Company, *Medical Questions* (n.d.).

[194] [Pivot Health] Companion Life Insurance Company, *Group Short Term Medical Plan Application* (Aug. 2018); Golden Rule Insurance Company, *Application for Short Term Medical Insurance* (June 20, 2017); National Health Insurance Company, *Enrollment Form for Short Term Medical Insurance* (2018); Independence American Insurance Company [IHC], *Application for Individual Limited Short Term Medical Expense Insurance* (Feb. 2019).

[195] [Pivot Health] Companion Life Insurance Company, *Group Short Term Medical Plan Application* (Aug. 2018).

[196] [Pivot Health] Companion Life Insurance Company, *Group Short Term Medical Plan Application* (Aug. 2018); Golden Rule Insurance Company, *Application for Short Term Medical Insurance* (June 20, 2017); Everest Reinsurance Company, *Individual Short Term Medical Plan Insurance Enrollment Form* (n.d.); Independence American Insurance Company [IHC], *Application for Individual Limited Short Term Medical Expense Insurance* (Feb. 2019).

[197] [Pivot Health] Companion Life Insurance Company, *Group Short Term Medical Plan Application* (Aug. 2018)

[198] Everest Reinsurance Company, *Individual Short Term Medical Plan Insurance Enrollment Form* (n.d.).

[199] National General Accident & Health, *Summary of Online Enrollment* (EHealth-EC-00000723, EHealth-EC-00000950 (MO app)).

company also requires applicants in certain states to disclose whether they are on medication or have received medical treatment for anxiety or depression.

- IAIC requires applicants to disclose whether they have taken controlled substances (opioids) for pain treatment or pain management, or if the applicant is prescribed more than four medications.[200]
- IAIC also requires applicants to disclose whether have undergone sex reassignment surgery or are in the process of sex reassignment surgery.[201]

STLDI plans also require individuals to disclose whether they have had any type of medical testing performed and have not received results or have been advised by a medical professional to have treatment, testing or surgery that has not been performed.[202]  NHIC also requires applicants to disclose whether they have consulted a health care professional for signs and symptoms of a medical condition for which a diagnosis has not been determined within the last 12 months.[203]

A majority of STLDI insurers do not maintain data on the percentage of consumers denied coverage.  Only two STLDI insurers under the Committee's investigation maintain data on the percentage of consumers denied coverage.

### 2.  Some STLDI Plans Provide Coverage to Individuals with Pre-Existing Conditions, but Enrollees are Exposed to Significant Cost-Sharing

**Three of the companies under the Committee's investigation offer coverage to individuals with pre-existing conditions, despite the fact that their policies exclude coverage for pre-existing conditions**.

- LifeMap and BCI do not require applicants to complete an extensive health questionnaire as part of the application process.[204]  LifeMap and BCI offer

---

[200] Independence American Insurance Company, *Application for Individual Limited Short Term Medical Expense Insurance* (2018) (IHC00000181 – IHC00000184.pdf).

[201] *Id.*

[202] Golden Rule Insurance Company, *Application for Short Term Medical Insurance* (June 20, 2017); National Health Insurance Company, *Enrollment Form for Short Term Medical Insurance* (2018); [Pivot Health] Companion Life Insurance Company, *Group Short Term Medical Plan Application* (Aug. 2018); Independence American Insurance Company, *Application for Individual Limited Short Term Medical Expense Insurance* (2018) (IHC00000181 – IHC00000184.pdf).

[203] National Health Insurance Company, *Application for Short Term Medical Insurance* (2018) (NHIC STM 2018 IND).

[204] Letter from Blue Cross of Idaho Health Service, Inc., to Rep. Frank Pallone, Jr., Chairman, House Committee on Energy, Rep. Anna G. Eshoo, Chairwoman, Subcommittee on Health, Rep. Diana DeGette, Chair, Subcommittee on Oversight and Investigations (Apr. 30,

coverage to applicants regardless of their health status, with the exception of women who are pregnant. While both companies accept applicants regardless of health status, the companies exclude coverage of pre-existing conditions.[205][206] Both LifeMap and BCI offer STLDI plans that exclude coverage of basic preventive care, including routine exams and screening procedures.[207][208]

- Arkansas BCBS also issues coverage to individuals with a pre-existing condition under two of its plans, despite the fact that all of Arkansas BCBS's products exclude coverage for pre-existing conditions for the first 12 months.[209][210]  Some individuals enrolled in Arkansas BCBS's STLDI plans are also subject to surcharge of up to 300 percent related to their health condition.  These same consumers are also subject to the pre-existing conditions exclusion for the first 12 months despite paying a surcharge related to their health status.

- Arkansas BCBS conducts an extensive review of applicants prior to approval for two of its STLDI plans.[211][212]  Arkansas BCBS requests the entirety of the

---

2019); Letter form Chris Blanton, President & CEO, LifeMap, to Rep. Frank Pallone, Jr. Chairman, House Committee on Energy and Commerce, Rep. Anna G. Eshoo, Chairwoman, Subcommittee on Health, Rep. Diana DeGette, Chair, Subcommittee on Oversight and Investigations (Apr. 19, 2019).

[205] Blue Cross of Idaho, *Short Term PPO* (2017) (BCI_00000006).

[206] LifeMap, *Non-Renewable Short Term Medical Insurance Policy* (May 2013) (LM-E&C-000101).

[207] Blue Cross of Idaho, *Short Term PPO Individual Policy, Outline of Coverage,* Exclusions *and Limitations Section* (BCI_00000031).

[208] LifeMap, *Non-Renewable Short Term Medical Insurance Policy* (May 2013) (LM-E&C-000101).

[209] Letter from Curtis E. Barnett, CEO, Arkansas BlueCross BlueShield, to Rep. Frank Pallone, Jr., Chairman, House Committee on Energy and Commerce (May 2, 2019).

[210] The Committee has represented this information as it existed at the point in time in which the documents were produced to the Committee. On June 18, 2020, Arkansas BCBS informed the Committee that the company had made changes to two of the STLDI policies effective April 1, 2020.  The company informed the Committee that two of its products will offer coverage for pre-existing conditions for the entirety of the plan duration.

[211] Arkansas BlueCross BlueShield, *Application for Short-Term Blue, Non-Discrimination and Language Assistance Notice* (Nov. 4, 2017) (Application for Complete ArkBCBS. ABCBS-000777).

[212] The Committee has represented this information as it existed at the point in time in which the documents were produced to the Committee. On June 18, 2020, Arkansas BCBS informed the Committee that the company had made changes to two of the STLDI policies effective April 1, 2020, and that it will no longer require medical and prescription drug records from applications prior to enrollment.

applicant's medical and prescription drug records from the applicant's health care providers for up to seven years prior to the application date.[213]  The consumer is required to sign an authorization to allow "any medical professional, medical care institution, pharmacy organization, pharmacy benefit manager, or other provider of health care services or supplies, as well as any individual, company, or prior insurance carrier possessing relevant medical, health, treatment or payment information to provide Arkansas BCBS and its affiliate or agent's information" all protected health information for the applicant.  The company then requests detailed information from the enrollee's providers on all conditions present, date (s), type(s) of treatment, medication(s), frequency of treatment, lab/diagnostic/pathology report(s), hospital summaries, diagnosis, and genetic health appraisal.  After receiving all of the information noted above, the company then determines the applicant's eligibility for coverage.

### 3.  STLDI Insurers Exclude Coverage for Pre-Existing Conditions

**The Committee's investigation finds that most STLDI insurers exclude coverage for pre-existing conditions, and any complications resulting from a pre-existing condition.**  The STLDI plans generally define a pre-existing condition as any illness, medical condition or injury for which medical advice, diagnosis, case or treatment was recommended or received within the applicable lookback period, which ranges from 6 to 60 months depending on applicable state requirements, immediately preceding the effective date of the policy.  A condition is also considered a pre-existing condition if it had manifested itself in such a manner that would have caused an ordinary prudent person to seek medical advice, diagnosis, care or treatment within the applicable lookback period, which ranges from 6-60 months depending on applicable state requirements, immediately preceding the effective date of the policy.

**While all insurers offer STLDI plans that exclude coverage for pre-existing conditions, some STLDI plans offered by IAIC, Arkansas BCBS, Golden Rule, and LNIC do offer limited coverage for pre-existing conditions.**

- Arkansas BCBS offers pre-existing conditions protection for two types of its products, but consumers are still subject to a 12-month pre-existing condition waiting period.[214] [215] Any medical conditions existing prior to the effective date of the policy are not covered until the policy has been in effect for 12 months.

---

[213] Letter from CEO, Arkansas BlueCross BlueShield, to Rep. Frank Pallone, Jr., Chairman, House Committee on Energy and Commerce (Aug. 23, 2019) (Letter 100 and 103 are in Appendices F.3 and F.4).

[214] Letter from Curtis E. Barnett, CEO, Arkansas BlueCross BlueShield, to Rep. Frank Pallone, Jr., Chairman, House Committee on Energy and Commerce (May 2, 2019).

[215] The Committee has represented this information as it existed at the point in time in which the documents were produced to the Committee.  On June 18, 2020, Arkansas BCBS informed the Committee that the company made changes to two of the STLDI policies effective

- Golden Rule also offers limited coverage for pre-existing conditions for individuals who purchase the company's TriTerm policy for up to 36 months. However, pre-existing conditions are covered only after the individual has been enrolled for 12 months.[216]
- IAIC offers one STLDI product that provides coverage for certain pre-existing conditions up to a maximum of $25,000.[217]
- LNIC offered a pre-existing conditions waiver that provided limited coverage for pre-existing conditions for consumers who renewed their STLDI plans.[218]  The waiver provided coverage of pre-existing conditions for medical conditions that were diagnosed or the symptoms started while the consumer was insured under a previous STLDI plan offered by LNIC, and the STLDI plans were issued consecutively.[219]

### G.   STLDI Plans Offer Limited Benefits and Limited Financial Protection

STLDI plans subject consumers to higher cost-sharing, greater financial risk, and include lifetime limits on coverage.  While STLDI plans have lower premiums than ACA-compliant plans,[220] these plans are exempt from all of the ACA's consumer protection provisions and provide very limited coverage, and limited protection against significant or catastrophic medical costs.  STLDI plans are exempt from the ACA's guaranteed availability requirement, community rating (including gender and age rating protections), and the requirement that plans cover ten categories of essential health benefits, including prescription drugs, maternity coverage, and mental health and substance use disorder.  STLDI plans are also not subject to the prohibition on

---

April 1, 2020, and that these products will now include coverage for pre-existing conditions protections.

[216] UnitedHealthcare, Golden Rule Insurance Company, *Producer Guide, TriTerm Medical Plans* (Feb. 25, 2019) (NG000665, Golden Rule Brochure).

[217] Letter from Independence Holding Company, to Rep. Frank Pallone, Jr., Chairman, House Committee on Energy and Commerce, Rep. Anna G. Eshoo, Chairwoman, Subcommittee on Health, Rep. Diana DeGette, Chair, Subcommittee on Oversight and Investigations (May 24, 2019).

[218] Letter from LifeShield National Insurance Company, to Rep. Frank Pallone, Jr., Chairman, House Committee on Energy and Commerce May 6, 2019) (Waiver of Pre-Existing Conditions Rider, LN-3005).

[219] *Id.*

[220] *Understanding Short-Term Limited Duration Health Insurance,* Kaiser Family Foundation (Apr. 23, 2018) (www.kff.org/health-reform/issue-brief/understanding-short-term-limited-duration-health-insurance); *Why Do Short-Term Health Insurance Plans Have Lower Premiums Than Plans That Comply with the ACA?,* Kaiser Family Foundation (Oct. 31, 2018) (www.kff.org/health-reform/issue-brief/why-do-short-term-health-insurance-plans-have-lower-premiums-than-plans-that-comply-with-the-aca/).

annual and lifetime coverage limits, and the annual out-of-pocket limits that protect consumers from large health care costs.

### 1. STLDI Plans Exclude Coverage of Many Common Medical Conditions

The Committee finds that STLDI plans exclude coverage for many common medical conditions resulting from pre-existing conditions, as well as coverage of basic medical services that consumers would reasonably expect to be covered by health insurance. The Committee finds that consumers who develop a medical condition have their claims denied by some STLDI insurers, because the medical condition was excluded from coverage or deemed to be due to a pre-existing medical condition.

In addition to pre-existing condition exclusions, STLDI plans exclude coverage of a range of other common medical conditions, varying greatly from plan to plan. These coverage limitations are for medical conditions regardless of whether the condition is pre-existing or not, thereby adding an additional layer of confusion and complication for consumers. Below is an illustrative list of some of the medical conditions that may be excluded from coverage regardless of whether they arise during the term of coverage or were pre-existing:

- Pregnancy, routine pre-natal care, childbirth, post-natal care;
- Mental, emotional or nervous disorder, including routine or periodic mental examination;
- Substance use disorder;
- Suicide or attempted suicide or self-inflected injury while sane or insane;
- Prescription drugs;
- Chronic fatigue or pain disorders;
- Sleep disorder;
- Learning disabilities;
- Kidney or end stage renal disease;
- Treatment or diagnosis of allergies;
- Treatment for cataracts;
- Kidney disease;
- Acquired Immune Deficiency Syndrome (AIDS)/ Human Immuno-deficiency Virus (HIV);
- Skin disease;
- Eye surgery;
- Coverage exclusions apply for the following medical conditions for the first six months of coverage:
    - Total or partial hysterectomy;
    - Tonsillectomy;
    - Adenoidectomy;
    - Repair of deviated nasal septum or any type of surgery involving the sinus;
    - Myringotomy;
    - Tympanotomy;
    - Herniorrhaphy;
    - Cholecystectomy;

App. 174

- Coverage limitations apply for the following medical conditions:
  - Appendectomy
  - Knee injury
  - Kidney stones
  - Gallbladder surgery
- Care or treatment for the feet;
- Transplants of bone marrow, liver, heart, heart/lung combinations, lung, corneas, kidneys, pancreas, pancreas/kidney combinations, brain tissue or brain membrane, islet tissue, pancreas, intestine, pituitary and adrenal glands, hair transplants;
- Outpatient occupation therapy, outpatient speech therapy, inpatient or outpatient custodial care;
- Treatment of obesity or morbid obesity;
- Expenses for replacement of artificial limbs or eyes.

### 2.  All STLDI Plans Exclude Coverage for Basic Services

The Committee finds that STLDI insurers fail to provide coverage for basic medical services that consumers would reasonably expect to be covered by health insurance.  ACA required plans in the individual market to provide coverage for ten categories of benefits: (1) ambulatory patient services; (2) emergency services; (3) hospitalization; (4) maternity and newborn care; (5) mental health and substance use disorder services including behavioral health treatment; (6) prescription drugs; (7) rehabilitative and habilitative services and devices; (8) laboratory services; (9) preventive and wellness services and chronic disease management; and (10) pediatric services, including oral and vision care.

STLDI insurers often exclude coverage entirely for maternity and newborn care, prescription drugs, rehabilitative services, and some exclude coverage entirely for mental health and substance use disorders.  **Some STLDI plans that include coverage of prescription drugs, mental health and substance abuse disorder treatment, ambulatory care, emergency services, and hospitalization impose draconian limits on the coverage.**  Some STLDI plans also decline to provide coverage of basic preventive care.

60

### a. *Some STLDI Plans Exclude Coverage of Basic Preventive Care*

Some STLDI plans exclude coverage for routine tests or screenings procedures and physical examinations.[221] [222]  Golden Rule offers STLDI plans that provide a benefit of up to $200 per person per policy term for preventive care wellness checks but includes a 6-month waiting period.[223]  LifeMap offers plans that exclude coverage of pelvic exams and pap smear exams,[224] and several STLDI plans exclude routine or preventive immunization.[225]  A number of insurers exclude coverage of contraception, including birth control pills, implants, injections, supply, treatment device or procedure.[226]

Although these coverage limitations are not particularly common, the Committee has strong concerns about these coverage limitations on preventive services, which are not in the interest of public health.  In particular, the exclusion of pap smears and pelvic exams is questionable given that these services are not even particularly costly, and appear to be driven by risk selection considerations and the desire to avoid enrolling women of childbearing age.  The Committee finds these coverage limitations to be discriminatory and not in the interest of public health.

---

[221] LifeMap, *Short Term Medical Insurance for Idaho Individuals and Families, Exclusions (cont.)* (Dec. 2018) (LifeMap LM-E&C-00009); Independence American Insurance Company, *Individual Short Term Medical Expense Insurance Policy, Section 5- Exclusions and Limitations from Coverage* (IHC 00330); BlueCross of Idaho, *Short Term PPO Individual Policy, Outline of Coverage, Inpatient Notification Section* (BCI 00045); Pivot Health, *Short Term Medical* (Attachment B Pivot Brochure); Golden Rule Insurance Company, *Sample Short Term Network Provider Medical Expense Coverage, Outline of Coverage for Policy Form IST6.1-P-GRI-10* (GRIC003988).

[222] The Committee notes that it is not a widespread industry practice to exclude routine tests or screening procedures, and that this was observed in only some plans offered by two STLDI insurers.

[223] UnitedHealthcare, Golden Rule Insurance Company, *Producer Guide, TriTerm Medical Plans* (Feb. 25, 2019) (NG000665, Golden Rule Brochure).

[224] LifeMap, *Short Term Medical Insurance for Idaho Individuals and Families, Exclusions (cont.)* (Dec. 2018) (LifeMap LM-E&C-00009).  However, the company also offers some plans that include coverage for pap smear exams.

[225] LifeMap, *Short Term Medical Insurance for Oregon Individuals and Families* (Jan. 1, 2019) (LifeMap Exhibit 3 LM-E&C-00029), Pivot Health, *Short Term Medical* (Attachment B Pivot Brochure); BlueCross of Idaho, *Short Term PPO Individual Policy, Outline of Coverage, Inpatient Notification Section* (BCI 00045)

[226] LifeMap, *Non-Renewable Short Term Medical Insurance Policy, Exclusions and Limitations* (May 2013) (LifeMap E&C-000124); Independence American Insurance Company, *Individual Short Term Medical Expense Insurance* (IHC 0031-0055); BlueCross of Idaho, *Short Term PPO Individual Policy, Outline of Coverage, Inpatient Notification Section* (BCI 00045).

### b.   STLDI Plans Exclude Altogether or Limit Coverage of Prescription Drugs

The Committee finds that most STLDI plans exclude or limit coverage for outpatient prescription drugs.  **Pivot, Golden Rule, LNIC, Arkansas BCBS, NHIC, IAIC, and Everest offer STLDI plans that do not include prescription drug benefits**.[227] [228]

The Committee finds that some STLDI plans that offer prescription drug coverage impose significant limitations on the coverage.

- Golden Rule offers STLDI plans that apply dollar maximum cap of $3,000 on outpatient prescription drugs.[229]
- Arkansas BCBS offers STLDI policies that cap prescription drug coverage at $1,000 per member per policy.[230]

### c.   STLDI Plans Discriminate Against Individuals with Mental Health and Substance Use Disorders

**The Committee finds that major STLDI insurers discriminate against individuals with mental health and substance use disorders**.  Some STLDI plans require applicants to disclose whether they have been diagnosed with a mental disorder, bipolar disorder, substance use disorder, schizophrenia, or eating disorder.  Patients who respond affirmatively are denied coverage.  NHIC also requires applicants in certain states to disclose in the plan applications

---

[227] Pivot Health, *Short Term Medical*; UnitedHealthCare, Golden Rule Insurance Company, *Short Term Medical Plans, Highlights of Covered Expenses* (Apr. 11, 2019) (GRIC000097); Golden Rule Insurance Company, *Sample Policy, Agreement and Consideration* (Dec. 1, 2016)(GRIC000957);  LifeShield National Insurance Company, *Individual Short Term Medical Insurance Policy* (Generic LNG-3000); Arkansas BlueCross BlueShield, *Limited Duration Health Insurance Plans* (2019) (ARKBCBS-00528); Arkansas BlueCross BlueShield, *PPO Short-Term Major Medical Policy* (ARKBCBS-000040); Everest Reinsurance Company, Short-Term Medical Insurance Certification of Coverage (EAH 005240815), Everest *FlexTerm Health Insurance* (Oct. 6, 2018); UnitedHealthCare, Golden Rule Insurance Company, *Short Term Medical Plans, Highlights of Covered Expenses* (Apr. 11, 2019) (GRIC000097); Golden Rule Insurance Company, *Sample Policy, Agreement and Consideration* (June 1, 2016) (GRIC000229); National General Accident & Health, *Sample Policy Packet* (Jan. 3, 2019); Independence American Insurance Company, *Individual Short Term Medical Expense Insurance Policy, Section 5- Exclusions and Limitations from Coverage* (IHC0000219).

[228] LNIC has ceased offering STLDI plans.

[229] Golden Rule Insurance Company, *Sample Policy, Plus Elite, Agreement and Consideration* (GRIC001072); UnitedHealthCare, Golden Rule Insurance Company, *Short Term Medical Plans, Highlights of Covered Expenses* (Apr. 11, 2019) (GRIC000097).

[230] Arkansas BlueCross BlueShield, *Limited Duration Health Insurance Plans, Benefits at a Glance* (ABCBS-000532).

whether they have been hospitalized for a mental illness within the last five years or visited a psychiatrist more than 5 times during the last 12 months preceding the date of the application.[231] Applicants that have been hospitalized with a mental illness within the last five years are denied coverage.  The company also requires applicants in certain states to disclose whether they are on medication or have received medical treatment for anxiety or depression.[232]

The Committee finds that most STLDI plans do not provide coverage for mental health and substance use disorders or provide extremely limited coverage.  **Golden Rule, LifeMap, NHIC, and IAIC offer STLDI policies that exclude treatment of mental health and substance use disorders from coverage.**[233]  Some STLDI plans also specifically exclude coverage for autism, schizophrenia, psychosis, bipolar disorder, and depression.

**STLDI plans that do offer coverage for mental health and substance abuse treatment impose significant limits on coverage.**  For instance, STLDI plans from Everest, LNIC, NHIC, and Pivot include a $100 maximum per day and a 31-day maximum for inpatient care.  Some of these same plans include a $50 maximum per outpatient visit and a 10-day maximum for outpatient care.[234]

The Committee finds that STLDI plans deny claims that stem from mental health and substance use disorders.  In one instance, a consumer was billed approximately $100,000 for treatment related to substance use disorder.[235]  IAIC initially denied the claim and asserted that any claims related to substance use disorder is excluded from the policy.  The company subsequently reconsidered the claim due to state mandate on chemical dependency treatment, but

---

[231] National General Accident & Health, *Short Term Medical Enrollment – Client Form* (EHealth-EC-00000718 (NG Indiana)).

[232] National Insurance Health Company, *Application for Short Term Medical Insurance* (EHealth-EC-00000976(IND application)).

[233] Golden Rule Insurance Company, *Sample Short Term Network Provider Medical Expense Coverage, Outline of Coverage for Policy Form IST6.1-P-GRI-10* (GRIC003988)*;* National General Accident & Health, *Short Term Medical for use in Maryland, Limitations and Exclusions* (Mar. 31, 2019) (NG000260); Independence American Insurance Company, *Individual Short Term Medical Expense Insurance Policy, Section 5- Exclusions and Limitations from Coverage* (IHC0000022, NG000513); LifeMap, *Short Term Medical Insurance for Oregon Individuals and Families* (Jan. 1, 2019) (LifeMap Exhibit 3 LM-E&C-00029).

[234] Pivot Health, *Short Term Medical*; Everest, *FlexTerm Health Insurance* (Oct. 6, 2018); LifeShield National Insurance Company, *Short Term Medical Insurance Certificate of Coverage* (2018) (Generic LNG-3001 STMCertificate_Plan2_2019); National General Accident & Health, *Sample Policy Packet*.

[235] IHC Health Solutions, Health Administration Exchange, *Explanation of Benefits* (2018) (IHC00005758); IHC Health Solutions, Health Administration Exchange, *Explanation of Benefits* (2018) (IHC00005760); IHC Health Solutions, Health Administration Exchange, *Explanation of Benefits* (2018) (IHC00005736).

only paid $2,000.  STLDI plans also exclude coverage for medical claims arising from attempted suicide or self-harm.  The Committee finds that it is a common practice for STLDI insurers to deny claims that stem from self-inflicted harm.[236]  In data provided to the Committee, an STLDI insurer denied hundreds of claims due to self-inflected harm.[237]

### 3.   All STLDI Plans Impose Limitations & Exclusions on Benefits Covered

STLDI plans impose significant limitations and exclusions on the limited benefits and services they cover.  Many of these plans impose significant limitations on doctor's office visits, hospitalization, emergency services, prescription drugs, and mental health and substance use disorders.  Consumers are often left with exorbitant medical bills and out-of-pocket costs for sparse coverage.

Some STLDI plans reviewed provide coverage for hospitalization, emergency room services, and surgical services subject to cost-sharing, including deductible, copayments and coinsurance.  NHIC, BCI, Golden Rule, LifeMap, Arkansas BCBS, and Everest offer STLDI plans that include coverage for doctor's office visits, hospitalization, urgent care visits, and emergency room visits subject to cost-sharing, including deductible and coinsurance.[238] However, these plans still impose maximum coverage limits and lifetime limits.

A number of STLDI plans impose draconian coverage limitations for illnesses, injuries, and conditions arising after a consumer purchases a policy.

---

[236] Pivot Health, *Short Term Medical* (Attachment B Pivot Brochure), Independence American Insurance Company, *Individual Short Term Medical Expense Insurance Policy, Section 5- Exclusions and Limitations from Coverage* (IHC00000315); LifeMap, *Short Term Medical Insurance for Oregon Individuals and Families* (Jan. 1, 2019) (LifeMap Exhibit 3 LM-E&C-00029); Golden Rule Insurance Company, *Sample Short Term Network Provider Medical Expense Coverage, Outline of Coverage for Policy Form IST6.1-P-GRI-10* (GRIC003988); National General Accident & Health, *Sample Policy Packet*; LifeShield National Insurance Company, *Individual Short Term Medical Insurance Policy* (Generic LNG-3000); Everest Reinsurance Company, Short-Term Medical Insurance Certification of Coverage (EAH 005240815).

[237]  The company provided the Committee a detailed breakdown of claim denial rates, including the basis for denial. The company denied over 600 claims due to self-inflicted harm for the 2017 and 2018 plan year.

[238] National General Accident & Health, *Sample Policy Packet*; Independence American Insurance Company, *Individual Short Term Schedule of Benefits* (IHC0000251); Everest, *FlexTerm Health Insurance* (Oct. 6, 2018); Golden Rule, *Short Term Medical Policy* (GRIC0000189); LifeMap,  *Short Term Policy;* Blue Cross of Idaho, *Short-Term PPO Outline of Coverage Brochure;* Arkansas BlueCross BlueShield, *Complete Short-Term Policy Schedule of Benefits.*

> A consumer enrolled in a STLDI plan by IAIC **was billed approximately $222,000 after suffering a heart attack.**[238] **Meanwhile, the company only paid $13,131** and denied the rest of the claims due to maximum payable benefits.[239]  The consumer was ultimately responsible for approximately $172,000.

The consumer was enrolled in a STLDI plan that limited hospital intensive care unit services to $1,250 per day, and emergency room treatment to $500 per day.  The company wrote to the patient that the patient's claims had reached the maximum payable benefits.

- According to a consumer complaint, a consumer enrolled in a LNIC plan was billed $30,000 for an emergency surgery.[241]  The consumer was enrolled in a STLDI plan that provided a maximum of $250 for emergency room visit, and a maximum of $1,250 for outpatient surgical facility.[242]
- A consumer enrolled in a STLDI plan by IAIC was billed approximately $22,000 while the company paid approximately $5000.  IAIC denied the rest of the claim stating that it exceeded the maximum allowable benefit.[243]

### a. *Some STLDI Plans Impose Limitations on Physician Office Visits*

Some STLDI plans provide coverage for doctor's office visits subject to cost-sharing, including coinsurance, copayments, and deductible.  For example, NHIC, BCI, Golden Rule, LifeMap, and Arkansas BCBS offer STLDI plans that provide coverage for doctor's office visits

---

[239] Letter from Complainant, to Consumer Affairs Division, Arizona Department of Insurance (2018) (IHC00001562 – IHC00001563).

[240] Letter from IHC Carrier Solutions, Independence Holding Group, to Arizona Department of Insurance, Consumer Protection Division (2018) (IHC00001564 – IHC00001660).

[241] Letter from Investigator, Minnesota Commerce Department, to LifeShield National Insurance Company (Sept. 10, 2019) (LNIC_EC_C000842).

[242] Letter from Assistant Vice President, Director of Compliance, LifeShield National Insurance Company, to Investigator, Minnesota Department of Commerce (2019) (LNIC_EC_C00846).

[243] Letter from Standard Security Life Insurance, Independence Holding Group, to Consumer Specialist, Arizona Department of Insurance, Consumer Affairs (2018) (IHC00006642).

subject to coinsurance and the plan's deductible.[244]  However, some STLDI plans impose limitations on basic services consumers would reasonably expect insurance to cover such as doctor's office consultations.

Some STLDI plans reviewed impose a maximum limit of three doctor's office visits for the duration of the policy, or $500 maximum per policy period.

- IAIC offers some STLDI plans that provide coverage for doctor's office visits subject to deductible and coinsurance, but the company also offers STLDI policies that limit doctor's visit consultations between one to three visits.[245]  IAIC also offers plans that limit doctor's office visits to a maximum of $1,000 per person, and $500 maximum for inpatient doctor visits for hospital confinement.[246]
- Golden Rule offers some STLDI plans that limit doctor's visit to one per policy period for a plan of 90 days duration, and limit it to three doctor's visits for plans with duration of 181 days or more.[247]
- Everest offers some STLDI plans that limit doctor's office visits to a maximum of three visits per coverage period per person.[248]
- LNIC's STLDI plans limited doctor's office visits to a maximum of three visits with copayment, or limited doctor's visits for inpatient hospital services to a maximum of $500 per coverage period.[249]  LNIC also offered STLDI plans that limit doctor's visit to a maximum of $200 per coverage period.[250]

### b.  Some STLDI Plans Impose Limitations on Hospitalization

---

[244] National General Accident & Health, *Sample Policy Packet*; Golden Rule, *Short Term Medical Policy* (GRIC0000189); LifeMap, *Short Term Policy;* Blue Cross of Idaho, *Short-Term PPO Outline of Coverage Brochure;* Arkansas BlueCross BlueShield, *Complete Short-Term Policy Schedule of Benefits.*

[245] Independence American Insurance Company, The IHC Group, *Short Term Health Insurance* (2018) (IHC0000419); Independence American Insurance Company, The IHC Group, *Interim Coverage Plus* (2018) (IHC0000430).

[246] Independence American Insurance Company, *Schedule of Benefits* (IHC0000062 – IHC0000064).

[247] Golden Rule Insurance Company, *Key to Data Page Variables in Sample Policies/Certificates and Other Explanations* (GRIC001798)*.*

[248] Agile Health Insurance, *Everest STM* (Everest exhibit 2(c)).

[249] LifeShield National Insurance Company, *LifeShield Advantage and LifeShield Flex Plans* (Apr. 10, 2019) (Exhibit III LNG 3001).

[250] LifeShield National Insurance Company, *Merit STM* (Exhibit III LNG-3200 NCE Merit STM Brochure).

App. 181

Some STLDI policies reviewed provide coverage for hospitalization subject to cost-sharing, including copayment, coinsurance, and deductible.  For example, NHIC, Arkansas BCBS, BCI, and LifeMap offer STLDI plans that provide coverage for hospitalization subject to deductible and coinsurance.[251]  IAIC and Everest offer some STLDI plans that provide coverage for hospitalization services subject to the average standard room rate or the amount billed for semi-private room.[252]  **However, the Committee finds that a number of STLDI plans impose significant limitations on coverage for hospitalization and intensive care unit services.**

- A number of policies reviewed limit coverage for hospital services ranging from a maximum of $500 or $1,000 per day to $10,000.[253]
- A patient was billed approximately $14,000 after being hospitalized for pneumonia.[254]  In a letter to the patient, LNIC wrote that the plan's maximum payable benefit for inpatient hospital stay is $1,000 per day," and therefore, "the maximum payable benefit of $2,000 will be paid to the provider."[255]
- Another patient enrolled in a LNIC policy was billed approximately $22,000 in medical bills for an emergency procedure.  In a letter to the patient, the company wrote that the maximum payable benefit for inpatient stay is $1,000 per day, and the maximum payable benefit for ER visit is $250.00.  The company only paid approximately $7,000 of a $35,500 bill. [256]

---

[251] National General Accident & Health, *Sample Policy Packet*; LifeMap, *Short Term Policy;* Blue Cross of Idaho, *Short-Term PPO Outline of Coverage Brochure;* Arkansas BlueCross BlueShield, *Complete Short-Term Policy Schedule of Benefits.*

[252] Independence American Insurance Company, *Individual Short Term Schedule of Benefits* (IHC0000251); Everest, *FlexTerm Health Insurance* (Oct. 6, 2018).

[253] Independence American Insurance Company, *Schedule of Benefits* (IHC0000062-IHC0000064)*; LifeShield National Insurance Company, *Individual Short Term Medical Insurance Policy* (LifeShield (LNG 3001); Agile Health Insurance, *Everest STM* (Everest exhibit 2(c)).

[254] Letter from Insurance Analyst, Consumer Services, Life and Health Section, Colorado Department of Regulatory Agencies, to LifeShield National Insurance Company (2019) (LNIC_EC_C000731);  Letter from Assistant Vice President, Director of Compliance, LifeShield National Insurance Company, to Colorado Department of Regulatory Agencies, Division of Insurance (2019) (LNIC_EC_C000763).

[255] Letter from Director of Compliance, LifeShield National Insurance Company, to Complainant (2019) (LNIC_EC_C000763).

[256] Office of Insurance and Safety Fire Commissioner, State of Georgia, *Complaint Form* (Jan. 31, 2019) (LNIC_EC_C000358).

App. 182

While IAIC offers STLDI plans that limit inpatient hospital services to maximum benefit of $10,000 per day and intensive care to $12,500 per day,[257] the company also offers STLDI policies that limit hospital visit to a maximum benefit of $500 per hospital confinement, or not to exceed $1,000 per day.[258]   IAIC also offers some STLDI policies that that limit intensive care unit services not to exceed maximum benefit of $1,250 per day.[259]

Everest offers STLDI plans that limit inpatient hospital services to $1,000 per day and intensive care unit services to $1,250 per day. [260] [261]   LNIC offered STLDI plans that that limited coverage for intensive care unit hospitalization to $1,250 per day and inpatient hospital services to $1,000 per day.[262]

### d.  Some STLDI Plans Impose Severe Limitations on Emergency Services

Some STLDI plans impose severe limitations on coverage for emergency services, one of the main reasons consumers purchase health insurance.  STLDI plans offered by insurers including Golden Rule, Arkansas BCBS, IAIC, and NHIC, provide coverage for emergency room services subject to cost-sharing including the plan deductible.  Some of these plans require emergency room copayment of $250 or $500 per visit, and any additional covered expenses are subject to the deductible amount and coinsurance percentage.  **However, LNIC offered STLDI plans that include a limit of $750 per day for all emergency room expenses.[263]  LNIC also offered STLDI plans that limit emergency room coverage to $250 per visit.[264]  As a result, patients are billed thousands of dollars in medical bills for common emergency room visits such as pneumonia, appendicitis, and kidney infection.  Patients are also billed thousands**

---

[257] Independence American Insurance Company, *Schedule of Benefits* (IHC00062-IHC00064).

[258] Independence American Insurance Company, *Schedule of Benefits* (IHC00000248-IHC00000250); The IHC Group, *Fixed Benefit Plan Combo and Interim Coverage Combo* (2018) (IHC00000463).

[259] Independence American Insurance Company, *Schedule of Benefits* (IHC000249).

[260] Agile Health Insurance, *Everest STM* (Everest exhibit 2(c)).

[261] The Committee has represented this information as it existed at the point in time in which the documents were produced to the Committee.  On June 18, 2020, Everest informed the Committee that the company had ceased offerings products with these limitations.

[262] LifeShield National Insurance Company, *Individual Short Term Medical Insurance Policy* (LifeShield (LNG 3001)).

[263] LifeShield National Insurance Company, *Individual Short Term Medical Insurance Policy* (Individual Policy LA (LN-3001 LA)); LifeShield National Insurance Company, *Merit STM* (Exhibit III LNG-3200 NCE Merit STM Brochure).

[264] LifeShield National Insurance Company, *Individual Short Term Medical Insurance Policy* (Exhibit III LNG 3001 HIIQ STM Brochure).

**of dollars for necessary and life-threatening medical treatment**.  According to a consumer complaint, a patient was billed over $30,000 for an emergency room visit, and LNIC denied parts of claim asserting that it was subject to the maximum payable benefit.  In a letter to the patient, the company wrote that the maximum payable benefit for an ER visit is $250, and the maximum payable benefit for outpatient surgical facility is $1,250 per day.[265]

IAIC offers STLDI plans limit emergency room coverage to a maximum of $500 per day.[266] [267]  Everest offers some plans that limit emergency services not to exceed three visits per policy period.[268]  A consumer enrolled in an IAIC plan wrote in a complaint that he was billed approximately $10,000 for an emergency room visit while the plan only paid $500.[269]  In a letter to the patient, the company wrote that the maximum payable benefits for emergency room services is $500 per day.[270]

### e.   Some STLDI Plans Limit Coverage and Impose Exclusions for Surgery Services

Some STLDI plans offer coverage for surgery services subject to deductible and coinsurance.  For example, IAIC and NHIC offer STLDI plans that provide coverage for surgery expenses subject to deductible and coinsurance.[271]  However, some insurers offer STLDI plans that limit coverage for surgery and intensive care services, and impose limitations on coverage for surgery services.

---

[265] Letter from Investigator, Minnesota Department of Commerce, to LifeShield National Insurance Company (2019) (LNIC_EC_C000842),

[266] Independence American Insurance Company, *Schedule of Benefits* (IHC0000062-IHC0000064).

[267] The Committee has represented this information as it existed at the point in time in which the documents were produced to the Committee.  On June 22, 2020, IAIC informed the Committee that the company ceased offerings products with these limitations on March 2020.

[268] Everest, *FlexTerm Health Insurance* (2018).

[269] Email from Wisconsin Office of the Commissioner of Insurance, to Standard Security Life Insurance Company of New York (2018) (IHC0001870); IHC Health Solutions, Health Administration Exchange, *Explanation of Benefits* (2018) (IHC00001893-IHC00001895).

[270] Wisconsin Complains Insurance Company Access, *Complaint* (IHC00001869); Letter from Insurance Paralegal, IHC Carrier Solutions, Independence Holding Group, to Wisconsin Office of the Commissioner of Insurance (2018) (IHC00001894).

[271] National General Accident & Health, *Sample Policy Packet*; Independence American Insurance Company, *Individual Short Term Schedule of Benefits* (IHC0000251).

- Everest offers STLDI plans that limit outpatient surgery to a maximum of 3 surgeries per covered person.[272]
- LNIC offered some policies that limit coverage for outpatient surgical facility to maximum benefit of $1,250 per day.[273]
- IAIC offers some STLDI plans limit outpatient surgery services to a maximum of $1,000 per day or a maximum benefit of $2,500 per surgery for surgeon services.[274]

A number of other short-term policies provide coverage of up to $5,000 per surgery for surgeon expenses, not to exceed $10,000 per coverage period.[275]  Examples of coverage limitations for surgery services also include $2,500 maximum for joint surgery, and $2,500 maximum for gallbladder surgery.[276]

NHIC offers some STLDI plans that exclude coverage for surgery expenses during the first six months of coverage.  A consumer was billed over $30,000 for a cholecystectomy and NHIC denied parts of the claims.[277]  The company asserted that expenses for that particular surgery was excluded from coverage during the first six months.[278]  NHIC denied another consumer's claims for anesthesia services during surgery and other medical services.  The company asserted that the claim was ineligible for coverage based on the plan's policy limitations and exclusions.  The plan excluded expenses and benefit for "joint replacement or other treatment of joints, spine, bones or connective tissue including tendons, ligaments and cartilage." [279]  NHIC also denied part of the consumer's claim due to pre-existing conditions exclusions.

---

[272] Everest, *FlexTerm Health Insurance* (2018).

[273] LifeShield National Insurance Company, *Individual Short Term Medical Insurance Policy* (Exhibit III LNG-3001).

[274] Independence American Insurance Company, *Schedule of Benefits* (IHC00000062-IHC00000064); Independence American Insurance Company, *Schedule of Benefits* (IHC00000248-IHC00000250).

[275] LifeShield National Insurance Company, *Individual Short Term Medical Insurance Policy* (LNG-3001, Individual Policy_LA Plan).

[276] Agile Health Insurance, *Everest Prime STM* (Everest exhibit 2(b)); LifeShield National Insurance Company, *Individual Short Term Medical Insurance Policy* (LNIC Individual_Policy_LA_Plans).

[277] Letter from Complainant, to Appeals Department, National General Accident & Health (2018) (NG001663).

[278] Letter from Correspondence Team, National General Accident & Health, to Complainant (2018) (NG001584).

[279] Letter from Correspondence Team, National General Accident & Health, to Complainant (2018) (NG000813).

### f.   STLDI Plans Impose Lifetime Limits, Exposing Consumers to Significant, Unexpected Health Care Costs

STLDI plans include severely limited benefits, impose lifetime limits, and require significant cost-sharing from consumers.  While the ACA banned annual and lifetime limits, all STLDI plans include lifetime limits.  The ACA also imposed an annual out-of-pocket maximum on the amount that consumers have to pay for covered services in a given year.  However, STLDI plans are exempt from these requirements, exposing consumers to significant financial risk.

STLDI plans impose maximum benefit limits and lifetime limits.  STLDI plans cap covered benefits between $250,000 to $2,000,000 per policy.  However, despite having lifetime limits as high $2,000,000 per policy, these companies may actually pay very little in claims costs.  Some STLDI plans have coinsurance rates that range from 20 to 50 percent, and deductibles that range between $1,000 to $25,000.[280]

- IAIC and Everest offer STLDI plans with deductibles as high as $10,000 and coinsurance rates as high as 50 percent.[281]
- Golden Rule offers short-term policies with deductibles as high as $12,500 and a 40 percent coinsurance rate.[282]
- NHIC offers STLDI plans with deductibles as high as $25,000.[283]
- A number of STLDI plans also impose a maximum benefit limit of $3,000 for prescription drugs.[284]

These practices are outright banned in the ACA-compliant market.  However, some STLDI plans pay a limited amount in health care claims cost compared to consumers.  Consumers enrolled in STLDI plans may be forced to pay a large share of their medical bills out-of-pocket.

---

[280] National General Accident & Health, *Short Term Medical* (2018) (NGAH 5.25.18); The IHC Group, Independence American Insurance Company, *Connect 2.0, Short-term medical insurance for individuals and families* (2018) (IHC000349).

[281] Independence American Insurance Company, *Short Term Health Insurance* (2018); Everest, *FlexTerm Health Insurance* (Oct. 6, 2018).

[282] Golden Rule Insurance Company, *Sample Policy* (Aug. 2017) (GRIC003446); Golden Rule Insurance Company, *Sample Policy* (Apr. 2017) (GRIC000229).

[283] National General Accident & Health, *Short Term Medical* (May 2018) (NGAH STMASSOCIATIONBRO.05.25.18).

[284] Golden Rule Insurance Company, *Sample Policy, One Parent Family* (Aug. 2017) (GRI00187).

App. 186

### g.   *STLDI Plans Impose Waiting Periods*

Some STLDI insurers impose waiting periods for any type of illness, including 30-day waiting periods for cancer.[285]  STLDI plans also impose 5-day waiting periods, even in instances when a consumer has a medical emergency.[286]  Some STLDI plans also impose a 6-month waiting period for surgery.[287]

- In one instance, LNIC denied all claims for a medical emergency and the patient was billed $17,000.  In a letter to the patient, the company wrote that the consumer is entitled to "receive benefits for sicknesses that begin, by occurrence of symptoms and/or receipt of treatment more than 5 days" after the consumer enrolls in the product, and that her symptoms started three weeks prior to the date of coverage.[288]
- LNIC denied another consumer's claims due to the 5-day waiting period.[289]
- Everest denied all claims for an emergency procedure, and the patient was billed approximately $14,000 due to the fact that the medical procedure happened during the waiting period.[290]  In a letter to the patient, the company wrote that the claims are denied due to the waiting period provision.
- In another instance, NHIC denied claims for over $30,000 for a surgery citing the plan's waiting period policy.[291]

Based on the consumer complaints documents provided to the Committee, the Committee finds various instances of consumers whose claims were outright denied due to the waiting period policy by STLDI plans.

---

[285] Pivot Health, *Short Term Medical* (Attachment B Pivot Brochure); Everest Reinsurance Company, Short-Term Medical Insurance Certification of Coverage (EAH 005240815; LifeShield National Insurance Company, *Individual Short Term Medical Insurance Policy* (Individual Policy LA).

[286] *Id.*

[287] Letter from Correspondence Team, National General Accident & Health, to Complainant (2018) (NG001584).

[288] International Benefits Administrations, *Explanation of Benefits* (2018) (LNIC_EC_C000266); Letter from Assistant Vice President, Director of Compliance, LifeShield National Insurance Company, to Nevada Division of Insurance (2019) (LNIC_EC_C000270).

[289] Letter from LifeShield National Insurance Company, to Rep. Frank Pallone, Jr. Chairman, House Committee on Energy and Commerce (LNIC complaints log).

[290] Letter from State of Washington, Office of Insurance Commissioner, to Everest Reinsurance Company (2018) (Everest Complaint #6 (WA).

[291] Letter from Complainant, to Appeals Department, National General Accident & Health (2018) (NG001663); Letter from Correspondence Team, National General Accident & Health, to Complainant (2018) (NG001584).

**H.    All STLDI Plans Discriminate Against Women**

The Committee finds that all STLDI plans discriminate against women.  These plans engage in discriminatory practices that negatively impact women by charging women more than men and denying women basic medical services.

- LifeMap offers some STLDI plans that exclude coverage for basic preventive screening procedures or routine tests, including pelvic exams and pap smear exams.[292][293]
- BCI denied claims for a mammogram screening and the patient was billed the full amount.  The company wrote in a letter to the patient that the screening was related to a pre-existing condition as she previously had a mammogram screening where a mass was found in the patient, which had occurred while the patient was enrolled in a previous STLDI plan by BCI.[294]
- NHIC also denied a consumer's claim for contraceptive services.  In a letter to the patient, the company wrote that that "the plan does not include benefits for drugs or devices used directly or indirectly to promote or prevent conception."[295]

**All STLDI plans require women to disclose whether they are pregnant.  Most STLDI plans also require women to disclose whether they are an expectant parent, in the process of adoption, or in the process of undergoing infertility treatment.  Women who respond affirmatively are denied coverage.**  STLDI plans reviewed also consider a pregnancy existing on the effective date of coverage as a pre-existing condition.  STLDI plans by Golden Rule note that "a pregnancy existing on the effective date of coverage will be considered a pre-existing condition."[296]  **The Committee finds that all STLDI plans reviewed do not provide coverage for maternity and newborn care.  Some STLDI plans also exclude routine pre-natal care, childbirth and post-natal care from coverage.[297]**

---

[292] LifeMap, *Short Term Medical Insurance for Idaho Individuals and Families* (Dec. 2018) (LifeMap LM-E&C-00008, LM-E&C-00009).

[293] LifeMap offers policies in Idaho that exclude coverage for pelvic exams and pap smears.

[294] Letter from Complainant, to Blue Cross of Idaho (Date redacted) (BCI_00000533).

[295] Letter from Manager, Contract and Policy Administration, National General Accident & Health, to Compliance Specialist, Policyholder Service, Office of Commissioner of Security and Insurance, State of Montana (2018) (NG001598).

[296] Golden Rule Insurance Company, *Sample Short Term Medical Expense Policy, Definitions* (Apr. 2017) (GRIC002769); Golden Rule Insurance Company, *Sample Short- Term Non-Renewable Medical Expense Policy, Section 10- Reimbursements* (June 2018) (GRIC01821); Golden Rule Insurance Company, *Sample Short Term Medical Expense Policy, Definitions* (Apr. 2017) (GRIC000238).

[297] Pivot Health, *Short Term Medical* (Attachment B Pivot Brochure); Agile Health Insurance, *Everest Prime STM* (Everest exhibit 2(b)).

**BCI requires pregnant women who submit claims to disclose the date of their menstrual cycle.**[298]  The company then determines the date of conception, and if the date of conception is prior to the effective date of contract, the company denies the claims related to the pregnancy.   In one instance, a woman alleged that did not know she was pregnant at the time she enrolled in the company's STLDI plan.  However, BCI denied her claims, and in a letter to the patient, the company wrote "a pregnancy that exists at the time of effective date of coverage is considered to be pre-existing."[299]  In the underlying consumer complaints, the consumer alleged that she had no way of knowing she was pregnant as she had experienced a regular menstrual cycle two days prior to enrolling in the STLDI plan, and that "I had no way of knowing until there was enough pregnancy hormone in my system to show a positive reading."

**STLDI insurers also practice "gender-rating", and charge women more than men for the same coverage in states that allow gender rating.**  Under the ACA, qualified health plans are not allowed to charge women more than men, and a study found that this policy cost women more than $1 billion a year pre-ACA.[300]  In documents provided to the Committee, some STLDI insurers charge women up to 1.5 times more for the same coverage.  One STLDI insurer charges women between 30-34 years old up to twice the rate for men for the same coverage.  Some insurers charge women between 30-45 years up to 30 percent more than men for the same coverage.

BCI denied claims for an endometrial ablation noting that the patient had a history of heavy menstrual bleeding.[301]  In another instance, a woman was billed $18,000 for a medical procedure, and BCI denied the claim on the basis that the patient had a history of "heavy and painful periods,"[302] and that the medical procedure was due to pre-existing conditions.  The company further wrote that "your condition of excessive and frequent menstruation…would have caused an ordinarily prudent person to seek advice, diagnosis, care or treatment prior to your effective date of coverage."[303]

---

[298] Letter from Blue Cross of Idaho, to Rep. Frank Pallone, Jr., Chairman, House Committee on Energy and Commerce, Rep. Anna G. Eshoo, Chairwoman, Subcommittee on Health, Rep. Diana DeGette, Chair, Subcommittee on Oversight and Investigations (Apr. 30, 2019) (Business claims manual) (BCI_0000928).

[299] Blue Cross of Idaho, *Provider Inquiry and Appeal Form* (BCI_00000519-BCI_00000530).

[300] National Women's Law Center, *Turning to Fairness: Insurance discrimination against women today and the Affordable Care Act* (Mar. 2012).

[301] Letter from Complainant, to Blue Cross of Idaho (Date redacted) (BCI_00000552-BCI00000593).

[302] Letter from Complainant, to Appeals and Grievance Coordinator, Blue Cross of Idaho (n.d.) (BCI_00000173-BCI00000181).

[303] Letter from Grievances and Appeals Specialist, Blue Cross of Idaho, to Complainant (Date redacted) (BCI_00000182-BCI_00000188).

I.   **STLDI Plans Employ Many Ways to Refuse to Pay for Medical Care After Claims Arise**

The Committee's investigation finds that all STLDI insurers engage in heavy-handed back end tactics that significantly limit their financially liability for medical claims and to avoid paying medical claims that do arise.  **Across all STLDI insurers under the Committee's investigation, it is a common industry practice for STLDI plans to deny claims for medical care through a process known as post claims underwriting.**  All STLDI insurers engage in intrusive and burdensome administrative processes by requiring consumers to submit extensive medical records dating back six months up to five years.  Insurers then conduct an extensive review process to determine whether the medical condition for which the claim was submitted was due to a pre-existing condition or whether the health condition should have been disclosed by the applicant in the plan application.  In these cases, if the insurer determines that the individual had a pre-existing condition, claims may be denied.  Patients who fall seriously ill or injured during the term of coverage are subsequently left in the lurch and may be saddled with hundreds of thousands of dollars in medical debt.

STLDI insurers require consumers to provide a list of past health care providers dating back many years.  These companies also require consumers and the consumers' providers to submit medical and prescription drug records, including the names of any medication and pharmacies utilized.

1.   **STLDI Plans Deny Claims Related to Pre-Existing Conditions**

The Committee finds that STLDI insurers often deny claims following a lengthy medical investigation if they make a determination that the medical claims and expenses incurred were due to pre-existing conditions, or that resulted from pre-existing conditions.  **The Committee reviewed thousands of consumer complaints document from eight STLDI insurers in reaching these determinations.**

- A consumer was billed over $65,000 for treatment of a heart condition.[304]  IAIC denied the consumer's claim, asserting that the medical records demonstrate that the patient previously sought treatment for "heart attack, abnormal electrocardiogram, and echocardiography."[305]
- Another patient was billed over $20,000 for seeking treatment.  IAIC denied the claims on the basis that the consumer's medical records indicate that the

---

[304] Letter from Investigator, Minnesota Commerce Department, to Standard Security Life Insurance Company of New York (2018) (IHC00002939).

[305] Letter from Insurance Compliance Specialist, IHC Carrier Solutions, Independence Holding Group, to Consumer Protection & Education Division, Minnesota Department of Commerce (2018) (IHC00002896).

consumer previously received medical advice, consultation or treatment for "other neurological disorder" prior to coverage.[306]

Based on the documents provided to the Committee by Golden Rule, the company denies consumers' claims for a range of medical conditions and treatment asserting that the claims submitted were due to pre-existing conditions.[307] [308] [309]

- In one instance, Golden Rule denied medical services for a consumer who needed neurophysiological monitoring services that the consumer's provider deemed as medically necessary.  Golden Rule asserted that the claim for the medical services was due to pre-existing conditions.[310]
- In another instance, Golden Rule denied a consumer's claim asserting that the patient was previously diagnosed with anxiety disorder and hyperlipemia.[311]

### 2.  STLDI Plans Deny Claims for Cancer Treatment

In the Committee's review of consumer complaints documents, the Committee finds a number of consumer complaints for denial that were due to cancer.  This is unsurprising given cancer is a high cost condition to treat, and it appears that STLDI insurers attempt to avoid paying claims for cancer patients.  **Some STLDI plans the Committee reviewed deny claims related to cancer treatment and leave cancer patients in a lurch with thousands of dollars in unpaid medical bills.**

---

[306] Standard Security Life Insurance Company of New York, *Application for Individual Limited Short Term Medical Expense Insurance* (2016) (IHC00002369); Letter from Legal/Compliance, IHC Carrier Solutions, Independence Holding Group, to Analyst, Colorado Division of Insurance (2018) (IHC00002438).

[307] Letter from Complainant, to Specialist, Medical History Review, Golden Rule Insurance Company (2018 11516 Golden Rule).

[308] Letter from Senior Appeals Representative, Golden Rule Insurance Company, to Complainant (2018 07621 Golden Rule).

[309] Letter from Senior Appeals Representative, Golden Rule Insurance Company, to Complainant (2018 10920 Golden Rule).

[310] Letter from Professional Reimbursement Specialist, to Golden Rule Insurance Company (2018 12434 Golden Rule).

[311] Letter from Senior Appeals Representative, Golden Rule Insurance Company, to Complainant (2018 12461 Golden Rule).

- A cancer patient was billed over $100,000 for treatment of a brain tumor.  IAIC denied the patient's claim, and in a letter to the patient, the company wrote that the patient's diagnosis was considered a pre-existing condition.[312]
- In another instance identified in a consumer complaint, a cancer patient was billed $70,000 for cancer treatment.[313]  IAIC denied the claims citing the consumer's medical records that indicated the patient previously received a referral for cancer.[314]
- Golden Rule denied a cancer patient's chemotherapy treatment and in a letter to the patient, the company asserted that the patient's claims were for pre-existing condition.[315]
- There are also a couple of instances in which BCI has denied cancer patients' medical claims.  In one instance, a consumer was billed approximately $21,000 for a surgery to remove a tumor.[316]  The company denied the claim and wrote to the patient that the definition of a pre-existing condition includes those which would cause "an ordinary prudent person to seek treatment" prior to the effective date of coverage, and that "no clinical documentation has been present that would establish your symptoms started between your date of coverage" and when seen by the health care provider.
- Another consumer's claim for a cancer surgery was also denied by BCI, and the consumer was billed nearly $20,000.[317]  In a letter to the patient, the company wrote "that you only received a diagnosis and sought treatment after you purchased the policy does not negate the fact that a reasonable person would have sought treatment."

### 3.  STLDI Plans Deny Claims for Surgery

The Committee finds that some STLDI insurers deny claims stemming from lifesaving surgeries or medically necessary surgeries.

---

[312] Letter from Insurance Compliance Specialist, IHC Carrier Solutions, Independence Holding Group, to Consumer Consultant, Consumer Service Division, Indiana Department of Insurance, State of Indiana (2018) (IHC00001917-IHC00001921, IHC00001922-IHC00001923).

[313] Email from Complainant, to Message Center, State of Illinois (2018) (IHC0002839).

[314] Letter from Insurance Paralegal, IHC Carrier Solutions, Independence Holding Group, to Illinois Department of Insurance (2018) (IHC00002842).

[315] Letter from Senior Appeals Representative, Golden Rule Insurance Company, to Complainant (2018 13515 Sep Oct Golden Rule).

[316] Letter from Complainant, to Blue Cross of Idaho (Date redacted) (BCI_00000792-BCI_00000797).

[317] Letter from Complainant, to Grievance and Appeals Department, Blue Cross of Idaho (Date redacted) (BCI_00000719-BCI_00000732).

- BCI denied one consumer's claims for a heart surgery, and the patient was stuck with an approximately $230,000 medical bill.  The company wrote to the patient that his claim was denied because the patient had experienced "chest burning symptoms" in the past, and had a history of peripheral arterial disease, hypertension, hyperlipidemia among other conditions.[318]
- BCI also denied another patient's medical claim for hand surgery, leaving the patient with $30,000 in medical claims.  The consumer's medical records indicated that the consumer had "wrist pain prior to the effective date of the policy."[319]
- IAIC denied a consumer's claim for a sinus surgery and the patient was billed more than $45,000.[320]  IAIC claimed that the surgery was due to pre-existing conditions because the consumer previously experienced shoulder pain, chest congestion, coughing, sore throat, chronic sinusitis, and headaches.
- IAIC denied a consumer's claim for over $100,000 for a hip replacement surgery. The company asserted that the hip surgery was due to pre-existing conditions.[321]
- A consumer was billed approximately $43,000 for a surgery after Golden Rule refused to pay the claims.[322]  Golden Rule denied the claim on the basis of pre-existing conditions.
- NHIC denied a patient's medical claims for a surgery, and the patient was subsequently billed approximately $64,000 according to documents provided to the Committee.[323]  In a letter to the patient, the company stated that the patient was previously diagnosed with a number of health conditions, which the company determined to be pre-existing conditions.

---

[318] Letter from Complainant, to Appeals Department, Blue Cross of Idaho. (Date redacted) (BCI_0000158-BCI10000167).

[319] Letter from St. Luke's Orthopedics, to Appeals/Grievance, Blue Cross of Idaho (Date redacted) (BCI_0000137-BCI1000157).

[320] Letter from Insurance Operations Specialist, Department of Insurance, Securities and Banking, Government of the District of Columbia, to Standard Security Life Insurance Company (2019) (IHC00004573, IHC00004644).

[321] Email from Complainant, to Illinois Department of Insurance (2019) (IHC00004945, HC00005045).

[322] Letter from Senior Appeals Representative, Golden Rule Insurance Company, to Complainant (2019) (2018 14988 Golden Rule).

[323] Letter from Life, Accident & Health Intake Unit, Complaints Resolution, Texas Department of Insurance, to National Health Insurance (2018) (NG001226); Letter from Manager, Contract and Policy Administration, National General Accident & Health, to Life, Accident & Health Intake Unit, Complaints Resolution, Texas Department of Insurance (2017) (NG000963, NG0000937, NG001226).

- Another consumer was billed over $110,000 for a sinus surgery.  NHIC denied the claims noting that the consumer was previously seen for acute bronchitis and sinusitis.[324]
- One consumer's claim for gallbladder surgery was denied, and based on the consumer's written complaint, the consumer was billed over $30,000.[325]  NHIC asserted that expenses for gallbladder surgery are excluded from coverage during the first six months of the plan.[326]
- Similarly, the company initially denied another consumer's claim for gallbladder surgery.  However, NHIC processed the claims after the consumer filed an appeal with the Arizona Department of Insurance's Office of Administrative Hearings.[327]

### 4.  STLDI Plans Deny Claims for "At-Risk" Consumers

The Committee finds that some STLDI insurers deny claims if they believe that it resulted from a pre-existing condition, that there were risk factors present at time of enrollment, or the medical condition manifested itself in such a manner that would have caused an ordinary prudent person to seek medical advice, diagnosis, care or treatment dating back up to five years. Additionally, some companies refuse to pay medical claims for individuals who are diagnosed with medical conditions and seek treatment after enrolling in a STLDI plan, including in instances where only risk factors or symptoms are present at the time of enrollment.

> In one instance, a consumer was billed approximately $14,000 which was then reduced to $7,500.  Everest denied the claims, and in a letter to the patient, **the company wrote that its pre-existing condition exclusion includes "any symptoms which would have caused a reasonable prudent person to seek diagnosis, care or treatment prior to the Coverage Effective Date."**[328]

---

[324] Letter from Complainant, to National General Accident & Health (2017) (NG001674).

[325] Letter from Complainant, to Appeals Department, National General Accident & Health (2018) (NG001663).

[326] Letter from Correspondence Team, National General Accident & Health, to Complainant (2018) (NG001584).

[327] Letter from Vice President & Corporate Counsel, National General Accident & Health, to Complainant (2018) (NG000730).

79

- IAIC denied claims for a patient who was billed approximately $20,000 for emergency room and urgent care visits for rhabdomyolysis.[329]  The company's investigation found that the patient previously experienced "back pain" and muscular cramps."[330]
- Golden Rule denied a consumer's claim for a heart procedure, citing the exclusion for pre-existing conditions.  According to the consumer's complaint, the patient had previously "complained of tugging or pulling in the chest."[331]
- In one instance, a consumer was billed approximately $29,000 and LifeMap denied the claims.  LifeMap engaged in what the Committee views as an intrusive and invasive post-claims review process, and subsequently refused to pay the patient's medical claims.  The company wrote that the symptoms occurred and existed during the five-year preceding the effective date of coverage.[332]
- In another instance, a patient was billed approximately $15,000 and LifeMap denied all claims.[333]  The company wrote to the patient that the symptoms existed prior to the effective date of the policy for which a prudent person would have sought medical diagnosis and treatment.[334]
- A consumer was billed $7,000, and Arkansas BCBS denied all claims due to pre-existing condition.[335]  In a letter to the patient, the company wrote that the consumer's "symptoms were such that they would have caused an ordinarily prudent person to seek diagnosis, care or treatment."[336]

---

[328] Letter from Insurance Regulatory Analyst, South Carolina Department of Insurance, to Director, Compliance-Product Management, Everest National Insurance Company (2018) (Everest Complaint #1 (SC)).

[329] Letter from Insurance Compliance Specialist, IHC Carrier Solutions, Independence Holding Group, to Life, Accident & Health Intake Unit, Complaints Resolution, Texas Department of Insurance (2018) (IHC00002463).

[330] Medical History Records (2016) (IHC00002791).

[331] Letter from Complainant, to Grievance Administrator, Golden Rule Insurance Company (2018) (2018 01653 Golden Rule).

[332] Letter from Consumer Advocate, Department of Consumer and Business Services, State of Oregon, to LifeMap Assurance Company (2019) (LM-E&C-000481).

[333] State of Washington, Office of Insurance Commissioner, *Complaint* (2017) (LM-E&C-000402).

[334] Letter from Senior Audit and Appeals Analyst, LifeMap Assurance Company, to Consumer Advocacy, State of Washington (LM-E&C-000406).

[335] Letter from Attorney at Law, to Senior Counsel Appeals, Arkansas BlueCross BlueShield (2018) (ABCBS-000801).

[336] Letter from Senior Counsel, Appeals, Arkansas BlueCross BlueShield, to Complainant (2018) (ABCBS-000847).

- A patient was billed approximately $11,000 after having a tonsil procedure.[337] BCI denied the claims based on the pre-existing conditions exclusion, which includes "a condition that would have caused an ordinary prudent person" to seek care, and that the patient had a history of tonsillitis and recurring sore throat.
- In another instance, a patient was billed approximately $70,000 for a surgery to remove a mass.[338]  Even though the patient's provider wrote to the insurance company that the basis for the surgery was not "pre-existing", the company denied the claims. In a letter to the patient, the company wrote that the patient's history of pelvic pain and prior symptoms were considered to be pre-existing condition, which includes those that would have caused a prudent person to seek care.[339]
- BCI also refused to a pay for a consumer's heart stent surgery, and the patient was billed nearly $52,000.[340]  The company's medical investigation determined that the surgery stemmed from a pre-existing condition.
- A consumer was billed approximately $25,000 for a shoulder surgery and the company denied the claims.[341]  The company wrote to the patient that "without any acute trauma, the only way to explain the need for surgical intervention is that it had been previously torn."
- Another consumer's claim for shoulder surgery was denied by BCI, and the consumer was billed $20,000.[342]  The company wrote that the patient has a history of right shoulder pain and had previously been treated for shoulder pain.

### 5.  STLDI Plans Deny Claims for Routine Medical Services and Procedures

The Committee finds that some STLDI plans deny claims for routine medical services and procedures, claiming that the medical conditions and procedures are stemming from pre-existing conditions.

- BCI denied a patient's claim for treatment of osteoarthritis, stating that there were certain symptoms present prior to the effective date of coverage, including

---

[337] Letter from Medical Director, Internal Medicine, Blue Cross of Idaho, to Complainant (Date redacted) (BCI_00000412-BCI_00000415).

[338] Letter from Provider, to Blue Cross of Idaho, (Date redacted) (BCI_00000197).

[339] Letter from Physician Reviewer, Blue Cross of Idaho, to Complainant (Date redacted) (BCI_00000241).

[340] Letter from Complainant, to Appeals & Grievance Coordinator, Blue Cross of Idaho (Date redacted) (BCI_00000424-BCI00000430).

[341] Letter from Blue Cross of Idaho Physician Reviewer, to Complainant (Date redacted) (BCI_00000262-BCI_00000269).

[342] Letter from Complainant, to Blue Cross of Idaho (Date redacted) (BCI_00000485-BCI_00000495).

"difficulty staying asleep, muscle stiffness, muscle soreness, severe fatigue, decreased energy and weight gain."[343]

- BCI also denied a patient's medical bill for a colonoscopy, stating that the patient's medical records indicate that the patient previously had "bleeding with bowel movement and hemorrhoids."  In a letter to the company, the patient alleged that he had not been previously diagnosed with any bowel issues or condition.[344]

- Another patient had her claims denied for a colonoscopy and biopsy.[345]  The company claimed that the basis for the denial was the fact that the patient experienced issues with "diarrhea and constipation" in the past, and that the patient does "not have to be diagnosed with any definitive condition for the symptoms to be considered pre-existing".

- The company denied another consumer's claim for a biopsy, asserting that it was due to pre-existing conditions.[346]

### 6.   STLDI Plans Deny Claims for Missing Documentation

All companies require consumers and their health care providers to provide medical and prescription drug records dating back six months to up to five to seven years.  Claims are not paid until a final determination is made regarding whether the medical claim filed is due to a pre-existing condition.  **STLDI plans close or deny claims if the consumer or the consumer's provider fail to submit the medical and prescription drug records within the time period requested.[347]  Based on the claims manuals reviewed by the Committee, a number of the STLDI insurers also reserve the right to deny claims due to "lack of information."**

STLDI insurers require consumers and their health providers to submit extensive medical records in order to prove that the condition for which the claim was submitted is not in fact pre-existing.  STLDI plans request treatment notes, previous surgery dates, previous treatment dates, any complications and dates of those complications, history of previous doctor's visits, and doctor's office notes.  In some instances, Golden Rule also contacts the broker who sold the

---

[343] Letter from Blue Cross of Idaho Physician Reviewer, to Complainant (Date redacted) (BCI_000000248).

[344] Letter from Complainant, to Blue Cross of Idaho (Date redacted) (BCI_00000344-BCI_00000350).

[345] Letter from Complainant, to Grievance & Appeals Coordinator, Blue Cross of Idaho (Date redacted) (BCI_00000351-BCI_00000356).

[346] Letter from Medical Director, Blue Cross of Idaho, to Complainant (Date redacted) (BCI_0000121-BCI000136).

[347] STLDI insurers will reopen the underlying claim for review if the health care provider submits the requested materials after the initial time period. However, the review window is often limited to one year.

underlying policy, and asks for detailed information regarding the consumer, including the broker's relationship with the consumer and the type of information they have on the consumer.

**The Committee finds that STLDI companies deny claims if the consumer or the consumer's provider fail to submit the extensive medical documentations within the time period requested.  Sometimes, the consumer or the consumer's health care providers is provided 30 days to submit all medical and prescription drug records dating back many years.**  Some STLDI plans have denied claims in instances where only one of the consumer's past medical provider failed to submit the medical documentation in time.

- A consumer enrolled in a Golden Rule STLDI plan had his claims for an emergency appendectomy initially denied.  Golden Rule asserted that they had not received the medical records from the provider within the timeframe requested. After months of delay and medical investigation, Golden Rule finally processed the consumer's claims.[348]
- Another consumer's claim was originally denied by NHIC because the consumer's health care provider failed to submit the medical records requested.[349] After a medical investigation, the company determined that the claims were not due to pre-existing conditions, and the company finally proceed the consumer's claims.[350]
- Another consumer filed a complaint noting the significant delays by IAIC to resolve their claims.[351]  The company indicated that it could not process the claim until all medical records were received from the health care provider.

STLDI companies will reopen the underlying claim for review if the health care providers submit the requested materials after the initial time period.  However, the review window is often limited to one year.  Additionally, consumers encounter significant delays in getting their claims resolved, and that the process for receiving and reviewing the medical records can be lengthy.  It is fairly routine for consumers' claims to be pending or denied until the STLDI insurer conducts a lengthy medical investigation.  There are examples in which NHIC originally did not pay consumers' claims, asserting that they did not have all the medical records requested from the consumers or the consumers' providers.  The company processed the claims

---

[348] Letter from Medical History Review Specialist, Golden Rule Insurance Company, to Department of Insurance, State of Missouri (2018 04020 Golden Rule).

[349] Email from Insurance Specialist III, Division of Consumer Services, Florida Department of Financial Services, to National General Insurance Company (2018) (NG001669).

[350] Letter from Manager, Contract and Policy Administration, National General Accident & Health, to Florida Department of Financial Services (2018) (NG001623).

[351] Letter from Life and Health Analyst, Consumer Assistance/Claims Division, Oklahoma Insurance Department, to Standard Security Life Insurance Company of New York, IHC Health Solutions, Inc. (2017) (IHC00001863-IHC00001865).

only after consumers appealed or filed complaint with state regulators.[352][353]  NHIC took months to process another patient's claim and to reach the determination that the claim submitted was not related to a pre-existing condition.[354]  In another instance, a consumer was informed by his health care providers that he could be billed by collection agencies due to the delays by NHIC, which could negatively impact a consumer's credit score.[355]

### 7.  STLDI Plans Refuse to Pay for Medical Claims that Should Be Covered

The Committee finds that some insurers often avoid paying medical claims when the claim should be rightfully covered under the terms of the contract.  In a number of complaints the Committee reviewed, consumers hired outside counsel to have their claims resolved or filed complaints with the state regulators.  The refusal of STLDI plans to pay legitimate claims can result in tremendous financial burden for consumers.  Consumers who cannot afford to retain legal counsel may have their credit rating negatively impacted and are left thousands of dollars in medical debt.

The process to resolve a claim can take many months, and this may affect consumers' credit rating.[356][357]  Consumers may have to pay their medical bills out-of-pocket while their claim is being investigated.

- In one instance, Golden Rule did not make payments for claims for a cancer patient undergoing treatment.[358]  The cancer patient retained attorney and filed an official complaint with the company.

---

[352] Letter from Correspondence Team, National General Accident & Health, to Complainant (2018) (NG001564).

[353] Louisiana Department of Insurance, *LDI Complaint Information* (2018) (NG000783); Letter from Manager, Contract and Policy Administration, National General Accident & Health, to Insurance Specialist III, Louisiana Department of Insurance (2018) (NG000765).

[354] Letter from Manager, Contract and Policy Administration, National General Accident & Health, to Life, Accident & Health Intake Unit, Texas Department of Insurance (2018) (NG000878).

[355] Letter from Senior Insurance Market Examiner, Life and Health Division, State Corporation Commission, Commonwealth of Virginia, to Manager, Aetna Life Insurance Company, Aetna Regulatory Resolution Team (2018) (NG000838).

[356] Letter from Legal Representation of Complainant, to Meritain Health (2018) (NG001343).

[357] Letter from Correspondence Team, National General Accident & Health, to Complainant (2018) (NG000813).

[358] Letter from Attorney at Law, to Golden Rule Insurance Company (2018) (2018 02773 Golden Rule).

- Another cancer patient's medical claims were originally denied by Golden Rule. The company asserted that the patient's testicular cancer was a pre-existing condition.  The company processed the claims only after the consumer retained legal representation and filed an appeal.[359]

Consumers are often billed thousands of dollars and have to navigate complex administrative processes to get their claims resolved.

- NHIC initially did not pay a consumer's medical bill for approximately $62,000, citing the fact that the company is conducting a pre-existing conditions investigative review.  After the consumer filed a complaint and following an investigation, the company finally paid the claim.[360]
- NHIC initially denied claims and rescinded coverage for a patient who was diagnosed with colon cancer.  The company asserted that consumer previously had a pre-existing condition.  However, the decision was overturned after the consumer appealed.[361]
- According to a consumer complaint, NHIC also denied another consumer's claim, noting that it was due to pre-existing conditions.  After the consumer filed a complained with regulators in his state, the company processed the claim.[362]
- NHIC also originally denied coverage for adenoids and nasal turbinates, asserting that it was due to pre-existing conditions.  After the consumer filed a complaint, the company processed the claims.[363]
- NHIC initially denied claims for a consumer who was treated for renal colic based on the pre-existing conditions exclusion. The company asserted that kidney or end stage renal disease is excluded under the policy.  The consumer alleged that he was not previously diagnosed with kidney disease or end stage renal disease, and that those conditions are not related to renal colic.[364]  After the consumer appealed, the company processed the claims.

---

[359] Letter from Senior Appeals Representative, Golden Rule Insurance Company, to Attorneys at Law Office (2018) (2018-12069 Golden Rule).

[360] Letter from Manager, Contract and Policy Administration, National General Accident & Health, to Consumer Assistance Division, Kansas Insurance Department (2018) (NG001634, NG001660).

[361] Letter from Manager, Contract and Policy Administration, National General Accident & Health, to Insurance Investigator, Appeals & Grievance Unit, Maryland Insurance Administration (2018) (NG001363).

[362] Letter from Manager, Contract and Policy Administration, National General Accident & Health, to Florida Department of Financial Services (2018) (NG000895, NG000781).

[363] Letter from Manager, Contract and Policy Administration, National General Accident & Health, to Florida Department of Financial Services (2018) (NG001594).

[364] Letter from Complainant, to Meritian Health (2018) (NG001608).

85

- In one instance, a consumer was billed approximately $85,000 for an emergency procedure, and LNIC denied the claims.[365]  LNIC processed parts of the claim only after the consumer filed a complaint with the Insurance Division of Minnesota Commerce Department.[366]  While the consumer received a network discount, LNIC only paid the maximum payable benefit of $5,250.  The company wrote to the Committee that the remaining $47,000 exceeded the maximum payable benefit under the policy.
- BCI initially refused to provide authorization for a neck and spinal surgery, deeming it a pre-existing condition.[367]  The company overturned its decisions only after the consumer retained an attorney and filed an appeal.
- In another instance, BCI initially refused to pay claims for a gallbladder surgery, and the patient was billed over $30,000.  After subjecting the consumer to the review process and appeals, the company overturned its decision.[368]
- IAIC initially denied claims for a consumer who sought treatment for kidney failure.  IAIC reversed its decision and processed the claims after the consumer filed multiple appeals and wrote an official complaint to state regulators.[369]
- According to a complaint reviewed by the Committee, a consumer who had a preventative colonoscopy experienced over a year delay in getting their claims processed while IAIC conducted an extensive medical investigation.[370]  The company processed the claims after the medical history investigation determined that the colonoscopy was not due to pre-existing conditions.[371]
- In one instance, a consumer hospitalized in the intensive care unit after suffering a hemorrhage and respiratory failure was billed over $113,000.  IAIC initially only paid parts of the claim and wrote to the patient that the inpatient stay was not

---

[365] Minnesota Commerce Department, *Insurance Division Consumer Complaint Form* (2019) (LNIC_EC_C000001).

[366] International Benefits Administration, *Remittance Advice* (2019) (LNIC_EC_C000216).

[367] Letter from Legal Representation of Complainant, to Customer Advocate, Blue Cross of Idaho (BCI_00000327-BCI00000330).

[368] Letter from Complainant, to Blue Cross of Idaho (Date redacted) (BCI_00000275-BCI_00000287).

[369] Letter from Legal/Compliance, Standard Security Life Insurance Company, Independence Holding Group, to Senior Insurance Market Examiner, Bureau of Insurance, Life and Health Division, Commonwealth of Virginia (2018) (IHC00002163); Letter from Senior Insurance Market Examiner, Life and Health Division, State Corporation Commission, Commonwealth of Virginia, to Standard Security Life Insurance Company of New York (2018) (IHC00002103).

[370] Letter from Life and Health Analyst, Colorado Department of Regulatory Agencies, to Independence American Insurance Company (2019) (IHC00004877).

[371] Independence American Insurance Company, *Schedule of Benefits* (IHC00004942).

medically necessary in its entirety.  However, the company processed the claims following appeal.[372] [373]

**J.        Most STLDI Insurers Rescind Coverage**

The Committee finds that most SLTDI insurers rescind policies, leaving consumers uninsured and with exorbitant medical bills.[374]  These STLDI insurers rescind a policy if a determination is made that the enrollee previously had a health condition that should have been disclosed in the plan application.  In some instances, STLDI insurers also deny claims and rescind consumer's plan in instances where the consumer never sought treatment or received an official diagnosis.  In these instances, the company determines that there were risk factors present, such as the patient was advised to have treatment, medical consultation, testing or surgery performed, and that the applicant failed to disclose such information on the plan application.  These companies maintain that the decision to rescind coverage is due to intentional misrepresentation of material fact by the consumer relevant to their decision to extend coverage.  However, the Committee finds that a consumer's coverage is rescinded in some instances where the consumer did not previously receive an official medical diagnosis, but the company asserted that the consumer failed to disclose they had testing performed, or were advised to have further medical evaluation.[375]  **The Committee reviewed rescission policies and consumer complaints documents from eight STDLI insurers in arriving at these conclusions.**

The Committee does not dispute that the companies' rescission policies are in accordance with applicable state laws.  However, the Committee finds the practice of rescinding a consumer's coverage when an individual gets sick or injured deeply concerning.  Through these tactics, STLDI plans significantly limit their financial liability for medical claims.

In some instance, STLDI plans rescind the underlying coverage and also deny medical claims related to pre-existing conditions.

- According to a consumer complaint, a patient was billed $150,000 for treatment of a medical condition after Golden Rule denied the claim and rescinded the underlying policy.  In a letter to the patient, the company wrote that the patient

---

[372] Letter from Correspondence Team, IHC Carrier Solutions, to Complainant (2018) (IHC00006168, IHC00006463)

[373] Letter from Complainant, to Insurance Commissioner Ralph Hudgens, Consumer Services Division, Georgia Insurance Department (2018) (IHC00006471).

[374] The Committee notes that Arkansas BCBS and BCI did not issue rescissions during the 2017 and 2018 plan years.

[375] The Committee notes that the decision to issue rescission requires the companies to provide accurate and verifiable documentation, and to demonstrate that the enrollee made an intentional misrepresentation of material fact.

was previously diagnosed with hypertension, obesity and atrial fibrillation, all of which are pre-existing conditions.[376]

- Golden Rule rescinded a consumer's policy and denied claims because the consumer was previously diagnosed with Hepatitis C.[377]
- According to a consumer complaint, another patient was billed $28,000 for a surgery after Golden Rule rescinded the consumer's coverage.[378]  In a letter to the patient, the company wrote that patient was previously on medication for diabetes and also received a referral to a cardiologist.
- The Committee reviewed multiple consumer complaints' documents from consumers whose policies were rescinded by Golden Rule because they were previously diagnosed with pre-existing conditions or were advised to have further medical evaluation.[379] [380] [381]
- Golden Rule also denied claims and rescinded a consumer's policy after the individual had a shoulder surgery.  In a letter to the patient, the company asserted that the surgery was due to pre-existing conditions because the patient had received an orthopedic evaluation for left shoulder pain and the patient was also previously diagnosed for atrial fibrillation.[382]
- Another consumer's STLDI plan was rescinded by NHIC because the consumer had previously been diagnosed with seizure disorder.[383]

Some STLDI insurers rescind policies if a determination is made that the patient had a health condition that should have been disclosed in the plan application, even in instances where the medical claim is not related to the patient's health condition.

---

[376] Letter from Senior Appeal Representative, Golden Rule Insurance Company, to Complainant (2018) (2018 14048 Golden Rule).

[377] Letter from Senior Appeal Representative, Golden Rule Insurance Company, to Complainant (2018) (2018 10046 Golden Rule).

[378] Letter from Associate Examiner, Insurance Department, State of Connecticut, to Regulatory Affairs Consultant, Golden Rule Insurance Company (2018) (2018 08621 Golden Rule).

[379] Letter from Specialist, Medical History Review, Golden Rule Insurance Company, to Life, Accident & Health Intake Unit, Texas Department of Insurance (2019) (2018 16129 Golden Rule).

[380] Letter from Senior Appeal Representative, Golden Rule Insurance Company, to Complainant (2019) (2018 15067 Golden Rule).

[381] Letter from Senior Appeal Representative, Golden Rule Insurance Company, to Complainant (2018) (2018 14036 Golden Rule).

[382] Letter from Senior Appeal Representative, Golden Rule Insurance Company, to Complainant (2018) (2018 02546 Golden Rule).

[383] Letter from National General Accident & Health, to Complainant (2018) (NG001577).

- In one instance, a patient was billed approximately $187,000 for treatment of heart related condition.[384]  Golden Rule denied the claims and rescinded the plan asserting that the patient had failed to disclose that he was previously diagnosed with diabetes.
- According to a consumer complaint NHIC denied claims and rescinded a consumer's plan after the patient was treated for a bacterial infection.  NHIC asserted that the consumer was ineligible for coverage based on the pre-existing conditions exclusion, having been treated in the preceding 5 years for Hepatitis B. According to the consumer's written complaint, the bacterial infection was unrelated to the Hepatitis B diagnosis.[385]
- Golden Rule rescinded a consumer's plan and denied claims because the patient had failed to disclose in the plan application that she had a history of sickle cell anemia.[386]  The company wrote to the patient that "had we known about your sickle cell anemia, we would not have issued you coverage."
- Another consumer's STLDI plan was rescinded by the company and claims denied because the patient was previously diagnosed with coronary artery disease.[387]
- Golden Rule also rescinded another consumer's policy and denied claims after the consumer had surgery for a broken vertebra.  In a letter to the patient, the company wrote that the patient had a history of "alcohol abuse," and that the patient's medical records note alcohol abuse, anxiety, and major depressive disorder are all pre-existing conditions. The company would not have issued coverage if the company had known about the patient's history of alcohol abuse.[388]

### 1. Some STLDI Plans Rescind Policies if Consumers Previously Exhibited Risk Factors

In some instances, STLDI plans deny claims and rescind plans in some instances where the consumer has never sought treatment or received an official diagnosis, but the company determines that there were risk factors present, such as the patient was advised to have treatment, or received medical consultation, testing or surgery performed.  These companies maintain that

---

[384] Letter from Counsel for Insured, to Appeals Department, Golden Rule Insurance Company (2018) (2018 04207 Golden Rule).

[385] Letter from National General Accident & Health, to Complainant (2018) (NG000789, NG000710).

[386] Letter from Senior Appeal Representative, Golden Rule Insurance Company, to Complainant (2018 00789 Golden Rule).

[387] Letter from Senior Appeal Representative, Golden Rule Insurance Company, to Complainant (2018 02202 Golden Rule).

[388] Letter from Senior Appeal Representative, Golden Rule Insurance Company, to Complainant (2018 00411 Golden Rule).

the decision to rescind coverage is due to enrollee's failure to disclose such information on the plan application, and an intentional misrepresentation of material fact.

- A patient was billed $280,000 after receiving treatment for an infection related to an open wound in his left ankle.  Golden Rule denied all claims and rescinded the consumer's plan.  The company asserted that the patient previously had an ultrasound that revealed findings "suspicious for deep venous thrombosis", and that the patient should have disclosed it in the plan application.[389]
- Golden Rule denied claims and rescinded another consumer's plan. In a letter to the patient, the company wrote that "had we known about your deep vein thrombosis, we would not have issued you coverage."[390]
- Golden Rule rescinded another consumer's coverage because the patient previously had a CT scan prior to enrolling in the company's STLDI plan.  Even though the consumer was not aware of the CT scan's results, the company asserted that the patient should have disclosed in the plan application that he had testing performed.[391]
- Another consumer's claim for a gallbladder surgery was denied and the STLDI plan rescinded by Golden Rule because the consumer previously had an ultrasound that showed gallstones and was advised to seek treatment.[392]
- Golden Rule rescinded a consumer's coverage and denied claims for medical treatment stemming from a motorcycle accident.  The consumer had previously seen a health care provider for insomnia, and fatigue, and the consumer's health care provider had also recommended a prostate cancer screening.  In a letter to the patient, the company wrote that "had known you were recommended to have further evaluation, we would not have issued you coverage."[393]
- Golden Rule rescinded another consumer's coverage and denied claims. The consumer had previously been seen a primary care physician who diagnosed the consumer with paresthesia and recommended a follow-up.[394]

---

[389] Letter from Senior Appeal Representative, Golden Rule Insurance Company, to Complainant (2018 02552 Golden Rule).

[390] Letter from Senior Appeal Representative, Golden Rule Insurance Company, to Complainant (2018 00822 Golden Rule).

[391] Letter from Specialist, Medical History Review, Golden Rule Insurance Company, to Counsel for Insured (2018 12961 Golden Rule).

[392] Letter from Senior Appeal Representative, Golden Rule Insurance Company, to Complainant (2018 14117 Golden Rule).

[393] Letter from Senior Appeal Representative, Golden Rule Insurance Company, to Complainant (2018 04847 Golden Rule).

[394] Letter from Senior Appeal Representative, Golden Rule Insurance Company, to Complainant (2018 02590 Golden Rule).

- Another consumer's medical claims were denied and the coverage rescinded by Golden Rule because the consumer's doctor had heard a "heart murmur" and advised the patient to schedule an echocardiogram.  In a letter to the company, the consumer wrote that he did not exhibit any symptoms and the health care provider had informed him that the heart murmur was harmless.  However, the company maintained the rescission and noted that "had we known of your heart murmur for which you were advised to have echocardiogram, we would not have issued you coverage."[395]
- According to a consumer complaint, Golden Rule rescinded another consumer's coverage and denied all claims for an emergency procedure.  The company upheld the rescission even after the consumer provided the company written letters from previous health care providers who attested that the procedure was not due to pre-existing condition.[396]

In a few instances, STLDI plans rescind coverage if it is determined that consumer was on medication for a medical condition prior to the effective date of coverage.

- According to a consumer complaint, NHIC rescinded the STLDI plan of a breast cancer survivor, even though the consumer was diagnosed with breast cancer prior to the policy's 5-year lookback period.  However, the company asserted that the consumer did not indicate at the time of application that the consumer was still on medication for tamoxifen, a medication that helps prevent breast cancer from developing again.[397]
- Golden Rule rescinded a consumer's plan and denied claims because the consumer was on medication for Plavix, a drug that helps prevent heart attack. The company wrote that had it known of the diagnosis and treatment of heart disease, it would not have issued coverage. [398]
- Another consumer's plan was rescinded by Golden Rule and claims denied because the patient had failed to disclose in the plan application that they were on medication to help manage diabetes.[399]

---

[395] Letter from Senior Appeal Representative, Golden Rule Insurance Company, to Complainant (2018 05479 Golden Rule).

[396] Letter from Senior Appeal Representative, Golden Rule Insurance Company, to Complainant (2018 04527 Golden Rule).

[397] Email from Correspondence, National General Accident & Health, to Complainant (2019) (NG000713); Letter from National General Accident & Health, to Complainant (2018) (NG000733); Letter from National General Accident & Health, to Insured (2017) (NG000891).

[398] Letter from Senior Appeal Representative, Golden Rule Insurance Company, to Complainant (2018 13367 Golden Rule).

[399] Letter from Senior Appeal Representative, Golden Rule Insurance Company, to Complainant (2018 12641 Golden Rule).

### 2.  Some STLDI Plans Rescind Policies of Cancer Patients

The Committee reviewed consumer complaints documents and finds that in a few instances, STLDI insurers rescind coverage of cancer patients, and deny claims related to cancer treatment.

- Golden Rule rescinded a cancer patient's coverage.  The patient previously had a CT scan that showed adrenal mass, and was given a referral for a specialist.  In a letter to the patient, the company wrote that "had we known you were advised for further evaluation and treatment, we would not have issued you coverage."[400]
- Golden Rule also rescinded a colon cancer's patient coverage and denied claims.[401]  The patient had previously undergone a colonoscopy and his provider had recommended that the patient see a general surgical specialist.
- Golden Rule denied claims and rescinded coverage for a consumer who underwent surgery to have her ovary removed.  The company asserted that the surgery was due to pre-existing condition, and cited medical records indicating that the consumer had a history of pelvic pain and ovarian cyst.[402]
- NHIC rescinded another cancer patient's policy who was diagnosed with breast cancer.  The company asserted that the consumer had a lump in her breasts that had doubled in size prior to the effective date of coverage, and thus experienced signs or symptoms of cancer.[403]

## V.      CONCLUSION

The Committee concludes that STLDI plans present a significant threat to the health and financial well-being of American families.  STLDI plans include limited protection for both catastrophic medical costs and routine medical care, and it is unclear what kind of value consumers are getting for their premium dollars, other than a false sense of security.  The Committee staff recommend federal legislation subject STLDI plans to the all of the ACA's interlocking consumer protections, including guaranteed issue and renewability, the ban on pre-existing condition exclusions, coverage of the essential health benefits, the medical loss ratio, and the prohibition on rescissions.  Subjecting STLDI plans to all of the ACA's consumer protections at a federal level will ensure adequate protection for consumers.

In the absence of federal legislation, the Committee recommends that states significantly restrict STLDI plans.  Additionally, states should limit STLDI plan duration to 90 days and

---

[400] Letter from Senior Appeal Representative, Golden Rule Insurance Company, to Complainant (2018 05286 Golden Rule).

[401] Letter from Senior Appeal Representative, Golden Rule Insurance Company, to Complainant (2018 03543 Golden Rule).

[402] Letter from Medical History Review, Golden Rule Insurance Company, to Department of Financial Services, State of Florida (2018 07043 Golden Rule).

[403] Letter from National General Accident & Health, to Complainant (2018) (NG000735).

prohibit renewability, including prohibiting the purchase of multiple STLDI plans in one plan year.  Individuals who purchase consecutive policies may not fully understand the policies limitations and exclusions, including the pre-existing conditions exclusions.  STLDI plans that are available for the entire plan year are also being marketed as an alternative to comprehensive, major medical insurance and are causing confusion for consumers who may be unaware that they are purchasing plans that do not provide comprehensive coverage.

The Committee staff recommend that states prohibit the sale of STLDI plans during ACA's open enrollment.  The increase in enrollment in STLDI plans by brokers and agents in December and January suggests that these plans are benefiting from and possibly capitalizing on the marketing and advertising around the ACA's open enrollment season.  Additionally, states should require STLDI plans to be sold only in-person.  This may help prevent some of the aggressive marketing tactics that brokers are engaging in such as pushing consumers to purchase plans over the phone without reviewing any written information or coverage documents.  Lastly, states should subject STLDI plans to the ACA's consumer protection provisions, including the requirement that they provide coverage for all essential health benefits, and cover pre-existing conditions.

# Appendix

# Appendix A:

# Arkansas BlueCross

# BlueShield Application



## Application for
# Short Term

**READ ALL INSTRUCTIONS BEFORE COMPLETING THIS APPLICATION. APPLICATION MUST BE COMPLETED IN ITS ENTIRETY IN ORDER TO BE PROCESSED.**

### SECTION 1 – WHO IS APPLYING

- Oldest person applying for coverage should be listed on the first line of the application. If applicant is under the age of 19, parent or guardian information should be indicated in Section 2 (*Parent/Guardian*).
- Social Security numbers are **required** for every applicant. If you are applying for coverage for a child less than one year old who does not yet have a Social Security number, you may apply; however, you will be required to submit the Social Security number within 90 days.
- If applying for Individual and Spouse coverage, primary applicant must be age 19 or older and spouse must be age 14 or older.
- If applying for Individual, Spouse and Child(ren) coverage or Individual and Child(ren) coverage, primary applicant must be age 19 or older.
- In "*Relationship*" box, indicate "spouse, son, daughter, stepson, stepdaughter, or dependent child" beside each dependent's name.
  - "Eligible Short Term dependents must be permanent residents of Arkansas and must be between the ages of 6 months and age 19."
- If applying for coverage for dependent child other than son, daughter, stepson, or stepdaughter, submit copy of appropriate dependent documentation (legal guardianship, custodial relationship, etc.) when submitting the application.
- If primary applicant is under age 19 and does NOT reside with the Parent/Guardian named on this application, custodial parent must also sign the application (see *Signature Section* on Page 3).
- If any dependents are under age 19 and do NOT reside with the primary applicant, the custodial parent must also sign the application (see *Signature Section* on Page 3).

### SECTION 2 – PARENT/GUARDIAN (If policy is only for a child under age 19)

- If applicant is under the age of 19, parent or guardian information must be indicated in this section.
- If applying for coverage as the "Guardian" of a dependent child under the age of 19, please submit appropriate dependent documentation (legal guardianship, custodial relationship, etc.) when submitting the application.

### SECTIONS 4 AND 5 – ADDRESS INFORMATION

- You are required to provide address information when submitting this application. Please note there are three separate listings for this information. Complete all that apply.
  - **Residential** – This address will be noted as your physical place of residence.
  - **Mailing** – Correspondence such as letters and Explanations of Benefits (EOBs) will be mailed to this address.

### SECTION 8 – U.S. CITIZENSHIP STATUS

- For any applicant who is not a U.S. citizen, a copy of his/her Permanent Resident VISA or Green Card issued by the U.S. Citizenship and Immigrant Services must be submitted with the application.
- Applicants must reside in the U.S. at least one year and must have a primary care physician in the U.S. prior to being eligible to apply for coverage.
- Applicants who are not U.S. citizens will also be contacted by phone to complete a Foreign National Questionnaire.

Arkansas
**BlueCross BlueShield**
An Independent Licensee of the Blue Cross and Blue Shield Association

# Application for Short Term

## 1  WHO IS APPLYING

Read all instructions for Section 1 before completing.

| First Name | M.I. | Last Name | Suffix | Relationship | Sex | Date of Birth | Social Security No. |
|---|---|---|---|---|---|---|---|
| | | | | **Self** | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

## 2  PARENT/GUARDIAN (If policy is only for a child under age 19)

Additional information may be required. Read instructions for Section 2 before completing.

| First Name | M.I. | Last Name | Relationship (Check One) |
|---|---|---|---|
| | | | ☐ Mother   ☐ Stepmother   ☐ Guardian<br>☐ Father   ☐ Stepfather |

## 3  MARITAL STATUS

☐ Single (including widowed or divorced)          ☐ Married (including separated)

## 4  RESIDENTIAL ADDRESS (Must be permanent address - No P.O. box, please)

| Street | City | State<br>AR | Zip |
|---|---|---|---|

## 5  MAILING ADDRESS (Complete only if different from residential address)

| Street or P.O. Box | City | State | Zip |
|---|---|---|---|

## 6  CONTACT INFORMATION

| Primary Phone Number<br>(     ) | Alternate Phone Number<br>(     ) | E-mail Address | How do you prefer we communicate with you?<br>☐ E-mail   ☐ Phone |
|---|---|---|---|

## 7  HOUSEHOLD INFORMATION

☐ Yes   ☐ No   a. Do all applicants under the age of 19 reside in the same household?
If "no," please provide reason and his/her name and address:
Name: _____   Address: _____
Reason: _____

☐ Yes   ☐ No   b. Are all applicants permanent, legal residents of Arkansas?
If "no," please provide reason and his/her name and address:
Name: _____   Address: _____
Reason: _____

## 8  U.S. CITIZENSHIP STATUS

Additional information may be required. Read instructions for Section 8 before completing. Documentation may also be required upon request.

☐ Yes   ☐ No   Are all applicants U.S. citizens? If "No," please provide the name(s) of the applicant(s) who are not U.S. citizens.
Name: _____

| Type of Permanent Visa or Permanent Green Card<br>USCIS Category: _____<br>Registration No.: _____ | Issue<br>Date<br>Mo. Day Yr.<br>/    / | Expiration<br>Date<br>Mo. Day Yr.<br>/    / |
|---|---|---|

## OFFICE USE ONLY (Do Not Write In This Space)

| I.D. No. | Group No. | Effective Date |
|---|---|---|

(Continued on page 2)

app-212

**ABCBS-000002**

# Application for Short Term

Short Term is a short-term, limited-duration health insurance policy that provides health insurance coverage for 30 to 88 days.

This coverage is not required to comply with certain federal market requirements for health insurance, principally those contained in the Affordable Care Act. Be sure to check your policy carefully to make sure you are aware of any exclusions or limitations regarding coverage of preexisting conditions or health benefits (such as hospitalization, emergency services, maternity care, preventive care, prescription drugs, and mental health and substance use disorder services). Your policy might also have lifetime and/or annual dollar limits on health benefits. If this coverage expires or you lose eligibility for this coverage, you might have to wait until an open enrollment period to get other health insurance coverage. Also, this coverage is not "minimum essential coverage." If you don't have minimum essential coverage for any month in 2018, you may have to make a payment when you file your tax return unless you qualify for an exemption from the requirement that you have health coverage for that month.

## 9  SHORT TERM COVERAGE INFORMATION

**Deductible:**
☐ $500    ☐ $1,000

**Type of Coverage:**

☐ Individual                    ☐ Individual and Spouse

☐ Individual and Child(ren)     ☐ Individual, Spouse and Child(ren)

**Requested Effective Date:** ___/___/___
The effective date cannot be more than 30 days from the sign date on the application.

**Number of Days:** _____ (30 minimum / 88 maximum) X Daily Rate _____ = $_____

*See rate calculation page in Short Term brochure.
Enclose a check made payable to Arkansas Blue Cross and Blue Shield in the amount of the premium for the entire term of the policy.

## 10  SHORT TERM ELIGIBILITY QUESTIONS

**The following questions must be answered in relation to each person applying for coverage.**

1. Is any male applying for coverage an expectant parent?          ☐ Yes ☐ No

   If you answer "Yes," you and any other family members who are not pregnant may apply for **"Individual"** coverage; however, you must complete separate applications.

**If question 2, 3 or 4 is answered "Yes", you are not eligible for Short Term and no policy will be issued.**

2. Is any female applying for coverage pregnant?                   ☐ Yes ☐ No

3. Will there be any other health insurance in force on the effective date of this coverage?   ☐ Yes ☐ No

4. Within the last five (5) years, have you or anyone listed on the application received medical or surgical consultation, advice, or treatment, including medication, for **any of the following**: liver disorders, kidney disorders, chronic obstructive pulmonary disease (COPD), emphysema, diabetes, cancer (other than skin cancer), heart or circulatory system disorders, alcohol or drug abuse or immune system disorders, including HIV infection, or tested positive for HIV infection?   ☐ Yes ☐ No

App Page 213

**ABCBS-000003**

## PLEASE READ BEFORE SIGNING

**I UNDERSTAND:** (1) The agent or broker involved in this insurance transaction may receive compensation from Arkansas Blue Cross and Blue Shield (hereafter referred to as the COMPANY), or one of its affiliates, for services related to the placement of this insurance. Any such compensation is included in the insurance premium paid by the insured. For more information on the compensation involved in this transaction, please direct your inquiry to the agent or broker. In signing, I: (a) represent that the statements and answers given in this application and any signed and dated addendum to this application (both front and back) are true, complete and correctly recorded; (b) agree that a photocopy of this application shall be as valid as the original, and I understand that a copy is available to me upon request.

**I UNDERSTAND** that this application may be rejected. If persons proposed for coverage are eligible and coverage is offered, I understand: (1) The coverage shall not become effective until the date shown on my identification card and the premium is paid in full. (2) Once the policy is in effect and payment received, premiums will not be refunded for any reason. (3) Pre-existing conditions will not be covered. (4) No changes can be made to the policy after coverage is in effect. (5) If my application is accepted relying on my representations on this document, any coverage which may be issued to me shall be invalid if based on false information. (6) Arkansas Blue Cross and Blue Shield may phone or e-mail me for additional information that may help with the timely processing of my application. **This application is valid for 30 days only when completed and signed.**

In signing, I: (a) understand that if intentionally fraudulent misstatements were made, the COMPANY may take legal action at any time; (b) understand my signature authorizes the COMPANY to coordinate benefits under this policy with other insurance I have which is subject to coordination; (c) agree that this application shall be valid without time limit. Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

### Please read below. Your application will not be accepted unless you check the boxes confirming you understand the following statements:

☐ I have read and understand that this plan does not meet the federal government's "minimum essential coverage" requirements and I will have to pay a tax penalty when income taxes are filed, unless a waiver from the federal government is received.

☐ I certify that I am a resident and signed this application in the state of Arkansas.

## SIGNATURE SECTION (Please sign appropriate line only)

| Primary Applicant OR Parent/Legal Guardian **(if policy for a minor)** | X | Date Signed |
|---|---|---|

## This Section to be Completed by Sales Representative

| Sales Rep License # | Sales Representative's Signature<br>X | Date Signed |
|---|---|---|
| Agency Federal Tax ID #<br>(if applicable) | Sales Representative's Name (please print) | Phone # |

| Comments: | OFFICE USE ONLY |
|---|---|
| | |

**ABCBS-000004**

# Pre-Authorized Bank Draft

## One-Time Bank Draft Form

Our monthly bank draft service makes premium payments easy and convenient for you. Just a few steps now help assure your payment is made accurately and timely.

**Complete the information below.**

**THIS FORM IS NOT TO BE RETURNED. IT IS FOR OBTAINING ONLINE PAYMENT INFORMATION.**

### Important: Please Read Before Signing

I authorize Arkansas Blue Cross and Blue Shield and the BANK indicated below, to debit my Arkansas Blue Cross premium from my checking or savings account indicated below. This authority is to remain in full force and effect until my BANK has received written notification from me of the Pre-Authorized Bank Draft Program termination in such time and manner as to afford the BANK a reasonable opportunity to act on it, or until the BANK has sent me ten (10) days' written notice of the BANK's termination of this agreement.

I understand that by revoking the Pre-Authorized Bank Draft Program after I have agreed to it, I also will be terminating my Arkansas Blue Cross coverage, UNLESS Arkansas Blue Cross has received written notice from me of my desire to continue coverage at least twenty (20) days prior to the next Pre-Authorized Bank Draft Program withdrawal date.

I understand that an insufficient check fee will be assessed for any payment returned to Arkansas Blue Cross as a result of insufficient funds.

## Insured's Information

First Name_____   Last Name _____

Address _____
　　　　　　Street　　　　　　　　　　　　　　　　　　　　　　　　　Apt. No

_____
　　　　　　City　　　　　　　　　　　　　State　　　　　　　　　　　Zip

## Bank Account Information

Bank Name_____   Name on Account _____
　　　　　　　　　　　　　　　　　　　　　　　　　(If different than the insured)

Routing Number_____   Account Number _____

Type of Account: ☐ Checking ☐ Savings



J. L. Webb
123 Main Street
Anytown, USA  12345

DATE　　　　　　1175

PAY TO THE
ORDER OF _____   $_____

SAMPLE

_____ DOLLARS

MEMO

| : 123456789  | : 1234567890123  | 1175

Bank Routing Number　　　　Bank Account Number　　　　Check Number

## Signature

Signature_____   Date_____
　　　　　　　Signature of Bank Account Holder

We hope you find this bank draft service of value. It is our privilege to serve you. Thank you for your business!

### For Office Use Only (please do not write in this space)

| ID NO. | EFFECTIVE DATE |
|--------|----------------|
|        |                |

### Arkansas
### BlueCross BlueShield
An Independent Licensee of the Blue Cross and Blue Shield Association

App. 215

ABCBS-000005

**NON-DISCRIMINATION AND LANGUAGE ASSISTANCE NOTICE**

**NOTICE:** Our Company complies with applicable federal and state civil rights laws and does not discriminate, exclude, or treat people differently on the basis of race, color, national origin, age, disability, or sex.

We provide free aids and services to people with disabilities to communicate effectively with us, such as qualified sign language interpreters, written information in various formats (large print, audio, accessible electronic formats, other formats), and language services to people whose primary language is not English, such as qualified interpreters and information written in other languages. **If you need these services, contact our Civil Rights Coordinator.**

If you believe that we have failed to provide these services or discriminated in another way on the basis of race, color, national origin, age, disability, or sex, you can file a grievance with:

> **Civil Rights Coordinator**
> 601 Gaines Street, Little Rock, AR 72201
> Phone: 1-844-662-2276; TDD: 1-844-662-2275

You can file a grievance in person, by mail, or by email. If you need help filing a grievance our Civil Rights Coordinator is available to help you.

You can also file a civil rights complaint with the U.S. Department of Health and Human Services, Office for Civil Rights electronically through the Office for Civil Rights Complaint Portal, available at https://ocrportal.hhs.gov/ocr/portal/lobby.jsf, or by mail or phone at:

> **U.S. Department of Health and Human Services**
> 200 Independence Avenue SW., Room 509F, HHH Building, Washington, DC 20201
> Phone: 1-800-368-1019; TDD: 1-800-537-7697

Complaint forms are available at http://www.hhs.gov/ocr/office/file/index.html.

---

**ATTENTION: Language assistance services, free of charge, are available to you. Call 1- 844-662-2276.**

**ATENCIÓN:** si habla español, tiene a su disposición servicios gratuitos de asistencia lingüística. Llame al 1-844-662-2276 .

注意：如果您使用繁體中文，您可以免費獲得語言援助服務。請致電 1-844-662-2276.

**CHÚ Ý:** Nếu bạn nói Tiếng Việt, có các dịch vụ hỗ trợ ngôn ngữ miễn phí dành cho bạn. Gọi số 1-844-662-2276

주의: 한국어를 사용하시는 경우, 언어 지원 서비스를 무료로 이용하실 수 있습니다. 1-844-662-2276 번으로 전화해 주십시오.

**PAUNAWA:**  Kung nagsasalita ka ng Tagalog, maaari kang gumamit ng mga serbisyo ng tulong sa wika nang walang bayad.  Tumawag sa 1-844-662-2276.

**ВНИМАНИЕ:**  Если вы говорите на русском языке, то вам доступны бесплатные услуги перевода.  Звоните 1-844-662-2276.

حظة  إذاكنتتتحدثاللغةالعربية،فتتوفرلك خدماتالمساعدةاللغويةمجانا. دعوة 2276-662-844-1العدد.

**ATANSYON:**  Si w pale Kreyòl Ayisyen, gen sèvis èd pou lang ki disponib gratis pou ou. Rele 1-844-662-2276.

**ATTENTION :**  Si vous parlez français, des services d'aide linguistique vous sont proposés gratuitement.  Appelez le 1-844-662-2276.

**UWAGA:**  Jeżeli mówisz po polsku, możesz skorzystać z bezpłatnej pomocy językowej. Zadzwoń pod numer 1-844-662-2276.

**ATENÇÃO:**  Se fala português, encontram-se disponíveis serviços linguísticos, grátis.  Ligue para 1-844-662-2276.

**ATTENZIONE:**  In caso la lingua parlata sia l'italiano, sono disponibili servizi di assistenza linguistica gratuiti.  Chiamare il numero 1-844-662-2276.

**注意事項:** 日本語を話される場合、無料の言語支援をご利用いただけます。1-844-662-2276 まで、お電話にてご連絡ください。

**ACHTUNG:**  Wenn Sie Deutsch sprechen, stehen Ihnen kostenlos sprachliche Hilfsdienstleistungen zur Verfügung.  Rufnummer: 1-844-662-2276.

.  حظة  إذاكنتتتحدثاللغةالفارسية، وللخدماتاللغويةالمقدمةمجانابالمجانبتفضل، يرجى اتصال 7722-227-488-1

सुचना: જો તમે ગુજરાતી બોલતા હો, તો નિ:શુલ્ક ભાષા સહાય સેવાઓ તમારા માટે ઉપલબ્ધ છે. ફોન કરો 1-844-662-2276.

**ध्यान दें:** यदि आप हिंदी बोलते हैं तो आपके लिए मुफ़्त में भाषा सहायता सेवाएं उपलब्ध हैं। 1-844-662-2276 पर कॉल करें।

**LUS CEEV:**  Yog tias koj hais lus Hmoob, cov kev pab txog lus, muaj kev pab dawb rau koj. Hu rau 1-844-662-2276.

انتباہ: آپ اردوبولتے ہيں توتو زبانکی مدکی خدمات      مےاضب،دستيابمفتفتميں کالکريں 7722-227-488-1

ໂປດຊາບ: ຖ້າວ່າ ທ່ານເວົ້າພາສາ ລາວ, ການບໍລິການຊ່ວຍເຫຼືອດ້ານພາສາ, ໂດຍບໍ່ເສັງຄ່າ, ແມ່ນມີພ້ອມໃຫ້ທ່ານ. ໂທຣ 1-844-662-2276.

**LALE:** Ñe kwōj kōnono Kajin Ṃajōḷ, kwomaroñ bōk jerbal in jipañ ilo kajin ṇe aṃ ejjeḷọk wōṇāān. Kaaḷọk 1-844-662-2276

App. 217
ABCBS-000007

# Appendix B:

# Arkansas BlueCross BlueShield

# Complete Plan Application



Arkansas
**BlueCross BlueShield**
An Independent Licensee of the Blue Cross and Blue Shield Association

# Application for
# COMPLETE PLUS

**Type of coverage you're applying for:**

☐ **Complete Plus Single Term**
A Complete Plus Single Term is a short term, limited-term health insurance policy that provides health insurance coverage for a Term of less than 12 months after the Policy Effective Date; the Policy Term expires at 11:59 PM on the last day of the twelfth month. THIS POLICY IS NON-RENEWABLE.

☐ **Complete Plus Renewable Term**
A Complete Plus Renewable Term is a short term, limited-term health insurance policy that provides health insurance coverage for a Term of less than 12 months after the Policy Effective Date; the Policy Term expires at 11:59 PM on the last day of the twelfth month. Upon expiration of the initial Term, the Policy may be renewed at the option of the policyholder for two subsequent terms, which will allow the Policy to have a duration of no longer than 36 months in total.

**READ ALL INSTRUCTIONS BEFORE COMPLETING THIS APPLICATION. APPLICATION MUST BE COMPLETED IN ITS ENTIRETY IN ORDER TO BE PROCESSED.**

This application is a legal document. If you are approved for coverage, it will become a part of your contract. Therefore, all information provided must be accurate and legible.
- This application must be completed in dark blue or black ink. Applications completed in **pencil** will not be accepted.
- If you make a mistake, mark through the incorrect information, initial it, date it, and provide the correct information.
- Do not use liquid paper, correction tape, or "white out" to correct any mistakes on this application.
- Any **attachments** submitted with the application must be signed and dated.
- Please ensure all required parties have signed and dated the application prior to submission.
- **We strongly recommend you make a copy of this completed application for your records.**

## SECTION 1 | WHO IS APPLYING

- Oldest person applying for coverage should be listed on the first line of the application. If applicant is under the age of 18, parent or guardian information should be indicated in Section 2 (Parent/Guardian).
- Social Security numbers are **required** for every applicant. If you are applying for coverage for a child less than one year old who does not yet have a Social Security number, you may apply; however, you will be required to submit the Social Security number within 90 days.
- If applying for Individual and Spouse coverage, primary applicant must be age 18 or older and spouse must be age 14 or older.
- If applying for Individual, Spouse and Child(ren) coverage or Individual and Child(ren) coverage, primary applicant must be age 18 or older and children must be age six (6) months or older.
- In the "Relationship" box, indicate "spouse, son, daughter, stepson, stepdaughter, or dependent child" beside each dependent's name.
  -Eligible Complete Plus dependents must be permanent residents of Arkansas and must be under the age of 26.
- If applying for coverage for dependent child other than son, daughter, stepson, or stepdaughter, submit copy of appropriate dependent documentation (legal guardianship, custodial relationship, etc.) when submitting the application.
- If primary applicant is under age 18 and does NOT reside with the Parent/Guardian named on this application, custodial parent must also sign the application (see Signature Section on Page 7).
- If any dependents are under age 18 and do NOT reside with the primary applicant, the custodial parent must also sign the application (see Signature Section on Page 7).

## SECTION 2 | PARENT/GUARDIAN (If policy is only for a child under age 18)

- If applicant is under the age of 18, parent or guardian information must be indicated in this section.
- If applying for coverage as the "Guardian" of a dependent child under the age of 18, please submit appropriate dependent documentation (legal guardianship, custodial relationship, etc.) when submitting the application.

## SECTIONS 4, 5 AND 6 | ADDRESS INFORMATION

- You are required to provide address information when submitting this application. Please note there are three separate listings for this information. Complete all that apply.
  - **Residential** – This address will be noted as your physical place of residence.
  - **Mailing** – Correspondence such as letters and Explanations of Benefit (EOBs) will be mailed to this address.
  - **Billing** – All billing invoices will be mailed to this address.

## SECTION 9 | U.S. CITIZENSHIP STATUS

- For any applicant who is not a U.S. citizen, a copy of his/her Permanent Resident VISA or Green Card issued by the U.S. Citizenship and Immigrant Services must be submitted with the application.
- Applicants must reside in the U.S. at least one year and must have a primary care physician in the U.S. prior to being eligible to apply for coverage.
- Applicants who are not U.S. citizens may be contacted by phone to complete additional questions.

## SECTION 10 | COMPLETE PLUS COVERAGE INFORMATION

- If applicant is applying for coverage other than "Individual," please indicate if still interested in coverage if one or more applicants is declined or ineligible. If "Yes" is selected, Arkansas Blue Cross will continue the underwriting process if one or more applicants is declined or ineligible. If "No" is selected, Arkansas Blue Cross will close out the application if one or more applicants is declined or ineligible.
- Single Term policies can increase but cannot decrease deductibles.
- Renewable Term policies can increase deductibles at any time and can decrease deductibles coinsurance after the policy has been effective 12 months.



**IMPORTANT NOTE:** We cannot process your Complete Plus application without this completed form.

---

**AUTHORIZATION TO DISCLOSE PROTECTED HEALTH INFORMATION**

As a condition of coverage and of my enrollment in the policy, I authorize any medical professional, medical care institution, pharmacy related service organization, pharmacy benefit manager, or other provider of healthcare services or supplies, as well as any individual, company or prior insurance carrier possessing relevant medical, health, treatment or payment information, to provide Arkansas Blue Cross and Blue Shield and its affiliate or agents information concerning services, supplies, benefit or payments provided or denied to me or to any family member listed in my application, including but not limited to any and all protected health information related to treatments where a restriction was requested for any healthcare item or service in relation to the healthcare provider having been paid in full out-of-pocket. I understand that information obtained as a result of this authorization will be used for the purpose of determining eligibility for coverage. This information may also be used by Arkansas Blue Cross and Blue Shield in investigating and adjudicating claims for benefits. I understand that in the course of its business operations, Arkansas Blue Cross and Blue Shield may disclose this information to others as required or permitted by law and as set out in the Arkansas Blue Cross and Blue Shield Notice of Privacy Practices. I understand that information re-disclosed may no longer be protected by federal privacy regulations. This authorization does not provide for the disclosure of psychotherapy notes as defined in 45 CFR §164.501. I understand that I may terminate this authorization by sending a written revocation to Arkansas Blue Cross and Blue Shield, PO Box 2181, Little Rock, AR 72203- 2181. However, if I revoke this authorization before I am enrolled in the policy(ies), my application for coverage will be denied. Unless I revoke this authorization, it shall be valid for 30 months from the date of my signature for information collected in connection with review of this application; it is valid for the duration of the coverage for information collected in connection with investigation of claims. Both the federal government and the State of Arkansas have enacted electronic signature laws, which allow the use of electronic signatures in all areas of commerce. See the Electronic Signatures in Global and National Commerce Act 15 USC §§ 7001 et seq., the Arkansas Electronic Records and Signatures Act A.C.A. §§25-31-101 et seq. and the Uniform Electronic Transaction Act, A.C.A. §§25-31-101 et seq. Electronic signatures are specifically authorized in the business of insurance. See 15 USC §§ 7001(i).

---

**This authorization must be signed by each applicant age 18 or older.**

**Applicants age 18 and older**

| Print Name(s) | Signature | Date |
|---|---|---|
| _____ | _____ | ___/___/___ |
| _____ | _____ | ___/___/___ |
| _____ | _____ | ___/___/___ |
| _____ | _____ | ___/___/___ |
| _____ | _____ | ___/___/___ |
| _____ | _____ | ___/___/___ |

---

**Applicants under age 18**

List applicants under age 18 (Print Name).

_____

_____

_____

_____

_____                    ___/___/___

Parent/Legal Guardian's                         Date
Signature (if policy for a minor)

---

**App. 221**

**ABCBS-000090**

# APPLICATION FOR COMPLETE PLUS

## SECTION 1 | WHO IS APPLYING

Read all instructions for Section 1 before completing.

| First Name | M.I. | Last Name | Suffix | Relationship | Sex | Date of Birth | Social Security No. | Height | Weight |
|---|---|---|---|---|---|---|---|---|---|
| | | | | **Self** | | | | ___ft.___ in. | _____ lbs. |
| | | | | | | | | ___ft.___ in. | _____ lbs. |
| | | | | | | | | ___ft.___ in. | _____ lbs. |
| | | | | | | | | ___ft.___ in. | _____ lbs. |
| | | | | | | | | ___ft.___ in. | _____ lbs. |
| | | | | | | | | ___ft.___ in. | _____ lbs. |

## SECTION 2 | PARENT/GUARDIAN (If policy is only for a child under age 18)

Additional information may be required. Read instructions for Section 2 before completing.

| First Name | M.I. | Last Name | Relationship (Check One) |
|---|---|---|---|
| | | | ☐ Mother   ☐ Stepmother   ☐ Guardian |
| | | | ☐ Father   ☐ Stepfather |

## SECTION 3 | MARITAL STATUS

☐ Single (including widowed or divorced)      ☐ Married (including separated)

## SECTION 4 | RESIDENTIAL ADDRESS (Must be permanent address - No P.O. box, please)

| Street | City | State AR | County | Zip |
|---|---|---|---|---|

## SECTION 5 | MAILING ADDRESS (Complete only if different from residential address)

| Street or P.O. Box | City | State | County | Zip |
|---|---|---|---|---|

## SECTION 6 | BILLING ADDRESS (Complete only if different from residential address)

| Street or P.O. Box | City | State | County | Zip |
|---|---|---|---|---|

## SECTION 7 | CONTACT INFORMATION

| Primary Phone Number ( ) | Alternate Phone Number ( ) | E-mail Address | How do you prefer we communicate with you? ☐ E-mail   ☐ Phone |
|---|---|---|---|

Arkansas Blue Cross and Blue Shield may contact you, either directly or through a business associate, using your postal or email addresses, telephone numbers or other personal information, regarding your health insurance plan, healthcare providers participating in our networks, disease management, health education and health promotion, preventive care options, wellness programs, treatment or care coordination or case management activities of Arkansas Blue Cross.

## SECTION 8 | HOUSEHOLD INFORMATION

☐ Yes   ☐ No   a. Do all applicants under the age of 18 reside in the same household?
If "no," please provide reason and his/her name and address:
Name: _____   Address: _____
Reason: _____

☐ Yes   ☐ No   b. Are all applicants permanent, legal residents of Arkansas?
If "no," please provide reason and his/her name and address:
Name: _____   Address: _____
Reason: _____

## SECTION 9 | U.S. CITIZENSHIP STATUS

Additional information may be required.

☐ Yes   ☐ No   Are all applicants U.S. citizens? If "No", please provide the name(s) of the applicant(s) who are not U.S. citizens.
Name: _____
Type of Permanent Visa or Permanent Green Card          Issue Date       Expiration Date
USCIS Category: _____          Mo. Day Yr.       Mo. Day Yr.
Registration No.: _____          /    /          /    /

☐ Yes   ☐ No   Have all applicants applying for coverage resided in the U.S. for at least 12 continuous months? If "No", please provide the name(s) of the applicant(s) who have not resided in the U.S. for at least 12 continuous months.
Name: _____

☐ Yes   ☐ No   Do all applicants applying for coverage have a Primary Care Physician established in the U.S.? If "No", please provide the name(s) of the applicant(s) who do not have a Primary Care Physician established in the U.S.
Name: _____

## OFFICE USE ONLY (do not write in this space)

| I.D. No. | Group No. | Effective Date |
|---|---|---|

# APPLICATION FOR COMPLETE PLUS

This coverage is not required to comply with certain federal market requirements for health insurance, principally those contained in the Affordable Care Act. Be sure to check your policy carefully to make sure you are aware of any exclusions or limitations regarding coverage of pre-existing conditions or health benefits (such as hospitalization, emergency services, maternity care, preventive care, prescription drugs, and mental health and substance use disorder services). Your policy might also have lifetime and/or annual dollar limits on health benefits. If this coverage expires or you lose eligibility for this coverage, you might have to wait until an open enrollment period to get other health insurance coverage.

| **SECTION 10** | **COMPLETE PLUS COVERAGE INFORMATION** |
|---|---|

| **Duration:** | ☐ Single Term (up to 12 months) | ☐ Renewable Term (up to 36 months) |
|---|---|---|
| **Deductible:** | ☐ $500 Individual/$1,000 Family<br>☐ $2,500 Individual/$5,000 Family | ☐ $1,000 Individual/$2,000 Family<br>☐ $5,000 Individual/$10,000 Family |
| **Coinsurance:** | ☐ 20% | |

☐ Yes  ☐ No   If you are applying for coverage other than "Individual," do you want to continue the application process if one or more applicants is declined or ineligible?

**Requested Effective Date:**
Arkansas Blue Cross and Blue Shield assigns 1st of the month effective dates. This is your opportunity to request an effective date that coordinates with the termination of current health insurance coverage. While we cannot guarantee a specific requested effective date, we will make every effort to accommodate the request. If your application is approved, the effective date will be assigned based on the date of approval. Retroactive effective dates will not be assigned.

**Please write the day you would like your coverage to become effective:**

Requested effective date: ____/01/_____

Monthly auto pay is required upon enrollment.

| **SECTION 11** | **INSURANCE/OTHER INFORMATION** |
|---|---|

☐ Yes  ☐ No   a. Are any applicants covered by Medicaid (including AR Kids First)? If "Yes," please provide name(s) below:

   Applicant Name: _____

   Applicant Name: _____

☐ Yes  ☐ No   b. Are any applicants covered by Medicare? If "Yes," please provide name(s) below:

   Applicant Name: _____

   Applicant Name: _____

☐ Yes  ☐ No   c. Is any applicant Medicare disabled? If "Yes," please provide name(s) below:

   Applicant Name: _____

   Applicant Name: _____

**SECTION 11** | INSURANCE INFORMATION (continued)

☐ Yes  ☐ No   d. Do you or any applicant have current Arkansas Blue Cross Blue Shield coverage? If "Yes," please provide:

ABCBS ID# _____

☐ Yes  ☐ No   e. Have you or any applicant had ABCBS coverage that has terminated within the last 6 months? If "Yes," please provide:

ABCBS ID# _____

☐ Yes  ☐ No   f. Is any male applying for coverage an expectant father or a potential adoptive father? If "Yes," please provide:

Applicant Name: _____

☐ Yes  ☐ No   g. Is any female applying for coverage pregnant or a potential adoptive mother? If "Yes", please provide:

Applicant Name: _____

☐ Yes  ☐ No   h. Has any applicant ever consumed alcohol to excess, received treatment, or joined an organization for alcoholism or drug addictions? If "Yes", please provide name(s) below:

Applicant Name: _____

Applicant Name: _____

☐ Yes  ☐ No   i. Has any applicant ever used any addictive drug or substance for purposes other than recommended by your physician? If "Yes", please provide name(s) below:

Applicant Name: _____

Applicant Name: _____

☐ Yes  ☐ No   j. Has any applicant ever been treated for, diagnosed by or consulted a physician, psychotherapist, counselor or any other provider, or had any indication(s) of having a drug dependency/habit? If "Yes," please provide name(s) below:

Applicant Name: _____

Applicant Name: _____

☐ Yes  ☐ No   k. Has any applicant required the assistance of any other individual for performances of any activities of daily living? If "Yes", please provide name(s) below:

Applicant Name: _____

Applicant Name: _____

☐ Yes  ☐ No   l. Is any applicant currently a patient in a hospital or nursing home? If "Yes," please provide name(s) below:

Applicant Name: _____

Applicant Name: _____

## SECTION 12 | APPLICANT(S) EMPLOYMENT INFORMATION [applicant(s) age 18 and older]

Name: _____ Employer: _____

Job duties: _____

Name: _____ Employer: _____

Job duties: _____

## SECTION 13 | DRIVER'S LICENSE INFORMATION [applicant(s) age 14 and older]

Name: _____ License No. : _____ State:_____

Name: _____ License No. : _____ State:_____

Name: _____ License No. : _____ State:_____

In the past 5 years, has any applicant:

☐ Yes   ☐ No     a. Had his or her driver's license suspended or revoked?

☐ Yes   ☐ No     b. Had two or more moving traffic violations?

☐ Yes   ☐ No     c. Been convicted or charged with driving under the influence of alcohol or a controlled substance?

If you answered "Yes", to any of the above questions, you **MUST** provide the following information:

Name:_____ Date: ____/____/_____ Violation(s):_____

Name:_____ Date: ____/____/_____ Violation(s):_____

## SECTION 14 | INFERTILITY

Has any applicant or spouse of an applicant **(whether applying for coverage or not)**:

☐ Yes   ☐ No     a. Ever been diagnosed or treated for infertility?

☐ Yes   ☐ No     b. Had surgical sterilization? **If "Yes" to question a. or b., please provide the following:**

Name: _____ Treatment/Procedure: _____ Date: ____/____/_____

Name: _____ Treatment/Procedure: _____ Date: ____/____/_____

## SECTION 15 | TOBACCO USAGE

☐ Yes   ☐ No     Has any applicant to be covered used **any form of tobacco or e-cigarettes** within the last 12 months?
                  If "Yes," please provide the following:

Name: _____ Date Last Used: ____/____/_____

Name: _____ Date Last Used: ____/____/_____

Name: _____ Date Last Used: ____/____/_____

App. 225

ABCBS-000094

## SECTION 16 | PRESCRIPTION QUESTIONNAIRE

☐ Yes   ☐ No   Is any applicant **currently** taking any prescription medication, or has any applicant taken prescription medication in the last 3 years?

If you answered "Yes," please provide full details below. Use separate sheet if necessary. **Any attachment must include all of the same information requested here and must be signed and dated.** A printout from the pharmacy is **not** acceptable. **Please provide the name that would have been used at the time of the prescription — e.g., a maiden name may have been used.**

| Person Treated | Name of Drug | Dosage | Specific Disorder or Illness | Start Date/ Stop Date | Complete Name and Address of Prescribing Physician |
|---|---|---|---|---|---|
| | | | | _____/_____<br>mo    year<br><br>_____/_____<br>mo    year | |
| | | | | _____/_____<br>mo    year<br><br>_____/_____<br>mo    year | |

## SECTION 17 | MEDICAL QUESTIONNAIRE

**ALL OF THE FOLLOWING QUESTIONS MUST BE ANSWERED FOR EACH PERSON APPLYING FOR COVERAGE.**

For each question checked below, give full details in the ADDITIONAL MEDICAL INFORMATION section which follows.

In the last 7 years, has any applicant had or been told he/she had:

☐ Acquired Immune Deficiency Syndrome (AIDS) or AIDS-related Complex (ARC) or Immune Deficiency Disorder or HIV
☐ Adrenal disorders
☐ Alzheimer's Disease or senile dementia
☐ Amyotrophic Lateral Sclerosis (Lou Gehrig's Disease)
☐ Anemia
☐ Angina, heart attack, myocardial infarction
☐ Arteriosclerosis, atherosclerosis, Coronary Artery Disease, stent placement or angioplasty
☐ Attempted suicide
☐ Brain and nervous system disorders
☐ Cancer, Leukemia, or malignancy of any kind
☐ Cerebral Palsy
☐ Cerebrovascular accident (stroke), including Transient Ischemic Attack (TIA)
☐ Chronic fatigue
☐ Chronic Obstructive Pulmonary Disease, emphysema, lung disease or Respiratory Syncytial Virus (RSV), sleep apnea
☐ Cirrhosis
☐ Connective Tissue disorder
☐ Crohn's Disease or ulcerative colitis
☐ Diabetes, abnormal glucose
☐ Dialysis
☐ Eyes, Ears, Nose or Throat disorders
☐ Fibromyalgia
☐ Gastric bypass surgery or other weight loss procedure
☐ Gastric or duodenal ulcer
☐ Glandular disorders
☐ Heart bypass surgery, pacemaker implant

☐ Heart or vein/artery surgery
　☐ Congenital   ☐ Disease
☐ Hemophilia
☐ Hepatitis
☐ Hodgkin's or Non-Hodgkin's Disease
☐ Hypertension
☐ Lupus, systemic
☐ Kidney, urinary, or reproductive disorders
☐ Meniere's Disease
☐ Mental disorders
☐ Multiple Sclerosis, Muscular Dystrophy, or Myasthenia Gravis
☐ Musculoskeletal disorders
☐ Nephritis
☐ Nephrotic Syndrome, renal disease or failure
☐ Pancreatitis
☐ Parkinson's Disease
☐ Pending surgery
☐ Polyneuritis
☐ Respiratory, digestive or circulatory condition
☐ Sarcoidosis
☐ Silicone breast implants
☐ Sugar, blood, or protein in urine
☐ Thyroid disorders
☐ Transplant recipient (except cornea/lens)
☐ Valve repair/replacement/shunts or stents/retained hardware
　☐ Congenital   ☐ Disease
☐ Any injury, deformity, incapacitation, disease or condition not listed elsewhere

☐ **None of the above apply to any applicant(s)**

App 226

ABCBS-000095

## SECTION 17 | MEDICAL QUESTIONNAIRE (continued)

### ADDITIONAL MEDICAL INFORMATION

Give full details to questions answered affirmatively (checked or answered "Yes") to explain answers to questions in SECTION 17. In addition to **condition/illness**, please provide the **type of treatment** provided or planned – for example, surgery, X-rays, EKG, lab tests, hospitalization, emergency room visit, nursing home confinement, doctor visits, rehabilitation services, occupational therapy, physical therapy, speech therapy or chiropractic treatments. **Please ensure you include all the treatments that apply. Please use the name that would have been given at the time of the physician visit — e.g., a maiden name.**

| Condition/ Illness | Person Treated | Specific Disorder/Illness | Type of Treatment | Frequency of treatment | Complete Name and Address of Physician |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

## SECTION 18 | PRIMARY CARE PHYSICIAN INFORMATION (Please provide for each applicant for the last five years)

| Applicant's Name | Complete Name and Address of Physician | Date of Last Visit* |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

*Please enter **NO VISIT** in this box if the applicant has never seen the physician.

## PLEASE READ BEFORE SIGNING

**I UNDERSTAND:** (1) The agent or broker involved in this insurance transaction may receive compensation from Arkansas Blue Cross and Blue Shield (hereafter referred to as the COMPANY), or one of its affiliates for services related to the placement of this insurance. Any such compensation is included in the insurance premium paid by the insured. For more information on the compensation involved in this transaction, please direct your inquiry to the agent or broker. In signing, I: (a) represent that the statements and answers given in this application and any signed and dated addendum to this application (both front and back) are true, complete and correctly recorded; (b) agree that a photocopy of this application shall be as valid as the original, and I understand that a copy is available to me upon request.

**COMPLETE PLUS: I UNDERSTAND:** (1) This application will be medically underwritten in order to assess the potential financial risk of each individual on the application. As the result of the assessment, my application may be approved with no changes, approved but charged a higher premium, or I may be declined for coverage. I will also be subject to a 12-month pre-existing waiting period. **This means conditions existing prior to the effective date of the policy will not be covered until the policy has been in effect for 364 days.** If Single Term coverage is selected, pre-existing conditions will not be covered for duration of policy. (2) Any coverage which may be issued to me shall be invalid if based on intentional misrepresentation of material fact provided by me on the application. (3) Arkansas Blue Cross and Blue Shield (hereafter referred to as the COMPANY) may phone me for additional information that may help with the timely processing of my application. (4) The health insurance applied for will not be effective on any proposed insured if there has been a change in the health of any proposed insured between the date this application is signed and the effective date of coverage. **This application is valid for 45 days only when completed and signed.**

In signing, I: (a) understand that the COMPANY may, within three years of the date of this application, void or terminate this coverage or deny claims for coverage if intentional misrepresentations of material fact have been provided by me in this application; (b) understand that if intentionally fraudulent misstatements were made, the COMPANY may take legal action at any time; (c) understand my signature authorizes the COMPANY to coordinate benefits under this policy with other insurance I have which is subject to coordination; (d) agree that this application shall be valid without time limit. Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

### Please read below. Your application will not be accepted unless you check the box confirming you understand the following statement:

☐ **I certify that I am a resident and signed this application in the state of Arkansas.**

| SIGNATURE SECTION (Please sign appropriate line only) | |
|---|---|
| Primary Applicant OR Parent/Legal Guardian **(if policy for a minor)** X | Date Signed |
| Spouse **(required if applying)** X | Date Signed |
| Dependent age 18 or older **(required if applying)** X | Date Signed |
| Dependent age 18 or older **(required if applying)** X | Date Signed |

### CUSTODIAL PARENT SECTION

**If any applicant under age 18 (primary applicant or dependent), named on this application, does NOT reside with the primary applicant or the parent/guardian indicated in Section 2, the custodial parent's signature is also required.**

| Custodial Parent's Name **(please print)** | | | Telephone No. | |
|---|---|---|---|---|
| Custodial Parent's Address | Street or PO Box | City | State | Zip |
| Custodial Parent's Signature | X | | Date Signed | |

### THIS SECTION TO BE COMPLETED BY SALES REPRESENTATIVE

☐ Yes ☐ No  To the best of your knowledge, will the coverage applied for replace or change any existing hospital, medical or major medical insurance if this coverage is approved by Arkansas Blue Cross and Blue Shield and accepted by the applicant?

| Sales Rep License No. (required) | Sales Representative's Name (Please Print) | Telephone No. |
|---|---|---|
| Agency Federal Tax ID No. (If applicable) X | Sales Representative's Signature | Date Signed |

| Comments: | OFFICE USE ONLY |
|---|---|

## PRE-AUTHORIZED BANK DRAFT | Monthly Program Sign-up Form

**Our monthly bank draft service makes premium payments easy and convenient for you. Completing this simple form helps assure your payments are made accurately and timely.**

Depending on the health insurance plan you are applying for and the date your application is approved, we may be able to draft your first month's premium. If so, you will be notified in writing prior to the draft. Once the bank draft is in effect, you will not receive a billing statement. Until that time, make sure you pay any statement you receive.

**Complete the information below.**

## IMPORTANT: PLEASE READ BEFORE SIGNING

I authorize Arkansas Blue Cross and Blue Shield and/or the BANK indicated below, to debit my Arkansas Blue Cross premium from my checking or savings account indicated below. This authority is to remain in full force and effect until my BANK has received written notification from me of the Pre-Authorized Bank Draft Program termination in such time and manner as to afford the BANK a reasonable opportunity to act on it, or until the BANK has sent me ten (10) days' written notice of the BANK's termination of this agreement.

I understand that by revoking the Pre-Authorized Bank Draft Program after I have agreed to it, I also will be terminating my Arkansas Blue Cross coverage, UNLESS Arkansas Blue Cross has received written notice from me of my desire to continue coverage at least twenty (20) days prior to the next Pre-Authorized Bank Draft Program withdrawal date.

I understand that an insufficient check fee will be assessed for any payment returned to Arkansas Blue Cross as a result of insufficient funds.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

## PROPOSED INSURED'S INFORMATION

First Name: _____ Last Name: _____

Address: _____
        Street                                                    Apt. No.

        City                                   State                       Zip

## BANK ACCOUNT INFORMATION

Bank Name: _____ Name on Account: _____
                                                          (If different than the proposed insured)

Routing Number: _____ Account Number: _____
                                                       Type of Account: ☐ Checking  ☐ Savings

J.L. Webb
123 Main Street
Anytown, USA 12345

Date

1175

PAY TO THE ORDER OF _____ $

SAMPLE

_____ DOLLARS

MEMO _____  SIGNATURE _____

|: 0123456789    |: 0001234567890    1175

Bank Routing Number     Bank Account Number     Check Number

## SIGNATURE

Signature: _____ Date: _____
                      Signature of Bank Account Holder

**After Arkansas Blue Cross receives and processes this completed authorization form, you will receive a letter providing the effective date of your first scheduled draft. We hope you find this bank draft service of value. It is our privilege to serve you. Thank you for your business!**

**For Office Use Only** (please do not write in this space)

| ID NO. | EFFECTIVE DATE |
|--------|----------------|
|        |                |

**Arkansas BlueCross BlueShield**
An Independent Licensee of the Blue Cross and Blue Shield Association

**Please keep for your records**

**FAIR CREDIT REPORTING ACT NOTICE** | Notice to Proposed Insured

In connection with your application for insurance, an investigative consumer report may be prepared. Information may be obtained through personal interviews with your family, friends, neighbors, business associates, financial sources, or others with whom you are acquainted. This inquiry includes information as to your character and general reputation. If an investigative consumer report is prepared in connection with your application, you may receive a copy of that report upon written request to Arkansas Blue Cross and Blue Shield. Your written request should be forwarded to Arkansas Blue Cross and Blue Shield, Enterprise Underwriting, P.O. Box 2181, Little Rock, Arkansas 72203-2181.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -



Arkansas
**BlueCross BlueShield**
An Independent Licensee of the Blue Cross and Blue Shield Association

P.O. Box 2181, Little Rock, AR 72203-2181
www.ArkansasBlueCross.com

Form No. COMP PLUS (R03/19)

**App. 231**
**ABCBS-000100**

# Appendix C:

# Blue Cross of Idaho Application



# Short Term PPO℠ Enrollment Application
### Short Term PPO℠ Solicitud de Inscripción

## APPLICANT INFORMATION  (PLEASE COMPLETE EACH SECTION OF THIS APPLICATION IN INK) / INFORMACIÓN DEL SOLICITANTE (POR FAVOR COMPLETE CADA UNA DE LAS SECCIONES DE ESTA SOLICITUD CON TINTA).

| Your Name (first, initial, last) / Su Nombre (nombre, inicial, apellido) | Social Security Number/ Número de Seguro Social | Date of Birth (mm/dd/yy)/ Fecha de Nacimiento (mm/dd/aa) | Age / Edad | ❑ Male Masculino    ❑ Female Femenino |
|---|---|---|---|---|
| Physical Address / Domicilio Real | City, State, Zip Code / Ciudad, Estado, Código Postal | | | County / Condado |
| Mailing Address (street or route) / Domicilio Postal (calle o ruta) | City, State, Zip Code / Ciudad, Estado, Código Postal | | | County / Condado |
| Billing Address (if different from mailing address) Domicilio de Facturación (en caso de ser diferente al domicilio postal) | City, State, Zip Code / Ciudad, Estado, Código Postal | | | County / Condado |

| Idaho Resident Residente de Idaho ❑ Yes/Sí ❑ No | Preferred Phone Número de Teléfono Preferido | Alternate Phone / Número de Teléfono Alternativo | ❑ I don't have a phone / No tengo teléfono | Marital Status / Estado Civil ❑ Single / Soltero ❑ Married / Casado |
|---|---|---|---|---|

List all eligible dependents you wish to enroll, including any child who is under the age of 26; or who is medically certified as disabled and dependent on parent for support (copy of certification required). If you have more dependents to include, please include the information on a separate sheet of paper.

Nombre todos los dependientes elegibles que desea inscribir, incluso a todos los hijos menores de 26 años; o a aquellos que tengan certificación médica de discapacidad y que dependan de los padres para su manutención (es obligatorio presentar copia de la certificación). Si usted tiene más dependientes para incluir, por favor incluya la información en una hoja aparte.

| Family Member's Name (first, initial, last) Nombre del Familiar (nombre, inicial, apellido) | Relationship to Applicant (spouse, child, stepchild, etc.) Relación con el Solicitante (cónyuge, hijo/a, hijo/a adoptivo/a, etc) | Date of Birth Fecha de Nacimiento (mm/dd/aa) | Social Security Number Número de Seguro Social | Age / Edad | ❑ Male Masculino  ❑ Female Femenino |
|---|---|---|---|---|---|
| Family Member's Name (first, initial, last) Nombre del Familiar (nombre, inicial, apellido) | Relationship to Applicant Relación con el Solicitante | Date of Birth Fecha de Nacimiento (mm/dd/aa) | Social Security Number Número de Seguro Social | Age / Edad | ❑ Male Masculino  ❑ Female Femenino |
| Family Member's Name (first, initial, last) Nombre del Familiar (nombre, inicial, apellido) | Relationship to Applicant Relación con el Solicitante | Date of Birth Fecha de Nacimiento (mm/dd/aa) | Social Security Number Número de Seguro Social | Age / Edad | ❑ Male Masculino  ❑ Female Femenino |
| Family Member's Name (first, initial, last) Nombre del Familiar (nombre, inicial, apellido) | Relationship to Applicant Relación con el Solicitante | Date of Birth Fecha de Nacimiento (mm/dd/aa) | Social Security Number Número de Seguro Social | Age / Edad | ❑ Male Masculino  ❑ Female Femenino |
| Family Member's Name (first, initial, last) Nombre del Familiar (nombre, inicial, apellido) | Relationship to Applicant Relación con el Solicitante | Date of Birth Fecha de Nacimiento (mm/dd/aa) | Social Security Number Número de Seguro Social | Age / Edad | ❑ Male Masculino  ❑ Female Femenino |
| Family Member's Name (first, initial, last) Nombre del Familiar (nombre, inicial, apellido) | Relationship to Applicant Relación con el Solicitante | Date of Birth Fecha de Nacimiento (mm/dd/aa) | Social Security Number Número de Seguro Social | Age / Edad | ❑ Male Masculino  ❑ Female Femenino |

Benefit Period Desired/Período de Beneficios Deseado:  ❑ 1 mth/mes  ❑ 2 mths/meses  ❑ 3 mths/meses  ❑ 4 mths/meses  ❑ _____ mths/meses (max. 10 mths)/(máx. 10 meses)

Deductible Option/Opción Deducible: ❑ $500  ❑ $1,000  ❑ $2,000

Requested Effective Date/Fecha de Vigencia Solicitada _____    Total Payment/Pago total $ _____

When your application is approved, your coverage will begin at 12:01 a.m. the day after we receive your completed application, or the effective date you request, whichever is later. You must submit your first month's payment with this application. If your benefit period extends beyond one month, and you choose not to pay in full, you must complete the Authorization Agreement for Automatic Withdrawal found at bcidaho.com/_forms/automaticwithdrawal.pdf and include it with this application.

Cuando se apruebe su solicitud, su cobertura comenzará a las 12:01 a.m. del día siguiente al de la recepción de su solicitud completa, o en la fecha de vigencia solicitada, lo que sea posterior. Debe presentar el pago del primer mes con esta solicitud. Si su período de beneficios se extiende por más de un mes, y usted elige no pagarlo en su totalidad, debe completar este Acuerdo de Autorización para el Retiro Automático que se encuentra en bcidaho.com/_forms/automaticwithdrawal.pdf e incluirlo con esta solicitud.

3000 E. Pine Ave. • Meridian, Idaho 83642 • (208) 345-4550
Mailing Address/ Dirección Postal: P.O. Box 7408 • Boise, ID 83707-1408

App. 233

BCI_00000010

© 2016 by Blue Cross of Idaho, an Independent Licensee of the Blue Cross and Blue Shield Association

Form No. 20-842NL (01-16)

Please answer each question below. If any question is answered YES, you are not eligible for Short Term PPO coverage
Por favor, responda cada una de las preguntas a continuación. Si responde SÍ a cualquiera de las siguientes preguntas, no es elegible para la cobertura PPO de Corto Plazo

1. Has anyone listed on this application been refused health insurance coverage or offered coverage under the Idaho State Mandated High-risk Pool plans within the last 12 months?   ☐ Yes/Sí   ☐ No

   ¿Se le ha negado cobertura médica a alguien nombrado en esta solicitud o se le ha ofrecido a esta persona cobertura en el marco de los Planes de Fondo de Alto Riesgo bajo Mandato del Estado de Idaho en los últimos 12 meses?

2. Does anyone listed on this application currently have other health insurance coverage, Medicare, or Medicaid that will remain in force beyond the effective date of this coverage?   ☐ Yes/Sí   ☐ No

   ¿Alguna persona nombrada en esta solicitud actualmente cuenta con otro seguro de cobertura médica, Medicare, o Medicaid que vaya a seguir vigente pasada la fecha de vigencia de esta cobertura?

3. Are you, your spouse, or any eligible dependent, whether or not listed on this application, now pregnant?   ☐ Yes/Sí   ☐ No

   Usted, su cónyuge, o cualquier dependiente elegible, nombrada o no en esta solicitud, ¿se encuentra en este momento embarazada?

4. Is anyone listed on this application currently admitted to a health care facility, or has surgery or other inpatient treatment been planned (but not yet performed) for anyone listed on this application?   ☐ Yes/Sí   ☐ No

   ¿Alguna persona nombrada en esta solicitud actualmente se encuentra en una institución de salud, o se ha planificado una cirugía u otro tipo de tratamiento hospitalario (que todavía no se haya llevado a cabo) para alguna de las personas mencionadas en esta solicitud?

5. Has anyone listed on this application had a short term policy within the past 63 days with Blue Cross of Idaho?   ☐ Yes/Sí   ☐ No

¿Alguna de las personas nombradas en esta solicitud ha tenido una póliza de corto plazo con Blue Cross of Idaho, en los últimos 63 días?

## SMOKER DESIGNATION AND CERTIFICATION / DESIGNACIÓN Y CERTIFICACIÓN DE FUMADOR

Has any person listed on this application used tobacco during the past twelve months?

¿Alguna de las personas nombradas en esta solicitud ha consumido tabaco en los últimos doce meses?   ☐ Yes/Sí   ☐ No

## FOR INDEPENDENT PRODUCER'S USE ONLY / SOLO PARA EL USO DE PRODUCTORES INDEPENDIENTES

Independent Producer Certification/Certificado de Productor Independiente

1. Who actually completed this application?
   ¿Quién ha completado esta solicitud?   ☐ Applicant/Solicitante   ☐ Independent Producer/Productor Independiente   ☐ Other/Otro

   If Independent Producer or Other, please explain _____

   Si lo hizo el Productor Independiente u Otro, por favor explique _____

2. Were you present at the time the application was filled out?
   ¿Estuvo usted presente en el momento en el que se completó la solicitud?   ☐ YES/Sí   ☐ NO

   If NO, please explain: _____

   Si su respuesta es NO, por favor explique: _____

I have explained the eligibility provisions to the applicant. I have not made any representations about benefits, conditions, or limitations of the policy except through written material furnished by Blue Cross of Idaho. I hereby certify that the information supplied to me by the applicant has been completely and accurately recorded.

He explicado las cláusulas de elegibilidad al solicitante. No he hecho ninguna representación sobre beneficios, condiciones o limitaciones de la póliza excepto a través de material escrito provisto por Blue Cross of Idaho. Por la presente, certifico que la información que me ha brindado el solicitante se ha registrado de manera completa y precisa

| | | | |
|---|---|---|---|
| Independent Producer's Printed Name | Independent Producer's Signature | Date (mm/dd/aa) | Blue Cross of Idaho Number |
| Nombre del Productor Independiente en Imprenta | Firma del Productor Independiente | Fecha (mm/dd/aa) | Número de Identificación de Blue Cross of Idaho |

Type of Company Appointment
Tipo de Designación de la Empresa   ☐ Personal   ☐ Agency/Agencia

| | |
|---|---|
| Name | Business Phone |
| Nombre | Teléfono de la Empresa |

*This application is approved by Blue Cross of Idaho.*
*Esta solicitud se encuentra aprobada por Blue Cross of Idaho.*

**Benefit Period**
**Período de Beneficios**

District Manager's Signature/ Firma del Gerente de Distrito
Vencimiento:

Date/ Fecha
(mm/dd/aa)

Effective Date/ Fecha de Vigencia
(mm/dd/aa)

Expiration Date/ Fecha de
(mm/dd/aa)

(Dates assigned by District Manager)
(Fechas asignadas por el Gerente de Distrito)

**App. 234**

BCI 00000011

## REPLACEMENT OF EXISTING COVERAGE / REEMPLAZO DE LA COBERTURA EXISTENTE

Will this policy replace any other accident and sickness insurance presently in force?
¿Esta póliza reemplazará a algún otro seguro de accidente y enfermedad que se encuentre actualmente vigente?  ❑ YES/Sí ❑ NO

If YES, please read, sign and date the following notice.
Si su respuesta fue Sí, por favor lea y firme la siguiente notificación y colóquele la fecha.

Notice to Applicant Regarding Replacement of Accident and Sickness Insurance
Notificación para el Solicitante en Relación con el Reemplazo del Seguro de Accidente y Enfermedad

According to this application, you intend to allow to lapse or otherwise terminate existing accident and sickness insurance and replace it with a program to be issued by Blue Cross of Idaho. For your own information and protection, you should be aware of and seriously consider certain factors which may affect the health care coverage available to you under the new program

De acuerdo con esta solicitud, usted tiene la intención de permitir la caducidad o la terminación del seguro de accidente y enfermedad que existe en la actualidad, y reemplazarlo por un programa que emitirá Blue Cross of Idaho. Para su información y protección personal, debe ser consciente de algunos factores que pueden afectar la cobertura médica disponible para usted en el marco del nuevo programa y considerarlos seriamente

1.  Health conditions which you may presently have (preexisting conditions), may not be immediately or fully covered under the new program or the new program may also require a waiting period for certain specified conditions. This could result in denial or delay of a claim for benefits under the new program, whereas a similar claim might have been payable under your present program

    Las enfermedades que usted puede tener actualmente (enfermedades preexistentes), pueden no estar inmediatamente o completamente cubiertas en el marco del nuevo programa, o el nuevo programa también puede requerir un período de espera para afecciones específicas. Esto puede resultar en el rechazo o la demora de una solicitud de beneficios en el marco del nuevo programa, mientras que un reclamo similar podría haber sido pagadero con su programa actual

2.  You may wish to secure the advice of your present insurer or its agent regarding the proposed replacement of your present program. This is not only your right, but it is also in your best interest to make sure you understand all the relevant factors involved in replacing your present coverage.

    Es posible que desee obtener el consejo de su asegurador actual o su agente en relación con el reemplazo propuesto de su actual programa. Esto no sólo es su derecho, sino también es lo más conveniente para asegurarse de que comprenda todos los factores relevantes que intervienen en la sustitución de su cobertura actual.

3.  If, after due consideration, you still wish to terminate your present program and replace it with new coverage, please be certain to completely and accurately answer all questions on this application. Failure to include all information on an application may provide a basis for the company to deny any future claims and to refund your premiums as though your policy had never been in force. After the application has been completed and before you sign it, reread it carefully to be certain that all information has been properly recorded

    Si, luego de considerarlo, todavía desea finalizar su programa actual y reemplazarlo por la nueva cobertura, por favor asegúrese de responder de manera completa y precisa todas las preguntas de esta solicitud. El hecho de no incluir toda la información necesaria en una solicitud puede servir de base para que la empresa niegue futuros reclamos y el reembolso de sus primas como si su póliza nunca hubiera estado en vigencia. Después de completar la solicitud y antes de firmarla, reléala cuidadosamente para asegurarse de que la información se haya registrado correctamente

    *I confirm that a copy of "Notice to Applicant Regarding Replacement of Accident and Sickness Insurance" was furnished to me.*
    *Confirmo que se me ha brindado una copia de la "Notificación para el Solicitante en Relación con el Reemplazo del Seguro de Accidente y Enfermedad".*

    X _____

    Applicant's Signature/Firma del Solicitante                    Date/Fecha (mm/dd/aa)
    Parent or Guardian's signature if applicant is under age 18)

## PARENTAL OR GUARDIAN CONSENT TO APPLICATION / CONSENTIMIENTO DE LA SOLICITUD POR PARTE DEL PADRE O TUTOR

I, the undersigned, represent that the person listed as the applicant on this application is under 18 years of age and is making application for Blue Cross of Idaho health coverage with my full knowledge and consent. I hereby accept full responsibility for the payment of premiums and for the answers and information provided in this application.

Yo, el abajo firmante, declaro que represento a la persona nombrada como solicitante de esta solicitud es menor de 18 años y se encuentra solicitando cobertura de salud con Blue Cross of Idaho con mi pleno conocimiento y consentimiento. Por la presente acepto la responsabilidad total del pago de las primas y de las respuestas y la información que se han brindado en esta solicitud.

X _____

Signature/Firma          Date/ Fecha (mm/dd/aa)   Print Name/ Nombre en Imprenta      Relationship/ Parentesco

**App. 235**

**BCI_00000012**

Form No. 20-042NJ (01-10)

## STATEMENT OF UNDERSTANDING

By signing this application, I represent that all my answers are complete and accurate, and that I understand and agree to the following conditions:

- No independent producer, agent, or employee of Blue Cross of Idaho can change any part of this application or waive the requirement that I answer all questions completely and accurately, nor can any such person change the terms of the policy, except by endorsement issued expressly for that purpose over the signature or facsimile signature of the President of Blue Cross of Idaho
- Blue Cross of Idaho may review this application and, at its discretion, request supplemental information from me, any family member listed on this application, or any health care providers before deciding whether to approve or reject the application
- Blue Cross of Idaho may deny benefits or terminate or rescind my policy retroactive to its effective date for any misrepresentation, omission, or concealment of fact by, concerning, or on behalf of any persons listed on this application that was or would have been material to Blue Cross of Idaho's acceptance of a risk, extension of coverage, provision of benefits, or payment of any claim
- If this application is not approved for the program applied for, any payment submitted with this application will be refunded. Upon the refund of the payment, Blue Cross of Idaho will have no further obligations to me or any family member listed on this application
- If this application is approved, coverage for myself and any eligible family members named on this application will begin on the date assigned by Blue Cross of Idaho
- I authorize any physician, hospital or other health care provider to furnish Blue Cross of Idaho information regarding the history, diagnosis or treatment of any symptom, condition, disease, illness or accidental injury of any person named on this application
- On behalf of myself and all enrolled family members, I authorize Blue Cross of Idaho to release information to enrolled family members, health care providers, other insurers and government agencies to the extent required to process claims, coordinate benefits, conduct utilization review, and perform audits and fraud investigations

- This program does not cover services received for any Preexisting Conditions. Preexisting Condition means any condition:
  - that would cause an ordinarily prudent person to seek medical advice, diagnosis, care or treatment within the six month period preceding the effective date; or
  - for which medical advice, diagnosis, care or treatment was recommended by or received from a health care provider within the six month period preceding the effective date; or
  - a pregnancy existing on the effective date of coverage, except for involuntary complications of pregnancy incurred after the effective date
- I acknowledge and understand my health plan may request or disclose health information about me or my dependents (persons who are listed for benefits coverage on the enrollment form) from time to time for the purpose of facilitating health care treatment, payment or for the purpose of business operations necessary to administer health care benefits; or as required by law. For more information about such uses and disclosures, including uses and disclosures required by law, please refer to the Blue Cross of Idaho Notice of Privacy Practices that is available at bcidaho.com
- I affirm that I have reviewed all the answers given on this application and, regardless of whether an independent producer or other person has filled out the answers for me and on my behalf, I verify the answers accurately reflect all the information given by me. I understand that this application will become part of any agreement or policy that Blue Cross of Idaho issues

X _____  _____
Applicant's Signature                          Date (mm/dd/aa)
(Parent or Guardian's signature if applicant is under age 18)

## DECLARACIÓN DE ENTENDIMIENTO

Al firmar esta solicitud, declaro que todas mis respuestas han sido completas y precisas y que comprendo y acepto las siguientes condiciones

- Ningún productor independiente, agente o empleado de Blue Cross of Idaho puede cambiar ninguna parte de esta solicitud ni renunciar al requisito de que yo responda todas las preguntas de forma completa y precisa, y dichas personas tampoco pueden cambiar las condiciones de la póliza, excepto mediante una aprobación emitida expresamente para tal fin con la firma o la firma facsímil del Presidente de Blue Cross of Idaho
- Es posible que Blue Cross of Idaho revise esta solicitud y, a su discreción, solicite información adicional sobre mí, cualquier miembro de la familia mencionado en esta solicitud, o cualquier profesional médico antes de decidir aprobar o rechazar la solicitud
- Es posible que Blue Cross of Idaho niegue beneficios o anule o rescinda mi póliza retroactiva a su fecha de vigencia por cualquier falsedad, omisión, u ocultación de los hechos, que concierna o represente a todas las personas que figuran en esta solicitud, y que sea o hubiera podido ser significativa para Blue Cross of Idaho en cuanto a la aceptación de un riesgo, la ampliación de la cobertura, la provisión de beneficios, o el pago de cualquier reclamo
- Si esta solicitud no es aprobada por el programa que solicita, se reembolsará cualquier pago realizado junto con la entrega de esta solicitud. Tras la devolución del pago, Blue Cross of Idaho no tendrá obligaciones futuras conmigo ni con ningún miembro de mi familia mencionado en esta solicitud
- Si esta solicitud se aprueba, mi cobertura y la de cualquier familiar elegible nombrado en esta solicitud entrará en vigencia en la fecha asignada por Blue Cross of Idaho
- Autorizo a mi médico, hospital u otros proveedores de salud a brindar información a Blue Cross of Idaho sobre la historia clínica, los diagnósticos o tratamientos de cualquier síntoma, trastorno, enfermedad o herida por accidente de todas las personas nombradas en esta solicitud
- En nombre mío y de todos los miembros de mi familia inscritos, autorizo a Blue Cross of Idaho a divulgar información a los familiares inscritos, profesionales de la salud, otros aseguradores y organismos gubernamentales en la medida que sea necesaria para procesar reclamos, coordinar beneficios, llevar a cabo la revisión de la utilización, y realizar auditorías e investigaciones de fraude

- Este programa no cubre servicios recibidos por ninguna Enfermedad Preexistente. Se entiende por Enfermedades Preexistentes toda afección:
  - que haría que una persona comúnmente prudente busque ayuda médica, diagnóstico, cuidado o tratamiento durante los seis meses anteriores a la fecha de entrada en vigencia; o
  - para la cual el consejo médico, diagnóstico, cuidado o tratamiento haya sido recomendado o brindado por un profesional de la salud durante los seis meses anteriores a la fecha de entrada en vigencia; o
  - un embarazo existente a la fecha de vigencia de la cobertura, excepto por complicaciones involuntarias del embarazo que tengan lugar después de la fecha de vigencia
- Reconozco y comprendo que mi plan de salud podría solicitar o divulgar, en ocasiones, información de salud sobre mí o mis dependientes (personas detalladas en el formulario de inscripción para la cobertura de beneficios) con el fin de facilitar el tratamiento médico o los pagos, o por cualquier otro motivo relacionado con operaciones comerciales necesarias para administrar los beneficios del cuidado de la salud; o según lo requerido por la ley. Para obtener más información sobre tales usos o divulgaciones, incluyendo los usos y divulgaciones que exige la ley, consulte la Notificación de Prácticas de Privacidad de Blue Cross of Idaho que se encuentra disponible en bcidaho.com
- Declaro que he revisado todas las respuestas brindadas en esta solicitud e, independientemente de que un productor independiente u otra persona haya completado las respuestas por mí y en mi nombre, yo he verificado con precisión que las respuestas reflejan toda la información que se me ha brindado. Entiendo que esta solicitud será parte de cualquier acuerdo o póliza que Blue Cross of Idaho emita

X _____  _____
Firma del Solicitante                          Fecha (mm/dd/aa)
(Firma del Padre o Tutor si el solicitante es menor de 18 años)

# Appendix D:

# Everest Application



# EVEREST REINSURANCE COMPANY

Statutory Office:  1209 Orange Street, Wilmington, DE 19801
Administrative Office: PO Box 998 Janesville, WI 53547
1-800-279-2290



(hereafter referred to as "We", "Us", "Our" or "the Company")

## INDIVIDUAL SHORT TERM MEDICAL PLAN INSURANCE ENROLLMENT FORM

### SECTION A

Applicant _____

Date of Birth _____ Age _____ Gender ____ Social Security Number _____

Home Address_____ City _____ State ____ Zip _____

Home Phone _____ Mobile Phone (____) _____

Best time to call _____ ☐ a.m. ☐ p.m.   Email _____

Please print the full name of all other Proposed Covered Persons (Use additional sheet and attach if needed).

| Last, First, Middle Initial | Relationship to Applicant | Date of Birth Month, Day, Year | Gender M/F | Social Security Number |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |

### BENEFIT AND PREMIUM DATA

Deductible               Coinsurance               Out of Pocket Maximum

Coverage Period Maximum

Requested Effective Date: _____

Payment Option:  ☐ Monthly – 6 month plan   ☐ Monthly – 12 month plan (364 Days)

☐ Single Up Front Number of days (minimum of 30, maximum of 180 days) _____

### SECTION B

If the answer to any question in Section B is "Yes," the coverage cannot be issued.

1. Is the Applicant or any Proposed Covered Person eligible for Medicaid or Medicare?...................... ☐ Yes ☐ No
2. Is the Applicant or any Proposed Covered Person:
   a. Now pregnant, an expectant parent, in process of adoption or undergoing infertility treatment?...... ☐ Yes ☐ No
   b. Over 325 pounds if male, or over 275 pounds if female?................................................. ☐ Yes ☐ No
3. Will the Applicant or any Proposed Covered Person have any other group major medical health insurance or individual major medical health insurance in force on the requested effective date?.......................................................................................... ☐ Yes ☐ No
4. Within the last 5 years has any applicant been diagnosed with, received treatment, abnormal test results, medication, consultation for, or had symptoms of: Insulin or medication dependent diabetes except gestational, stroke, transient ischemic attack (TIA), cancer or tumor except basal cell skin

EAPP 228 08 18                                          1

CONFIDENTIAL TREATMENT REQUESTED
NOT FOR CIRCULATION/COMMITTEE
MEMBERS AND STAFF ONLY

**App. 238**

EHEALTH-EC-00000189

cancer, Crohn's disease, ulcerative colitis, rheumatoid arthritis, systemic lupus, chronic obstructive pulmonary disease (COPD), emphysema, cystic fibrosis, hepatitis C, multiple sclerosis, muscular dystrophy, alcohol or drug abuse; bipolar disorder or schizophrenia; hospitalization for mental disorder, an eating disorder; or any diseases or disorders of the following: liver, kidney, blood, pancreas, lung, brain, heart or circulatory including heart attack or catheterization?..................... ☐ Yes   ☐ No

5.  Within the past 5 years, has the Applicant or any Proposed Covered Person been diagnosed or treated by a physician or medical practitioner for Acquired Immune Deficiency Syndrome (AIDS), AIDS Related Complex (ARC) or tested positive for Human Immunodeficiency Virus (HIV)? .............. ☐ Yes   ☐ No

6.  If the Applicant and all Proposed Covered Person(s) are United States citizens, please answer "No" to this question. If the Applicant or any Proposed Covered Person is not a United States Citizen, has that person resided outside the United States for more than 4 weeks over the last 12 months?   ☐ Yes   ☐ No

## SECTION C

**CERTIFICATION**— I/We hereby request coverage under the insurance underwritten by **Everest Reinsurance Company (Company). I/We understand this insurance contains a Pre-existing Condition exclusion, a Pre-certification Penalty and other restrictions and exclusions.** I/We agree that coverage will not become effective for me or any dependent whose medical status, prior to the effective date, has changed and therefore results in a "yes" answer to any of the medical questions on this Application. If my/our medical status changes in this way, coverage will be declined for all individuals included on this Application. I/We understand that if I/we have elected the Monthly Payment option, my/our credit card will be charged each month on the due date of the premium for 6 or 12 months, depending on the plan I/we have selected. I/We understand that I/we may terminate the scheduled payments by notifying the insurance company or its authorized agent in writing at least one business day prior to the next scheduled payment date. I/We understand that this coverage is not renewable or extendable. I/We may obtain a complete copy of the Policy upon request. I/We understand that the Company, as underwriter of the plan, is solely liable for the coverage and benefits provided under the insurance. I/We understand and agree that the insurance agent/broker, if any, assisting with this Application is a representative of the Applicant. If coverage is agreed by a representative of the Applicant, the undersigned represents his/her capacity to so act. If coverage is agreed as guardian or proxy of the Applicant, the undersigned represents his/her capacity to so act. By acceptance of coverage and/or submission of any claim for benefits, the Applicant ratifies the authority of the signer to so act and bind the Applicant. [I/We understand an administrative fee of $10 per month is required. If this Enrollment Form is completed electronically, I/we agree that my/our electronic signature serves as my/our original signature. If this Enrollment Form is not completed electronically, I/We agree to provide my/our verbal consent to certify my/our application in lieu of a signature.

This coverage is not required to comply with certain federal market requirements for health insurance, principally those contained in the Affordable Care Act. Be sure to check your Certificate carefully to make sure you are aware of any exclusions or limitations regarding coverage of preexisting conditions or health benefits (such as hospitalization, emergency services, maternity care, preventive care, prescription drugs, and mental health and substance use disorder services). Your Certificate might also have lifetime and/or annual dollar limits on health benefits. If this coverage expires or you lose eligibility for this coverage, you might have to wait until an open enrollment period to get other health insurance coverage.

**THIS PLAN PROVIDES LIMITED BENEFIT COVERAGE. IT IS NOT DESIGNED TO COVER ALL MEDICAL EXPENSES AND IT IS NOT A MAJOR MEDICAL OR COMPREHENSIVE HEALTHCARE POLICY. PLEASE READ YOUR POLICY CAREFULLY!**

EAPP 228 08 18                                             2

CONFIDENTIAL TREATMENT REQUESTED
NOT FOR CIRCULATION/COMMITTEE
MEMBERS AND STAFF ONLY

**App. 239**

EHEALTH-EC-00000190

Applicant's Signature _____   Date _____

Spouse's Signature _____   Date _____

Signed by Company Appointed Agent: _____

Printed Name: _____   License Number: _____

**Fraud Warning for residents of all states except those listed below**: Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit, or knowingly presents false information in an application for insurance may be guilty of a crime and subject to fines, confinement in prison and/or denial of insurance benefits.

**Alaska:** Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit, or knowingly presents false information in an application for insurance may be guilty of a crime and subject to fines, confinement in prison and/or denial of insurance benefits. **Colorado:** It is unlawful to knowingly provide false, incomplete or misleading facts or information to an insurance company for the purpose of defrauding or attempting to defraud the company. Penalties may include imprisonment, fines, denial of insurance and civil damages. Any insurance company or agent of an insurance company who knowingly provides false, incomplete, or misleading facts or information to a policyholder or claimant for the purpose of defrauding or attempting to defraud the policyholder or claimant with regard to a settlement or award payable from insurance proceeds shall be reported to the Colorado Division of Insurance within the Department of Regulatory Agencies. **Kansas:** Any person who knowingly and with intent to injure, defraud, or deceive any insurance company or other person submits an insurance application or statement of claim containing any materially false, incomplete or misleading information may be committing a crime and may be guilty of insurance fraud as determined by a court of law and subject to civil and/or criminal penalties. **Louisiana:** Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison. **Maine** Any person who knowingly or wilfully presents a false or fraudulent claim for payment of a loss or benefit or who knowingly or wilfully presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison. **Maryland:** Any person who knowingly and wilfully presents a false or fraudulent claim for payment of a loss or benefit or who knowingly and wilfully presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison. **Minnesota:** A person who files a claim with intent to defraud or helps commit a fraud against an insurer is guilty of a crime. **New Hampshire** Any person who, with a purpose to injure, defraud or deceive any insurance company, files a statement of claim containing any false, incomplete or misleading information is subject to prosecution and punishment for insurance fraud, as provided in RSA 638.20. **Oregon:** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance containing any materially false information, or conceals, for the purpose of misleading information concerning any fact material thereto commits a fraudulent insurance act, which may be a crime and may subject such person to criminal and/or civil penalties. **Washington:** It is a crime to knowingly provide false, incomplete, or misleading information to an insurance company for the purpose of defrauding the company. Penalties include imprisonment, fines, and denial of insurance benefits.

EAPP 228 08 18                                   3

CONFIDENTIAL TREATMENT REQUESTED
NOT FOR CIRCULATION/COMMITTEE
MEMBERS AND STAFF ONLY

**App. 240**

EHEALTH-EC-00000191

## PAYMENT AUTHORIZATION

**CREDIT CARD AND CHECK AUTHORIZATION**

❑ Checking

❑ Savings

❑ MasterCard ❑ VISA

❑ Discover

❑ American Express

AUTHORIZATION FOR AUTOMATIC BANK DRAFT OR CREDIT CARD PAYMENT:
I am signing up for an automatic payment plan. I agree that the Company or its authorized agent may automatically debit my bank account or Credit Card for the amount due on or around the payment due date. I can cancel this automatic payment at any time by calling or writing the Company or its authorized agent at least 30 days prior to the next due date. I agree that the Company, its authorized agent, or my financial institution can cancel automatic payment for my account for any reason, at any time, with or without prior notice to me. I understand that $25.00 will be charged for each transaction rejected for insufficient funds. I acknowledge that the origination of these debits to my account must comply with U.S. laws. I agree that this agreement remains in effect until canceled by Company, its authorized agent, my financial institution, or me. I have a copy of this agreement and I know I can also contact the Company or its agent for a copy.

Date Signed _____   Signature _____

Account Holder's name _____

Billing Address _____

_____

Account Number _____

Routing Number _____

Credit Card Number _____   Exp. Date _____

CONFIDENTIAL TREATMENT REQUESTED
NOT FOR CIRCULATION/COMMITTEE
MEMBERS AND STAFF ONLY

**App. 241**

EHEALTH-EC-00000192



# Payment Authorization Form

## Applicant Information:

Name: (Last, First, MI) _____ Date of Birth: (MM/DD/YY) __/__/__ Gender: M☐ F☐

Phone Number: _____ Email Address: _____

Street: _____ City: _____ State: _____ Zip: _____

## List Products

_____

_____

_____

_____

_____

## Payment Information:

I am signing up for an automatic payment plan. I authorize InsuranceTPA.com to charge my account (Credit Card, Debit Card, Bank Account) for the products above, until I request cancellation in writing. I understand I can request future payments to be stopped if I notify InsuranceTPA.com 30 days in advance of the next charge occurring. I understand that $25.00 will be charged for each transaction rejected for insufficient funds. I acknowledge that the origination of these debits to my account must comply with U.S. laws. Non-payment of insurance premium will result in non payment of claims or services. I have a copy of this agreement or can contact InsuranceTPA.com for a copy. I acknowledge and understand that the following plans/rates may include an additional merchant account fee for credit card (cc) and/or electric funds transfer (eft).

### Credit Card Payment Request:

I authorize InsuranceTPA.com to charge my credit card for insurance premium, fees and dues.

☐ MasterCard  ☐ VISA  ☐ [card]  ☐ DISCOVER

_____ _____ _____
Account Number      Exp. Date    Sec. Code

_____
PPM Account Holder's Name (As is on card)

_____ _____
Signature of Card Holder      Date

### Automatic Check Withdrawal Request:

☐ By selecting automatic check withdrawal, your insurance premium, fees and dues will be withdrawn from your checking account until the term of insurance expires. Complete the form below. Attach a voided check and a check for the first month's premium, fees and dues.

_____ _____
Print name of Bank or Institution   Address of Bank or Institution

_____ _____
Bank Account Number      Bank Routing Number

_____ _____
Signature of Payer      Date

## Signature:

_____ __/__/__
Signature                      Date

_____ __/__/__
Representative Signature      Date

CONFIDENTIAL TREATMENT REQUESTED
NOT FOR CIRCULATION/COMMITTEE
MEMBERS AND STAFF ONLY

**App. 242**

# Appendix E:

# Golden Rule Application

**Alabama**

## APPLICATION FOR SHORT TERM MEDICAL INSURANCE
## GOLDEN RULE INSURANCE COMPANY
## INDIANAPOLIS, INDIANA 46278-1719

Please Print in Black Ink

### Applicant(s) Information

| Gender | Name (Last, First, M.I.) | Birth Date* | MUST BE ACCURATE** Height | MUST BE ACCURATE** Weight |
|---|---|---|---|---|
| ☐ Male ☐ Female | Primary (You) | | | |
| ☐ Male ☐ Female | Spouse | | | |
| ☐ Male ☐ Female | Child 1 | | | |
| ☐ Male ☐ Female | Child 2 | | | |
| ☐ Male ☐ Female | Child 3 | | | |
| ☐ Male ☐ Female | Child 4 | | | |
| ☐ Male ☐ Female | Child 5 | | | |

\* If born within 30 days prior to the effective date of coverage, the person will not be covered under the policy/certificate.
\*\* Applicants must meet our height and weight guidelines to qualify for coverage.
If you need to list additional dependents, please use lined paper, sign and date it, and check this box. ☐

### Resident Physical Address (where you live and pay taxes). PO Boxes are not accepted.

| Street (Include Apt.) | City | State | ZIP Code |
|---|---|---|---|
| | | | |

### Mailing Address (if different than Resident Address)

| Street (Include Apt.) | City | State | ZIP Code |
|---|---|---|---|
| | | | |

### Payor (if not you)

| Name (Last, First, M.I.) | Relationship to Primary |
|---|---|
| | ☐ Relative ☐ Other (Specify): |

| Street (Include Apt.) | City | State | ZIP Code |
|---|---|---|---|
| | | | |

### Contact Information

| | Phone Number | Email |
|---|---|---|
| **Primary (You)** | | |
| **Spouse** | | |
| **Payor (if not You)** | | |

Jun 20 2017 08:46:26 am



App. 244

GRIC000001

## Plan Selection

Requested Effective Date: ___/___/___
(See Statement of Understanding section)

Days of Coverage: _____

| Plans (Choose one plan and one coinsurance option for that plan) | | | |
|---|---|---|---|
| ☐ Short Term Medical Value Select A | ☐ 70/30 - $5,000 ☐ 60/40 - $5,000 | ☐ 70/30 - $10,000 ☐ 60/40 - $10,000 | |
| ☐ Short Term Medical Value Select | ☐ 70/30 - $5,000 ☐ 60/40 - $5,000 | ☐ 70/30 - $10,000 ☐ 60/40 - $10,000 | |
| ☐ Short Term Medical Copay Select A 80/20 - $5,000 | | | |
| ☐ Short Term Medical Copay Select 80/20 - $5,000 | | | |
| ☐ Short Term Medical Plus Select A | ☐ 80/20 - $2,000 ☐ 60/40 - $2,000 | ☐ 80/20 - $5,000 ☐ 60/40 - $5,000 | ☐ 80/20 - $10,000 ☐ 60/40 - $10,000 |
| ☐ Short Term Medical Plus Select | ☐ 80/20 - $2,000 ☐ 60/40 - $2,000 | ☐ 80/20 - $5,000 ☐ 60/40 - $5,000 | ☐ 80/20 - $10,000 ☐ 60/40 - $10,000 |
| ☐ Short Term Medical Plus Elite A 100/0 - $0 | | | |
| ☐ Short Term Medical Plus Elite 100/0 - $0 | | | |

**Deductible Amount** (Choose one)
☐ $1,000 (Not available with Short Term Medical Plus Elite A or Short Term Medical Plus Elite)
☐ $2,500   ☐ $5,000   ☐ $10,000   ☐ $12,500

## Optional Benefits Selection

**Supplemental Accident Benefit** (You may only choose one)
☐ $1,000 (Not available with Short Term Medical Plus Elite A or Short Term Medical Plus Elite)
☐ $2,500   ☐ $5,000   ☐ $10,000   ☐ $12,500

## Application Questions

| General Information | Yes | No |
|---|---|---|
| **G1** Has any applicant been declined for insurance due to health reasons? If yes, select each person: ☐ Primary ☐ Spouse ☐ Child 1 ☐ Child 2 ☐ Child 3 ☐ Child 4 ☐ Child 5 The person(s) named will not be covered under the policy/certificate. | ☐ | ☐ |
| **G2** Has any applicant lived in the 50 states of the USA or the District of Columbia for **less than** the past 12 months? If yes, select each person: ☐ Primary ☐ Spouse ☐ Child 1 ☐ Child 2 ☐ Child 3 ☐ Child 4 ☐ Child 5 The person(s) named will not be covered under the policy/certificate. | ☐ | ☐ |

| Medical History Information | Yes | No |
|---|---|---|
| **M1** Are you or is any family member (whether or not named in this application) an expectant mother or father, in the process of adopting a child, or undergoing infertility treatment? **If yes, coverage cannot be issued.** | ☐ | ☐ |
| **M2** Within the last 5 years, has any applicant received medical or surgical consultation, advice, or treatment, including medication, for **any of the following:** blood disorders (except sickle-cell anemia), liver disorders, kidney disorders, chronic obstructive pulmonary disorder (COPD) or emphysema, diabetes, cancer, multiple sclerosis, heart or circulatory system disorders (excluding high blood pressure), Crohn's disease or ulcerative colitis, or alcohol or drug abuse or immune system disorders? If yes, select each person: ☐ Primary ☐ Spouse ☐ Child 1 ☐ Child 2 ☐ Child 3 ☐ Child 4 ☐ Child 5 The person(s) named will not be covered under the policy/certificate. | ☐ | ☐ |
| **M3** Has any applicant had testing performed and has not received results, or been advised by a medical professional to have treatment, testing, or surgery that has not been performed? If yes, select each person: ☐ Primary ☐ Spouse ☐ Child 1 ☐ Child 2 ☐ Child 3 ☐ Child 4 ☐ Child 5 The person(s) named will not be covered under the policy/certificate. | ☐ | ☐ |
| **M4** Within the last 5 years, has any applicant received treatment, advice, medication, or surgical consultation for HIV infection from a doctor or other licensed clinical professional, or had a positive test for HIV infection performed by a doctor or other licensed clinical professional? If yes, select each person: ☐ Primary ☐ Spouse ☐ Child 1 ☐ Child 2 ☐ Child 3 ☐ Child 4 ☐ Child 5 The person(s) named will not be covered under the policy/certificate. | ☐ | ☐ |

Jun 20 2017 08:46:28 am

**App. 245**

GRIC000002

## Application Questions *(continued)*

### Other Coverage Information

| | | Yes | No |
|---|---|---|---|
| O1 | Does any applicant now have hospital or medical expense insurance that **will not** terminate prior to the requested effective date?<br>If yes, select each person: ☐ Primary ☐ Spouse ☐ Child 1 ☐ Child 2 ☐ Child 3 ☐ Child 4 ☐ Child 5<br>The person(s) named will not be covered under the policy/certificate. | ☐ | ☐ |

## THIS IS NOT QUALIFYING HEALTH COVERAGE ("MINIMUM ESSENTIAL COVERAGE") THAT SATISFIES THE HEALTH COVERAGE REQUIREMENT OF THE AFFORDABLE CARE ACT. IF YOU DO NOT HAVE MINIMUM ESSENTIAL COVERAGE, YOU MAY OWE AN ADDITIONAL PAYMENT WITH YOUR TAXES.

## Statement of Understanding

I have read this application and represent that the information on it is true and complete. I understand that:

(1) No insurance will become effective unless my application is approved and the appropriate premium is actually received by Golden Rule with this application.

(2) No benefits will be paid for a health condition that exists prior to the date insurance takes effect.

(3) If coverage is issued, the coverage will not be a continuation of any prior coverage.

(4) Unless Golden Rule agrees to an earlier date, coverage for illness begins on the 6th day after a person becomes insured for injury.

(5) Incorrect or incomplete information in this application may result in voidance of coverage and claim denial.

(6) The information provided in this application, and any supplement or amendments to it, will be made a part of any policy/certificate that may be issued.

(7) For an application sent by any electronic means, insurance, if approved, will be effective the later of:

　(a) The requested effective date; or

　(b) The day after receipt by Golden Rule.

(8) For a mailed application, insurance, if approved, will be effective the later of:

　(a) The requested effective date; or

　(b) The day after the **postmark date** affixed by the U.S. Postal Service. If mailed and not postmarked by the U.S. Postal Service or if the postmark is not legible, the effective date will be the later of:

　　(i) The requested effective date; or

　　(ii) The day received by Golden Rule.

(9) The producer is only authorized to submit the application and initial premium and may not change or waive any right or requirement.

## Signature Information

| | Signature | Date Signed |
|---|---|---|
| Proposed Insured (or Parent/Legal Guardian if Proposed Insured is a child) | | |

## Important Notes:

- "Postmark date" means the date of the postmark as affixed by the U.S. Postal Service.

- No application will be accepted if received by Golden Rule more than 15 days after the date signed.

- Altered applications will not be accepted.

- Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or who knowingly presents false information in an application for insurance is guilty of a crime and may be subject to restitution fines or confinement in prison, or any combination thereof.

Jun 20 2017 08:46:28 am



## To Continue Your Application for Coverage, You Must Become A Member Of FACT

Read and fill out the following FACT Membership Enrollment Form.

### FACT Membership Enrollment Form

I hereby enroll for Basic ($4 a month) membership in the FEDERATION OF AMERICAN CONSUMERS AND TRAVELERS (FACT). Upon completion of this enrollment form and payment of initial dues, I understand that: (a) I will be entitled to FACT's benefits; (b) these benefits may change from time to time; (c) some benefits may have a delayed effective date; (d) my membership will become effective on the day this enrollment form is dated and signed; (e) I am eligible to apply for association group insurance; and (f) I authorize the release of my name, address, date of birth, certificate and phone numbers, application date, membership level, and email address listed on the Golden Rule Application for Short Term Medical Insurance to FACT. Note: Accident insurance is included in your FACT membership and you will have an opportunity to name your beneficiary(ies) by mail or on the FACT website.

X _____    _____

Member's Signature                                                                                   Date

FACT ENRD STM 0216

If you wish to apply for association group health insurance, please complete the application.

### PAYMENT OPTIONS:  Single or Monthly (Initial Payment Method Required With Application)

Electronic Funds Transfer (EFT) and Credit Card payment will be collected at the time of application.  If coverage is not issued, we will refund the money we collected, minus the nonrefundable application fee.

☐ **Single Payment** (one single payment for all days of coverage chosen):

    ☐ **EFT $ Amount** _____ Includes $20 nonrefundable application fee.
    Please complete the EFT Authorization below.

    ☐ **Credit card  $ Amount** _____ Includes $20 nonrefundable application fee.
    Please complete the Credit Card Authorization below.

    ☐ **Check or money order  $ Amount** _____ Includes $20 nonrefundable application fee.
    Please mail your check or money order, payable to FACT, with your application. Checks are deposited upon receipt.

OR

☐ **Monthly Payment:**  (Based on 30 days of coverage.) Final Premium Payment may be less due to less than 30 days of coverage remaining.

    **Initial Payment** ☐ EFT (Ongoing payment must be EFT ) ☐ Credit Card ☐ Check or money order
    Please mail your check or money order, payable to FACT, with your application. Checks are deposited upon receipt.

    **$ Amount** _____ Initial Payment amount (shown) includes a one-time $20 nonrefundable application fee.

    **Ongoing Payments (Choose one)**

    ☐ **Electronic Funds Transfer (EFT)** (No billing fee.)
    Ongoing monthly EFT payments will not include the $20 application fee.

    ☐ **Credit Card** (No billing fee.)
    Ongoing monthly Credit Card payments will not include the $20 application fee.

### Producer

X _____

Print Full Name

Producer Number

Jun 20 2017 08:46:28 am

GRIC000004

## Electronic Funds Transfer Authorization — Complete Only If Paying By EFT

I (we) hereby authorize FACT or Golden Rule to initiate debit entries to the account indicated below. I also authorize the named financial institution to debit the same to such account.

I agree this authorization will remain in effect until you actually receive written notification of its termination from me.

Type of Account: ☐ Checking ☐ Savings

Nine-digit Routing No.

Account No.

Financial Institution's Name _____

Address _____

City, State, ZIP _____

Draft On _____ / ___ / ___
             Day              Date Signed

X _____
Authorized Account Signature

In Tennessee and Texas, drafts may only be scheduled on 1) the premium due date; or 2) up to 10 days after the due date.

## Credit Card Authorization — Complete Only If Paying By Credit Card

**Credit Card Authorization**  ☐ Visa   ☐ MasterCard   ☐ American Express

I authorize FACT or Golden Rule Insurance Company to charge my Visa/MasterCard/American Express account for the Single Payment or Monthly Payment above.

Account No. _____     Expiration Date (MM/YY) ____     Billing ZIP Code _____     X _____
                                                                                                    Signature of Authorized User

NOTE: Some card issuers/financial institutions charge cash advance fees on insurance payments.

Charge On _____ (29th, 30th, 31st not available)
                Day

Jun 20 2017 08:46:26 am

GRIC000005

## CONSENT TO RECEIVE ELECTRONIC RECORDS
## AND TO CONDUCT TRANSACTIONS ELECTRONICALLY

By submitting this consent form or a health insurance application or HMO enrollment form, you hereby consent to presentation, delivery, storage retrieval and transmission of "Communications" related to "Our Transaction" as electronic records instead of in paper form.

For the purposes of this form, "Our Transaction" means the entirety of the business relationship between you and us. "Communications" includes, but is not limited to:

1. Your application or enrollment form, including subsequent amendments;
2. Information related to Our Transaction that we are required to provide or make available in writing such as privacy notices or fraud warnings;
3. Documents related to Our Transaction such as policy, certificate, or evidence of coverage forms, claim forms, explanation of benefit forms, premium notices, or other administrative forms (to the extent permitted by applicable law);
4. Any emails, faxes, recorded telephone calls, or other electronic transmissions of information between you and us and an insurance producer contracted with us, or between us and any third party.

Subject to our obligations to protect your privacy, we may, at our sole discretion, post Communications on a website (in which case they will be sent or received, as the case may be, regardless of whether or not we own, operate or control the website). Or send them in or attached to an email. You must promptly tell us about any change to your electronic or physical mailing address, or other contact information.

You acknowledge that you can receive or access Communications because you have the following:

- A telephone
- A computer and printer
- A device or computer program for listening to audio CDs, mp3, WAV or other common computer audio files
- An Internet browser
- Access to the Internet
- A valid email address
- Adobe Acrobat Reader or other sufficient PDF reader

You can request a free copy of any Communications, or withdraw your consent to receive electronic Communications at any time by sending a written request to:

**Policy Administration**
**PO Box 31372**
**Salt Lake City, UT  84131-0372**

☐ I hereby consent to receive Communications and Transaction Documents electronically, as per the aforementioned conditions. All of the Communications between the time you submit your consent and withdraw your consent will remain valid and binding on both you and us notwithstanding your withdrawal.

☐ I hereby DO NOT consent to receive Communications and Transaction Documents electronically, as per the aforementioned conditions. If you do not consent, we will conduct all future business with you in paper form.

X _____     X _____
Primary Applicant (You)                Parent/Guardian (if you are a minor)     Relationship

_____        X _____
Primary Applicant (You) Email Address   Parent/Guardian (if you are a minor) Email Address

_____        _____
Date                                    Policy ID Number

Jun 20 2017 08:46:28 am

44177a-X-1116
REV. 2017
6 of 6

**App. 249**

GRIC000006

# Appendix F:

# Independence American

# Insurance Company

# Application

**INDEPENDENCE AMERICAN INSURANCE COMPANY**
485 Madison Avenue, New York, NY 10022

## APPLICATION FOR INDIVIDUAL LIMITED SHORT TERM MEDICAL EXPENSE INSURANCE

This coverage is not required to comply with certain federal market requirements for health insurance, principally those contained in the Affordable Care Act. Be sure to check your policy carefully to make sure you are aware of any exclusions or limitations regarding coverage of preexisting conditions or health benefits (such as hospitalization, emergency services, maternity care, preventive care, prescription drugs, and mental health and substance use disorder services). Your policy might also have lifetime and/or annual dollar limits on health benefits. If this coverage expires or you lose eligibility for this coverage, you might have to wait until an open enrollment period to get other health insurance coverage.

**APPLICANT INFORMATION**

| Applicant's Name | | | Home Telephone | Work Telephone | |
|---|---|---|---|---|---|
| Home Address | | | Billing Address | | |
| City | State | ZIP Code | City | State | ZIP Code |

| Marital Status | | Sex | Date of Birth | Social Security Number (OPTIONAL) |
|---|---|---|---|---|
| ☐ Single ☐ Married ☐ Domestic Partner | | ☐ Male ☐ Female | | |

E-mail Address

**DEPENDENT INFORMATION, if applying for insurance coverage (please fill out completely)**
**Attach separate sheet if more space is needed**

| Spouse/Domestic Partner Name *(First, Middle, Last)* | Date of Birth | Social Security Number(OPTIONAL) | Sex |
|---|---|---|---|
| | | | ☐ M ☐ F |
| Dependent(s) Name (First, Middle, Last) & Relationship | Date of Birth | Social Security Number(OPTIONAL) | Sex |
| | | | ☐ M ☐ F |
| | | | ☐ M ☐ F |
| | | | ☐ M ☐ F |
| | | | ☐ M ☐ F |

**REQUESTED COVERAGE INFORMATION:**

| Effective Date | Duration | Plan | Deductible | Coinsurance Percentage | Out-of-Pocket Maximum |
|---|---|---|---|---|---|
| | | | | | |

| **Optional Benefit Rider(s)** | **Hearing Aid Benefit Rider** | ☐ Yes ☐ No |
|---|---|---|

**Confidential for Committee Production Only. Not for Public Disclosure**

**App. 251**

IHC00000004

## MEDICAL QUALIFYING QUESTIONS

**Please answer the following medical questions for all individuals, including dependents, applying for coverage:**

Please be aware that Fraud or intentional material misrepresentation may be a basis for rescission of your coverage. In the event of a rescission: (1) coverage will be void as of the Effective Date; (2) all premiums paid will be refunded; (3) any claims that have been submitted will be denied; (4) if any claims have been paid, the amount of claims paid will be deducted from any premium refund due.

| | | |
|---|---|---|
| ☐ Yes ☐ No | 1. | Will any person to be covered be eligible for a government sponsored health insurance plan (Medicare or Medicaid)? |
| ☐ Yes ☐ No | 2. | Are you or is any immediate family member (whether named or not named in this enrollment form) pregnant, an expectant parent, in the process of adopting a child, or undergoing fertility treatment? |
| ☐ Yes ☐ No | 3. | Are you or any person applying for coverage in the process of or have undergone sex reassignment surgery? |
| ☐ Yes ☐ No | 4. | Are you or any person applying for coverage currently over 300 pounds if male or 250 pounds if female **OR** has anyone to be insured undergone weight loss or bariatric surgery? |
| ☐ Yes ☐ No | 5. | Have you or any person proposed for coverage been diagnosed or treated for Acquired Immune Deficiency Syndrome (AIDS) or, AIDS-related complex? Answer this question "no" if you have tested positive for HIV but have not developed symptoms of the disease AIDS. |
| ☐ Yes ☐ No | 6. | Have you been prescribed or are you currently taking controlled substances (opioids) for pain treatment or pain management? Are you currently taking 4 or more prescription medications? |
| ☐ Yes ☐ No | 7. | Have you or any person applying for coverage currently have a pending test(s), had testing performed and have not received results, or been advised by a medical professional to have treatment, testing, or surgery that has not been performed? |

**8. HAS ANY PERSON LISTED ON THIS APPLICATION RECEIVED AN ABNORMAL TEST REPORT, MEDICAL ADVICE, OR DIAGNOSIS, CARE OR TREATMENT RECOMMENDED OR RECEIVED WITHIN THE LAST 5 YEARS FOR A CONDITION LISTED BELOW?**

| | |
|---|---|
| ☐ Yes ☐ No | Circulatory System Disorders: Heart Attack, Coronary Artery Disease, Atherosclerosis, Carotid Artery Disease, Cardiomyopathy, Peripheral Vascular Disease, Atrial Fibrillation, Aneurysm, Congestive Heart Failure, Congenital Heart Disorder |
| | Neurological Disorders: Stroke, Epilepsy, Parkinson's Disease, Tourette's Syndrome |
| | Cancer, Tumor, Cyst, Polyp, Abnormal Growth, OR taking medication to prevent recurrence of cancer or tumorous growth |
| | Brain or Central Nervous System Disorders: Paraplegia, Quadriplegia, Multiple Sclerosis, Muscular Dystrophy, Guillain-Barre Syndrome, Alzheimer's Disease, Spina Bifida, Cerebral Palsy, Chorea, Huntington's or Sydenham's |
| | Stem Cell Transplant and Organ Transplant |
| | Lung/Respiratory Disorders:  Emphysema, COPD (Chronic Obstructive Pulmonary Disease), Chronic Bronchitis, Cystic Fibrosis |
| | Endocrine Disorders: Diabetes or Chronic Pancreatitis |
| | Liver Disorders: Hepatitis B or C, Cirrhosis of the liver |
| | Kidney Disorders:  Chronic Kidney Disease, Renal Failure, Hydronephrosis, Polycystic Kidney Disease, Glomerulonephritis, Pyelonephritis, Medullary Cystic Disease, Kidney Stones |
| | Arthritis/Degenerative Disorders: Rheumatoid or Psoriatic Arthritis, Degenerative Disc Disease, Herniated Disc, Osteoarthritis or Degenerative Joint Disease |
| | Mental Illness Disorders: Bipolar Disorder, Schizophrenia, Major Depression or Substance Use Disorders: Alcohol, Cannabis, Stimulants, Hallucinogens, And Opioids |
| | Blood/Bleeding Disorders: Hemophilia, Anemia, Aplastic, Sickle Cell, Thalassemia, Hemolytic, Hemorrhagic, Agranulocytosis, Pancytopenia, Thrombocytopenia, Von Willebrand Disease, Wegener's Granulomatosis, Rare Factor Deficiencies |
| | Gastrointestinal Disorders: Ulcerative Colitis, Crohn's Disease, Regional Ileitis, Diverticulitis, Hernia |
| | Autoimmune Disorders: Systemic Lupus Erythematosus, Sjogren's Syndrome, Myasthenia Gravis, Scleroderma, Chronic Inflammatory Demyelinating Polyneuropathy |

**App. 252**

Confidential for Committee Production Only.  Not for Public Disclosure                                            IHC00000005

**FRAUD WARNING**

Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

**ACCEPTANCE AND ACKNOWLEDGEMENT**

I hereby apply for the coverage selected on this application form.  I understand that the coverage shall not become effective until this application is accepted by the insurer and the initial premium is paid.  I read this application carefully and represent that the information I provided is true, correct and complete to the best of my knowledge and belief.   I understand that the insurer relied on my statements and my answers to the medical history questions and it is the basis for determining the issuance or denial of coverage.  I understand that any Fraud or intentional material misstatement (such as an omission) may result in the denial of benefits and/or the termination of coverage.

I agree and understand that coverage will not become effective for any applicant whose medical history changes prior to that person's Effective Date such that the applicant's answer would be "yes" to any of the medical history questions in this application and agree to immediately notify the insurer of any such changes.  If such person is the Applicant, I understand that coverage is automatically declined for all persons applying on this application.

I understand that health insurance benefits may be excluded for pre-existing conditions depending on the plan I select.  If applicable, this coverage will not pay benefits for a disease or physical condition that I or another applicant may now have or have had within 5 years of the application for coverage.

I understand that the producer who solicited this application and upon whose explanation of the benefits, limitations or exclusions I relied on was retained by me as my agent and is an independent contractor who has no right to alter the application, bind or approve coverage or alter any of the terms or conditions of the policy.

I understand that cancellation of this coverage in writing within the 10 day right to return the policy period will result in a refund of premiums and fees.

**SIGNATURE**

| City | State | Day | Month | Year |
|------|-------|-----|-------|------|
| Applicant Signature | Spouse/Domestic Partner Signature if applying for coverage | | | |
| Applicant Name (print) | Spouse/Domestic Partner Name if applying for coverage (print) | | | |

**FOR PRODUCER USE ONLY**

Are you licensed in the state where the application was completed?     ☐ Yes   ☐ No

Are you currently appointed with INDEPENDENCE AMERICAN INSURANCE COMPANY in the state where the application was completed? ☐ Yes   ☐ No

**By signing below, the Producer understands that commissions cannot be paid unless appointed with INDEPENDENCE AMERICAN INSURANCE COMPANY.**

| Producer Name | Company | | |
|---------------|---------|--|--|
| Address | City | State | ZIP Code |
| Phone | Producer Number | E-mail Address | |
| Producer Signature | | | Date |

App. 253

**Confidential for Committee Production Only.  Not for Public Disclosure**

IHC00000006

# Appendix G:

# LifeMap Application

Confidential and Business Sensitive.  Not for Public Disclosure

**Application for**
**Short Term Medical Insurance**
Non-Renewable

LifeMap Assurance Company®
200 SW Market Street
P.O. Box 1271, M/S E8L
Portland, OR 97207-1271
(800) 756-4105

**Note:**  Coverage begins at 12:00 a.m. on the **later** of the day **after** online application is submitted, the date you request, or the postmark date stamped on the application envelope.  If there is no postmark, the Policy Effective Date is the later of the date the application is received by us or the date you requested.

- If applying by mail, coverage will take effect only upon receipt of full premium.  Cash is not accepted.  Please do not staple or tape your payment to this application.

- If applying online, coverage will only take effect upon receipt of full premium.  Automatic payments by credit card or electronic check are available.

| Home Office Use Only |
|---|
| Policy  # |
| Eff. Date |
| Term Date |
| Check # |

**Please complete all information on this page and on page 2, missing information may cause your effective date to be delayed.**

| Primary Insured's Name (Last, First, Middle) | ☐ M ☐ F | Social Security Number | **Requested Effective Date** |
|---|---|---|---|
| Date of Birth (mm/dd/yyyy) | ☐ Married  ☐ Divorced  ☐ Single | | Telephone Number ( ) |
| Home Address (Street, City, State and Zip) | | Email Address | |

**Additional Family Members to be enrolled:**  May include your Spouse and Dependent Children under the age of 26.

| Name (Last, First, M.I.) | Social Security Number | Birth Date | Sex | Relationship To You |
|---|---|---|---|---|
| | | | ☐ M ☐ F | |
| | | | ☐ M ☐ F | |
| | | | ☐ M ☐ F | |
| | | | ☐ M ☐ F | |

List names as they should appear on your identification card.  If enrolling additional family members, please attach a separate sheet including all of the information requested above.

| **Individual Deductible Amount** | | **Policy Term**   (30 – 90 Days) | **Total Premium $** |
|---|---|---|---|
| ☐ $500  ☐ $1000  ☐ $2,500  ☐ $5,000  ☐ $7,500 | | **Number of Days** _____ | **Policy Fee +**  $    20.00 |
| **Coinsurance Amount After Deductible**  ☐ 80% to $10,000  ☐ 50% to $10,000 | | | **Total Due**      $ |

| 1. Are you, or any person to be insured, age 65 or older? | ☐ YES  ☐ NO | **If YES, this policy cannot be issued.** |
|---|---|---|
| 2. Are you, or any person to be insured, eligible for Medicare now or will become eligible at any time during the duration of the policy? | ☐ YES  ☐ NO | **If YES, this policy cannot be issued.** |
| 3. Do you, or any person to be insured, now have any hospital, major medical, group health or medical insurance coverage that will not terminate prior to the beginning of this policy? | ☐ YES  ☐ NO | **If YES, this policy cannot be issued.** |
| 4. Are you, or any family member, now pregnant? | ☐ YES  ☐ NO | **If YES, this policy cannot be issued.** |

5. How did you learn about LifeMap?  ☐ Radio Ad  ☐ Agent  ☐ Employer  ☐ Friend/Family  ☐ Online  ☐ Community Event  ☐ Other_____

**App. 255**

LM-E&C-000013

Confidential and Business Sensitive.  Not for Public Disclosure

**Application for**
### Short Term Medical Insurance
Non-Renewable

LifeMap Assurance Company®
200 SW Market Street
P.O. Box 1271, M/S E8L
Portland, OR 97207-1271
(800) 756-4105

---

Is this coverage intended to replace any other accident or sickness insurance presently in force?  ☐ **YES**  ☐ **NO**

If Yes, please sign and return the Notice to Applicant with your signed Application.

**Please note:  This Short Term Medical Insurance is designed to provide medical coverage on a temporary basis.  It cannot be renewed and is not intended to replace permanent coverage.**

---

I understand that:

1) if my application for coverage is accepted, the Policy Effective Date will be the later of the day after online application is submitted, the date you request, or the postmark date stamped on the application envelope.   If there is no postmark, the Policy Effective Date is the later of the date the application is received by us or the date you requested.

2) if my application for coverage is not accepted, any premium I paid will be promptly refunded;

3) this is not a continuation of any previous medical plan, including any prior Short Term Medical Plan;

4) this Policy is not renewable; and

5) this insurance will not cover Pre-Existing Conditions.  Pre-Existing Conditions are defined as any illness or injury for which any medical diagnosis, advice, treatment or service was received during the 6 month period immediately preceding the effective date of coverage.  A condition is also considered pre-existing if, during the 6 month period immediately preceding the effective date of coverage, symptoms existed which would cause a prudent person to seek medical diagnosis, advice, care or treatment.

I acknowledge and understand LifeMap Assurance Company (LifeMap) may request or disclose health information about me or my dependents (persons who are listed for benefit coverage on the enrollment form) from time to time for the purpose of facilitating health care treatment, payment or for the purpose of business operations necessary to administer health care benefits; or as required by law.

Health information requested or disclosed may be related to treatment or services performed by:

1) a physician, dentist, pharmacist or other physical or behavioral health care practitioner;

2) a clinic, hospital, long-term care or other medical facility;

3) any other institution providing care, treatment, consultation, pharmaceuticals or supplies, or

4) an insurance carrier or group health plan.

Health information requested or disclosed may include, but is not limited to: claims records, correspondence, medical records, billing statements, diagnostic imaging reports, laboratory reports, dental records, or hospital records (including nursing records and progress notes).

**Disclosure:**  If you have a broker or agent, they may receive bonuses, commissions, administrative service fees or other compensation, including non-cash compensation, from LifeMap.  Incentives may be based on any of several factors, the products you buy, your broker or agent's volume of business with LifeMap and the other services your agent or broker provides to you.  These incentives may have a direct or indirect impact on your rates.  For more information, please contact your broker or agent.

**Please Note:  Short Term Medical Insurance is an individual insurance plan and cannot be purchased by employers for their employees.**

I represent that each of the above statements and answers are complete and true to the best of my knowledge and belief.  I understand that if I have made intentionally false or misleading statements or answers on behalf of myself or any family members that all entitlements to benefits are void and the contract may be canceled or modified retroactively to its effective date.  I acknowledge that I have read the Fraud Notices attached to this form.

▶ _____          _____
   Primary Insured's Signature                                      Parent's or Guardian's Signature

▶ _____  _____          _____
   Date Signed              LifeMap Producer Number          Licensed Producer's Name / Agency (Please Print)

**NOTE:** This coverage is not required to comply with certain federal market requirements for health insurance, principally those contained in the Affordable Care Act. Be sure to check your policy carefully to make sure you are aware of any exclusions or limitations regarding coverage of preexisting conditions or health benefits (such as hospitalization, emergency services, maternity care, preventive care, prescription drugs, and mental health and substance use disorder services). Your policy might also have lifetime and/or annual dollar limits on health benefits. If this coverage expires or you lose eligibility for this coverage, you might have to wait until an open enrollment period to get other health insurance coverage.

**App. 256**

LM-E&C-000014

# Appendix H:

# LifeShield Application

# LIFESHIELD NATIONAL INSURANCE CO.

Home Office: 5701 N. Shartel Avenue, 1st Floor, Oklahoma City, OK 73118
Toll-Free Telephone Number: 1-877-376-5831

### GROUP SHORT TERM MEDICAL PLAN INSURANCE ENROLLMENT FORM

**SECTION A**

Applicant _____

Date of Birth _____ Age _____ Gender _____

Home Address_____ City _____ State ____ Zip _____

Home Phone (_____) _____ Mobile Phone (____) _____

Best time to call _____ ❏ a.m. ❏ p.m.      Email _____

Please print the full name of all other Proposed Insureds (Use additional sheet and attach if needed).

| Last, First, Middle Initial | Relationship | Date of Birth Month, Day, Year | Gender M/F |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

**BENEFIT AND PREMIUM DATA**

**Deductible**              **Coinsurance**              **Out of Pocket Maximum**

**Coverage Period Maximum**

**Requested Effective Date:** _____

**Payment Option**:  **[**❏ Monthly – 3 months (1 day less than)   ❏ Monthly – 6 months   ❏ Monthly – 12 months
            (364 days)

         ❏ Single Up Front Number of days (minimum of 30, maximum of 180 days) _____

**SECTION B**

**If the answer to any question in Section B is Yes, the coverage cannot be issued.**

1.  Is the Applicant or any Proposed Insured eligible for Medicaid or Medicare?........................................ ❏ Yes ❏ No
2.  Is the Applicant or any Proposed Insured:
    a.  Now pregnant, an expectant parent, in process of adoption or undergoing infertility treatment?....... ❏ Yes ❏ No
    b.  Over 325 pounds if male, or over 275 pounds if female?................................................................... ❏ Yes ❏ No
3.  Will the Applicant or any Proposed Insured have any other group major medical health insurance or
    individual major medical health insurance in force on the requested effective date?............................. ❏ Yes ❏ No
4.  Within the last 5 years has any applicant been diagnosed with, received treatment, abnormal test results,
    medication, consultation for, or had symptoms of: Insulin or medication dependent diabetes except
    gestational (diabetes does not  apply to residents of DC), stroke, transient ischemic attack (TIA), cancer
    or tumor except basal cell skin cancer, Crohn's disease, ulcerative colitis, rheumatoid arthritis, systemic

LNG-3003 FL                                    1

App. 258

lupus, chronic obstructive pulmonary disease (COPD), emphysema, cystic fibrosis, hepatitis C,  multiple sclerosis, muscular dystrophy, alcohol or drug abuse; bipolar disorder or schizophrenia; an eating disorder; or any diseases or disorders of the following: liver, kidney, blood, pancreas, lung, brain, heart or circulatory including heart attack or catheterization?.............................  ☐ Yes  ☐ No

5.  Within the past 5 years, has the Applicant or any Proposed Insured been diagnosed or treated by a physician or medical practitioner for Acquired Immune Deficiency Syndrome (AIDS), AIDS Related Complex (ARC) or tested positive for Human Immunodeficiency Virus (HIV)?  (Residents of Wisconsin do not need to disclose HIV test results)................................................................................  ☐ Yes  ☐ No

## SECTION C

**CERTIFICATION**— I/We hereby request coverage under the insurance issued to the Med-Sense Guaranteed Association and underwritten by **LifeShield National Insurance Co. (Company).  I/We understand this insurance contains a Pre-existing Condition exclusion, a Pre-certification Penalty and other restrictions and exclusions.** I/We agree that coverage will not become effective for me or any dependent whose medical status, prior to the effective date, has changed and therefore results in a "yes" answer to any of the medical questions on this Application. If my/our medical status changes in this way, coverage will be declined for all individuals included on this Application. I/We understand that if I/we have elected the Monthly Payment option, my/our credit card will be charged each month on the due date of the premium for _____months, depending on the plan I/we have selected. I/We understand that I/we may terminate the scheduled payments by notifying the insurance company or its authorized agent in writing at least one business day prior to the next scheduled payment date. I/We understand that this coverage is not renewable or extendable. I/We may obtain a complete copy of the Certificate of Insurance upon request. I/We understand that the Company, as underwriter of the plan, is solely liable for the coverage and benefits provided under the insurance. I/We understand and agree that the insurance agent/broker, if any, assisting with this Application is a representative of the Applicant. If signed by a representative of the Applicant, the undersigned represents his/her capacity to so act. If signed as guardian or proxy of the Applicant, the undersigned represents his/her capacity to so act. By acceptance of coverage and/or submission of any claim for benefits, the Applicant ratifies the authority of the signer to so act and bind the Applicant. If I/we am/are not already a member of the Med-Sense Guaranteed Association, I/we hereby request to be enrolled as a member. I/We will receive a membership packet after my/our membership fees of _____ per month are received. If this Enrollment Form is completed electronically,I/we agree that my/our electronic signature serves as my/our original signature.

**This coverage is not required to comply with certain federal market requirements for health insurance, principally those contained in the Affordable Care Act. Be sure to check the Certificate carefully to make sure You are aware of any exclusions or limitations regarding coverage of Pre-Existing Conditions or health benefits (such as hospitalization, Emergency Services, maternity care, preventive care, Prescription Drugs, and mental health and Substance Use Disorder services). Your coverage also has lifetime and/or annual dollar limits on health benefits. If this coverage expires or You lose eligibility for this coverage, You might have to wait until an open enrollment period to get other health insurance coverage.**

**Short term medical plans do not satisfy the requirement for individuals to have insurance under the Patient Protection and Affordable Care Act and individuals who have purchased short term**

**medical coverage may be subject to federal penalties for not having minimum essential coverage.**

**THIS PLAN PROVIDES LIMITED BENEFIT COVERAGE. IT IS NOT DESIGNED TO COVER ALL MEDICAL EXPENSES AND IT IS NOT A MAJOR MEDICAL OR COMPREHENSIVE HEALTHCARE POLICY. PLEASE READ YOUR CERTIFICATE CAREFULLY!**

Applicant's Signature_____ Date_____

Spouse's Signature_____ Date_____

Signed by Company Appointed Agent: _____

Printed Name:_____ License Number:_____

**Fraud Warning** Any person who knowingly and with intent to injure, defraud, or deceive any insurer files a statement of claim or an application containing any false, incomplete, or misleading information is guilty of a felony of the third degree.

| PAYMENT AUTHORIZATION | |
|---|---|
| **CREDIT CARD AND CHECK AUTHORIZATION**<br><br>❏ Checking<br><br>❏ Savings<br><br>❏ MasterCard ❏ VISA<br>❏ AMEX ❏ Discover | AUTHORIZATION FOR AUTOMATIC BANK DRAFT OR CREDIT CARD PAYMENT:<br>I am signing up for an automatic payment plan. I agree that the Company or its authorized agent may automatically debit my bank account or Credit Card for the amount due on or around the payment due date. I can cancel this automatic payment at any time by calling or writing the Company or its authorized agent at least 30 days prior to the next due date. I agree that the Company, its authorized agent, or my financial institution can cancel automatic payment for my account for any reason, at any time, with or without prior notice to me. I understand that $25.00 will be charged for each transaction rejected for insufficient funds. I acknowledge that the origination of these debits to my account must comply with U.S. laws. I agree that this agreement remains in effect until canceled by Company, its authorized agent, my financial institution, or me. I have a copy of this agreement and I know I can also contact the Company or its agent for a copy.<br><br>_____    _____<br>Date Signed                     Signature<br><br>Account Holder's name _____<br><br>Billing Address_____<br><br>_____<br><br>Account Number _____<br><br>Routing Number _____<br><br>Credit Card Number _____ Exp. Date _____ |

LNG-3003 FL                                                    3

App. 260

# Appendix I:

# National Health Insurance

# Company  Application

## National Health Insurance Company
4455 LBJ Freeway, Suite 375
Dallas, TX 75244

### GROUP SHORT TERM MAJOR MEDICAL INSURANCE
### ENROLLMENT APPLICATION FORM

**GENERAL INFORMATION**

Applicant's Name: _____ Gender: _Date of Birth: _____ SSN: N/A

Home Address: _____ Phone: _____

Height: N/A _____ Weight: N/A _____

Association Name: L.I.F.E. Association _____

_____

Association Address: 1200 Golden Key Circle, Suite 136, El Paso, TX 79925

Member Class: _____ Join Date: _____

Member ID: _____

| Spouse Domestic Partner and Dependent Information | | | | | |
|---|---|---|---|---|---|
| Name | Relationship to Applicant | Date of Birth | SSN | Height | Weight |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |

Payment Option _____ month plan   Single Up Front (please Specify End Date)

| Plan Options | Please mark corresponding to your selections for a Deductible, Coinsurance Percentage, Out-of-Pocket Maximum, Maximum Benefit and Requested Effective Date. |
|---|---|
| Deductible |  |
| Coinsurance |  |
| Out-of-Pocket $10,000 |  |
| Maximum Benefit Per Coverage Period: $1,000,000 |  |
| Requested Effective Date _____ |  |

| Benefit Options   Please mark corresponding to your benefit selections: | |
|---|---|
| Emergency Room   Additional Deductible of   $250 | |
| Ambulance   Maximum per trip of   $250 | |
| Skilled Nursing Facility   Maximum per Day of   $150 | |
| Maximum Days per Coverage Period of   50 | |
| Urgent Care Facility   Copay of   $50 | |
| Doctor's Office Visits not subject to Deductible and Coinsurance:   0 | |

NHIC GP STM ENRL TX 2014                1

**App. 262**

Confidential Treatment Requested                    NG000878

| | |
|---|---|
| Home Health Care Maximum visits per Coverage Period: | 60 |
| Transplant Benefit Maximum per Coverage Period: | $100,000 |
| Physical Therapy Maximum Benefit per Day: | $50 |

## Health Eligibility Questions   Please answer the questions below as they apply to all family members applying for coverage

1. Are you or any applicant:   __Yes   __No
   a. Now pregnant, an expectant father, in process of adoption, or undergoing infertility treatment?
   b. Over 300 pounds if male or over 250 pounds if female?

2. Within the last 5 years has any applicant been diagnosed, treated, or taken medication for or   __Yes   __No
experienced signs or symptoms of any of the following:   cancer or tumor, stroke, heart disease
including heart attack, chest pain or had heart surgery, COPD (chronic obstructive pulmonary disease) or
emphysema, Crohn's disease, liver disorder, degenerative disc disease or herniation/bulge, rheumatoid
arthritis, kidney disorder, diabetes, degenerative joint disease of the knee, alcohol abuse
or chemical dependency, or any neurological disorder?

3. Within the last 5 years has any applicant been diagnosed or treated by a physician or medical   __Yes   __No
practitioner for Acquired Immune Deficiency Syndrome (AIDS) or tested positive for Human
Immunodeficiency Virus (HIV)?

4. Have you been hospitalized for mental illness in the last 5 years or have you seen a psychiatrist on more than
5 times during the last 12 months?   __Yes   __No

5. If you are not a US Citizen, do you expect to legally reside in the US for the duration of the coverage? __Yes   __No

**If you have answered "Yes" to questions 1 through 4 or "No" to question 5 above, coverage cannot be issued.
Thank you for your interest.**

## Agreement and Understanding

1. I understand that the Group Short Term Major Medical Plan Covered Persons are covered by group insurance benefits. The group insurance benefits vary depending on plan selected. These benefits are provided under a group insurance policy underwritten by National Health Insurance Company and subject to the exclusions, limitations, terms and conditions of coverage as described in the insurance certificate which includes, but is not limited to, limitations for pre-existing conditions. This is not designated as a substitute for comprehensive major medical coverage.

2. I agree that coverage will not become effective for any person whose medical history changes prior to coverage approval, such that the person's answer would be "yes" to any of the Medical History questions in this application. If such person is the Applicant, coverage is automatically declined for all persons included in this application.

3. I understand that health insurance benefits are excluded for pre-existing conditions, and there are other restrictions and exclusions including a Pre-Authorization Penalty.

4. I understand that the broker who solicited this application was acting as an independent contractor and not as an agent of the Insurance Company. I further acknowledge that the person who solicited this application and upon whose explanation of benefits, limitations or exclusions we relied, was retained by me as my agent, and that such person has no right to bind or approve coverage or alter any of the terms or conditions of the policy.

5. I understand that any intentional misstatement or omission of information material to approval of coverage made on this form will be considered a misrepresentation and may be the basis for later rescission of my coverage and that of my dependents. In the event of rescission or termination for any reason, the Insurer shall have the right to deduct any premiums due and unpaid from any claims payable to me or my dependents.

6. I have read this enrollment application and have verified that all of the information provided in it is complete, true and correct, and is all within my personal knowledge. I agree to immediately notify the insurer of any changes in any of the information contained in this form which may occur prior to the approval of coverage.

**App. 263**

Confidential Treatment Requested                    NIG000679

Any person who, with intent to defraud or knowing that he is facilitating a fraud against an insurer, submits an application or files a claim containing a false or deceptive statement may be guilty of insurance fraud as determined by a court of law.

Alabama Residents - Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or who knowingly presents false information in an application for insurance is guilty of a crime and may be subject to restitution fines or confinement in prison, or any combination thereof.

Arkansas and West Virginia Residents - Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application is guilty of a crime and may be subject to fines and confinement in prison.

California - For your protection California law requires the following to appear on this form - Any person who knowingly presents a false or fraudulent claim for the payment of a loss is guilty of a crime and may be subject to fines and confinement in state prison.

District of Columbia Residents - It is a crime to provide false or misleading information to an insurer for the purpose of defrauding the insurer or any other person. Penalties include imprisonment and/or fines. In addition, an insurer may deny insurance benefits if false information materially related to a claim was provided by the applicant.

Florida - Any person who knowingly and with intent to injure, defraud, or deceive any insurer files a statement of claim or an application containing any false, incomplete, or misleading information is guilty of a felony of the third degree.

Kansas and Oregon Residents - Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto may be guilty of fraud as determined by a court of law.

Kentucky Residents - WARNING: Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance containing any materially false information or conceals, for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime.

Louisiana Residents - Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

Maine Residents - It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties may include imprisonment, fines or a denial of insurance benefits.

Maryland Residents - Any person who knowingly or willfully presents a false or fraudulent claim for payment of a loss or benefit or who knowingly or willfully presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

New Jersey Residents - WARNING: Any person who includes any false or misleading information on an application for an insurance policy is subject to criminal and civil penalties.

New Mexico Residents - ANY PERSON WHO KNOWINGLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT OR KNOWINGLY PRESENT FALSE INFORMATION IN AN APPLICATION OF IR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO CIVIL FINES AND CRIMINAL PENALTIES.

New York - Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime, and shall also be subject to a civil penalty not to exceed five thousand dollars and the stated value of the claim for each such violation.

**App. 264**

Confidential Treatment Requested                                NIG000680

Ohio Residents – Any person who, with intent to defraud or knowing that he is facilitating a fraud against an insurer, submits an application or files a claim containing a false or deceptive statement, or conceals information for the purpose of misleading may be guilty of insurance fraud and subject to criminal and/or civil penalties.

Oklahoma Residents – WARNING:  Any person who knowingly, and with intent to injure, defraud or deceive any insurer, makes any claims for the proceeds of an insurance policy containing any false, incomplete or misleading information is guilty of a felony.

Pennsylvania Residents - Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects such person to criminal and civil penalties.

Tennessee Residents - It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties include imprisonment, fines and denial of insurance benefits.

Texas Residents - Any person who knowingly and with intent to injure, defraud, or deceive any insurer files a statement of claim or an application/enrollment form containing any false, incomplete, or misleading information may be guilty of a crime and may be subject to fines and confinement in prison.

Virginia Residents - Any person who, with the intent to defraud or knowing that he is facilitating a fraud against an insurer, submits an application or files a claim containing a false or deceptive statement may have violated state law.

Washington Residents - It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company.   Penalties include imprisonment, fines and denial of insurance benefits.

| Applicant Signature | Date | Spouse Signature | Date |
|---|---|---|---|
|  |  |  |  |

Signed by National Health Insurance Company Agent:

App. 265

Confidential Treatment Requested                                                                                NG000681

# Appendix J:

# Pivot Application

## Group Short Term Medical Plan Application


Underwritten by:
**Companion Life**

**Please submit completed applications with payment to:**

Insurance Benefit Administrators
Administrator for Companion Life Ins. Co.
P O Box 2943, Shawnee Mission, KS 66201-1343
844-630-7500

Please complete this application entirely. Failure to provide complete information may delay processing.

### Personal Details    Please provide the following details for all individuals to be covered.

| Name (First and Last) | Date of Birth | Gender | Contact Information | | |
|---|---|---|---|---|---|
| Primary<br>SSN# | | ☐ Male<br>☐ Female | Address | | |
| Spouse<br>SSN# | | ☐ Male<br>☐ Female | City | State | Zip |
| Child 1 | | ☐ Male<br>☐ Female | Phone Number | | |
| Child 2 | | ☐ Male<br>☐ Female | E-mail Address | | |

### Plan Options    [HML Plan]

**Deductible** [$1,000, $1,500, $2,000 $2,500, $3,000, $5,000, $7,500, $10,000]

**Coinsurance** [70%, 80%]

**Out of Pocket Maximum** [$3,000, $5,000, $10,000, $15,000]

**Coverage Period Maximum** [$1,000,000, $500,000, $250,000, $100,000]

**[Outpatient Prescription Drug Rider** ☐ Yes   ☐ No]

**Payment Option**

☐ Monthly – 90 day plan

☐ Monthly – 180 day plan

☐ Monthly – 364 day plan

☐ Single Up Front (please specify termination)

Specify Term Date _____

Number of days (max 180) _____

**Requested Effective Date ____ / _____ /**

### Medical Questions    Please answer the questions below as they apply to all family members applying for coverage.

| | | |
|---|---|---|
| 1. Will any applicant be eligible for Medicaid or Medicare on the requested effective date? | ☐ Yes | ☐ No |
| 2. Have/Are you, or any applicant:<br>  a.  Been denied insurance due to any health reasons for a condition that is still present? (Does not apply to residents of MO)<br>  b.  An expectant parent, in process of adoption or undergoing infertility treatment?<br>  c.  Over 300 pounds if male or over 250 pounds if female?<br>  d.  Been advised by a medical professional to have diagnostic testing, treatment, surgery that has not yet been completed? | ☐ Yes | ☐ No |
| 3. Within the last 5 years has any applicant had a diagnosis, symptoms, an abnormal test result or received treatment, medication or consultation for:  cancer or malignant melanoma; atrial fibrillation or abnormal heart rhythm, heart disorders, angina, heart attack or heart failure; stroke; uncontrolled hypertension; Type 1 diabetes (does not apply to residents of DC);   hepatitis C or liver or kidney disorders; organ transplant; chronic obstructive pulmonary disease (COPD) or emphysema; rheumatoid arthritis or degenerative disk disease;  hemophilia, leukemia or blood disorders;  muscular dystrophy or multiple sclerosis; alcohol or drug abuse or misuse; bipolar, schizophrenia; or eating disorders? | ☐ Yes | ☐ No |
| 4. Within the last 5 years has any applicant been diagnosed or treated by a physician or medical practitioner for Acquired Immune Deficiency Syndrome (AIDS) or tested positive for Human Immunodeficiency Virus (HIV)? (Residents of WI do not need to disclose HIV test results.) | ☐ Yes | ☐ No |
| 5. If all persons to be insured are United States citizens, please answer "No" to this question.<br>  If any person to be insured is not a United States citizen, has that person resided outside the United States at any time during the prior 12 months? | ☐ Yes | ☐ No |

**If you have answered "Yes" to questions 1 through 5, coverage cannot be issued.
Thank you for your interest.**

**For product information or assistance with this application, please contact:**

Insurance Benefit Administrators
Administrator for Companion Life Insurance Company
P O Box 2943, Shawnee Mission, KS 66201-1343
844-630-7500

**App. 267**

## Payment Information
Please provide complete payment information. Applications without payment cannot be processed.

<table>
<tr>
<td>
☐ Check/Money Order (Single Up-Front Payment Only)<br>
☐ ACH Account #_____ Routing #_____<br>
☐ MasterCard   ☐ VISA   ☐ PayPal<br>
☐ Discover   ☐ American Express
</td>
<td rowspan="4">
Check or Money Orders should be made payable, in US dollars, to Companion Life Insurance Company.<br>
If paying by credit card or ACH, I authorize Companion Life or its authorized agent to debit my bank account or Discover, VISA, MasterCard or American Express account for the applicable premium.  If I have selected a monthly plan, I hereby request and authorize Companion Life or its authorized agent to debit my Credit Card or bank account for the proper installment amounts on the due dates of the installments.  This authorization will remain in effect for the duration of the Coverage Period elected or until revoked by me in writing.  Coverage purchased by credit card is subject to validation and acceptance by the credit card company.
</td>
</tr>
<tr>
<td>Credit Card Number             Exp Date</td>
</tr>
<tr>
<td>Name on Card</td>
</tr>
<tr>
<td>Phone #</td>
</tr>
</table>

Billing Address (including city, state and zip)

| Cardholder Signature | Date |
|---|---|
| | |

## Authorization

I hereby request coverage under the insurance issued to the Communicating for America, Inc. and underwritten by Companion Life Insurance Company (Companion Life). **I understand this insurance contains a Pre-existing Condition exclusion, a Pre-certification Penalty and other restrictions and exclusions.**  I agree that coverage will not become effective for me or any dependent whose medical status, prior to the effective date, has changed and therefore results in a "yes" answer to any of the medical questions on this Application.  If my medical status changes in this way, coverage will be declined for all individuals included on this application.  I understand that if I have elected the Monthly Payment option, my credit card will be charged each month on the due date of the premium.  I understand that I may terminate the scheduled payments by notifying Companion Life in writing at least one business day prior to the next scheduled payment date. I understand that this coverage is not renewable or extendable.  I understand that the information contained herein is a summary of the coverage offered in the Certificate of Insurance and that I may obtain a complete copy of the Certificate of Insurance upon request to Companion Life.  I understand that Companion Life, as underwriter of the plan, is solely liable for the coverage and benefits provided under the insurance.  I understand and agree that the insurance agent/broker, if any, assisting with this Application is a representative of the Applicant.  If signed by a representative of the Applicant, the undersigned represents his/her capacity to so act.  If signed as guardian or proxy of the Applicant, the undersigned represents his/her capacity to so act.  By acceptance of coverage and/or submission of any claim for benefits, the Applicant ratifies the authority of the signer to so act and bind the Applicant.  If I am not already a member of the Communicating for America, Inc., I hereby request to be enrolled as a member.  I will receive a membership packet after my membership fees are received.

This coverage is not required to comply with certain federal market requirements for health insurance, principally those contained in the Affordable Care Act.  Be sure to check your Certificate carefully to make sure you are aware of any exclusions or limitations regarding coverage of preexisting conditions or health benefits (such as hospitalization, emergency services, maternity care, preventive care, prescription drugs, and mental health and substance use disorder services).  Your Certificate might also have lifetime and/or annual dollar limits on health benefits.  If this coverage expires or you lose eligibility for this coverage, you might have to wait until an open enrollment period to get other health insurance coverage.

**Fraud Warning**: Any person who knowingly and with intent to injure, defraud, or deceive any insurance company or other person submits an insurance application or statement of claim containing any materially false, incomplete or misleading information may be committing a crime and may be subject to civil or criminal penalties.

| Applicant Signature | Date | Spouse Signature | Date |
|---|---|---|---|
| | | | |

| Signed by Companion Life Appointed Agent: | Agent Number: | Plan Administrator Use Only: | |
|---|---|---|---|
| | | | |

App. 268

Classic (08/18) HC

# Appendix K:

# Marketing Materials







# Interim Coverage Plus

Short-term medical insurance with a limited benefit for pre-existing conditions. Providing peace of mind during times of transition.

Anthem Blue Cross and Blue Shield does not underwrite, insure or administer the insurance plans described in this brochure. The Interim Coverage Insurance plans are underwritten by Independence American Insurance Company (IAIC), a member of The IHC Group. For more information about IAIC and The IHC Group, visit www.ihcgroup.com. These products are not considered Minimal Essential Coverage as defined by the Patient Protection and Affordable Care Act (ACA).

**App. 270**



When circumstances leave you temporarily uninsured, short-term medical insurance helps protect you during coverage gaps.

**Interim Coverage Plus is a short-term medical (STM) insurance plan with a limited benefit for pre-existing conditions.** STM, sometimes called short-term medical limited duration insurance, is designed to provide coverage during transitions or gaps in major medical coverage. Most STM plans do not cover healthcare expenses for pre-existing medical conditions. Interim Coverage Plus provides a benefit up to a maximum of $25,000 for eligible pre-existing healthcare expenses.

**Why STM insurance?**

STM plans provide coverage during life transitions. When you are between group insurance or individual major medical policies, STM plans pay for covered medical expenses due to unexpected illnesses or injuries. Covered expenses include diagnostic physician visits, emergency room treatment, hospital stays, surgery, intensive care and more, but do not include maternity care or outpatient prescription drugs.

- **Affordable**
  STM plans are affordable. While STM contains limitations when compared to traditional major medical plans, the premium is generally lower.

- **Customizable**
  Select from various benefit levels which best meet your coverage and premium needs. You can also include other supplemental coverage such as dental or a discount prescription drug program to obtain additional coverage.

- **Convenient**
  Coverage can begin as early as the day following your online application. The underwriting process is simple and policy fulfillment, including claims and ID cards, are available online.

**App. 271**

**A STM plan may be right for you if you:**

- Have missed the open enrollment period and aren't eligible for special enrollment under the Affordable Care Act (ACA)
- Are waiting for your ACA coverage to start
- Are waiting for health insurance benefits to begin at a new job
- Are looking for coverage to bridge you to Medicare
- Are turning 26 and coming off your parent's insurance
- Are losing coverage following a divorce
- Are needing an alternative to COBRA
- Are healthy and under age 65

## STM plans are not ACA plans

STM plans do not meet ACA standards. The ACA is a Federal law that requires all major medical plans to provide specific benefits and mandates that most Americans have health plans that qualify as Minimum Essential Coverage (MEC). These rules do not apply to STM plans.

You may want to keep the following in mind as you plan for your needs and explore your options:

- STM plans do not meet the Minimum Essential Coverage requirements under the ACA and may result in a tax penalty. STM plans are designed to provide temporary healthcare insurance during unexpected coverage gaps.
- The ACA-compliant medical plans are guaranteed issue, meaning you cannot be denied coverage based on your health history. STM plans are underwritten, which means you must answer a series of medical questions when applying for coverage. Based on your answers, you may be declined for coverage.
- Unlike the ACA plans, which are required to cover the 10 Essential Health Benefits (EHB), STM plans cover some EHBs but not necessarily all. Plans will vary in what they cover, so you should check your plan details carefully.

**STM plans provide fast, flexible temporary coverage. It's also important that you understand what you're buying so you can make a good choice for you and your family.**

## Pre-existing condition limitation

Unlike most STM plans, Interim Coverage Plus provides a benefit for eligible pre-existing conditions. The plan provides up to a maximum of $25,000 for eligible medical expenses for a pre-existing condition, per person, per policy. After the $25,000 maximum has been reached, expenses due to pre-existing conditions are not covered. Refer to page five for the definition of a pre-existing condition.

**App. 272**

## Plan selection

All benefits listed apply per covered person, per coverage period.

| | |
|---|---|
| **Office visit copay**<br><br>The copay applies to the first covered office visit during the policy period. After the copay, the balance of the doctor office visit charge is covered at 100 percent.<br><br>Additional covered expenses incurred during the office visit, including expenses for laboratory and diagnostic tests, will be subject to plan deductible and coinsurance. | $50 copay |
| **Choose deductible**<br><br>The selected deductible must be paid by the covered person before coinsurance benefits begin.<br><br>Family deductible maximum: Three individual deductible amounts. When three covered persons in a family each satisfy their deductible, the deductibles for any remaining covered family members are deemed satisfied for the remainder of the coverage period. | • $2,500<br>• $5,000<br>• $10,000 |
| **Choose coinsurance percentage and out-of-pocket**<br><br>After the deductible has been met, you pay the selected percentage of covered expenses until the out-of-pocket amount has been reached. The plan covers the remaining percentage of covered expenses up to the maximum benefit.<br><br>The out-of-pocket amount is specific to expenses applied to the coinsurance; it does not include the deductible.<br><br>Once the deductible and coinsurance out-of-pocket amounts have been satisfied, additional covered charges within the coverage period are paid at 100 percent, up to the maximum benefit amount. Benefit-specific maximums may apply. The out-of-pocket does not include the deductible, any precertification penalty amounts or expenses not covered by the plan. | **80%**<br>• $1,000<br>• $2,000<br>• $3,000<br>• $4,000<br><br>**70%**<br>• $1,500<br>• $3,000<br>• $4,500<br>• $6,000<br><br>**50%**<br>• $2,500<br>• $5,000<br>• $7,500<br>• $10,000 |
| **Maximum benefit** | $2,000,000 |
| **Pre-existing condition coverage period maximum**<br><br>After maximum is reached, expenses due to pre-existing conditions are not covered.<br><br>Primary insured<br>Covered spouse<br>Covered child(ren) | $25,000<br>$25,000<br>$25,000 |

**App. 273**

## Covered expenses

All benefits, except office visits applied to the copay, are subject to the selected plan deductible and coinsurance. Covered expenses are limited by the usual and reasonable charge as well as any benefit-specific maximum. If a benefit-specific maximum does not apply to the covered expense, benefits are limited by the coverage period maximum. Benefits may vary based on your state of residence.

### Covered expenses include treatment, services and supplies for:

- Physician services for treatment and diagnosis
- Hospital room and board, doctor visits and general nursing care up to the amount billed for a semi-private room or 90 percent of the private room billed amount
- Intensive care or specialized care unit up to three times the amount billed for a semi-private room or three times 90 percent the private room billed amount
- Prescription drugs administered while hospital confined
- X-ray exams, laboratory tests and analysis
- Mammography, Pap smear and prostate antigen test (covered at specific age intervals, not subject to deductible)
- Emergency room, outpatient hospital surgery or ambulatory surgical center
- Surgeon services in the hospital or ambulatory surgical center
- Services when a doctor administers anesthetics up to 20 percent of the primary surgeon's covered charges
- Assistant surgeon services up to 20 percent of the primary surgeon's covered charges
- Surgeon's assistant services up to 15 percent of the primary surgeon's covered charges
- Ground ambulance services up to $500 per occurrence
- Air ambulance services up to $1,000 per occurrence
- Organ, tissue or bone marrow transplants up to $150,000 per coverage period
- Acquired Immune Deficiency Syndrome (AIDS) up to $10,000 per coverage period
- Blood or blood plasma and their administration, if not replaced
- Oxygen, casts, non-dental splints, crutches, non-orthodontic braces, radiation and chemotherapy services and equipment rental

## Pre-existing condition definition

A pre-existing condition is any medical condition or sickness for which medical advice, care, diagnosis, treatment, consultation or medication was recommended or received from a doctor within five years immediately preceding the covered person's effective date of coverage; or symptoms within the five years immediately prior to the coverage that would cause a reasonable person to seek diagnosis, care or treatment. This period of time may vary by state.

## Utilize a network provider and save

With your plan, you have the freedom to choose any provider. In certain markets, you also have access to discounted medical services through national preferred provider organizations (PPOs). These network providers have agreed to negotiated prices for their services and supplies. While you have the flexibility to choose any healthcare provider, the discounts available through network providers for covered services may help to lower your out-of-pocket costs.

At the time of service, simply present your identification card which will include the network information needed for the provider to correctly process covered billed charges.

**App. 274**

## Eligibility

Individuals, spouses and dependents may be covered. Interim Coverage Plus is available to the primary applicant from age 18 to 64, his or her spouse age 18 to 64 and dependent children under the age of 26. A child-only plan is available for children age 2 up to age 18. All family members will need to apply and meet the medical requirements of the plan.

## Usual and reasonable charge

The usual and reasonable charge for medical services or supplies is the lesser of: a) the amount usually charged by the provider for the service or supply given; or b) the average charged for the service or supply in the locality in which it is received.

With respect to the treatment of medical services, usual and reasonable means treatment that is reasonable in relationship to the service or supply given and the severity of the condition. In reaching a determination as to what amount should be considered as usual and reasonable, we may use and subscribe to an industry reference source that collects data and makes it available to its member companies.

## Right to return period

If you are not completely satisfied with this coverage and have not filed a claim, you may return the Policy within 10 days and receive a premium refund.

## Precertification

Precertification is required prior to each inpatient confinement for injury or illness, including chemotherapy or radiation treatment, at least seven days prior to receiving treatment. Emergency admissions must be pre-certified within 48 hours following the admission, or as soon as reasonably possible. Failure to complete precertification will result in a benefit reduction of 50 percent which would have otherwise been paid. Precertification is not a guarantee of benefits.

## Continuing coverage

If your need for temporary health insurance continues, most states allow you to apply for another STM plan. Your application is subject to eligibility, underwriting requirements and state availability of the coverage. The next coverage period is not a continuation of the previous period; it is a new plan with a new deductible, coinsurance and pre-existing condition limitation. Note that based on your state, you may be limited to two or three consecutive terms only.

## Coverage termination

Coverage ends on the earliest of the date: the premium is not paid when due; you enter full-time active duty in the armed forces or Independence American Insurance Company determines intentional fraud or material misrepresentation has been made in filing a claim for benefits. A dependent's coverage ends on the earliest of the date: your coverage terminates; the dependent becomes eligible for Medicare; or the dependent ceases to be eligible.

**App. 275**

## Exclusions

The Policy does not provide any benefits for the following expenses:

- Treatment of pre-existing conditions, as defined in the pre-existing conditions limitation provision, unless applied to the limited pre-existing condition benefit, shown in the Policy schedule of benefits
- Incurred prior to the effective date of a covered person's coverage or incurred after the expiration date, regardless of when the condition originated, except in accordance with the extension of benefits provision
- Treatment, services & supplies for:
  - Complications resulting from treatment, drugs, supplies, devices, procedures or conditions which are not covered under the Policy;
  - Experimental or investigational services or treatment or unproven services or treatment and/or
  - Purposes determined to be educational.
- Amounts in excess of the usual, reasonable and customary charges made for covered services or supplies or you or your covered dependent are not required to pay, or which would not have been billed, if no insurance existed; paid under another insurance plan, including Medicare, government institutions, workers' compensation or automobile insurance
- Expenses incurred by a covered person while on active duty in the armed forces. Upon written notice to us of entry into such active duty, the unused premium will be returned to you on a pro-rated basis
- Treatment, services and supplies resulting from:
  - War (declared or undeclared);
  - The commission of engaging in an illegal occupation;
  - Normal pregnancy or childbirth, except for complications of pregnancy;
  - A newborn child not yet discharged from the hospital, unless the charges are medically necessary to treat premature birth, congenital injury or sickness, or sickness or injury sustained during or after birth;
  - Voluntary termination of normal pregnancy, normal childbirth or elective cesarean section;
  - Any drug, including birth control pills, implants, injections, supply, treatment device or procedure that prevents conception or childbirth, including sterilization or reversal of sterilization; sex transformation (unless required by law), penile implants, sex dysfunction or inadequacies and/or
  - Diagnosis and treatment of infertility, including but not limited to any attempt to induce fertilization by any method, invitro fertilization, artificial insemination or similar procedures, whether the covered person is a donor, recipient or surrogate.
- Physical exams or prophylactic treatment, including surgery or diagnostic testing, except as specifically covered
- Mental illness or substance use, including alcoholism or drug addiction or loss due to intoxication of any kind unless mandated by law
- Tobacco use cessation
- Suicide or attempted suicide or intentionally self-inflicted injury, while sane or insane
- Dental treatment or care or orthodontia or other treatment involving the teeth or supporting structures, except as specifically covered and the treatment by any method for jaw joint problems including temporomandibular joint dysfunction (TMJ), TMJ pain syndromes, craniomandibular disorders, myofascial pain dysfunction or other conditions of the joint linking the jaw bone and skull and the complex of muscles, nerves and other tissues related to the joint
- Eye care, hearing, including hearing aids and testing
- Cosmetic or reconstructive procedures that are not medically necessary, breast reduction or augmentation or complications arising from these procedures
- Outpatient prescriptions, drugs to treat hair loss
- Feet unless due to accidental bodily injury or disease
- Weight loss programs or diets, obesity treatment or weight reduction including all forms of intestinal and gastric bypass surgery, including the reversal of such surgery
- Transportation expenses, except as specifically covered
- Rest or recuperation cures or care in an extended care facility, convalescent nursing home, a facility providing rehabilitative treatment, skilled nursing facility, or home for the aged, whether or not part of a hospital
- Providing a covered person with (1) training in the requirements of daily living; (2) instruction in scholastic skills such as reading and writing; (3) preparation for an occupation; (4) treatment of learning disabilities, developmental delays or dyslexia; or (5) development beyond a point where function has been demonstrably restored
- Personal comfort or convenience, including homemaker services or supportive services focusing on activities of daily life that do not require the skills of qualified technical or professional personnel, including bathing, dressing, feeding, routine skin care, bladder care and administration of oral medications or eye drops; supplies provided by a member of your immediate family and sleeping disorders
- Expenses incurred in the treatment of injury or sickness resulting from participation in skydiving, scuba diving, hang or ultralight gliding, riding an all-terrain vehicle such as a dirt bike, snowmobile or go-cart, racing with a motorcycle, boat or any form of aircraft, any participation in sports for pay or profit, or participation in rodeo contests
- Bone stimulator, common household items
- Participating in interscholastic, intercollegiate or organized competitive sports
- Medical care, treatment, service or supplies received outside of the United States, Canada or its possessions
- Spinal manipulation or adjustment
- Private duty nursing services
- The repair or maintenance of a wheelchair, hospital-type bed or similar durable medical equipment
- Orthotics
- Marital counseling or social counseling
- Acupuncture
- Artificial limbs or eyes, removal of breast implants
- Treatment, services or supplies not defined or specifically covered under the Policy

**App. 276**

**Short-term medical expense coverage under the Interim Coverage Plus plan is not available in all states.**

This policy has exclusions, limitations, reduction of benefits and terms under which the Policy may be continued in force or discontinued. For costs and complete details of the coverage, call your insurance producer or Anthem. This brochure provides a very brief description of the important features of Interim Coverage Plus plans. This brochure is not a policy and only the actual policy provisions will control. The policy itself sets forth in detail the rights and obligations of both the policyholder and the insurance company. It is, therefore, important that you READ THE POLICY CAREFULLY. For complete details, refer to the Short Term Medical Expense Insurance Policy Form #IAIC ISTM POL 0913 (Policy number may vary by state).

Anthem Blue Cross and Blue Shield is the trade name of: In Indiana: Anthem Insurance Companies, Inc. In Kentucky: Anthem Health Plans of Kentucky, Inc. In Maine: Anthem Health Plans of Maine, Inc. In Missouri (excluding 30 counties in the Kansas City area): RightCHOICE® Managed Care, Inc. (RIT), Healthy Alliance® Life Insurance Company (HALIC), and HMO Missouri, Inc. RIT and certain affiliates administer non-HMO benefits underwritten by HALIC and HMO benefits underwritten by HMO Missouri, Inc. RIT and certain affiliates only provide administrative services for self-funded plans and do not underwrite benefits. In Nevada: Rocky Mountain Hospital and Medical Service, Inc. HMO products underwritten by HMO Colorado, Inc., dba HMO Nevada. In Wisconsin: Blue Cross Blue Shield of Wisconsin (BCBSWi), underwrites or administers PPO and indemnity policies and underwrites the out of network benefits in POS policies offered by Compcare Health Services Insurance Corporation (Compcare) or Wisconsin Collaborative Insurance Corporation (WCIC). Compcare underwrites or administers HMO or POS policies; WCIC underwrites or administers Well Priority HMO or POS policies. Independent licensees of the Blue Cross and Blue Shield Association. ANTHEM is a registered trademark of Anthem Insurance Companies, Inc. The Blue Cross and Blue Shield names and symbols are registered marks of the Blue Cross and Blue Shield Association.

## About Independence American Insurance Company

Independence American Insurance Company is domiciled in Delaware and licensed to write property and/or casualty insurance in all 50 states and the District of Columbia.  Its products include short-term medical, hospital indemnity, fixed indemnity limited benefit, group and individual dental, and pet insurance. Independence American is rated A- (Excellent) for financial strength by A.M. Best, a widely recognized rating agency that rates insurance companies on their relative financial strength and ability to meet policyholder obligations (an A++ rating from A.M. Best is its highest rating).

## About The IHC Group

Independence Holding Company (NYSE: IHC) is a holding company that is principally engaged in underwriting, administering and/or distributing group and individual specialty benefit products, including disability, supplemental health, pet, and group life insurance through its subsidiaries since 1980. The IHC Group owns three insurance companies (Standard Security Life Insurance Company of New York, Madison National Life Insurance Company, Inc. and Independence American Insurance Company), and IHC Specialty Benefits, Inc. (IHC SB), a technology-driven full-service marketing and distribution company that focuses on small employer and individual consumer products through general agents, telebrokerage, advisor centers, private label arrangements, and through the following brands: www.HealtheDeals.com; Health eDeals Advisors; Aspira A Mas; www.PetPartners.com; and www.PetPlace.com. IHC creates value for insurance producers, carriers and consumers (both individuals and small businesses) through a suite of proprietary tools and products, all of which are underwritten by IHC's carriers or placed with highly rated insurance companies.

"IHC" and "The IHC Group" are the brand names for plans, products and services provided by one or more of the subsidiaries and affiliate member companies of The IHC Group ("IHC Entities"). Plans, products and services are solely and only provided by one or more IHC Entities specified on the plan, product or service contract, not The IHC Group. Not all plans, products and services are available in each state.

## The Loomis Company

The Loomis Company (Loomis), founded in 1955, has been a leading Third Party Administrator (TPA) since 1978. Loomis has strategically invested in industry leading ERP platforms, and partnered with well-respected companies to enhance and grow product offerings. Loomis supports a wide spectrum of clients from self-funded municipalities, school districts and employer groups, to large fully insured health plans who operate on and off state and federal marketplaces. Through innovation and a progressive business model, Loomis is able to fully support and interface with its clients and carriers to drive maximum efficiencies required in the ever evolving healthcare environment.

**App. 277**

These plans are not qualifying health coverage ("Minimum Essential Coverage") that satisfies the health coverage requirement of the Affordable Care Act. If you don't have Minimum Essential Coverage, you may owe an additional payment with your taxes. The termination or loss of this policy does not entitle you to a special enrollment period to purchase a health benefit plan that qualifies as Minimum Essential Coverage outside of an open enrollment period. These products may include a pre-existing condition exclusion provision.

# To bridge the gap in your coverage, call your broker or sales representative to find out about the Interim Coverage Plus plan.



THE IHC GROUP

Copyright © 2018 The IHC Group. All Rights Reserved.

**App. 278**



## Open Enrollment Starts Today!

Open Enrollment for health insurance is here! This is your chance to **upgrade your Short-term coverage**.



**Get a Major Medical Health Plan** — these plans have comprehensive health benefits and typically provide coverage for pre-existing conditions, doctor visits and prescription drugs.



**Extend your Short-term coverage** — check out the NEW Short-term plans that have longer coverage lengths. Plans range from 6-12 months of coverage.

Come back to eHealth and choose the coverage that's right for you!

[ Compare your options ]

Follow us on:

   

©{CurrentYear} eHealthInsurance Services, Inc.
440 East Middlefield Road, Mountain View, CA 94043

eHealthInsurance Services, Inc. does business as eHealth nationally and as eHealthInsurance Agency in NY and OK.

Privacy Policy | Licensing | About Us

Unsubscribe | Terms of Use

CONFIDENTIAL TREATMENT
REQUESTED NOT FOR CIRCULATION/
COMMITTEE AND STAFF ONLY

**App. 279**

{OmnitureTracking.ifp_broadcast_oep2019_starts_st_upgrade_stifp}

**CONFIDENTIAL TREATMENT
REQUESTED NOT FOR CIRCULATION/
COMMITTEE AND STAFF ONLY**

**App. 280**

EHEALTH-EC-00000041

# eHealth®

Hi {FirstName},

You may be wondering why you should **consider short-term insurance** instead of other coverage options available. **Here are three reasons why people typically buy a short-term plan:**

**1. Major Medical coverage is too expensive**
Short-term coverage can be a good solution for people who want an affordable way to protect themselves against unexpected or emergency medical bills.

**2. Missed the Open Enrollment Period**
Short-term coverage can be a temporary solution if you missed the annual Open Enrollment Period for major medical insurance and do not qualify for a **Special Enrollment Period**.

**3. Need coverage fast!**
Unlike major medical plans, many Short-term insurance plans can start the very next day after you submit your application.

**Get short-term coverage**

Follow us on:

   

Privacy Policy | Licensing | About Us

Unsubscribe | Terms of Use

©{CurrentYear} eHealthInsurance Services, Inc.
{CustSrvcPhysicalAddress}

*Short-term plans and medical insurance packages generally cost less per month than Obamacare-compliant plans because they are much more limited. For example, they do not meet the coverage requirements of Obamacare, may not cover pre-existing conditions, and have other significant restrictions. They are also not eligible for government subsidies. However, some people find these options to be a better fit for their situation than Obamacare-compliant

CONFIDENTIAL TREATMENT
REQUESTED NOT FOR CIRCULATION/
COMMITTEE AND STAFF ONLY

**App. 281**

EHEALTH-EC-00000050

plans.

eHealthInsurance Services, Inc. does business as eHealth nationally and as eHealthInsurance Agency in NY and OK.

{OmnitureTracking.ifp_incomplete_st_day4}

CONFIDENTIAL TREATMENT
REQUESTED NOT FOR CIRCULATION/
COMMITTEE AND STAFF ONLY

**App. 282**

EHEALTH-EC-00000051

# eHealth®



Now's your chance to sign up for affordable health insurance for 2019. Visit eHealth and we'll show you the **lowest cost options** in your area. Short-term plans* start as **low as $75/month**!

Find affordable coverage

Remember, all of our services are completely free and we can guarantee that you'll pay the lowest possible price available.

Follow us on:

   

©{CurrentYear} eHealthInsurance Services, Inc.

440 East Middlefield Road, Mountain View, CA 94043

*Based on the lowest price plans available from eHealth for a 30 year old female for coverage starting on January 1, 2019. Prices and availability vary based on age, geographic location, and other factors.

eHealthInsurance Services, Inc. does business as eHealth nationally and as

CONFIDENTIAL TREATMENT
REQUESTED NOT FOR CIRCULATION/
COMMITTEE AND STAFF ONLY

App. 283

EHEALTH-EC-00000075

eHealthInsurance Agency in NY and OK.

Privacy Policy | Licensing | About Us

Unsubscribe | Terms of Use

{OmnitureTracking.ifp_broadcast_oep2019_reminder1_ifpqhp_price}

CONFIDENTIAL TREATMENT
REQUESTED NOT FOR CIRCULATION/
COMMITTEE AND STAFF ONLY

App. 284

EHEALTH-EC-00000076









# Unexpected illnesses and accidents happen every day, and the resulting medical bills can be disastrous.

FlexTerm Health Insurance helps to protect you from the medical bills that can result from unexpected Injuries and Sickness.

Safeguard your financial future with FlexTerm Health Insurance. It provides the peace of mind and health care access you need at a price you can afford.

- Plans available up to 12 months*
- 5 minute simple application process
- Flexibility to choose your own physician and hospital
- Next Day Coverage

This is Short Term Medical Insurance that does not qualify as the minimum essential coverage required by the Affordable Care Act (ACA). Unless you purchase a plan that provides minimum essential coverage in accordance with the ACA, you may be subject to a federal tax penalty.

*Rates may vary.

**App. 285**

Everest_STM_Traditional_Broch

Confidential Treatment Requested

NG000007

# Is FlexTerm Health right for you?

## VALUABLE HEALTH INSURANCE COVERAGE FOR TIMES OF TRANSITION

**Between Jobs**
If you're between jobs, consider Short Term Medical. For about half the cost of COBRA*, Short Term Medical offers next-day coverage to help you bridge the insurance gap.

**Waiting for Employer Benefits**
Often new employers impose a waiting period before you're eligible for health benefits. With Short Term Medical, you stay insured and can choose your own plan duration.

**Temporary or Seasonal Employees**
When your employment schedule is unpredictable, it's hard to maintain health coverage. Short Term Medical offers you flexible coverage options to suit your situation.

**New Graduates**
If you've just graduated, you're probably no longer eligible for health insurance through a student plan. Short Term Medical is an affordable way to guard against unexpected medical bills until you secure permanent coverage.

## SUMMARY OF COVERAGE

 WELLNESS

 INPATIENT/OUTPATIENT SURGERY

 HOSPITAL BENEFITS

 EMERGENCY ROOM CARE

 OUTPATIENT SERVICES

 X-RAY AND LABORATORY

 TRANSPLANT BENEFITS

 URGENT CARE

 SICKNESS



Next day coverage available. Don't be without Health Insurance!

### How Does It Work?



**FIRST** — YOU PAY A $50 COPAY FOR A PHYSICIAN OFFICE VISIT OR YOU PAY A $50 COPAY FOR AN ANNUAL ROUTINE PHYSICAL EXAM

**THEN** — COVER YOUR DEDUCTIBLE OF $1,000, $2,500, $5,000, $7,500, $10,000
Your Deductible is the amount you must pay before FlexTerm Health Insurance pays benefits.

80%/90% coinsurance    or    80%/80% coinsurance    or    100% coinsurance

**AFTER** — FlexTerm Health pays all remaining covered charges, up to the Policy Period Maximum

*Short Term Medical insurance is often a lower-cost alternative to COBRA. However, if you purchase Short Term Medical rather than maintaining COBRA coverage, you may give up your rights to coverage for pre-existing conditions or guaranteed health insurance in the future. Short Term Medical benefits may be limited compared to COBRA coverage.

Everest_STM_Traditional_Broch_0118.pdf

**App. 286**

2

Confidential Treatment Requested

NG000008



## Choose your FlexTerm Health Insurance Plan

Eligible Expenses are subject to your selected Deductible and Coinsurance.

| Traditional Plan | |
| --- | --- |
| Coinsurance | 50/50, 80/20 or 100/0 |
| Deductible | $1,000, $2,500, $5,000, $7,500 or $10,000 |
| Out-Of-Pocket Maximum | $2,000 or $5,000 |
| Coverage Period Maximum | $250,000, $750,000, $1,000,000 or $1,500,000 |

Unless specified otherwise, the following benefits are for the Insured and each Covered Dependent subject to the plan Deductible, Coinsurance Percentage, Out-Of-Pocket Maximum and Policy Maximum chosen. Benefits are limited to the Maximum Allowable Expense for each Covered Expense, in addition to any specific limits stated in the policy.

| Doctor Office Consultation | |
| --- | --- |
| Copay | $50 Copay |
| Wellness Benefit Copay | $50 Copay |

| Inpatient Hospital Services | |
| --- | --- |
| Average Standard Room Rate | Average Standard Room Rate |
| Hospital ICU | Average Standard Room Rate |
| Doctor Visits | Subject to Deductible and Coinsurance |

| Outpatient Services | |
| --- | --- |
| Outpatient Surgery Deductible | $500 per surgery, maximum 3 |
| Emergency Room - Deductible | $500 per visit, maximum 3 |
| Advanced Diagnostic Studies Deductible | $500 per occurrence |
| Ambulance Benefit | Injury and Sickness: $250 per transport |
| Extended Care Facility Benefit | $250 per day, maximum 30 days |
| Home Health Care Benefit | $50 per visit, maximum 30 days (1 per day) |
| Physical, Occupational and Speech Therapy Benefit | $50 per day, maximum 20 visits |

| Mental Disorders | |
| --- | --- |
| Inpatient | $100 per day, maximum 31 days |
| Outpatient | $50 per day, maximum 10 visits |

| Substance Abuse | |
| --- | --- |
| Inpatient | $100 per day, maximum 31 days |
| Outpatient | $50 per day, maximum 10 visits |

This coverage contains a Pre-Existing Condition Exclusion. Pre-Existing Condition means a condition for which a Covered Person received medical treatment, diagnosis, care or advice, including diagnostic tests or medications, during the months prior to the Covered Person's effective date of coverage.
Policy terms, conditions, exclusions and limitations may vary by state. This product may not be available in all states.
Some waiting periods may apply. See Certificate for details.

Everest_(Flst_Traditional_Broc)_Feb_15_08.14

**App. 287**

Confidential Treatment Requested

NG000009

# 3 Quick & Simple

## Steps to the Short Term Medical Insurance



Select Plan/Rate → Complete Application → Post Payment

Coverage can begin as soon as 12:01 a.m. the next day once application is processed and payment is posted.

## Decide if Short Term Medical Insurance is right for you

FlexTerm Health Insurance coverage isn't right for everybody. You may want to consider a major medical plan that incorporates full health care reform benefits.

**SHORT TERM HEALTH PAYS FOR**

- Unexpected Sickness
- Unexpected Injuries
- Annual Preventive Exam
- Emergency Room
- Hospital Charge
- Urgent Care
- Physician Visits
- Surgery
- Accidents

**SHORT TERM HEALTH DOES NOT PAY FOR**

- Conditions that existed prior
- Dental and Vision Care
- Maternity

## KNOW WHAT'S NOT COVERED

Knowing exactly what your Short Term Medical Insurance does and does not cover is important. To give you the best possible experience, we offer this summary of what is not covered. Complete details are included in your policy.

- Treatment of a Pre-Existing condition, including those not inquired about on the enrollment form
- Spinal manipulations or adjustments
- Illness or injury that is self inflicted or caused while engaged in a felony, under the influence, in military service, in a hazardous

- occupation or activity, or while engaged in intercollegiate sports
- Vision or dental treatments, foot care or orthotic
- Expenses incurred outside the United States and its possessions
- Genetics or fertility treatment or testing
- Custodial care or private

- duty nursing
- Cosmetic, experimental, investigational or non-medically necessary treatment
- Hearing examination or hearing aids
- Maternity

Note: Plan terms, limitations and exclusions may vary by state.

## After Your Plan Expires...

This Short Term Medical insurance is nonrenewable, and policy termination is not considered a qualifying life event for purposes of enrolling in a plan. Therefore, depending on your policy's termination date and state laws about reapplying for a new plan, when your FlexTerm Health Insurance expires, you may have a gap in insurance coverage until you can begin coverage with new Short Term Medical Insurance or an ACA or other comprehensive insurance plan. You must re-apply for a new STM policy if you want to remain covered after expiration of your existing policy. Your new plan is not an extension of your current plan. As a result, your deductibles, waiting periods, maximum benefit limits and maximum out-of-pocket obligations will reset under your new policy and any illness or condition you develop under your current policy will be considered a pre-existing condition under your new plan.

Everest_STM_Traditional_Broc...

**App. 288**

Confidential Treatment Requested                                    NG000010

## Payment Options

**Single Payment** - If you know the exact length of time you will need this coverage for and prefer to make one single payment for the entire Policy Period, this payment option is ideal. Simply enter the exact total number of days you need coverage (30 day minimum/364 day maximum).

**Monthly Payment** - If you are unsure how long you will need this coverage or prefer the convenience of making monthly installments, this option is ideal. Each monthly payment is for 30 days of coverage, up to a 364 day maximum Policy Period. If you need this coverage ceased simply stop making payments and your coverage will terminate at the end of the 30 day period.

Payment methods include: automatic bank draft or credit card.

Note: 5 days advance written and signed notice from the Insured Person is required to ensure future premium payments are discontinued.

---

This FlexTerm Health Insurance Plan does not qualify as the minimum essential coverage required by the Affordable Care Act (ACA). Unless you purchase a plan that provides minimum essential coverage in accordance with the ACA, you may be subject to a federal tax penalty.

Underwritten by Everest Reinsurance Company rated A+ Superior by the A.M. Best Company (6/9/19). A.M. Best is an independent global rating organization that examines insurance companies and publishes its opinion on their financial strength.

Everest Reinsurance Company, 477 Martinsville Road, P.O. Box 830 Liberty Corner, NJ 07938-0830. Benefits not available in all states at this time. Members can be enrolled only once. Duplicate or multiple memberships are not allowed. Coverage is not provided for members age 65 or over, coverage will terminate at the end of the month insured turns age 65. If coverage is canceled, persons may not re-enroll in coverage with Everest Reinsurance Company until six months after their termination date.

This coverage contains a Pre-Existing Condition Limitation. Pre-Existing Condition means a condition for which a Covered Person received medical treatment, diagnosis, care or advice, including diagnostic tests or medications, during the months prior to the Covered Person's effective date of coverage.

---

This brochure provides summary information.  Please refer to the certificate or ask your agent for a complete listing of benefits, exclusions and terms of coverage.

FlexTerm Health Insurance is administrated by:
InsuranceTPA.com Administrators

 **RATING** by AM Best Company

FlexTerm Health Insurance Plan is the brand name for products underwritten by: Everest Reinsurance Company and it is rated A+ Superior by the A.M. Best Company.

Marketed by: _____

Broker: _____

Website: _____

Phone: _____

Email: _____

This coverage is not required to comply with certain federal market requirements for health insurance, principally those contained in the Affordable Care Act. Be sure to check your policy carefully to make sure you are aware of any exclusions or limitations regarding coverage of preexisting conditions or health benefits (such as hospitalization, emergency services, maternity care, preventive care, prescription drugs, and mental health and substance use disorder services). Your policy might also have lifetime and/or annual dollar limits on health benefits. If this coverage expires or you lose eligibility for this coverage, you might have to wait until an open enrollment period to get other health insurance coverage. Also, this coverage is not "minimum essential coverage."







**App. 289**

5

NG000011

 

# Short Term Medical

Temporary Insurance for
Gaps in Health Coverage

⊗ Between Jobs

⊗ Waiting for
Employer Benefits

⊗ Temporary or
Seasonal Employees

⊗ New Graduates

**1**

App. 290

LNG-3001    STH_Brochure_4.22.19



Coverage for **unexpected** Sickness & Injury

# Consider Short Term Health Insurance

Unexpected illnesses and accidents happen every day, and the resulting medical bills can be disastrous. Short Term Medical Health Insurance helps to protect you from the medical bills that can result from unexpected Injuries and Sickness.

Safeguard your financial future with SMART Term Health temporary insurance. It provides the peace of mind and health care access you need at a price you can afford.

**Underwritten by LifeShield National Insurance Co.** When you need reliable Short Term Medical insurance, you can depend on SMART Term Health.

## GET THE COVERAGE YOU NEED WITH SHORT TERM MEDICAL INSURANCE

**You can rely on a SMART Term Health Insurance Plan to provide the insurance coverage you need.**



Plans available up to 364 days
5 minute simple application process
Flexibility to choose your own Physician and hospital
Next Day Coverage*

*There is a 5 day waiting period for sickness benefits and 30 day waiting period for cancer benefits in most states.

This is Short Term Medical Insurance that does not qualify as the minimum essential coverage required by the Affordable Care Act (ACA). Unless you purchase a plan that provides minimum essential coverage in accordance with the ACA, you may be subject to a federal tax penalty.

### Why Choose SMART Term?

Feel Secure:

LifeShield is rated B++ (Good) for financial strength by AM Best Company.

Feel Confident:

You have access to convenient resources that make Short Term Medical Insurance easier to understand & help you save money.

Feel Respected:

No matter your question, concern or request, you can contact us knowing we'll treat you with respect.

App. 291

LNG-3001    STH_Brochure_4.22.19

# Is Short Term Medical right for you?

## VALUABLE MAJOR MEDICAL COVERAGE FOR TIMES OF TRANSITION

**Between Jobs**
If you're between jobs, consider Short Term Medical. For about half the cost of COBRA*, Short Term Medical offers next-day coverage to help you bridge the insurance gap.

**Waiting for Employer Benefits**
Often new employers impose a waiting period before you're eligible for health benefits. With Short Term Medical, you stay insured and can choose your own plan duration.

**Temporary or Seasonal Employees**
When your employment schedule is unpredictable, it's hard to maintain health coverage. Short Term Medical offers you prescription drug savings and flexible coverage options to suit your situation.

**New Graduates**
If you've just graduated, you're probably no longer eligible for health insurance through a student plan or your parent's plan. Short Term Medical is an affordable way to guard against unexpected medical bills until you secure permanent coverage.

### SUMMARY OF COVERAGE

- WELLNESS
- INPATIENT/OUTPATIENT SURGERY
- HOSPITAL BENEFITS
- EMERGENCY ROOM CARE

- OUTPATIENT SERVICES
- X-RAY AND LABORATORY
- TRANSPLANT BENEFITS
- URGENT CARE
- SICKNESS



Next day coverage available. Don't be without Health Insurance!

## So how does it work?



| FIRST | YOU PAY A $50 COPAY FOR A PHYSICIAN OFFICE VISIT |
| | OR YOU PAY A $50 COPAY FOR AN ANNUAL ROUTINE PHYSICAL EXAM |

| THEN | COVER YOUR DEDUCTIBLE OF $250, $500, $1,000, $2,500, $5,000, $7,500 OR $10,000 |
| | Your Deductible is the amount you must pay before SMART Term Health pays benefits. |

| AFTER | **50% / 50% coinsurance** | **80% / 20% coinsurance** | **100% coinsurance** |
| | You pay 50% of any additional covered charges, up to $2,000 or $5,000 | You pay 20% of any additional covered charges, up to $2,000 or $5,000 | We pay 100% of the covered charges up to the plan maximum |

SMART Term Health pays all remaining covered charges, up to the Policy Period Maximum

*Short Term Medical insurance is often a lower-cost alternative to COBRA. However, if you purchase Short Term Medical rather than maintaining COBRA coverage, you may give up your rights to coverage for pre-existing conditions or guaranteed health insurance in the future.

App. 292

LNG-3001    STH_Brochure_4.22.19



## Choose your SMART Term Health Insurance Plan
**Eligible Expenses are subject to your selected Deductible and Coinsurance.**

| Smart Term | |
|---|---|
| Coinsurance | 50/50, 80/20 or 100/0 |
| Deductible | $250, $500, $1,000, $2,500, $5,000, $7,500, $10,000 |
| Out-Of-Pocket Maximum | $0, $2,000, $5,000 |
| Coverage Period Maximum | $250,000, $1,000,000 |

**Unless specified otherwise, the following benefits are for Insured and each Covered Dependent subject to the plan Deductible, Coinsurance Percentage, Out-Of-Pocket Maximum and Policy Maximum chosen. Benefits are limited to the Maximum Allowable Expense or each Covered Expense, in addition to any specific limits stated in the policy.**

| Doctor Office Consultation | |
|---|---|
| Copay | $50 Copay, maximum 3 |
| Wellness Benefit Copay | $50 Copay, maximum 1 |
| **Inpatient Hospital Services** | |
| Average Standard Room Rate | Average Standard Room Rate |
| Hospital ICU | Average Standard Room Rate |
| Doctor Visits | Subject to Deductible and Coinsurance |
| **Outpatient Services** | |
| Surgical Facility | Subject to Deductible and Coinsurance |
| Outpatient Surgery Deductible | N/A |
| Emergency Room - Deductible | N/A |
| Advanced Diagnostic Studies Deductible | N/A |
| Ambulance | Injury: $250 per transport, Sickness: $250 per transport if admitted as an inpatient |
| Extended Care Facility | $150 per day, maximum 30 days |
| Home Health Care | $50 per visit, maximum 1 day |
| Physical, Occupational and Speech Therapy | $50 per day, maximum 20 visits |
| **Mental Disorders** | |
| Inpatient | $100 per day, maximum 45 days |
| Outpatient | $50 per day, maximum 60 visits |
| **Substance Abuse** | |
| Inpatient | $100 per day, maximum 31 days |
| Outpatient | $50 per day, maximum 10 visits |

**This coverage contains a Pre-Existing Condition Limitation. Pre-Existing Condition means a disease or physical condition for which medical advice or treatment was recommended or recieved by the Covered Person during the 12 months prior to the Covered Person's Effective Date of coverage.**
**Policy terms, conditions, exclusions and limitations may vary by state. This product may not be available in all states. Some waiting periods may apply. See Certificate for details.**
***Premiums vary depending on benefit level chosen.**

**App. 293**

LNG-3001    STH_Brochure_4.22.19



# 3 Quick & Simple
## Steps to the Short Term Medical Insurance

**1** Select Plan/Rate → **2** Complete Application → **3** Post Payment

Coverage can begin as soon as 12:01 a.m. the next day once application is processed and payment is posted.

**Decide if Short Term Medical Insurance is right for you**

SMART Term Health Insurance coverage isn't right for everybody. You may want to consider a major medical plan that incorporates full health care reform benefits.

### SHORT TERM HEALTH PAYS FOR

- Unexpected Sickness
- Unexpected Injuries
- Annual Preventive Exam
- Emergency Room
- Hostpital Charge
- Urgent Care
- Physicians Visits
- Surgery
- Accidents

### SHORT TERM HEALTH DOES NOT PAY FOR

- Conditions that existed preplan
- Dental and Vision Care
- Maternity

## KNOW WHAT'S NOT COVERED

Knowing exactly what your Short Term Medical Insurance does and does not cover is important. To give you the best possible experience, we offer this summary of what is not covered. Complete details are included in your policy.

• Treatment of a Pre-Existing condition, including those not inquired about on the enrollment form

• Spinal manipulations or adjustments

• Illness or injury that is self inflicted or caused while engaged in a felony, under the influence, in military service, in a hazardous occupation or activity, or while engaged in intercollegiate sports

• Vision or dental treatments, foot care or orthotic

• Expenses incurred outside the United States, its possessions, Canada

• Genetics or fertility treatment or testing

• Custodial care or private duty nursing

• Cosmetic, experimental, investigational or non-medically necessary treatment

• Hearing examination or hearing aids

• Maternity

• Any amount exceeding the benefit limits

• Expenses during the first 6 months after the Certificate Effective Date of coverage for a Covered Person for the following:

    a. Total or partial hysterectomy, unless it is Medically Necessary due to a diagnosis of carcinoma;
    b. Tonsillectomy;
    c. Adenoidectomy;
    d. Repair of deviated nasal septum or any type of surgery involving the sinus;
    e. Myringotomy;
    f. Tympanotomy;
    g. Herniorraphy; or
    h. Cholecystectomy

Note: Plan limits may vary by state. Please review the SMART Term Health Lite certificate for a full list of state specific exclusions.

## After Your Plan Expires...

This Short Term Medical insurance is nonrenewable, and policy termination is not considered a qualifying life event for purposes of enrolling in a plan. Therefore, depending on your policy's termination date, when your SMART Term Health Insurance expires, you may have a gap in insurance coverage until you can begin coverage with new Short Term Medical Insurance.

## State Rules for Reapplying for a new Plan

Arizona: 1 reapply of 180 days or less in any 12-month period
Colorado: Cannot exceed 2 Short Term Medical policies (any carrier) in a 12-month period
Minnesota: May not have more than 365 days of coverage within 555 days
Nevada: Total days may not exceed 185 days in any given 365 day period
Oregon: Must wait 61 days before you can reapply for a new Short Term Medical plan
West Virginia: Reapplies are not allowed
All Others: No restrictions

**App. 294**

LNG-3001   STH_Brochure_4.22.19

## Payment Options

**Single Payment** - If you know the exact length of time you will need this coverage for and prefer to make one single payment for the entire Policy Period, this payment option is ideal. Simply enter the exact total number of days you need coverage (30 day minimum/364 day maximum).

**Monthly Payment** - If you are unsure how long you will need this coverage or prefer the convenience of making monthly installments, this option is ideal. Each monthly payment is for 30 days of coverage, up to a 364 day maximum Policy Period. If you need this coverage ceased simply stop making payments and your coverage will terminate at the end of the 30 day period.

Payment methods include: automatic bank draft or credit card.

Note: 5 days advance written and signed notice from the Insured Person is required to ensure future premium payments are discontinued.

THIS COVERAGE IS NOT REQUIRED TO COMPLY WITH FEDERAL REQUIREMENTS FOR HEALTH INSURANCE, PRINCIPALLY THOSE CONTAINED IN THE AFFORDABLE CARE ACT. BE SURE TO CHECK YOUR POLICY CAREFULLY TO MAKE SURE YOU UNDERSTAND WHAT THE POLICY DOES AND DOESN'T COVER. IF THIS COVERAGE EXPIRES OR YOU LOSE ELIGIBILITY FOR THIS COVERAGE, YOU MIGHT HAVE TO WAIT UNTIL AN OPEN ENROLLMENT PERIOD TO GET OTHER HEALTH INSURANCE COVERAGE. ALSO, THIS COVERAGE IS NOT "MINIMUM ESSENTIAL COVERAGE". IF YOU DON'T HAVE MINIMUM ESSENTIAL COVERAGE FOR ANY MONTH IN 2018, YOU MAY HAVE TO MAKE A PAYMENT WHEN YOU FILE YOUR TAX RETURN UNLESS YOU QUALIFY FOR AN EXEMPTION FROM THE REQUIREMENT THAT YOU HAVE HEALTH COVERAGE FOR THAT MONTH.

**Underwritten by LifeShield National Insurance Co., Oklahoma City, OK 73118. A.M. Best affirmed the financial strength rating of B++ and revised the outlook to positive from stable for the long-term issuer credit rating of the company.  B++ (Good) is the fifth highest rating possible out of a total of 16. Benefits not available in all states at this time. Members can be enrolled only once. Duplicate or multiple memberships are not allowed. Coverage is not provided for members age 65 or over, coverage will terminate at the end of the month insured turns age 65. Changes to coverage underwritten by LifeShield National Insurance Co. can only be made if the change is the result of a qualifying life event. A qualifying life event means marriage, divorce, the death of your spouse, or the birth or adoption of a child. If coverage is canceled, persons may not re-enroll in coverage with LifeShield National Insurance Co. until six-months after their termination date.**

**This coverage contains a Pre-Existing Condition Limitation. Pre-Condition Limitation. Pre-Condition means a disease or physical condition for which medical advice or treatment was recommended or received by the Covered Person during 12 months prior to the Covered Person's Effective Date of coverage.**

This brochure provides summary information.  Please refer to the certificate or ask your agent for a complete listing of benefits, exclusions and terms of coverage.

**SMART Term Health Insurance Plan is the brand name for products underwritten by: LifeShield National Insurance Co.**

SMART Term Health is administrated by: InsuranceTPA.com Administrators

**Marketed by:**  _____

**Broker:**  _____

**Website:**  _____

**Phone:**  _____

**Email:**  _____





App. 295

LNG-3001      STH_Brochure_4.22.19



## Short Term Medical

Temporary health care coverage for you and your family.

### National General
Accident & Health

NGD0011RG

National General Accident and Health insurance products underwritten by National Health Insurance Company, Integon National Insurance Company, or Integon Indemnity Corporation.

**FOR USE IN THE FOLLOWING STATES:**

AL, AR, AZ, DC, FL, GA, IL, KS, LA, MN, MO, MS, MT, NE, NC, NV, OH, OK, PA, SC, SD, TX, UT, VA, WI, WV, WY

---

### National General
Accident & Health

This coverage is not required to comply with federal market requirements for health insurance, principally those contained in the Affordable Care Act. Be sure to check your policy carefully to make sure you are aware of any exclusions or limitations regarding coverage of preexisting conditions or health benefits (such as hospitalization, emergency services, maternity care, preventive care, prescription drugs, and mental health and substance use disorder services). If this coverage expires or you lose eligibility for this coverage, you might have to wait until an open enrollment period to get other health insurance coverage.

This document provides summary information. For a complete listing of benefits, exclusions and limitations, please refer to the Insurance Policy. In the event there are discrepancies with the information in this document, the terms and conditions of the coverage documents will govern.

LIFE Association is a membership organization that provides Members benefits for its members. Membership in the Association is required in order to be eligible for insurance coverage of certain states. Annual membership dues vary by state, are non-refundable and failure to renew membership dues and result in loss of eligibility to participate in any of the Association-sponsored programs or benefits. National General Accident & Health has sole responsibility for the insurance Plan selectively vary for benefits in some states this plan is only available through the LIFE Association. Membership dues apply.

Go to ngah.ehtc.com and download the Short Term Medical brochure.

**THIS PLAN PROVIDES LIMITED BENEFITS.**

NGAH-STM-BROCH-SL-RC 02/2018
© 2018 National Health Insurance Company. All rights reserved.

---

## Why choose Short Term Medical?

### Because life is unpredictable

Our Short Term Medical insurance gives you a plan to face those unpredictable moments in life with confidence. It provides the financial protection you need from unexpected medical bills and other health care expenses, including:

- Doctor visits and home preventive care
- Emergency rooms and ambulance coverage
- Urgent care benefits, and more

Short Term Medical is a good choice if you're:

- Between jobs
- Waiting for Medicare
- Waiting for new employee benefits

### Get covered.
### Contact me today.

[NAME]
[TITLE]
[EMAIL]
[PHONE]

App. 296

Confidential Treatment Requested

You choose your own coverage term, from 30 days to up to 12 months[1]



## aetna

Choose your doctor from more than 690,000 primary care doctors and specialists, across 5,700 hospitals in the Aetna Open Choice® PPO Network[5]

Find a provider at www.aetna.com/docfind/custom/mymemberlink

 

## LIFE Association Membership

A LIFE Association Membership helps you save even more by providing you with access to services and discounts such as:

 Telemed for LIFE

 Automobile services

Fitness programs

Travel advantages, entertainment and more

# Find the plan option fitting your needs and budget

## Building a Short Term Medical plan is easy

All you have to do is choose a deductible, select a coinsurance option, designate your coverage term, complete a health questionnaire, and you're all set.

Coverage is available as soon as the next day.

| DEDUCTIBLE[1] | COINSURANCE | OUT-OF-POCKET MAXIMUM AFTER DEDUCTIBLE | COVERAGE PERIOD MAXIMUM[1] |
|---|---|---|---|
| $1,000 | 50% / 50% | $5,000 | $250,000 |
|  | 80% / 20% | $5,000 | $1,000,000 |
| $2,500 | 50% / 50% | $5,000 | $250,000 |
|  | 80% / 20% | $5,000 | $1,000,000 |
|  | 100% | $0 | $1,000,000 |
| $5,000 | 50% / 50% | $5,000 | $250,000 |
|  | 80% / 20% | $5,000 | $1,000,000 |
|  | 100% | $0 | $1,000,000 |
| $10,000 | 80% / 20% | $5,000 | $1,000,000 |
| $25,000 | 80% / 20% | $5,000 | $1,000,000 |



Ask your agent about Guaranteed Issue Short Term Medical plans[7]

Confidential Treatment Requested



**Get the coverage you want, for the time you need**

## One application, up to 24 months of coverage.

### Our new innovative options help you stay covered.

With Short Term Medical from National General, you'll have the opportunity to purchase multiple plans[1] in one application.

 When you apply once for Standard Issue Short Term Medical you're guaranteed eligibility for another policy, for up to two years of coverage[4]

 Your pre-existing condition look-back period will be based on the first policy's effective date

 Deductibles and out-of-pocket maximums are reset with each new policy term

 No payment for future plans required at time of application

 New policy documents and ID cards will be provided with each new policy period

### Get the coverage you need, for the length of time you need it.

This coverage is not required to comply with federal market requirements for health insurance, principally those contained in the Affordable Care Act. Be sure to check your policy carefully to make sure you are aware of any exclusions or limitations regarding coverage of preexisting conditions or health benefits (such as hospitalization, emergency services, maternity care, preventive care, prescription drugs, and mental health and substance use disorder services). If this coverage expires or you lose eligibility for this coverage, you might have to wait until an open enrollment period to get other health insurance coverage.

### Contact me to learn more.

[NAME]
[TITLE]
[EMAIL]
[PHONE]

SHORT TERM MEDICAL PLANS PROVIDE LIMITED BENEFITS.

Availability and policy durations vary by state.

[1] Maximum allowable policy period is 364 days. Policy durations will vary by state. Some states have a maximum duration of 3 or 6 months per policy period.

National General Accident & Health markets products underwritten by National Health Insurance Company, Integon National Insurance Company, and Integon Indemnity Corporation.

NGAH-STMxMFLYER-CLIENT (Rev. 02/2019)

© 2019 National Health Insurance Company. All rights reserved.



**App. 298**



SHORT-TERM
COVERAGE
FROM THE NAME YOU TRUST

Arkansas
**BlueCross BlueShield**
An Independent Licensee of the Blue Cross and Blue Shield Association

MPI 6047 1/17_STB_DR

App. 299

ABCBS-000506

# Short-Term Blue

- Provides coverage for 30 to 182 days

- Protects against catastrophic medical costs

- Features no monthly premium, just one simple payment when you buy the policy

- Can be effective almost immediately

- Apply online at **arkansasbluecross.com** or by calling **1-800-392-2583**



| PLAN BENEFITS | Short-Term Blue |
|---|---|
| Coverage Length | 30 to 182 days |
| Deductible Amount | $500 or $1,000 |
| Coinsurance | You pay 20% coinsurance after the deductible is met |
| Primary Care Physician Office Visit (In-network) | You pay 20% coinsurance after the deductible is met |
| Specialist Office Visit and Inpatient/Outpatient Services (Hospital and Physician) | You pay 20% coinsurance after the deductible is met |
| Prescription Drugs | **Not** covered |
| Policy Coinsurance Maximum | $2,000 |
| Children's Preventive Care Services (Immunizations and Well-Patient Care) | You pay 0% coinsurance. Deductible does **not** apply. |
| Preventive Care Services | **Not** covered |
| Emergency Room (Hospital Only) | You pay 20% coinsurance after the deductible is met |
| Mental Health/Substance Abuse Benefits | **Not** covered |
| Maximum Policy Benefit | $1,000,000 per person |
| Maternity Benefits | **Not** available |
| Payment Method | One-time lump payment* |

*No refunds. Must apply online or over the phone.

*This is not qualifying health coverage ("minimum essential coverage") that satisfies the health coverage requirement of the Affordable Care Act. If you don't have minimum essential coverage, you may owe an additional payment with your taxes.*



Looking for **dental coverage?** We sell separate plans to help you keep your dental costs low. We even have a dental plan that includes vision coverage. Call and ask us about our dental plans at **1-800-392-2583**.

❷

SHORT TERM BLUE



**App. 300**

**ABCBS-000507**

# Continuing Your Coverage with Our Short-Term Blue Insurance Policy

**What happens when my Short-Term policy ends?**
You have the chance to purchase a new policy, which will cover you 30 to 182 days. Once your new policy is effective, you will receive a new ID card in the mail.

**Pre-Existing Conditions**
Any condition discovered during the previous policy will be considered a pre-existing condition and will NOT be covered by any new Short-Term Blue policy.

**Payment Method**
As with your initial Short-Term Blue policy, a one-time payment is submitted up-front (no refunds available).

# Calculating Plan Costs

**Short-Term Blue**
(Refer to the rate chart at right)

**STEP 1:** Find the appropriate deductible heading—$500 or $1,000.

**STEP 2:** Choose the type of coverage for which you are applying—Individual; Individual and Spouse; Individual and Child(ren); or Individual, Spouse and Child(ren).

**STEP 3:** Find the age of the oldest person to be covered.

**STEP 4:** This should lead you to your daily premium. $ _____

**STEP 5:** Multiply your daily premium by the number of days of coverage for which you are applying.*
X _____

**STEP 6:** Make your online premium payment for this total amount. $ _____

\* When counting the number of days, count the first day of coverage and the last day of coverage (30 minimum/182 maximum). **Coverage begins at 12:01 a.m. on the first day and terminates at 12:00 midnight on the last day of coverage.**

**Short-Term Blue Daily Premiums**

| Age | $500 Deductible | $1,000 Deductible |
|---|---|---|
| **Individual** | | |
| 6 months-24 years | $1.45 | $1.30 |
| 25-29 | $1.75 | $1.55 |
| 30-34 | $1.95 | $1.70 |
| 35-39 | $2.35 | $2.05 |
| 40-44 | $2.70 | $2.35 |
| 45-49 | $3.35 | $2.90 |
| 50-54 | $4.10 | $3.55 |
| 55-59 | $5.35 | $4.65 |
| 60-64 | $6.75 | $5.85 |
| **Individual and Spouse** | | |
| 18-24 | $2.60 | $2.30 |
| 25-29 | $3.25 | $2.80 |
| 30-34 | $3.70 | $3.20 |
| 35-39 | $4.35 | $3.80 |
| 40-44 | $5.05 | $4.40 |
| 45-49 | $5.90 | $5.15 |
| 50-54 | $7.30 | $6.35 |
| 55-59 | $9.70 | $8.40 |
| 60-64 | $12.60 | $10.90 |
| **Individual and Child(ren)** | | |
| 18-24 | $3.40 | $2.95 |
| 25-29 | $3.70 | $3.20 |
| 30-34 | $3.90 | $3.40 |
| 35-39 | $4.30 | $3.75 |
| 40-44 | $4.75 | $4.10 |
| 45-49 | $5.05 | $4.40 |
| 50-54 | $5.35 | $4.65 |
| 55-59 | $6.70 | $5.80 |
| 60-64 | $8.30 | $7.20 |
| **Individual, Spouse and Child(ren)** | | |
| 18-24 | $4.35 | $3.80 |
| 25-29 | $5.10 | $4.45 |
| 30-34 | $5.65 | $4.90 |
| 35-39 | $6.50 | $5.65 |
| 40-44 | $7.30 | $6.35 |
| 45-49 | $8.20 | $7.15 |
| 50-54 | $9.60 | $8.30 |
| 55-59 | $12.30 | $10.65 |
| 60-64 | $15.60 | $13.50 |

# Important Information About Our Short-Term Blue Insurance Policy

**Eligibility:** You are eligible for Short-Term Blue if you are a permanent resident of Arkansas and *between* the ages of six months and 65. You are **NOT** eligible if:

- You are covered by Medicaid or Medicare or any other health nsurance. (Short-Term Blue does **not** coordinate benefits with any other health insurer.)
- You are pregnant.
- Within the past five years, you received consultation or treatment for any of the conditions identified on the application.

Eligible Short-Term Blue **dependents** must be permanent residents of Arkansas and must be between the ages of 6 months and age 19.

**Pre-existing Conditions Exclusion Period:** Pre-existing conditions or diseases are NOT covered. A pre-existing condition or disease is one that causes symptoms, before the effective date of the policy, that would have caused an ordinarily prudent person to seek diagnosis, care or treatment. This also applies to aggravations of such conditions or diseases. There is NO credit given toward the pre-existing condition exclusion for prior insurance.

**Excluded Benefits:** The following services are NOT covered under Short-Term Blue:

- Pregnancy/childbirth (complications are covered)
- Prescription drugs
- Mental health/substance abuse
- Outpatient physical/occupational/speech therapy
- Transplants
- Infertility
- Adult routine care
- Hospice
- Vision (refractory, eyeglasses, etc.)
- Pre-existing conditions
- Services that are not medically necessary

- Services or supplies received outside the United States
- Other limits and exclusions apply as written in the policy contract

**Policy terms and termination:** If your temporary need for coverage continues beyond your original coverage period, you may apply for a **new** Short-Term Blue policy.

**Any condition that manifested during the term of the previous policy will be considered a pre-existing condition and will NOT be covered by the subsequent Short-Term Blue policy.**

This policy does **not** provide continuous coverage for any other Arkansas Blue Cross individually underwritten policies, including any you apply for while your Short-Term Blue policy is in effect. A policy is issued based on the status of the applicant(s) at the time the policy is effective. No changes are allowed to the policy once it has been issued. We may terminate the policy only if you have furnished fraudulent information or if you misuse your identification card. If we terminate this policy, we will give you 10 days' written notice. We will not refund any part of your premium. **Once you have been accepted into Short-Term Blue and payment has been received, the premium will not be refunded for any reason.**

**Extension of Benefits:** If you are hospitalized for a covered condition when your Short-Term Blue policy ends, you may be eligible for an extension of benefits. This extension applies only to the condition for which you are hospitalized, and covers related hospital and physician services. Benefits may be extended until the earlier of the date you reach any applicable benefit maximum or the date following your discharge from the hospital. Under no circumstances, can benefits be extended more than 60 days from the original termination date of your policy.



## Questions?
Call toll-free **1-800-392-2583**
Monday–Friday, 8 a.m. to 5 p.m.
or visit **arkansasbluecross.com**

  Arkansas
**BlueCross BlueShield**
An Independent Licensee of the Blue Cross and Blue Shield Association

Our Company complies with applicable federal civil rights laws and does not discriminate on the basis of race, color, national origin, age, disability, or sex. ATENCIÓN: si habla español, tiene a su disposición servicios gratuitos de asistencia lingüística. Llame al 1-844-662-2276. CHÚ Ý: Nếu bạn nói Tiếng Việt, có các dịch vụ hỗ trợ ngôn ngữ miễn phí dành cho bạn. Gọi số 1-844-662-2276.



Individual & Family

# SHORT TERM MEDICAL INSURANCE

*Protects you while you're between health plans.*

Have a little down time after college or before you start a new job?
If you find yourself between health plans, there's no need to tiptoe around.
Enjoy the break, knowing we'll help protect you when no one else does.



App. 303

Insurance for every step of life.



## Individual & Family
# SHORT TERM MEDICAL INSURANCE

Whether you're between jobs or just entering the workforce, you don't have to put your life on hold because you don't have health insurance. For less than the cost of your daily espresso, you can have coverage in case something goes wrong with your health. Plus, Short Term Medical Insurance will tide you over temporarily until you can enroll in Affordable Care Act (ACA)-mandated health coverage.

## HOW IT WORKS
Short Term Medical Insurance bridges the gap when you're between health plans.

**1 Temporary time out**
You're starting a catering business in your cousin's kitchen. You've graduated from your parents' health plan. Or maybe you've landed a full-time job with a big-time waiting period for health benefits. Whatever the reason, if you need temporary medical insurance, we can help.

**2 Plug the gap**
Buying Short Term Medical Insurance is quick, cheap and easy. Simply visit our website to get protection within 24 hours, or talk to your insurance producer to request an application. Just choose deductible and coinsurance amounts, plus the length of time you'd like to be covered—from 30 to 90 days.

**3 Breathe a little easier**
The coverage works like a major medical plan if an illness or accident sends you to the doctor or hospital.

## WHY SHOULD YOU BUY IT?
Think of Short Term Medical Insurance as protection for the intervals of life.

### Good and cheap
Single folks and families can get first-rate coverage at a cut-rate price. For covered accidents or illnesses, you can see the doctor of your choice anywhere, at any time—no referrals needed.

### Skip the wait
With no lapse in coverage, you may be able to avoid a benefit waiting period when you find a new job.

### Option to COBRA
If you don't have any current health issues, Short Term Medical Insurance could be an affordable alternative to more expensive COBRA coverage. Short Term Medical Insurance doesn't cover preventive care, normal pregnancies or any pre-existing illnesses or injuries.

### Accidental death benefits
The plan includes a $25,000 benefit for your loved ones if you die in an accident.

## Need temporary medical insurance? Talk to your insurance producer or call LifeMap Assurance Company®.

**New policies: 1 (800) 320-2915**
**Service and support: 1 (800) 756-4105**

● **LifeMapCo.com**

*This document is intended to give a brief overview of the product and how it may be used. This in no way serves as a certification of coverage and should be used for educational purposes only. For a copy of the full policy including all covered benefits, exclusions and limitations, please contact LifeMap.*

LM-144467-17/03rep09679-lm | © 2017 LifeMap



**App. 304**

Insurance for every step of life.

# Appendix L:

# Medical Record/HIPAA

# Authorization Form



DATE


Member Name
Member Address
Member City, State, Zip

Insured Name:
Member ID#:
Date of Service:
Group: LIFESHIELD STM

Dear Member,

Your benefit plan has a provision that limits benefits for pre-existing conditions.  In order to determine if the treatment is related to a pre-existing condition, we need additional information from you.

Please return this letter, listing the names and addresses of all physicians that you have consulted between MM/DD/YYYY – MM/DD/YYYY. Please include the names and addresses of your primary care physician and any specialists that you have seen, and complete the Provider Information Form enclosed.

The HIPAA Compliant Authorization form (enclosed) is also required to be completed in order for us to request information regarding this claim.

IF THERE IS NO RESPONSE WITHIN 30 DAYS, THIS CLAIM WILL BE CLOSED.  THE CLAIM WILL BE RECONSIDERED IF REQUESTED INFORMAOITN IS RECEIVED WITHIN 60 DAYS OF THIS NOTICE.

Please return this letter with your response at your earliest convenience.  If you have any questions or concerns, please call our Customer Service Department at 1-877-390-2501.

Thank you,

**Desiree Perez**
Account Manager- Carrier Plans
100 Garden City Plaza, Suite 110
Garden City, NY 11530
**O:** 516.739.1060 ext. 127 | **F:** 516.739.1066
dperez@ibatpa.com


**INTERNATIONAL BENEFITS ADMINISTRATORS**
GARDEN CITY PLAZA SUITE 110
GARDEN CITY, NY 11530

**App. 306**



**Provider Information**

**Please complete the following information:**

Insured Information:

Name:_____    Address:_____

Home Phone (    ) _____   Cell Phone (    ) _____

Patient Information:

Name:  _____    Address: _____

Home Phone (     ) _____   Cell Phone:  (      ) _____

Please list ALL Medical Doctors, Surgeons, Specialists, Nurse Practitioners, Physicians Assistants, Psychiatrists or Counselors that you (claimant) have seen or been treated by in the period listed above.

Provider Name                    Provider Address                    Provider Phone

_____

_____

_____

_____

_____

**Please attach a separate sheet if more space is needed.

**Any misstatement and/or omission of information may be considered a misrepresentation and may result in a possible termination of coverage for the insured and all dependents.**

Please have the claimant complete and sign the attached authorization and this form.  In case of a minor claimant, parent or legal guardian must complete the authorization on their behalf.  Your signature will be taken as notice of your agreement to allow IBA to request and review medical information from the providers listed.  All information will be kept in compliance with privacy statutes and be used for the sole purpose of benefits determination per the guidelines of your insurance plan.

**Signature** _____ **Date**_____ App. 307

**HIPPA COMPLIANT AUTHORIZATION FOR THE RELEASE OF PATIENT INFORMATION**

By signing below, I authorize the Physician(s) and/or Facility(s) to disclose the requested information to International Benefits Administrators.  I understand that this information will be used for the purposes of payment or healthcare operations as such are defined under the HIPAA privacy regulation.  This Authorization is valid from the date signed for the duration of the claim and a photographic copy of this authorization shall be valid as an original.

PLEASE CHECK ALL THAT APPLY:

___   All medical records, meaning every page in my record, including but not limited to:  office notes, face sheets, history and physical, consultation notes, impatient and/or emergency room treatment, all clinical records, progress notes, treatment plans, admission records, test results.

___   All physical, occupational and rehabilitation records

___   All laboratory, pathology, radiology records including CT scan, MRI, EKG, ECG reports

I understand that information to be released or disclosed may include information related to sexually transmitted diseases acquired immunodeficiency syndrome (IADS), or human immunodeficiency virus (HIV), and alcohol and drug abuse.

This authorization is given in compliance with the federal consent requirements for release of records in accordance of 42 CFR 2.31.

I understand the following:

   A. I have the right to revoke this authorization in writing at any time, except to the extent information has been released upon this authorization.

   B. The information release in response to this authorization may be re-disclosed to other parties.

   C. My treatment or payment for my treatment cannot be conditioned on the signing of this authorization.

Signature: _____   Date: _____
                      (Claimant/Patient)

Signature: _____   Date: _____
                  (Parent/Guardian if Patient is a Minor)



InsuranceTPA.com
PO Box 998
Janesville, WI 53547



Return To:

InsuranceTPA.com
PO Box 998
Janesville, WI 53547
Claims@insurancetpa.com
Fax #: 608-601-1088

| Date Processed: | |
| Account ID: | |
| Trns #: | |
| Letter ID: | |

INSURED N
PLAN ID:
PATIENT N
DATE OF SERVIC
DATE OF BIRTH:



Dear Member,

This letter is being sent to you by InsuranceTPA.com, Inc.
As a valued customer, we strive to provide you with the highest
quality in customer care.
Your benefit plan has a provision that limits benefits for a
pre-existing condition. In order to determine if the treatment is
related to a pre-existing condition, you must return this letter
with the following information.

Please list all names and addresses of the physicians you have
visited during the period of 02-05-2013 to 02-05-2018. Please complete
the Provider Information form enclosed.

We also require that you sign the HIPAA Compliant Authorization
form to request information regarding this claim.

IF THERE IS NO RESPONSE WITHIN 45 DAYS, THIS CLAIM WILL BE CLOSED.
THIS CLAIM WILL BE RECONSIDERED IF REQUESTED INFORMATION IS RECEIVED
WITHIN 60 DAYS OF THIS NOTICE.

If you have any questions or concerns regarding this letter, please
call our Customer Service Department at 1-855-848-9591, option #1.
Our hours of operation are Monday through Friday, 8:30am-5:00pm CST.

You may also visit our website at www.insurancetpa.com to check the
status of your claim, review your benefit guidelines or print a copy
of your ID card.

Respectively,
InsuranceTPA.com, Inc.

**App. 309**

HIPAA COMPLIANT AUTHORIZATION FOR THE RELEASE OF PATIENT INFORMATION

By signing below, I authorize the Physician(s) and/or Facility(s) to disclose the requested information to InsuranceTPA.com. I understand that this information will be used for purposes of payment or healthcare operations as such are defined under the HIPAA privacy regulation. This authorization is valid from the date signed for the duration of the claim and a photographic copy of this authorization shall be valid as an orginal.

__ All medical records, meaning every page in my record, including but not limited to: office notes, face sheets, history and physical, consultation notes, inpatient and/or emergency room treatment, all clinical records, progress notes, treatment plans, admission records, test results

__ All physical, occupational and rehabilitation records

__ All laboratory, pathology, radiology records including CT scan, MRI, EKG, ECG reports

I understand that information to be release or disclosed may include information related to sexually transmitted diseases, acquired immunodeficiency syndrome (AIDS), or human immunodeficiency virus (HIV), and alcohol and drug abuse.

This authorization is given in compliance with the federal consent requirements for release of records in accordance of 42 CFR 2.31.

I understand the following:
a. I have a right to revoke this authorization in writing at any time, except to the extent information has been released upon this authorization.
b. The information released in reponse to this authorization may be re-disclosed to other parties.
c. My treatment or payment for my treatment cannot be conditioned on the signing of this authorization.

Signature:_____ Date:_____
(Claimant/Patient)

Signature:_____ Date:_____
(Parent/Guardian if Patient is a Minor)



**InsuranceTPA.com**
**CLAIMS ADMINSTRATOR**
14 North Parker Dr.
Janesville, WI 53545



**Provider Information**

**Please complete the following information:**

Insured Information:

Name _____ Address _____

Home Phone ( ) _____ Cell Phone ( ) _____

Patient Information:

Name _____ Address _____

Home Phone ( ) _____ Cell Phone ( ) _____

Please list **ALL** Medical Doctors, Surgeons, Specialists, Nurse Practitioners, Physicians Assistants, Psychiatrists or Counselors that you (claimant) have seen or treated by.

Provider Name          Provider Address          Provider Phone

_____

_____

_____

_____

_____

**Please attach a separate sheet if more space is needed.

**Any misstatement and or omission of information may be considered a misrepresentation and result in a possible termination of coverage for the insured and all dependents.**

Please have the claimant complete and sign the attached authorization and this form. In case of minor claimant, parent or legal guardian must complete the authorization on their behalf. Your signature will be taken as notice of your agreement to allow insuranceTPA.com as agents of United States Fire Insurance Company, to request and review medical information from the providers listed. All information will be kept in compliance with privacy statutes and be used for the sole purpose of benefits determination per the guidelines of your insurance plan.

Signature _____ Date _____

**App. 311**

## CERTIFICATE OF SERVICE

I certify that on November 15, 2021, I served this document through CM/ECF

upon:

Christopher M. Lynch
Jordan L. Von Bokern
Trial Attorneys
U.S. Department of Justice
Civil Division
1100 L Street, NW
Washington, DC 20005
(202) 353-4537 (phone)
(202) 616-8460 (fax)
christopher.m.lynch@usdoj.gov
jordan.l.von.bokern2@usdoj.gov

Brian W. Stoltz
Assistant United States Attorney
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
(214) 659-8626 (phone)
(214) 659-8807 (fax)
brian.stoltz@usdoj.gov

*Counsel for the Defendants*

      /s/ Jonathan F. Mitchell
      Jonathan F. Mitchell
      *Counsel for Plaintiffs*