UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

**Braidwood Management Inc.**, et al.

                    Plaintiffs,

v.                                                    Case No. 4:20-cv-00283-O

**Xavier Becerra**, et al.,

                    Defendants.

**Plaintiffs' Reply Brief In Support Of Supplemental Motion For Summary Judgment And Response To Plaintiffs' Supplemental Cross-Motion For Summary Judgment**

# TABLE OF CONTENTS

Table of contents ........................................................................................................... i

Table of authorities ...................................................................................................... ii

I.   Each of the non-Braidwood plaintiffs has Article III standing to challenge the preventive-care coverage mandates ....................................................................... 1

   A.   The religious-objector plaintiffs are suffering injury despite the fact that none of them are currently carrying health insurance ........................................ 1

   B.   The non-Braidwood plaintiffs have purchaser standing ................................. 5

II.  The Court should enter judgment for the defendants on the plaintiffs' claims related to the Contraceptive Mandate .................................................................... 9

III. This Court has no authority to "sever" 42 U.S.C. § 299b-4(a)(6) or "authorize" the Secretary to review the Task Force's recommendations .............. 10

   A.   The defendants' proposed remedy does not cure the Appointments Clause Violation .......................................................................................... 10

   B.   A federal district court has no authority to nullify a federal statute or confer powers on the Secretary that Congress has withheld ...................................... 12

   C.   The defendants' proposed remedy will not redress the plaintiffs' Article III injuries ........................................................................................................ 15

IV.  The plaintiffs are entitled to a universal remedy under section 706 of the Administrative Procedure Act .............................................................................. 16

   A.   The Court should award the plaintiffs an APA remedy regardless of whether they specifically requested it in their pleadings ................................. 16

   B.   The plaintiffs' challenge to the constitutionality of 42 U.S.C. § 300gg-13(a)(1) logically encompasses a challenge to the legality of all agency actions taken to implement the statute ............................................................ 20

   C.   The Court should vacate only the agency actions that implement the requirements of 42 U.S.C. § 300gg-13(a)(1), rather than the Task Force recommendations themselves .......................................................................... 22

   D.   The law of the Fifth Circuit interprets section 706(2) of the APA to require vacatur .......................................................................................................... 23

   E.   A universal remedy is appropriate ................................................................. 24

Conclusion .................................................................................................................. 25

Certificate of service .................................................................................................. 27

## TABLE OF AUTHORITIES

**Cases**

American Legion v. American Humanist Ass'n, 139 S. Ct. 2067 (2019) ............................8

*Buckley v. Valeo*, 424 U.S. 1 (1976) (per curiam) ..........................................................passim

*Camreta v. Greene*, 563 U.S. 692 (2011) ...........................................................14

Center for Auto Safety v. National Highway Traffic Safety Administration, 793 F.2d 1322 (D.C. Cir. 1986) ....................................................................4

Citizens United v. Federal Election Comm'n, 558 U.S. 310 (2010) ..................................16

*City of Los Angeles v. Barr*, 929 F.3d 1163 (9th Cir. 2019) ..................................................8

*Collins v. Mnuchin*, 938 F.3d 553 (5th Cir. 2019) ............................................................15

Competitive Enterprise Institute v. National Highway Traffic Safety Administration, 901 F.2d 107 (D.C. Cir. 1990) ..............................................4

*Cooper v. Aaron*, 358 U.S. 1 (1958) ...........................................................14

Crawford v. Marion County Election Board, 472 F.3d 949 (7th Cir. 2007)........................7

Czyzewski v. Jevic Holding Corp., 137 S. Ct. 973 (2017).......................................................7

Data Marketing Partnership, LP v. United States Dep't of Labor, 45 F.4th 846 (5th Cir. 2022).................................................................24

Dobbs v. Jackson Women's Health Organization, 142 S. Ct. 2228 (2022)................16, 19

Franciscan Alliance, Inc. v. Becerra, 47 F.4th 368 (5th Cir. 2022) ...................................24

Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc., 527 U.S. 308 (1999)...........................................................................13

Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992)......................................................3, 6

*March for Life v. Burwell*, 128 F. Supp. 3d 116 (D.D.C. 2015).....................................2, 8

New York Republican State Committee v. SEC, 927 F.3d 499 (D.C. Cir. 2019)................................................................................................7

Ohio v. Akron Ctr. for Reproductive Health, 497 U.S. 502 (1990) .................................20

*Orangeburg, South Carolina v. FERC*, 862 F.3d 1071 (D.C. Cir. 2017) ...........................5

Professional Association of College Educators v. El Paso County Community College District, 730 F.2d 258 (5th Cir. 1984)...........................................25

Public Interest Research Group v. Powell Duffryn Terminals, 913 F.2d 64 (3d Cir. 1990).....................................................................7

Rental Housing Ass'n of Greater Lynn, Inc. v. Hills, 548 F.2d 388 (1st Cir. 1977).........................................................................................7

Steel Co. v. Citizens for a Better Environment, 523 U.S. 83 (1998) ................................15

Tax Analysts & Advocates v. Blumenthal, 566 F.2d 130 (D.C. Cir. 1977)..........................7

Town of Chester v. Laroe Estates, Inc., 137 S. Ct. 1645 (2017)......................................10

*United States v. Arthrex, Inc.*, 141 S. Ct. 1970 (2021) ..............................................11, 12

United States v. Students Challenging Regulatory Agency Procedures
(SCRAP), 412 U.S. 669 (1973)............................................................................5, 8

*Weissman v. Nat'l R.R. Passenger Corp.*, 21 F.4th 854 (D.C. Cir. 2021) ...................5, 6, 7

Whole Woman's Health v. Hellerstedt, 136 S. Ct. 2292 (2016)................................19, 20

Whole Woman's Health v. Hellerstedt, 579 U.S. 582 (2016) ...........................................16

Wieland v. United States Dep't of Health & Human Services, 196 F. Supp.
3d 1010 (E.D. Mo. 2016) ...................................................................................2, 8

**Statutes**

42 U.S.C. § 299b-4(a)(6) ...............................................................................10, 12

42 U.S.C. § 300gg-13(a)(1) ...............................................................................passim

5 U.S.C. § 702 .................................................................................................6

5 U.S.C. § 706(1)............................................................................................13

**Other Authorities**

Nicholas Bagley, *Remedial Restraint in Administrative Law*, 117 Colum. L.
Rev. 253 (2017) .............................................................................................24

John Harrison, *Section 706 of the Administrative Procedure Act Does Not Call
for Universal Injunctions or Other Universal Remedies*, 37 Yale J. On Reg.
Bull. 37 (2020) .............................................................................................23

Edward A. Hartnett, *A Matter of Judgment, Not A Matter of Opinion*, 74
N.Y.U. L. Rev. 123 (1999)................................................................................15

Thomas W. Merrill, *Article III, Agency Adjudication, and the Origins of the
Appellate Review Model of Administrative Law*, 111 Colum. L. Rev. 939
(2011)..........................................................................................................24

Thomas W. Merrill, *Judicial Opinions as Binding Law and as Explanations
for Judgments*, 15 Cardozo L. Rev. 43 (1993).............................................................15

Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 Va. L. Rev. 933
(2018)..........................................................................................................21

Nicholas Quinn Rosenkranz, *The Subjects of the Constitution*, 62 Stan. L. Rev.
1209 (2010)...................................................................................................21

Mila Sohoni, *The Power to Vacate a Rule*, 88 Geo. Wash. L. Rev. 1121
(2020)......................................................................................................23, 24

The defendants argue that each of the non-Braidwood plaintiffs lacks Article III standing and that any remedy should be limited to Braidwood's self-insured plan. *See* Defs.' Br., ECF No. 99, at 1–7; 8–22. The defendants also contend that the non-Braidwood plaintiffs' challenges to the Contraceptive Mandate should be dismissed for lack of subject-matter jurisdiction (rather than on the merits) if the Court determines that the particular plaintiff lacks Article III standing to challenge the Contraceptive Mandate independently from Braidwood. *See id.* at 7–8. We will address these contentions in the order that they appear in the defendants' brief.

## I.   Each Of The Non-Braidwood Plaintiffs Has Article III Standing To Challenge The Preventive-Care Coverage Mandates

It is not necessary for this Court to determine whether the non-Braidwood plaintiffs can independently demonstrate Article III standing if it concludes that Braidwood is entitled to a universal remedy. But if the Court decides to reach this question—or if it rejects Braidwood's arguments for a universal remedy—then it should hold that each of the non-Braidwood plaintiffs has demonstrated Article III standing.

### A.   The Religious-Objector Plaintiffs Are Suffering Injury Despite The Fact That None Of Them Are Currently Carrying Health Insurance

The defendants argue that the religious-objector plaintiffs[1] lack standing because none of them are currently carrying health insurance,[2] but this observation does not in any way obviate or eliminate the injury that the plaintiffs seek to redress. Each of the plaintiffs is currently unwilling to purchase health insurance because the preventive-care mandates would force them to pay for coverage that violates their religious beliefs.[3] And each of the plaintiffs

---

1.   The religious-objector plaintiffs include John Kelley, Kelley Orthodontics, Joel Starnes, and Zach and Ashley Maxwell.

2.   *See* Defs.' Br., ECF No. 99, at 2–5.

3.   *See* Second Starnes Decl. ¶ 5 (attached as Exhibit 1) ("I stopped purchasing health insurance for myself and my family and switched to Christian bill-sharing in 2016. I made this decision both because the preventive-care mandates were forcing me to pay

remains interested in purchasing health insurance and wants the option of purchasing health insurance that excludes the objectionable coverage.[4] The denial of this option inflicts injury in fact. *See March for Life v. Burwell*, 128 F. Supp. 3d 116, 128–29 (D.D.C. 2015) ("[T]he employee plaintiffs have demonstrated that the [Contraceptive] Mandate substantially burdens their sincere exercise of religion . . . [because] [t]he Mandate, in its current form, makes it impossible for employee plaintiffs to purchase a health insurance plan that does not include coverage of contraceptives to which they object."); *Wieland v. United States Dep't of Health & Human Services*, 196 F. Supp. 3d 1010, 1017 (E.D. Mo. 2016) (federal contraceptive mandate substantially burdens the religious freedom of individual consumers of health insurance because "the ultimate impact is that Plaintiffs must either maintain a health insurance plan that includes contraceptive coverage, in violation of their sincerely-held religious beliefs, or they can forgo healthcare altogether").

---

for coverage that that violated my religious beliefs and because the premiums had become too expensive."); Second Kelley Decl. ¶ 5 (attached as Exhibit 2) (same); *id.* at ¶ 6 ("I stopped purchasing health insurance for my employees at Kelley Orthodontics in 2016 for several reasons: (1) the premiums had become too expensive; (2) my company was being forced to pay for coverage that I found objectionable; and (3) several of my employees asked me to drop coverage because they were unable to enroll in their husbands' much better plans as long as I was offering coverage to them as part of their job."); Second Zach Maxwell Decl. ¶ 6 (attached as Exhibit 3) ("We still intend and want to purchase health insurance but we currently do not have it because the available plans are either too expensive or require us to pay for compulsory coverage mandates that violate our religious beliefs (or both).").

4.   *See* Second Starnes Decl. ¶ 6 ("I remain interested in purchasing health insurance for myself and my family, and I would strongly consider doing so if the preventive-care coverage mandates were declared unconstitutional and enjoined."); Second Kelley Decl. ¶ 7 ("I remain interested in purchasing health insurance for myself and my family, as well as for my employees at Kelley Orthodontics, and I would strongly consider doing so if the preventive-care coverage mandates were declared unconstitutional and enjoined."); Second Maxwell Decl. ¶ 6 ("We would love to purchase affordable health insurance that excludes compulsory coverage of care that violates our religious beliefs, and we would strongly prefer that to our current situation.").

Of course, if the religious-objector plaintiffs had *no* interest or desire to purchase health insurance then they would not be suffering injury from the preventive-care coverage mandates. But that is not situation here. Each of the plaintiffs previously carried health insurance but dropped it in response to the high costs and the compulsory coverage that violated their religious beliefs.[5] And each of the plaintiffs remains interested in purchasing health insurance and will "seriously consider" it if the preventive-care coverage mandates are declared unconstitutional or enjoined.[6] Restricting the types of health insurance available to individuals who remain interested in purchasing health insurance—and who will choose between purchasing health insurance or going without it—inflicts Article III injury by restricting the range of choices available to these individuals.

The defendants try to analogize this case to *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 563–64 (1992), which held that the plaintiffs in that case had failed to establish an "imminent" Article III injury from harm to endangered species—despite their professed desires and intentions to travel to places where those species might be observed. The Court faulted the plaintiffs' affidavits for failing to describe "concrete plans" to visit the relevant locations, or even to specify when the future travel might occur:

> [T]he affiants' profession of an "inten[t]" to return to the places they had visited before—where they will presumably, this time, be deprived of the opportunity to observe animals of the endangered species—is simply not enough. Such "some day" intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be—do not support a finding of the "actual or imminent" injury that our cases require.

*Id.* at 564. The analogy to *Lujan* is inapt for several reasons. First, the injury in *Lujan* was contingent on the plaintiffs' "some day" intentions to travel to locations where they might observe the endangered species. In this case, by contrast, the plaintiffs' injury is not contingent on any future action that the plaintiffs may or may not undertake; they are injured *now*

---

5.   *See* note 3, *supra*.

6.   Second Starnes Decl. ¶ 7; Second Kelley Decl. ¶ 8; Second Maxwell Decl. ¶ 7; *see also* note 4, *supra*.

by their inability to purchase health insurance that excludes objectionable coverage. That injury is both "actual" and "imminent," and it is not contingent on anything. The defendants appear to believe that the religious-objector plaintiffs cannot establish Article III standing unless they respond to their constricted options by purchasing health insurance that includes the objectionable coverage. But the religious-objector plaintiffs are equally injured if they respond by opting for Christian bill-sharing (as Dr. Kelley and Mr. Starnes have done) or forgo health insurance and bill sharing until an acceptable option emerges (as the Maxwells have done). In all of these situations, the individuals are facing constricted options with respect to their health-insurance decisions, and they remain injured by the constricted options regardless of how they choose to respond.

Second, a plaintiff who asserts purchaser standing does not need to prove that he actually would buy the product or service that has made unavailable.[7] He needs only to show that he has been deprived of an *opportunity* to purchase the desired product. *See Center for Auto Safety v. National Highway Traffic Safety Administration*, 793 F.2d 1322, 1332 (D.C. Cir. 1986) (injury in fact arises from agency rules that "will diminish the types of fuel-efficient vehicles and *options available*," and provide plaintiffs with "less *opportunity to purchase* fuel-efficient light trucks than would otherwise be available to them." (emphasis added)); *Competitive Enterprise Institute v. National Highway Traffic Safety Administration*, 901 F.2d 107, 112–13 (D.C. Cir. 1990) ("In affidavits, Consumer Alert's members state that they have looked for, but have been unable to find new cars of large size, such as station wagons, in a price range they could afford. Consumer Alert's president stated that she had been contacted by many members who have been *frustrated by the declining availability* and high prices of large cars, which they prefer for reasons of safety, comfort, and performance. For standing purposes, these assertions adequately support Consumer Alert's claims of injury on behalf of its members." (emphasis added)); *Orangeburg, South Carolina v. FERC*, 862 F.3d

---

7.    *See* Defs.' Br., ECF No. 99, at 3 (criticizing plaintiffs for not "establish[ing] that they would purchase such coverage it it were available").

1071, 1078 (D.C. Cir. 2017) ("The lost *opportunity* to purchase a desired product is a cognizable injury" (emphasis added)). Because the lost opportunity is itself the injury in fact, there is no issue with respect to the "imminence" of that injury under *Lujan*. It is enough for the plaintiffs to show that they remain interested in purchasing health insurance that excludes the objectionable coverage, and that their inability to do so is attributable to the defendants' actions.[8]

It is of course possible that the religious-objector plaintiffs will ultimately decide that health insurance remains too expensive even if this Court grants the requested relief, and they may decide (after considering their options) to continue relying on Christian bill sharing or continue shopping for health insurance until a suitable option emerges. But that does not defeat the Article III injury arising from the constricted options that the plaintiffs *currently* face—and it certainly does not suggest that this injury fails the "imminence" requirement.

### B.    The Non-Braidwood Plaintiffs Have Purchaser Standing

The defendants observe that the Fifth Circuit "has never adopted"[9] the purchaser-standing doctrine, but it has never rejected it either. The Fifth Circuit's silence is the result of an absence of cases presenting the issue; it does not reflect or evince opposition to idea. The defendants present no argument against recognition of the purchaser-standing doctrine, and the lost opportunity to purchase a desired product is surely enough to meet the "identifiable trifle" standard for Article III injury. *See United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 689 n.14 (1973) ("[A]n identifiable trifle is enough for standing" (citation and internal quotation marks omitted)).

The defendants also suggest that the purchaser-standing doctrine should apply only when a litigant is challenging agency action under the APA. *See* Defs.' Br., ECF No. 99, at 5 (quoting *Weissman v. Nat'l R.R. Passenger Corp.*, 21 F.4th 854, 859 (D.C. Cir. 2021)). But

---

8.    *See* note 4, *supra*.

9.    *See* Defs.' Br., ECF No. 99, at 5–7.

*Weismann* did not hold that the purchaser-standing doctrine is so limited,[10] and there is no basis in reason or law for applying broader rules of standing in APA litigation. Article III standing doctrine establishes the "irreducible constitutional minimum" that a litigant needs to get into federal court, so every APA litigant must satisfy the Article III standing test — in addition to any requirements for statutory standing that might be found in the APA.[11] *See Lujan*, 504 U.S. at 560. That means any "injury" that confers standing under the APA will by definition confer standing under Article III. It is inconceivable — and unconstitutional — for the APA to create a more expansive standing regime than that established by Article III, so the doctrine of purchaser-standing doctrine must be equally available to APA and non-APA litigants alike.

Finally, the defendants rely on the D.C. Circuit's decision in *Weismann*, which sought to dial back the purchaser-standing doctrine by distinguishing between a product's "core features" and its "ancillary terms." *Weissman*, 21 F.4th at 859. *Weismann* held that the plaintiffs in that case could not establish Article III injury from their inability to purchase a rail ticket without an arbitration clause, because the presence or absence of an arbitration clause was (in the court's view) a mere "ancillary term" rather than a "core feature" of the desired product. The Court explained:

> In [the plaintiff's] view, their claim is akin to the cases where government action made a consumer's desired product altogether unavailable. In those cases, however, the product at issue was differentiated from available alternatives by its core features. The consumers defined their desired product at a reasonable level of generality, tying the product to a concrete, cognizable interest, such as the ability to purchase vaccines without certain ingredients, a cable internet package without content restrictions, or cars of a certain size. So too in the cases in which consumers alleged an impact on cost: the loss of money was a concrete, traditional kind of Article III harm. Whether the harm alleged was

---

10. *See Weissman*, 21 F.4th at 859 ("Even assuming that the desired-products theory could apply beyond [the APA] context . . .")

11. Section 702 of the APA, for example, requires that an APA litigant also show that he is "suffering legal wrong because of agency action," or that is "adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702.

economic or non-economic, these cases thus presented a concrete impairment of a protected interest. By contrast, appellants' desired product is only distinguished from the available alternative by an ancillary term: the arbitration provision. They have simply reframed a general objection to mandatory arbitration as a lost opportunity to purchase a desired product.

*Weissman*, 21 F.4th at 859. The defendants urge this Court to embrace the *Weismann* Court's distinction between "core features" and "ancillary terms," and hold that the non-Braidwood plaintiffs lack purchaser standing because the presence or absence of objectionable preventive-care coverage is a mere "ancillary term" rather than a "core feature" of the desired product.

We must confess that we are at a loss to understand how the presence or absence of Article III standing can turn on whether a court considers a desired attribute of a product to be a "core feature" rather than an "ancillary term." It has long been established that the magnitude of an asserted injury is irrelevant to Article III standing. *See Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 983 (2017) ("For standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'"); *Tax Analysts & Advocates v. Blumenthal*, 566 F.2d 130, 138 (D.C. Cir. 1977) ("Although appellant's economic injury is relatively small in magnitude, this does not negate our finding of injury in fact."); *New York Republican State Committee v. SEC*, 927 F.3d 499, 504 (D.C. Cir. 2019) ("As we have long held, even a slight injury is sufficient to confer standing; the size of the harm therefore poses no jurisdictional barrier"); *Rental Housing Ass'n of Greater Lynn, Inc. v. Hills*, 548 F.2d 388, 390 (1st Cir. 1977) ("It is well-settled, however, that the injury required for standing need not be substantial, it need only exist." (citing *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 690 n.14 (1973)); *Public Interest Research Group v. Powell Duffryn Terminals,* 913 F.2d 64, 72 n.8 (3d Cir. 1990) ("The size of the injury is not germane to standing analysis."); *Crawford v. Marion County Election Board*, 472 F.3d 949, 951 (7th Cir. 2007), *aff'd*, 553 U.S. 181 (2008) ("The fact that the added cost has not been estimated and may be slight does not affect standing, which requires only a minimal showing

of injury."); *City of Los Angeles v. Barr*, 929 F.3d 1163, 1173–74 (9th Cir. 2019) ("[A] plaintiff need show only a slight injury for standing."). And an Article III injury can be as trivial as an unwanted contact with a religious display. *See American Legion v. American Humanist Ass'n*, 139 S. Ct. 2067 (2019). It is hard to understand how any of this can be squared with *Weismann*'s attempt to distinguish "core features" from "ancillary terms." If a plaintiff wants an opportunity to purchase something that is no longer available, then it should not matter whether there are other available products that retain the so-called "core features" of the desired product. The inability to purchase *any* desired product should inflict Article III injury, no matter how slight or trivial the distinctions between the desired product and the available products. Article III standing doctrine is simply unconcerned with the substantiality or the magnitude of an asserted injury. No decision prior to *Weissman* had ever attempted to limit purchaser standing by invoking a distinction between the "core features" and "ancillary terms" of a desired product, and no decision since *Weissman* has followed its lead. The distinction is unsound and should be rejected. Courts are to inquire only into the existence of an injury and not its substantiality or magnitude. *See SCRAP*, 412 U.S. at 689 n.14 ("[A]n identifiable trifle is enough for standing" (citation and internal quotation marks omitted)).

The second problem with the defendants' reliance on *Weissman* is that their argument is incompatible with the cases holding that the unavailability of contraceptive-free health insurance not only inflicts Article III injury on those with religious objections to compulsory contraceptive coverage, but also substantially burdens their exercise of religion under the Religious Freedom Restoration Act. *See March for Life*, 128 F. Supp. 3d at 128–29 ("[T]he employee plaintiffs have demonstrated that the [Contraceptive] Mandate substantially burdens their sincere exercise of religion . . . [because] [t]he Mandate, in its current form, makes it impossible for employee plaintiffs to purchase a health insurance plan that does not include coverage of contraceptives to which they object."); *Wieland*, 196 F. Supp. 3d at 1017 (federal contraceptive mandate substantially burdens the religious freedom of individual consumers of health insurance because "the ultimate impact is that Plaintiffs must either maintain a

health insurance plan that includes contraceptive coverage, in violation of their sincerely-held religious beliefs, or they can forgo healthcare altogether"). The holdings of *March for Life* and *Wieland* cannot co-exist with the defendants' claims that the presence or absence of contraceptive coverage is a mere "ancillary term" of a health-insurance policy, and that the religious-objector plaintiffs are not suffering Article III injury because they can purchase other health-insurance plans that include the objectionable coverage.

Finally, if the Court decides to endorse and follow *Weissman*'s distinction between the "core features" and "ancillary terms" of a desired product, it should conclude that the presence or absence of objectionable coverage falls on the "core features" side of the line. The defendants assert in conclusory fashion that the contested coverage mandates concern only "ancillary" aspects of a health-insurance policy,[12] but they do not present an argument to this effect, nor do they provide a test for distinguishing coverage decisions that relate to the "core features" of a plan from those that are merely "ancillary." It is hard to claim that contraceptive coverage, for example, can be passed off as "ancillary" when federal officials think it important enough to compel in every non-grandfathered (and non-church-affiliated) health-insurance policy. The same goes for each of the remaining preventive-care mandates that the defendants are imposing on non-grandfathered plans. And given how dubious the distinction between "core features" and "ancillary terms" is to begin with, the Court should resolve doubts in favor of finding that the presence or absence of the compulsory preventive-care coverage is a "core feature" of the product desired by the plaintiffs.

## II.   THE COURT SHOULD ENTER JUDGMENT FOR THE DEFENDANTS ON THE PLAINTIFFS' CLAIMS RELATED TO THE CONTRACEPTIVE MANDATE

The parties agree that the plaintiffs' challenges to the Contraceptive Mandate should be dismissed in accordance with this Court's opinion and order of September 7, 2022. The only

---

12.   *See* Defs.' Br., ECF No. 99, at 6 ("Plaintiffs may have a primary interest in obtaining health insurance, but not in obtaining health insurance that excludes coverage for ancillary preventive services they have no intention of using.").

question is whether the dismissal of the non-Braidwood plaintiffs' claims should be for lack of subject-matter jurisdiction (without prejudice) or on the merits (with prejudice).

The Court should dismiss the non-Braidwood plaintiffs' Contraceptive Mandate claims on the merits (with prejudice) if it concludes that the plaintiffs have Article III standing. The Court should dismiss the non-Braidwood plaintiffs' Contraceptive Mandate claims for lack of subject-matter jurisdiction (without prejudice) if it concludes that the plaintiffs lack Article III standing. Braidwood's Contraceptive Mandate claims should be dismissed on the merits (with prejudice) because this Court has already found that Braidwood has standing.

## III. This Court Has No Authority To "Sever" 42 U.S.C. § 299b-4(a)(6) Or "Authorize" The Secretary To Review The Task Force's Recommendations

The defendants propose a remedy that would have this Court "sever" the statutory provision that prohibits political interference with the recommendations of the U.S. Preventive Services Task Force,[13] and "authorize" the Secretary of Health and Human Services to review Take Force recommendations before they take effect. *See* Defs.' Br., ECF No. 99, at 8–10. The defendants' proposed remedy is unlawful for multiple independent reasons.

### A. The Defendants' Proposed Remedy Does Not Cure The Appointments Clause Violation

The defendants claim that their proposed remedy "cures in full" the Appointments Clause violation, but it does nothing of the sort. A regime in which the Secretary is empowered to ignore 42 U.S.C. § 299b-4(a)(6) and countermand the recommendations of the Task Force *still violates* the Appointments Clause. The Task Force will remain empowered to impose preventive-care mandates on its own initiative, which will take effect and remain in effect *until* the Secretary gets around to deciding whether to overrule the Task Force or leave its recommendation. In addition, neither the Secretary—nor any other principal officer of the

---

13. *See* 42 U.S.C. § 299b-4(a)(6) ("All members of the Task Force . . . , and any recommendations made by such members, shall be independent and, to the extent practicable, not subject to political pressure.").

United States—has any authority to adopt or impose a preventive-care coverage mandate unless the Task Force first recommends it.

The defendants' proposed remedy would create a regime in which *both* the Secretary and the Task Force have gatekeeping functions in deciding which preventive care the private insurers must cover. But that means the Task Force will still wield "significant authority pursuant to the laws of the United States,"[14] because preventive-care mandates cannot and will not take effect without its recommendation and approval. And it does nothing to make the "principal officers" at the Task Force into "inferior officers," because no principal officer will have any ability to review or countermand their decisions *not* to adopt a preventive-care mandate. *See Arthrex*, 141 S. Ct. at 1981.[15]

The situation in *United States v. Arthrex, Inc.*, 141 S. Ct. 1970 (2021), was different because the court-imposed remedy made *every* decision by the Administrative Patent Judges reviewable by the Director of the Patent and Trademark Office—regardless of which direction the decision took. A decision denying the validity of a patent was subject to plenary review by the Senate-confirmed Director in the same manner as a decision upholding the patent's validity. *See Arthrex*, 141 S. Ct. at 1986 ("Decisions by APJs must be subject to review by the Director."). The Court's remedy therefore ensured that the decisions of Administrative Patent Judges would *always* be subject to review by a principal officer, and the APJs would have no ability to render an unreviewable decision on anything pertaining to a patent's validity. The defendants' proposed remedy, by contrast, allows for principal-officer review only of decisions to recommend preventive-care coverage, and it leaves the Task Force

---

14. *Buckley v. Valeo*, 424 U.S. 1, 126 (1976) (per curiam).
15. Finally, even if the defendants' proposed remedy could somehow convert every "principal officer" at the Task Force into an "inferior officer," the regime would *still* violate the Appointments Clause because there is no statute that "vests" the appointment of these individuals in the President alone, the Courts of Law, or the Heads of Department.

with unreviewable discretion when it declines to enact or recommend new coverage man-dates. In addition, there was no dispute in *Arthrex* that the Administrative Patent Judges were appointed as "inferior officers" in a manner consistent with Article II. *See Arthrex, Inc.*, 141 S. Ct. at 1983 (acknowledging the Administrative Patent Judges' "status as inferior of-ficers"). In this case, by contrast, the members of the Task Force have not been appointed as "inferior officers," because there is no statute vesting their appointment in the President alone, the Courts of Law, or the Heads of Department.

### B.   A Federal District Court Has No Authority To Nullify A Federal Statute Or Confer Powers On The Secretary That Congress Has Withheld

There is a more serious problem with the defendants' proposed remedy: A federal district court simply has no power to cancel the statutory provision in 42 U.S.C. § 299b-4(a)(6) or confer new powers on the Secretary of Health and Human Services. A district court's reme-dial tools extend to declaratory judgments, injunctions, APA remedies, and writs—and the scope of these remedies is limited by statute and historical practice. The defendants do not even attempt to explain how their proposed remedy could fit into any of these categories.

The defendants would have this Court "sever" and "disregard" 42 U.S.C. § 299b-4(a)(6), which explicitly prohibits the Secretary (or anyone else) from reviewing, influencing, or countermanding the Task Force's preventive-care recommendations,[16] thereby "allowing the Secretary to review" the Task Force's recommendations. But it is impossible to see how this proposed remedy could take the form of a declaratory judgment, injunction, APA rem-edy, or writ. The Declaratory Judgment Act, for example, authorizes courts to declare only "the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a). It does not empower courts to opine on any issue of law. The only "inter-ested part[ies]" seeking a declaration of their "rights and other legal relations" in this case

---

16.   *See* 42 U.S.C. § 299b-4(a)(6) ("All members of the Task Force . . . , and any recom-mendations made by such members, shall be independent and, to the extent practicable, not subject to political pressure.").

are the plaintiffs, as the defendants have not counterclaimed for a declaration of *their* "rights" or "legal relations." So it is hard to see how this Court could use the Declaratory Judgment Act to impose the remedy that the defendants suggest, and the defendants do not explain how this could be done consistent with the language of 28 U.S.C. § 2201(a).

It is equally difficult to envision an injunction that could impose the remedy described by the defendants. Injunctions are used to restrain litigants from violating the law and to order litigants to take affirmative steps to ensure compliance with the law. The defendants, however, are proposing a remedy that would confer new powers on the Secretary—to review and veto the Task Force's preventive-care recommendations. It is not at all clear how that regime can be imposed in the form of an injunction. Whom would the injunction be directed to, and what would it say? The equitable powers of a federal district court are limited to relief that was "traditionally accorded by courts of equity" at the time of the Constitution's ratification. *See Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 318–19 (1999). Courts of equity did not confer new powers on government officials when the Constitution was ratified, and the defendants cite no authority to support this idea.

The APA allows reviewing courts to "hold unlawful and set aside"[17] agency action, but the defendants' proposed remedy is not asking the Court to do anything of the sort. It is instead asking the Court to *authorize* agency action that Congress has refused to allow. Nothing in the APA empowers courts to award that relief. The APA also allows reviewing courts to "compel agency action unreasonably withheld or unreasonable delayed,"[18] but the defendants are not asking this Court to *compel* the Secretary to do anything. They simply want the Secretary to be given the power to review and countermand the Task Force's preventive-care recommendations.

Finally, the All Writs Act permits federal courts to issue "all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28

---

17.  5 U.S.C. § 706(2).
18.  5 U.S.C. § 706(1).

U.S.C. § 1651(a). But the defendants do not identify any writ that could be used to confer new powers on the Secretary that Congress has withheld by statute, and we cannot think of any common-law writ that would be suitable to the task.

The defendants think their proposed remedy is "mandate[d]" by *Arthrex*. Defs.' Br., ECF No. 99 at 9. But the federal courts in *Arthrex* were conducting *review* of an agency adjudication, and the Supreme Court was therefore empowered to remand the agency appeal to the Acting Director of the Patent and Trademark Office, whom it had newly empowered to review decisions of Administrative Patent Judges (APJs). *Arthrex*, 141 S. Ct. at 1986–88. The procedural posture of this case is different, as it was initially filed in federal district court and does not represent an appeal from any agency proceeding. So this litigation cannot be "remanded" to any agency official—and it certainly cannot be remanded to the Secretary for review of the Task Force's preventive-care decisions. The Supreme Court of the United States also has the power to announce binding law in its opinions, which is controlling all government actors (including agency officials). *See Cooper v. Aaron*, 358 U.S. 1, 18 (1958) ("[T]he interpretation of the [Constitution] enunciated by this Court . . . is the supreme law of the land, and Art. VI of the Constitution makes it of binding effect."). So the Supreme Court can, simply by declaring it so in its opinion, render a federal statutory constraint non-operative and confer new powers of review on agency officials. *See id*.[19] A federal district court has no such power, and its decisions and opinions have no precedential weight in any forum. *See Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011) ("A decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case." (quoting 18 J. Moore et al., Moore's

---

19.  Chief Justice Roberts's opinion on the remedial issue in *Arthrex* received only four votes, so the plurality *opinion* does not have "supreme law of the land" status. But the holding of the Chief Justice's plurality opinion was joined by three other justices, so its ultimate conclusion on the remedy binds other government actors under *Cooper*.

Federal Practice § 134.02[1][d], at 134–26 (3d ed. 2011))). So an opinion of a federal district court (unlike a Supreme Court opinion) has no generative effect, and it is only the judgment of a district court that has binding legal force. *See* Edward A. Hartnett, *A Matter of Judgment, Not A Matter of Opinion*, 74 N.Y.U. L. Rev. 123, 126–27 (1999) ("The operative legal act performed by a court is the entry of a judgment; an opinion is simply an explanation of reasons for that judgment."); Thomas W. Merrill, *Judicial Opinions as Binding Law and as Explanations for Judgments*, 15 Cardozo L. Rev. 43, 62 (1993) ("[J]udicial opinions are simply explanations for judgments—essays written by judges explaining why they rendered the judgment they did."). A federal district court must therefore enter a *judgment* that awards relief to the prevailing party—and the relief in that judgment must be authorized by the Declaratory Judgment Act, the Administrative Procedure Act, the All Writs Act, or the practice of equity courts at the time the Constitution was ratified. The defendants have not shown how any of this could allow a federal district court to impose the remedial regime that they describe.

### C. The Defendants' Proposed Remedy Will Not Redress The Plaintiffs' Article III Injuries

A final problem with the defendants' proposed remedy is that it will not redress the Article III injuries that the plaintiffs have alleged. The plaintiffs' alleged injuries are all being caused by the Secretary's *enforcement* of the preventive-care mandates, not by his failure to review or ratify them, and the defendants' proposed remedy will not alleviate or redress the plaintiffs' Article III injuries. A remedy from this Court that does not redress any of the plaintiffs' injuries is incompatible with Article III. *See Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 107 (1998) ("Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court."); *Collins v. Mnuchin*, 938 F.3d 553, 611 (5th Cir. 2019) (Oldham, J., concurring in part and dissenting in part) ("[O]ur Court does not have the power under Article III to order a remedy that does not redress Plaintiffs' injuries.").

## IV. THE PLAINTIFFS ARE ENTITLED TO A UNIVERSAL REMEDY UNDER SECTION 706 OF THE ADMINISTRATIVE PROCEDURE ACT

The plaintiffs' opening supplemental brief argued that Braidwood (as well as any other plaintiff that establishes Article III standing) is entitled to a universal remedy under the APA that would formally "set aside" every agency action taken to implement the preventive-care coverage mandates recommended by the U.S. Preventive Services Task Force after March 23, 2010, as well as an injunction that restrain the defendants from implementing the vacated agency actions. *See* 5 U.S.C. § 706(2). The defendants resist this conclusion, but none of their arguments hold water.

### A. The Court Should Award The Plaintiffs An APA Remedy Regardless Of Whether They Specifically Requested It In Their Pleadings

The defendants claim that the plaintiffs cannot seek or obtain vacatur of agency action under section 706 of the APA because (according the defendants) the plaintiffs "neither brought, nor prevailed on, an APA claim." Defs.' Br., ECF No. 99, at 11. The defendants' contention is meritless.

The requirement of Rule 54(c) is clear. The court's final judgment "should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings." Fed. R. Civ. P. 54(c); *see also Whole Woman's Health v. Hellerstedt*, 579 U.S. 582, 136 S. Ct. 2292, 2307 (2016) (a request in the complaint to issue "such other and further relief as the Court may deem just, proper, and equitable" is sufficient to preserve claims that go unmentioned in the pleadings), overruled on other grounds in *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022); *Citizens United v. Federal Election Comm'n*, 558 U.S. 310, 333 (2010) (in "the exercise of its judicial responsibility" it may be "necessary . . . for the Court to consider the facial validity" of a statute, even though a facial challenge was not brought); see also Pls.' Supp. MSJ Br., ECF No. 98, at 9 n.6 (citing authorities). The requirement 5 U.S.C. § 706 is equally clear: The Court "shall" (not "may") "hold un-lawful and set aside" agency rules that are "not in accordance with law." 5 U.S.C. § 706(2)(A). The agency actions that implement the Task Force's post-ACA preventive-care

recommendations are "not in accordance with law" because this Court has found that the members of the Task Force cannot wield "significant authority pursuant to the laws of the United States"[20] under Article II of the Constitution. So the Court is obligated to vacate "set aside" these agency actions under 5 U.S.C. § 706 and Rule 54(c)—regardless of whether the plaintiffs specifically requested this remedy in their amended complaint.

The defendants accuse the plaintiffs of springing a "new claim" that they never brought or pursued during the litigation. *See* Defs.' Br., ECF No. 99, at 11 (asserting that the plaintiffs "neither brought, nor prevailed upon, an APA claim."); *id.* ("[T]he plaintiff[s] did not bring an APA claim."). This is a mischaracterization. The plaintiffs are not asserting a "new claim" by requesting vacatur of agency actions under the APA; they are merely requesting vacatur as a *remedy* for the claims on which they have already prevailed.

There are two (and only two) claims on which the plaintiffs have prevailed. The first is their claim that 42 U.S.C. § 300gg-13(a)(1) violates the Appointments Clause by empowering the members of the U.S. Preventive Services Task Force to unilaterally determine the preventive care that private insurers must cover. *See* First Amended Complaint, ECF No. 14, ¶ 71. The second is that the PrEP coverage mandate violates the plaintiffs' rights under the Religious Freedom Restoration Act. *See id.* at ¶¶ 108–111. The Court has already determined that Braidwood is entitled to judgment as a matter of law on each of these claims. *See* Opinion and Order, ECF No. 92. What remains to be determined are the *remedies* that the Court should award Braidwood (and the other plaintiffs) in response to Braidwood's success on these claims.

The defendants say that by asking this Court to vacate agency actions taken to implement 42 U.S.C. § 300gg-13(a)(1) and the PrEP mandate as a *remedy* for the claims described in their complaint, the plaintiffs are somehow asserting a new and different "claim" under the APA that was never pleaded or presented to the Court. *See* Defs.' Br., ECF No. 99, at 11–

_____

20.  *Buckley v. Valeo*, 424 U.S. 1, 126 (1976) (per curiam).

13. The plaintiffs are doing nothing of the sort. They are presenting the exact same claims as they did throughout this litigation. They are merely asking this Court to vacate agency actions taken to implement 42 U.S.C. § 300gg-13(a)(1) and the PrEP mandate as a *remedy* for the claims that he have asserted from the outset of this case—a remedy that is entirely warranted given this Court's rulings that the members of the U.S. Preventive Services Task Force cannot wield "significant authority pursuant to the laws of the United States"[21] consistent with the Appointments Clause, and that the PrEP mandate violates the rights of Braidwood (and other religious objectors) under the Religious Freedom Restoration Act. 5 U.S.C. § 706(2)(A) establishes a remedy for courts to impose, and the plaintiffs may request that remedy after prevailing on their claims so long as they can show that the criteria of section 706(2)(A) have been met.

The situation is no different from the plaintiffs requesting a damages remedy after the Court grants their motion for summary judgment. A request of that sort should be denied because sovereign immunity precludes a damages award, but no one would say this is a "new claim" or accuse of the plaintiffs of sandbagging by waiting until the remedial stage of the litigation to request this relief. It is simply a *remedy* for a claim on which they have already prevailed—and the Court must evaluate that requested remedy on the merits rather than blowing it off as a different "claim" from what the plaintiffs have asserted throughout the litigation. The plaintiffs are asserting the same claims as they did from the beginning of the litigation; they are merely requesting a remedy for those claims consistent with this Court's order and opinion of September 7, 2022.

The defendants' contention that they plaintiffs "expressly disclaimed that they were challenging agency action" is meritless. *See* Defs.' Br., ECF No. 99, at 12. Although the plaintiffs observed in earlier brief that they were challenging the legality of *Congress's* decision to enact

---

21.   *Buckley v. Valeo*, 424 U.S. 1, 126 (1976) (per curiam).

section 300gg-13(a)(4),[22] a challenge to the constitutionality of a statute necessarily encompasses a challenge to every agency action taken to implement the unconstitutional statutory command. It is no different from a "facial" constitutional challenge to a statute restricting abortion, and when a plaintiff prevails on such a claim a court not only declares the statute unconstitutional but also enjoins the implementation of agency rules that implement the disapproved statutory provision. *See, e.g.*, *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292 (2016), overruled on other grounds by *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022). Whenever a court pronounces a statute unconstitutional, it simultaneously dooms agency actions taken to implement the unconstitutional statutory command. For the same reasons, the plaintiffs' decision to abandon their claim that attacked the preventive-care mandates for failure to go through notice-and-comment rulemaking is irrelevant to whether the plaintiffs can obtain a *remedy* under section 706 of the APA in response to the claims on which they *have* prevailed.

The defendants also suggest that consideration of an APA remedy would violate principles of fair notice and due process,[23] but they do not explain how they would be prejudiced by the plaintiffs' requested relief. The defendants have had every opportunity to defend the constitutionality of 42 U.S.C. § 300gg-13(a)(1) and the legality of the agency actions taken to implement that statute, and they have a full and fair opportunity to brief the propriety of an APA remedy before this Court finalizes its judgment in this case. It is also entirely normal for courts to request briefing on remedial questions after rendering summary judgment for

---

22. Pls.' Br. in Opp'n to Defs.' MTD, ECF No. 24, at 13-14 ("The constitutional challenge to section 300gg-13(a)(4) alleges that Congress violated the Constitution by enacting this statute. It challenges the legislature's action in enacting a law . . . . There is no concern with how [HHS] decides to use its powers under the statute; that is irrelevant to the Appointments Clause . . . challenge[] alleged in the first amended complaint.") (citation omitted).

23. *See* Defs.' Br., ECF No. 99, at 12 ("Plaintiffs' contrary rule would violate basic principles of both notice pleading and due process.").

a party, and the defendants' opportunities to respond to the plaintiffs' remedial briefing ob-
viate any accusations of "prejudice" that the defendants might try to assert in this Court or
on appeal. The defendants are in a much better situation than the defendants in *Hellerstedt*,
as the plaintiff in this case has explicitly asked this Court for vacatur and provided an oppor-
tunity for opposing arguments to be fully vetted before this Court. *See Whole Woman's Health
v. Hellerstedt*, 136 S. Ct. 2292 (2016) (affirming a district-court ruling that enjoined the
enforcement of a hospital admitting-privileges law across the board—even though the plain-
tiffs in that case had never even *asked* the district court for that relief at *any* stage of the
district-court proceedings); *see also id.* at 2307; *id.* at 2330 (Alito, J., dissenting) ("The Court
does this even though petitioners . . . did not presume to include such a claim in their com-
plaint. The Court favors petitioners with a victory that they did not have the audacity to
seek.").

**B.    The Plaintiffs' Challenge To The Constitutionality Of 42 U.S.C.
§ 300gg-13(a)(1) Logically Encompasses A Challenge To The Legality
Of All Agency Actions Taken To Implement The Statute**

The defendants once again observe that the plaintiffs are challenging the constitutional-
ity of the congressional decision to enact 42 U.S.C. § 300gg-13(a)(1)—and they insist that
this means that the plaintiffs cannot seek or obtain a vacatur of any agency actions taken to
implement the unconstitutional statutory command. *See* Defs.' Br., ECF No. 99, at 14–15.
This is a non-sequitur. A facial challenge to the constitutionality of a statute logically encom-
passes a challenge to the legality of every executive action taken to implement the disputed
statutory provision—and agency actions taken to implement a facially unconstitutional stat-
ute are as unconstitutional as the statute itself. *See, e.g., Ohio v. Akron Ctr. for Reproductive
Health*, 497 U.S. 502, 514 (1990) ("[B]ecause appellees are making a facial challenge to a
statute, they must show that 'no set of circumstances exists under which the Act would be
valid.'" (citation omitted)). It is impossible for agency actions taken to implement an uncon-

stitutional statute to survive after a court has pronounced the underlying statute unconstitutional on its face—and the defendants do not attempt to explain how such agency actions could survive a judicial pronouncement condemning the statute facially unconstitutional.

Instead, the defendants argue that the plaintiff have somehow disclaimed the possibility of an APA remedy by insisting throughout this litigation that their constitutional grievance centered around *Congress's* decision to *enact* 42 U.S.C. § 300gg-13(a)(1), which the plaintiffs attacked as facially unconstitutional, rather than complaining that the Task Force members violated the Constitution in the way they decided to use their statutorily conferred powers. *See* Defs.' Br., ECF No. 99, at 14 (quoting Pls.' Br. in Opp'n to Defs.' MTD, ECF No. 24, at 13–14). The plaintiffs have indeed brought a facial challenge to 42 U.S.C. § 300gg-13(a)(1), alleging that *Congress* violated the Appointments Clause by *enacting* this statute, which confers "significant authority pursuant to the laws of the United States,"[24] on Task Force members who have not been appointed in conformity with Article II. The plaintiffs did not bring an as-applied constitutional challenge to 42 U.S.C. § 300gg-13(a)(1), which would point the finger not at Congress but at the executive-branch or agency officials who exercise their statutorily conferred discretion in an unconstitutional manner. *See* Nicholas Quinn Rosenkranz, *The Subjects of the Constitution*, 62 Stan. L. Rev. 1209, 1230–42 (2010) (explaining the distinction between "facial" and "as-applied" challenges).

But that does not mean that the plaintiffs cannot seek a remedy against the executive-branch or agency officials who implement this facially unconstitutional statute—even if Congress is ultimately to blame for enacting the unconstitutional law. Indeed, the plaintiffs can *only* seek a remedy against the executive-branch or agency officials who implement 42 U.S.C. § 300gg-13(a)(1), because no court can order Congress to repeal an unconstitutional statute or delete a previously enacted statute from the law books. *See generally* Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 Va. L. Rev. 933 (2018). So even when a litigant challenges

---

24.   *Buckley v. Valeo*, 424 U.S. 1, 126 (1976) (per curiam).

the constitutionality of a congressional decision to enact a disputed statutory provision, ju-dicial relief must *always* run against the executive-branch or agency officials who implement the contested statute. That is the only way for a court to remedy an unconstitutional con-gressional enactment, because no remedy can be directed at the legislative body.

### C. The Court Should Vacate Only The Agency Actions That Implement The Requirements Of 42 U.S.C. § 300gg-13(a)(1), Rather Than The Task Force Recommendations Themselves

The defendants note a potential problem with vacating Task Force recommendations with "A" or "B" ratings that were issued on or after March 23, 2010: The Task Force ratings serve other purposes besides defining the scope of compulsory preventive-care coverage un-der 42 U.S.C. § 300gg-13(a)(1)—and there has been no finding or determination by this Court that the other statutes that rely on Task Force recommendations violate the Appoint-ments Clause. *See* Defs.' Br., ECF No. 99, at 16–17. So a judgment from this Court that formally vacates the "A" and "B" ratings that were issued on or after March 23, 2010, could impose an over-inclusive remedy by disrupting other statutory schemes that incorporate Task Force recommendations. *See id*. at 17 (citing 42 U.S.C. § 1395m(n)(2) and 42 U.S.C. § 1395x(ddd)).

The defendants are also correct to observe that there is nothing inherently wrong with the U.S. Preventive Services Task Force making *recommendations* as authorized by 42 U.S.C. § 299b-4(a)(1). The problem is that 42 U.S.C. § 300gg-13(a)(1) gives binding legal effect to the "A" and "B" recommendations, and it converts these so-called "recommendations" into edicts that all private insurers must obey. That regime, in turn, converts the members of the Task Force into officers of the United States by giving them "significant authority pur-suant to the laws of the United States."[25]

---

25. *Buckley v. Valeo*, 424 U.S. 1, 126 (1976) (per curiam).

The Court can thread this needle by vacating only the agency actions that have been taken to implement 42 U.S.C. § 300gg-13(a)(1)'s compulsory preventive-care coverage regime, while leaving the actual recommendations of the Task Force untouched—and by enjoining the Secretary and the United States from taking future agency action to implement 42 U.S.C. § 300gg-13(a)(1) or enforce a compulsory coverage requirement in response to an "A" or "B" rating from the Task Force. This would allow the Task Force to continue making "A" or "B" recommendations, and it would leave the Task Force's previous "A" or "B" recommendations in place, while removing any binding legal force that would otherwise attach to those recommendations under 42 U.S.C. § 300gg-13(a)(1). By defanging the "A" or "B" recommendations in this manner, the Task Force would return to issuing true recommendations (rather than edicts) and its members would no longer be wielding "significant authority pursuant to the laws of the United States."[26] This approach would allow the Task Force to continue issuing "A" or "B" recommendations and preserve its past "A" or "B" recommendations, while fully remedying the Appointments Clause problem posed by 42 U.S.C. § 300gg-13(a)(1) and its decision to empower the Task Force to dictate the preventive care that private insurers must cover.

### D.     The Law Of The Fifth Circuit Interprets Section 706(2) Of The APA To Require Vacatur

The defendants deny that the APA's "set aside" language authorizes universal remedies such as vacatur and nationwide injunctions, and we acknowledged in our previous brief that there is respectable academic commentary in support of that view. *Compare* John Harrison, *Section 706 of the Administrative Procedure Act Does Not Call for Universal Injunctions or Other Universal Remedies*, 37 Yale J. On Reg. Bull. 37, 41 (2020), *with* Mila Sohoni, *The Power to Vacate a Rule*, 88 Geo. Wash. L. Rev. 1121 (2020) (defending universal remedies under the APA and responding to Harrison's criticisms).

---

26.   *Buckley v. Valeo*, 424 U.S. 1, 126 (1976) (per curiam).

But the law of the Fifth Circuit has rejected this argument, and the defendants appear to acknowledge as much. *See Data Marketing Partnership, LP v. United States Dep't of Labor*, 45 F.4th 846, 859 (5th Cir. 2022) ("The APA gives courts the power to 'hold unlawful and set aside agency action[s].' 5 U.S.C. § 706(2). Under prevailing precedent, § 706 'extends beyond the mere non-enforcement remedies available to courts that review the constitutionality of legislation, as it empowers courts to "set aside"—*i.e.*, formally nullify and revoke— an unlawful agency action.'" (citation omitted)); *Franciscan Alliance, Inc. v. Becerra*, 47 F.4th 368, 374–75 (5th Cir. 2022) ("Vacatur is the only statutorily prescribed remedy for a successful APA challenge to a regulation.");[27] Defs.' Br., ECF No. 99, at 18 ("Defendants recognize that the Fifth Circuit has previously accepted the argument that 5 U.S.C. § 706(2) authorizes vacatur of an agency action"). The defendants may wish to preserve this argument for appeal and en banc reconsideration, but we believe this Court is bound by Fifth Circuit precedent on this issue until that precedent is overruled.

### E.    A Universal Remedy Is Appropriate

The defendants recite many criticisms that have been made of "nationwide injunctions." *See* Defs.' Br., ECF No. 99, at 19. But none of those criticisms arose in cases where a litigant sought and obtained vacatur of agency action under section 706 of the APA. Vacatur under

---

27.    *See also* Nicholas Bagley, *Remedial Restraint in Administrative Law*, 117 Colum. L. Rev. 253, 258 (2017) ("The APA instructs federal courts to 'hold unlawful and set aside' arbitrary or unlawful agency action. When the APA was enacted in 1946, that instruction reflected a consensus that judicial review of agency action should be modeled on appellate review of trial court judgments . . . . Just as a district court judgment infected with error should be invalidated and returned for reconsideration, so too with agency action."); Thomas W. Merrill, *Article III, Agency Adjudication, and the Origins of the Appellate Review Model of Administrative Law*, 111 Colum. L. Rev. 939, 940 (2011) (explaining how judicial review of agency action is "built on the appellate review model of the relationship between reviewing courts and agencies," which "was borrowed from the understandings that govern the relationship between appeals courts and trial courts in civil litigation"); Mila Sohoni, *The Power to Vacate a Rule*, 88 Geo. Wash. L. Rev. 1121, 1126 (2020) ("[T]he APA allows universal vacatur of rules.").

the APA is inherently a universal remedy—at least under the existing law of the Fifth Cir-
cuit—because it compels the reviewing court to formally "set aside," *i.e.*, vacate the disputed
agency action, whether a rule or adjudication. *See* note 27, *supra*, and accompanying text.

In all events, a universal remedy would be appropriate even if this Court had discretion
to construe section 706's "set aside" language in the manner suggested by the defendants
and Professor Harrison—especially if this Court concludes that the non-Braidwood plaintiffs
have Article III standing. It is hard to imagine how anything short of a universal remedy will
redress the non-Braidwood plaintiffs' inability to purchase health insurance that excludes the
objectionable or unwanted coverage, and the Fifth Circuit has recognized that universal rem-
edies are appropriate when such relief is needed to fully redress the injuries of the named
plaintiffs. *See Professional Association of College Educators v. El Paso County Community Col-
lege District*, 730 F.2d 258, 273–74 (5th Cir. 1984) ("An injunction, however, is not neces-
sarily made overbroad by extending benefit or protection to persons other than prevailing
parties in the lawsuit—even if it is not a class action—if such breadth is necessary to give
prevailing parties the relief to which they are entitled.").

## CONCLUSION

The Court should enter judgment for the defendants on the Contraceptive Mandate
claims. The Court should enter a universal remedy that sets aside any past agency action
taken to implement a compulsory coverage mandate in response to an "A" or "B" recom-
mendation from the U.S. Preventive Services Task Force on or after March 23, 2010, other
than the actual recommendations of the Task Force itself, and that enjoins the defendants
from taking any future action to implement any compulsory coverage mandate in response
to an "A" or "B" recommendation from the Task Force.

Respectfully submitted.

_/s/ Jonathan F. Mitchell_

Gene P. Hamilton                          Jonathan F. Mitchell
Virginia Bar No. 80434                    Texas Bar No. 24075463
Vice-President and General Counsel        Mitchell Law PLLC
America First Legal Foundation            111 Congress Avenue, Suite 400
300 Independence Avenue SE                Austin, Texas 78701
Washington, DC 20003                      (512) 686-3940 (phone)
(202) 964-3721                            (512) 686-3941 (fax)
gene.hamilton@aflegal.org                 jonathan@mitchell.law

H. Dustin Fillmore III
Texas Bar No. 06996010
Charles W. Fillmore
Texas Bar No. 00785861
The Fillmore Law Firm, LLP
201 Main Street, Suite 700
Fort Worth, Texas 76102
(817) 332-2351 (phone)
(817) 870-1859 (fax)
dusty@fillmorefirm.com
chad@fillmorefirm.com

Dated: January 6, 2023                    *Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that on January 6, 2023, I served this document through CM/ECF upon:

CHRISTOPHER M. LYNCH
JORDAN L. VON BOKERN
Trial Attorneys
U.S. Department of Justice
Civil Division
1100 L Street, NW
Washington, DC 20005
(202) 353-4537 (phone)
(202) 616-8460 (fax)
christopher.m.lynch@usdoj.gov
jordan.l.von.bokern2@usdoj.gov

BRIAN W. STOLTZ
Assistant United States Attorney
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
(214) 659-8626 (phone)
(214) 659-8807 (fax)
brian.stoltz@usdoj.gov

*Counsel for the Defendants*

/s/ Jonathan F. Mitchell
JONATHAN F. MITCHELL
*Counsel for Plaintiffs*