UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| BRAIDWOOD MANAGEMENT INC., et al., | § § § | |
| Plaintiffs, | § § | |
| v. | § § | Civil Action No. 4:20-cv-00283-O |
| XAVIER BECERRA, et al., | § § | |
| Defendants. | § § | |

## SECOND MEMORANDUM OPINION & ORDER ON REMEDIES IN RELATION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Before the Court are Plaintiffs' Supplemental Brief in Support of Plaintiffs' Motion for Summary Judgment (ECF No. 98), filed October 24, 2022; Defendants' Response to Plaintiffs' Supplemental Motion for Summary Judgment and Supplemental Cross-Motion for Summary Judgment (ECF No. 99) and Supplemental Appendix in Support (ECF No. 100), filed November 23, 2022; Plaintiffs' Reply Brief in Support of Supplemental Motion for Summary Judgment and Response to Defendants' Supplemental Cross-Motion for Summary Judgment (ECF No. 111), filed January 6, 2023; and Defendants' Reply in Support of Supplemental Cross-Motion for Summary Judgment (ECF No. 112), filed January 27, 2023. Also before the Court are the *Amici Curiae* Brief for the American Cancer Society, et al. (ECF No. 107), filed December 1, 2022; and the Brief of *Amici Curiae* American Medical Association, et al. (ECF No. 108), filed December 1, 2022.

On September 7, 2022, this Court resolved the parties' cross-motions for summary judgment on the merits partly in favor of Plaintiffs and partly in favor of Defendants. Mem. Op. 41–42, ECF No. 92. The Court ordered supplemental briefing regarding standing for the non-

Braidwood Plaintiffs, the non-Braidwood religious objector Plaintiffs' Religious Freedom Restoration Act claim with respect to the PrEP coverage mandate, and the appropriate scope of relief for the successful parties. *Id.* Having considered the parties' briefing and applicable law on those issues, and in light of its prior decision on the merits in favor of Defendants, the Court **DISMISSES with prejudice** the religious objector Plaintiffs', including Braidwood Management Inc.'s, contraceptive mandate claim. The non-religious objector Plaintiffs' contraceptive mandate claim is **DISMISSED without prejudice** for lack of subject matter jurisdiction. Because the Court concludes that the PrEP coverage mandate violates RFRA, the Court **GRANTS** the non-Braidwood religious objector Plaintiffs' summary judgment motion and **DENIES** Defendants' summary judgment motion on this claim.

Therefore, the Court **GRANTS** all religious objector Plaintiffs', including Braidwood Management Inc.'s, request for declaratory and injunctive relief as to this claim. Finally, in light of its prior ruling that 42 U.S.C. § 300gg-13(a)(1)'s compulsory preventive care coverage requirements in response to an "A" or "B" rating by the U.S. Preventive Services Task Force made on or after March 23, 2010 violates the Appointments Clause, the Court **GRANTS** Plaintiffs' request for declaratory and injunctive relief with respect to this claim, **VACATES** any and all agency actions implementing or enforcing that provisions' mandatory coverage requirements, and **ENJOINS** Defendants and their officers, agents, servants, and employees from implementing or enforcing the compulsory preventive care coverage mandate in the future.

## I.    BACKGROUND

### A.  Legal Background

On March 23, 2010, Congress enacted the Patient Protection and Affordable Care Act (ACA), which dictates four categories of preventive care services most private health insurance

companies must cover. 42 U.S.C. § 300gg-13. The Act empowers three agencies—the U.S. Preventive Services Task Force (PSTF), the Health Resources and Services Administration (HRSA), and the Advisory Committee on Immunization Practices (ACIP)—to unilaterally determine what kinds of preventive care fall within each category of mandatory coverage by issuing guidelines or recommendations that, by operation of the statute, carry the force of law. *Id.* Specifically, PSTF recommends "A" or "B" ratings for specific evidence-based items and services for all patient demographics; HRSA issues "comprehensive guidance" regarding preventive care and screening for infants, children, adolescents, and women; and ACIP recommends certain immunizations. *Id.* § 300gg-13(a)(1)–(4). Private health insurers must cover and cannot impose cost sharing requirements for these recommended services. *Id.* § 300gg-13(a).

While all three agencies are affiliated with the U.S. Department of Health and Human Services (HHS), they are not all identically structured. ACIP and HRSA were created by the Secretary of HHS to provide vaccine recommendations and guidance on programs and activities within the agency.[1] *See* 42 U.S.C. § 217a(a) (authorizing HHS Secretary to create advisory councils or committees). Both ACIP and HRSA are ultimately subject to the "supervision and direction" of the HHS Secretary. 42 U.S.C. §§ 202, 243, 247b.[2] By contrast, PSTF is a volunteer body of non-federal experts that provides evidence-based recommendations related to preventive care services and health promotion.[3] And though the Task Force receives support from AHRQ, an

---

[1] Mem. Op. 3, ECF No. 92.

[2] Mem. Op. 14–17, ECF No. 92 (recognizing HHS Secretary's authority to ratify actions taken by ACIP and HRSA).

[3] Defs.' App. in Supp. of Cross-Mot. for Summ. J. 66, ECF No. 65. Though PSTF is not housed within another federal agency, given its authority to compel insurers to cover recommended services through issuance of ratings in conjunction with the ACA's compulsory coverage requirements, the Task Force members function as "officers" of the United States that exercise significant legal authority and are therefore referred to as an "agency" for purposes of this Opinion. Mem. Op. 18–24, ECF No. 92; *see also* 5 U.S.C. § 701 (defining "agency" as "each authority of the Government of the United States, whether or not it is within or subject to review by another agency").

agency within HHS, the Task Force is not itself a part of AHRQ or HHS.[4] 42 U.S.C. § 299b-4(a)(1). When it created PSTF, Congress specified that the Task Force's recommendations "shall be independent and, to the extent practicable, not subject to political pressure." *Id.* § 299b-4(a)(6).

Since the ACA's enactment, the agencies have issued several such pronouncements. Among those, and relevant to the case at hand, are HRSA's 2011 guidance compelling insurance companies to cover all FDA-approved contraceptive methods—including certain abortifacients ("contraceptive mandate")—and PSTF's 2019 issuance of an "A" rating for preexposure prophylaxis (PrEP) drugs that are used by persons at high risk of HIV acquisition ("PrEP mandate").[5] For purposes of this Opinion, the Court refers collectively to agency guidance or recommendations made compulsory through operation of § 300gg-13(a)(1) through (a)(4), and including the contraceptive and PrEP mandates, as the "preventive care mandates."

### B. The Parties

Plaintiffs are six individuals and two businesses who challenge the legality of the preventive care mandates as violative of the Constitution and the Religious Freedom Restoration Act (RFRA). Each desires the option to purchase or provide insurance that excludes or limits coverage currently required by the preventive care mandates and argues that Defendants' implementation and enforcement of the preventive care mandates prevents them from doing so. Each Plaintiff objects to the preventive care mandates for religious or personal reasons, or both.[6]

Plaintiffs John Kelley, Joel Starnes, Zach Maxwell, and Ashley Maxwell provide health coverage for themselves and their families. They want the option to purchase health insurance that

---

[4] Defs.' Resp. to Pls.' Mot. for Summ. J. 40, ECF No. 64.

[5] Pls.' App. 21, 12, ECF No. 46.

[6] For purposes of this Opinion, the Court refers to Plaintiffs Miller, Scheideman, and Fort Worth Oral Surgery as the "non-religious objector Plaintiffs"; to Plaintiffs Kelley, Starnes, Maxwell, Kelley Orthodontics, and Braidwood Management Inc. as the "religious objector Plaintiffs"; and to all Plaintiffs except for Braidwood Management Inc. as the "non-Braidwood Plaintiffs."

excludes or limits coverage of PrEP drugs, contraception, the HPV vaccine, and the screenings and behavioral counseling for STDs and drug use.[7] They say neither they nor their families require such preventive care.[8] They also claim that compulsory coverage for those services violates their religious beliefs by making them complicit in facilitating homosexual behavior, drug use, and sexual activity outside of marriage between one man and one woman.[9]

Plaintiff Joel Miller likewise provides health coverage for himself and his family. Like the other Plaintiffs, Miller wants the option to purchase health insurance that excludes or limits coverage of preventive care that "he does not want or need."[10] Miller's wife "is past her childbearing years," and neither he nor his family members "engage in the behaviors that makes [sic] this preventive treatment necessary."[11] Plaintiff Gregory Scheideman provides health coverage for himself, his family, and the employees of his company, Fort Worth Oral Surgery. Scheideman wants the option to purchase health insurance that excludes or limits coverage of services currently required by the preventive care mandates.[12] Scheideman says neither he nor his family members require such preventive care.[13] In addition, Scheideman and his business partners do not want to cover such care for their employees.[14]

Plaintiff Kelley Orthodontics provides health insurance for its employees. Kelley Orthodontics is a Christian professional association that wishes to provide health insurance for its employees that excludes coverage of preventive care such as contraceptives and PrEP drugs.[15]

---

[7] *See* Pls.' App. 33–37, 39–43, 50–54, 56–60, ECF No. 46.
[8] *Id.*
[9] *Id.* at 36, 42, 53, 59.
[10] *Id.* at 62–65.
[11] *Id.* at 65.
[12] *Id.* at 45–48.
[13] *Id.*
[14] *Id.*
[15] *Id.* at 37.

Plaintiff John Kelley, the owner of Kelley Orthodontics, says that providing such coverage violates his religious beliefs.[16]

Plaintiff Braidwood Management Inc. is a Christian for-profit corporation owned by Steven Hotze.[17] Braidwood provides health insurance to its approximately seventy employees through a self-insured plan, and Hotze wishes to provide health insurance for Braidwood's employees that excludes coverage of preventive care such as contraceptives and PrEP drugs.[18] Hotze, like Plaintiffs Kelley, Starnes, and the Maxwells, objects to coverage of those services on religious grounds.[19] Hotze also wants the option to impose copays or deductibles for preventive care in Braidwood's self-insured plan.[20]

Defendants are the Secretary of HHS, Xavier Becerra; the Secretary of the Treasury, Janet Yellen; the Secretary of Labor, Martin Walsh; and the United States. The three individual Defendants are sued in their official capacities for their roles in enforcing the preventive care mandates.

### C.  Procedural Background

Plaintiffs' First Amended Complaint alleged several claims: (1) that the preventive care mandates violate Article II's Appointments Clause; (2) the preventive care mandates violate the nondelegation doctrine; (3) that 42 U.S.C. § 300gg-13(a)(1) violates Article II's Vesting Clause; (4) the preventive care mandates, as a matter of statutory interpretation, apply only to ratings, recommendations, or guidelines in place at the time Congress passed the ACA; and (5) that the PrEP Mandate individually violates RFRA.[21] The Court dismissed Plaintiff's statutory

---

[16] *Id.*
[17] *Id.* at 67.
[18] *Id.* at 67–71.
[19] *Id.* at 69–71.
[20] *Id.*
[21] First Am. Compl., ECF No. 14.

interpretation claim for failure to state a claim and denied on the merits their Appointments Clause

claim with respect to ACIP and HRSA and their nondelegation and Vesting Clause claims.[22]

However, the Court granted summary judgment in favor of Plaintiffs' Appointment Clause claim

with respect to PSTF and that the PrEP mandate violates Braidwood's rights under RFRA.[23] The

issues left to resolve are whether the non-Braidwood Plaintiffs have standing, whether the PrEP

Mandate violates RFRA as to the non-Braidwood Plaintiffs, and what is the appropriate remedy

for the Plaintiffs who succeed on their claims. The parties have briefed the issues, which are ripe

for the Court's review.

## II.   DISCUSSION

### A.  Whether the Non-Braidwood Plaintiffs Have Standing to Press their Claims

The Court turns first to the question of whether the non-Braidwood Plaintiffs have Article

III standing such that they may be granted relief on their successful claims. *See Town of Chester

v. Laroe Ests., Inc.*, 137 S. Ct. 1645, 1650 (2017) (requiring each plaintiff to demonstrate its own

Article III standing to seek and obtain each form of relief sought). To establish Article III standing,

each plaintiff must set forth specific evidence showing (1) an injury-in-fact (2) that is fairly

traceable to the defendants' conduct, and (3) is likely to be redressed by a favorable judicial

decision. *Id.* An injury-in-fact must be "concrete and particularized" and "actual or imminent, not

conjectural or hypothetical" in nature. *Lujan v. Defs. Of Wildlife*, 504 U.S. 555, 560–61 (1992).

As the parties invoking federal jurisdiction, Plaintiffs bear the burden of proving each element of

standing. *Id.* at 561.

The purchaser standing doctrine, developed in the D.C. Circuit in cases challenging

---

[22] Order, ECF No. 35 (denying statutory interpretation claim for failure to state a claim); Mem. Op., ECF No. 92 (denying Plaintiffs' motion for summary judgment on the merits as to their nondelegation claim, Vesting Clause claim, and Appointments Clause claim with respect to ACIP and HRSA).
[23] Mem. Op. 41–42, ECF No. 92.

government conduct, recognizes Article III injury-in-fact when a plaintiff has been deprived of the opportunity to purchase a desired product due to government action. *See, e.g.*, *Weissman v. Nat'l R.R. Passenger Corp.*, 21 F.4th 854, 857–58 (D.C. Cir. 2021); *Orangeburg, S.C. v. FERC*, 862 F.3d 1071, 1077–78 (D.C. Cir. 2017); *Competitive Enter. Inst. v. Nat'l Highway Traffic Safety Admin.*, 901 F.2d 107, 113–14 (D.C. Cir. 1990). Under this theory, courts have recognized purchaser standing where the plaintiffs have "lost [the] opportunity to purchase a desired product . . . even if they could ameliorate the injury by purchasing some alternative product." *Orangeburg*, 862 F.3d at 1078 (cleaned up). However, such plaintiffs need not lose *all* opportunity to purchase a product to establish injury-in-fact. They must simply demonstrate that their choices have been "restrict[ed]" or that there is "*less* opportunity to purchase [the desired product] than would otherwise be available to them." *Competitive Enter. Inst.*, 901 F.2d at 112; *Center for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 793 F.2d 1322, 1332 (D.C. Cir. 1986) (emphasis added). In making this determination, courts have focused on whether the challenged government action has rendered the consumer's desired product "unreasonably priced" or has made it "not readily available." *Weissman*, 21 F.4th at 858.

While lost or diminished opportunity to purchase a desired product has been the general rule for purchaser standing since its inception, the D.C. Circuit's recent decision in *Weissman v. National Railroad Passenger Corporation* adds nuance to the standard. 21 F.4th at 858–59. In *Wiessman*, now the leading decision on the doctrine of purchaser standing, the D.C. Circuit distinguished "core features" versus "ancillary terms" of a particular product, holding that would-be plaintiffs have purchaser standing if they can show that their desired product, "defined at a reasonable level of generality" and "differentiated from available alternatives by its core features," is no longer available. *Id.* at 859. If the desired product is only distinguishable from the available

alternative product "by an ancillary term," however, the plaintiff has not carried its burden as to injury-in-fact. *Id.*

Here, Plaintiffs rely exclusively on the doctrine of purchaser standing and argue that, because each of the non-Braidwood Plaintiffs has been denied the opportunity to purchase a desired product—namely, health insurance coverage that excludes services the would-be consumers find religiously objectionable, unnecessary, or otherwise undesirable—they have standing to press their associated claims for relief.[24] Defendants attack Plaintiffs' reliance on purchaser standing at a theoretical level, arguing first the doctrine is inapplicable to this case because "the Fifth Circuit has never adopted the purchaser standing doctrine;" that the doctrine is limited exclusively to the context of the Administrative Procedure Act (APA); and, those issues aside, Plaintiffs cannot satisfy the standard under *Weissman* anyway.[25]

As an initial matter, that the Fifth Circuit has not expressly adopted the purchaser standing doctrine does not bar its application here because neither has the Fifth Circuit *rejected* the theory. Nor is it uncommon or improper for a district court to look to outside Circuits for persuasive legal authority where there is no binding precedent on the issue at hand. And despite Defendants' contrary assertion, the purchaser standing doctrine need not confer standing only in cases alleging claims under the APA. Indeed, as Defendants concede, the *Weissman* decision does not expressly foreclose the doctrine's application beyond the APA context.[26] *See Weissman*, 21 F.4th at 859 (noting that the Circuit "has assumed" purchaser standing applies only in the APA context but theorizing that it "could apply beyond that context"). The Court knows of no compelling reason to impose more stringent rules of standing when a plaintiff brings an APA claim as opposed to any

---

[24] Pls.' Supp. Br. 11–12, 14–15, ECF No. 98.
[25] Defs.' Resp. 5, ECF No. 99.
[26] *Id.*

9

other sort of claim, and Defendants offer none. Therefore, provided they satisfy purchaser standing as the D.C. Circuit has articulated it, the Court finds no reason to deny the Plaintiffs standing on this basis.[27]

The religious objector Plaintiffs attest that they want the option to purchase health insurance—for themselves, their families, or their employees—that excludes coverage of preventive care such as PrEP drugs, the HPV vaccine, contraceptives, and screenings and behavioral counseling for STDs and drug use.[28] Each claims that the preventive care mandates requiring compulsory coverage for those services violates their religious beliefs by making them complicit in facilitating homosexual behavior, drug use, and sexual activity outside of marriage between one man and one woman as a condition of purchasing health insurance.[29]

By contrast, the non-religious objector Plaintiffs, as well as those who object to the preventive care mandates on religious grounds, claim injury based on their inability to purchase insurance that excludes or imposes copays or deductibles for preventive care services they do not want or need, resulting in higher monthly premiums.[30] Plaintiffs claim this denial of choice is a distinct injury from the inability to purchase insurance that is violative of one's sincerely held religious beliefs.[31]

Defendants do not contest that the religious objector Plaintiffs' Hobson's choice between purchasing health insurance that includes religiously objectionable services or forgoing

---

[27] Plaintiffs suggest that the Court should decline to follow *Weissman* on grounds that the decision is an anomaly, departing from decades of D.C. Circuit and Supreme Court precedent with its core feature-versus-ancillary term distinction. Pls.' Reply 6–7, ECF No. 111. While it may be true that *Weissman* substantially amends the rule of purchaser standing, that case is the Circuit's leading decision on the doctrine. And given no controlling authority within the Fifth Circuit, the Court is unwilling to depart from that same Circuit's most recent precedential decision on the subject.

[28] See note 7 *supra*.

[29] *See* Pls.' App. at 36–37, 42, 53, 59, ECF No. 46; Pls.' Supp. Br. at 12, ECF No. 98.

[30] Pls.' App. 33, 39, 45, 50, 56, 62, ECF No. 46.

[31] *Id.*; Pls.' Supp. Br. 14–15, ECF No. 98.

conventional health insurance altogether is an injury-in-fact. And such an argument would be meritless. *See March for Life v. Burwell*, 128 F. Supp. 3d 116, 128–29 (D.D.C. 2015) ("The employee plaintiffs have demonstrated that the [Contraceptive] Mandate substantially burdens their sincere exercise of religion . . . [because] the Mandate, in its current form, makes it impossible for employee plaintiffs to purchase a health insurance plan that does not include coverage of [services] to which they object [on religious grounds]."). Instead, Defendants argue that these plaintiffs suffer no real injury as a result of the preventive care mandates because they do not currently participate in the health care market and that they opted out of the insurance market for reasons other than the mandates, namely, the *cost* of coverage.[32] But each of these arguments fail.

First, the Plaintiffs need not *act* to violate their sincerely held religious convictions by purchasing a product they believe would make them complicit in objectionable conduct just to obtain standing. Defendants' contrary assertion is both illogical and legally incorrect. Rather, Plaintiffs need only show their *opportunity* to purchase their desired product, as defined by its core features, has been reduced or eliminated. *Weissman*, 21 F.4th at 859; *Competitive Enter. Inst.*, 901 F.2d at 112 (finding plaintiffs' "restricted opportunity to purchase" a desired product to be a "cognizable injury"); *Center for Auto Safety*, 793 F.2d at 1332 (finding standing where plaintiffs had "less opportunity to purchase [the desired product] than would otherwise be available to them"). It is undisputed that health insurance companies stopped selling insurance plans excluding the objectionable coverage in response to the preventive care mandates. As a result, these Plaintiffs lost access to health insurance plans they could purchase without religious objection. Thus, religious objector Plaintiffs have made the necessary showing here.[33]

The fact that Plaintiffs Kelley and Starnes utilize Christian bill-sharing does not negate this

---

[32] Defs.' Resp. 3–5, ECF No. 99; Defs.' Reply 2–7, ECF No. 112.
[33] See notes 7 and 29 *supra*.

cognizable injury. *See Orangeburg*, 862 F.3d at 1078 (cleaned up) (noting that "lost opportunity to purchase a desired product [is sufficient to demonstrate injury-in-fact] . . . even if [plaintiffs] could ameliorate the injury by purchasing some alternative product"). Nor does this standard require Plaintiffs to prove that they would, in fact, purchase conventional health insurance if the preventive care mandates were lifted.[34] As discussed, Plaintiffs are suffering a cognizable injury *now* through their current inability to purchase conventional health insurance that excludes the objectionable coverage.[35] And Defendants have not offered any decision indicating that purchaser standing plaintiffs must evince a *commitment*, rather than a desire, to purchase the product in question.[36]

Second, Defendants argue that several of the religious objector Plaintiffs cannot demonstrate standing because in their verified responses to requests for admissions, they indicated they stopped purchasing health insurance "because it was too expensive," not because of the preventive care mandates.[37] Defendants argue that under Federal Rule of Civil Procedure 36, the Court must accept these statements as "conclusively established."[38] FED. R. CIV. P. 36(b). While Defendants are correct about the conclusive nature of the responses, they are wrong that the Court must accept them as the "*complete and sufficient* basis for [the plaintiffs'] decision to stop purchasing health insurance."[39] The language of Rule 36(b) does not compel this result and Defendants cite no authority to support the proposition that the responses must be read as the *exclusive* basis for Plaintiffs' decisions. Reading the statements in context supports this conclusion.

---

[34] Defs.' Resp. 4, ECF No. 99.
[35] For this reason, the Court need not address whether the Plaintiffs' late-coming declarations are permissible to support their assertions of standing.
[36] *See* Defs.' Reply 4–6, ECF No. 111.
[37] Defs.' Resp. 3, ECF No. 99; Defs.' Reply 2–3, ECF No. 111.
[38] Defs.' Reply 2–3, ECF No. 111.
[39] *Id.* at 3 (emphasis added).

Importantly, Defendants' requests for admission addressed solely whether Plaintiffs could *quantify* the impact of the mandates on their insurance premiums.[40] Plaintiffs responded that they could not quantify the increased costs, but that they knew their premiums had become too expensive to afford.[41] Their discussion of costs is a natural result of Defendants' targeted questions about premiums.[42] As such, the Court finds no reason to deny standing on this basis.

The only remaining issue related to this element of the standing inquiry is whether the preventive care mandates to which the non-Braidwood Plaintiffs object are "core features" or merely "ancillary terms." In *Weissman*, the D.C. Circuit applied its core features-versus-ancillary term distinction to hold that would-be plaintiffs did not have purchaser standing because they had no cognizable interest in contracting to purchase train tickets without being subject to a binding arbitration provision. *Weissman*, 21 F.4th at 859. The court concluded that the purchasers had "adequately alleged a 'primary,' concrete consumer interest in traveling on Amtrak, but not in purchasing an Amtrak ticket without an arbitration provision." *Id.* at 860. In other words, the arbitration provision was merely ancillary to the desired product defined at a reasonable level of generality—namely, a train ticket.

Defendants argue that, here, the objectionable preventive care coverages are merely ancillary terms and that "whatever precise features of health insurance may be 'core' to Plaintiffs, they continue to have access to health insurance that includes those features, and thus do not have standing under the 'purchaser standing' theory."[43] The Court agrees in part. Defendants' argument

---

[40] *See* Defs.' App. in Supp. of Cross-Mot. for Summ. J. 181–222, 277–96, ECF No. 65.

[41] See note 40 *supra*.

[42] Of course, had Plaintiffs offered this same response to a broad question about *why* they stopped purchasing insurance, and later tried to back away from that answer in their pleadings, Rule 36 would compel a different result. But the specific cost-based questions in Defendants' requests for admission are important context.

[43] Defs.' Reply 10, ECF No. 111.

is true as to the non-religious objector Plaintiffs, who would like to purchase health insurance without the unwanted an unnecessary preventive care services and associated copays or deductibles but otherwise retain access to conventional healthcare. Indeed, these Plaintiffs are current participants in the health insurance market and, by all appearances, are not prevented from retaining it for their personal or business needs on account of expense.[44] The *Weissman* court offered no guidance about where the line between "core features" and "ancillary terms" is to be drawn. But wherever that line may be, that the non-religious objector Plaintiffs may still—and indeed do—purchase conventional health insurance despite its inclusion of preventive care coverage suggests the features are merely ancillary.

The same argument cannot be made for the religious-objector Plaintiffs. These Plaintiffs, who do not currently and are unwilling to purchase health insurance that includes the preventive care coverage, find those services objectionable enough to forgo conventional health insurance altogether. Though the Court does not suggest that a decision not to purchase, without more, would be enough to determine whether a feature is "core," a decision not to purchase *based on one's religious convictions* certainly meets the criteria. In short, these Plaintiffs have a cognizable interest in being able to purchase a product that does not obligate them to violate their religious beliefs. Though the Government may disagree with those beliefs, it is no position to dictate whether the Plaintiffs' interests in adhering to their religious convictions is a core or merely ancillary component of their decision to abstain. Thus, the religious objector Plaintiffs have carried their burden to demonstrate injury-in-fact based on a theory of purchaser standing.

The remaining two elements for Article III standing—traceability and redressability—are relatively straightforward. Plaintiffs "must satisfy the 'causation' and 'redressability' prongs of

---

[44] Pls.' App. 45–48, 62–65, ECF No. 46.

the Art. III minima by showing that the injury 'fairly can be traced to the challenged action' and 'is likely to be redressed by a favorable decision.'" *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990). When a plaintiff suffers injury as the object of the challenged government action, "there is ordinarily little question that the action . . . has caused him injury, and that a judgment preventing . . . the action will redress it." *Lujan*, 504 U.S. at 561–62. And indeed, there is little doubt that Plaintiffs' injuries—incurred through PSTF's ratings operating in conjunction with 42 U.S.C. § 300gg-13—are fairly traceable to Defendants' enforcement of the preventive care mandates. Nor is it contested that the forms of relief sought would likely redress the Plaintiffs' injuries. Moreover, the proliferation of short-term, limited duration insurance (STLDI) plans in response to Congress's exempting them from the ACA requirements adds further support to these elements.[45] That insurance companies are offering STLDI plans without preventive care coverage when not legally required to do so indicates that the restricted options in the conventional market are at least partly attributable to the Government's enforcement of the mandates. Thus, it is reasonable to conclude that if Defendants are broadly enjoined from enforcing these mandates, the conventional health insurance market may respond similarly to the STLDI market, meaning Plaintiffs' injuries would *likely* be redressed by a favorable decision.

*     *     *     *

In sum, the religious objector Plaintiffs have demonstrated standing and are entitled to press their claims for relief. Non-religious objector Plaintiffs Joel Miller and Gregory Scheideman have not made this showing. Given these conclusions, and the Court's prior determination that 42 U.S.C. § 300gg-13(a)(4) does not violate the Appointments Clause with respect to HRSA, the Court **DISMISSES with prejudice** the religious objector Plaintiffs' contraceptive mandate claims

---

[45] Pls.' App 176, ECF No. 46.

and shall enter summary judgment in favor of Defendants as to this claim. The Court **DISMISSES without prejudice** non-religious objector Plaintiffs' contraceptive mandate claim for lack of subject matter jurisdiction.[46]

### B. Whether the PrEP Coverage Mandate Violates the Religious Freedom Restoration Act as to the Non-Braidwood Religious Objector Plaintiffs

Having concluded that the non-Braidwood religious objector Plaintiffs have standing to press their claims for relief, the Court must now resolve on the merits their claim that the PrEP mandate violates RFRA. The Court previously decided the mandate violates RFRA as to Braidwood and incorporates much of its prior analysis here.[47]

RFRA generally prohibits the government from "substantially burden[ing] a person's exercise of religion even if the burden results from a rule of general applicability." 42 U.S.C. § 2000bb-1(a). To demonstrate a violation of RFRA, the remaining religious objector Plaintiffs "must show that (1) the relevant religious exercise is grounded in a sincerely held religious belief and (2) the government's action or policy substantially burdens that exercise by, for example, forcing [the plaintiffs] to engage in conduct that seriously violates [their] religious beliefs." *Ali v. Stephens*, 822 F.3d 776, 782–83 (5th Cir. 2016) (cleaned up) (interpreting RLUIPA).[48] If Plaintiffs carry that burden, the government "*may* substantially burden a person's exercise of religion *only*

---

[46] Defendants suggest the Court should dismiss the non-religious objector Plaintiffs' contraceptive coverage claim with prejudice, citing two decisions that depart from the general rule that dismissals based on lack of subject matter are without prejudice. Defs.' Reply 11 n.4 (citing *Guajardo v. Air Exp. Int'l, USA, Inc.*, No. 3:12-CV-815-L, 2012 WL 2886672, at *3 n.* (N.D. Tex. July 16, 2012) and *Westfall v. Miller*, 77 F.3d 868 (5th Cir. 1996)). Because these Plaintiffs have had ample opportunity to demonstrate standing, Defendants argue, they need not be given another chance to replead their claims. *Id.* But the single authoritative decision Defendants cite also dismissed based on the plaintiffs' failure to state a claim. *Westfall*, 77 F.3d at 870. For this reason, and because Defendants have not offered any other reason to depart from the general rule of dismissal, the Court dismisses without prejudice.

[47] Mem. Op. 36–41, ECF No. 92.

[48] *Holt v. Hobbs*, 574 U.S. 352, 356–58 (2015) (noting that RFRA and its sister statute RLUIPA apply identical standards).

*if* it demonstrates that application of the burden to the person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(b) (emphases added).

As it does with Braidwood, the PrEP mandate substantially burdens the religious exercise of the remaining non-Braidwood Plaintiffs. And like the owner of Braidwood, these Plaintiffs object to purchasing or providing coverage for PrEP drugs because they believe that (1) the Bible is "the authoritative and inerrant word of God," (2) the "Bible condemns sexual activity outside marriage between one man and one woman, including homosexual conduct," (3) providing coverage of PrEP drugs "facilitates and encourages homosexual behavior, intravenous drug use, and sexual activity outside of marriage between one man and one woman," and (4) purchasing coverage of PrEP drugs by purchasing such coverage for personal or business use makes them complicit in those behaviors.[49]

Yet, as previously discussed, the ACA forces these Plaintiffs to choose between purchasing health insurance that violates their religious beliefs and foregoing conventional health insurance altogether. 42 U.S.C. § 300gg-13(a)(1); 45 C.F.R. § 147.130(b)(1). It is undisputed that putting individuals to this choice imposes a substantial burden on religious exercise. *See Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 725–26 (2014). Thus, Plaintiffs have shown that the PrEP mandate substantially burdens their religious exercise. The burden thus shifts to Defendants to show that the PrEP mandate furthers a compelling governmental interest and is the least restrictive means of furthering that interest.

For the reasons set out in the Court's prior Opinion, however, the Court finds that Defendants have not carried their burden to demonstrate a compelling government interest or that

---

[49] Pls.' App. 36–37, 42–43, 53–54, 59–60, ECF No. 46.

the PrEP mandate is the least restrictive means of furthering that articulated interest.[50] *Braidwood*

*Mgmt., Inc. v. Becerra*, --- F. Supp. 3d ---, 2022 WL 4091215, at *19–20 (N.D. Tex. Sept. 7, 2022).

Defendants claim—and Plaintiffs do not dispute—a compelling government interest in inhibiting

the spread of a potentially fatal infectious disease like HIV.[51] But as this Court previously held,

properly framed in the context of this RFRA case, the question is whether the government has a

compelling interest in requiring *all private insurers to cover PrEP drugs* in every one of their

insurance policies.[52] But neither Congress nor PSTF expressed that compelling interest and the

ACA's several exemptions for grandfathered plans and small businesses undermine Defendants'

argument that all insurers must provide plans with PrEP drug coverage.[53] Nor have Defendants

offered any meaningful argument as to how the PrEP mandate satisfies the "exceptionally

demanding" least-restrictive-means test.[54] *Hobby Lobby Stores*, 573 U.S. at 728.

*     *     *     *

Because Defendants have not carried their burden to show that the PrEP mandate merits

the substantial burden on Plaintiffs' religious exercise, the Court **GRANTS** summary judgment in

favor of the remaining non-Braidwood Plaintiffs as to Claim 5 of Plaintiffs' Amended Complaint

and **DENIES** Defendants' corresponding motion for summary judgment as to this claim. Under

28 U.S.C. § 2201, the Court **HOLDS** that the PrEP mandate violates Plaintiffs Braidwood

Management Inc., Kelley Orthodontics, John Kelley, Joel Starnes, Zach Maxwell, and Ashley

Maxwell's rights under the Religious Freedom Restoration Act. Braidwood Management Inc. and

Kelley Orthodontics, and to the extent applicable, individual Plaintiffs need not comply with the

---

[50] Mem. Op. 38–41, ECF No. 92.

[51] Defs.' Mot. for Summ. J. 57, ECF No. 64; Pls.' Resp. to Mot. for Summ. J. 39, ECF No. 74.

[52] Mem. Op. 39, ECF No. 92.

[53] *Id.* at 39–40.

[54] *Id.* at 40–41.

preventive care coverage recommendations of the U.S. Preventive Services Task Force issued on or after March 23, 2010, because the members of the Task Force have not been appointed in a manner consistent with Article II's Appointments Clause. Accordingly, the Court **ENJOINS** Defendants and their officers, agents, servants, and employees from implementing or enforcing the PrEP mandate as against these Plaintiffs.

### C. Whether Plaintiffs are Entitled to a Universal Remedy or to Narrowly Tailored Relief

Having found in favor of the religious objector Plaintiffs on the merits of their Appointments Clause claim as it relates to PSTF and their claim that the PrEP mandate violates their rights under RFRA, the Court must determine the appropriate remedy. Though Defendants contest the parties' success on the merits, they do not dispute that successful Plaintiffs are entitled to party-specific declaratory and injunctive relief.[55] Thus, the final issue before the Court is what relief the Plaintiffs are entitled to for their success on the merits of their Appointments Clause claim as it pertains to PSTF.

Plaintiffs argue Braidwood, and the other religious objector Plaintiffs who have demonstrated Article III standing, is entitled to a universal remedy under the APA "set[ting] aside" every agency action taken to implement or enforce the preventive care recommendations (made compulsory through operation of 42 U.S.C. § 300gg-13(a)(1)) of the unconstitutionally appointed Task Force since March 23, 2010.[56] *See* 5 U.S.C. § 706(2)(A). Defendants object to this proposal and claim that, at most, Plaintiffs are entitled to targeted relief that permits the Court to sever the unconstitutional portions of the ACA, but not vacate the unlawful agency actions.[57] Alternatively, Defendants concede declaratory and injunctive relief that specifically addresses the prevailing

---

[55] *See* Defs.' Resp. 15 n.5, 20, ECF No. 99.
[56] Pls.' Supp. Br. 8, ECF No. 98; Pls.' Reply 16, ECF No. 111.
[57] Defs.' Resp. 8–10, 20, ECF No. 99.

parties' injuries is permissible.[58] Because the parties agree that the latter forms of relief are appropriate, here the Court will address only whether Plaintiffs are entitled to a universal remedy that prevents Defendants from enforcing the disputed coverage mandates against anyone, or only against the Plaintiffs to this dispute who have demonstrated Article III standing.

The first question is whether the APA permits vacatur of the unlawful agency actions taken to implement or enforce PSTF's constitutionally infirm preventive care mandates. It does. *Data Mktg. P'ship, LP v. U.S. Dep't of Labor*, 45 F.4th 846, 859 (5th Cir. 2022) (acknowledging the APA language authorizing courts to "hold unlawful and set aside agency actions" to permit vacatur) (cleaned up). The next question is whether vacatur is permissible here. It is. While Defendants raise a host of challenges to this conclusion, each is unavailing.

The Court begins with the text of the relevant statute, § 706(2) of the APA, which authorizes courts to "hold unlawful and set aside agency action" that the court finds to be "not in accordance with law" or "contrary to constitutional [] power." 5 U.S.C. § 706(2)(A)–(B). As an initial objection to Plaintiffs' proposed remedy, Defendants contend that even if the APA *permits* vacatur, it does not *require* it.[59] But the plain language of § 706 contradicts that argument. 5 U.S.C. § 706 ("The reviewing court *shall* . . ."). And the authority Defendants cite to suggest that courts may *choose* whether to vacate agency action is inapplicable in this case because this Court has no option to remand the subject statute or contested implementation or enforcement action to a responsible agency. Defendants cite *Central and South West Services, Inc. v. U.S. EPA* to support the proposition that this Court may decline to vacate the unlawful agency action.[60] 220 F.3d 683, 692 (5th Cir. 2000). But the plaintiffs in that case challenged discrete segments of a Final Rule

---

[58] *Id.* at 20–22.
[59] Defs.' Reply 16 n.6, ECF No. 112.
[60] Defs.' Reply 16 n.6, ECF No. 112.

issued by the EPA, arguing that the agency failed to consider relevant factors and evidence in issuing its regulation. *Cent. & S. W. Servs.*, 220 F.3d at 686–87. The court agreed and, rather than vacate the Rule's contested provisions, remanded them to the agency for reconsideration, following the general rule that provides for remand instead of vacatur where an agency may be able to substantiate its regulatory decision. *Id.* at 690–92, 702. Because the Court has nothing to remand here, that decision is inapt.

That the Plaintiffs did not prevail on an APA claim is no bar to the remedy they seek. The Court's prior Opinion makes clear that this case involves government action the Court has found to be "not in accordance with law" or "contrary to constitutional [] power." 5 U.S.C. § 706(2)(A)–(B); *Braidwood Mgmt.*, 2022 WL 4091215, at *12–13, 20 (holding that the statutory scheme that gives PSTF's recommended ratings the force and effect of law violates Braidwood's rights under RFRA and Article II's Appointments Clause). Yet Defendants respond that the APA is inapplicable here because Plaintiffs have only challenged the acts of *Congress*, and *not* the actions of the Task Force.[61] Because Plaintiffs did not specifically challenge PSTF's authority to issue recommendations under 42 U.S.C. § 299b(a)(1), Defendants claim they are not entitled to vacatur of those actions.[62] That may be true. But Plaintiffs *did* successfully challenge the constitutionality of the statute that gives PSTF's recommendations the force and effect of law.

As Plaintiffs assert, "a challenge to the constitutionality of a statute necessarily encompasses a challenge to every agency action taken to implement [or enforce] the unconstitutional command."[63] The Court agrees. And the Fifth Circuit recently affirmed a conceptually similar notion. *See Franciscan Alliance, Inc. v. Becerra*, 47 F.4th 368, 378 (5th Cir.

---

[61] Defs.' Reply 15–16, ECF No. 112.
[62] Defs.' Reply 15, ECF No. 112.
[63] Pls.' Reply 20, ECF No. 111.

2022) ("HHS implicitly argues that a lawsuit challenging a regulation and a lawsuit challenging the underlying statute are different. But . . . a challenge to an agency regulation is *necessarily* a challenge to the underlying statute as well.") (emphasis added). An attack on the underlying statute would then logically present an attack on the executive actions taken pursuant to that statute. Thus, every executive action taken to implement or enforce PSTF's recommended ratings, by HHS or any other agency, are as constitutionally invalid as the authorizing statutory provision. Additionally, the only remedy that could relieve Plaintiffs' injury is one directed at the agencies tasked with implementing and enforcing the unconstitutional statute, since courts have no authority to order Congress to cure its statutory deficiency. *See generally* Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 VA. L. REV. 933 (2018).

Defendants also suggest that any party pursuing relief under the APA must follow the "comprehensive statutory scheme for litigating certain types of challenges to agency action."[64] They say this scheme "establishes certain claims (*see, e.g.*, 5 U.S.C. §§ 702, 706) and prerequisites to bringing them (*see, e.g.*, 5 U.S.C. § 704), and then authorizes the Court to take certain actions to remediate them (*see, e.g.*, 5 U.S.C. §§ 703, 705)."[65] Beyond this general assertion, however, Defendants provide no indication of what prerequisites or administrative remedies the Plaintiffs in this case might have been obligated to exhaust.[66] Nor do they identify any provision of the ACA that sets out an appropriate course for administrative review of the preventive care mandates they challenge.[67] And while they fault Plaintiffs for citing "no case" in support of their proposed

---

[64] Defs.' Reply 17, ECF No. 111.

[65] *Id.*

[66] *See* Defs.' Reply 17–19, ECF No. 111.

[67] *Id.* Moreover, Defendants offer no explanation why the very provisions they cite as part of this statutory scheme are inapplicable to the instant case. Indeed, § 702 provides that a person "adversely affected or aggrieved by agency action *within the meaning of a relevant statute*, is entitled to judicial review thereof." *Id.* § 702 (emphasis added). Here, Plaintiffs have been adversely affected by the implementation and

remedial posture, the criticism applies equally to Defendants.[68] Indeed, Defendants cite no authority—not one—dictating the opposite rule that they urge this Court to adopt: that APA remedies *are* reserved exclusively for successful APA claims.[69] So while the Court is without clear precedential guidance on this question, the plain language of the APA supports Plaintiffs' remedial position.

Additionally, Federal Rule of Civil Procedure 54 allows the Court to provide the relief to which Plaintiffs are entitled, despite their failure to request that form of relief at the outset of their case, and provided the request is not prejudicial to the opposing party. FED. R. CIV. P. 54(c); *Peterson v. Bell Helicopter Textron, Inc.*, 806 F.3d 335, 340 (5th Cir. 2015) ("there is no prejudice when 'all of the elements justifying relief were fully established before the district court'"); *see also Whole Woman's Health v. Hellerstedt*, 579 U.S. 582, 136 S. Ct. 2292, 2307 (2016) (applying Rule 54 and noting "in 'the exercise of its judicial responsibility' it may be 'necessary . . . for the Court to consider the facial validity' of a statute even though a facial challenge was not brought) (quoting *Citizens United v. Federal Election Comm'n*, 558 U.S. 310, 333 (2010)), overruled on other grounds in *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022).

Here, the elements necessary to justify vacatur under the APA have been proven. This Court has already found that, by operation of 42 U.S.C. § 300gg-13(a)(1), the PSTF members wield "significant authority pursuant to the laws of the United States" in violation of Article II. *Braidwood Mgmt.*, 2022 WL 4091215, at *10. This constitutionally infirm statutory creation is

---

enforcement of 42 U.S.C. § 300gg-13(a)(1)'s compulsory effect on the PSTF's recommendations. And § 704 provides that courts may review agency action "for which there is no other adequate remedy in a court are subject to judicial review." *Id.* § 704. Again, other than Congress's revision of the statute in question— which the Court has no authority to dictate—the Court knows of no adequate remedy for curing the constitutional violation at bar. And Defendants suggest none.

[68] Defs.' Reply 18, ECF No. 112 ("But a court cannot award such relief if a plaintiff, like Plaintiffs here, does *not bring* any APA claim. *Plaintiffs cite no case to the contrary.*") (second emphasis added).

[69] *See* Defs.' Resp. 11–13, ECF No. 99; Defs.' Reply 17–19, ECF No. 112.

"not in accordance with law" and makes the issuance of their recommendations "contrary to constitutional [] power." 5 U.S.C. § 706(2)(A)–(B). And, as discussed, Plaintiffs' challenge to the § 300gg-13(a)(1) logically includes a challenge to the executive actions taken pursuant to that statute. Thus, any *agency actions* taken to implement and enforce the corresponding preventive care mandates are necessarily "not in accordance with law" and may be "set aside." *Id.* § 706.

Nor are Defendants prejudiced by Plaintiffs' requested relief. In passing, Defendants suggest that Plaintiffs' proposing vacatur as a remedy at this stage of litigation presents notice and due process concerns.[70] But Defendants have been on notice that Plaintiffs were seeking a universal remedy since they filed their Amended Complaint. Throughout, Plaintiffs repeatedly expressed their intent to obtain broad relief:

> The Court should therefore declare that any and all preventive-care mandates based on a rating, recommendation, or guideline issued by the U.S. Preventive Services Task Force, the Advisory Committee on Immunization Practices, or the Health Resources and Services Administration after March 23, 2010—the date on which the Affordable Care Act was signed into law—are unconstitutional and unenforceable, and it should permanently enjoin the defendants from enforcing them.[71]

> [T]he Court should enjoin the defendants from enforcing any preventive-care mandate derived from an agency rating, recommendation, or guideline that issued after March 23, 2010.[72]

> [The Court should] permanently enjoin the defendants from enforcing any coverage mandate based upon an agency rating, recommendation, or guideline that issued after March 23, 2010.[73]

> [And the Court should] award all other relief that the Court deems just, proper, or equitable.[74]

This was sufficient to provide Defendants fair notice of the type of relief Plaintiffs were seeking

---

[70] Defs.' Resp. 12, ECF No. 99.
[71] Am. Compl. ¶ 77, ECF No. 14.
[72] *Id.* ¶ 80.
[73] *Id.* at 26.
[74] *Id.*

for their Appointments Clause claim. Moreover, Defendants have been given ample opportunity—a response and sur-reply—to fully brief the propriety of vacatur at the remedies stage.

Beyond the statutory scheme and Rule 54, there is some authority that suggests courts possess a degree of inherent authority to provide the remedies that Plaintiffs seek here. *See Collins v. Yellen*, 141 S. Ct. 1761, 1799 (2021) (Gorsuch, J., concurring) ("Whether unconstitutionally installed or improperly unsupervised, officials cannot wield executive power except as Article II provides. Attempts to do so are void. . . . [W]here individuals are burdened by unconstitutional executive action, they are entitled to relief.") (cleaned up); *see also Collins v. Mnuchin*, 938 F.3d 553, 609 (5th Cir. 2019) (severing the "for cause" provision that presented a Removal Clause violation), *aff'd in part, rev'd in part, vacated in part sub nom. Collins v. Yellen*, 141 S. Ct. 1761, 1787 (2021) (Oldham and Ho, JJ., concurring in part and dissenting in part) ("Our *Article III powers* permit us to [vacate unlawful agency action], as it would redress Plaintiffs' injury-in-fact. Such a remedy finds support in precedent.") (emphasis added) (internal citations omitted). Though these hints do not resolve every question presented here, they provide some support for the Court's conclusion that it may grant the relief the Plaintiffs have requested in this case.

Finally, a universal remedy is appropriate because Defendants' alternative remedial proposal—severing the statutory provision that purportedly gives rise to the appointment problem—will not cure Plaintiffs' injuries. Rather than vacating the agency actions implementing or enforcing PSTF's recommendations, Defendants urge the Court to sever 42 U.S.C. § 299b-4(a)(6).[75] This section provides that PSTF's rating recommendations "shall be independent and, to the extent practicable, not subject to political pressure." *Id.* § 299b-4(a)(6). "Severing" or singly making this provision unenforceable would permit the Secretary of HHS to review and approve

---

[75] Defs.' Resp. 8–10, ECF No. 99.

the Task Force's recommendations, Defendants say, curing the Appointments Clause problem without unnecessarily disrupting the ACA's overarching statutory scheme.[76] But Defendants' assertion is wrong for several reasons.

First, by Defendants own admission, PSTF is not part of HHS or any federal agency and is not, therefore, automatically subject to the Secretary's "supervision and direction" as are ACIP and HRSA. 42 U.S.C. §§ 202, 243, 247b.[77] For this reason, the Supreme Court's decision in *United States v. Arthrex, Inc.* is inapplicable. 141 S. Ct. 1970 (2021) (curing appointment problem by ordering every administrative patent judge's decision to be subject to the review of the PTO Director). Even if it is assumed for the sake of argument that PSTF were subject to the Secretary's oversight, severing § 299b-4(a)(6) might *permit* the Secretary to authorize or reject PSTF's recommendations *post hoc* but it would not *compel* him to take such action. Moreover, § 300gg-13(a)(1) would still operate to give PSTF's ratings the force and effect of law unless and *until* the Secretary decided to ratify or veto a particular recommendation.

Moreover, Fifth Circuit and Supreme Court precedent indicate that, given the particular constitutional violation at issue here, vacatur is the appropriate remedy for Plaintiffs' injury. In fact, the line of decisions from the Fifth Circuit and Supreme Court, which Defendants say *rejects* Plaintiffs' remedial position, is more properly read to support it.[78] *See generally Collins v. Mnuchin*, 938 F.3d 553 (5th Cir. 2019) (severing the "for cause" provision that presented a Removal Clause violation), *aff'd in part, rev'd in part, vacated in part sub nom. Collins v. Yellen*, 141 S. Ct. 1761, 1787 (2021) (discussing the propriety of vacatur based on removal versus

---

[76] *Id.* at 10.

[77] Defs.' Mot. for Summ. J. 40, ECF No. 64; Mem. Op. 25, ECF No. 92.

[78] Defs.' Reply 15 n.5, ECF No. 112 ("[T]he remedial position proffered in the partially dissenting opinion cited by Plaintiffs in *Collins v. Mnuchin*, 938 F.3d 553 (5th Cir. 2019), was rejected first by the *en banc* Fifth Circuit and subsequently by the Supreme Court as 'neither logical nor supported by precedent.' *Collins v. Yellen*, 141 S. Ct. 1761, 1787 (2021).").

appointments problems). In *Mnuchin*, the *en banc* and closely divided Fifth Circuit considered the proper remedy for a restriction on removal that violated Article II. *Mnuchin*, 938 F.3d at 591. Ultimately the court concluded that the appropriate remedy was to sever the "for cause" provision, thus curing the unconstitutional removal restriction. *Id.* at 595. But that case is distinguishable from this one for an obvious reason: that decision involved a Removal Clause violation, *not* an Appointments Clause violation. And the *Mnuchin* court expressly noted the difference. *Id.* at 593 ("[T]he Court has invalidated [and vacated] actions taken by individuals who were not properly *appointed* under the Constitution. [In this scenario,] officers were vested with authority that was never properly theirs to exercise. Such separation-of-powers violations are, as the D.C. Circuit put it, 'void *ab initio*.' *Noel Canning v. NLRB*, 705 F.3d 490, 493 (D.C. Cir. 2013) . . . Restrictions on *removal* are different.") (emphases added). For these reasons, the Court holds that vacatur—not severance—is the appropriate remedy for curing Plaintiffs' constitutional injuries.

*     *     *     *

In sum, Plaintiffs have shown that they are entitled to vacatur as a *remedy* for their successful Appointments Clause claim. All agency action taken to implement or enforce the preventive care coverage requirements in response to an "A" or "B" recommendation by the U.S. Preventive Services Task Force on or after March 23, 2010 and made compulsory under 42 U.S.C. § 300gg-13(a)(1) are **HELD** unlawful as violative of the Appointments Clause. The Court **ORDERS** that such agency actions are **VACATED** and Defendants and their officers, agents, servants, and employees are **ENJOINED** from implementing or enforcing 42 U.S.C. § 300gg-13(a)(1)'s compulsory coverage requirements in response to an "A" or "B" rating from the Task Force in the future.

Further, under 28 U.S.C. § 2201, the Court **HOLDS** that agency action taken to implement

or enforce the preventive care mandates in response to an "A" or "B" recommendation by the U.S. Preventive Services Task Force on or after March 23, 2010 and made compulsory under 42 U.S.C. § 300gg-13(a)(1) are unlawful as violative of the Appointments Clause. Braidwood Management Inc. and Kelley Orthodontics, and to the extent applicable, individual Plaintiffs need not comply with the preventive care coverage recommendations of the U.S. Preventive Services Task Force issued on or after March 23, 2010, because the members of the Task Force have not been appointed in a manner consistent with Article II's Appointments Clause. Accordingly, the Court **ENJOINS** Defendants and their officers, agents, servants, and employees from implementing or enforcing the same against these Plaintiffs.

## III.    CONCLUSION

Therefore, the Court **DISMISSES with prejudice** the religious objector Plaintiffs', including Braidwood Management Inc.'s, contraceptive mandate claims. The non-religious objector Plaintiffs' contraceptive mandate claims are **DISMISSED without prejudice** for lack of subject matter jurisdiction. The parties' cross-motions for summary judgment are **GRANTED in part** and **DENIED in part**. For the reasons discussed, the remaining Plaintiffs have shown they are entitled to declaratory and injunctive relief as to their RFRA claims and to declaratory and injunctive relief and to a universal remedy with respect to their Appointments Clause claim as it relates to PSTF. Separate final judgment shall issue.

**SO ORDERED** this **30th day** of **March, 2023**.

Reed O'Connor
**UNITED STATES DISTRICT JUDGE**